**Nos. 23-11528, 23-11644**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Florida

## REPLY IN SUPPORT OF TIME SENSITIVE MOTION FOR
## ADMINISTRATIVE STAY AND STAY PENDING APPEAL

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044
SARAH S. WILSON
  *Assistant Director*
JOSEPH A. DARROW
  *Trial Attorney*

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants

certify that the following have an interest in the outcome of this appeal:

<u>Natural Persons</u>

Bell, Daniel W.

Boynton, Brian M.

Brodeen, Karen A.

Butler, Steven

Christmas, Natalie

Coody, Jason R.

Crapo, Matt A.

Darrow, Joseph A.

DeSantis, Ronald

Fabian, Sarah B.

Faruqui, Bilal A.

Fudim, Elissa P.

Garland, Merrick

Guard, John M.

Hart, Joseph E.

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

Hudak, Matthew

Jaddou, Ur M.

Johnson, Tae D.

Mayorkas, Alejandro

Miller, Troy

Monson, Darrick

Moody, Ashley

Moyle, Marie A.

Ortiz, Raul

Patel, Anita J.

Peachey, William C.

Percival, James H.

Reuveni, Erez

Ryan, Erin T.

Ward, Brian C.

Wetherell, T. Kent

Whitaker, Henry C.

<u>Entities</u>

Immigration Reform Law Institute

State of Florida

*State of Florida v. Alejandro Mayorkas, et al.*, Nos. 23-11528, 23-11644

Florida Office of the Attorney General

United States of America

U.S. Attorney's Office, Northern District of Florida

U.S. Citizenship and Immigration Services

U.S. Customs and Border Protection

U.S. Department of Homeland Security

U.S. Immigration and Customs Enforcement

U.S. Department of Justice, Civil Division


Dated:  May 25, 2023                    */s/ Erez Reuveni*_____
                                        EREZ REUVENI

# TABLE OF CONTENTS

**INTRODUCTION**............................................................................. **1**

**ARGUMENT**.................................................................................... **2**

**I.    Defendants are likely to succeed on appeal**................................ **2**

    Standing ....................................................................................... 2

    Contrary to law ........................................................................... 2

    Arbitrary and Capricious. ........................................................... 5

    Notice and Comment .................................................................. 7

**II.    Equitable factors overwhelmingly favor a stay** ........................ **8**

**III.    The injunction is invalid and overbroad.** ................................ **11**

**CONCLUSION** ............................................................................ **12**

**CERTIFICATE OF COMPLIANCE** ................................................

**CERTIFICATE OF SERVICE** .......................................................

# TABLE OF AUTHORITIES

## CASE LAW

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ................................................................. 2

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ...................................................................... 11

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ............................................................................. 3

*Cruz-Miguel v. Holder*,
    650 F.3d 189 (2d Cir. 2011) ................................................................ 5

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................. 6

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) ................................................................. 11, 12

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ............................................................................. 5

*INS v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ............................................................................. 3

*Latif v. Obama*,
    666 F.3d 746 (D.C. Cir. 2011) ............................................................ 4

*Nat'l Min. Ass'n v. Sec'y of Lab*.,
    589 F.3d 1368 (11th Cir. 2009) ........................................................... 8

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ................................................................. 8

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ............................................................................. 3

# STATUTES LAW

5 U.S.C. § 553(b)(A) ................................................................. 7

5 U.S.C. § 553(b)(B) ................................................................. 8

5 U.S.C. § 553(d)(3) ................................................................. 8

5 U.S.C. § 703 ....................................................................... 11

8 U.S.C. § 1182(d)(5) ................................................................ 1

8 U.S.C. § 1182(d)(5)(A) ..................................................... 2, 3, 4

8 U.S.C. § 1252(f) ................................................................... 11

# FEDERAL RULES FOR APPELLATE PROCEDURE

Fed. R. App. P. 32 27(d)(1)(E) .................................................... 1

# FEDERAL REGULATIONS

8 C.F.R. § 212.5(b)(1) ............................................................... 3

# FEDERAL REGISTER

87 Fed. Reg. 18,078 ................................................................. 3

87 Fed. Reg. 18,107-08 ............................................................. 3

# LEGISLATIVE HISTORY

H.R. Rep. No. 469 ................................................................... 5

H.R. Rep. No. 828 ................................................................... 5

## INTRODUCTION

Florida offers no persuasive justification for declining a stay and allowing the district court's orders to prevent the United States—during clearly articulated emergency circumstances—from engaging in the most effective measures available to decompress overwhelmed U.S. Border Patrol (USBP) detention capacity and therefore ensure the safety and welfare of USBP agents and noncitizens in government custody. The orders limit the options available to the Department of Homeland Security (DHS) to address future sudden increases in border encounters, leaving only inferior options that risk allowing many noncitizens to abscond after being encountered. Florida offers no credible response to the irreparable harms the orders cause, dismissing them as self-inflicted. That disregards the record and the Executive's authority to manage the border and migration.

