# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-11528

_____

STATE OF FLORIDA,

                                                        Plaintiff-Appellee
                                                        Cross Appellant,

*versus*

UNITED STATES OF AMERICA,
ACTING COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,
U.S. CUSTOMS AND BORDER PROTECTION,
DIRECTOR, U.S. CITIZENSHIP & IMMIGRATION SERVICES,
U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
SECRETARY, et al.,

2                         Order of the Court                         23-11528

Defendants-Appellants
Cross Appellees.

_____

No. 23-11644

_____

STATE OF FLORIDA,

Plaintiff-Appellee,

*versus*

SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY,
CHIEF OF THE UNITED STATES BORDER PATROL,
UNITED STATES OF AMERICA,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket Nos. 3:21-cv-01066-TKW-ZCB,
3:23-cv-09962-TKW-ZCB

_____

Before JILL PRYOR, LUCK, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

The Department of Homeland Security[1] ("DHS") has filed a motion to stay two orders pending its appeal in this case: (1) the March 8, 2023, order that vacated DHS's Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations (the "Parole+ATD policy"); and (2) the May 16, 2023, order enjoining DHS's Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document memorandum (the "PWC policy"). After careful consideration, we deny DHS's motion.[2]

## I. STANDARD OF REVIEW

When reviewing a motion to stay pending appeal, we consider the "traditional" stay factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

---

[1] We refer to the Defendants in this case—the United States, U.S. Customs and Border Protection, DHS, U.S. Immigration and Customs Enforcement, DHS Secretary Alejandro Mayorkas, Troy Miller, Ur M Jaddou, and Tae D Johnson—collectively as DHS for ease of reference.

[2] In denying this stay, we note that we write only for the parties' benefit. "Because an 'order[ ] concerning [a] stay[ is] not a final adjudication of the merits of the appeal, the tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1369 n.1 (11th Cir. 2022) (some alterations in original) (quoting *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 n.1 (11th Cir. 2020)).

merits; (2) whether the stay applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other persons interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Among these four factors, the first and second "are the most critical." *Id.* at 434. "To satisfy its burden as to those [two] factors, the party seeking the stay must show more than the mere possibility of success on the merits or of irreparable injury." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019); *accord Nken*, 556 U.S. at 434–35. Indeed, "[a] stay is not a matter of right" but rather "an exercise of judicial discretion," *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926), and so the "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," *Nken*, 556 U.S. at 433–34. Where the balance of equities identified in the second, third, and fourth factors weighs heavily in favor of granting the stay, "we relax the likely-to-succeed-on-the-merits requirement" of the first factor. *League of Women Voters*, 32 F.4th at 1370; *accord Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

Moreover, "[i]n considering whether to stay a preliminary injunction, we apply the usual standards of review governing our review of the merits of the preliminary injunction." *Democratic Exec. Comm.*, 915 F.3d at 1317. Thus, we review legal conclusions

*de novo* and findings of fact for clear error. *Id.*; *accord Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).

## II.    ANALYSIS

In its motion to stay, DHS argues that it has satisfied all four of the *Nken* stay factors as to both of the orders on appeal. We disagree and deny the motion because DHS has not met its burden to show that it will suffer an irreparable injury absent a stay.[3]

As to irreparable injury, DHS argues that, if left in effect, the district court's orders will "undermine the Executive Branch's constitutional and statutory authority to implement its immigration priorities and secure the border." "The most immediate consequence of the orders," according to DHS, "will likely be [the] overcrowding [of] CBP facilities during increases in border encounters," which would threaten the "health, safety, and security" of USBP officers and aliens. DHS warns that the overcrowding of CBP facilities could cause it to have to release some aliens without adequate monitoring measures and could, in the "worst-case scenario," prevent it from apprehending some aliens entirely. Each of these potential consequences, DHS asserts, would have negative downstream effects on public safety and national security.

---

[3] Because we conclude that DHS has failed to meet its burden on establishing irreparable harm, we need not address the other *Nken* factors, including whether DHS has made a strong showing that it is likely to succeed on the merits.

Overall, we do not find this argument persuasive for the following reasons.

To start, DHS's claims of irreparable injury ring somewhat hollow on this record, considering the department's track record of overstating similar threats in the underlying proceedings. For instance, on January 12, 2023, DHS represented to the district court that any vacatur of the Parole+ATD policy would result in "disastrous consequences" for the management of the border starting the very next day. DHS made the same representation again on February 16, 2023. But, in truth, CBP had stopped using the Parole+ATD practices as of January 2, 2023, and DHS now admits that it was able to "manage[] its detention capacity [since January] using many other tools at its disposal." The department's ability to ascertain future harm is uncertain at best. Given this record, we take DHS's latest claims of impending disaster if it is not allowed to use either of the challenged policies with some skepticism.

Recent data from the border casts further doubt on DHS's irreparable-injury argument. Contrary to DHS's catastrophic predictions, the number of daily encounters with aliens did not surge in the days following the expiration of the Title 42 order on May 11, 2023, but instead fell significantly. *Compare* Doc. 13-1 ¶ 11 in No. 23-cv-09962 (predicting a daily average of 12,000–14,000 encounters), *with* Doc. 28 at 4 in No. 23-cv-09962 (showing that the number of encounters dropped from 9,649 on May 11, 2023, to 4,193 on May 14). DHS has neither explained how that data is consistent with its representations nor provided any more recent data

23-11528               Order of the Court                    7

demonstrating a surge in illegal crossings at the border.  This Court will not find irreparable harm based on mere conjecture.

Lastly, the timing of DHS's appeals and motion for stay undermines the department's assertions of irreparable injury.  As discussed, the district court entered its order vacating the Parole+ATD policy on March 8, 2023, but stayed the decision for seven days "to allow [DHS] to seek appellate review."  Further, as Florida points out, DHS has known since January 30, 2023, that the Title 42 order would terminate on May 11.  DHS, however, chose not to initiate an appeal of the vacatur order until May 5, 2023—almost sixty days after entry of the order.  And, to be clear, USBP did not issue the PWC memo—which the district court found to be "materially indistinguishable from the Parole+ATD policy"—until May 10, 2023, right before the Title 42 order expired.  Given that DHS stopped using the Parole+ATD policy in early-January 2023, DHS operated for approximately five months without either of the challenged policies before seeking relief from this Court.  In this context, i.e., where DHS frames its concerns over its tools in detaining aliens at the border in terms of national security, that delay of several months greatly undermines the department's position.  *Cf. Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (discussing the similar factors for injunctive relief and noting that "[a] delay in seeking a preliminary injunction of even

only a few months—though not necessarily fatal—militates against a finding of irreparable harm").

In sum, DHS has not carried its burden of showing that the second factor under the "traditional" stay framework, i.e., irreparable injury, is met. Indeed, "simply showing some 'possibility of irreparable injury,' fails to satisfy the second factor." *Nken*, 556 U.S. at 435 (citation omitted) (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)). Because DHS therefore has failed to establish one of the two "most critical" factors, *id.* at 434, we do not find a stay pending appeal to be warranted as to either of the district court's orders.

### III.    CONCLUSION

For these reasons, the motion to stay is **DENIED.**

23-11528   J. PRYOR, J., Concurring in Part, Dissenting in Part     1

J. PRYOR, Circuit Judge, concurring in part and dissenting in part:

    I would grant the motion with respect to the Parole With Conditions policy.