Nos. 23-11528 & 23-11644

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

State of Florida,

Plaintiff-Appellee,

v.

United States of America, et al.,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 3:21-cv-01066 & 3:23-cv-09962

BRIEF FOR AMICI CURIAE
LEGAL SERVICE PROVIDERS FOR CUBAN
REFUGEE DIASPORA IN SUPPORT OF REVERSAL

Mark Andrew Prada
Prada Urizar Dominguez, PLLC
3191 Coral Way, Suite 500
Miami, FL 33145
o. 786.703.2061
mprada@pradaurizar.com

June 12, 2023          *Counsel for Amici Curiae*

*State of Florida* v. *United States of America*,
Nos. 23-11528 & 23-11644

## Certificate of Interested Persons and Corporate Disclosure Statement

In accordance with Federal Rule of Appellate Procedure 26.1(a) and 11th Cir. R. 26.1-1(a)(1) & 26.1-2(b), amici curiae submitting this brief make the following disclosures, and certify that the following additional persons and entities may have an interest in the outcome of this case:

### Amici Curiae
### Legal Service Providers for Cuban Refugee Diaspora

1.  Americans for Immigrant Justice, Inc., a Florida Not for Profit Corporation:

    - no parent corporations

    - no publicly held corporations own 10% or more of the entity's stock

2.  Canizares Law Group LLC, a Florida Limited Liability Company:

    - no parent corporations

    - no publicly held corporations own 10% or more of the entity's stock

3.  Catholic Charities Legal Services, Archdiocese of

*State of Florida* v. *United States of America*,
Nos. 23-11528 & 23-11644

Miami, Inc., a Florida Not for Profit Corporation:

- Archbishop Thomas G. Wenski is the Corporation Sole

- no parent corporations aggregate

- no publicly held corporations own 10% or more of the entity's stock

4. Garcia, Miranda & Gonzalez-Rua, P.A., a Florida

Profit Corporation:

- no parent corporations

- no publicly held corporations own 10% or more of the entity's stock

5. Gurian Group, P.A., a Florida Profit Corporation:

- no parent corporations

- no publicly held corporations own 10% or more of the entity's stock

6. Prada, Mark Andrew, Prada Urizar Dominguez,

PLLC, Miami, FL — counsel for amici curiae

s/ Mark Andrew Prada
Prada Urizar Dominguez, PLLC

June 12, 2023                    *Counsel for Amici Curiae*

## Statement of Party Consent
## and Authorship

In accordance with Federal Rules of Appellate Procedure 29(a)(2) & (4)(E), counsel for amici curiae states that counsel for the State of Florida and for the United States of America consent to the filing of this brief.

And in accordance with Rule 29(a)(4)(E), counsel for amici curiae states that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief, and no person other than the amici, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

s/ Mark Andrew Prada
Prada Urizar Dominguez, PLLC

June 12, 2023                    *Counsel for Amici Curiae*

i

# Contents

Certificate of Interested Persons and Corporate Disclosure Statement ........................................................... C-1

Statement of Party Consent and Authorship .......................... i

Table of Citations ................................................................... iv

Introduction and Statement of Amici .................................... 1

Statement of the Issues........................................................... 6

Summary of the Argument ...................................................... 7

Argument and Citations of Authority

    I.    Parole is the only option and explanation for an applicant for admission's post-inspection liberty ........................................................................ 9

    II.    Parole is simply a mechanism for release which, by legal fiction, retains an unadmitted person at the border, and is historically a tool to protect refugees such as Cuban nationals ..................................................................... 14

    III.    When Congress reformed the immigration laws, it intended to return persons who entered without inspection to the border, with all the attendant consequences thereto ................. 20

    IV.    Early INS policy and later DOJ policy understood this point ...................................................... 23

    V.    Regardless, the district court should be reversed because it lacked jurisdiction, and because § 1182(d)(5) parole has been properly exercised ............................................................... 29

Conclusion .......................................................................... 41

Addendum:

*In re: S-V-*, A —— (IJ Feb. 23, 2021) (Miami, Fla.) (Burgess, IJ).........................................................1a

*In re: H-A-H-*, A —538 (IJ Apr. 26, 2021) (Houston, Tex.) (Schumann, IJ)...........................................9a

*In re:* —— (IJ Nov. 17, 2022) (San Antonio, Tex.) (McCullough, IJ)........................................................13a

USCIS, *Notice for Certain Natives or Citizens of Cuba* (Feb. 23, 2022) ...............................................17a

Virtue, P., Gen. Counsel, Memo, *Authority to parole applicants for admission who are not also arriving aliens*, p. 1 (Aug. 21, 1998)...........................19a

Meissner, D., Comm'r, Memo, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999) ....................................................................23a

Coldebella, G., Gen. Counsel, Memo, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) ....................................................................26a

Certificate of Compliance

Certificate of Service

## Table of Citations

### Judicial Cases

*Alvarez Acosta* v. *U. S. Att'y Gen.*,
  524 F. 3d 1191 (CA11 2008).........................................31–32

*Assa'ad* v. *U. S. Att'y Gen.*,
  332 F. 3d 1321 (CA11 2003)..............................................14

*Bertrand* v. *Holder*,
  No. CV-10-0604-PHX-GMS,
  2011 WL 4356375 (D. Ariz. Aug. 16, 2011),
  report and recommendation adopted,
  No. CV-10-604-PHX-GMS,
  2011 WL 4356369 (D. Ariz. Sept. 19, 2011) .....................13

*Brasil* v. *Sec'y, Dep't of Homeland Sec.*,
  28 F. 4th 1189 (CA11 2022) ........................................32–33

*Commandant* v. *Dist. Dir.*,
  No. 21-10372 (CA11) (argued Apr. 7, 2022) .....................35

*Emokah* v. *Mukasey*,
  523 F. 3d 110 (CA2 2008)..................................................11

*Garcia-Mir* v. *Smith*,
  766 F. 2d 1478 (CA11 1985)................................. 15, 34–35

*Jamal A.* v. *Whitaker*,
  358 F. Supp. 3d 853 (D. Minn. 2019)................................28

*Jean* v. *Nelson*,
  727 F. 2d 957 (CA11 1984) (en banc),
  aff'd, 472 U. S. 846 (1985)......................... 14–15, 23, 34–35

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018)....................................... 1–2, 4, 13–14

*Kaplan* v. *Tod*,
  267 U. S. 228 (1925)..........................................................15

iv

## Judicial Cases—continued

*Leng May Ma* v. *Barber*,
357 U. S. 185 (1958) ............................................. 15, 37, 40

*Martinez* v. *Att'y Gen.*,
693 F. 3d 408 (CA3 2012).................................................. 11

*Marczak* v. *Greene*,
971 F. 2d 510 (CA10 1992)................................................ 37

*McNary* v. *Haitian Refugee Ctr., Inc.*,
498 U. S. 479 (1991)........................................................ 35

*Medina Fernandez* v. *Hartman*,
260 F. 2d 569 (CA9 1958)................................................. 10

*Mejia Rodriguez* v. *U. S. Dep't of Homeland Sec.*,
562 F. 3d 1137 (CA11 2009).............................................. 30

*Ponce Flores* v. *U. S. Att'y Gen.*,
64 F. 4th 1208 (CA11 2023) ......................................... 31–32

*Rabelo-Rodriguez* v. *Mayorkas*,
1:21-cv-23213-BB (S.D. Fla.) ............................................ 2–3

*Ruiz* v. *U. S. Att'y Gen.*,
67 F. 4th 1321 (11th Cir. 2023)......................................... 32

*Sum* v. *Holder*,
602 F. 3d 1092 (CA9 2010)................................................ 11

*Texas* v. *Biden*,
20 F. 4th 928 (5th Cir. 2021),
rev'd, 142 S. Ct. 2528 (2022)............................................ 14

*Trump* v. *Hawaii*,
138 S. Ct. 2392 (2018)................................................. 32–33

*Tula-Rubio* v. *Lynch*,
787 F. 3d 288 (CA5 2015);................................................ 11

## Judicial Cases—continued

*Udall* v. *Tallman,*
  380 U. S. 1 (1965) ................................................................ 24

*Vazquez Romero* v. *Garland,*
  999 F. 3d 656 (CA9 2021) ............................................ 38–39

*Vitale* v. *INS,*
  463 F. 2d 579 (CA7 1972) .................................................. 10

*Webster* v. *Doe,*
  486 U. S. 592 (1988) ........................................................... 33

*Weyerhaeuser Co.* v. *U. S. Fish & Wildlife Serv.,*
  139 S. Ct. 361 (2018) .......................................................... 32

## Agency Cases

*In re Applicant,*
  2004 WL 3456026 (AAO Feb. 11, 2004) ........................... 26

*In re Applicant,*
  2004 WL 3457036 (AAO Oct. 21, 2004) ............................ 26

*In re Applicant,*
  2006 WL 4739186 (AAO Aug. 28, 2006) ........................... 26

*Matter of Areguillin,*
  17 I. & N. Dec. 308 (BIA 1980) ......................................... 11

*Matter of Badalamenti,*
  19 I. & N. Dec. 623 (BIA 1988) ......................................... 39

*Matter of K-,*
  9 I. & N. Dec. 143 (AG 1959) ............................................ 38

*Matter of O-,*
  16 I. & N. Dec. 344 (BIA 1977) .................................... 10–11

## Agency Cases—continued

*Matter of Quilantin*,
    25 I. & N. Dec. 285 (BIA 2010)..........................................11

*Matter of Sanchez-Avila*,
    21 I. & N. Dec. 444 (BIA 1996) (en banc)...................22–23

*Matter of Valenzuela-Felix*,
    26 I. & N. Dec. 53 (BIA 2012) ..........................................38

## Statutory Provisions

8 U. S. C.:

    § 1101(a)(13)(B)..............................................................14

    § 1157 ............................................................................13

    § 1182(a) ........................................................................12

    § 1182(a)(6)(A) ..............................................................21

    § 1182(d)(5)............................................................ *passim*

    § 1182(d)(5)(A)........................................................13, 30

    § 1182(d)(5)(B)........................................................13, 18

    § 1184(f) ........................................................................13

    § 1229a ..........................................................................13

    § 1225 ....................................................................8–9, 21

    § 1225(a)(1)........................................................11–12, 31

    § 1225(b) ............................................................... *passim*

    § 1225(b)(1)........................................................... *passim*

    § 1225(b)(1)(A)(i) ..........................................................12

Statutory Provisions—continued

§ 1225(b)(1)(B)(ii) ................................................................ 12

§ 1225(b)(1)(B)(iii)(IV) ....................................................... 12

§ 1225(b)(1)(F) .................................................................... 19

§ 1225(b)(2) ..................................................... 13, 22, 27–28

§ 1225(b)(2)(A) ........................................................... 13, 28

§ 1226 ....................................................................... 9, 26

§ 1226(a) ................................................ 1, 7, 14, 26, 27–28

§ 1226(c) ............................................................................ 28

§ 1231(a) ................................................................... 12, 14

§ 1231(a)(3) ......................................................................... 1

§ 1252(a)(2)(B)(i) ............................................................. 31

§ 1252(a)(2)(B)(ii) ............................................. 29–30, 35–36

8 U. S. C. (1994):

§ 1225(b) ........................................................................ 22

§ 1252(a)(1) .................................................................... 22

Antiterrorism and Death Penalty Act of 1996,
    Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ....... 21

§ 1, Cuban Refugee Adjustment Act of 1966 (CAA),
    Pub. L. No. 89-732, 80 Stat. 1161 ...................... 1, 17, 19–20

Immigration and Nationality Act (INA),
    Pub. L. No. 82-414, 66 Stat. 163 (June 27, 1952):

§ 212(d)(5) ................................................................. 30–31

**Statutory Provisions—continued**

§ 235(a) ............................................................... 31

§ 235(b) ............................................................... 37

Immigrant Responsibility Act of 1996 (IIRIRA),
Pub. L. No. 104-208, Div. C, Tit. III, Subtit. A,
110 Stat. 3009-546 (Sept. 30, 1996)...................... 18–20, 23

§ 23, Internal Security Act of 1950,
Pub. L. No. 81-831, 64 Stat. 987 (Sept. 23, 1950) ............ 22

Refugee Act of 1980,
Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980)....... 17–18

H.R. Conf. Rep. 104-518 (Apr. 15, 1996)............................... 21

H.R. Conf. Rep. 104-828 (Sept. 24, 1996) ....................... 20–21

Senate Rep No. 1137, 82d Cong., 2d Sess............................. 38

**Regulatory Provisions**

8 CFR:

§ 235.3(b)(2)(iii) ................................................ 12

§ 241.4 ............................................................... 10

§ 241.13 .............................................................. 10

Eliminating Exception To Expedited Removal Authority
for Cuban Nationals Encountered in the United States
or Arriving by Sea,
82 Fed. Reg. 4902 (Jan. 17, 2017) ..................................... 19

## Miscellaneous Authorities

Coldebella, G., Gen. Counsel, Memo, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) .............................. 26–27

Darrow, et al., *Immigration Detention: Emerging Issues Concerning Arriving Aliens, Criminal and Terrorist Aliens, and Hard-to-Remove Aliens*,
    65 U. S. Attorneys' Bulletin, July (I) 2017 ................ 13, 27

Meissner, D., Comm'r, Memo, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999)................................ 25–26

Morton, J., Dir. No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009) .................................................................. 37

Staff of S. Comm. on the Judiciary, 96th Cong. 2d Sess., *Review of U. S. Refugee Resettlement Programs and Policies* ......................................................... 16–18

Virtue, P., Gen. Counsel, Memo, *Authority to parole applicants for admission who are not also arriving aliens* (Aug. 21, 1998) ....................................................... 24–25

Wasem, R. E., Cong. Research Serv., *Cuban Migration to the United States: Policy and Trends* (June 2, 2009) ............................................................................ 16–18

## Introduction and Statement of Amici

Following *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), litigation spurred about whether the custody practices of the immigration agencies comport with 8 U. S. C. § 1225(b).   This litigation is part of that fallout.

But there has also been administrative litigation on the topic.   For one group in particular, Cuban nationals seeking refuge from communist autocracy after the end of the "wet-foot/dry-foot policy," this Court's application of *Jennings* to immigration custody practices is of great import.

Longstanding remedial legislation passed to protect Cubans requires that they were admitted or paroled to obtain legal status in this country.   § 1, Cuban Refugee Adjustment Act of 1966 (CAA), Pub. L. No. 89-732, 80 Stat. 1161 (as amended).   But with the wet-foot/dry-foot policy's ending, the immigration agencies continued to parole Cubans while mis-papering their releases as having occurred under 8 U. S. C. §§ 1226(a) or 1231(a)(3) in order to deprive them of access to the Cuban Refugee Adjustment Act.

1

The amici are part of a nationwide coalition of advocates arguing that members of this new Cuban refugee diaspora were paroled as a matter of law, grounded upon the holdings in *Jennings*. The amici have been observing this litigation along with other State-led litigation because the outcome of these cases will likely impact their efforts.

There has been some success before the immigration courts, with cases currently fully briefed before the Board of Immigration Appeals. Several immigration judges from courts in Florida, Texas, Kentucky, Tennessee, and New York have agreed with these arguments, granting Cuban adjustment applications under a *Jennings* theory. Others across the country are waiting to see what the Board will do. A small sample of immigration court decisions is appended to this brief's addendum. (Addend. 1a–16a.)