Florida's opposition also confirms the government is likely to prevail on the merits. The Parole+ATD and Parole with Conditions (PWC) memoranda, which articulate when USBP may use its discretionary parole authority under 8 U.S.C. § 1182(d)(5), are consistent with section 1182(d)(5)'s requirements and satisfy the Administrative Procedure Act (APA) because they are reasonable and reasonably explained and are not subject to notice-and-comment procedures. Mot. 8-18. Regardless, Florida fails to explain how the district court had authority to issue the nationwide orders it did, and why narrower orders could not provide them full relief.

The Court should stay the orders pending appeal.

## ARGUMENT

## I.  **Defendants are likely to succeed on appeal**.

<u>Standing</u>. Florida does not dispute it alleges only *indirect* injuries caused by the actions of third parties—migrants—who they contend may relocate to Florida. Such allegations fail at the threshold, Mot. 8, and the district court erred in concluding that the downstream impacts of the memoranda in the form of the presence of third-party noncitizens in Florida's sovereign territory satisfy Article III. *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 383-87 (6th Cir. 2022).

<u>Contrary to law</u>. The Parole+ATD and PWC policies are consistent with section 1182(d)(5)(A). Mot. 9-13. Under this provision, the Secretary may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The policies apply only during high-encounter periods where there is an urgent humanitarian reason to exercise parole authority to maintain safe conditions in USBP facilities. The policies direct that parole be exercised on a case-by-case basis in a manner that maximizes the significant public benefit in the safe use of USBP's limited detention space. A203-209; A234-237. DHS's authority to assess the humanitarian and public benefit factors in this manner has long been

recognized by the regulations implementing section 1182(d)(5)(A), *see* 8 C.F.R. § 212.5(b)(1), (5); 87 Fed. Reg. 18,078, 18,107-08 & nn.46-49 (2022), and are reasonable and entitled to deference. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999). This longstanding agency practice has been ratified through Congressional acquiescence. *See* A472-75, A715-58; *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983).

Florida first argues the policies are inconsistent with section 1182(d)(5)(A) because they do not require an individual to be returned to custody. Opp. 11. Florida does not contest the government's position (Mot. 11) that parole under either memoranda has a definite termination point. Florida's concern that DHS might not take certain noncitizens back into custody when their parole has terminated, even if credited, does not provide a basis for challenging DHS's *releases* under Parole+ATD or PWC. If the Secretary determines that "the purposes of such parole have been served," 8 U.S.C. § 1182(d)(5)(A), ICE may then take enforcement action against the noncitizen. But the decision to take a noncitizen back into custody after parole has terminated involves a separate enforcement decision not governed by either policy. And nothing in the statute affirmatively requires enforcement actions in any particular case, nor could it. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) ("law-enforcement discretion" so "deep-rooted" that it remains intact "even in the presence of seemingly mandatory legislative commands").

3

Florida next argues the required "case-by-case" determination is not individualized because the policies aim to "alleviate congested detention space and increase operational efficiency," authorize assessments that can be completed in 15 minutes, and may result in many paroles. Opp. 12-13. Each of those criticisms is misplaced. The policies employ a case-by-case analysis to identify and prioritize low-risk noncitizens for parole after screening and vetting, which serves the significant public benefit of allowing for the continued detention of higher-risk noncitizens. A203-209; A234-237. The parole rates and processing times are not evidence that USBP agents are failing to comply with the policies' case-by-case requirements. It is not surprising that parole numbers may increase with the number of border encounters (particularly where there is no concurrent increase in available bedspace), and that USBP will need to maximize processing efficiencies during high-encounter periods. USBP agents are entitled to a presumption of regularity, which has not been rebutted, that they would faithfully discharge the case-by-case analysis required by each policy. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011). Congress has not placed any numerical limitation on parole grants or required the Secretary to spend any minimum period assessing parole eligibility. *See* 8 U.S.C. § 1182(d)(5)(A). The district court erred by imposing extra-statutory requirements to invalidate the policies.