And there was also some success as a result of a local putative class action. *Rabelo-Rodriguez* v. *Mayorkas*, 1:21-cv-23213-BB (S.D. Fla.). That case was voluntarily dismissed after USCIS published an online notice offering relief

to Cubans who meet the regulatory "arriving alien" definition. (Addend. 18a–19a.)

The amici expected these issues to eventually reach the courts of appeals after adjudication by the Board.   However, given the issues raised by this case, the iron is too hot to not strike.   In short, the issues presented by this case have broad ramifications beyond the four corners of the district court's judgment, and the amici urge the Court to reverse it.

While the amici agree with the reading of § 1225(b) advanced by Florida and the district court, they disagree with their limited interpretation of parole under § 1182(d)(5) which not only invades the province of the executive, but also cripples law enforcement tools.   The amici agree with the United States that the manner in which parole is exercised involves nonjusticiable discretion, but disagree with the idea—inherent in the policies challenged by Florida—that parole can "expire" while an applicant for admission remains at liberty.

Americans for Immigrant Justice, Inc. (AIJ), is a non-profit organization that fights for justice for immigrants

3

through a combination of direct representation, impact litigation, advocacy and outreach. Founded in 1996, AIJ advocates for the rights of unaccompanied immigrant children and survivors of trafficking and domestic violence; serves as a watchdog on immigration detention practices and policies; and pursues redress on behalf of immigrant groups with particular and compelling claims to justice. AIJ is headquartered in Florida and has devoted a significant portion of its resources to representing citizens and nationals of Cuba since its inception in 1996.

Canizares Law Group LLC is a private law firm founded by Claudia Canizares who is herself a Cuban refugee. Over 90% of the firm's clientele are Cuban nationals, the majority of which have sought refuge following the end of the wet-foot/dry-foot policy. The firm is one of the leading proponents of the *Jennings* approach to representing the contemporary Cuban refugee diaspora.

Catholic Charities Legal Services, Archdiocese of Miami, Inc. (CCLS), is a non-profit organization incorporated

under the auspices of the Archdiocese of Miami with the sole mission of providing legal representation and immigration services to those who come to South Florida from foreign lands. Each month over 2,500 individuals seek services from CCLS. A large portion of these individuals have been paroled into the United States. For this reason, CCLS has addressed the legal issues surrounding parole for thousands of individuals spanning three decades, and has acquired a significant institutional expertise in paroles and parolees. The outcome of this case impacts the everyday practice of the agency and the many it serves.

Garcia, Miranda & Gonzalez-Rua, P.A. is a private law firm spearheaded by former CCLS attorneys Callan Garcia, Andoni Gonzalez-Rua, and Javier Taveras Paguagua, and former Immigration Judge and INS prosecutor Pedro A. Miranda. They serve immigrant clients throughout South and Central Florida, with a heavy focus on Cuban refugees following the end of the wet-foot/dry-foot policy.

Gurian Group, P.A. is a private law firm owned by

5

Joseph Gurian who is the son of Cuban refugees, and the grandson of a Polish immigrant who fled the Holocaust only to have to flee Cuba thereafter.   He provides comprehensive immigration representation, and has heavily concentrated in representing Cuban refugees following the end of the wet-foot/dry-foot policy.

## Statement of the Issues

The issues presented are:

1.   Whether 8 U.S.C. § 1225(b) functions to make an exercise of parole under § 1182(d)(5) the only plausible explanation for an inspected applicant for admission's liberty.

2.   Whether the Department of Homeland Security's (DHS) exercise of the parole authority is reviewable, and if so, whether it has been properly exercised here.

## Summary of the Argument

A proper discussion of § 1182(d)(5)'s scope and purpose depends on an understanding of how § 1225(b) functions. The history behind exclusion practices and the evolution of refugee law is needed to shed light on that issue.

When Congress reformed the immigration code during the 1990s, part of that effort expanded the entry doctrine's application to every foreign national who entered the United States improperly, subjecting them to excludability as if they were at a port of entry. That doctrine operates through constructive custody (parole) while an admissibility determination is pending, or even where no such determination is to be made. Custody determinations under § 1226(a), long reserved for cases of deportability, have no role here. The legacy-INS understood this, but things changed during the Bush administration leading to almost two decades of practices including those challenged by Florida.

Applying the statute's terms, the necessary conclusion is that every applicant for admission inspected and released

by immigration authorities, while an inadmissibility determination is non-final, was paroled under § 1182(d)(5). Nothing in § 1182(d)(5) is violated by that process.

As the Supreme Court ruled soon after parole was codified by Congress, liberty is the presumption even in the face § 1225's original detention rule written with the same "shall" found there today. Although Congress amended § 1182(d)(5) various times after 1952, those changes were meant to steer the executive towards alternative options for refugee processing, not to mandate mass incarceration.

Despite those amendments, the statute is still drawn in broad discretionary terms leaving such decisions to the political branches. Regardless of that point, resource determinations have always been a proper basis for the exercise of the parole authority, and are necessary to prioritize national security.

8

<u>Argument and Citations of Authority</u>

## I.    Parole is the only option and explanation for an applicant for admission's post-inspection liberty.

There are broader practices occurring at the border, and the amici understand titles such as "Parole + ATD," "Parole with Conditions," and "NTA/on own recognizance (OR) process,"[1] etc., to simply be euphemisms for DHS' wrongful aggrandizement of the power to pick which statute—§ 1225(b) or § 1226—governs detention at its purportedly unfettered discretion.   As explained later, these permutations of border practices are just variations of a power claimed by the agency in 2007.   (Addend. 26a–31a.)

Amici have encountered Cuban refugees released with: (1) Forms I-220A, Order of Release on Recognizance, with or without NTAs, sometimes with Form G-56 reporting instructions; (2) Forms I-385 with a Form G-56; (3) Forms I-385 with parole stamps, with or without Form G-56; (4) orders of supervision on Forms I-220B; and (5) letters indicating

---

[1] An amended complaint (D.E. 43) was filed in case 3:23-cv-09962 challenging this alleged policy.

9

referencing a post-order custody review process under 8 CFR §§ 241.4 & 241.13. There are even variations within family groups that are processed together, *e. g.*, a mother and child released with parole, with the father released with a Form I-220A.

As far as the amici have seen, there is no rhyme or reason to what is happening at the border—at least not in a way explained to advocates and immigrants. The only way to make sense of it all is to look to the statute.

The law's procedures govern over paperwork. Courts have long understood that point in the context of determining whether a parole did or did not occur. *Vitale* v. *INS*, 463 F. 2d 579, 580–82 (CA7 1972) (placing entrant in custody of airline for further inspection was parole, not an entry, though done without parole paperwork); *Medina Fernandez* v. *Hartman*, 260 F. 2d 569, 570–73 (CA9 1958) (holding parole paperwork was a sham where Spanish sailors were involuntarily brought from Mexico into the United States on allegations of desertion). The Board has understood this as well. *Matter*

*of O-*, 16 I. & N. Dec. 344 (BIA 1977) (holding that 126 persons evacuated from Vietnam were paroled as a matter of law).

Ultimately, procedural regularity is the test for determining what occurred at the time of a physical entry, as the statute provides for mechanisms to remedy substantive errors. *Matter of Quilantin*, 25 I. & N. Dec. 285 (BIA 2010); *Matter of Areguillin*, 17 I. & N. Dec. 308, 310 (BIA 1980) (relying on "long-settled construction" of " 'inspected and admitted' or paroled" to reject idea "that only an alien who has been 'lawfully or legally' admitted to the United States may qualify for adjustment of status as one who has been inspected and admitted.") (footnotes omitted). See also *Tula-Rubio* v. *Lynch*, 787 F. 3d 288, 292–92 & 292 n. 2 (CA5 2015); *Martinez* v. *Att'y Gen.*, 693 F. 3d 408, 414 (CA3 2012); *Sum* v. *Holder*, 602 F. 3d 1092, 1096 (CA9 2010); *Emokah* v. *Mukasey*, 523 F. 3d 110, 118 (CA2 2008).

With that framework in mind, the only explanation for an applicant for admission's post-inspection liberty is parole. That broad classification applies to four classes of foreign

11

nationals: a foreign national (1) "present in the United States who has not been admitted;" (2) "who arrives in the United States ([(a)]whether or [(b)] not at a designated port of arrival;" and (3) "including an alien who is brought to the United States after having been interdicted in international or United States waters)."    8 U. S. C. § 1225(a)(1).    Essentially, anyone subject to potential inadmissibility under § 1182(a) is an applicant for admission.

There are five stages of processing where detention is required subject only to parole.    First, through expedited removal proceedings without a fear claim until removal.    8 U. S. C.  § 1225(b)(1)(A)(i), 8 CFR § 235.3(b)(2)(iii).    Second, during consideration of an asylum application if a credible fear claim is successful.  § 1225(b)(1)(B)(ii).    Third and fourth, while there is "pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."  § 1225(b)(1)(B)(iii)(IV).[2]    Last, throughout

---

[2] For the latter group, the DHS successfully argues in habeas cases that detention is under § 1225(b)(1) as opposed to § 1231(a), thus making parole the only option for release.

removal proceedings under § 1229a for all other applicants for admission.    § 1225(b)(2)(A).

"Read most naturally, §§ 1225(b)(1) and (b)(2) thus mandate detention of applicants for admission until certain proceedings have concluded."    *Jennings* v. *Rodriguez*, 138 S. Ct. 830, 842 (2018).    However, "there is a specific provision authorizing release from § 1225(b) detention … ."    *Id.*, at 844.   "With a few exceptions not relevant here, the Attorney General may 'for urgent humanitarian reasons or significant public benefit' temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2)."    *Id.* (citing § 1182(d)(5)(A)).[3]

---

Darrow, et al., *Immigration Detention: Emerging Issues Concerning Arriving Aliens, Criminal and Terrorist Aliens, and Hard-to-Remove Aliens*, 65 U.S. Attorneys' Bulletin 70 & 76 n. 64, July (I) 2017 <https://www.justice.gov/media/905531/dl?inline>; *Bertrand* v. *Holder*, No. CV-10-0604-PHX-GMS, 2011 WL 4356375, at *4 (D. Ariz. Aug. 16, 2011), report and recommendation adopted, No. CV-10-604-PHX-GMS, 2011 WL 4356369 (D. Ariz. Sept. 19, 2011).

Thus, persons released under these circumstance were paroled, even if mis-papered with an order of supervision.

[3] Those exceptions limit parole where the § 1157 refugee process is available, and during labor disputes for certain nonimmigrant crewmembers. § 1182(d)(5)(A) (referencing §§ 1182(d)(5)(B) & 1184(f).

"That express exception to detention implies that there are no *other* circumstances under which aliens detained under § 1225(b) may be released."  *Id.* (emphasis in original) (citation omitted).  Thus, neither § 1226(a), § 1231(a), nor amorphous concepts of prosecutorial discretion can apply. See *Texas* v. *Biden*, 20 F. 4th 928, 995–96 & 996 n. 17 (5th Cir. 2021), rev'd on other grounds, 142 S. Ct. 2528 (2022) (noting how this distinction determines adjustment eligibility).

## II.  Parole is simply a mechanism for release which, by legal fiction, retains an unadmitted person at the border, and is historically a tool to protect refugees such as Cuban nationals.

Parole is not a method of entry.   A person who has been paroled is considered to never have made an entry.  *Assa'ad* v. *U.S. Att'y Gen.*, 332 F. 3d 1321, 1338 (CA11 2003) ("The term 'parole' has a well-established meaning: that the alien is allowed into the country but remains constructively at the border, seeking admission and subject to exclusion proceedings."); accord § 1101(a)(13)(B).

This notion is known as the "entry doctrine fiction." *Jean* v. *Nelson*, 727 F. 2d 957, 969 (CA11 1984) (en banc),

14

aff'd, 472 U. S. 846 (1985).   It arises from the "fundamental distinction between excludable aliens and deportable aliens which permeates our immigration law" where "[e]xcludable aliens are those who seek admission but have not been granted entry" thus being "legally considered detained at the border." *Garcia-Mir* v. *Smith*, 766 F. 2d 1478, 1483–84 (CA11 1985).

Parole is nothing more than the act of releasing an inadmissible person, not entitled to be in or enter the United States, from physical custody.   *Leng May Ma* v. *Barber*, 357 U. S. 185, 190 (1958) ("The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted."). For example, a person detained "at Ellis Island" whose "prison bounds were enlarged by committing her to the custody of" a sponsor "was still in theory of law at the boundary line and had gained no foothold in the United States."   *Id.*, at 189 (citing *Kaplan* v. *Tod*, 267 U. S. 228, 230 (1925)).

Historically, and to this day, parole was also used as a

tool for the development of domestic refugee policy. Traditionally, "refugees were indistinct from immigrants under [the 1917 and 1924] immigration laws." Staff of S. Comm. on the Judiciary, 96th Cong. 2d Sess., *Review of U. S. Refugee Resettlement Programs and Policies* ("Refugee Review"), at 1 (Comm. Print 1980).[4] Things changed "following World War II," leading to the "adopt[ion] of a series of special refugee programs outside the regular immigration law." *Id.*

With the 1952 "consolidat[ion] [of] previous immigration laws into one statute," "[t]he parole provision of the Immigration and Nationality Act, section 212(d)(5), incorporated into statutory law a provision authorizing the temporary parole of aliens into the United States, which had been an administrative practice of longstanding." *Id.*, at 7–8. "Parole has since been used as the primary basis for entry of large numbers of refugees." *Id.*, at 8. For example, "[b]etween 1962 and 1979, hundreds of thousands of Cubans entered the United

---

[4] Available at:
https://files.eric.ed.gov/fulltext/ED206779.pdf.

States under the Attorney General's parole authority." Wasem, R. E., Cong. Research Serv., *Cuban Migration to the United States: Policy and Trends*, at 1 (June 2, 2009) (footnote omitted).[5]

However, "[d]uring the mid-1960s, the Immigration and Nationality Act did not permit the adjustment of status of Western Hemisphere natives," Refugee Review, *supra* n. 6, at 16. Thus, Congress passed the Cuban Refugee Adjustment Act in 1966 which "enabled Cuban refugees to adjust their status to that of permanent residents" while inside the United States. *Id*.

During the 1970s, Congress began working on the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980), in order "to provide a permanent statute revising U. S. refugee admissions policy" to supplant the "[p]ast U. S. refugee policy [that] was often categorized as being 'ad hoc,' 'piecemeal,' or 'stopgap' in nature." Refugee Review, *supra* n. 6, at

---

[5] Available at: https://fas.org/sgp/crs/row/R40566.pdf.

17

35.    As part of that effort, 203(f) of the Refugee Act, 94 Stat. 107–08, added subparagraph (B) to § 1182(d)(5) as a restriction on parole for persons eligible for the new refugee process codified as § 1184.

Throughout the 1980s and into the early 1990s, the United States and Cuba began entering into a series of Migration Accords with interspersed breakdowns in diplomatic ties and retaliatory acts.   Ultimately, agreements led to a new policy of returning Cubans interdicted at sea, starting the "wet-foot/dry-foot policy."   Wasem, *supra* n. 7, at 2 ("Until 1995, the United States generally had not repatriated Cubans (except certain criminal aliens on a negotiated list) under a policy established when the government became Communist within two years of the 1959 revolution.").