4

Florida finally argues that the policies are inconsistent with "Congress's decision in 1996 to narrow the statute from permitting parole of aliens 'in the public interest'" in favor of the current standard. Opp. 14. Florida's description of the legislative history is incomplete. At the time, there were competing versions of the parole standard. The House Report proposed constraints on parole authority that would have tightly limited the substantive grounds for release. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 77-78 (1996) (cited in *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011)). However, Congress did not adopt the House's proposed constraints, instead adopting the Senate's amendment to section 1182(d)(5)(A), which proposed, in material respects, the current standard. *See* H.R. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996). That Congress rejected the House's more restrictive proposal weighs heavily against Florida's interpretation. *See* *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation.").

Arbitrary and Capricious. Parole+ATD is reasonable and reasonably explained. Mot. 13-15.

Florida first argues that the government failed to cite "specific evidence" in the administrative record addressing the "backlog" caused by Parole+ATD. Opp. 14-15. But Defendants cited the portion of the record, prepared by ICE, that

expressly addresses the backlog. A238-355. This includes data showing how the backlog developed (including check-in and capacity rates at individual ICE offices with reduced hours during the pandemic), A252-333, and analyses of the cost of clearing the backlog, including through ICE efforts to serve NTAs on noncitizens to bring down the backlog in "Operation Horizon," A247-51, A334-36, A339-353.

Next, Florida contends the July 18, 2022 memorandum "unreasonably failed to acknowledge or explain the expansion of the Parole+ATD policy beyond family units to single adults." Opp. 15. But this "expansion" did not represent an agency reversal requiring explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). While Parole+ATD initially discussed family units, parole under section 1182(d)(5) and enrollment in ATD have never been limited to family units, and no iteration of the Parole+ATD policy expressly precluded its application to single adults. A244-46.

Third, Florida argues that the July 18, 2022 memorandum failed to consider the statistics regarding use of Parole+ATD when it specified that that authority should be "used sparingly." Opp. 15. That argument impermissibly relies on extra-record evidence, the very evidence the district court itself rejected as improper in ruling that review of Parole+ATD was limited to the administrative record, A356-60, and it selectively quotes the memorandum, which indicates "spare" use would include "disease-mitigation" and "a safety valve to address overcrowding." A235.

Florida also disregards the argument that the district court's reasoning was flawed because it looked at only a single month's encounter data, taken out of sufficient context, to reach this conclusion. Mot. 14; A356-360. Nor does Florida indicate how the "sparingly" exhortation creates a judicially enforceable mandate limiting Parole+ATD to a certain number of uses. It does not.

As to PWC, the district court did not rule on Florida's arbitrary and capricious claim, recognizing such a determination would be premature absent a record. A162. For its part, Florida contends only that PWC is arbitrary and capricious as "an attempt to circumvent" the ruling on Parole+ATD. Opp. 15-16. But the record lacks evidence supporting that claim. PWC has material differences from Parole+ATD, as explained, *supra*; *see* Mot. 5-6, and the district court acknowledged that its order on the latter "did not preclude DHS from using its parole authority in other ways." A177.

Notice and Comment. Both memoranda are "general statement[s] of policy" exempt from notice-and-comment rulemaking. 5 U.S.C. § 553(b)(A); Mot. 15-16.

Florida disagrees, contending the memoranda "establish the methods— including threshold requirements and factors to consider—by which DHS will determine the status of aliens at the border." Opp. 16. But the memoranda do not address a noncitizen's legal status—they merely state how DHS will apply its discretionary parole authority at the border in particular circumstances. Neither

memorandum "establishes a binding norm," each agent remains free to consider facts on a case-by-case basis, and no agent is required to grant or not grant parole in any specific case. A205-07, A236-37; *see Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1371 (11th Cir. 2009); Mot. 15-16. Nor does it matter that the memoranda include "threshold requirements" concerning overcapacity conditions that trigger their use. Despite those "requirements," nothing in the memoranda compels any specific result, and the "ultimate decision" is discretionary. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 599-601 (5th Cir. 1995).

Additionally, "good cause" excuses notice-and-comment procedures for PWC. 5 U.S.C. § 553(b)(B), (d)(3); Mot. 16-17. Florida contends the "agency's own delay" caused the exigency, but DHS undertook a host of enforcement and policy actions in the months prior to Title 42's termination attempting to prevent increased border encounters. A212-14. The border nevertheless experienced sustained, heightened encounters in the days before Title 42's end, and DHS determined it needed to issue the PWC memorandum. A214-17.