Then, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, Tit. III, Subtit. A, 110 Stat. 3009-546 (Sept. 30, 1996).   One change was the introduction of expedited removal.   § 302(a), IIRIRA (codified at 8 U.S.C.

§ 1225(b)(1)).    This included a safety valve for Cuban nationals.    8 U. S. C. § 1225(b)(1)(F).    Thus, Cubans continued obtaining parole in order to qualify for relief under the Cuban Refugee Adjustment Act.

However, in January 12, 2017, the Obama administration issued a Joint Statement with Cuba declaring that it would end the wet-foot/dry-foot policy, thereby subjecting Cubans to normal removal procedures, and that Cuba would begin accepting removals.    Five days later, it was announced that "Cuban nationals encountered on or after January 13, 2017 are [now] included in the classes of aliens subject to expedited removal."    Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902, 4904 (Jan. 17, 2017).

However, in practice, Cuba failed to accept removals as intended, and hundreds of thousands of Cubans seeking refuge at the border have been released from custody just as before, but with varying documentation in what appears to be a

preconceived attempt to undermine the goals of the Cuban Refugee Adjustment Act.

### III.   When Congress reformed the immigration laws, it intended to return persons who entered without inspection to the border, with all the attendant consequences thereto.

Against the backdrop of the entry doctrine fiction, Congress knew exactly what it was doing when it decided to expand it by treating entrants without inspection as being excludable.   It intended mandatory detention, swift exclusion procedures, and parole as the only available life line for release.   This was accomplished by reclassifying entry without inspection (EWI) cases as present without admission (PWA) cases, and to subject all PWA persons to exclusion—and thus, parole under § 1182(d)(5) in cases of release.

Today, an intent to evade inspection cannot serve as a pathway to deportability procedures.   Title III of the IIRIRA made all persons who have not been admitted subject to exclusion (today referred to as inadmissibility).   H.R. Conf. Rep. 104-828, at 208 (Sept. 24, 1996) ("The current category of persons who are deportable because they have made an

20

entry without inspection will, under the amendments made by section 301(c) of this bill, instead be considered inadmissible under revised paragraph (6)(A) of subsection 212(a).").

Change began with AEDPA.[6]   One of the major purposes of AEDPA was to subject foreign nationals who had entered without inspection to the stricter exclusion procedures. AEDPA § 414(a) ("an alien found in the United States who has not been admitted to the United States after inspection in accordance with section 235 is **deemed for purposes of this Act to be seeking entry** and admission to the United States **and shall be subject to examination and exclusion**") (emphasis added).   "This section by operation of law, **returns 'to the border' any alien who has entered the United States unlawfully**, regardless of the duration of his or her presence in the United States."   H.R. Conf. Rep. 104-518, at 117 (Apr. 15, 1996) (emphasis added).

One of the features of exclusion proceedings was

---

[6] Antiterrorism and Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).

21

detention which could only be alleviated through a § 1182(d)(5) parole. The law provided that an excludable foreign national "**shall be detained** for further inquiry." 8 U. S. C. § 1225(b) (1994) (emphasis added). This was a mandatory detention statute too.[7] *Matter of Sanchez-Avila*, 21 I. & N. Dec. 444, 457 (BIA 1996) (en banc) ("Congress contemplated that aliens seeking admission to the United States,

---

[7] As is true today, conditional parole was only available to deportable persons for decades:

> Pending a determination of **deportability** in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody. Except as provided in paragraph (2), any such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of **deportability**, (A) be continued in custody; or (B) be released under bond in the amount of not less than $500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on **conditional parole**.

8 U. S. C. § 1252(a)(1) (1994) (emphasis added).

This distinction is older than the INA itself. § 23, Internal Security Act of 1950, Pub. L. No. 81-831, 64 Stat. 987, 1011 (Sept. 23, 1950) (original codification of former 8 U. S. C § 1252(a)(1) (1994)).

who did not appear to be clearly admissible, in the ordinary course would be detained in custody for further proceedings.").

But parole was always available as **the** safety valve for exclusion cases, as it is today. *Jean* v. *Nelson*, 727 F. 2d 957, 977 (CA11 1984) (en banc) (treating parole as the "obverse" of detention under former § 1225(b)); *Jean* v. *Nelson*, 472 U. S. 846, 848–49 (1985) (same).

In essence, IIRIRA carried over the scheme that was established in AEDPA, that all foreign nationals who have not been admitted, even those traditionally classified as "EWI," were to be subjected to exclusion, including its mandatory detention rule that was subject only to parole under § 1182(d)(5). And the IIRIRA continued the same project, but through a bifurcated inadmissibility scheme (§§ 1255(b)(1) v. (b)(2)) that reaches the same outcome.

## IV.  Early INS policy and later DOJ policy understood this point.

After AEDPA these changes, the legacy-INS issued memoranda understanding these to mean that all inadmissible persons released from custody were paroled under

§ 1182(d)(5) as a matter of law. These contemporaneous interpretations are worthy of great respect. *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965) ("'Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'") (citation omitted).

In 1998, an INS memorandum explained that persons who had entered without inspection "are now considered by law to be applicants for admission." Virtue, P., Gen. Counsel, Memo, *Authority to parole applicants for admission who are not also arriving aliens* 1 (Aug. 21, 1998) (Addend., 19a). This memo recognized the "authority to parole from custody 'an alien applying for admission' who would otherwise be held in custody until the Attorney General had resolved whether to admit or remove the alien." *Id.*, at 2 (Addend., 20a).

Even with regard to the bond regulations, the Memo held that "release under § [1226] . . . should not be seen as

24

separate form of relief from custody" in that "[a]ny release of an applicant from custody, without resolution of his or her admissibility, is a parole." *Id.*, at 3 (Addend., 21a) (citations omitted). This was decided specifically in the context of persons who are "present in the United States without having been admitted or paroled" because they "are applicants for admission." *Id.*, at 4 (Addend., 22a) (citations omitted).

The following year, another memo was published on the topic. Meissner, D., Comm'r, Memo, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999) (Addend., 23a–25a). Affirming the Virtue Memo, the Commissioner held that if a Cuban "surrender[s] himself or herself into Service custody," and "if the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled." *Id.*, 2–3 (Addend., 24a–25a). This was the rule regardless of whether "the Service officer who authorized the release

thought there was a legal distinction between paroling an applicant for admission and releasing an applicant for admission under § [1226]." *Id.*, at 3 (Addend., 25a). This interpretation was employed for nearly a decade.[8]

However, the DHS departed from this longstanding, contemporaneous policy as part of a move to limit access to relief. Coldebella, G., Gen. Counsel, Memo, *Clarification of the Relation Between Release Under Section 236 and Parole Under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) (Addend., 26a–31a). In short, the DHS began taking the position that §§ 1182(d)(5) and 1226(a) were distinct procedures with overlapping application subject to the unrestricted (and ungoverned by any standards) discretion of DHS officials. The memo was clear that it intended

---

[8] *E. g.*, *In re Applicant*, 2006 WL 4739186, at *2 (AAO Aug. 28, 2006) ("[I]f the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled."); *In re Applicant*, 2004 WL 3457036, at *2 (AAO Oct. 21, 2004) (same); *In re Applicant*, 2004 WL 3456026, at *2 (AAO Feb. 11, 2004) (same).

26

to make the availability of adjustment dependent upon the whims of DHS officials under this new interpretation.  *Id.*, at 5 (Addend., 30a).[9]

However, under the direction of Attorney General Sessions, a new approach (ultimately adopted by the Supreme Court) interpreted §§ 1182(d)(5) and 1226(a) as mutually exclusive from one another.  In instructions to U. S. Attorney offices across the country, General Sessions' DOJ explained the workings of the INA's detention statutes.  Darrow, *supra* n. 3.  Therein, the principle that section 1225(b)(2) was a mandatory detention statute, applicable to "aliens arriving at or apprehended shortly after crossing the border, or who are present in the country without having been admitted," subject only to a § 1182(d)(5) parole release, with § 1226(a) being inapplicable "to those subject to mandatory detention," was established.  *Id.*, at 70–72 & 77.

---

[9] Such an approach is arbitrary and capricious in violation of administrative law principles.  See *Judulang* v. *Holder*, 565 U. S. 42, 57 (2011) (the availability of relief cannot "rest on the happenstance of an immigration official's charging decision").

This understanding has had success in the district courts. *E.g.*, *Jamal A.* v. *Whitaker*, 358 F. Supp. 3d 853, 857 n. 2 (D. Minn. 2019) ("Although ICE claimed to have detained Jamal under 8 U.S.C. § 1226(c), *see* ECF No. 8 at 2, both parties agree that his detention is instead governed by § 1225(b)(2)(A), ECF No. 1 at 1 n.1; ECF No. 7 at 4."). And it succeeded with the Supreme Court. U. S. Br., *Jennings* v. *Rodriguez*, O.T. 2017, No. 15-1204, pp. 15–18.[10] The brief argued that both §§ 1225(b)(1) and (b)(2) required mandatory detention, *id.*, at 16, and that "shall" means "shall," not "may" in this context, *id.*, at 17.

However, the current Solicitor General took a contrary position in defense of the current administration's efforts to end the MPP program. At one point during the argument, General Prelogar suggested that § 1226(a) was available to persons detained under § 1225(b)(2)(A). Transcript, *Biden* v.

---

[10] Available at: https://www.scotusblog.com/wp-content/uploads/2016/09/15-1204-petitioner-merits-brief.pdf.

*Texas*, O.T. 2021, No. 21-954, Tr. at 24:22–25.[11]    However,

the Court did not take kindly to this:

> I'll tell you, when I read your brief on this point, I said:
> Wow, this is exact -- I remember the Jennings case,
> where I had the pleasure of writing the opinion for the
> Court, and I said: Boy, my recollection is that the gov-
> ernment's brief in that case took exactly the opposite po-
> sition from what the -- the government is taking here.

> And I went back and looked at it, and that is exactly the
> case. You stressed that "shall be detained" means shall
> be detained.  I have it right before me.  You empha-
> sized the -- the language, "shall be detained."

*Id.*, Tr. at 26 (Alito, J.).

And here we are today.

## V.    Regardless, the district court should be reversed because it lacked jurisdiction, and because § 1182(d)(5) parole has been properly exercised.

The immigration code's bar to review of discretionary

determinations applies to parole decisions under § 1182(d)(5)

because they are made under the same subchapter of Title 8

that contains the bar.    § 1252(a)(2)(B)(ii) ("any other decision

or action … specified under this subchapter").    It "eliminates

---

[11] Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/21-954_8m59.pdf.

review by any court of discretionary decisions or actions of the Attorney General or Secretary." *Mejia Rodriguez* v. *U. S. Dep't of Homeland Sec.*, 562 F. 3d 1137, 1142 (CA11 2009) (citing § 1252(a)(2)(B)(ii)).

Applying the presumption of judicial review, the Court held that this bar "requires us to look at the *particular* decision being made and to ascertain whether *that* decision is one that Congress has designated to be discretionary." *Id.*, at 1143 (emphasis in original).   For example "preliminary *statutory* eligibility decisions are not ones that involve discretion." *Id.* (emphasis in original).   That "requires an assessment of an alien's statutory eligibility" for a given exercise of discretion. *Id.*, at 1144.

The only eligibility requirement for an exercise of parole discretion contained in § 1182(d)(5)(A) is that the foreign national being paroled be an "applicant for admission" interchangeably referred to as being within the class of "any alien applying for admission."   This requirement has gone unchanged since that section's original enactment.   § 212(d)(5),

Immigration and Nationality Act (INA), Pub. L. No. 82-414, 66 Stat. 163, 188 (June 27, 1952). The only difference was that the original class of people this applied to was "aliens arriving at ports of the United States," INA § 235(a), 66 Stat., at 198–99 (1952), until the IIRIRA broadened the scope of that classification as now found in 8 U. S. C. § 1225(a)(1). Thus, the Court could review whether the DHS is paroling people who are not applicants for admission.

But that is the extent of available review. Whether or not the DHS is exercising its authority "for urgent humanitarian reasons or significant public benefit" is a question about how it is applying the standards that guide the exercise of its discretion. That sort of question is a "garden variety abuse of discretion argument" that "does not amount to a legal question." *Ponce Flores* v. *U. S. Att'y Gen.*, 64 F. 4th 1208, 1226 (CA11 2023) (applying § 1252(a)(2)(B)(i)).

As precedent dictates, the Court cannot review an argument that the agency "abused [its] discretion by failing properly to weigh the factual scenario [that was] presented."

*Alvarez Acosta* v. *U. S. Att'y Gen.*, 524 F. 3d 1191, 1196 (CA11 2008).   And the Court "lack[s] jurisdiction to decide whether the facts of [a] particular case satisfy the correct legal standard."   *Ruiz* v. *U. S. Att'y Gen.*, 67 F. 4th 1321, 1330 n. 5 (11th Cir. 2023).   " 'As long as the [agency] cites and proceeds to apply the proper legal standard," the Court "cannot make legal error out of an inherently subjective determination." *Ponce Flores*, 64 F. 4th, at 1222 (citation omitted).

Additionally, these are standardless guidelines that Courts independently cannot review under the APA because there is "no meaningful standard against which to judge the agency's exercise of discretion."   *Weyerhaeuser Co.* v. *U. S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation omitted).   Similarly worded guideposts have been held to be nonreviewable.   *E. g.*, *Brasil* v. *Sec'y, Dep't of Homeland Sec.*, 28 F. 4th 1189, 1194 (CA11 2022) ("the phrase 'national interest' invokes the types of decisions that 'are firmly committed to the discretion of the Executive Branch' ") (citations omitted); *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2409 (2018) (finding it

"questionable" that the Court could review a finding that certain entries are "detrimental to the interests of the United States"); *Webster* v. *Doe*, 486 U. S. 592, 600 (1988) (reading "necessary or advisable in the interests of the United States," especially when preceded with the verb "deem," "to foreclose the application of any meaningful judicial standard of review") (emphasis omitted).

Here, the phrase "significant public benefit" is of the same nature as the non-reviewable phrases above. And just like the word "deem" in *Webster*, § 1182(d)(5) uses the words "may" and "discretion" in conjunction with the "significant public benefit" standard to "reinforc[e] this discretion." *Brasil*, 28 F. 4th, at 1193. And the phrase "urgent humanitarian reasons" connotes that same lack of a meaningful judicial standard.

That leaves us left with the case-by-case review requirement, and the purported return-to-custody and case requirements addressed by the district court. The latter do not exist. The former, even if reviewable, is subject to a highly

deferential standard of review that was more than met here.

Prior to the existence of the current jurisdictional bars, the Court noted the importance of judicial restraint in this area, cautioning against exactly what has occurred below in this case:

> In overriding the government's decisions about how best to handle the sudden influx of Mariel Cubans, the district court has failed to take account of those significant countervailing national concerns that have led our immigration law to place primary decisionmaking authority about such a problem squarely into the hands of the political branches.

*Garcia-Mir* v. *Smith*, 766 F. 2d 1478, 1484 (CA11 1985). Thus, where judicial review existed, "the scope of that review [wa]s extremely limited." *Jean* v. *Nelson*, 727 F. 2d 957, 976 (CA11 1984) (en banc).

"Congress has delegated remarkably broad discretion to executive officials under the INA, and these grants of statutory authority are particularly sweeping in the context of parole." *Id.*, at 977. Considering "the broad discretion given the Attorney General in making parole decisions," the rule is "that a federal court's scope of review in such instances is not

34

the traditional abuse of discretion standard, but rather is limited to ascertaining whether he has advanced 'a facially legitimate and bona fide reason' for his decision." *Garcia-Mir*, 766 F. 2d, at 1485 (quoting *Jean,* 727 F. 2d, at 977). The DHS easily meets that standard here.