## II.    Equitable factors overwhelmingly favor a stay.

Florida does not seriously dispute the irreparable harms the district court's orders cause the government and public by significantly limiting DHS's options for managing the border and releasing individuals deemed no threat to public safety to decompress facilities in exigent circumstances. Mot. 18-22. Nor does Florida dispute

that migration surges can arise without warning or that the absence of either Parole+ATD or PWC in USBP's toolkit will undermine USBP's ability to safely manage the border. *Id.* And Florida has no answer to the fact that the orders likely force the United States to resort to substantially less effective approaches to ensuring noncitizens are appropriately screened for public safety threats and that they report to be formally charged following their release. *Id.*

Responding to none of this, Florida instead contends that the government cannot show harm from the Parole+ATD order because DHS waited until May to seek a stay of that order, so DHS's harms are "self-inflicted." Mot. 20. From January 2023, until May 10, DHS managed its detention capacity using the many other tools at its disposal. A211-14. But the increase in border encounters preceding Title 42's end was a significant break from DHS's experience and raised detention capacity concerns anew. At that point, DHS faced an urgent situation and took action to address it with PWC. But without either PWC or Parole+ATD, DHS faces irreparable harm, having lost two of its best tools for managing border facility overcrowding.

Florida also dismisses two sworn declarations from the Chief and Deputy Chief of USBP attesting to the government's harms from the two orders as "innaccura[te]" and their "predictions incredible," contending they "exaggerated" predicted harms and were contradicted by public statements by the DHS Secretary.

Opp. 19. This is incorrect and misses the point. Border encounters had previously dropped in January 2023, such that the predicate triggers for using Parole+ATD were not met. *See* A211. On May 10, 2023, border encounters had for multiple days been at all-time highs. A211-14. Although encounters subsided in the days following May 10, *after* DHS's Deputy Chief Hudak's declaration, and before the Secretary's public statements, that does not alter the fundamental harms the orders cause: when the next spike in encounters occurs, DHS will have inferior options for safeguarding the border and protecting the health and safety of USBP agents, noncitizens, and the public. Mot 20-21. A "crisis point could occur with little to no warning" as tens of thousands of noncitizens (and potentially more) on the Mexican side of the border may "attempt to illegally enter" the country, potentially "in large numbers." Mot., Ex. A, ¶ 12.c, 14. And without Parole+ATD or PWC, DHS will have to engage in far less effective enforcement mechanisms. Mot. 20-21.

Finally, Florida faults DHS for not explaining why the memoranda are necessary to manage large numbers of noncitizens, contending DHS could increase detention capacity or return noncitizens encountered at the border to Mexico pending completion of removal proceedings under section 1225(b)(2)(C). Opp. 20. Both contentions are incorrect. CBP has in fact taken steps to increase capacity, A214, but it is beyond dispute that DHS can detain only a fraction of noncitizens encountered daily, and that has been true across multiple Presidential administrations over

decades. A471-72, A489-90, A496. As to contiguous territory return, DHS cannot return noncitizens to Mexico without Mexico's consent, and Mexico will not accept section 1225(b)(2)(C) returns. A214. After the court's orders, only inferior options remain to address exigent circumstances, including notices to report without conditions, or, worst-case, not apprehending noncitizens at all. Mot. 20.

## III.    The injunction is invalid and overbroad.

The district lacked authority to enter the orders, which are overbroad in any event. Mot. 22-23.

Florida contends that 8 U.S.C. § 1252(f) does not preclude the orders, because section 1182(d)(5), which the memoranda implement, is not covered by section 1252(f). Opp. 17-18. But section 1182(d)(5) is a critical part of *how* DHS implements section 1225(b)'s detention provisions. *See Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022). An order precluding parole thus in effect requires detention under section 1225 absent some other mechanism for release, prohibiting "actions that" "in the government's view" "are allowed." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2066 (2022).

Section 1252(f)(1) also barred the Parole+ATD vacatur. Even accepting the APA contemplates universal vacatur, *see* 5 U.S.C. § 703 (authorizing traditional equitable remedies but not vacatur), section 1252(f)(1) bars judicial relief, vacatur

11

or injunction, that has the effect of prohibiting government actions that the government maintains "are allowed" by the statute. *Garland*, 142 S. Ct. at 2066.

At a minimum, the Court should limit the scope of the orders to Florida. Florida ignores this Court's direction in *Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022), that courts "must" issue "non-nationwide" relief where such orders provide "complete relief." An order precluding DHS's implementation of the policies as to noncitizens indicating a final address in Florida does just that. *See id.* at 1308.

### CONCLUSION

The Court should stay the district court's orders pending appeal.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*
WILLIAM C. PEACHEY
  *Director*
/s/ *Erez Reuveni*
EREZ REUVENI
  *Assistant Director*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044
SARAH S. WILSON
  *Assistant Director*
JOSEPH A. DARROW
  *Trial Attorney*

12

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,587 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Erez Reuveni*
EREZ REUVENI

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Erez Reuveni*
EREZ REUVENI