Setting all that aside, the district court did touch upon an important aspect about § 1252(a)(2)(B)(ii) applying "preclud[ing] review of individual immigration decisions," but not review of "challenged policies." Order Denying Motion to Dismiss (D.E. 45), 3:21-cv-01066, slip op., at 26–27 (N.D. Fla. May 4, 2022). The amici agree with that reading of the statute, and point out that a similar argument is currently pending a decision by this Court. *Commandant* v. *Dist. Dir.*, No. 21-10372 (argued Apr. 7, 2022); see also *McNary* v. *Haitian Refugee Ctr., Inc.*, 498 U. S. 479 (1991).

However, there is no way to evaluate whether groups of foreign nationals were released on a case-by-case basis without engaging in individualized reviews of samples of release decisions, and which is exactly the type of review barred by

§ 1252(a)(2)(B)(ii).   At the very least, any ruling on the legality of the DHS' systemic use of parole by this Court must explicitly refrain itself from affecting the conclusion that individual foreign nationals were in fact paroled under the challenged policies, else the prohibition on individualized review in § 1252(a)(2)(B)(ii) would be for naught.

Either way, assuming that compliance with the case-by-case requirement is reviewable, the district court still erred. It found a violation of that principle on the grounds that: (1) DHS largely focused on operational circumstances rather an individual parolee's circumstances; and (2) the review of those circumstances inquired whether the parolee was a public safety risk or flight risk, rather than working from a presumption of detention.   Judgment (D.E. 157), 3:21-cv-01066, slip op., at 91–92 (N.D. Fla. Mar. 8, 2023).   This is wrong for two reasons.

First, there is nothing wrong with considering operational circumstances in making parole decisions.   This has

long been a common practice,[12] and the reality of limited resources requires the agency to pick out the greatest security and safety risks for detention—something which can only be done on a case-by-case basis.

Second, the district court got the presumption backwards. Ever since the original parole statute was first interpreted by the Supreme Court in 1958—while having a mandatory detention provision in INA § 235(b) (1952) using the same "shall be detained" language used in § 1225(b) today—it was held that the codification of parole meant that "[p]hysical **detention of aliens is now the exception, not the rule**, and is generally employed only as to security risks or those likely to abscond." *Leng May Ma*, 357 U. S. 185, 190 (1958) (emphasis added) (citation omitted); accord *Marczak* v. *Greene*, 971 F. 2d 510, 513–14 (CA10 1992). Thus, the manner in which the DHS has been exercising parole is unobjectionable.

---

[12] See Morton, J., Dir. No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* (Dec. 8, 2009) <https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf>.

Last, the district court's imposition of a return-to-cus-
tody requirement is unfounded, and undermines longstanding
parole practices that Congress never gave any indication of
intending to prohibit.   Doing so undermines important law
enforcement tools, as well as humanitarian objectives.

"[T]he legislative history of the parole provision at sec-
tion 212(d)(5) shows that one of Congress' primary purposes
was to allow parole for the purpose of prosecution." *Matter
of Valenzuela-Felix*, 26 I. & N. Dec. 53, 56 (BIA 2012) (cita-
tions omitted); accord *Matter of K-*, 9 I. & N. Dec. 143, 157 (AG
1959) ("the legislative history of the parole provisions of sec-
tion 212(d)(5) of the Immigration and Nationality Act reveals
that they were enacted in compliance with a recommendation
by the Attorney General that he be given the necessary au-
thority to parole aliens for purposes which are in the public
interest" such as "'purposes of prosecution'") (citing Senate
Rep No. 1137, 82d Cong., 2d Sess., pp. 12–13).

This has always been and still is the case. *E.g.*,
*Vazquez Romero* v. *Garland*, 999 F. 3d 656, 665 (CA9 2021)

38

("Given Congress's grant of discretion to the government in § 1182(d)(5), the government may exercise its parole authority to permit an admissibility determination to be made **after** a criminal prosecution.") (emphasis added) (citation omitted). In fact, foreign nationals extradited to the United States for prosecution against their will are immune from exclusion proceedings under the INA because they are not applicants for admission. *Matter of Badalamenti*, 19 I. & N. Dec. 623, 625–27 (BIA 1988). This is on top of the possibility that the extradition treaty might immunize the extraditee from civil proceedings. If there is indeed a judicially enforceable return-to-custody and case requirement, notwithstanding the language referencing "the opinion of the Attorney General" in § 1182(d)(5), the United States would lose the ability to efficaciously prosecute extradition cases.

There is also the fact the humanitarian parole is used to bring inadmissible persons into the United States for reasons

39

such as receiving rare and experimental surgeries.[13]   Impos-

ing a custody plan and the initiation of removal persons in

such cases is nonsensical, and a waste of agency resources.

What the district court did here completely undermines the

United States' choices and ability to effectuate positive out-

comes in humanitarian cases as it has long done.

But there is a simpler answer to all this.   Given that

"parole of aliens seeking admission is simply a device through

which needless confinement is avoided while administrative

proceedings are conducted," *Leng May Ma*, 357 U. S., at 190,

the fact that DHS has not ordered or sought return upon the

purported expiration date of parole in the Parole + ATD con-

text leads to an inescapable conclusion—the foreign nationals

released under that program were indefinitely paroled, and

remain paroled until the DHS makes efforts to take them back

into custody.

---

[13] See: https://www.uscis.gov/humanitarian/humanitarian-parole/guidance-on-evidence-for-certain-types-of-humanitarian-or-significant-public-benefit-parole-requests.

## Conclusion

Based upon the foregoing, the judgment of the district court should be reversed.

Respectfully submitted,

**s/ Mark Andrew Prada**
Prada Urizar Dominguez, PLLC
3191 Coral Way, Suite 500
Miami, FL 33145
o. 786.703.2061
mprada@pradaurizar.com

June 12, 2023                    *Counsel for Amici Curiae*

41

# ADDENDUM

USCA11 Case: 23-11528    Document: 44    Date Filed: 06/12/2023    Page: 56 of 88



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**MIAMI, FLORIDA**

IN THE MATTER OF:                          )
                                           )
████████ S██-V█████                        )
A#█████████                                )        IN REMOVAL PROCEEDINGS
                                           )
████████████████                           )
                                           )
                                           )
**RESPONDENTS**                            )
_____           )

**CHARGE:**     Section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA or Act): An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

**ON BEHALF OF RESPONDENT**
Michelle Acebo, Esq.
6175 N.W. 153rd Street, #115
Miami Lakes, Florida 33014

**ON BEHALF OF THE DEPARTMENT**
Mario Bravo, Esq.
Office of the Chief Counsel
Department of Homeland Security
333 South Miami Avenue, Suite 200
Miami, Florida 33130

## WRITTEN DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I.    PROCEDURAL HISTORY

████████ S██-V█████ and ████████████████████ are natives and citizens of Cuba, who entered the United States without admission at or near El Paso, Texas on or about May 29, 2019. See Exh. 1 and 1A. On May 30, 2019, the Department of Homeland Security (DHS) personally served the Respondents with Notices to Appear (NTA), charging them as being inadmissible pursuant to section 212(a)(6)(A)(i) of the INA. On August 6, 2019, DHS filed the NTAs with the Miami Immigration Court, thereby commencing removal proceedings against the Respondents. See id.; Perez-Sanchez v. U.S. Att'y Gen., 935 F.3d 1148, 1156 (11th Cir. 2019).

On January 15, 2020, the Respondents, through counsel admitted the factual allegations contained in the NTA and the charges of inadmissibility. Based on Respondent's admissions and

Page **1** of **8**

concessions, the Court sustained the charges of inadmissibility. See INA § 240(c)(1)(A), (2); 8 C.F.R. § 1240.10(c). Respondents declined to designate a country of removal and the Court designated Cuba. See 8 C.F.R. § 1240.10(f). On November 30, 2020, the Respondents filed an Application to Register Permanent Residence or Adjust Status (Form I-485). On January 15, 2020, the Respondents filed an Application for Asylum and Withholding of Removal (Form I-589). On December 29, 2020, the Respondent testified in support of the applications.

## II.    SUMMARY OF THE EVIDENCE

The record of proceedings consists of exhibits one through eleven and the Lead Respondent's testimony. The Court has considered all submitted evidence in its entirety, regardless of whether specifically mentioned in this decision. Below is a summary of Respondent's testimony.

The Lead Respondent is a 30 year old woman from Cuba. The Lead Respondent's child is ▮ and is 3 years old. The Respondents entered the United States on May 29, 2019. The Lead Respondent has another child as well that is 3 months old. The second child was born in the United States. The Lead Respondent is married to a Lawful Permanent Resident.

The Lead Respondent has been arrested or detained twice in Cuba. She believes she was arrested for her manifestations of the politics of the country. These problems with the Cuba government started in 2019. In Cuba she was a member of the Patriotic Union of Cuba (UNPACU). She joined in 2014. She was involved in handling out bulletins. She stated that she has never been a member of any Communist Party.

The Lead Respondent stated she attended college in Cuba for 5 years, and studied economy. She graduated in 2013. She worked at a tobacco company in Cuba and managed the finances of the tobacco company. She worked with payroll and the payment of salaries. She worked at the company for around 5 years.

While the Lead Respondent was living in Cuba she did travel. She went to Vietnam to visit friends with a tourist visa. She traveled to Vietnam at least three times. She had friends who lived in Vietnam who were originally from Cuba. These friend helped her finance the travel. She would have layovers in Russia when she flew to Vietnam. She also had a visa to travel to Mexico, which she used in her to transit to the US. She had travel documents for her daughter and herself which here arranged by the daughter's father.

The Lead Respondent has family that lives in the United States that would come to visit the Respondent while she was Cuba. She met her current husband after she came to the United States. Her first husband (the father of ▮) resides in Cuba, but he has traveled to the United States before. Her first husband flew to the United States to get divorced from the Respondent.

At the conclusion of the testimony, the representative of DHS stated that the Respondents were eligible to Adjust Status under the Cuban Adjustment Act, but for the elements of discretion and parole.

Page **2** of **8**

III.　**STATEMENT OF LAW**

A.　Cuban Adjustment Act

The applicant for adjustment of status under the Cuban Adjustment Act must establish that he or she: (1) is a native or citizen of Cuba, (2) was inspected and admitted or paroled into the United States subsequent to January 1, 1959, (3) has been physically present in the United States for at least one year, (4) is admissible to the United States for permanent residence or qualifies for an applicable waiver, and (5) is worthy of a favorable exercise of discretion. See Cuban Refugee Adjustment Act of November 2, 1966, Pub. L. No. 89-732, 80 Stat. 1161.

B.　Discretion

When considering the exercise of discretion, the Court balances favorable and unfavorable factors within the context of the relief sought. Adverse factors to be considered by the Court include the nature and underlying circumstances of the exclusion ground at issue, the presence of additional significant violations of this country's immigration laws, the existence of a criminal record and, if so, its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident of this country.

By contrast, favorable factors to be considered by the Court include "family ties in the United States, residence of long duration in this country (particularly where the alien began his residency at a young age), evidence of hardship to the alien and his family if he is excluded and deported, service in this country's Armed Forces, a history of stable employment, the existence of property or business ties, evidence of value and service to the community, evidence of genuine rehabilitation if a criminal record exists, and other evidence attesting to the alien's good character (e.g., affidavits from family, friends, and responsible community representatives)."

The Court has balanced the favorable and unfavorable factors within the context of the relief sought under and is going to find that given the totality of circumstances, the Respondents merits a favorable exercise of discretion.

IV.　**FINDINGS**

At the conclusion of the Individual Hearing, the representative of DHS stated that the Respondents were eligible to Adjust Status under the Cuban Adjustment Act, but for the elements of discretion and parole. The DHS representative further argued in its Opposition Memorandum, please See Exh. 10, that the Respondents have not been inspected, admitted or paroled, and such that they cannot adjust under the CAA.

A.  Parole

According to the DHS' Opposition Memorandum, See Exh. 10, the Respondents entered the United States without admission, inspection or parole on or about May 29, 2019. Immigration Officials encountered and apprehended the Respondents in the El Paso, Texas Border Patrol Station area of responsibility and elected to place the Respondents in INA § 240 proceedings by issuing a NTA.  The Respondents were charged as removable pursuant to INA § 212(a)(6)(A)(i).  The Respondents indicated they would reside in Florida, and were released on their own recognizance pursuant to INA § 236 and ordered to report to the non-detained Enforcement and Removal Operations facility in Miramar, Florida.  The Department did not extend to the Respondents an INA § 212(d)(5) parole, rather they were permitted to be released on their own recognizance pursuant to INA § 236(a)(2)(B).

So therefore the question is: have the Respondents, who were released on May 30, 2019, after the Decision in *Jennings,* been paroled?  Or stated another way: does the paperwork control, meaning they were released on a bond under INA § 236(a), or does our new understanding of the law control, such that they were paroled under INA § 212(d)(5)(A)?

The paperwork documenting the Respondents states that they were released on a bond pursuant to INA § 236(a), consistent with the previously-binding decision of the Board of Immigration Appeals ("Board") in *Matter of X-K-,* 23 I&N Dec. 731 (BIA 2005).  However, we have learned from the Supreme Court in *Jennings v. Rodriguez,* 138 S. Ct. 830 (2018), and the Attorney General in *Matter of M-S-,* 27 I&N Dec. 509 (A.G. 2019), two important points.  The first is that these aliens, as inadmissible applicants for admission, were detained under INA § 235(b).  The second, is that the exclusive legal means for the release of inadmissible applicants for admission is the parole authority under INA § 212(d)(5)(A).

Ultimately, the Court is going to conclude that it is the law, not the paperwork or anything else, that controls.  Aliens like these Respondents have been paroled into the United States.  Their release by the Department cannot qualify as a bond under INA § 236(a), and can only be classified as a release on parole under INA § 212(d)(5)(A).  The Court comes to this conclusion based on an application of *Jennings* to the facts in this  and the binding decision of the Board of Immigration Appeals ("Board") in a similar dispute on the issue of parole in *Matter of O-,* 16 I&N Dec. 344 (BIA 1977).

According to *Jennings v. Rodriguez,* 138 S. Ct. 830 (2018), parole under INA § 212(d)(5)(A) is the exclusive legal means for the release of inadmissible applicants for admission who are detained by the Department under INA § 235(b).  *See* 138 S. Ct. at 844.  Inadmissible applicants for admission "shall" be detained under INA § 235(b).  *See* INA § 235(b)(1)(B)(ii), (iii)(IV), (2)(A).  Other than a parole under INA § 212(d)(5)(A), "there are no *other* circumstances under which aliens detained under § 1225(b) [INA § 235(b)] may be released." *Jennings,* 138 S. Ct. at 844 (emphasis in original).  The Respondents were inadmissible applicants for admission who the Department detained and later released.  Therefore, the respondents were detained under INA § 235(b), and their release qualifies as a parole under INA § 212(d)(5)(A).

Page **4** of **8**

The Board has already considered a case where certain aliens argued they were paroled, and the Department argued they were not paroled. The Board stressed that the correct characterization of the release of those aliens was controlled by the law. The Board therefore rejected the contrary view that an alien can be paroled only if the Department clearly intended to grant parole, or issued the appropriate parole paperwork.

The case is *Matter of O-*, 16 I&N Dec. 344 (BIA 1977), which arose at the end of the Vietnam War. Approximately 130,000 aliens from Vietnam, mostly Vietnamese, were evacuated to the United States in April and May of 1975. *Id.* at 348. The Vietnamese aliens in this large group were considered to have been paroled by the government. *Id.* at 351. However, a small group of 126 non-Vietnamese aliens who were evacuated on American military aircraft were placed in exclusion proceedings. *Id.* at 345. The issue before the Board in the consolidated appeals of the 126 aliens was whether or not they had been paroled, with the aliens arguing they had been paroled, and the government arguing the opposite. *Id.*

Upon review, the Board recognized that none of the 126 non-Vietnamese aliens (or *any* of the 130,000 evacuees) was issued paperwork to memorialize that they were paroled (Form I-512). *Id.* at 348. The Board further recognized that evidence of the intent of the government to exercise its parole authority for the 126 non-Vietnamese aliens was "inconclusive." *Id.* at 349. Nevertheless, the Board held that all of these aliens were paroled under INA § 212(d)(5). *Id.* at 348, 351. The Board reasoned:

> We are unaware of, and the Service had not provided us any authority making it lawful for the Government to bring these aliens to the United States other than the parole authority granted the Attorney General under section 212(d)(5) of the Act.

*Id.* at 348. The Board found that the aliens were paroled for several other reasons, including that: (1) the procedure used to bring them to the United States was no different than the procedure used to bring aliens to the United States who concededly were paroled, (2) Congress contemplated that non-Vietnamese evacuees would be treated similarly to Vietnamese evacuees, and (3) the aliens were removed from Vietnam with the express consent of the United States government. *Id.* at 351.

Just as in *Matter of O-*, here the Department cannot provide the Court any lawful authority justifying the release of these Respondents "other than the parole authority granted the Attorney General under section 212(d)(5) of the Act." *Id.* at 348. The Respondents were inadmissible applicants for admission, and the Supreme Court has made it clear that apart from a parole under INA § 212(d)(5)(A), "there are no *other* circumstances" justifying release. *Jennings*, 138 S. Ct. at 844 (emphasis in original). While the paperwork might have been issued under a mistaken view of the law, the only lawful authority for release was a parole.

The Supreme Court in *Jennings* stated that other than a release on parole under INA § 212(d)(5)(A), "there are no *other* circumstances under which aliens detained under § 1225(b) [INA § 235(b)] may be released." *Jennings*, 138 S. Ct. at 844 (emphasis in original). The Department claims in its Opposition Memo, See <u>Exh</u> 10., that these words of the Supreme Court are "dicta" or incorrect as a matter of law. This Court will not be faulting the Supreme Court for

Page **5** of **8**

"ignoring" *Matter of E-R-M- & L-R-M-*, 25 I&N Dec 520 (BIA 2011) or any other case, and finds the reasoning of the Supreme Court, even if dicta, highly persuasive and correct. *See generally Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (recognizing that Supreme Court dicta is not something to be lightly cast aside: "there is dicta, and then there is Supreme Court dicta.").

Furthermore, the Court is not taking the words of the Supreme Court "out of context." The Supreme Court's statement came during review of a broad ruling of the Ninth Circuit Court of Appeals requiring periodic bond hearings in a class action lawsuit. *See Jennings*, 138 S. Ct. at 838. The certified class included certain aliens detained longer than six months pursuant to one of the general immigration detention statutes pending completion of removal proceedings, and was ultimately divided into three broad subclasses: those detained under INA § 235(b), INA § 236(a), and INA § 236(c). *Id.* at 839. In that context, the Supreme Court held that periodic bond hearings were not required for any of the three subclasses. *Id.* at 842. And in that context, the Supreme Court explained that the reason bond hearings were not required was because parole, not bond, is the exclusive legal means to release an alien detained under INA § 235(b). *See id.* at 844. The Supreme Court's conclusion is not dicta – it is the express reasoning invoked in *Jennings* to overrule the contrary conclusion of the Ninth Circuit Court of Appeals that periodic bond hearings were required. *See Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996) (the holding of a case includes the result of the case and "those portions of the opinion necessary to that result.").

The Department now says it disagrees with the straightforward conclusion of the Supreme Court in *Jennings*. It appears it has taken that position for these cases only. As a represented party, the Department has repeatedly argued before the Federal Courts, without qualification, that parole is the sole legal means to release aliens detained under INA § 235(b). In fact, the Department has even cited to the exact language from Jennings it now says is not a correct statement of the law at all.

Finally, the Department points out that the parole authority has been delegated exclusively to the Secretary of Homeland Security. See Exh. 10. Accordingly, it argues that Immigration Judges may not "constructive parole" an alien into the United States. However, the Court is not ordering the release of detained aliens under INA § 212(d)(5)(A). Instead, the Court is presiding over the cases of respondents who have already been released by the Department, and determining the correct legal classification for that release. This is exactly what was done in *Matter of O-*. A legal ruling that the respondents have been paroled is not a "constructive parole" or a *"nunc pro tunc"* parole. It is a rather unremarkable function of a judge—the application of the law to past facts. *See, e.g., Matter of Quilantan*, 25 I&N Dec. 285 (BIA 2010) (concluding that the Department's decision to allow an alien to pass through a port of entry without questioning qualified as an "admission" to the United States).

To summarize: the law is clear that the Respondents were inadmissible applicants for admission who were detained under INA § 235(b). The only legal basis for their release was a parole under INA § 212(d)(5)(A). This was made clear by the Supreme Court, whose words this Court will not lightly cast aside. The Department's contrary theory about detention and release at the U.S. border is contradicted by INA § 235(b)(2). Simply put, the paperwork issued to these

Page **6** of **8**

respondents does not control. The law controls. Just as in *Matter of O-*, there is no other lawful explanation for the release of these respondents other than parole. For all of the reasons above and after a careful review, the Court therefore concludes that the Respondents have been paroled for the purposes of their eligibility for adjustment of status under the Cuban Adjustment Act.

## V.    CONCLUSION

The Court is going to conclude that the Respondents meet the eligibility requirements to adjust status under section 1 of the Cuban Refugee Adjustment Act of November 2, 1966, Pub. L. No. 89-732, 80 Stat. 1161, as amended ("Cuban Adjustment Act" or "CAA"). The Court will further find that the Respondents merit a favorable exercise of discretion.

In light of the foregoing, the Court enters the following order:

## <u>ORDER</u>

**IT IS HEREBY ORDERED** that Respondents' application to adjust status under section 1 of the Cuban Refugee Adjustment Act of November 2, 1966, Pub. L. No. 89-732, 80 Stat. 1161, as amended ("Cuban Adjustment Act" or "CAA"). is **GRANTED**.

**IT IS FURTHER ORDERED** that the Respondents' application for asylum under §208 of the Act be **WITHDRAWN**.

**IT IS FURTHER ORDERED** that the Respondents' application for withholding of removal under § 241(b)(3) of the Act be **WITHDRAWN**.

**IT IS FURTHER ORDERED** that the Respondents' applications for protection under the United Nations Convention Against Torture be **WITHDRAWN**

Dated this 23rd day of Feb , 2021

Abraham Burgess
**Immigration Judge**

**APPEAL RIGHTS**: A notice of appeal must be filed with the Board of Immigration Appeals within thirty calendar days of the issuance date of this decision. <u>See</u> 8 C.F.R. § 1003.38(b). If the

final date for filing the notice of appeal occurs on a Saturday, Sunday, or federal holiday, the time period for filing will be extended to the next business day. <u>See</u> <u>id.</u> If the time period expires and no appeal has been filed, this decision becomes final. <u>See</u> 8 C.F.R. § 1003.38(d).

Addend. 008a

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**HOUSTON, TEXAS**



IN THE REMOVAL PROCEEDING OF:

H_____-A____ H_____

**RESPONDENT**

§
§
§
§
§
§

A____538

**FOR RESPONDENT:**

Zulimary V. Maymi Serrano, Esq.
Mark A. Prada, Esq.
Canizares Law Group, LLC.
8360 W. Flagler St., Ste. 103
Miami, FL 33144

**FOR DHS:**

Assistant Chief Counsel, DHS
126 Northpoint Drive, Suite 2020
Houston, TX 77060

---

Pending before the Court is Respondent's motion to determine prima facie eligibility, filed on April 6, 2021. Respondent requests this Court find that the Respondent is prima facie eligible for adjustment of status under the Cuban Refugee Adjustment Act of 1966 (CAA). More specifically, the Respondent requests this Court find that the Respondent was paroled from Department of Homeland Security (DHS) custody under 8 U.S.C. § 1182(d)(5) when he was released on his own recognizance via ICE Form I-220A. *See* Respondent's Motion.

A response to the Respondent's motion was due NLT April 16, 2021. The Department of Homeland Security (DHS) has not filed a response to the pending motion. The motion is therefore considered unopposed. 8 C.F.R. § 1003.23(a).

## FACTUAL BACKGROUND

According to the Form I-862, Notice to Appear (NTA), the Department alleges that the Respondent is not a citizen or national of the United States but is a native and citizen of Cuba. The Respondent arrived in the United States at or near El Paso, Texas, on or about April 13, 2019 and was not then admitted or paroled after inspection by an Immigration Officer. The Respondent was charged with violating Section 212(a)(6)(A)(i) of the Immigration and Nationality Act, as amended, as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. According to the DHS Form I-286, the Respondent was placed into custody on April 17, 2019 at

1131. However, the document indicates that the Respondent, on April 13, 2019, acknowledged his right to have the custody determination reviewed by an immigration judge. The document indicates the custody took place at Fort Hancock, Texas, and that the Respondent was being detained pursuant to the authority contained in section 236 of the Immigration and Nationality Act and Part 236 of Title 8, Code of Federal Regulations. The record then indicates that the Respondent was transferred to the Tacoma Washington Immigration Court, where he was released from custody as documented on Form I-220A. That form is titled "Order of Release on Recognizance" and is dated May 29, 2019. The form indicates that the Respondent was being released on his own recognizance pursuant to section 236 of the Immigration and Nationality Act and applicable provisions of Title 8 of the Code of Federal Regulations. Venue was ultimately changed to the Houston South Gessner Immigration Court.

## STATEMENT OF THE LAW

The Court exercises jurisdiction over an alien's removal proceedings once DHS properly files an NTA. *See* INA § 240(a)(1); 8 C.F.R. § 1003.14(a).

In general, Section 235(b)(1)(A) of the INA applies to arriving aliens and those aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. Individuals falling into this category are identified as inadmissible aliens and are subject to the expedited removal provisions found at INA § 235(b)(1)(A)(i). *See also*, 8 C.F.R. § 235.3(b). Individuals subject to this provision are also subject to mandatory detention. INA § 235(b)(1)(A)(iii)(IV). Under certain circumstances, the Attorney General may parole into the United States any alien applying for admission to the United States. INA § 212(d)(5)(A).

Section 236(a) of the INA addresses the apprehension and detention of aliens in removal proceedings. Detention under INA § 236(a) is discretionary, and immigration authorities are not required to detain an alien subject to removal unless the alien falls within one of the categories of aliens subject to mandatory detention as outlined in INA § 236(c). An alien arrested and detained under INA § 236(a) that is not subject to mandatory detention can either be detained pending removal proceedings, released on bond, or released on conditional parole. While detention under INA § 236(a) is generally discretionary, detention for inadmissible applicants under INA § 235(b) is mandatory. INA § 235(b)(1)(B)(iii)(III). The parole authority found under INA § 212(d)(5)(A) is the only legal means for release of inadmissible applicants for admission who are subject to expedited removal under INA § 235(b). *See*, Jennings v. Rodriguez, 138 S. Ct. 830, 844 (2018). *See also*, *Matter of M-S*, 27 I&N Dec 509 at 517 ("It suffices to find that section 236(a) provides an independent ground for detention that does not limit DHS's separate authority to detain aliens originally placed in expedited removal, who, after the credible-fear stage, 'shall be detained' either for further adjudication of their asylum claims or for removal.")

2

## ANALYSIS

Based on the record, the Respondent was initially apprehended at the border and charged with being an alien present in the United States who had not been admitted or paroled. He was therefore an "inadmissible applicant" subject to INA § 235(b). Under that section, inadmissible applicants "shall" be detained, and the Respondent in this case was in fact detained and placed into custody. Other than a parole under INA § 212(d)(5)(A), "there are no other circumstances under which aliens detained under § 1225(b) [INA § 235(b)] may be released." *Jennings*, 138 S. Ct. at 844. Although the Department's documentation relating to the Respondent's release from custody indicates that he was being released pursuant to INA § 236, because the Respondent was detained under INA § 235(b) he was ineligible for release under § 236, and therefore his release qualifies as parole under INA § 212(d)(5)(A).

While release from detention under INA § 236(a)(2)(B), conditional parole, does not equate to being "paroled into the United States" for purposes of establishing eligibility for adjustment of status,[1] conditional parole under that section only applies to those aliens who were detained and placed into custody under the authority of INA § 236(a). If an alien was detained under the authority of INA § 235(b), they would not be eligible for conditional parole under INA § 236(a)(2)(B). In the instant case, based on the record before the Court, the Respondent was detained and placed into custody under the authority of INA § 235(b), and therefore was not eligible for conditional parole under INA § 236(a)(2)(B). Consistent with the Supreme Court's determination in *Jennings* and applicable board decisions, and regardless of the fact that the Department utilized documentation indicating the Respondent was being released pursuant to § 236, the Respondent's release was instead consistent with parole into the United States IAW INA § 212(d)(5)(A).

As for that aspect of the Respondent's motion that requests this Court make a prima facie determination of eligibility for adjustment of status, the Court declines to consider that issue at this time. In general terms, to be eligible for adjustment of status, the Respondent must be eligible to receive an immigrant visa and admissible for permanent residence, and an immigrant visa must be immediately available at the time of filing. Furthermore, a grant of adjustment of status is discretionary and there are several grounds of inadmissibility. Such matters are best addressed in the context of an evidentiary hearing, as the Court is unable to make a proper determination on prima facie eligibility based on the materials contained in the record.

Accordingly, the following orders shall enter:

The Respondent's Motion for a determination of prima facie eligibility is **DENIED** in part and **GRANTED** in part. In this case, the Respondent's release from custody constitutes a parole IAW INA § 212(d)(5)(A).

**SO ORDERED** this 26th day of April, 2021, in Houston, Texas.

---

[1] *See*, Matter of Castillo-Padilla, 25 I & N Dec. 257 (2010)

3

Christopher Schumannm
Digitally signed by
Christopher Schumannm
Date: 2021.04.26 11:16:47
-05'00'

_____
Christopher M. Schumann
Immigration Judge

**APPEAL RIGHTS:** Both parties have the right to appeal the decision of the Immigration Judge in this case. Any appeal must be received by the Board of Immigration Appeals on or before thirty calendar days from the date of service of this decision.

_____

## CERTIFICATE OF SERVICE

THIS DOCUMENT SERVED BY:  MAIL (M) PERSONAL SERVICE (P)
TO: ( ) ALIEN   (m) ALIEN'S ATTORNEY (P) DHS
DATE:  4-29-21  BY COURT STAFF:  T Mason

4

Addend. 012a

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**SAN ANTONIO, TEXAS**

File #: A███████                                    Date:  November 17, 2022

In the Matter of:                              )
                                               )
███████████████████                            )       IN REMOVAL PROCEEDINGS
                                               )
Respondent.                                    )

CHARGE:          INA § 212(a)(6)(A)(i)—Presence without admission or parole

ON BEHALF OF RESPONDENT:                  ON BEHALF OF THE GOVERNMENT:
Mario A. Boisselier, Esq.                 Ricardo A. Cuellar, Assistant Chief Counsel
Boisselier Law Group PLLC                 United States Department of Homeland Security
8200 N. Mopac Expy, Suite 360             1035 Jackson Keller
Austin, Texas 78759                       San Antonio, Texas 78213

## INTERLOCUTORY DECISION OF THE IMMIGRATION JUDGE

### I.  Background and Procedural History

███████████████████ (Respondent) is a native and citizen of Cuba. Exhibit (Exh.) 1 (Notice to Appear) at 1; Exh. 2 (Application for Asylum and for Withholding of Removal (Form I-589)) at 3. She entered the United States on November 4, 2021. Exh. 1 at 1; Exh. 2 at 3. Respondent and the United States Department of Homeland Security (DHS) both report that she was apprehended by immigration officials. *See, e.g.*, Respondent's Brief in Support of Eligibility to Apply for Adjustment of Status Under the Cuban Adjustment Act (Respondent's Brief) at 4; DHS's Brief in Support of DHS's Position That Respondent Was Not Paroled Under INA § 212(d)(5) (DHS's Brief) at 2. A Notice to Appear (NTA) was issued on November 7, 2021; that NTA was later superseded by another NTA. *See* Exh. 1 at 1. Respondent reports in her brief, filed on August 18, 2022, that she "was released from custody on November 8, 2022." Respondent's Brief at 4. Aside from the fact that statements in a brief are not evidence, *see, e.g.*, *Matter of O-M-O-*, 28 I&N Dec. 191, 195 (BIA 2021) (citing *Matter of Rodriguez*, 27 I&N Dec. 762, 765–66 (BIA 2020), and *Matter of S-M-*, 22 I&N Dec. 49, 51 (BIA 1998)), that release date cannot be correct as it postdates the brief. Additionally, the superseding NTA was mailed to Respondent at an apartment address on January 24, 2022, *see* Exh. 1 at 1–2, and she was not detained at the time of her hearings on August 18, 2022, and November 3, 2022.

On January 24, 2022, DHS commenced removal proceedings against Respondent under the authority of the Immigration and Nationality Act (INA or Act) pursuant to the filing of an NTA

1

EOIR – 1 of 4



with the Immigration Court, charging her with removability under section 212(a)(6)(A)(i) of the Act. *See* Exh. 1; 8 C.F.R. § 1003.14(a).

On February 25, 2022, Respondent, through counsel, filed an Application for Asylum and for Withholding of Removal (Form I-589) with the Court. Exh. 2.

At her initial master hearing, on August 18, 2022, Respondent, through counsel, admitted the factual allegations and conceded the charge of removability in the NTA. *See also* Exh. 1. The Court sustained the charge of removability and designated Cuba as the country of removal. Respondent, through counsel, indicated that on November 4, 2022, Respondent would become eligible to apply for adjustment of status under the Cuban Adjustment Act (CAA). Respondent, through counsel, informed the Court that earlier on the day of that initial hearing, August 18, 2022, she had submitted a legal brief in support of her eligibility. *See also* Respondent's Brief. DHS took the position that Respondent has not been paroled and thus is not eligible. Respondent, through counsel, orally moved for the Court to find Respondent prima facie eligible to apply for adjustment of status under the CAA. On September 8, 2022, DHS filed its brief on the issue. *See* DHS's Brief. Oral argument on the issue was presented at a master calendar hearing on November 3, 2022.

For reasons set forth in this interlocutory decision, the Court finds that Respondent was paroled and thus is eligible to apply for adjustment of status under the CAA.

## II.  Law and Analysis

It is undisputed that Respondent is a native and citizen of Cuba who has been present in the United States for at least one year. *See, e.g.*, Exh. 1 at 1; Exh. 2 at 3. She was not admitted but argues that her release from DHS custody constitutes parole. DHS argues that she was not paroled.

As an inadmissible applicant for admission, Respondent was subject to mandatory detention until the conclusion of proceedings, under section 235(b) of the Act. *See, e.g.*, INA §§ 235(a)(1), 235(b)(1)(B)(iii)(IV), 235(b)(2); *Jennings v. Rodriguez*, 138 S. Ct. 830, 842, 844 (2018). The Court finds that she was detained under section 235(b) of the Act.

The Attorney General may parole a noncitizen detained under section 235(b), but "there are no *other* circumstances under which aliens detained under § 1225(b) [(i.e., INA § 235(b))] may be released." *Jennings*, 138 S. Ct. at 844. Because parole was the only lawful means for DHS to release Respondent from detention and because DHS *did* release her from detention, the Court finds that her release by DHS qualifies as a parole under section 212(d)(5)(A) of the Act.

DHS argues that "[t]he resolution of the question before the Court is not governed by *Jennings*" and that Respondent "seems to equate a snippet of *Jennings* to the holding of the case: '. . . there are no other circumstances under which aliens detained under [INA § 235(b)] may be released" . . . [aside from parole under [INA § 212(d)(5)]].'" DHS's Brief at 3–4. DHS further argues that none "[o]f the three questions the Supreme Court granted *certiorari* to decide in *Jennings* . . . had to do with the mechanics of placing someone into INA § 235 expedited removal proceedings; rather, they all had to do with whether mandatory bond hearings were required by statute after a

2



period of detention." *Id.* at 4. However, the Supreme Court's statement in *Jennings* that parole is the exclusive legal means to release a noncitizen detained under section 235(b) of the Act is part of the express reasoning relied on by the Supreme Court for its resolution of the questions in that case. *See Seminole Tribe of Fla. V. Fla.*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."). Specifically, the Supreme Court explained that bond hearings were not required because the provisions at issue mandate detention of noncitizens detained under section 235(b) of the Act until a certain point and authorize release prior to that point only through parole, not bond. *See Jennings*, 138 S. Ct. at 844. Even if the "snippet" were dicta (which it is not), the Supreme Court's reasoning is highly persuasive, and Supreme Court dicta is not something to be lightly cast aside. *See, e.g., Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) ("[W]e are generally bound by Supreme Court dicta, especially when it is 'recent and detailed.'").

DHS argues that the answer to the question whether Respondent was paroled is controlled by *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520 (BIA 2011). DHS's brief at 5. DHS argues that DHS has "discretion whether to apply expedited removal under INA § 235 or to initiate removal proceedings before an immigration judge under INA § 240" and that "*E-R-M & L-R- M-* therefore precludes the court from finding that all noncitizens must be placed into INA § 235 expedited removal proceedings." *Id.* The Court agrees that DHS has discretion in cases such as this as to whether to apply expedited removal under section 235 of the Act or to initiate removal proceedings under section 240 of the Act. However, DHS's discretion regarding the type of proceedings does not change the facts that Respondent was subject to mandatory detention under section 235(b) and that parole was the sole legal means available for releasing her prior to the conclusion of the chosen proceedings. *See, e.g.*, INA §§ 235(b)(1)(B)(iii)(IV), 235(b)(2)(A). DHS's choice to place Respondent into removal proceedings under section 240 of the Act at some point after releasing her does not change the nature of her detention or of her release.[1]

DHS argues that "[o]nly the Department has the sole discretionary authority under INA § 212(d)(5) to parole a noncitizen into the United States after careful consideration of various factors" and that parole "must be knowingly conferred." DHS's Brief at 5–6. The Court finds in this interlocutory decision that when DHS released Respondent, DHS paroled her. In making that finding, the Court is not infringing on DHS's discretionary authority (e.g., the Court is not ordering the release of Respondent under section 212(d)(5)(A) of the Act). Rather, the Court is applying the law to the facts to determine the correct legal classification for Respondent's release by DHS. In *Matter of O-*, the Board of Immigration Appeals similarly considered a case where the noncitizens argued they were paroled and DHS argued they were not paroled. 16 I&N Dec. 344 (BIA 1977). In that case, it was likewise determined "that the applicants were, in fact, paroled." *Id.* at 351. It is clear from *Matter of O-* that the correct characterization of the release was controlled by the law rather than by whether DHS clearly intended to grant parole or issued the appropriate parole paperwork. *See, e.g., id.* at 347–48. As in *Matter of O-*, DHS cannot provide any lawful authority justifying the release of Respondent other than DHS's parole

---

[1] DHS asserts that Respondent "entered the United States without inspection, was apprehended, placed into INA § 240 proceedings, and thereafter released on her own recognizance." DHS's Brief at 8. However, the evidence shows that on January 24, 2022, the date proceedings against her were commenced through the filing of an NTA with the Immigration Court, Respondent was *not* in detention. Rather, a copy of the NTA was mailed to her at an apartment address on that same date.

3

EOIR - 3 of 4



authority under section 212(d)(5) of the Act. DHS's contention that she was released on her own recognizance does not constitute such lawful authority, as a noncitizen detained under section 235(b) of the Act cannot be released on his or her own recognizance. *See, e.g.*, DHS's Brief at 8; *Jennings*, 138 S. Ct. at 844.

DHS also argues that a "harmonious reading of the applicable sections of the INA and Board precedent" leads to the conclusion that Respondent "was not paroled as a matter of law when released on his [sic] own recognizance by DHS." DHS's Brief at 8. DHS argues that "subparagraph (1)(A) of INA § 236(c), as well as the reference to INA § 212(a)(3)(B) in subparagraph (1)(D), would be superfluous if INA § 236 did not apply to inadmissible noncitizens." *Id.* Those subparagraphs in section 236(c) do not apply to Respondent's situation. The Supreme Court discussed the groups subject to detention under section 235(b) and section 236(c) of the Act in *Jennings* and indicated that sections 235(b)(1) and (b)(2) "unequivocally mandate that aliens falling within their scope 'shall' be detained." 138 S. Ct. at 837–38, 844. Respondent falls within the scope of the mandatory detention requirement under section 235(b).

Having concluded that Respondent was paroled under section 212(d)(5) of the Act, the Court finds that she is prima facie eligible to apply for adjustment of status under the CAA.

___11/21/2022___
Date Signed

CHARLES MCCULLOUGH
Digitally signed by CHARLES MCCULLOUGH
Date: 2022.11.21 12:28:12 -06'00'

Charles M. McCullough
Immigration Judge

**CERTIFICATE OF SERVICE**

THIS DOCUMENT WAS SERVED BY:
Electronic MAIL (m) PERSONAL SERVICE (P)
(E) TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer
[ ] ALIEN'S ATT/REP [ ] DHS
DATE: 11/21/22 BY: COURT STAFF ____
Attachments: [ ] EOIR 33 [ ] EOIR 28
[ ] Legal Services List [ ] Other



4

Addend. 016a

**NOTICE FOR CERTAIN NATIVES OR CITIZENS OF CUBA WHO ARE "ARRIVING ALIENS" AND WHO WERE DENIED ADJUSTMENT OF STATUS UNDER THE CUBAN ADJUSTMENT ACT BASED SOLELY ON A DETERMINATION THAT THEY HAD NOT MET THEIR BURDEN OF ESTABLISHING THAT THEY HAD BEEN ADMITTED OR PAROLED**

**February 23, 2022**

If you are a native or citizen of Cuba who:

(1) meets the definition of an "arriving alien" under 8 C.F.R. 1.2;[1] and

(2) was, prior to the entry of a removal order under Section 240 of the Immigration and Nationality Act (INA), initially released by the Department of Homeland Security (DHS) from DHS custody into the United States under INA 236 (for example, with a Form I-220A, Order of Release on Recognizance, or on a DHS Bond under INA 236)[2] between January 12, 2017 and November 17, 2021; and

(3) has not departed the United States since this initial release by DHS from DHS custody; and

(4) applied for adjustment of status under the Cuban Adjustment Act (CAA) by filing a Form I-485, Application to Register Permanent Residence or Adjust Status (Form I-485) with USCIS; and

(5) USCIS denied your Form I-485 based *solely* on a determination that you did not meet your burden of establishing that you had been admitted or paroled as required for adjustment of status under the CAA.

You may:

- File a new Form I-485 with USCIS, with fee, or with a Form I-912, Request for a Fee Waiver (Form I-912), if eligible; or
- File a timely Form I-290B, Notice of Appeal or Motion (Form I-290B) with USCIS, with fee, or with a Form I-912, if eligible.  If a timely Form I-290B is filed and the above criteria are met, USCIS will reopen and re-adjudicate the previously denied Form I-485.

Additionally, if the deadline for filing a timely Form I-290B has passed, you may, for a period of one year from the date of this notice, file an untimely Form I-290B, with fee, or with a Form I-912, if eligible.  If an untimely Form I-290B is

---

[1] *See* 8 C.F.R. 1.2, defining an "arriving alien" as "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport."

[2] This does not include any release pursuant to an order by an Immigration Judge under INA 236.

filed within one year from the date of this notice and the above criteria are met, USCIS will reopen and re-adjudicate the previously denied Form I-485.  An untimely Form I-290B should be annotated "UNTIMELY MTR – DENIED CAA I-485 FOR NO ADMISSION OR PAROLE."

If you meet the above criteria you should attach a copy of this notice to the top of any new Form I-485 or Form I-290B, clearly indicate that you meet the qualifying criteria, and include evidence that you meet the qualifying criteria with the filing.   Additionally, if subsequent to the USCIS denial of the Form I-485 DHS has since issued you a parole under INA 212(d)(5), you should also include a copy of this parole (for example, a Form I-94 or other document issued to you by DHS indicating that you have been paroled under 212(d)(5)) with the new filing.



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 120/17-P

Office of the General Counsel

*425 I Street NW*
*Washington, DC 20536*

**AUG 2 1 1998**

MEMORANDUM FOR EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND
                      PLANNING
                      EXECUTIVE ASSOCIATE COMMISSIONER FOR FIELD
                      OPERATIONS
                      ALL REGIONAL COUNSELS
                      ALL DISTRICT COUNSELS
                      ALL SECTOR COUNSELS

FROM.        Paul W. Virtue
              General Counsel

SUBJECT:    <u>Authority to parole applicants for admission who are not also arriving aliens</u>

**I.    QUESTION**

    This memorandum addresses the following issue, which has arisen recently in several
cases in the Miami district:

    Does the Service have authority to parole an applicant for admission who is not also an
    "arriving alien," as defined by 8 C.F.R. § 1.1(q)?

**II.    SUMMARY CONCLUSION**

    Aliens who were once deportable for having entered without inspection are now
considered in law to be applicants for admission. *Id.* § 235(a)(1)(A), 8 U.S.C. §
1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i).
As aliens applying for admission, they are within the scope of the statutory parole
authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The Service has authority,
therefore, to parole an applicant for admission who is not also an "arriving alien," as
defined by 8 C.F.R. § 1.1(q). It remains the case, however, that parole is an act of
discretion, not an entitlement. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

Headquarters, Programs
Headquarters, Field Operations
All Regional, District and Sector Counsels
Page 2

## III. ANALYSIS

This question over the extent of the parole authority arises because of two significant amendments to the immigration laws enacted in 1996. INA § 212(a)(6)(A)(i) and 235, 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225, *as amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Division C, §§ 301(c) and 302(a), 110 Stat. 3009-546, 3009-578, 3009-579. First, aliens who are present in the United States without having been admitted or paroled are now deemed to be applicants for admission. *Id.* § 235(a)(1), 8 U.S.C. § 1225(a)(1), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Before this amendment, of course, aliens who had entered the United States without having been inspected were amenable to deportation, rather than to exclusion, proceedings. 8 U.S.C. § 1251(a)(1)(B) (1994). Second, Congress has now provided for an expedited removal proceeding, conducted by a Service officer, rather than an immigration judge. INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A). The Service may invoke this procedure if an alien "who is arriving in the United States" is inadmissible because the alien does not have the required passport or visa, or because the alien obtained a passport or visa by fraud or material misrepresentation. The Service has defined by regulation which aliens are to be considered "arriving aliens." 8 C.F.R. § 1.1(q), *as amended*, 63 *Fed. Reg.* 19,382, 19,383 (1998). The consequence of these two amendments is that there are now two categories of applicants for admission: those who are arriving aliens, and those who are not. *See, e.g.,* 62 *Fed. Reg.* 444, 444-5 (1997).[1]

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), gives the Attorney General authority to parole from custody "an alien applying for admission" who would otherwise be held in custody until the Attorney General had resolved whether to admit or remove the alien. In order to exercise this authority, the Attorney General must find, on a case-by-case basis, either that "urgent humanitarian reasons" justify the parole, or that paroling the alien will yield a "significant public benefit." *Id.* Even if the Attorney General finds that either factor exists, parole remains a matter of discretion. In fact, there is no judicial review of the exercise of this discretion. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). The Attorney General has delegated this parole authority to the Service. 8 C.F.R. § 2.1.

As we have already noted, aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

The question whether there is authority to parole these aliens arises not from the statute itself, but from an implementing regulation. 8 C.F.R. § 212.5. Section 212.5(a) specifies

---

[1] The Attorney General has the authority to invoke the expedited removal proceeding against an alien who is inadmissible because he or she is present in the United States without admission or parole, if the alien has been physically present for less than 2 years. INA § 235(b)(1)(A)(iii), 8 U.S.C. § 1225(b)(1)(A)(iii). To date, neither the Attorney General nor the Commissioner has chosen to exercise this authority. 8 C.F.R. § 235.3(b)(1)(ii); *cf.* 62 *Fed. Reg.* 10,312, 10,313 (1996).

Headquarters, Programs
Headquarters, Field Operations
All Regional, District and Sector Counsels
Page 5

circumstances in which it is, generally, appropriate to parole aliens "detained in accordance with § 235.3(b) or (c)." *Id.* Sections 235.3(b) and (c), in turn, refer not to the universal set of all applicants for admission, but to the subset of arriving aliens. 8 C.F.R. § 235.3(b) (arriving aliens subject to expedited removal) and (c) (arriving aliens subject to § 240 removal proceedings).[2] Section 212.5(b) refers to "all other arriving aliens." 8 C.F.R. § 212.5(b). Neither § 212.5(a) nor § 212.5(b) addresses the parole of applicants for admission who are not also "arriving aliens." Neither provision, therefore, purports to prohibit the Service from exercising the Attorney General's broad statutory parole authority in the case of an applicant for admission who is not an "arriving alien."

For two reasons, we conclude that § 212.5 cannot correctly be read as exhausting the Service's parole authority. First, nothing in § 212.5 expressly purports to forbid the parole of applicants for admission who are not also arriving aliens. Section 212.5 simply says nothing at all about that issue. Second, as we have noted, the Attorney General has delegated to the Commissioner the fullness of the Attorney General's statutory authority under the INA, except for matters delegated to the Executive Office for Immigration Review. 8 C.F.R. § 2.1. The Service, therefore, may parole anyone whom the Attorney General may parole.

We are mindful of the protracted litigation that resulted in the Supreme Court's judgment in *Jean v. Nelson,* 472 U.S. 846 (1985). But our reading of § 212.5 is an expansive, not a restrictive, application of the parole authority. A rule that said, in effect, that the parole authority is as broad as the statute says it is, would clearly be an interpretative rule. There is no obligation to publish interpretative rules in accordance with the APA. 5 U.S.C. § 553(b)(A) and (d)(2).

We are also aware of the argument that our conclusion, in effect, gives an inadmissible applicant for admission who is not an arriving alien "two bites at the apple" in seeking release from custody. If the Service denies a parole request, the alien may seek release from the immigration judge. 8 C.F.R. § 236.1(d)(1). The restrictions on the immigration judge's authority would not apply, since the alien is not an "arriving alien." *Cf.* 8 C.F.R. §§ 3.19(h)(1)(B) and (2)(I)(B) and 236.1(c)(11), *as amended,* 63 *Fed. Reg.* 27,441, 27,448-49 (1998). But release under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. *See* INA §§ 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B) and 1182(d)(5)(A); *Leng May Ma v. Barber,* 357 U.S. 185, 189 (1958); *Matter of L- Y- Y-,* 9 I & N Dec. 70, 71 (BIA 1960). In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms. We realize that the traditional rule has been that neither the Board nor an immigration judge had authority to exercise the parole authority. *Matter of Concetro,* 14 I & N Dec. 278, 281 (BIA 1973). But the Board based this rule on the fact that the Attorney General had established by regulation that only the Service could exercise the parole authority on the Attorney General's behalf. *Id.* The statute itself does

_____

[2] Section 235.3(b) also refers to applicants for admission who are not arriving aliens, but who are inadmissible, and subject to expedited removal, because they are present without admission or parole, but have been present for less than two years. 8 C.F.R. § 235.3(b)(1)(ii). No aliens currently belong to this subset, since neither the Attorney General nor the Commissioner has provided for the use of expedited removal proceedings for these aliens.

Headquarters, Programs
Headquarters, Field Operations
All Regional, District and Sector Counsels
Page 4

not forbid delegation of the parole authority to officials who are not Service officers. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

The Service may consider it imprudent, as a matter of policy, to permit an immigration judge to adjudicate requests for release made by applicants for admission who are not arriving aliens. The way to achieve this policy, however, is to ask the Attorney General to amend 8 C.F.R. §§ 3.19 and 236.1. Taking the position that the Service has no authority to parole in these cases does not amend the regulations that appear to permit an immigration judge to adjudicate a request for release, if the applicant for admission is not an arriving alien.

We conclude that the Service may, in the exercise of discretion, parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 2.1. Aliens present in the United States without having been admitted or paroled are applicants for admission. *Id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A). To say that these aliens are *eligible* for parole, of course, does not mean that they are *entitled* to parole. Whether to parole any particular alien remains a matter entrusted to the exercise of discretion. *Id.* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The exercise of this discretion is not subject to judicial review. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 120/17-P

Office of the Commissioner

*425 I Street NW*
*Washington, DC 20536*

APR 19 1999

MEMORANDUM FOR ALL REGIONAL DIRECTORS
                              ALL DISTRICT DIRECTORS
                              ALL CHIEF PATROL AGENTS
                              ALL OFFICERS-IN-CHARGE

FROM:        Doris Meissner
                  Commissioner

SUBJECT:    Eligibility for Permanent Residence Under the Cuban Adjustment Act
                  Despite having Arrived at a Place Other than a Designated Port-of-Entry

    This memorandum sets forth the Immigration and Naturalization Service (Service) policy concerning the effect of an alien's having arrived in the United States at a place other than a designated port of entry on the alien's eligibility for adjustment of status under the Cuban Adjustment Act of 1966 (CAA), 8 U.S.C. § 1255, note. This issue arises because many CAA applicants, in fact, arrive in the United States in an irregular manner. Section 1 of the CAA, however, requires that they must be "admissible." CAA § 1, 8 U.S.C. § 1255, note. If the inadmissibility ground that is based on an alien's having arrived at a place other than a port-of-entry, the Immigration and Nationality Act (INA) § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), applies to CAA applicants, then many aliens who were formerly eligible for adjustment of status will no longer be eligible.

    The policy of the Service is that the inadmissibility ground that is based on an alien's having arrived at a place other than a port-of-entry *does not* apply to CAA applicants. All Service officers adjudicating CAA applications will do so in accordance with this policy. So long as the applicant meets all other CAA eligibility requirements, it is contrary to this policy to find the alien ineligible for CAA adjustment on the basis of the alien's having arrived in the United States at a place other than a designated port-of-entry.

Memorandum for All Regional Directors                                    Page 2
Subject: Eligibility for Permanent Residence Under the Cuban Adjustment Act
         Despite having Arrived at a Place Other than a Designated Port-of-Entry

The Service will incorporate this policy into Service regulations as promptly as possible. The policy is, however, effective immediately. Service officers are not to await the publication of the intended rule before deciding CAA applications in accordance with this policy.

This policy is based on the rationale of the decision in *Matter of Mesa*, 12 I & N Dec. 432 (INS 1967). In *Matter of Mesa*, the Service held that the admissibility requirement of § 1 of the CAA must be construed generously, in order to give full effect to the purpose of the CAA. The decision noted that Congress was fully aware that many, and perhaps most, Cuban nationals were dependent on some forms of public assistance. Yet the purpose of the CAA would have been defeated, if the public charge ground of inadmissibility applied to these applicants. The Service concluded, therefore, that the public charge ground does not apply to CAA applicants. *Id.*

I have concluded that the same reasoning applies to inadmissibility for having arrived at a place other than a designated port-of-entry. Aliens arriving in this manner have been eligible for CAA adjustment for many years. Congress recently reaffirmed the availability of this adjustment provision, by enacting that the CAA is to continue in force until there is a democratic government in Cuba. Illegal Immigration Reform and Immigrant Responsibility Act of 1966 (IIRIRA), Pub. L. No. 104-208, Division C, § 606(a), 110 Stat. 3009-546, 3009-695. Section 212(a)(6)(A)(i) of the INA was designed to complement the new legal doctrine, enacted as part of IIRIRA, under which aliens who come into the United States without inspection are inadmissible, rather than deportable, aliens. *Compare* INA §§ 212(a)(6)(A)(i) and 235(a)(1), 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225(a)(1) *with* 8 U.S.C. § 1241(a)(1)(B) (1994). Nothing in the legislative history of these changes suggests that Congress also intended to make aliens who arrive in the United States away from ports-of-entry ineligible for CAA adjustment.

This policy does not relieve the applicant of the obligation to meet all other eligibility requirements. In particular, CAA adjustment is available only to applicants who have been "inspected and admitted or paroled into the United States." CAA § 1, 8 U.S.C. § 1255, note. The authority to parole an applicant for admission, of course, is set forth in § 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), with § 236 of the INA, 8 U.S.C. § 1226, providing additional authority concerning the conditions the Service may place on the alien's parole. An alien who is present without inspection, therefore, would not be eligible for CAA adjustment unless the alien first surrendered himself or herself into Service custody and the Service released the alien from custody pending a final determination of his or her admissibility.

Service officers will not deny parole to an alien whose parole would be consistent with Service parole regulations and policy, solely in order to preclude CAA eligibility. Nor does this policy require the parole of any alien whose parole would not be consistent with Service parole regulations and policy, merely because paroling the alien would open the path to CAA adjustment. In the absence of a disqualifying criminal record or other factors that would bar CAA adjustment, however, the on-going difficulty in actually removing aliens to Cuba and the availability of CAA adjustment should ordinarily weigh heavily in favor of a grant of parole.

Memorandum for All Regional Directors                              Page 3
Subject: Eligibility for Permanent Residence Under the Cuban Adjustment Act
         Despite having Arrived at a Place Other than a Designated Port-of-Entry

The Service may properly consider the avoidance of detention costs with respect to an alien whose actual removal is unlikely as a factor in determining, as a matter of discretion, that parole would yield a "significant public benefit." INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). In similar fashion, the Service may properly consider the availability of CAA adjustment as a factor in determining, as a matter of discretion, that an "urgent humanitarian reason" justifies a grant of parole. *Id.* If the Service paroles the alien, he or she will be eligible to apply for employment authorization. 8 C.F.R. § 274a.12(c)(12).

The Service is also aware that, because of the CAA eligibility requirements, the parole will be for at least 1-year, so that the alien will be a "qualified alien" for purposes of eligibility for Federal means-tested public benefits. 8 U.S.C. § 1641(b)(4). The alien will also be a "Cuban-Haitian entrant" for purposes of the Refugee Education Assistance Act of 1980, as amended. 8 C.F.R. § 212.5(g). Service officers will not consider these two factors as "adverse factors" in determining whether to grant or deny parole.

Finally, the Office of the General Counsel has advised the Service concerning the relationship between parole under § 212(d)(5) and "release" under § 236. Memorandum from Paul W. Virtue to Executive Associate Commissioners for Policy and Planning and for Field Operations, and to Regional, District and Sector Counsels (August 21, 1998). In a case involving an applicant for admission, the General Counsel concluded that

> . . . release under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. (Citations omitted.) In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms.

*Id.* at 3. For this reason, if the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled. This conclusion applies even if the Service officer who authorized the release thought there was a legal distinction between paroling an applicant for admission and releasing an applicant for admission under § 236. When the Service releases from custody an alien who is an applicant for admission because he or she is present without inspection, the Form I-94 should bear that standard annotation that shows that the alien has been paroled under § 212(d)(5)(A).[1]

---

[1] It may be the case that the Service has released an alien who is an applicant for admission because he or she is present without inspection, without providing the alien with a parole Form I-94. In this case, the Service will issue a parole Form I-94 upon the alien's asking for one, and satisfying the Service that the alien is the alien who was released. The Service will then update the Service records concerning the alien to reflect the fact that the alien has been paroled.

*Exceptions to consider*

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Office of the General Counsel*
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

September 28, 2007

Memorandum For:  Chief Counsel, U.S. Customs and Border Protection
Principal Legal Advisor, U.S. Immigration and Customs Enforcement
Chief Counsel, U.S. Citizenship and Immigration Services
Judge Advocate General, U.S. Coast Guard

From:  Gus P. Coldebella **(b) (6)**

Subject:  Clarification of the Relation Between Release Under Section 236 and
Parole Under Section 212(d)(5) of the Immigration and Nationality Act

I.  Question Presented

Is any release of an applicant for admission from immigration custody, including
"conditional parole" under section 236(a)(2) of the Immigration and Nationality Act (INA), a
"parole" of the alien into the United States for purposes of section 212(d)(5)(A) of the INA?

II.  Summary Conclusion

Parole under section 212(d)(5)(A) of the INA is a discretionary act exercised on a case-
by-base basis that is expressly limited to aliens applying for admission to the United States and
in which circumstances present "urgent humanitarian reasons" for the parole or the parole would
serve a "significant public benefit." Release under section 236(a)(2) of the INA, including
"conditional parole," is a separate and distinct procedure applicable to an alien who has been
arrested and detained pending a decision on whether he or she is to be removed from the United
States. Neither statute nor regulations provide that a release under section 236(a)(2) is to be
deemed a parole under section 212(d)(5)(A). Because some may read certain language in a 1998
opinion of the General Counsel of the former Immigration and Naturalization Service (INS),
*Authority to Parole Applicants for Admission Who are Not Also Arriving Aliens*, No. 98-10
(Aug. 21, 1998) (*1998 Parole Opinion*), as inconsistent with that conclusion, paragraph seven of
section III of the *1998 Parole Opinion* (Paragraph Seven) is superseded by the following

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

analysis.[1]  Paragraph Seven is to be given no weight or effect by the Department of Homeland Security ("the Department" or "DHS") and its component agencies.[2]

III.    Analysis

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, amended section 235(a)(1) of the INA to provide that an alien present in the United States who has not been admitted shall be deemed an applicant for admission.  The amendment thus expanded the group of aliens deemed applicants for admission to include not only aliens arriving at the ports-of-entry, *see* 8 C.F.R. §§ 1.1(q) (defining "arriving alien"), 1001.1(q) (same), but also aliens present in the United States without inspection or admission.  In 1998, the INS General Counsel considered whether applicants for admission other than arriving aliens were eligible for parole into the United States under INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).  The INS General Counsel concluded in the *1998 Parole Opinion* that such aliens were eligible for parole.  The Department concurs with this assessment.

In expounding on his reasoning, however, the INS General Counsel made the following statement:

> [R]elease under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody [from parole under section 212(d)(5)(A)]. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole . . . . In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms.

*1998 Parole Opinion* at § III, ¶ 7.  Recent immigration cases have focused attention on the meaning and applicability of this language.  Applicants for admission have cited this language as

---

[1]    The analysis set forth herein also supersedes any prior opinions relying on Paragraph Seven, but only to the extent that the opinions rely on the superseded language.

[2]    In addition to the *1998 Parole Opinion* and opinions implicated by reference in footnote 1, *supra*, the General Counsel of the former Immigration and Naturalization Service (INS) issued other legal opinions and advisory memoranda to advise the INS. These opinions and memoranda did not create any individual rights of action against INS under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, or other laws, nor do they create any such rights against DHS. Furthermore, because DHS is a newly-created department charged with, among other things, administering federal immigration law, these former INS opinions and memoranda do not bind the Office of the General Counsel of DHS from providing alternative guidance as it deems appropriate.

2

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

support for the position that merely by being released from custody on "conditional parole"[3] pursuant to section 236(a)(2)(B) of the INA, 8 U.S.C. § 1226(a)(2)(B), the applicant thereby has been paroled under section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A). *See, e.g., Ortega-Cervantes v. Gonzales,* --- F.3d ---, 2007 WL 2472487 (9th Cir. Sept. 4, 2007) (rejecting argument that aliens granted conditional parole under INA § 236 are "paroled into the United States" within the meaning of INA § 245(a)).

To date, the Ninth Circuit is the only court to have opined on this question. Although the court rejected the argument that release under INA § 236(a)(2)(B) constitutes "parole" for purposes of adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a), *see Ortega-Cervantes,* 2007 WL 2472487 at *1, *5, cases in which aliens rely on the *1998 Parole Opinion* in support of the position rejected in *Ortega-Cervantes* remain pending under the jurisdiction of other circuit courts of appeal.[4] To ensure nationwide uniformity by Department personnel consistent with the Ninth Circuit's holding in *Ortega-Cervantes,* and because the interpretation of the *1998 Parole*

---

[3]   Section 236(a)(2) of the Act provides that an alien in removal proceedings may be released either on bond or "conditional parole." The origin of the term "conditional parole" can be traced back to at least 1952, when it was adopted in former INA § 242, the predecessor to INA § 236. "Conditional parole" referred to the release of a deportable alien from INS custody without bail. *See Rubenstein v. Brownell,* 206 F.2d 449, 455 (D.C. Cir. 1953) ("Section 242(a) authorizes the Attorney General to keep an alien in custody, release him on bond. or release him on conditional parole."). Similarly. section 23(a) of the Internal Security Act of 1950 had provided for the release from INS custody without bond of a deportable alien and termed it "conditional parole." *Lee Ah Youw v. Shaughnessy.* 102 F. Supp. 799, 800-01 (S.D.N.Y. 1952). Thus, under former INA § 242, a deportable alien could be released on "conditional parole" pending a final determination on deportability.

The 1952 Act also included section 212(d)(5). providing for the discretionary parole of excludable aliens. The term "parole" referred to a procedure to allow excludable aliens into the United States and which INS had utilized for many years prior to the codification of the term in INA § 212(d)(5) in 1952. *See Matter of R-,* 3 I&N Dec. 45, 46 (BIA 1947) ("Parole is an administrative device of long standing."). Prior to the 1952 Act, the enlargement of inadmissible aliens into the United States on parole had been fashioned out of necessity and without statutory sanction. *Matter of Conceiro,* 14 I&N Dec. 278, 279-80 (BIA), *aff'd, Conceiro v. Marks,* 360 F. Supp. 454 (S.D.N.Y. 1973). Under the 1952 regime, deportable aliens were not eligible for section 212 parole. *See Matter of K-H-C-,* 6 I&N Dec. 295, 298 (BIA 1954) ("The authority to continue or detain aliens in, or release them from custody, provided by [Section 242 of the INA] relates solely to an alien apprehended in deportation proceedings. . . . Since this authority relates solely to aliens apprehended in deportation proceedings, it has no application to an alien detained in an exclusion proceeding. Provision for the release of an excluded alien is found in section 212(d)(5)."). Therefore, while lexically similar, the terms "conditional parole" and "parole" referred to two wholly distinct concepts applicable to separate classes of aliens. Although IIRIRA expanded the class of aliens eligible for parole under section 212(d)(5), it did not eliminate the distinction between "conditional parole" under section 236 and parole under section 212.

[4]   *See, e.g., Francisco-Lorenzo v. Gonzales,* No. 06-0768-AG (2d Cir. petition filed Feb. 17. 2006) (considering petition for review of decision where the Board of Immigration Appeals (BIA) rejected the argument that "conditional parole" under INA § 236(a)(2) is to be equated with parole under INA § 212(d)(5)(A) and declined to follow *1998 Parole Opinion* to the extent it reasoned otherwise); *Espino Del Angel v. Gonzales.* No. 06-2832-AG (2d Cir. petition filed June 13, 2006) (same). Pursuant to joint stipulations, the petitions for review in *Francisco-Lorenzo* and *Espino Del Angel* were withdrawn. The cases are again pending before the Immigration Court for determination as to whether the petitioners were paroled into the United States.

3

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Opinion* forwarded by certain litigants is directly contrary to the language and structure of the INA, Paragraph Seven hereby is superseded by the analysis set forth in this memorandum.[5]

Parole under section 212(d)(5)(A) of the INA and release, including "conditional parole," under section 236 of the INA are separate and distinct procedures. *Ortega-Cervantes*, 2007 WL 2472487 at *7 ("Even after IIRIRA, the parole provisions of § 1182(d)(5)(A) and § 1226(a) continue to serve distinct purposes."). Parole under section 212(d)(5)(A) is a discretionary act exercised by DHS on a case-by-case basis and restricted to circumstances where urgent humanitarian reasons justify the parole or where a significant public benefit will result from the parole. By contrast, a release under section 236 may be justified by factors that would not be adequate for parole under section 212(d)(5)(A). *See, e.g., Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) ("An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations."). For example, a release under section 236 could be predicated on no more than a determination that the alien does not present a danger to persons or property, is not a threat to national security, and does not pose a flight risk. *See id.; Matter of Adeniji*, 22 I&N Dec. 1102, 1111-13 (BIA 1999). A release under section 236 need not be for humanitarian reasons or for a significant public benefit. Therefore, to hold that any release under section 236 is a parole under section 212(d)(5)(A) would be contrary to the statutory framework restricting parole under section 212(d)(5)(A) to specified circumstances. Moreover, automatically deeming a release under section 236 a parole under section 212(d)(5)(A) would violate the explicit statutory mandate that a parole under section 212(d)(5)(A) is permitted only after a case-by-case assessment based on the section 212(d)(5) criteria.[6] *See Ortega-Cervantes*, 2007 WL 2472487 at *8.

Equating a release under section 236 with parole under section 212(d)(5)(A) also would create a conflict with the regulations implementing the INA. Although the Executive Office for Immigration Review (EOIR), along with DHS, has authority under section 236 to make custody determinations, EOIR does not have authority to grant a section 212(d)(5)(A) parole. It was well-settled law at the time of IIRIRA's enactment, and at the time of the *1998 Parole Opinion*, that the parole authority under section 212(d)(5) of the INA had been exclusively delegated to the INS by the Attorney General since 1952, and that EOIR both lacked parole authority and would be ill-equipped to exercise parole authority even if it were available. *See Matter of United*

---

[5]    The Department's conclusion that release from custody under section 236(a)(2) is not deemed a parole under section 212(d)(5)(A) is consistent with the cases on which the INS General Counsel relied in Paragraph Seven of the *1998 Parole Opinion*. The cited cases address a separate issue regarding the legal status of aliens who have been paroled, and not whether all releases from custody amount to a parole. *See Leng May Ma v. Barber*, 357 U.S. 185 (1958) (considering whether paroled alien was eligible for relief under provision of the INA applicable to aliens "within the United States"); *Matter of L-Y-Y-*, 9 I&N Dec. 70 (BIA 1960) (considering whether exclusion proceedings may be converted to deportation proceedings following termination of alien's parole).

[6]    Significantly, only aliens "applying for admission" are eligible for parole under INA § 212(d)(5)(A), while release under INA § 236 is applicable to all aliens who have been arrested and detained pending a decision on whether the alien is to be removed from the United States.

4

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Airlines Flight UA802*, 22 I&N Dec. 777. 782 (BIA 1999) (noting that "the district director [of the INS] has exclusive jurisdiction to parole an alien into the United States"); *Matter of Singh*, 21 I&N Dec. 427, 434 (BIA 1996) (stating that neither the immigration judge nor the BIA has jurisdiction to exercise parole power): *Matter of Conceiro*, 14 I&N Dec. 278. 281-82 (BIA) (stating that BIA is "ill-equipped to make the inquiries and to conduct the investigations needed to make the summary decisions relating to the parole of recently arrived aliens"), *aff'd, Conceiro v. Marks*, 360 F. Supp. 454 (S.D.N.Y. 1973); 8 C.F.R. §§ 212.5(a) (listing those who can invoke parole authority under section 212(d)(5)(A) of the Act). 1212.5(a) (recognizing that granting of parole is done "by the Department of Homeland Security" and referencing 8 C.F.R. § 212.5). As an authority delegated exclusively to the INS. the parole authority was transferred to DHS by the Homeland Security Act. *See* 6 U.S.C. §§ 251–298. The Department has retained the parole authority in its regulations as an authority to be exercised only by DHS: therefore, that authority is not one that may be exercised by EOIR under section 236(a)(2) or any other provision of the INA. *See* 8 C.F.R. § 212.5(a); *cf.* 8 C.F.R. §§ 1236.1 (EOIR regulations setting forth release procedures under INA section 236). 1240.1 (listing authority of EOIR to determine applications under specified sections of the INA. and excluding section 212(d)(5)): *Matter of D-J-*, 23 I&N Dec. 572 (A.G. 2003) (considering EOIR release solely in terms of INA § 236 authority and standards).

Furthermore. equating release under section 236 with parole under section 212(d)(5)(A) would create tension with the statutory scheme as implemented by DHS consistent with the intent of Congress. For example. an alien who is arrested for being present in the United States without inspection and who is subsequently released under section 236 pending the outcome of removal proceedings. may. under such an interpretation. become eligible by virtue of the "parole" for certain benefits that would not otherwise be available—including ceasing to accrue unlawful presence time, *see* INA § 212(a)(9)(B)(ii). 8 U.S.C. § 1182(a)(9)(B)(ii); adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a), *see Ortega-Cervantes*. 2007 WL 2472487 at *8 ("Given that § 1255(i) permits unlawful entrants to adjust their status only under certain specified conditions. it would be odd to read § 1255(a) to authorize unlawful entrants who do not meet those conditions to seek adjustment of status whenever they are conditionally paroled pursuant to § 1226(a)."); and a discretionary grant of work authorization, *compare* INA § 236(a)(3), 8 U.S.C. § 1226(a)(3) (prohibiting work authorization for aliens released under section 236 unless otherwise eligible), *with* 8 C.F.R. § 274a.12(c)(11) (authorizing grants of employment authorization to aliens paroled under INA § 212). Such an expansion of benefits is contrary to the overall structure of IIRIRA. which was designed to reduce, not increase. the opportunities available to aliens present without inspection. Likewise. equating section 236 release with parole would drastically expand the frequency with which "parole" is granted. contrary to the purpose of section 602 of IIRIRA.[7] *See Ortega-Cervantes*, 2007 WL 2472487 at *8 ("Congress responded in IIRIRA by narrowing the circumstances in which aliens could

---

[7]   IIRIRA § 602(a) amended INA § 212(d)(5)(A) by striking the phrase "for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," captioned under the title "Limitation on Use of Parole."

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
## DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF THE OFFICE OF THE GENERAL COUNSEL

qualify for 'parole into the United States' under § 1182(d)(5)(A) and thus become eligible for adjustment of status.").

### IV.   Conclusion

A release from custody of an applicant for admission under section 236(a)(2) of the INA without resolution of his or her admissibility is not a parole under section 212(d)(5)(A). Although sections 212(d)(5)(A) and 236(a)(2) both provide applicants for admission a means of securing temporary release from the physical custody of immigration officials. these provisions are separate and distinct. and the legal status of an applicant released under section 236 is not identical to that of an applicant paroled under section 212(d)(5)(A). Equating section 236 release with section 212(d)(5) parole is contrary to the language. history. and policy of the INA and related regulations. Due to the possibility that language in the *1998 Parole Opinion* could be read as suggesting otherwise. that language hereby is superseded.[8]

---

[8]   By issuing this superseding memorandum, DHS neither concedes nor intends to suggest that the interpretation forwarded by the applicants in the cases cited above is a correct reading of the *1998 Parole Opinion*. The language of Paragraph Seven is at best ambiguous, and the remainder of the opinion correctly reaffirms that parole under section 212(d)(5)(A) is restricted to situations where a case-by-case assessment determines certain circumstances to be present justifying parole of the alien. *See, e.g., 1998 Parole Opinion* at § 3, ¶ 2 ("[T]he Attorney General must find, on a case-by-case basis, either that 'urgent humanitarian reasons' justify the parole, or that paroling the alien will yield a 'significant public benefit.'"); *id.* at § 3. ¶ 9 ("[T]he Service may, in the exercise of discretion. parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit."). In fact, the Ninth Circuit explicitly rejected a broad reading of the *1998 Parole Opinion* suggested by the petitioner in that case. *See Ortega-Cervantes*, 2007 WI. 2472487 at *7 ("[T]he [*1998 Parole Opinion*] does not further state that every conditional parole under § 1226(a) necessarily constitutes a 'parole into the United States' within the meaning of § 1255(a).").

FOR OFFICIAL USE ONLY
### PRIVILEGED ATTORNEY CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), excluding parts exempted by Fed. R. App. P. 32(f), in that it contains no more than 6,500 words, to wit: **6,493** words.

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) in that it was prepared in a proportionally spaced typeface using Microsoft Word 2016 in NewCenturySchlbk LT Std font size 14.

<u>**s/ Mark Andrew Prada**</u>
Prada Urizar Dominguez, PLLC

June 12, 2023                    *Counsel for Amici Curiae*

## Certificate of Service

I certify that, on June 12, 2023, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.   I further certify that all participants in the case are registered CM/ECF users and that service will therefore be accomplished through the appellate CM/ECF system.

<u>s/ Mark Andrew Prada</u>
Prada Urizar Dominguez, PLLC

June 12, 2023                    *Counsel for Amici Curiae*