**Nos. 23-11528, 23-11644**

___

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

## APPENDIX TO APPELLANTS/CROSS-APPELLEES' PRINCIPAL BRIEF

_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
  *Trial Attorneys*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044

## TABLE OF CONTENTS

<u>Document</u>    <u>Appendix ("A") Pages(s)</u>

1. "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations," July 18, 2022 — 1-4

2. "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document," May 10, 2021 — 5-11

3. No. 23-cv-9962, Preliminary Injunction Order — 12-21

4. No. 21-cv-1066, Complaint for Declaratory and Injunctive Relief — 22-44

5. No. 21-cv-1066, Amended Complaint — 45-80

6. No. 21-cv-1066, Order Denying Motion to Supplement Administrative Record — 81-85

7. No. 21-cv-1066, Second Amended Complaint for Declaratory and Injunctive Relief — 86-118

8. No. 21-cv-1066, Joint Pretrial Stipulation — 119-149

9. No. 21-cv-1066, Transcript Trial Day 1 — 150-322

10. No. 21-cv-1066 Opinion and Order of Mar. 8, 2023 — 323-431

11. "Prosecutorial Discretion," Mar. 19, 2021 — 432-433

12. "Parole Plus Alternative to Detention," Nov. 2, 2021 — 434-436

13. Declaration of Matthew J. Hudak, May 11, 2023 — 437-449

14. No. 23-cv-9962, Complaint for TRO, Preliminary and Permanent Injunctive Relief, and Declaratory Relief — 450-459

15. No. 23-cv-9962, Order Granting TRO, May 11, 2023                    460-476

16. No. 23-cv-9962, Order Denying Stay, May 15, 2023                    477-492

17. No. 23-cv-9962, Preliminary Injunction Order                       493-502

18. Supplemental Administrative Record for July 18, 2022               503-622
    Parole+ATD Memorandum

19. CBP Directive 3340-043 (Sept. 3 2008)                              623-636

20. ICE Parole Directive 11002.1                                       637-646

21. ICE Transportation, Detention and Processing                       647-652
    Requirements (Jan. 11, 2005)

22. ICE ERO, Parole of Arriving Noncitizens Considered                 653-654
    for Release (broadcast email) (Nov. 17, 2021)

23. DHS Memorandum "Implementing the President's                       655-667
    Border Security and Immigration Enforcement
    Improvements Policies" (Feb. 20, 2017)

24. Florida v. United States, No. 21-cv-1066, District Court           668-691
    Docket Sheet

25. Florida v. Mayorkas, No. 23-cv-9962, District Court                692-698
    Docket Sheet

FOR OFFICIAL USE ONLY

 **U.S. Immigration and Customs Enforcement**

 **U.S. Customs and Border Protection**

July 18, 2022

MEMORANDUM FOR:  Raul L. Ortiz
Chief
U.S. Border Patrol

Corey A. Price
Executive Associate Director
Enforcement and Removal Operations

FROM:  Chris Magnus
Commissioner
U.S. Customs and Border Protection

Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

SUBJECT:  Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations

**Purpose**

To require that certain processing be completed, and certain capacity criteria be met, before noncitizens may be released from custody along the Southwest border via Parole plus Alternatives to Detention (Parole + ATD). This memorandum rescinds and replaces all prior guidance regarding the use of Parole + ATD, including but not limited to the November 2, 2021, memorandum from USBP Chief Raul L. Ortiz, titled *Parole Plus Alternative to Detention*.

**Background**

Undocumented noncitizens who are not expelled pursuant to the court-ordered implementation of the Centers for Disease Control & Prevention's Title 42 public health Order are inspected by U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP) upon encounter, consistent with 8 U.S.C. § 1225(a); this is often referred to as "processing." Processing includes, among other things, identification, review of immigration and criminal history, an assessment of national security concerns, and an evaluation of what pathway is most appropriate for the individual noncitizen, to include removal proceedings under section 240 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1229. expedited removal, permitting an individual to voluntarily return, and/or parole.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 2

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of
Homeland Security has the authority to parole certain noncitizens into the United States
"temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public
benefit." When, pursuant to an inspection of a noncitizen under 8 U.S.C. § 1225(a), CBP
exercises its discretion to parole noncitizens on a case-by-case basis into the United States,
including during the initiation of or to facilitate the initiation of removal proceedings under
section 240 of the INA, those noncitizens may be eligible to be enrolled in the U.S. Immigration
and Customs Enforcement (ICE) ATD program.

The goal of the ICE ATD program is, for a portion of the enrolled non-detained population, to
increase compliance with release conditions, court appearances, and final orders of removal.
ATD is an alternative to detention and allows ICE to exercise increased supervision over
noncitizens who, on a case-by-case basis, are not detained, but are potentially subject to removal.
The level of supervision and technology assigned to noncitizens enrolled in the ATD program is
determined on a case-by-case basis based on each individual's current immigration status,
criminal history, compliance history, community or family ties, role as a caregiver or provider,
and other humanitarian or medical factors. ICE may adjust the level of supervision and
technology required as the level of the noncitizen's compliance either increases or decreases.

Generally, CBP standards allow for short-term detention of fewer than 72 hours in CBP
facilities, after which time CBP is expected to transfer the noncitizen to ICE if CBP believes
continued custody is required. While this time period may sometimes be exceeded, CBP
facilities are not structured or equipped for long-term detention. This yields numerous
challenges, including the ability to provide appropriate medical care and to treat and control
contagious illnesses. In sum, crowding in border facilities poses risks to both individuals in
custody and those working there. Border encounters remain at historic highs. With a record
number of displaced persons in the hemisphere, high encounter rates and the associated
challenges are expected to continue. It is incumbent on CBP to transfer noncitizens to ICE or if
discretion warrants, to release the noncitizen under appropriate conditions.

Parole + ATD provides a processing mechanism to address situations in which there is not
appropriate detention space available, and there are operational concerns about the number of
people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities
along the Southwest border. It is significantly more efficient—approximately 60 minutes
faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed
to issuing a Notice to Appear (NTA) or other charging document at the time of encounter. Use
of Parole + ATD also allows ICE to exercise increased supervision over certain noncitizens who
are released from CBP custody pending the initiation of removal proceedings. Those subject to
Parole + ATD are not simply released into the community; they are subject to supervision and
are subsequently issued an NTA under INA § 240.

That said, Parole + ATD is a tool that should be used sparingly—only when justified by an
urgent humanitarian reason or because it yields a significant public benefit in the form of
disease-mitigation, as a safety valve to address overcrowding.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 3

## Policy

Over the last several months, CBP and ICE have made deliberate efforts to prioritize the health and safety of noncitizens and the workforce. The use of Parole + ATD provides one such tool—allowing for the more rapid decompression of facilities that otherwise may be overcrowded in ways that promote health and safety. That said, and as this guidance makes clear, the use of Parole + ATD is not meant to be a primary processing tool; its use is permitted only in those situations in which threshold criteria are met, and its use is subject to appropriate approvals and oversight — thus ensuring that its application is limited to those situations in which the relevant health and safety conditions justify its use.

*Threshold Criteria and Approval Process*

Parole + ATD may be authorized by the Commissioner of CBP only when the following criteria exist:

- There are more than 15,000 noncitizens in USBP custody across all Southwest border sectors OR a sector or centralized processing center's in-custody total exceeds 100% of its full capacity; AND
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period.

When these scenarios exist, they create urgent crowding and excessive time-in-custody concerns that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

To use Parole + ATD in a specific border sector, the relevant USBP Sector Chief must request approval from the Commissioner of CBP, through the USBP Chief.

Approval for Parole + ATD may be granted only on a sector-by-sector basis and Parole + ATD may not be used for noncitizens transferred laterally from a sector that has not met the threshold criteria above. Additionally, approval for use of Parole + ATD is time limited and must be reassessed every week by the Commissioner or Deputy Commissioner. USBP is not authorized to process noncitizens via Parole + ATD when these criteria are not met, absent extraordinary circumstances as determined by the Commissioner of CBP.

*Individual Assessment*

Each noncitizen is individually processed consistent with 8 U.S.C. § 1225(a) after encounter. This inspection process includes, but is not limited to, an assessment of the individual's identification and immigration background, review of any national security or criminal concerns, and consideration of which immigration processing pathway is best applicable to the individual noncitizen. This memorandum applies only to those individuals who are expected to be placed in removal proceedings under INA § 240.

Once the Parole + ATD initial threshold is met, each individual noncitizen should be assessed on a case-by-case individualized basis to determine whether he or she is eligible for parole based on

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 4

an urgent humanitarian reason or whether there is a significant public benefit. In making this determination, agents shall consider individualized circumstances, such as an individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. Upon placing an individual in Parole + ATD, CBP will temporarily pause the completion of the removal paperwork under INA § 240, which will instead be completed at a later date.

Prior to a noncitizen's processing via Parole + ATD, CBP must conduct biometric identity verification and thoroughly evaluate any potential national security and public safety concerns. USBP must also collect and document a physical address for each noncitizen processed via Parole + ATD.

*Ineligible for Parole + ATD*

Parole + ATD may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely to be subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA §240, 8 U.S.C. § 1229.

*Subsequent Processing*

CBP and ICE will work jointly to streamline and complete charging document issuance for individuals processed via Parole + ATD. Each agency is responsible for completing the processing for 50 percent of the total Parole + ATD caseload. The final processing and placement into removal proceedings pursuant to 8 U.S.C. § 1229 is expected to be the same, regardless of whether that paperwork occurs as a part of the Parole + ATD processing.

**Reporting and Oversight**

CBP must notify ICE in writing each time Parole + ATD is authorized in a sector to ensure that ICE has the appropriate staff and ATD capacity available in the applicable location(s). Such notification must occur before processing for Parole + ATD begins in the authorized border sector(s). In each case, ICE will determine the appropriate ATD enrollment conditions for the noncitizen, including but not limited to the type of technology used or frequency of required check-in appointments.

CBP will provide daily reporting to Department of Homeland Security Headquarters and ICE, detailing how many noncitizens were processed at the Southwest border with charging documents, voluntary return, and Parole + ATD, by sector. The daily reports will be used to identify any operational changes that are needed to modify the continued use of Parole + ATD at any given time.

Pennsylvania Avenue NW
Washington, DC 20229

**FOR OFFICIAL USE ONLY**



U.S. Customs and
Border Protection

HQBOR 90/16.38

MAY 1 0 2023

TO:                  All Chief Patrol Agents
                        All Directorate Chiefs

MEMORANDUM FROM:    Raul L. Ortiz
                        Chief
                        U.S. Border Patrol

SUBJECT:           Policy on Parole with Conditions in Limited Circumstances
                        Prior to the Issuance of a Charging Document (Parole with
                        Conditions)

To outline how U.S. Customs and Border Protection (CBP) utilizes the longstanding authority under section 212(d)(5) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(d)(5), to temporarily parole certain noncitizens on a case-by-case basis for urgent humanitarian reasons or for significant public benefit. This memorandum describes the policy when that authority may, in certain circumstances, be used to consider individuals for parole after United States Border Patrol (USBP) has conducted an inspection of the noncitizen and prior to the issuance of a charging document where that parole is subject to the imposition of conditions on parole, as contemplated in the INA (hereinafter, Parole with Conditions). Specifically, this policy addresses when parole is conditioned on a noncitizen, within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility for the initiation of appropriate removal proceedings or requesting service, via a designated online location, of a Notice to Appear (NTA) by mail. This document describes the general policy of when such paroles may be considered and continues to require that each parole be considered individually, based on the facts and circumstances known to the Border Patrol Agent (BPA) at the time of processing. All paroled noncitizens will go through appropriate vetting and national security checks.

USBP conducts an inspection of each noncitizen it apprehends or arrests consistent with its authorities, including INA § 287, 8 U.S.C. § 1357 and INA § 235(a), 8 U.S.C. § 1225(a), often referred to as "processing." Processing noncitizens includes steps such as, among other things, identification of the noncitizen, review of immigration and criminal history, an assessment of any national security concerns, and an individualized evaluation of what processing pathway is most appropriate for the individual noncitizen, such as removal proceedings under INA § 240, 8 U.S.C. § 1229a; expedited removal; reinstatement of removal; permitting the individual to voluntarily withdraw their application for admission; and/or parole. This policy provides general guidance on when BPAs may consider parole for an individual who the agent expects is otherwise amenable for removal proceedings under INA § 240, 8 U.S.C. § 1229a. This

memorandum in no way removes agents' discretion to examine all appropriate processes for any particular noncitizen.

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the discretionary authority to parole applicants for admission into the United States "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." As part of an overall inspection of a noncitizen under INA § 235(a), 8 U.S.C. § 1225(a), CBP may exercise its discretion to parole a noncitizen on a case-by-case basis into the United States, including during the initiation of or to facilitate ICE's initiation of removal proceedings under section 240 of the INA, 8 U.S.C. § 1229a. Parole with Conditions provides a processing mechanism to allow for more expeditious processing of individuals who agents determine would be appropriate for section 240 removal proceedings.

This memorandum describes a policy concerning when CBP may exercise its discretionary parole authority for urgent humanitarian reasons or a significant public benefit, including where there are conditions requiring the expeditious processing of noncitizens in exigent circumstances in order to ensure (1) appropriate and safe conditions for the health and safety of individual noncitizens in custody and (2) USBP's continued ability to carry out its critical border security and enforcement mission. During periods of sustained high encounter numbers, it is significantly more efficient for USBP to process individuals, consistent with INA § 235(a), 8 U.S.C. § 1225(a), for Parole with Conditions as opposed to issuing an NTA or other charging document at the time of encounter. Those subject to Parole with Conditions are not simply released into the community; they are required to schedule an appointment with ICE for the initiation of section 240 removal proceedings, as appropriate, or, at a designated online location, request service of an NTA by mail.

Parole with Conditions is a tool that should only be used when one of the limited triggers below are met and only on a case-by-case individualized review of each noncitizen. Parole with Conditions permits CBP to prioritize the health and safety of individual noncitizens in its custody through reducing overcrowding, and to maintain adequate enforcement resources along the border to deter the efforts of criminal organizations and traffickers and intercept persons seeking to enter the United States unlawfully. It also allows for USBP to maintain safe and humane holding conditions, compliant with all applicable court orders and other legal obligations, for each noncitizen in its custody. It should be used only where USBP determines that there are urgent humanitarian reasons that warrant parole of a particular person, given the health and safety of individuals in custody, or that there is significant public benefit in paroling the particular person in order to allow for USBP to continue to process those it has in its custody or utilize its limited personnel to process and maintain border security.

Parole with Conditions will be utilized with the other steps USBP has already taken to ensure that processing is as efficient as possible. For instance, USBP has streamlined the NTA/on own recognizance (OR) process, while ensuring legal sufficiency for processing. Moreover, USBP has taken steps to automate the A-file processes and to make forms electronic where possible to further reduce processing times. With the rollout of mobile field processing, USBP has further provided agents with tools to improve processing times. Additionally, adding Border Patrol

Processing Coordinators who perform administrative work in supporting BPAs and engaging in a contract for data entry processors has allowed USBP to focus its BPA time and resources to its important border mission and immigration officer functions. USBP has taken steps to increase its short-term holding capacity. For example, USBP has opened new soft sided facilities and other facilities that allow for initial processing outside USBP stations. USBP continues to use all of its resources to achieve its mission needs, using remote agents for virtual processing, while also receiving assistance where available, from the immigration officers in Office of Field Operations for their processing of noncitizens on the Southwest border (SWB), the U.S. Department of Homeland Security (DHS) Volunteer Force, which permits federal employees to assist CBP in processing noncitizens along the SWB, and utilizing Department of Defense personnel to assist in non-immigration officer functions, such as data entry and warehouse duties.

Notwithstanding these efforts, USBP's resources, including personnel and physical space and equipment, are finite. USBP still needs additional mechanisms to ensure that individual noncitizens are processed expeditiously and released from or transferred out of USBP custody in a safe, swift, humane, and orderly fashion, in order to provide for appropriate and safe conditions for noncitizens.

It is the policy of CBP and USBP to hold noncitizens in appropriate short-term holding conditions upon apprehension, consistent with all applicable court orders and other legal obligations. It is important to ensure that conditions of short-term custody are appropriate for the nature and length of detention. USBP makes every effort to hold noncitizens for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible. This is because, as USBP's facilities reach capacity, it becomes more difficult to ensure the safety, health, and security of individual noncitizens, monitor medical needs, sanitation, mental health considerations, and other important factors for appropriate short-term custody conditions.

CBP understands that the DHS Office of Health Security has assessed that efforts to reduce overcrowding in DHS facilities to avoid preventable harm and mitigate health and welfare risks to both noncitizens and the DHS workforce should be prioritized.

Moreover, there are requirements such as *Flores*, regarding treatment of minors in DHS custody, and *Doe*, requiring certain detention conditions for those in custody longer than 48 hours in the Tucson sector, which mandate particular conditions for those in CBP custody. USBP recognizes that short-term custody conditions may have a disproportionate impact on different populations such as those with medical conditions or other vulnerabilities. Therefore, it is USBP's policy to apply the most appropriate processing pathway for an individual noncitizen, taking into account all appropriate factors including short-term holding conditions and the impact of conditions that could potentially impact the safety, health, and security of noncitizens in CBP custody.

*Approval Process*

Use of Parole with Conditions is not authorized unless it is specifically requested by a sector and authorized by the CBP Commissioner. In no circumstance does the authorization to apply Parole with Conditions for a particular sector mean that all noncitizens in a particular sector should be

paroled. Instead, it simply authorizes the BPA inspecting an individual noncitizen to consider one of several processes. As explained more fully below, the decision to parole a noncitizen must still be made on a case-by-case individualized basis, examining all of the facts and circumstances at the time of the noncitizen's inspection, and only if there is an urgent humanitarian reason, such as ensuring the safety, health, and security of the individual noncitizen, or significant public benefit justifying parole.

A sector may request authorization for the use of Parole with Conditions on a case-by-case individualized basis from the Commissioner due to exigent circumstances if one of the following exists:

- A sector or centralized processing center's (CPC) capacity in custody total exceeds 125%; OR
- USBP has apprehended 7,000 noncitizens per day across the SWB over a 72-hour period; OR
- The average time-in-custody (TIC) for noncitizens is over 60 hours.

Use of Parole with Conditions is only authorized during exigent circumstances, and as such may only be utilized to the extent necessary. If a sector or CPC reaches 95% capacity, then Parole with Conditions should not be utilized in that sector and other Title 8 processing pathways should be utilized. Once a sector or CPC is at 95% capacity, the concerns regarding health and safety of noncitizens in short-term custody are more likely mitigated for the reasons discussed below.

Based on USBP's long experience and expertise, USBP expects that the circumstances listed above reflect situations where it will become increasingly difficult for USBP to process noncitizens as quickly as they are apprehended while ensuring that custody conditions are consistently safe, humane, and orderly and consistent with applicable court orders and other legal obligations.

As short-term holding conditions become more crowded, USBP faces increasing challenges regarding maintenance of sanitation, medical needs, and mental health of noncitizens, among other short-term custody standard considerations. These circumstances do not require the parole of any particular noncitizen but instead are factors considered that USBP determines it is appropriate to request the use of Parole with Conditions from the Commissioner for urgent humanitarian reasons in addition to considering other processing pathways. Moreover, short-term custody conditions remain only one factor in the determination to parole. As discussed above, USBP continues to fully assess each individual on a case-by-case basis to determine the best processing pathway for that particular individual.

Approval of Parole with Conditions may be granted only on a sector-by-sector basis, and Parole with Conditions may not be used for noncitizens transferred laterally from a sector that has not met the threshold criteria above. Additionally, approval for use of Parole with Conditions is time limited, must be reassessed every week by the Commissioner or Deputy Commissioner, and is expected to be used sparingly even when approved. Lastly, CBP must obtain a valid mailing address using an address validation tool for every noncitizen paroled under this authority.

Nongovernmental organization and shelter addresses are not sufficient for a noncitizen address. USBP is not authorized to process noncitizens via Parole with Conditions when these criteria are not met, and when a sector or CPC is below 95% capacity, absent extraordinary circumstances as determined by the Commissioner.

The initial grant of Parole with Conditions should generally be for 60 days, for the purpose of allowing the noncitizen to schedule an appointment to appear at an ICE facility for the initiation of appropriate removal proceedings or to request service of an NTA by mail, via a designated online location. Parole is automatically terminated upon expiration of the period for which parole was authorized.

*Individual Assessment*

Each noncitizen is individually processed consistent with INA § 235(a), 8 U.S.C. § 1225(a), after encounter. This inspection process includes, but is not limited to, an assessment of the individual's identification and immigration background, review and vetting of any national security or criminal concerns, and consideration of which immigration processing pathway is best applicable to the noncitizen. This memorandum describes when Parole with Conditions may be appropriate in advance of the issuance of an NTA where the BPA expects that section 240 removal proceedings is likely the appropriate pathway.

Once the Parole with Conditions initial criteria are met, the decision to parole any individual noncitizen must be assessed on a case-by-case, individualized basis.

Prior to a noncitizen's processing via Parole with Conditions, CBP must conduct biometric identity verification. The BPA making determinations regarding Parole with Conditions must evaluate any potential national security and public safety concerns. Any assessment must consider all of the facts and circumstances known to the BPA at the time, including but not limited to, the noncitizen's immigration history, criminal history, community or family ties, medical concerns, role as a caregiver or provider, and other factors known to the BPA. The assessment may begin as early as the initial encounter in the field, and there is no limitation on the time period in which this individual evaluation must occur. BPAs must make determinations about national security and public safety based on the facts and circumstances known at the time of processing.

In addition, the BPA must consider whether, given the time the individual has been in custody, and the availability of ICE detention space, there is an urgent humanitarian reason or significant public benefit to parole the individual from custody, such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers. Additionally, because BP personnel and resources are finite, BP must consider whether processing personnel and resources are necessary to process other noncitizens in BP custody or accomplish enforcement actions that are immediately critical to border security for the greater public benefit. If so, the individual may be considered for Parole with Conditions.

USBP must collect and document a physical address for each noncitizen processed via parole with Conditions. In doing so, USBP is making a determination to temporarily pause the completion of the paperwork necessary for the initiation of removal proceedings under INA § 240, 8 U.S.C. § 1229a, which will instead be completed at a later date. It is expected that the individual noncitizen would receive the same initiation of removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a, regardless of whether the completion of that paperwork was to occur.

*Cases in Which Parole with Conditions May Not Be Utilized*

Parole with Conditions may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a.

*Subsequent Processing*

CBP and ICE will equally share responsibility and work jointly to streamline and complete charging document issuance for individuals processed via Parole with Conditions. The final processing and placement into removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a is expected to utilize the standard processing, regardless of whether that paperwork occurs as a part of the Parole with Conditions processing or another pathway.

CBP is closely coordinating with ICE on this policy to ensure appropriate communication regarding those CBP is processing via Parole with Conditions and will be jointly responsible for the same. CBP understands that noncitizens will either check in with ICE for an NTA or receive an NTA by mail, upon request. CBP also understands that in circumstances in which DHS processes noncitizens for Parole with Conditions, DHS will make a separate, independent determination, after processing the individual for appropriate removal proceedings, whether to release the individual on parole during the pendency of such proceedings.

CBP must notify ICE in writing each time Parole with Conditions is authorized in a sector, with information regarding data and statistics. Such notification must occur before processing for Parole with Conditions begins in the authorized border sector(s).

CBP will continuously coordinate with ICE and understands that ICE will be issuing guidance to its operators based on this policy in the near term.

This policy, which may be modified, superseded, or rescinded at any time without notice, is for CBP internal use only and is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, by any party. Moreover, as a general statement of policy and agency organization, procedure, or practice, this policy is not subject to the Administrative Procedure Act's requirement of notice and comment.[1] But, even if it were, the

---

[1] 5 U.S.C. § 553(b)(A).

Policy on Parole with Conditions
Page 7

situations in certain sectors are quickly evolving into exigent circumstances, constituting good cause for bypassing notice and comment rulemaking, as contrary to the public interest.[2] Encounters reached an all-time high of 2.2 million for noncitizens attempting to cross the SWB between ports of entry and without authorization in Fiscal Year 2022 and remain extremely high. The health, safety, and security of noncitizens in USBP custody is paramount to USBP's ability to effectively carry out its mission to secure the border, which in turn is important to protecting public safety. Moreover, on Thursday, May 11, 2023, at 23:59 ET, the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order will end. For the past 7 days, USBP has averaged over 8,750 encounters per day. This is over double the average daily encounters of 4,285 in May of 2019, the highest month of the 2019 surge. Even with significant personnel along the SWB, a significant detention capacity, and interagency resources supporting the effort, this situation requires urgent action.

cc: Corey Price, Executive Associate Director, ICE Enforcement and Removal Operations

---

[2] 5 U.S.C. § 553(b)(B); *see also Jifry v. F.A.A.*, 370 F.3d 1174, 1179-80 (D.C. Cir. 2004); *Haw. Helicopters Operators Ass'n v. F.A.A.*, 51 F.3d 212, 214 (9th Cir. 1995).

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

     **Plaintiff**,

**v.**                            **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, et al.,

     **Defendants**.

_____/

## <u>PRELIMINARY INJUNCTION</u>

This case involves a challenge to an immigration policy known as "Parole with Conditions."[1] The case has proceeded at a breakneck pace since it was filed last Wednesday, with extensive briefing and multiple orders being issued on an expedited basis. Currently, the issue before the Court is whether the temporary restraining order (TRO) issued last Thursday should be converted into a preliminary injunction that will remain in effect during the pendency of this case. This, in turn, will allow Defendants (collectively, "DHS") to seek review of the Court's decision enjoining the challenged policy from a higher court—first, the Eleventh Circuit, and then, if necessary, the Supreme Court.

---

[1] The policy is contained in a May 10, 2023, memorandum issued by U.S. Border Patrol (USBP) Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)." *See* Doc. 5-1.

## Background

For sake of brevity, the Court will not repeat here what it has said on multiple prior occasions about the ongoing immigration "crisis" at the Southwest Border and the circumstances that contributed to it. Suffice it to say, the Parole with Conditions policy is the latest in a series of policies adopted by DHS over the past two years to expedite the release of aliens arriving at the Southwest Border into the country instead of detaining them until their immigration proceedings are concluded as required by 8 U.S.C. §1225(b).

The Court vacated one of the prior policies—the "Parole+ATD" policy—in an earlier case filed by Florida against DHS. *See Florida v. United States*, Case No. 3:21cv1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023). DHS did not appeal the decision in that case until May 5, 2023—the next to last business day of the appeal period and five days before it adopted the Parole with Conditions policy.[2]

On Wednesday, May 10, Florida filed a complaint in this Court challenging the legality of the Parole with Conditions policy. The case was randomly assigned to me.

The next morning, Florida filed an emergency motion for a TRO. DHS was ordered to file a response that afternoon, which it did. That night, after considering

---

[2] Florida filed a cross-appeal today, presumably so it can argue on appeal that the Court also should have vacated DHS's overriding "non-detention policy" that the Court found to be contrary to the immigration statutes but not subject to judicial review.

A0013

the parties' filings, the Court entered a TRO enjoining DHS from "implementing or enforcing" the Parole with Conditions policy. *See* Doc. 10.

Over the weekend, DHS filed a motion to stay the TRO. Florida was ordered to file a response by mid-day yesterday, which it did. Last night, the Court entered an order denying the stay. *See* Doc. 29.

The Court scheduled a hearing for this Friday, May 19, to consider whether to convert the TRO into a preliminary injunction, but the Court cancelled the hearing yesterday after the parties entered into a stipulation (Doc. 16) waiving their rights to a hearing and agreeing on the evidence that the Court could consider in deciding whether to convert the TRO into a preliminary injunction.

The Court has carefully considered the parties' filings in support of and in opposition to preliminary injunctive relief, including the parties' stipulation, the declarations and other evidence submitted by DHS (*see* Docs. 9-2, 13-1, 13-2, 26-1, 27), the USBP statistical data (*see* Doc. 28), the parties' proposed orders (*see* Docs. 22, 24), and the relevant portions of the trial record in the *Florida* case.[3]  The Court

---

[3]   The parties agreed that the Court may consider evidence from the trial record in the *Florida* case "only to the extent relevant here."  Doc. 16 at 2.  The parties agree that the evidence in the *Florida* case is relevant to the issue of standing, but DHS disputes whether that the evidence establishes standing here, and it also appears to dispute that evidence about the Parole+ATD policy at issue in *Florida* is relevant to the balancing of the equities in this case.  *Id.* at 2-3.  The Court rejected DHS's position on the issue of standing in the order denying a stay of the TRO, *see* Doc. 29 at 6-7, and the Court finds that the circumstances of the *Florida* case (including the vacatur of the Parole+ATD policy) are relevant to various injunction factors, as discussed below and in the prior orders entered in this case.

A0014

sees no need for a lengthy order because the Court has entered multiple orders over the past few days analyzing the facts under the same legal standard that governs the issuance of a preliminary injunction.   Thus, in the interest of brevity and an expeditious ruling, this order will simply incorporate by reference the analysis in those prior orders, except in a few instances where additional discussion is warranted based on the new data or arguments that were not specifically addressed in the prior orders.

## Analysis

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a).

Both parties have asked the Court to enter a preliminary injunction.  Florida requested a preliminary injunction in its complaint and the parties agreed that its filings to date can be treated as its motion for preliminary relief, *see* Doc. 16 at 1; and even though DHS does not agree that a TRO should have been entered, it asked the Court to convert the TRO into a preliminary injunction so it can seek appellate review of the Court's decision to enjoin the Parole with Conditions policy, *see* Doc. 13 at 15-17.

To obtain a preliminary injunction, Florida has the burden to prove that "(a) there is a substantial likelihood of success on the merits; (b) the … preliminary injunction is necessary to present irreparable injury; (c) the threatened injury

A0015

outweighs the harm that the … preliminary injunction would cause to the non-movant; and (d) the … preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). The Supreme Court has stated that "the first two factors … are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), but the Eleventh Circuit has suggested that "[t]he first of the four prerequisites to temporary injunctive relief is generally the most important," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Here, as discussed below, all four factors weigh in favor of granting a preliminary injunction.

With respect to the first factor (substantial likelihood of success), Florida alleged in the complaint that the Parole with Conditions policy violates the Administrative Procedure Act (APA) because it is contrary to law (Count 1), arbitrary and capricious (Count 2), and was not adopted through "notice and comment" procedures (Count 3). The Court has no trouble finding that Florida has a substantial likelihood of ultimately showing that it has standing to challenge the Parole with Conditions policy and that it is likely to succeed on its claim that the policy is contrary to law for the reasons more fully stated in the TRO (*see* Doc. 10 at 8-11), the order denying a stay of the TRO (*see* Doc. 29 at 4-8), and the *Florida* decision invalidating the materially indistinguishable Parole+ATD policy (*see* 2023 WL 2399883 at *16-20, *29-31). The Court also finds that Florida has a substantial

A0016

likelihood of success on its "notice and comment" claim for the reasons stated in the TRO (*see* Doc. 10 at 8 n.5).[4]   The Court does not find persuasive any of DHS's arguments to the contrary on these points for the same reasons that the Court found in the order denying a stay of the TRO that DHS was not likely to succeed on its appeal.  *See* Doc. 29 at 4-8.

With respect to the second factor (irreparable harm to the movant), the Court finds that a preliminary injunction is necessary to prevent irreparable harm to Florida for the reasons stated in the TRO (*see* Doc. 10 at 12-13) and reaffirmed in the order denying a stay of the TRO (*see* Doc. 29 at 11-12).

With respect to the third factor (harm to the non-movant), the Court finds that the harm to Florida is not outweighed by the harm that the preliminary injunction will allegedly cause DHS because, as explained in the order denying a stay of the TRO, the Court is simply not persuaded that enjoining the Parole with Conditions policy is as big of a deal as DHS is making it.  *See* Doc. 10 at 8-11.  The finding on this point in the order denying a stay of the TRO is bolstered by the USBP data filed

---

[4]  The Court is not in a position to say at this point whether the Parole with Conditions policy is arbitrary and capricious because that determination will likely be made based on the administrative record, which has not yet been produced.  That said, the Court will be interested to see how DHS justifies the policy in light of the evidence in the *Florida* case showing that similar prior policies that relied on aliens to self-report to Immigration and Customs Enforcement facilities to receive charging documents forced DHS to expenditure of considerable time and money down the road to track down the substantial number of aliens who (not surprisingly) did not self-report.

A0017

after that order was posted,[5] which shows that encounters at the border have dropped significantly after the expiration of the Title 42 Order.  Indeed, as of two days ago, the number of aliens arriving the border was about one-third of the number predicted in the declaration that DHS relied on in support of its argument that the sky will fall if it cannot release aliens under the Parole with Conditions policy.  *Compare* Doc. 13-1 at 6 (¶11) (predicting "an average of 12,000-14,000 noncitizen [encounters] per day" after the Title 42 Order expires on May 11) *with* Doc. 28 at 4 (showing that alien encounters dropped from 9,649 on May 11, to 6,251 on May 12, to 4,335 on May 13, to 4,193 on May 14).  Likewise, contrary to the prediction in the declaration that USBP was projected to grow to "over 45,000 individuals in custody by the end of [May]," Doc 13-1 at 6 (¶12), the USBP data shows that the number of individuals in custody has declined every day since the Title 42 Order expired, and as of May 14, only 22,259 aliens were in custody, *see* Doc. 28 at 6.[6]

---

[5]  Technically, the USBP data was filed before the order was posted, but the Court put the order in the internal electronic folder to be posed by the Clerk and left the courthouse before seeing that the USBP data had been filed.  The USBP data would not have changed the Court's ruling on the motion to stay and, as discussed above, it bolsters the Court's decision not to give much weight to the declaration predicting dire consequences if USBP was prohibited from using the Parole with Conditions "processing pathway."

[6]  The Court did not overlook that the data shows an increase in the average time-in-custody (TIC) after the expiration of the Title 42 Order and the entry of the TRO, but the most recent figure is just slightly above the 72-hour period that USBP facilities are designed to accommodate, according to the evidence in the *Florida* case.  Also, the most recent TIC figure is well below the 20-day period in the *Flores* case that DHS repeatedly pointed to in the *Florida* case as compelling expedited release of children and family units.  Moreover, it is unclear whether these TIC figures include the amount of time aliens spend in custody between the completion of their processing and their physical release.  This may be significant because DHS claimed in its response to the Order

A0018

With respect to the fourth factor (public interest), the Court finds that a preliminary injunction is in the public interest for the reasons stated in the TRO (*see* Doc. 10 at 13-14) and the order denying a stay of the TRO (*see* Doc. 29 at 13-16), and because it would promote respect for the rule of law by not allowing DHS to achieve what amounts to an end-run around this Court's decision in *Florida* through the adoption of a functionally identical policy to the Parole+ATD policy invalidated in that case.  *See* Doc. 10 at 11 (agreeing with DHS that the *Florida* decision did not preclude DHS from using its parole authority in other ways, but explaining that "what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in *Florida* and then expect a different outcome when the policy is challenged").

The Court did not overlook DHS's argument that the Court does not have the authority to enjoin the Parole with Conditions policy under the immigration statutes and/or that the TRO was overbroad and must be narrowed, but the Court finds those arguments unpersuasive for the reasons stated in the order denying a stay of the TRO. *See* Doc. 29 at 7-8.  The Court also did not overlook Florida's request that the Court

---

to Show Cause that it did not violate the TRO by releasing more than 2,500 aliens after the TRO went into effect because "implementation" of the Parole with Conditions policy is complete when the alien is "fully processed" even though the alien may not be physically released until the following morning.  *See* Doc. 26-1 at 3 (¶¶9-10) (claiming that aliens "have been granted parole effective as of the time they are fully processed" even though they may remain in physical custody longer because USBP "generally does not release individuals overnight").  Thus, if the TIC figures include the time that aliens sometimes remain in custody after they are "paroled," those figures are likely overstated to some degree.

A0019

treat its filings as both a request for preliminary injunction and a request for a stay under the APA, 5 U.S.C. §705, but the Court tends to agree with DHS that an APA stay is unavailable because the Parole with Conditions policy was already in effect when Florida filed its complaint and that statute refers to "postpon[ing]" the effective date of the agency action.[7]

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a preliminary injunction prohibiting DHS from "paroling" aliens into the country under the Parole with Conditions policy.  No bond is required for the reasons stated in the TRO. *See* Doc. 10 at 15 n.8.  A stay of the preliminary injunction is not warranted for the reasons stated in the order denying a stay of the TRO.  *See* Doc. 29 at 3 n.3.

Accordingly, it is **ORDERED** that:

1.     DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)," pending disposition of this case or further order of the Court.

---

[7]  That said, the Court need not definitively decide that issue because an APA stay would not give Florida any more relief than it is getting through the preliminary injunction

A0020

2.      The parties shall file a status report 14 days from the date of this Order explaining how they intend to proceed with this case in this Court pending resolution of DHS's expected appeal of the preliminary injunction, and unless the parties agree that this case should be stayed pending appeal, the status report shall include a proposed scheduling order.

**DONE and ORDERED** this 16th day of May, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

A0021

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                        Case No. 3:21-cv-1066

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The Southwest border is in crisis, with record numbers of migrants

illegally entering our country.

2.      While some arriving migrants have legitimate asylum claims, many do not. Some are gang members and drug traffickers exploiting the crisis at the border, as evidenced by the skyrocketing amount of Fentanyl seized at the border this year.[1]

3.      Congress, aware of these issues, created a system for the orderly processing of migrants. This system allows authorities to admit the small fraction of migrants with valid asylum claims and to expel those who do not, or worse, who mean our country harm.

4.      All arriving aliens, even those claiming asylum, are required by law to be detained pending a decision as to whether they have a valid basis to enter the United States. *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1225(b)(1)(B).

5.      This rule applies to any arriving alien "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. *Id.* § 1225(a)(1).

6.      As the Supreme Court recently explained, there is only one "circumstance[] under which" these arriving aliens "may be released" from detention: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and

---

[1] https://www.cbsnews.com/news/fentanyl-seizures-texas-mexico-border-immigration/.

1

only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

7.    The Biden Administration is ignoring these requirements. It has released at least 225,000 illegal border crossers since taking office,[2] including "[a]bout 50,000" whom the government released without initiating immigration court proceedings as required by law.[3] This practice was apparently authorized by "[g]uidance sent to border patrol . . . from agency leadership," which has not been made public, and which appears to claim broad "prosecutorial discretion" to ignore the requirements of the immigration laws.[4]

8.    The government is not free to ignore the clear commands of Congress. It has claimed that it lacks the resources and detention capacity to process the surge of migrants arriving at the border. But the Biden Administration has actively sought to eliminate measures that increase its resources and detention capacity, such as the Migrant Protection Protocols (also known as the "wait in Mexico policy"), and has even asked Congress to *reduce* the number of immigration detention beds available to it. Further, it is the Biden Administration's misguided policies that have

---

[2]   https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[3]   https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[4]   https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

A0024

encouraged more migrants to make the dangerous journey to the United States. The government cannot, therefore, use a purported lack of resources as an excuse to ignore congressional mandates.

9.    The Biden Administration's illegal border policies cause Florida harm. Many of the aliens illegally released by the Biden Administration are arriving or will arrive in Florida,[5] harming the State's quasi-sovereign interests and forcing it to incur millions of dollars in expenses.

## PARTIES

10.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

11.    Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

12.    Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

---

[5] *See* https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (explaining that a majority of unlawful aliens live in just six states, including Florida); *see also Texas v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *9 (N.D. Tex. 2021) (finding that the Biden Administration's border policies harm the State of Missouri).

A0025

13.     Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the Biden Administration's illegal policies.

14.     Defendant Alejandro Mayorkas is the Secretary of DHS. Florida sues him in his official capacity.

15.     Defendant Tae Johnson is the Acting Director of ICE. Florida sues him in his official capacity.

16.     Defendant Troy Miller is the Acting Commissioner of CBP. Florida sues him in his official capacity.

17.     Defendant Ur M. Jaddou is the Director of USCIS. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–703.

19.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–2202, the Constitution, and the Court's equitable powers.

A0026

20.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).[6] Further, because illegal border crossers typically cross into Florida's territory in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here.

## FACTUAL BACKGROUND

### The Relevant Federal Immigration Scheme

21.    "[T]he Immigration and Nationality Act (INA) . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[7]

22.    When aliens arrive in this country, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i),

---

[6] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

[7] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

A0027

unless they indicate an intention to apply for asylum, *id.* In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution. *Id.* § 1225(b)(1)(B)(ii). If the alien makes that showing, he "shall be detained for further consideration of the application for asylum." *Id.*; *see Jennings*, 138 S. Ct. at 837.

23.    Aliens not subject to Section 1225(b)(1) are governed by Section 1225(b)(2). Under (b)(2), unless an alien is "clearly and beyond a doubt entitled to be admitted," Congress has mandated that the alien "shall be detained" pending further immigration proceedings.  *See Jennings*, 138 S. Ct. at 837.

24.    Because Congress has mandated detention under both subsection (b)(1) and subsection (b)(2), arriving aliens—other than those who are clearly and beyond a doubt entitled to be admitted—are to be released only pursuant to the government's parole authority, which is described in 8 U.S.C. § 1182(d)(5)(A). This authority may be used only "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Other than parole, there are "no other circumstances under which aliens detained under § 1225(b) may be released." *Jennings*, 138 S. Ct. at 844; *see also* 8 C.F.R. § 208.30(f)(2) (explaining

6

that Section 1182(d)(5) is the only basis for releasing an alien to which Section 1225(b)(1) applies;[8] 8 C.F.R. § 212.5 (describing some of DHS's parole practices).

25.     Notably, the government's parole authority used to be broader, and could be used "for emergent reasons or for reasons deemed strictly in the public interest." Congress, however, narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

26.     Mandatory detention aside, the government is also required to initiate removal proceedings against these aliens. The government does so by serving the alien with a charging document, which is the document that initiates proceedings in immigration court. For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[9]

---

[8] The regulation refers to INA § 212(d)(5), which is the same as 8 U.S.C. § 1182(d)(5).

[9] *See* https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal%20-%20English%20%2817%29.pdf, at 1–2 (discussing other similar charging documents).

A0029

27.    For aliens falling under Section 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed . . . without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed . . . without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I). And even for aliens who pass a credible fear screening, they still must be served with a charging document. Defendant USCIS admits this.[10]

28.    The same is true of aliens falling under Section 1225(b)(2). These aliens must be "detained *for a proceeding under Section 1229a*," 8 U.S.C. § 1225(b)(2)(A) (emphasis added), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

<u>The Biden Administration's Actions</u>

29.    The Biden Administration is systematically violating each of these requirements. For the entire month of December 2020—President Trump's last full month in office—Defendant CBP reports that Border Patrol released into the interior only 17 aliens after arresting them crossing the Southwest border and serving them

---

[10]    *See*    https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28 Approved%20as%20final%2011-7-11%29.pdf, at 2 (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf,    at 5.

A0030

with a notice to appear.[11] By July 2021, that number had risen to over 60,000, and the total number of unlawful aliens that Border Patrol has released at the border since President Biden took office is over 225,000.[12]

30.    Releasing this many arriving aliens into the interior necessarily means that the government is violating congressional commands in the immigration laws. If immigration officials are simply releasing these aliens, they are violating the mandatory detention provisions in Section 1225. If they are, instead, paroling each of these individuals, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

31.    It is also unclear whether the numbers reported by CBP include the approximately "50,000 migrants who crossed the southern border illegally" and were released without even being served with a notice to appear.[13] For these unlawful aliens, and likely many more, the government has instead served them with

---

[11]   https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[12] The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab).  In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

[13]   https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

9

a "notice to report," a document nowhere mentioned in statute or regulation, which apparently functions as "immigration enforcement by the honor system."[14] Predictably, although the notice to report asks these aliens to turn themselves into an ICE office within 60 days, approximately 80% fail to do so.[15]

32.    Beyond the Biden Administration's failed honor-system policy, serving a notice to report has other significant consequences. Most importantly, once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed in *absentia*." *Texas v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *4 (N.D. Tex. 2021). After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who declines to report following issuance of a notice to report—again, because this document has no legal significance and is nowhere to be found in statute or regulation.

33.    And, as further explained in ¶¶ 44–45, even aliens who are served with charging documents frequently do not appear for their removal proceedings. The Biden Administration is thus giving tens-of-thousands of aliens per month, in essence, license to disappear into the interior of the United States.

---

[14] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

[15] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

A0032

34.    Defendants will no doubt claim that they are overwhelmed by the surge of migrants at the Southwest border and have no choice but to release them. This argument is the first step in the Biden Administration's open-borders playbook, which involves a two-pronged approach: *First*, violate the congressionally mandated requirements in the immigration laws, and insist the government does not have the resources to comply. *Second*, eliminate effective measures that make more detention capacity available and otherwise relieve the taxed immigration system, so these unlawful actions appear justified and necessary.

35.    This is already playing out, as the Biden Administration is intentionally violating several congressional mandates in the immigration laws. *See, e.g.*, *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 2096669, at *38 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 3683913, at *42 (S.D. Tex. 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).[16]

36.    The Administration has even been found to have violated Section 1225(b)'s detention requirements, the same requirements Florida claims the government is violating here. *See Texas v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021)

---

[16] A panel of the Fifth Circuit stayed that preliminary injunction in part, but declined to stay the injunction insofar as it required the federal government not to release aliens subject to those two statutes. *See Texas v. United States*, --- F.4th ---, 2021 WL 4188102, at *3 (5th Cir. 2021).

A0033

(denying a stay because "the Government has not come close to showing that it is likely to succeed in challenging" the conclusion that it violated 8 U.S.C. § 1225).[17]

37.     In those cases, the Biden Administration insisted it lacked the resources to comply with its duties. *See, e.g.*, Mot. for Stay at 4, *Texas*, 2021 WL 3683913 (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

38.     Meanwhile, the Biden Administration is going out of its way to make its bad-faith prediction come true. For example, the Administration has asked Congress to *reduce* the number of immigration detention beds available to it.[18] It has justified this request in part based on "recent decreases in interior enforcement activity."[19]

39.     Similarly, the Administration has eliminated programs designed to reduce the taxing of immigration resources and detention space. For example, on its first day in office, the Biden Administration suspended the Migrant Protection

---

[17] The Supreme Court also denied the government a stay. *See Biden v. Texas*, --- S. Ct. ---, 2021 WL 3732667 (Aug. 24, 2021)

[18] https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-4d7427ff67d586a77487b7efec58e74d; Congressional Research Service, *DHS Budget Request Analysis: FY2022*, at 13 (noting that DHS's FY 2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY 2021 (reducing that average to 30,000)).

[19] https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf, at 43.

12

Protocols. *Biden*, 2021 WL 3603341 at *7. This DHS program "returned some aliens temporarily to Mexico during the pendency of their removal proceedings." *Id.* at *1. As Defendant CBP's reported statistics show, the Migrant Protection Protocols were effective at eliminating the illegal release of arriving aliens at the border because aliens remained in Mexico pending adjudication of their asylum claims rather than occupying DHS detention capacity.[20] *See also Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of the program, in which DHS found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border"). Unlike the Biden Administration's release policies, this program is expressly authorized by the immigration laws, which provide that "[i]n the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a [removal] proceeding." 8 U.SC. § 1225(b)(2)(C).

40.    And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. *See, e.g.*, Exec. Order No. 14,010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, 86 Fed. Reg. 8267, 8270 (Feb. 2,

---

[20]  https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab); https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (same).

A0035

2021) (revoking, among others, Executive Order 13767, which directed DHS to "terminat[e] . . . the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

41.    Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[21] The Biden Administration has, of course, not sought to do so.

<u>Irreparable Harm to Florida</u>

42.    States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Florida thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

43.    As a result, there is little Florida can do about the thousands of migrants who have arrived or will arrive in Florida. Some of these unlawful aliens may be

---

[21] https://www.gao.gov/assets/gao-18-343.pdf.

A0036

otherwise law-abiding, but others are gang members, drug traffickers, and other dangerous criminals.

44.     Many, if not most, of these individuals will never leave the country. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and did not show up to their hearings. *Biden*, 2021 WL 3603341 at *4. Of course, for those who never receive a notice to appear, a much higher number will abscond.[22]

45.     Moreover, "most aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Biden*, 2021 WL 3603341 at *4. Even most aliens who *pass* a credible-fear screening are not ultimately granted asylum. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,946 (Nov. 9, 2018) (explaining that in FY 2018, 71% of those who had passed a credible-fear screening were denied asylum). And a high percentage of those who claim asylum appear to be doing so in bad faith. *See id.* (explaining that in FY 2018, 31% of those who passed a credible-fear screening absconded and did not show up to their immigration hearings).

---

[22] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

A0037

46.   The presence of these aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State millions.

47.   Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government pursuant to 8 U.S.C. § 1231(i).

48.   Florida spends an average of almost $8,000 *per student* each year on public school education,[23] which it provides regardless of immigration status.

49.   Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

50.    Finally, the State frequently pays the cost of emergency medical services for the uninsured.

51.   Many of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur more of these expenses.

---

[23] https://www.fldoe.org/core/fileparse.php/7507/urlt/1920District-State-PerPupil.pdf.

A0038

## CLAIMS

## <u>COUNT 1</u>

### Agency action that is not in accordance with law
### and is in excess of authority, in violation of the APA

52.     Florida repeats and incorporates by reference ¶¶ 1–51.

53.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

54.     Defendants' policy—whether codified in writing or not[24]—of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2). And if Defendants claim to be exercising their parole authority, their policy is contrary to 8 U.S.C. § 1182 because that authority is neither being used "on a case-by-case basis" nor limited to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

55.     Nor does any regulation authorize Defendants' policy. 8 C.F.R. § 212.5—the principal parole regulation—says nothing about the mass release of arriving aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of Sections 1225(b) and 1182(d)(5)(A).

---

[24] An unwritten policy is subject to APA challenge just as a written policy is. *See Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities).

A0039

56.     Moreover, for the reasons described in ¶¶ 26–28, Defendants are required at a minimum to issue charging documents to arriving aliens released into the interior and initiate removal proceedings, which the Biden Administration has failed to do at least 50,000 times since taking office.

57.     Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT 2

### Arbitrary and capricious agency action in violation of the APA

58.     Florida repeats and incorporates by reference ¶¶ 1–51.

59.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

60.     Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

61.     Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858

A0040

(N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

62.    Moreover, Defendants have neither accounted for Florida's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Regents*, 140 S. Ct. at 1913.

63.    Finally, insofar as Defendants claim their policy is justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## COUNT 3

**Failure to conduct notice and comment in violation of the APA**

64.    Florida repeats and incorporates by reference ¶¶ 1–51.

65.    The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

66.    Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483

19

(11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[25]

## COUNT 4

### Agency action unlawfully withheld or unreasonably delayed in violation of the APA

67.    Florida repeats and incorporates by reference ¶¶ 1–51.

68.    At a minimum, Defendants' near-blanket refusal to comply with the mandatory-detention provisions in Section 1225 and the limits on their parole authority in Section 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT 5

### Violation of the INA and the Constitution

69.    Florida repeats and incorporates by reference ¶¶ 1–51, 54–56.

70.    The APA aside, the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count 1. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

---

[25] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). But the reason the en banc court did not address the notice-and-comment argument is because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

A0042

## COUNT 6

**Declaratory judgment that the Biden Administration's policy is unlawful**

71.    Florida repeats and incorporates by reference ¶¶ 1–51, 54–56.

72.    For the same reasons described in Counts 1 and 5, Florida is entitled to a declaratory judgment that the Biden Administration is violating the law.

### PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the Biden Administration's policy of releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States.

b) Issue permanent injunctive relief enjoining Defendants from enforcing that policy.

c) Compel the agency to comply with these binding requirements pursuant to 5 U.S.C. § 706.

d) Issue declaratory relief declaring the policy unlawful.

e) Award Florida costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 1029143)
SENIOR ASSISTANT ATTORNEY GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Rachel Siegel (FBN 1029143)
DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

A0044

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                                    Case No. 3:21-cv-1066-TKW-EMT

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; CHRIS MAGNUS,
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    *Defendants*.

_____/

## FIRST AMENDED COMPLAINT FOR
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

**INTRODUCTION**

1.      The Southwest border is in crisis, with record numbers of migrants illegally entering our country. In President Trump's last full month in office, Border Patrol released 17 migrants caught at the border into the interior of the United States. In December 2021, President Biden's Border Patrol released over 50,000.[1]

2.      While some arriving migrants have legitimate asylum claims, many do not. Some are gang members and drug traffickers exploiting the immigration crisis, as evidenced by the skyrocketing amount of fentanyl being seized at the border.[2]

3.      In order to protect national security and public safety, but also ensure that those with a legitimate basis to do so may enter the country, Congress created a system for the orderly processing of migrants. This system allows authorities to admit the small fraction of migrants with valid asylum claims and to expel those who are not entitled to asylum, or worse, who mean our country harm.

4.      All arriving aliens, even those claiming asylum, are required by law to be detained pending a decision as to whether they have a valid basis to enter the

---

[1]   Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021#. The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[2] CBP Release Operation Fiscal Year 2021 Statistics, U.S. Customs & Border Protection, (Jan. 3, 2022), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-operational-fiscal-year-2021-statistics (noting that fentanyl seizures increased 134% in FY2021).

1

United States. *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1225(b)(1)(B). That decision is made via immigration proceedings—often called "removal proceedings"—before an immigration judge. In expedited removal proceedings, a decision can be made quickly. If the government chooses not to use expedited removal, it can take much longer.

5.     Either way, Congress has commanded the Executive Branch to detain arriving aliens until a final decision is made regarding removal. Section 1225 "sets forth a general, plainly obligatory rule: detention for aliens seeking admission." *Texas v. Biden*, 20 F.4th 928, 996 (5th Cir. 2021).

6.     This mandatory detention rule applies to any arriving alien "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. 8 U.S.C. § 1225(a)(1).

7.     And the rule makes good sense. "[M]ost aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 3603341, at *4 (N.D. Tex. Aug. 13, 2021). This is, in part, because many aliens claim asylum in bad faith hoping to be released into the interior of the United States and abscond. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,946 (Nov. 9, 2018) (explaining that in

2

FY2018, a staggering 31% of those who were released after passing an initial asylum screening—called a "credible-fear screening"—absconded and did not appear at their immigration hearings).

8.      There are two exceptions to this mandatory detention rule. First, there is one (and only) "circumstance[] under which" these arriving aliens "may be released" into the United States: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In short, the government "cannot use that power to parole aliens *en masse*." *Texas v. Biden*, 20 F.4th at 997.

9.      Second, § 1225(b)(2)(C) allows the government to "return . . . aliens" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. In other words, when migrants arrive at the southern border and claim asylum, the federal government may—instead of detaining them—require them to wait in Mexico while their claims are adjudicated.

A0048

10.   Even though Congress has spoken unambiguously, the Biden Administration is willfully ignoring these requirements. It has released at least 366,000 illegal border crossers since taking office.[3]

11.   Before November 2021, the government was not only unlawfully releasing aliens, it was also frequently refusing to initiate immigration court proceedings as required by law.[4] Instead of issuing charging documents to aliens before (unlawfully) releasing them, the government was issuing something called a "notice to report," essentially a request for the alien to turn himself in at a later date. This practice—which is not authorized by any statute or regulation—was apparently described in "[g]uidance sent to border patrol . . . from agency leadership," and was based on an unprecedented assertion of "prosecutorial discretion" to ignore the requirements of the immigration laws.[5]

12.   After Florida filed this suit, the government realized it could not defend that practice. On November 2, 2021, the government issued a new memo (the November memo), which it has now made public only to defend this litigation. *See*

---

[3] *See supra* note 1.

[4] Stef W. Kight, *Scoop: 50,000 migrants released; few report to ICE*, Axios (July 27, 2021), https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[5] Stef W. Kight, *Rio Grande Valley border patrol releasing migrants without court date*, Axios (Mar. 22, 2021), https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

A0049

ECF 6-2 (designating the memo "law enforcement sensitive"). The memo states that, "[e]ffective immediately, [Border Patrol] is ceasing the use of" notices to report. *Id.* at 2.[6]

13.   The memo, however, does little more than move the goalposts. The government has replaced notices to report with a policy called "Parole + ATD" or "Parole and Alternative to Detention." *Id.* at 2–4. The Parole + ATD policy still involves releasing aliens subject to mandatory detention without initiating removal proceedings. But unlike with the notice to report policy, where the government could point to no authority whatsoever, the government now relies on a cramped reading of its parole authority in § 1182.

14.   The government "cannot use that power to parole aliens *en masse*," *Texas v. Biden*, 20 F.4th at 997, which is precisely what the Parole + ATD policy purports to authorize. While the memo implies that this "alternative path" will be used sparingly, ECF 6-2 at 2, the government released over *18,000 migrants* in December 2021 using the Parole + ATD policy.[7]

15.   Taking the challenged policies together, the government is violating clear congressional commands tens of thousands of times per month. It has claimed that it lacks the resources and detention capacity to process and detain the surge of

---

[6] Florida cites to ECF pagination rather than to internal pagination unless otherwise indicated.

[7] *See supra* note 1.

A0050

migrants arriving at the border. But if that is true, it is only because the Biden Administration has tied its own hands behind its back.

16.    For example, the government has flatly refused to use its power under § 1225(b)(2)(C) to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. As the Fifth Circuit recently held, Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention. *Texas v. Biden*, 20 F.4th at 996. They have instead terminated the program under that provision— known as the "Migrant Protection Protocols" or the "wait in Mexico policy"—even though that program was incredibly effective. *See Texas v. Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of that program, in which the government found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border").

17.    The Biden Administration has also—in an incredibly cynical fashion given its litigating position that it cannot detain all those it is required to detain— asked Congress to *reduce* the number of immigration detention beds available to it. It has also refused to avail itself of other options—such as reprogramming funds— to increase that capacity.

18.    To top it off, this Administration's misguided policies are the cause of the surge at the border in the first place. The Biden Administration has publicly

A0051

touted its lax border policies. As Defendant Secretary Mayorkas recently boasted, "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action."[8] The Biden Administration is not *unable* to control the border; it is *unwilling* to do so.

19. This Court, therefore, should vacate and permanently enjoin Defendants from enforcing their (1) policy of releasing aliens subject to mandatory detention (the non-detention policy)—either based on an untenable assertion of enforcement discretion to ignore § 1225 or an abuse of the parole authority under § 1182—and (2) the November memo (the Parole + ATD policy), which also misuses the parole authority under § 1182.

20. With respect to the non-detention policy, the government insists that "no such 'policy' exists." ECF 6-1 at 37. Discovery will show the opposite. In any event, the government does not deny that it is releasing and paroling arriving migrants by the tens of thousands, and the government cannot avoid judicial review of its widespread and unlawful practices by refusing to put them in writing, or more likely, putting them in writing and refusing to make them public. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities establishing that unwritten policies are subject to APA

---

[8] *Secretary Mayorkas Delivers Remarks at the U.S. Conference of Mayors*, U.S. Dep't of Homeland Security (Jan. 20, 2022), https://www.dhs.gov/news/2022/01/20/secretary-mayorkas-delivers-remarks-us-conference-mayors, but it has since been removed.

A0052

review); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (reasoning that a court may infer the existence of an immigration policy where the facts suggest that one exists).

21.    These policies harm Florida. The Biden Administration is releasing tens of thousands of migrants at the border every month.[9] Many of these migrants are arriving or will arrive in Florida,[10] harming the State's quasi-sovereign interests and forcing it to incur millions of dollars in expenses. The government has even confirmed in writing to Florida that it is aware of thousands of arriving aliens who have resettled in Florida.

22.    A video released only days ago demonstrates that federal immigration officials are not just unlawfully releasing migrants, they are affirmatively assisting them in resettling around the country, including in Florida.[11] In the video, federal immigration officials are seen transporting large groups of adult males by bus, and then by taxi, to an airport in the border city of Brownsville, Texas.[12] According to

---

[9] *See supra* note 1.

[10] *See U.S. unauthorized immigrant population estimates by state, 2016*, Pew Res. Ctr. (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (explaining that a majority of unlawful aliens live in just six states, including Florida); *see also Texas v. Biden*, 2021 WL 3603341, at *9 (finding that the Biden Administration's border policies harm the State of Missouri).

[11]    @BillFOXLA, Twitter (Jan. 25, 2022, 10:05 AM), https://mobile.twitter.com/BillFOXLA/status/1485992229017731077.

[12] The video is difficult to reconcile with public statements from the Biden Administration—not to mention representations made in this litigation—that the federal government is expelling single

8

the government, TSA is even accepting immigration arrest warrants as identification sufficient to board a domestic flight.[13]

23.    Despite all this, in its recently filed motion to dismiss, the government argues that any harm to Florida from the challenged policies is "speculative." ECF 6-1 at 21. That is a remarkable statement.[14] Florida spends over $100 million per year just on incarcerating unlawful aliens who commit crimes in the State.[15] And as further described below, Florida spends millions of dollars providing public services and benefits to unlawful immigrants.

---

adults under its public health authority given the COVID-19 pandemic, and therefore not processing them under the immigration laws. *See* Adam Shaw, *DeSantis requests Biden administration stop resettling illegal immigrants in Florida*, Fox News (Aug. 28, 2021), https://www.foxnews.com/politics/desantis-biden-administration-resettling-illegal-immigrants-florida; ECF 6-1 at 15–16 ("[A]lternative processing is not available to individuals . . . covered by" the CDC's "Title 42 Order.").

[13] Adam Shaw et al., *TSA confirms it lets illegal immigrants use arrest warrants as ID in airports*, Fox News (Jan. 21, 2022), https://www.foxnews.com/politics/tsa-confirms-allows-illegal-immigrants-arrest-warrants-id-airports.

[14] In the aforementioned video, one of the migrants is asked, "¿A dónde van?" [Where are you going.] The migrant responds, "A Miami." [To Miami.]

[15] Only months ago, an alien released by the Biden Administration brutally stabbed a Floridian to death. Jack Morphet et al., *Illegal immigrant who posed as minor while crossing border charged with murder in Florida*, N.Y. Post (Nov. 4, 2021, 5:00 AM), https://nypost.com/2021/11/04/illegal-immigrant-who-posed-as-minor-while-crossing-border-charged-with-murder/.

A0054

## PARTIES

24.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

25.    Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

26.    Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

27.    Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the Biden Administration's unlawful policies.

28.    Defendant Alejandro Mayorkas is the Secretary of DHS. Florida sues him in his official capacity.

29.    Defendant Tae Johnson is the Acting Director of ICE. Florida sues him in his official capacity.

A0055

30.     Defendant Chris Magnus is the Commissioner of CBP. He is automatically substituted for Acting Commissioner Troy Miller under Federal Rule of Civil Procedure 25(d). Florida sues him in his official capacity.

31.     Defendant Ur M. Jaddou is the Director of USCIS. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

32.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–03.

33.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

34.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division).[16] Further, because illegal border crossers typically cross into Florida's territory in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here. This Court has already denied Defendants' motion to transfer venue. *See* ECF 13.

---

[16] *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892).

11

# FACTUAL BACKGROUND

## The Relevant Federal Immigration Scheme

35.     "[T]he Immigration and Nationality Act [INA] . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[17]

36.     When aliens arrive in this country, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225 mandates detention for all arriving aliens. *Jennings*, 138 S. Ct. at 837.

37.     Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), unless they indicate an intention to apply for asylum, *id.* In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution (also known as a "credible-fear screening"). *Id.* § 1225(b)(1)(B)(ii). Even if the alien makes that showing, he "*shall be detained* for further consideration of the application for asylum." *Id.* (emphasis added); *see Jennings*, 138 S. Ct. at 837.

---

[17] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

A0057

38.     Aliens not subject to § 1225(b)(1) are governed by § 1225(b)(2). Under (b)(2), unless an alien is "clearly and beyond a doubt entitled to be admitted," Congress has mandated that the alien "*shall be detained*" pending further immigration proceedings. *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1225(b)(2)(A)) (emphasis added).

39.     In short, whether the alien falls under (b)(1) or (b)(2), whether the alien applies for asylum or not, and whether the alien passes a credible-fear screening or not, the alien is subject to mandatory detention. *Jennings*, 138 S. Ct. at 842 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applications for admission until [their] proceedings have concluded."); *accord Texas v. Biden*, 20 F.4th at 996 (explaining that § 1225 "sets forth a general, plainly obligatory rule: detention for aliens seeking admission").

40.     There are only two exceptions to this mandatory detention rule. First, there is one (and only) "circumstance[] under which" these arriving aliens "may be released": when the federal government exercises its "temporary parole" authority. *Jennings*, 138 S. Ct. at 844 (discussing 8 U.S.C. § 1182(d)(5)(A)); *see also* 8 C.F.R. § 208.30(f)(2) (providing parole under § 1182(d)(5) as the only basis for releasing an alien to which § 1225(b)(1) applies);[18] 8 C.F.R. § 212.5 (describing some of

---

[18] The regulation refers to INA § 212(d)(5), which is codified at 8 U.S.C. § 1182(d)(5).

A0058

DHS's parole practices). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In other words, the government "cannot use that power to parole aliens *en masse*." *Texas v. Biden*, 20 F.4th at 997.

41.    Second, § 1225(b)(2)(C) allows the government to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings.

42.    Notably, the government's parole authority used to be broader and could be used "for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (1995). But Congress narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

43.    In addition to detaining these aliens, the government is required to initiate removal proceedings against these aliens. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(1)(B)(iii)(I), (b)(2)(A). The government does so by serving the alien with a

A0059

charging document, which is the document that initiates proceedings in immigration court (much like an information or indictment). For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[19]

44.     For aliens falling under § 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed . . . without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

45.     For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed . . . without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

46.     This language, which is identical in both provisions, refers to expedited removal proceedings. But even if, as the government insists, it has "discretion whether to use expedited or full removal proceedings," ECF 6-1 at 13, this language at a minimum commands the government to initiate those proceedings (and thus serve a charging document).

47.     Even aliens who pass a credible fear screening must be served with a charging document. Defendant USCIS admits this.[20]

---

[19] *See What To Do if You Are in Expedited Removal or Reinstatement of Removal*, Florence Immigrant & Refugee Rights Project, at 1–2 (Oct. 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal% 20-%20English%20%2817%29.pdf (discussing other similar charging documents).

[20] *See Revised Guidance for the Referral of Cases and Issuance of Notice to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, U.S. Citizenship & Immigration Servs., at 4

A0060

48.     The same is true of aliens falling under § 1225(b)(2). These aliens "shall be detained *for a proceeding under section 1229a*," 8 U.S.C. § 1225(b)(2)(A) (emphasis added), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

### The Biden Administration's Actions

49.     The Biden Administration is systematically violating these congressional commands. For the entire month of December 2020—President Trump's last full month in office—Defendant CBP reports that Border Patrol (a component of CBP) released into the interior only 17 aliens after arresting them crossing the southern border and serving them with a notice to appear.[21] By July 2021, that number had risen to over 60,000.[22] In December 2021, the number was

---

(Nov. 7, 2011), https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28Approved%20as%20final%2011-7-11%29.pdf (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* Memorandum from David Pekoske, Acting Sec'y Dep't of Homeland Security, to Troy Miller, Senior Official Performing the Duties of the Comm'r, U.S. Custom & Border Protection 5 (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

[21] *See supra* note 1 (FY2021).

[22] *See supra* note 1 (FY2021).

A0061

over 50,000,[23] bringing the total number since President Biden took office to 366,000.[24]

50.    Releasing this many arriving aliens into the interior necessarily means that the government is violating congressional commands in the immigration laws. When immigration officials release these aliens, they violate the mandatory detention provisions in § 1225. When they, instead, parole aliens *en masse*, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Given the Biden Administration's over 366,000 unlawful releases at the border since February 2021, it is committing more than *one thousand discrete statutory violations per day*.

51.    When Florida filed its original complaint, ECF 1, the Biden Administration was also releasing tens of thousands of migrants without serving a notice to appear. It was instead issuing only a "notice to report," which is essentially a request for the immigrant to turn himself in at a later to date.

---

[23] *See supra* note 1 (FY2022).

[24] *See supra* note 1. The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See Custody and Transfer Statistics FY2020*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (last visited Jan. 31, 2022) (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

A0062

52.    With its motion to dismiss, however, the government attached the November memo, which claims to rescind the government's notice to report policy and replace it with the Parole + ATD policy. *See* ECF 6-2. That policy still involves releasing aliens in violation of the mandatory detention requirements and without initiating removal proceedings, but now doubles down on the government's misuse of its parole authority in § 1182. *Id.* at 3 (expressly invoking that authority).

53.    According to the November memo, § 1182's "urgent humanitarian reasons or significant public benefit" condition is satisfied by the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." ECF 6-2 at 3.

54.    In other words, the government is claiming that any time "capacity constraints or conditions in custody warrant . . . more expeditious" processing, it can ignore the requirements of the immigration laws because those conditions present either "urgent humanitarian reasons" or a "significant public benefit" justifying parole. *Id.*; 8 U.S.C. § 1182(d)(5)(A).

55.    But even if the government's understanding of "urgent humanitarian reasons" or "significant public benefit" were accurate (it is not), Parole + ATD fails to satisfy the "case-by-case" requirement. *See* 8 U.S.C. § 1182(d)(5)(A). For example, the Biden Administration released over *18,000 migrants* in December 2021

18

A0063

using Parole + ATD.[25] Over 550 grants of parole *per day* is not what Congress had in mind when it amended that provision to add the case-by-case requirement. *See Cruz-Miguel*, 650 F.3d at 199 n.15 (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

56.    Moreover, the Parole + ATD policy is a clear attempt to continue the notice to report policy of declining to issue charging documents. Specifically, "as a condition of their parole," individuals processed using Parole + ATD are "required to report to ICE within 15 days to be processed for" a notice to appear. ECF 6-2 at 3.

57.    The failure to issue charging documents immediately, has important consequences. Once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed *in absentia*." *Texas v. Biden*, 2021 WL 3603341, at *4. After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who is not issued a charging document.

---

[25] *See supra* note 1 (FY2022).

A0064

58.    Finally, the government's rationale regarding the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities," ECF 6-2 at 3, is an implausible basis for the Parole + ATD policy given the CDC's Title 42 Order, which addresses those concerns and which this Administration has not taken full advantage of. *See* Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 13, 2020) (exercising the CDC's power under 42 U.S.C. §§ 265, 268 to suspend the introduction of migrants into the United States to protect public health).[26]

59.    The government insists that it lacks the resources to control the surge of migrants at the border. But, as explained in ¶¶ 16–18, these circumstances are of the government's own making.

60.    The Biden Administration is thus promoting its open borders agenda with two steps. One, eliminate effective immigration enforcement measures, and two, use the resulting crisis as a basis to violate congressionally mandated requirements in the immigration laws.

---

[26] This order has been renewed. *See* Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9,942 (Feb. 17, 2021); Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021).

A0065

61.    This has been playing out since the first days of the Administration. *See, e.g.*, *Texas v. United States*, 524 F. Supp. 3d 598, 651–52661–62 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, No. 6:21-cv-16, 2021 WL 3683913, at *42 (S.D. Tex. Aug. 19, 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).

62.    The Administration has even been found to have violated § 1225's mandatory detention provisions, the same requirements Florida claims the government is violating here. *See Texas v. Biden*, 20 F.4th at 998.[27]

63.    In those cases, the Biden Administration insists it lacks the resources to comply with its duties. *See, e.g.*, Defs.' Emergency Mot. for Admin. Stay & Stay Pending Appeal at 4, *Texas v. Biden*, No. 6:21-cv-16 (S.D. Tex. Aug. 20, 2021) (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

64.    Meanwhile, the Biden Administration is going out of its way to make its bad-faith prediction come true. For example, the Administration has asked Congress to *reduce* the number of immigration detention beds available to it.[28] It has

---

[27] The Supreme Court denied the government a stay in that case. *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (Aug. 24, 2021).

[28] Philip Marcelo et al., *Immigrant detention soars despite Biden's campaign promises*, AP News (Aug. 6, 2021), https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-

A0066

justified this request in part based on "recent decreases in interior enforcement activity."[29]

65.    Similarly, as discussed above, *see* ¶ 16, the Administration has abandoned the Migrant Protection Protocols, which reduced the strain on the immigration detention system by requiring arriving migrants to wait in Mexico while their immigration proceedings were pending. Unlike the Biden Administration's policies, this program is expressly authorized by the immigration laws. *See* 8 U.S.C. § 1225(b)(2)(C); ¶ 16.

66.    And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. *See, e.g.*, Exec. Order No. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8,267, 8,270 (Feb. 2, 2021) (revoking, among others, Executive Order 13767, Border Security and Immigration

---

4d7427ff67d586a77487b7efec58e74d ("Biden has proposed funding for 32,500 immigrant detention beds in his budget, a modest decrease from 34,000 funded by Trump."); Cong. Rsch. Serv., R46822, DHS Budget Request Analysis: FY2022 13 (2021) (noting that DHS's FY2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY2021 (reducing that average to 30,000)").

[29] *Fiscal 2022 Congressional Justification*, U.S. Immigration & Customs Enforcement 43 https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement .pdf.

A0067

Enforcement Improvements, 82 Fed. Reg. 8,793 (Jan. 25, 2017), which directed DHS to "terminat[e] . . . the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

67.     Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[30] The Biden Administration has, of course, not sought to do so.

<u>Irreparable Harm to Florida</u>

68.     States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Florida thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

---

[30] U.S. Gov't Accountability Off., GAO-18-343, Immigration Detention: Opportunities Exist to Improve Cost Estimates 2 (2018), https://www.gao.gov/assets/gao-18-343.pdf.

A0068

69.     As a result, there is little Florida can do about the thousands of migrants who have arrived or will arrive in Florida. Some of these unlawful aliens may be otherwise law-abiding, but others are gang members, drug traffickers, and other dangerous criminals.

70.     Many, if not most, of these individuals will never leave the country. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and did not show up to their hearings. *Texas v. Biden*, 2021 WL 3603341, at *4.

71.     Moreover, "most aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Texas v. Biden*, 2021 WL 3603341, at *4. Even most aliens who *pass* the initial credible-fear screening are not ultimately granted asylum. *See* 83 Fed. Reg. at 55,946 (explaining that, in FY2018, 71% of those who had passed a credible-fear screening were denied asylum). And a high percentage of those who claim asylum appear to be doing so in bad faith. *See id.* (explaining that, in FY2018, 31% of those who passed a credible-fear screening absconded and did not show up to their immigration hearings).

72.     The presence of these aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State millions.

A0069

73.     Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government pursuant to 8 U.S.C. § 1231(i).

74.     Florida spends an average of almost $8,000 *per student* each year on public school education,[31] which it provides regardless of immigration status.

75.     Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

76.      Finally, the State frequently pays the cost of emergency medical services for the uninsured.

77.     Many of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur more of these expenses.

---

[31] Every Student Succeeds Act, 2019-20 Per-pupil Expenditures – District and State, Fla. Dep't of Ed., https://www.fldoe.org/core/fileparse.php/7507/urlt/1920District-State-PerPupil.pdf.

A0070

## CLAIMS

## COUNT 1

**Agency action that is not in accordance with law
and is in excess of authority, in violation of the APA
(Non-detention policy)**

78.     Florida repeats and incorporates by reference ¶¶ 1–77.

79.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

80.     The government's policy of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2).

81.     And to the extent the government attempts to justify those releases under the parole authority in § 1182(d)(5)(A), that authority may only be used "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The government's self-imposed crisis does not suddenly render tens of thousands of migrants eligible for relief limited to incredibly narrow circumstances. And even if it did, the government cannot ignore the "case-by-case" requirement.

82.     Nor does any regulation authorize Defendants' policy. The principal parole regulation, 8 C.F.R. § 212.5, says nothing about the mass release of arriving

A0071

aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of §§ 1225(b) and 1182(d)(5)(A).

83.     Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT 2

### Agency action that is not in accordance with law
### and is in excess of authority, in violation of the APA
### (Parole + ATD policy)

84.     Florida repeats and incorporates by reference ¶¶ 1–77, 79.

85.     For similar reasons, the Parole + ATD policy is unlawful. The government cannot parole aliens *en masse* and none of its rationales satisfy the exceedingly high standards in 8 U.S.C. § 1182.

86.     Finally, because this policy is not a valid exercise of the government's § 1182 power, it violates the mandatory detention provisions in § 1225.

## COUNT 3

### Arbitrary and capricious agency action in violation of the APA
### (Non-detention policy)

87.     Florida repeats and incorporates by reference ¶¶ 1–77.

A0072

88.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

89.    The government insists that "no such 'policy' exists." ECF 6-1 at 37. But the facts overwhelmingly suggest otherwise, which means that the government is either withholding the written policy in bad faith, or it has not reduced it to writing. If it is the latter, that means the government has implemented this policy without offering any reasoning in support of it, which is per se arbitrary and capricious.

90.    In any event, the policy is arbitrary and capricious for several reasons. It ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

91.    Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

92.    Moreover, Defendants have neither accounted for Florida's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Id.*

93.    And Defendants ignored an important aspect of the problem because they did not consider the high rate at which those who are released abscond and do not show up to their immigration proceedings.

28

A0073

94.     Finally, insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Com. V. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## COUNT 4

### Arbitrary and capricious agency action in violation of the APA (Parole + ATD policy)

95.     Florida repeats and incorporates by reference ¶¶ 1–77, 88.

96.     The November memo, ECF 6-2, is arbitrary and capricious and should be set aside for many reasons, including that it ignores costs to the States, *Michigan v. EPA*, 576 U.S. at 752–53, and neither accounts for reliance interests nor considers lesser alternatives, *Regents*, 140 S. Ct. at 1913.

97.     The November memo also fails to provide any reasoned explanation for its policy change, a *per se* violation of administrative law's reason-giving requirements. *See Dep't of Com.*, 139 S. Ct. at 2575–76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

A0074

98.   And the government did not consider the degree to which those subject to Parole + ATD will not report to an ICE facility as they are directed to do.

99.   Further, the memo's claim that overcrowding and lack of resources satisfy the "urgent humanitarian reasons or significant public benefit" requirement is an unreasonable interpretation of § 1182.

100.   Finally, insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Com.*, 139 S. Ct. at 2573–74. And the government's reliance on the COVID-19 pandemic is incredulous given it simultaneously claims the power to exclude immigrants wholesale to guard public health against the same pandemic. *See* ¶ 58.

## COUNT 5

### Failure to conduct notice and comment in violation of the APA
### (Non-detention policy)

101.   Florida repeats and incorporates by reference ¶¶ 1–77.

102.   The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

103.   Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483

A0075

(11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[32]

## COUNT 6

### Failure to conduct notice and comment in violation of the APA
### (Parole + ATD policy)

104.   Florida repeats and incorporates by reference ¶¶ 1–77, 102.

105.   The November memo, ECF 6-2, announces a drastic expansion of the government's use of its parole authority.

106.   The government granted parole to *18,000 migrants* in December 2021 alone under this policy.[33]

107.   To the extent this does not violate § 1182, the November memo significantly affected rights and obligations and at a minimum required notice and comment. *See Chrysler Corp.*, 441 U.S. at 303; *Jean*, 711 F.2d at 1482–83.

## COUNT 7

### Agency action unlawfully withheld or
### unreasonably delayed in violation of the APA
### (Non-detention policy)

108.   Florida repeats and incorporates by reference ¶¶ 1–77.

---

[32] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

[33] *See supra* note 1.

31

109.   Defendants' near-blanket refusal to comply with the mandatory-detention provisions in § 1225 and the limits on their parole authority in § 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law, qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT 8

### Violation of the INA and the Constitution

110.   Florida repeats and incorporates by reference ¶¶ 1–77, 80–83, 85–86.

111.   Florida has a non-statutory cause of action to challenge the government's unlawful, ultra vires conduct, which does indeed "survive[] displacement by the APA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)).

112.   The federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Counts 1 and 2. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

A0077

a) Hold unlawful and set aside the November memo and the non-detention policy.

b) Issue permanent injunctive relief enjoining Defendants from enforcing those policies.

c) Compel Defendants to comply with applicable requirements pursuant to 5 U.S.C. § 706.

d) Issue declaratory relief declaring the policies unlawful.

e) Award Florida costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

A0078

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry Whitaker (FBN 1031175)
SOLICITOR GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Rachel Siegel (FBN 1029143)
DEPUTY SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

A0079

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ James H. Percival
James H. Percival

A0080

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                                          **Case No. 3:21cv1066-TKW-EMT**

**UNITED STATES OF AMERICA**,
et al.,

    **Defendants**.

_____/

## ORDER DENYING MOTION TO
## SUPPLEMENT ADMINISTRATIVE RECORD

This case is before the Court based on Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47).  No hearing is necessary to rule on the motion, and upon due consideration of the motion and its attachments and Defendants' response in opposition (Doc. 54), the Court finds that the motion is due to be denied.

In this case, Florida challenges two of Defendants' immigration policies—the so-called "non-detention policy" and the parole + ATD policy—under the Administrative Procedure Act (APA) and the Constitution.  The administrative record prepared by Defendants for the parole + ATD policy consists of only 31 pages.  Florida believes that the administrative record is incomplete and that it should be allowed to conduct extra-record discovery to supplement the record.  Defendants

respond that Florida has not made the showing required to supplement the administrative record or to permit extra-record discovery.

Judicial review of agency action under the APA is typically limited to the record before the agency when it took the challenged action. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). However, the reviewing court may look beyond (and accordingly permit discovery to supplement) the administrative record provided by the agency in some circumstances—including "when 'an agency's failure to explain its action effectively frustrates judicial review' or when 'there is a strong showing of agency bad faith or improper behavior.'" *Morales v. Comm'r of Soc. Sec.*, 799 F. App'x 672, 676 (11th Cir. 2020) (quoting *Pres. Endangered Areas of Cobb's History*, 87 F.3d at 1246 n.1); *see also Marllantas, Inc. v. Rodriguez*, 806 F. App'x 864, 867 (11th Cir. 2020) (finding no error in the district court's decision not to allow discovery to supplement the administrative record produced by the agency because the plaintiff did not make "a strong showing of bad faith or improper behavior"); *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007) (similar); *SOSS2, Inc. v. U.S. Army Corps of Eng'rs*, 403 F. Supp. 3d 1233, 1239 (M.D. Fla. 2019) (finding that the lack of evidence concerning red tide in the

A0082

administrative record did not frustrate judicial review of whether the omission of an analysis of red tide constituted an arbitrary and capricious decision).

Here, it is hard to believe that Defendants adopted an entirely new program pursuant to which thousands of aliens have been released into the country without considering more than 31 pages of evidence,[1] but a government official has certified that to be the case.  That certification, which was made under penalty of perjury, is entitled to a presumption of regularity, *see Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019), and, at this point, Florida has not shown that the certification was made in bad faith or is otherwise improper.  Thus, the administrative record for the ATD + policy is what it is.

The possibility that the administrative record will not provide an adequate justification for the parole + ATD policy is not a sufficient reason to authorize Florida to supplement the record.   Indeed, an inadequate or incomplete administrative record will presumably work in Florida's favor because if the parole + ATD policy is not sufficiently supported by the record, it will be invalidated.  Thus,

---

[1] The paltry size of the administrative record certainly raises the proverbial judicial eyebrow, *see In re United States*, 875 F.3d 1200, 1206 (9th Cir. 2017), and is a factor to be considered in deciding whether to allow extra-record discovery, *see NVE, Inc. v. HHS*, 436 F.3d 182, 196 (3d Cir. 2006), but the Court agrees with Defendants that "the standard for completeness of [an administrative record] is not the number of pages, but the contents of those pages."  Doc. 54 at 19; *see also Nat'l Min. Ass'n v. Jackson*, 2011 WL 9977235, at *4 (D.D.C. Sept. 14, 2011) ("[T]he size of the administrative record is unimportant. … [T]he amount of material in the record is insignificant so long as that material enables the Court to review the agencies' actions and determine the issues in dispute.").

A0083

if as Florida argues in its motion, the administrative record omits material information that was necessary to support the parole + ATD policy, then the policy will not withstand judicial review.   Likewise, Florida's argument that the continuance of the parole + ATD policy cannot be logically squared with the federal government's contemporaneous efforts to repeal the "Title 42 Order" goes more to the merits of Florida's claims than the adequacy of the administrative record.  *See Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 2007 WL 1830864, at *3 (S.D. Ga. June 21, 2007) (rejecting plaintiffs' attempt to supplement the administrative record because their arguments in favor of doing so did not evince bad faith, but rather merely "disputed the … decision-making process" and "repackage[d]" plaintiffs' APA claims).

The fact that the Court's review of the parole + ATD policy under the APA is limited to the 31-page administrative record does not mean that Florida is precluded from seeking discovery altogether because, separate and apart from the APA claims, Florida has alleged that the challenged policies violate the Constitution.  *See Almaklani v. Trump*, 444 F. Supp. 3d 425, 432-33 (E.D.N.Y. 2020) (collecting cases acknowledging a lack of consensus among district courts as to whether additional discovery is appropriate when a constitutional claim is included along with APA claims, and ultimately declining to permit extra-record discovery); *California v. U.S. Dep't of Homeland Sec.*, 2020 WL 1557424, at *12-16 (N.D. Cal. Apr. 1, 2020)

A0084

(collecting cases and concluding that the APA and constitutional claims constituted different factual allegations, therefore opening up additional discovery). Additionally, because Defendants deny the existence of the non-detention policy,[2] Florida cannot be constrained by an administrative record as to that alleged policy. *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012) ("[A]bsent an administrative record constituting the materials upon which the agenc[y] arrived at some decision … plaintiffs would likely be entitled to some discovery to enable meaningful judicial review.").

Accordingly, for the reasons stated above, it is **ORDERED** that Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47) is **DENIED**.

**DONE and ORDERED** this 6th day of June, 2022.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

---

[2] Defendants go so far as to describe the non-detention policy as "imaginary," Doc. 54 at 1 n.1, but that derogatory rhetoric is hard to square with the reality that hundreds of thousands of aliens have not been detained pending immigration proceedings but rather have been released into the country on "parole" or otherwise since January 2021. It is also hard to square Defendants' claim that there is no overriding non-detention policy with the fact that parole decisions are supposed to be made on a case-by-case assessment of the alien's individual circumstances (not just Defendants' capacity constraints and enforcement priorities) and it would likely be statistically impossible for hundreds of thousands of "individualized" decisions to come out exactly the same (i.e., release on parole) by mere happenstance. *See* Doc. 45 at 24. However, the question of whether the non-detention policy is real or imaginary goes to the merits of this case, which is not yet before the Court.

5

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                            Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; CHRIS MAGNUS,
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    *Defendants*.
_____/

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF[*]

---

[*] Pursuant to Rule 15(a)(2), Florida files the Second Amended Complaint with the written consent of Defendants. For the Court's convenience, Florida has attached a redline, as Exhibit A, showing changes from the First Amended Complaint.

A0086

# INTRODUCTION

1.      The Southwest border is in crisis, with record numbers of migrants illegally entering our country. In President Trump's last full month in office, Border Patrol released 17 migrants caught at the border into the interior of the United States. By July 2021, President Biden's Border Patrol had monthly releases of over 60,000, and the numbers remain at that level to this day.[1]

2.      While some arriving migrants have legitimate asylum claims, many do not. Some are gang members and drug traffickers exploiting the immigration crisis, as evidenced by the skyrocketing amount of fentanyl being seized at the border.[2]

3.      In order to protect national security and public safety, but also ensure that those with a legitimate basis to do so may enter the country, Congress created a system for the orderly processing of migrants. This system allows authorities to admit the small fraction of migrants with valid asylum claims and to expel those who are not entitled to asylum, or worse, who mean our country harm.

---

[1]  Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021#. The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[2] CBP Release Operation Fiscal Year 2021 Statistics, U.S. Customs & Border Protection, (Jan. 3, 2022),   https://www.cbp.gov/newsroom/national-media-release/cbp-releases-operational-fiscal-year-2021-statistics (noting that fentanyl seizures increased 134% in FY2021).

1

4.      Aliens arriving at the border, even those claiming asylum, are required by law to be detained pending a decision as to whether they have a valid basis to enter the United States. *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1225(b)(1)(B). That decision is made via immigration proceedings—often called "removal proceedings"—before an immigration judge. In expedited removal proceedings, a decision can be made quickly. If the government does not use expedited removal, it can take much longer.

5.      Either way, Congress has commanded the Executive Branch to detain aliens arriving at the border until a final decision is made regarding removal.

6.      This mandatory detention rule applies "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. 8 U.S.C. § 1225(a)(1).

7.      And the rule makes good sense. "[M]ost aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 3603341, at *4 (N.D. Tex. Aug. 13, 2021). This is, in part, because many aliens claim asylum in bad faith hoping to be released into the interior of the United States and abscond. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,946 (Nov. 9, 2018) (explaining that in

2

FY2018, a staggering 31% of those who were released after passing an initial asylum screening—called a "credible-fear screening"—absconded and did not appear at their immigration hearings).

8.  There are two exceptions to this mandatory detention rule. First, there is one (and only one) "circumstance[] under which" these aliens "may be released" into the United States: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

9.  Second, § 1225(b)(2)(C) allows the government to "return . . . aliens" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. In other words, when migrants arrive at the southern border and claim asylum, the federal government may—instead of detaining them—require them to wait in Mexico while their claims are adjudicated.

10.  Even though Congress has spoken unambiguously, the Biden Administration is willfully ignoring these requirements.

11.  Before November 2021, the government was not only unlawfully releasing aliens, it was also frequently refusing to initiate immigration court

3

proceedings as required by law.[3] Instead of issuing charging documents to aliens before (unlawfully) releasing them, the government was issuing something called a "notice to report," essentially a request for the alien to turn himself in at a later date. This practice—which is not authorized by any statute or regulation—was apparently described in "[g]uidance sent to border patrol . . . from agency leadership," and was based on an unprecedented assertion of "prosecutorial discretion" to ignore the requirements of the immigration laws.[4]

12.     After Florida filed this suit, the government realized it could not defend that practice. On November 2, 2021, the government issued a new memo (the November memo), which it has now made public only to defend this litigation. *See* ECF 6-2 (designating the memo "law enforcement sensitive"). The memo states that, "[e]ffective immediately, [Border Patrol] is ceasing the use of" notices to report. *Id.* at 2.[5]

13.     The memo, however, did little more than move the goalposts. The government replaced notices to report with a policy called "Parole + ATD" or

---

[3] Stef W. Kight, *Scoop: 50,000 migrants released; few report to ICE*, Axios (July 27, 2021), https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[4] Stef W. Kight, *Rio Grande Valley border patrol releasing migrants without court date*, Axios (Mar. 22, 2021), https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

[5] Florida cites to ECF pagination rather than to internal pagination unless otherwise indicated.

A0090

"Parole and Alternative to Detention." *Id.* at 2–4. The Parole + ATD policy still involves releasing aliens subject to mandatory detention without initiating removal proceedings. But unlike with the notice to report policy, where the government could point to no authority whatsoever, the government now relies on a cramped reading of its parole authority in § 1182.

14.     After that policy change, Florida amended its complaint on February 1, 2022. ECF 16. Since that time, however, the government began using the Parole + ATD policy in manners inconsistent with the November memo and the government's representations to this Court. *See* ECF 70.

15.     About a week after Florida found out that the government was departing from the November memo, on July 18, 2022, the government issued a second Parole + ATD memo (the July memo). The government appears to be treating this as a "supplemental" memo regarding the Parole + ATD policy. But it is not. It is either an improper attempt at post hoc rationalization for actions taken under the old policy or a new iteration of the policy entirely.

16.     Taking the challenged policies together, the government is violating clear congressional commands tens of thousands of times per month. It has claimed that it lacks the resources and detention capacity to process and detain the surge of migrants arriving at the border. But if that is true, it is only because the Biden Administration has tied its own hands behind its back.

5

17.    For example, the government has flatly refused to use its power under § 1225(b)(2)(C) to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. It has instead terminated a program under that provision—known as the "Migrant Protection Protocols" or the "wait in Mexico policy"—even though that program was incredibly effective.

18.    The Biden Administration has also—in incredibly cynical fashion given its litigating position that it cannot detain all those it is required to detain—asked Congress to *reduce* the number of immigration detention beds available to it. *See Texas v. United States*, 40 F.4th 205, 217 n.5 (5th Cir. 2022) (finding similar arguments by the government to be made in bad faith). It has also refused to avail itself of other options—such as reprogramming funds—to increase that capacity.

19.    To top it off, this Administration's misguided policies are the cause of the surge at the border in the first place. The Biden Administration has publicly touted its lax border policies. As Defendant Secretary Mayorkas has boasted, "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action."[6] The Biden Administration is not *unable* to control the border; it is *unwilling* to do so.

---

[6] *Secretary Mayorkas Delivers Remarks at the U.S. Conference of Mayors*, U.S. Dep't of Homeland Security (Jan. 20, 2022), https://www.dhs.gov/news/2022/01/20/secretary-mayorkas-delivers-remarks-us-conference-mayors.

6

20.    This Court, therefore, should vacate the following policies: (1) the government's policy of releasing aliens subject to mandatory detention (the non-detention policy), whether based on an untenable assertion of enforcement discretion to ignore § 1225 or an abuse of the parole authority under § 1182, and (2) the Parole + ATD policy, which also misuses the parole authority under § 1182.

21.    With respect to the non-detention policy, the government insists that "no such 'policy' exists," ECF 6-1 at 37, even calling it "imaginary," ECF 55 at 5 n.2. But the policy does exist. And, in any event, the government does not deny that it is releasing and paroling migrants by the tens of thousands, and the government cannot avoid judicial review of its widespread and unlawful practices by refusing to put them in writing, or more likely, putting them in writing and refusing to make them public. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities establishing that unwritten policies are subject to APA review); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (reasoning that a court may infer the existence of an immigration policy where the facts suggest that one exists).

22.    These policies harm Florida. The Biden Administration is releasing tens of thousands of migrants at the border every month.[7] Many of these migrants are

---

[7] *See supra* note 1.

7

A0093

arriving or will arrive in Florida,[8] harming the State's quasi-sovereign interests and forcing it to incur millions of dollars in expenses. The government has even confirmed in writing to Florida that it is aware of thousands of aliens who have resettled in Florida.

23.     A video released by the media suggests that federal immigration officials are not just unlawfully releasing migrants, they are affirmatively assisting them in resettling around the country, including in Florida.[9] In the video, federal immigration officials are seen transporting large groups of adult males by bus, and then by taxi, to an airport in the border city of Brownsville, Texas.[10] According to

---

[8] *See U.S. unauthorized immigrant population estimates by state, 2016*, Pew Res. Ctr. (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (explaining that a majority of unlawful aliens live in just six states, including Florida); *see also Texas v. Biden*, 2021 WL 3603341, at *9 (finding that the Biden Administration's border policies harm the State of Missouri).

[9]     @BillFOXLA, Twitter (Jan. 25, 2022, 10:05 AM), https://mobile.twitter.com/BillFOXLA/status/1485992229017731077.

[10] The video is difficult to reconcile with public statements from the Biden Administration—not to mention representations made in this litigation—that the federal government is expelling single adults under its public health authority given the COVID-19 pandemic, and therefore not processing them under the immigration laws. *See* Adam Shaw, *DeSantis requests Biden administration stop resettling illegal immigrants in Florida*, Fox News (Aug. 28, 2021), https://www.foxnews.com/politics/desantis-biden-administration-resettling-illegal-immigrants-florida; ECF 6-1 at 15–16 ("[A]lternative processing is not available to individuals . . . covered by" the CDC's "Title 42 Order.").

A0094

the government, TSA is even accepting immigration arrest warrants as identification sufficient to board a domestic flight.[11]

24.    Despite all this, in its motions to dismiss, the government argued that any harm to Florida from the challenged policies is "speculative." ECF 6-1 at 21; ECF 23-1 at 21. That is a remarkable statement.[12] Florida spends over $100 million per year just on incarcerating unlawful aliens who commit crimes in the State.[13] And as further described below, Florida spends millions of dollars providing public services and benefits to unlawful immigrants.

## PARTIES

25.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

---

[11] Adam Shaw et al., *TSA confirms it lets illegal immigrants use arrest warrants as ID in airports*, Fox News (Jan. 21, 2022), https://www.foxnews.com/politics/tsa-confirms-allows-illegal-immigrants-arrest-warrants-id-airports.

[12] In the aforementioned video, one of the migrants is asked, "¿A dónde van?" [Where are you going.] The migrant responds, "A Miami." [To Miami.]

[13] Only recently, an alien released by the Biden Administration brutally stabbed a Floridian to death. Jack Morphet et al., *Illegal immigrant who posed as minor while crossing border charged with murder in Florida*, N.Y. Post (Nov. 4, 2021, 5:00 AM), https://nypost.com/2021/11/04/illegal-immigrant-who-posed-as-minor-while-crossing-border-charged-with-murder/.

A0095

26.     Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

27.     Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

28.     Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the Biden Administration's unlawful policies.

29.     Defendant Alejandro Mayorkas is the Secretary of DHS. Florida sues him in his official capacity.

30.     Defendant Tae Johnson is the Acting Director of ICE. Florida sues him in his official capacity.

31.     Defendant Chris Magnus is the Commissioner of CBP.  Florida sues him in his official capacity.

32.     Defendant Ur M. Jaddou is the Director of USCIS. Florida sues her in her official capacity.

10

## JURISDICTION AND VENUE

33.     The   Court   has   subject   matter   jurisdiction   pursuant   to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–03.

34.     The   Court   is   authorized   to   award   the   requested   declaratory   and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

35.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). Further, because illegal border crossers typically cross into Florida's territory in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here.

## FACTUAL BACKGROUND

### The Relevant Federal Immigration Scheme

36.     "[T]he   Immigration   and   Nationality   Act   [INA]   .  .  .   establishes   a comprehensive   scheme   for   aliens'   exclusion   from   and   admission   to   the   United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[14]

---

[14] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

A0097

37.     When aliens arrive at the border, either at a port of entry or when caught crossing illegally, they are subject to 8 U.S.C. § 1225. Section 1225 mandates detention for these aliens. *Jennings*, 138 S. Ct. at 837.

38.     Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), unless they indicate an intention to apply for asylum, *id.* In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution (also known as a "credible-fear screening"). *Id.* § 1225(b)(1)(B)(ii). Even if the alien makes that showing, he "*shall be detained* for further consideration of the application for asylum." *Id.* (emphasis added); *see Jennings*, 138 S. Ct. at 837.

39.     Aliens not subject to § 1225(b)(1) are governed by § 1225(b)(2). Under (b)(2), unless an alien is "clearly and beyond a doubt entitled to be admitted," Congress has mandated that the alien "*shall be detained*" pending further immigration proceedings. *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1225(b)(2)(A)) (emphasis added).

40.     In short, whether the alien falls under (b)(1) or (b)(2), whether the alien applies for asylum or not, and whether the alien passes a credible-fear screening or not, the alien is subject to mandatory detention. *Jennings*, 138 S. Ct. at 842 ("Read

A0098

most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applications for admission until [their] proceedings have concluded.").

41.    There are only two exceptions to this mandatory detention rule. First, there is one (and only) "circumstance[] under which" these aliens "may be released": when the federal government exercises its "temporary parole" authority. *Jennings*, 138 S. Ct. at 844 (discussing 8 U.S.C. § 1182(d)(5)(A)).[15] But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

42.    Second, § 1225(b)(2)(C) allows the government to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings.

43.    Notably, the government's parole authority used to be broader and could be used "for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (1995). But Congress narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650

---

[15] The regulation refers to INA § 212(d)(5), which is codified at 8 U.S.C. § 1182(d)(5).

A0099

F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

44.     In addition to detaining these aliens, the government is required to initiate removal proceedings against these aliens. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(1)(B)(iii)(I), (b)(2)(A). The government does so by serving the alien with a charging document, which is the document that initiates proceedings in immigration court (much like an information or indictment). For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[16]

45.     For aliens falling under § 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed . . . without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

46.     For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed . . . without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

47.     This language, which is identical in both provisions, refers to expedited removal proceedings. But even if, as the government insists, it has "discretion

---

[16] *See What To Do if You Are in Expedited Removal or Reinstatement of Removal*, Florence Immigrant & Refugee Rights Project, at 1–2 (Oct. 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal%20-%20English%20%2817%29.pdf (discussing other similar charging documents).

A0100

whether to use expedited or full removal proceedings," ECF 6-1 at 13, this language at a minimum commands the government to initiate those proceedings (and thus serve a charging document).

48.    Even aliens who pass a credible fear screening must be served with a charging document. Defendant USCIS admits this.[17]

49.    The same is true of aliens falling under § 1225(b)(2). These aliens "shall be detained *for a proceeding under section 1229a*," 8 U.S.C. § 1225(b)(2)(A) (emphasis added), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

<u>The Biden Administration's Actions</u>

50.    The Biden Administration is systematically violating these congressional commands. For the entire month of December 2020—President Trump's last full month in office—Defendant CBP reports that Border Patrol (a component of CBP) released into the interior only 17 aliens after arresting them

---

[17] *See Revised Guidance for the Referral of Cases and Issuance of Notice to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, U.S. Citizenship & Immigration Servs., at 4 (Nov. 7, 2011), https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28Approved%20as%20final%2011-7-11%29.pdf (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* Memorandum from David Pekoske, Acting Sec'y Dep't of Homeland Security, to Troy Miller, Senior Official Performing the Duties of the Comm'r, U.S. Custom & Border Protection 5 (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

A0101

crossing the southern border and serving them with a notice to appear.[18] By July 2021, that number had risen to over 60,000.[19] In December 2021, the number was over 50,000.[20] Since Florida filed its First Amended Complaint, the situation has not improved. In June 2022, the last month available, the number remained over 60,000.[21]

51.    Releasing this many aliens into the interior necessarily means that the government is violating congressional commands in the immigration laws. When immigration officials release these aliens, they violate the mandatory detention provisions in § 1225. When they, instead, parole aliens *en masse*, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

52.    When Florida filed its original complaint, ECF 1, the Biden Administration was also releasing tens of thousands of migrants without serving a notice to appear. It was instead issuing only a "notice to report," which is essentially a request for the immigrant to turn himself in at a later to date.

---

[18] *See supra* note 1 (FY2021).

[19] *See supra* note 1 (FY2021).

[20] *See supra* note 1 (FY2022).

[21] *See supra* note 1.

A0102

53.     The government has now attempted to rescind or modify its policy in response to this litigation twice. Regardless, it continues releasing aliens in violation of the mandatory detention requirements and, in some circumstances, without even initiating removal proceedings.

54.     The government appears to assume that detention capacity constraints satisfy the "urgent humanitarian reasons" or a "significant public benefit" language in the parole statute. *See* 8 U.S.C. § 1182(d)(5)(A); *see, e.g.*, ECF 6-2 at 3.

55.     But even if the government's understanding of "urgent humanitarian reasons" or "significant public benefit" were accurate (it is not), the government's policies fail to satisfy the "case-by-case" requirement. *See* 8 U.S.C. § 1182(d)(5)(A). For example, the Biden Administration released over *18,000 migrants* in December 2021 using the November memo.[22] Over 550 grants of parole *per day* is not what Congress had in mind when it amended that provision to add the case-by-case requirement. *See Cruz-Miguel*, 650 F.3d at 199 n.15 (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

56.     The failure to issue charging documents immediately has important consequences. Once a charging document is served, an alien who fails to appear for

---

[22] *See supra* note 1 (FY2022).

A0103

his removal proceedings can be ordered removed *in absentia*. After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who is not issued a charging document.

57.    Finally, COVID-19 cannot provide a basis for any of the challenged policies given the waning pandemic, the availability of vaccines and therapeutics, and the fact that the CDC's Title 42 Order remains in effect.

58.    The government insists that it lacks the resources to control the surge of migrants at the border. But, as explained in ¶¶ 16–19, these circumstances are of the government's own making.

59.    The Biden Administration is thus promoting its open borders agenda with two steps. One, eliminate effective immigration enforcement measures, and two, use the resulting crisis as a basis to violate congressionally mandated requirements in the immigration laws.

60.    In legal challenges, the Biden Administration insists it lacks the resources to comply with its duties. *See, e.g.*, Defs.' Emergency Mot. for Admin. Stay & Stay Pending Appeal at 4, *Texas v. Biden*, No. 6:21-cv-16 (S.D. Tex. Aug. 20, 2021) (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

A0104

61.     Meanwhile, the Biden Administration is going out of its way to make its bad-faith prediction come true. For example, the Administration has asked Congress to *reduce* the number of immigration detention beds available to it.[23] It has justified this request in part based on "recent decreases in interior enforcement activity."[24]

62.     Similarly, as discussed above, the Administration has abandoned the Migrant Protection Protocols, which reduced the strain on the immigration detention system by requiring arriving migrants to wait in Mexico while their immigration proceedings were pending.

63.     And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. *See, e.g.*, Exec. Order No. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America and To Provide Safe and Orderly Processing of Asylum

---

[23] Philip Marcelo et al., *Immigrant detention soars despite Biden's campaign promises*, AP News (Aug. 6, 2021), https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-4d7427ff67d586a77487b7efec58e74d ("Biden has proposed funding for 32,500 immigrant detention beds in his budget, a modest decrease from 34,000 funded by Trump."); Cong. Rsch. Serv., R46822, DHS Budget Request Analysis: FY2022 13 (2021) (noting that DHS's FY2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY2021 (reducing that average to 30,000").

[24] *Fiscal 2022 Congressional Justification*, U.S. Immigration & Customs Enforcement 43 https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement .pdf.

A0105

Seekers at the United States Border, 86 Fed. Reg. 8,267, 8,270 (Feb. 2, 2021) (revoking, among others, Executive Order 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793 (Jan. 25, 2017), which directed DHS to "terminat[e] . . . the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

64.    Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[25] The Biden Administration has, of course, not sought to do so.

<u>Irreparable Harm to Florida</u>

65.    States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Florida thus relies significantly on the federal government to fulfill its duties

---

[25] U.S. Gov't Accountability Off., GAO-18-343, Immigration Detention: Opportunities Exist to Improve Cost Estimates 2 (2018), https://www.gao.gov/assets/gao-18-343.pdf.

A0106

under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

66.    As a result, there is little Florida can do about the thousands of migrants who have arrived or will arrive in Florida. Some of these unlawful aliens may be otherwise law-abiding, but others are gang members, drug traffickers, and other dangerous criminals.

67.    Many, if not most, of these individuals will never leave the country. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and did not show up to their hearings. *Texas v. Biden*, 2021 WL 3603341, at *4.

68.    Moreover, "most aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Id.* Even most aliens who *pass* the initial credible-fear screening are not ultimately granted asylum. *See* 83 Fed. Reg. at 55,946 (explaining that, in FY2018, 71% of those who had passed a credible-fear screening were denied asylum). And a high percentage of those who claim asylum appear to be doing so in bad faith. *See id.* (explaining that, in FY2018, 31% of those who passed a credible-fear screening absconded and did not show up to their immigration hearings).

A0107

69.     The presence of these aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State millions.

70.     Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government pursuant to 8 U.S.C. § 1231(i).

71.     Florida spends an average of almost $8,000 *per student* each year on public school education,[26] which it provides regardless of immigration status.

72.     Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

73.      Florida frequently pays the cost of emergency medical services for the uninsured.

74.     Florida's   Department   of   Economic   Opportunity   provides unemployment benefits to certain aliens released under the challenged policies.

---

[26] Every Student Succeeds Act, 2019-20 Per-pupil Expenditures – District and State, Fla. Dep't of Ed., https://www.fldoe.org/core/fileparse.php/7507/urlt/1920District-State-PerPupil.pdf.

A0108

75.     Finally, Florida's Department of Highway Safety and Motor Vehicles provides driver's licenses and identification cards to certain aliens released under the challenged policies and incurs costs in doing so.

76.     Many of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur more of these expenses.

## CLAIMS

## COUNT 1

**Agency action that is not in accordance with law
and is in excess of authority, in violation of the APA
(Non-detention policy)**

77.     Florida repeats and incorporates by reference ¶¶ 1–76.

78.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

79.     The government's policy of refusing to detain aliens arriving at the border is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2).

80.     And to the extent the government attempts to justify those releases under the parole authority in § 1182(d)(5)(A), that authority may only be used "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The government's self-imposed crisis does not

23

suddenly render tens of thousands of migrants eligible for relief limited to incredibly narrow circumstances. And even if it did, the government cannot ignore the "case-by-case" requirement.

81.    Nor does any regulation authorize Defendants' policy. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of §§ 1225(b) and 1182(d)(5)(A).

82.    Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## <u>COUNT 2</u>

### Agency action that is not in accordance with law and is in excess of authority, in violation of the APA (Parole + ATD policy)

83.    Florida repeats and incorporates by reference ¶¶ 1–76, 78.

84.    For similar reasons, the Parole + ATD policy is unlawful. That policy is codified in both the November memo and the July memo. The November memo was contrary to law, and regardless whether the July memo is a new iteration of the

A0110

policy or an inappropriate post hoc rationalization for the existing policy, it is also contrary to law.

85.     The government cannot parole aliens *en masse* and none of its rationales satisfy the exceedingly high standards in 8 U.S.C. § 1182.

86.     Finally, because this policy is not a valid exercise of the government's § 1182 power, it violates the mandatory detention provisions in § 1225.

## COUNT 3

### Arbitrary and capricious agency action in violation of the APA
### (Non-detention policy)

87.     Florida repeats and incorporates by reference ¶¶ 1–76.

88.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

89.     The government insists that "no such 'policy' exists." ECF 6-1 at 37. But the facts overwhelmingly show otherwise. For example, Defendants have eliminated 100% of the government's detention capacity for family units. They are therefore acting in bad faith when they say that lack of detention capacity justifies mass releasing migrants.

90.     Moreover, the policy is arbitrary and capricious for several reasons. It ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

A0111

91.     Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

92.     Defendants have neither accounted for Florida's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Id.*

93.     And Defendants ignored an important aspect of the problem because they did not consider the high rate at which those who are released abscond and do not show up to their immigration proceedings.

94.     Finally, insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## **COUNT 4**

### **Arbitrary and capricious agency action in violation of the APA (Parole + ATD policy)**

95.     Florida repeats and incorporates by reference ¶¶ 1–76, 84, 88.

96.     The Parole + ATD policy is arbitrary and capricious and should be set aside for many reasons, including that it ignores costs to the States, *Michigan v. EPA*,

26

576 U.S. at 752–53, and neither accounts for reliance interests nor considers lesser alternatives, *Regents*, 140 S. Ct. at 1913.

97.   The policy fails to provide a reasoned explanation, a per se violation of administrative law's reason-giving requirements. *See Dep't of Com.*, 139 S. Ct. at 2575–76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

98.   The government did not consider the degree to which those subject to Parole + ATD will not report to an ICE facility as they are directed to do; it did not consider whether to increase detention capacity or reopen family detention centers; and it did not consider whether the Parole + ATD policy is creating a perception among potential migrants that traveling to the border will result in release into the interior and therefore whether the policy is exacerbating the border crisis.

99.   Further, the policy reflects an invalid interpretation of § 1182.

100.   Finally, insofar as Defendants claim their policies are justified by resource constraints or the COVID-19 pandemic, these justifications are pretextual. *See Dep't of Com.*, 139 S. Ct. at 2573–74.

A0113

## COUNT 5

**Failure to conduct notice and comment in violation of the APA
(Non-detention policy)**

101.   Florida repeats and incorporates by reference ¶¶ 1–76.

102.   The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

103.   Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to aliens arriving at the border, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483 (11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[27]

## COUNT 6

**Failure to conduct notice and comment in violation of the APA
(Parole + ATD policy)**

104.   Florida repeats and incorporates by reference ¶¶ 1–76, 84, 102.

105.   The Parole + ATD policy is a drastic expansion of the government's use of its parole authority.

---

[27] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

A0114

106.   To the extent this does not violate § 1182, the Parole + ATD policy significantly affected rights and obligations and at a minimum required notice and comment. *See Chrysler Corp.*, 441 U.S. at 303; *Jean*, 711 F.2d at 1482–83.

## COUNT 7

### Agency action unlawfully withheld or unreasonably delayed in violation of the APA (Non-detention policy)

107.   Florida repeats and incorporates by reference ¶¶ 1–76.

108.   Defendants' near-blanket refusal to comply with the mandatory-detention provisions in § 1225 and the limits on their parole authority in § 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law, qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT 8

### Violation of the INA and the Constitution

109.   Florida repeats and incorporates by reference ¶¶ 1–76, 79–82, 84–86.

110.   Florida has a non-statutory cause of action to challenge the government's unlawful, ultra vires conduct, which does indeed "survive[] displacement by the APA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)).

A0115

111.   The federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Counts 1 and 2. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the Parole + ATD policy and the non-detention policy.

b) Issue permanent injunctive relief enjoining Defendants from enforcing those policies.

c) Compel Defendants to comply with applicable requirements pursuant to 5 U.S.C. § 706.

d) Issue declaratory relief declaring the policies unlawful.

e) Award Florida costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

A0116

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

BILAL FARUQUI (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

31

**A0117**

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
James H. Percival

A0118

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                                Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## **JOINT PRETRIAL STIPULATION**

Pursuant to this Court's November 18, 2022 order, Doc. 118, the parties submit this joint pre-trial stipulation.[1]

### **Basis of Federal Jurisdiction**

The parties disagree as to whether Florida can establish Article III standing. The parties agree that the Court has jurisdiction to determine whether Florida has standing. If this Court finds that Florida has established standing, Florida maintains that this Court otherwise has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–03. Defendants maintain that the Court lacks subject matter jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii) and 5 U.S.C. § 701(a)(1)–(2), although they recognize that the Court has thus far disagreed. The

---

[1] The parties agree that this document also serves as their Rule 26(a)(3) disclosures.

parties agree that any other disputes between the parties do not go to subject matter jurisdiction.

## Nature of the Action

Florida challenges two immigration policies that, according to Florida, Defendants are implementing: (1) the alleged non-detention policy and (2) the Parole + ATD policy. The currently operative Parole + ATD policy is the July 18, 2022 memorandum; the parties dispute the existence of the non-detention policy.

Florida's second amended complaint, Doc. 74, asserts eight counts: (1) a contrary to law claim against the non-detention policy under the Administrative Procedure Act (APA), (2) a contrary to law claim against the Parole + ATD policy under the APA, (3) an arbitrary and capricious claim against the non-detention policy under the APA, (4) an arbitrary and capricious claim against the Parole + ATD policy under the APA, (5) a notice and comment claim against the non-detention policy under the APA, (6) a notice and comment claim against the Parole + ATD policy under the APA, (7) a claim for agency action unlawfully withheld or unreasonable delayed under the APA, and (8) an equitable and constitutional claim, brought pursuant to the Take Care Clause, the separation of powers doctrine, and the ultra vires doctrine, asserting that Defendants are violating the Immigration and Nationality Act (INA).

2

Florida seeks vacatur of the non-detention and Parole + ATD policies under 5 U.S.C. § 706, a declaratory judgment under 28 U.S.C. § 2201, and an injunction under 28 U.S.C. §§ 1361 and 2202.

Defendants maintain that Florida lacks standing to bring this case; that Florida's claims raise nonjusticiable political questions; that Florida cannot obtain review of its claims under the APA; that Florida lacks any cause of action under the United States Constitution; and that each of Florida's claims lacks legal and factual merit. Further, Florida cannot obtain injunctive relief, or any relief that operates as a functional equivalent of an injunction, under 8 U.S.C. § 1252(f)(1), including vacatur and certain declaratory relief.

## General Statement of Case

A. <u>Florida's Case</u>

8 U.S.C. § 1225(b)(1)–(2) mandates that Defendants detain applicants for admission, as defined in 8 U.S.C. § 1225(a)(1), until Defendants adjudicate whether the alien is to be removed.[2] Section 1182(d)(5) provides an exception. It allows Defendants, "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," to parole into the United States aliens otherwise subject to mandatory detention under § 1225(b)(1)–(2). *See* 8 U.S.C. § 1182(d)(5)(A).

---

[2] Defendants object to using the term "alien" as they prefer the term "non-citizen." Florida uses "alien" for the reasons stated in the Court's Order Denying Defendant's Motion to Dismiss. *See* Doc. 45 at 2 n.2.

A0121

Importantly, even when parole is permitted, "such parole . . . shall not be regarded as an admission of the alien and when the purposes of parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.*

Florida contends that, soon after President Biden took office, Defendants began systematically ignoring the mandatory detention language in § 1225(b) and misusing their parole authority in § 1182(d)(5). Beginning in February 2021, Defendants began taking steps to abolish all family detention and to reduce ICE's detention capacity for single adults. In March 2021, Defendants began releasing illegal border crossers into the interior of the United States under the guise of "prosecutorial discretion." Defendants also began releasing aliens under 8 U.S.C. § 1226(a), which does not apply to the aliens at issue in this case.

On November 2, 2021, after Florida filed this suit but before Defendants' motion to dismiss was due, Defendants issued the first Parole + ATD memo, though there is evidence that Parole + ATD began earlier. The November Parole + ATD memo purported to rescind the prosecutorial discretion policy, though it did not rescind the authorization to release under § 1226(a). The November Parole + ATD policy framed the policy as a COVID mitigation policy and limited its use to family units.

4

On July 18, 2022, Defendants issued a second Parole + ATD memo, which rescinded the November 2 version. This policy is not limited to family units and is not based on COVID. As with the November memo, there is evidence that these changes to Parole + ATD occurred before Defendants issued the July memo.

Since March 2021, Border Patrol has released approximately one million applicants for admission at the southwest border, including as many as 105,000 in a single month. These numbers reflect (a) prosecutorial discretion releases, (b) releases under § 1226(a), and (c) Parole + ATD releases. By comparison, the Trump Administration's Border Patrol released 17 applicants for admission in December of 2020.

Even as the border crisis has worsened, Defendants have continued to cut detention capacity, all the while telling Congress that these cuts will not interfere with their duties.

As injury to support standing, Florida relies on a variety of public services and other expenditures that it makes available to unauthorized aliens, including the cost of (a) incarcerating inadmissible aliens who commit crimes, (b) public school expenses, (c) public assistance, (d) emergency medical services, (e) unemployment benefits, and (f) costs associated with issuing driver's licenses and identification cards.

A0123

B. Defendants' Case

Section 1225(b) provides for detention of applicants for admission pending expedited removal proceedings or proceedings under 8 U.S.C. 1229a. 8 U.S.C. 1182(d)(5)(A) provides for parole of noncitizens from custody under section 1225(b), without numerical limitation unlike other provisions of the INA, so long as it is granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Regulation makes clear that parole is available for noncitizens "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5). Finally, applicants for admission who are unlawfully present inside the country may be released on bond or conditional parole pending removal proceedings under 8 U.S.C. § 1226(a).

In this case, Florida challenges (1) the Parole + ATD policy and (2) an alleged, but non-existent, "non-detention policy" under the APA and U.S. Constitution. The Court has previously indicated why Florida's constitutional claim lacks merit, and that it will be separately adjudicating the APA challenges to Parole + ATD on the basis of the administrative record, as is required under the APA.

At issue in this trial are (1) Florida's APA claims challenging the alleged "non-detention policy," (2) whether Florida has standing to bring this action, and (3) the scope of relief the Court can provide. Florida bears the burden of establishing that such a policy exists, much less that it violates the INA. Florida has not and

A0124

cannot meet this burden.  At threshold, there is no "non-detention policy." Rather, Florida takes issue with an amalgam of individual parole decisions and agency budgetary judgments that do not represent a challengeable agency action under the APA, and are fully within Defendants' discretion even if they were challengeable.

Outside of Parole + ATD—a policy not at issue in the trial but also fully in compliance with 8 U.S.C. § 1182(d)(5)(A)—Defendants have not promulgated any presently operative general policies concerning the release of noncitizens encountered at the Southwest border in the past two years. Rather, Defendants rely on their longstanding authority under 8 U.S.C. §§ 1182(d)(5)(A) and 1226(a), and their inherent enforcement discretion to make detention and release decisions guided by 8 C.F.R. § 212.5 and detention-and-parole guidance issued by prior Administrations. Regardless of the number of noncitizens paroled, all such paroles are granted only on an individualized "case-by-case" basis for an "urgent humanitarian reason or significant public benefit." Further, many of the releases Florida identifies are of noncitizens apprehended inside the United States border subject to and released pursuant to DHS's authority under 8 U.S.C. § 1226(a), which places no substantive limitation on Defendants' discretion to conditionally release them pending removal proceedings.

Florida has not and cannot show that Defendants are abdicating their statutory responsibilities under 8 U.S.C. §§ 1225 or 1226 to initiate removal and detain

applicants for admission. Undisputed statistics demonstrate that Defendants detain noncitizens presenting a public safety or flight risk. Defendants have also leveraged the Alternatives to Detention program to ensure a vastly greater number of noncitizens show up for their removal proceedings than if Defendants' resources were devoted to traditional detention alone. Florida's quantitative disagreements with Defendants' operational decisions do not show any violation of the law, but are instead policy debates ripe for resolution in the voting booths, not the courts.

Finally, Florida lacks standing to even challenge the alleged "non-detention policy" or Parole + ATD at all. It must establish an injury caused by these alleged practices that can be redressed by this Court. However, Florida lacks any injury against the federal government where it is challenging only the indirect effects to it of federal actions and decisions that operate directly upon the people in the States. Even if indirect effects in the form of costs to Florida's agencies were cognizable injuries, Florida has no evidence tracing these costs to the conduct challenged here. At most they can show only the general presence of third-party noncitizens under a variety of statuses in the State, which is insufficient to demonstrate Article III standing.  Finally, given this lack of evidence that Florida's costs are caused by the alleged practices at issue here, and that the Court cannot order injunctive or vacatur relief, or enter a declaration that functions as the equivalent of an injunction under 8 U.S.C. § 1252(f), Florida lacks redress.

A0126

## Exhibit List

Florida's exhibits are listed in the following table along with Defendants' objections.

| Exhibit Number | Description | Defendants' Objections[3] |
|---|---|---|
| Exhibit 1 | Customs and Border Protection Custody and Transfer Statistics FY2020 | |
| Exhibit 2 | Customs and Border Protection Custody and Transfer Statistics FY2021 | |
| Exhibit 3 | Customs and Border Protection Custody and Transfer Statistics FY2022 | |
| Exhibit 4 | Customs and Border Protection Custody and Transfer Statistics FY2023 | |
| Exhibit 5 | ICE Detention Data FY19 | |
| Exhibit 6 | ICE Detention Data EOFY2020 | |
| Exhibit 7 | ICE Detention Data, FY21 YTD | |
| Exhibit 8 | ICE Detention Data, FY2022 | |
| Exhibit 9 | ICE Detention Data, FY2023 (current through October 2022) | |
| Exhibit 10 | Data produced by Defendants regarding numbers of aliens present in Florida | |
| Exhibit 11 | Fiscal Year 2016 ICE Enforcement and Removal Operations Report | |
| Exhibit 12 | ICE Fiscal Year 2020 Enforcement and Removal Operations Report | |
| Exhibit 13 | FY2021 Budget in Brief (Price Ex. 13) | |
| Exhibit 14 | DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (January, 20, 2021) | Fed. R. Evid. (FRE) 402, 403 |
| Exhibit 15 | ICE Budget Overview, Fiscal Year 2021 Congressional Justification | |
| Exhibit 16 | January 20, 2021 Pekoske Memo | FRE 402, 403 |
| Exhibit 17 | January 27, 2021 Email from Enrique Lucero re: ERO historical book-in data compared to new DHS memo and PEP | FRE 402, 403, 802 |
| Exhibit 18 | U.S. Border Patrol February 16, 2021 Email re "ERO Changes" | FRE 802 |
| Exhibit 19 | March 2021 Interim Report of Juvenile Coordinator in *Flores v. Garland*, C.D. Cal., 2:85-cv-4544 | FRE 402, 403, 802 |
| Exhibit 20 | March 19, 2021 Memo re: Prosecutorial Discretion | FRE 402, 403 |

---

[3] Pursuant to the Court's rule that any objections not listed will be deemed waived, Doc. 118, Defendants make all potential objections based on the face of the document in an abundance of caution. Defendants may not assert all objections listed at trial depending on the foundation laid and the context in which each exhibit is proffered.

| Exhibit 21 | U.S. Border Patrol March 20, 2021 Email regarding "Prosecutorial Discretion Authority" | FRE 402, 403, 802 |
|---|---|---|
| Exhibit 22 | U.S. Border Patrol May 21, 2021 Email regarding "HOT TASKER – FMUA Daily Ave" | FRE 402, 403, 802 |
| Exhibit 23 | July 27, 2021 DHS and Mayorkas Testimony to Sen. Comm. on Hom. Sec. and Gov. Affairs | FRE 402, 403, 701, 802 |
| Exhibit 24 | October 20, 2021 Letter from Tae Johnson to Governor Ron DeSantis | FRE 402, 403, 802 |
| Exhibit 25 | DHS FY2022 Budget in Brief | |
| Exhibit 26 | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2022 | |
| Exhibit 27 | DHS FY 2023 Budget in Brief | |
| Exhibit 28 | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2023 | |
| Exhibit 29 | April 29, 2022 Letter from U.S. Reps. Soto and Murphy re: Backlog at Orlando ICE Facility | FRE 402, 802 |
| Exhibit 30 | May 15, 2022 Email from Tony Barker re: Quick Look Report | FRE 402, 403, 802 |
| Exhibit 31 | May 19, 2022 Memo from Chief Ortiz re: Noncitizens releases from U.S. Border Patrol Custody | |
| Exhibit 32 | November 2, 2021 Parole + ATD Memo Administrative Record | FRE 402, APA Record Rule |
| Exhibit 33 | July 1, 2022 Annual Report of Immigration and Customs Enforcement in *Flores v. Garland*, C.D. Cal., 2:85-cv-4544 | FRE 402, 403 |
| Exhibit 34 | Operation Horizon, Concept of Operations, November 2021 | FRE 402, 403 |
| Exhibit 35 | Operation Horizon Phase 2, Concept of Operations, February 2022 | FRE 402, 403 |
| Exhibit 36 | Operation Horizon NTA Packet Example | |
| Exhibit 37 | Operation Horizon ICE Training Video 1 (produced file name: "1066 - ICE - OH Video-Redacted 101222") | FRE 402, 802 |
| Exhibit 38 | Operational Horizon ICE Training Video 2 (produced file name: "1066 - ICE - Processing Officers-Meeting Recording 1st Session-Redacted 101422") | FRE 402, 802 |
| Exhibit 39 | Operational Horizon ICE Training Video 3 (produced file name: "1066 - Ice - Operation Horizon Phase 2 ----HSI & CBP   Train-the-Trainer 101422") | FRE 402, 802 |
| Exhibit 40 | July 18, 2022 Parole + ATD Memo CBP Supplemental Administrative Record | FRE 402, APA Record Rule |
| Exhibit 41 | July 18, 2022 Parole + ATD Memo ICE Supplemental Administrative Record | FRE 402, APA Record Rule |
| Exhibit 42 | Press Release: CBP Releases August 2022 Monthly Operational Update | FRE 402, 403 |
| Exhibit 43 | U.S. Government Accountability Office September 2022 Report regarding Challenges and Efforts Implementing New Processes for Noncitizen Families | FRE 402, 403, 701, 802 |

A0128

| Exhibit 44 | December 16, 2014 memo from Acting Executive Director, Admissibility and Passenger Program re: Parole of Inadmissible Aliens | FRE 402 |
|---|---|---|
| Exhibit 45 | The Biden Plan for Securing Our Values as a Nation of Immigrants | FRE 402, 403, 802 |
| Exhibit 46 | U.S. Border Patrol Processing Pathways | |
| Exhibit 47 | U.S. Customs and Border Protection (CBP), Overview of the Southwest Border | FRE 802 |
| Exhibit 48 | Defendants' Responses to Plaintiff's First Set of Interrogatories | |
| Exhibit 49 | Secretary Mayorkas Delivers Remarks in Del Rio, TX (September 20, 2021) | FRE 402, 403, 802 |
| Exhibit 50 | Customs and Border Protection Custody and Transfer Statistics FY2023 | |
| Exhibit 51 | [Intentionally left blank to avoid renumbering issues. Will be cut form final exhibit list.] | |
| Exhibit 52 | [Intentionally left blank to avoid renumbering issues. Will be cut form final exhibit list.] | |
| Exhibit 53 | Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (Feb. 2, 2021) | |
| Exhibit 54 | Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements) | FRE 402, 403 |
| Exhibit 55 | Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States) | FRE 402, 403 |
| Exhibit 56 | Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System) | FRE 402, 403 |
| Exhibit 57 | Presidential Memorandum of April 6, 2018 (Ending ''Catch and Release'' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement) | FRE 402, 403 |
| Exhibit 58 | Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States) | FRE 402, 403 |
| Exhibit 59 | June 2021 Memo re Notice to Report | FRE 402, 403, deliberative process privilege |
| Exhibit 60 | OIG Report re ICE Housing Migrant Families in Hotels (April 12, 2022) | FRE 402, 403, 802, 701 |
| Exhibit 61 | May 4, 2022 Testimony of Alejandro Mayorkas before Senate Comm. on Homeland Security and Governmental Affairs (https://www.hsgac.senate.gov/hearings/05/04/2022/resources- | FRE 402, 403, 802 |

11

| | and-authorities-needed-to-protect-and-secure-the-homeland) [Timestamp: 2:27:00–2:34:00] [updated with correct date] | |
|---|---|---|
| Exhibit 62 | May 26, 2021 Testimony of Alejandro Mayorkas, Tae Johnson, and Troy Miller before House Committee on Appropriations, Subcommittee on Homeland Security | FRE 402, 404, 701, 802 |
| Exhibit 63 | Defendants' Responses to Plaintiff's First Set of Requests for Admission | |
| Exhibit 64 | Apprehension, Processing, Care, and Custody of Alien Minors and UAC, 84 Fed. Reg. 44,392 (Aug. 23, 2019) (Price Ex. 12) | FRE 402 |
| Exhibit 65 | AHCA Florida Emergency Assistance for Noncitizens (Ex. B to AHCA Depo) | FRE 402 |
| Composite Exhibit 66 | Composite Exhibit 66: Data from Florida Department of Economic Opportunity | FRE 402, 802 |
| Exhibit 67 | Florida Department of Education State FEFP Distributions by Month from FY 2019–2020 through 2022–23 | FRE 402 |
| Exhibit 68 | Florida Department of Education State Class Size Reduction Distributions by Month from FY 2019–20 through 2022–23 | FRE 402 |
| Exhibit 69 | Florida Education and Finance Program 2021–22 Final Calculation | FRE 402 |
| Exhibit 70 | Florida Education and Finance Program 2020–21 Final Calculation | FRE 402 |
| Exhibit 71 | Florida Education and Finance Program 2022–23 Second Calculation | FRE 402 |
| Exhibit 72 | Florida Department of Education Enrollment by Immigration Status 2020–21 and 2021–22, Final Surveys 2,3,5 | FRE 402 |
| Exhibit 73 | FLHSMV Non-Immigrants Transactions from Jan. 1, 2020 through May 31, 2022 | FRE 402 |
| Exhibit 74 | FLHSMV Non-Immigrants Transactions from Jan. 1, 2020 through August 31, 2022 | FRE 402 |
| Composite Exhibit 75 | Highway Safety Examples of Paroled Noncitizens who Applied for a Driver's License or ID Card | FRE 402 |
| Exhibit 76 | FDC Costs of Incarceration Per Month | FRE 402, 802 |
| Exhibit 77 | FDC FY 15–16 SCAAP Data | FRE 402 |
| Exhibit 78 | FDC FY 16–17 SCAAP Data | FRE 402 |
| Exhibit 79 | FDC FY 17–18 SCAAP Data | FRE 402 |
| Exhibit 80 | FDC FY 18–19 SCAAP Data | FRE 402 |
| Exhibit 81 | FDC List of Criminal Aliens in FDC Custody as of May 6, 2022 | FRE 402, 802 |
| Exhibit 82 | DCF Domestic Violence Contractual Payments from July 1, 2020 through June 30, 2021 | FRE 402, 802 |
| Exhibit 83 | DCF Cheat Sheet for Domestic Violence Providers | FRE 402, 802 |
| Exhibit 84 | DCF FY 19–20 Bed Cost Chart | FRE 402, 802 |
| Exhibit 85 | DCF FY 20–21 Bed Cost Chart | FRE 402, 802 |
| Exhibit 86 | DCF FY 21–22 Bed Cost Chart | FRE 402, 802 |
| Exhibit 87 | DCF OCW Noncitizen Payments | FRE 402, 802 |

A0130

| Exhibit 88 | DCF ESS Data | FRE 402, 802 |
| Exhibit 89 | DCF Noncitizens Guide | FRE 802 |
| Exhibit 90 | DCF FY 19–20 Undocumented Persons in State Mental Health Treatment Facilities | FRE 402, 403, 802 |
| Exhibit 91 | DCF FY 21–22 Undocumented Persons in State Mental Health Treatment Facilities | FRE 402, 403, 802 |
| Exhibit 92 | DCF Community Mental Health Services Expenditures | FRE 402, 403, 802 |
| Exhibit 93 | DCF ESS Summary of Costs | FRE 402, 802 |
| Exhibit 94 | Summary of FLHSMV DL and ID Issuances | FRE 402, 802 |
| Exhibit 95 | Copy of PERA 4206 Immigration Enrollments 2021–2022 FS235 | FRE 402, 802 |
| Exhibit 96 | BJA FY 2021 State Criminal Alien Assistance Program Grant Solicitation O-BJA-2021-171190 | FRE 402, 403 |
| Exhibit 97 | Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where A Quarantinable Communicable Disease Exists (April 6, 2022) | FRE 402 |

Defendants' exhibits are listed in the following table. Florida has no objections.

| Exhibit No. | Description |
| --- | --- |
| A | *Padilla* Injunction Implementation Guidance and the Interim Parole Policy |
| B | CBP Parole Directive 3340-043 |
| C | ICE Parole Directive 11002.1 |
| D | CBP – Paroling Arriving Fugitives (Aug. 8, 2012) |
| E | CBP – Parole of Inadmissible Nonimmigrant Aliens (Nov. 19, 2014) |
| F | CBP – Parole of Inadmissible Nonimmigrant Aliens (Dec. 16, 2014) |
| G | CBP – Parole of Inadmissible Nonimmigrant Aliens (May 12, 2015) |
| H | ICE Academy: Guidelines for the Enforcement of Civil Immigration Law: Foundational Training |
| I | ICE Transportation, Detention and Processing Requirements (Jan. 11, 2005) |
| J | ICE ERO, Parole of Arriving Noncitizens Considered for Release (broadcast email) (Nov. 17, 2021) |
| K | DHS Memo – "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017) |
| L | USBP Processing Pathways Prioritization |
| M | DHS Southwest Border Task Force Executive Leadership Report (excerpt) |
| N | Statement by Secretary Mayorkas on CDC's Title 42 Order Termination |
| O | *Flores v. Rosen*, No. 19-56326 (9th Cir. Dec. 29, 2020) |
| P | "Prosecutorial Discretion Authority" email (March 20, 2021) |

| Q | CBP – Custody and Transfer Statistics FY2021 |
|---|---|
| R | CBP – Custody and Transfer Statistics FY2022 |
| S | CBP – Custody and Transfer Statistics FY2023 |
| T | ICE Detention Data, FY2021 |
| U | ICE Detention Data, FY2022 |
| V | ICE Detention Data, FY2023 |
| W | DHS FY2019 Budget in Brief |
| X | DHS FY2020 Budget in Brief |
| Y | DHS FY2021 Budget in Brief |
| Z | DHS FY2022 Budget in Brief |
| AA | Consolidated Appropriations Act 2019, H.J. Res. 31, P.L. 116-6 (DHS appropriations) |
| BB | FY 2020 Consolidated Appropriations Act, P.L. 116-93 (DHS appropriations) |
| CC | FY 2021 Omnibus and COVID Relief and Response Act, P.L. 116-260 (DHS appropriations) |
| DD | FY 2022 Consolidated Appropriations Act, P.L. 117-103 (DHS appropriations) |
| EE | Original Complaint, ECF No. 1 |
| FF | First Amended Complaint, ECF No. 16 |
| GG | Second Amended Complaint, ECF No. 74 |
| HH | Plaintiff's Response to Defendants' First Set of Interrogatories |
| II | Plaintiff's Amended Response to Defendants' First Set of Interrogatories |
| JJ | Plaintiff's Second Amended Response to Defendants' First Set of Interrogatories |
| KK | Plaintiff's Second Amended Response to Defendants' First Set of Interrogatories |
| LL | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2019 |
| MM | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2020 |
| NN | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2021 |
| OO | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2022 |

## Witness List

The parties plan to present both live testimony and deposition testimony.

Pursuant to the timing requirements of Rule 26(a)(3), the parties will promptly file

their deposition excerpts and will file objections and counter designations by Friday,

December 23.

<u>Plaintiff's Witness List:</u>

Kimberly Thomas
Florida Department of Corrections

Lavitta Stanford
Florida Department of Corrections

Jacob Oliva
Florida Department of Education

Tony Lloyd
Florida Department of Children and Families

Patti Grogan
Florida Department of Children and Families

Jesse Bottcher
Florida Agency for Health Care Administration

James Heckman
Florida Department of Economic Opportunity

Robert Kynoch
Florida Department of Highway Safety and Motor Vehicles

Chief Raul Ortiz (by deposition, Florida may also call as a live witness)
Border Patrol, U.S. Customs and Border Protection

Executive Director Matthew Davies (by deposition, Florida may also call as live witness)
Office of Field Operations, U.S. Customs and Border Protection

Deputy Assistant Director Robert Guadian (by deposition, Florida may also call as live witness)
Enforcement and Removal Operations, Immigration and Customs Enforcement

A0133

Executive Associate Director Corey Price (by deposition, Florida may also call as a live witness)
Enforcement and Removal Operations, Immigration and Customs Enforcement

Tony Barker (by deposition, Florida may also call as a live witness)
Former Chief of Law Enforcement Operations Directorate of
the U.S. Border Patrol, U.S. Customs and Border Protection

Defendants' Witness List:

Chief Raul Ortiz
Border Patrol, U.S. Customs and Border Protection

Executive Director Matthew Davies
Office of Field Operations, U.S. Customs and Border Protection

Deputy Assistant Director Robert Guadian
Enforcement Removal Operations, Immigration and Customs Enforcement

Executive Associate Director Corey Price
Enforcement and Removal Operations, Immigration and Customs Enforcement

Tony Barker (by deposition)
Former Chief of Law Enforcement Operations Directorate of
the U.S. Border Patrol, U.S. Customs and Border Protection
(No longer employed by Defendants)

## Admitted Facts

Background Facts on the Parties

    1. Plaintiff is the State of Florida.

    2. Defendant Department of Homeland Security (DHS) is the federal agency

principally responsible for immigration enforcement.

16

A0134

3. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE).

4. Defendant Alejandro Mayorkas is the Secretary of Homeland Security.

5. Defendant Tae Johnson is the Acting Director of ICE.

6. Defendant Troy Miller is the Acting Commissioner of CBP and is automatically substituted for Chris Magnus under Federal Rule of Civil Procedure 25(d).

7. Defendant Ur M. Jaddou is the Director of USCIS.

8. Defendant United States of America is the country bearing that name.

9. CBP's component, Office of Field Operations (OFO), is responsible for, among other things, immigration enforcement at the ports of entry.

10. CBP's component, U.S. Border Patrol, is responsible for immigration enforcement between ports of entry.

11. Enforcement and Removal Operations (ERO), an ICE component, is responsible for interior immigration enforcement.

12. ERO is also responsible for managing ICE's immigration detention.

13. CBP holding capacity and ICE detention capacity are distinct.

14. Border Patrol and OFO generally seek to limit detention in their holding facilities to 72 hours or less.

A0135

15. Longer term detention requires a transfer of custody to ERO.

DHS Data

16. CBP's dispositions and transfers from the Southwest Border for FY 2023 to date and the last three fiscal years are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy22, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020.

17. Border Patrol dispositions and transfers are provided in the "U.S. Border Patrol - Dispositions and Transfers" tab on the above-linked webpages.

18. Releases designated as "Parole + ATD" are releases under one of the iterations of that policy.

19. Releases designated as "Notice to Appear/Own Recognizance" are releases that, on DHS's view, are authorized under 8 U.S.C. §§ 1229a and 1226(a).

20. Before Border Patrol began reporting Parole + ATD releases in fiscal year 2021, Border Patrol reported releases under 8 U.S.C. § 1182(d)(5) as part of "Other."

21. ICE's detention statistics for FY 2023 year to date and the prior four fiscal years are available at https://www.ice.gov/detain/detention-management.

Facts Relevant to the Presence of Aliens in Florida

A0136

22. During discovery, Defendants produced data from ICE internal databases reflecting information about aliens released by DHS from January 20, 2021, to July 5, 2022.

23. An NTA/Own Recognizance release reflects a release purportedly under 8 U.S.C. § 1226(a).

24. A Notice to Report release reflects aliens released under prosecutorial discretion.

25. A Parole + ATD release reflects aliens released under 8 U.S.C. § 1182(d)(5)(A) pursuant to Defendants' Parole + ATD policy.

26. The Miami ERO Field Office has responsibility for Florida, Puerto Rico, and the U.S. Virgin Islands.

<u>Facts Relevant to Florida's Alleged Expenditures</u>

27. Florida does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies.

28. As such, Florida relies on expenditures on aliens that it tracks in broader categories, and the parties dispute whether this evidence is sufficient to support standing.

29. Florida's Department of Corrections (FDC) tracks expenditures on "undocumented criminal alien[s]" under 8 U.S.C. § 1231(i).

19

A0137

30. FDC does so in order to participate in the State Criminal Alien Assistance Program (SCAAP), a grant program run by the U.S. Department of Justice.

31. SCAAP implements 8 U.S.C. § 1231(i), which authorizes the federal government to "enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien."

32. The following reflects the information tracked by FDC and the reimbursements provided by the federal government through SCAAP.

| Reporting Period | 7/1/15 – 6/30/16 | 7/1/16 – 6/30/17 | 7/1/17 – 6/30/18 | 7/1/18 – 6/30/19 |
|---|---|---|---|---|
| Eligible Inmates Reported | 7,320 | 7,103 | 6,923 | 6,848 |
| Number of Inmate Days Reported | 2,231,181 | 2,171,574 | 2,118,554 | 2,115,979 |
| Costs of Incarceration Per Day | $53.52 | $55.80 | $59.57 | $62.16 |
| Estimated Costs to Incarcerate Reported Eligible Inmates | $119,412,807 | $121,173,829 | $126,202,262 | $131,529,255 |
| Amount Reimbursed by Federal Government | $6,823,144 | $6,786,271 | $7,380,287 | $8,236,498 |

20

33. Florida's Department of Education (DOE) tracks the number of "immigrant children and youth" enrolled in Florida's schools.

34. For fiscal year 2020–2021, the total number of "immigrant children and youth" enrolled in Florida's schools was 95,084.

35. For fiscal year 2021–2022, the data are not complete, but as of February 2022 there were 101,125 "immigrant children and youth" enrolled in Florida's schools.

36. "Immigrant student" is defined as any student who was born abroad and has been educated outside the United States in the last three academic school years, though the parties disagree as to whether the definition comes from federal or state law.

37. For fiscal year 2020–2021, the average cost per student was $8,034.39.

38. For fiscal year 2021–2022, the average cost per student was $7,812.67.

39. For fiscal year 2022–2023, the projected average cost per student is $8,216.74.

40. Federal funds received for "immigrant children and youth" are used to provide supplementary services and are not used to offset general education costs.

41. Florida's Agency for Health Care Administration (AHCA) administers Florida's Medicaid program.

42. Under 42 U.S.C. § 1395dd, participating medical facilities must provide emergency medical services to immigrants regardless of status.

A0139

43. AHCA covers these emergency medical services for aliens who meet eligibility requirements for Medicaid.

44. From January 2020 to April 2022, AHCA's records show that it paid emergency services for 153,575 noncitizens, totaling $345,639,592.

45. Those costs are shared between Florida and the federal government.

46. Florida's share of these expenditures was $111,451,901.

47. Because providers are given a year after performing a service to submit a claim, AHCA's data is not complete until a year after a service is performed.

48. Florida's Department of Economic Opportunity pays temporary wage replacement benefits to eligible individuals who are without employment through no fault of their own.

49. These benefits are paid from the Unemployment Compensation Trust fund, § 443.191, Florida Statutes, and is funded from state taxes paid by employers.

50. In order to qualify for benefits, the claimant must have been employed in Florida, earned at least $3,400 before taxes in the first four complete quarters beginning 18 months prior to their claim, and be able to work and actively seeking employment.

51. If an alien is authorized to work in the United States and meets other eligibility criteria, the alien is eligible to receive these benefits.

A0140

52. Aliens released under 8 U.S.C. § 1182(d)(5) are eligible to apply for work authorization.

53. Aliens released under other mechanisms, such as 8 U.S.C. § 1226(a), are eligible to apply for work authorization 150 days after submitting an application for asylum.

54. From January 2020 to May 2022, DEO paid $426,521,033.00 in reemployment assistance benefits to noncitizens.

55. From January 2020 to May 2022, DEO incurred staffing costs of $5,824.48/month, for a total of $168,909.92, associated with the processing of alien claims.

56. Florida's Department of Children and Families (DCF) provides a variety of public services, which aliens are either expressly eligible for or for which DCF provides services regardless of immigration status.

57. From January 2020 through January 2022, DCF spent $974,774.08 of state funds providing Temporary Assistance for Needy Families benefits to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

58. From January 2020 through January 2022, DCF spent approximately $2,162,194.18 of state funds providing Supplemental Nutrition Assistance Program

A0141

benefits to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

59. From January 2020 through January 2022, DCF spent $12,236 providing Relative Caregiver Financial Assistance from state funds to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

60. For fiscal year 2021–2022, DCF spent $7,636,351 specifically on unlawfully present aliens in state residential treatment facilities.

61. For fiscal year 2021–2022, DCF spent $940,389,499 on substance abuse and mental health services. DCF does not track the amount of these services to aliens.

62. For fiscal year 2021–2022, DCF spent $5,336,755.81 on Office of Child and Family Well-Being services for nonqualifying alien children, which include those who were paroled under 8 U.S.C. § 1182(d)(5) for less than one year, although DCF does not track which of those nonqualifying alien children are such parolees.

63. For fiscal year 2021–2022, DCF spent $38,511,217 in state funds on domestic violence services for victims. DCF does not track the amount of these services to aliens.

64. Florida's Department of Highway Safety and Motor Vehicles (FLHSMV) provides driver's licenses and state identification cards.

A0142

65. Aliens with certain immigration documents, such as a pending asylum application, a grant of parole under 8 U.S.C. § 1182(d)(5), and a Notice of Hearing before an immigration judge, are eligible for driver's licenses and state identification cards.

66. FLHSMV confirms immigration status via an inquiry in DHS's Systematic Alien Verification System (SAVE).

67. If an alien applies for an ID or driver's license, FLHSVM conducts at least one SAVE inquiry.

68. FLHSMV pays 50 cents for each SAVE inquiry.

69. FLHSMV charges applicants $48 for licenses and $25 for ID cards.

70. FLHSMV charges an applicant nothing if the SAVE inquiry reveals that the applicant is not eligible.

<u>Facts Relevant to the Merits</u>

The parties dispute virtually all facts on the merits in this case, or at least whether they are relevant, and thus prefer to present their respective cases at trial.

**Agreed Issues of Law**

The parties agree that the statutes at issue in this case are the relevant provisions of the INA, including 8 U.S.C. §§ 1182, 1225, 1226, 1229a, 1252, and 1357. As the Court is aware from previous briefing, the parties dispute the interpretations of these provisions and their application to the facts of this case.

**Disputed Facts**

The principal dispute in this case is whether Defendants have issued a "non-detention policy."

Florida's position is that Defendants have (1) withdrawn strict limits on the release of aliens at the border, (2) drastically cut detention capacity, even while telling Congress that doing so will not impede their duties, and (3) intentionally transitioned away from detention in favor of so-called "alternatives to detention," unless DHS finds that the alien is a public safety or flight risk. Florida's position is that these facts are sufficient to infer a non-detention policy subject to challenge under the APA.

Defendants' position is that there is no "non-detention policy." Florida takes issue with an amalgam of individual parole decisions and agency budgetary judgments that do not represent a challengeable agency action under the APA, and are fully within Defendants' discretion even if they were challengeable. Defendants continue to detain noncitizens presenting a national security, public safety or flight risk but have leveraged the Alternatives to Detention program to ensure the compliance of vastly more noncitizens than if they focused on traditional detention alone. Outside of Parole + ATD, a policy not at issue in the trial but also fully in compliance with 8 U.S.C. § 1182(d)(5)(A), Defendants have not promulgated any presently operative general policies concerning conditions for release of noncitizens

A0144

encountered at the Southwest border in the past two years, but continue to rely on 8

C.F.R. § 212.5 and detention-and-parole guidance developed under previous

Administrations.

Regardless of the number of noncitizens paroled, all such paroles continue to

be granted on an individualized "case-by-case" basis for an "urgent humanitarian

reason or significant public benefit." Further, many of the releases Florida identifies

are of noncitizens apprehended inside the United States subject to and released

pursuant to DHS's authority under 8 U.S.C. § 1226(a), which places no substantive

limitation on Defendants' discretion to conditionally release them pending removal

proceedings.

## Disputed Issues of Law

The principal legal disputes in this case are (1) the proper interpretation and

application of 8 U.S.C. § 1226(a); (2) the proper interpretation and application of 8

U.S.C. § 1225(a)–(b); (3) the proper interpretation and application of 8 U.S.C.

§ 1182(d)(5); (4) the reviewability of the challenged actions under 8 U.S.C.

§ 1252(a) & (f); (5) the availability of judicial review under the APA and the

Constitution; and (5) whether Florida has standing.

A0145

**Disagreement Regarding Rules of Evidence or Procedure**

The only disagreements the parties are aware of are reflected in Defendants' objections to Florida's exhibits, Defendants' motions in limine, and Florida's response to Defendants' motions in limine.

**All Motions or Matters Requiring Action**

Defendants' omnibus motions in limine. Doc. 120.

**Non-Jury Case**

This is a non-jury case.

**Length of Cases and Trial**

Florida hopes to finish its case in chief in two days but may need a third day depending on the Court's reception to Defendants' objections.

Defendants anticipate they will also need two days to present their case.

A0146

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

Bilal Faruqui (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

A0147

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA P. FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 805-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

A0148

## CERTIFICATE OF SERVICE

I certify that on December 9, 2022, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
Deputy Attorney General

31

A0149

1                 **UNITED STATES DISTRICT COURT**
                  **NORTHERN DISTRICT OF FLORIDA**
2                      **PENSACOLA DIVISION**

3    STATE OF FLORIDA,                    )
                                          )
4              Plaintiff,                 )
          vs.                             ) Case No: 3:21-CV-1066
5                                         )
     UNITED STATES OF AMERICA; ALEJANDRO  ) Pensacola, Florida
6    MAYORKAS, Secretary of the U.S.      )
     Department of Homeland Security, in  ) January 9, 2023
7    his official capacity; U.S. DEPARTMENT ) 8:57 a.m.
     OF HOMELAND SECURITY; TROY MILLER,   )
8    Acting Commissioner of U.S. Customs  )
     and Border Protection, in his official )
9    capacity; U.S. CUSTOMS AND BORDER    )
     PROTECTION; TAE JOHNSON, Acting      )
10   Director of U.S. Immigration and     )
     Customs Enforcement, in his official )
11   capacity; U.S. IMMIGRATION AND CUSTOMS )
     ENFORCEMENT; UR M. JADDOU, Director of )
12   U.S. Citizenship and Immigration     )
     Services, in her official capacity;  )
13   U.S. CITIZENSHIP AND IMMIGRATION     )
     SERVICES,                            )
14                 Defendants.            )
     _____)

15

16            **TRANSCRIPT OF BENCH TRIAL - DAY 1**
           **BEFORE THE HONORABLE T. KENT WETHERELL, II**
17               **UNITED STATES DISTRICT JUDGE**
                   **(Pages 1 through 173)**

18

     <u>APPEARANCES</u>:
19

20   For State of Florida:    Office of the Attorney General
                              by:  **JOHN M. GUARD, JAMES H. PERCIVAL,**
21                                 **ANITA J. PATEL, NATALIE CHRISTMAS**
                                   and **JOSEPH HART**
22                            The Capitol, Suite PL-01
                              400 South Monroe Street
23                            Tallahassee, Florida 32399
                              (850) 414-3300
24                            *james.percival@myfloridalegal.com*
                              *anita.patel@myfloridalegal.com*
25                            *joseph.guard@myfloridalegal.com*
                              *natalie.christmas@myfloridalegal.com*

```
1   APPEARANCES CONTINUED:

2   For the United States:    Department of Justice
                              Office of Immigration Litigation
3                             by:  ELISSA FUDIM, ERIN T. RYAN
                                   and JOSEPH A. DARROW
4                             450 5th Street NW
                              Washington, D.C. 20001
5                             (202) 532-5802
                              elissa.p.fudim@usdoj.gov
6                             erin.t.ryan@usdoj.gov
                              joseph.a.darrow@usdoj.gov
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3                    THE COURT:  Good morning.  Please be seated.

4                    All right.  This is Case Number 3:21cv1066, State of

5     Florida versus the United States.  Let's begin with appearances,

6     please.

7                    MR. PERCIVAL:  James Percival for the State of

8     Florida.

9                    MR. GUARD:  John Guard for the State of Florida, Your

10    Honor.

11                   MS. GERDTS:  I'm Simona Gerdts.  I'm a paralegal for

12    the State of Florida.

13                   MR. HART:  Joseph Hart for the State of Florida.

14                   MS. CHRISTMAS:  Natalie Christmas for the State of

15    Florida.

16                   MS. PATEL:  Anita Patel for the State of Florida.

17                   THE COURT:  All right.  And for the Federal

18    Government.

19                   MR. DARROW:  Joseph Darrow for the United States.

20                   MS. RYAN:  Erin Ryan for the United States.

21                   MS. LATIMER:  Maria Latimer, paralegal for the United

22    States.

23                   THE COURT:  All right.  Good morning.

24                   Again, I think the Federal Government is outnumbered

25    in people.  But it appears you brought a large amount of

1    documents, so it seems like a fair fight.

2            All right.  Before we get going today, a couple of

3    things I wanted to talk about.  I did receive the parties joint

4    Notice of Supplemental Depositions Designations, Objections and

5    Stipulations, and it didn't look like there was anything that

6    needed to be addressed with that at this point.

7            Is that correct?

8            MR. PERCIVAL:  That's correct, Your Honor.

9            THE COURT:  Mr. Darrow?

10           MR. PERCIVAL:  That's my understanding.

11           MR. DARROW:  Same.

12           THE COURT:  All right.  The other thing, maybe to

13   minimize some of the paperwork that I'm going to get, the

14   supplemental administrative record that I'm going to be

15   reviewing in conjunction with the parole policy, Parole Plus ATD

16   policy, that was submitted at summary judgment, it was document

17   87-1.  I assume that is not going to change and that's the

18   document that I can look at; I don't need to get it again.  Is

19   that fair?

20           MR. DARROW:  That's correct, Your Honor.

21           MR. PERCIVAL:  That's fine with us, Your Honor.  We

22   are offering that as a trial exhibit, but that's for a different

23   purpose.

24           THE COURT:  What other purpose would it be?  Why would

25   I need to have it again?

1          MR. PERCIVAL:  Well, Your Honor, we just wanted to

2     make sure it's in the trial record.  If we just want to

3     stipulate that insofar as we're relying on that evidence at

4     trial, you can look at the file, the administrative record,

5     that's fine.  But some of that material we're going to use for

6     purposes of talking about nondetention policy.

7          THE COURT:  All right.  Mr. Darrow.

8          MR. DARROW:  I mean, we previously objected to that in

9     our motions in limine, but Your Honor said that, you know, they

10    can discuss Parole ATD in the trial.  We would object to the

11    extent that anything is coming in from the merits of Parole ATD.

12         THE COURT:  Okay.  And I think that's consistent with

13    what I previously ruled.  I guess my question is just from a

14    physical perspective.  Why do I need to have that document

15    again, whatever purpose you're using it for?  Why can't your

16    witness just refer to the document that I already have?

17         MR. PERCIVAL:  That's totally fine with us, Your

18    Honor.

19         THE COURT:  Okay.  All right.  Well, let's do that

20    because it looks like I'm going to get a lot of paper, and I

21    don't want any more than I otherwise have to have.

22         MR. PERCIVAL:  Your Honor, just for clarity, can -- do

23    I understand you to have -- insofar as we would need to move to

24    admit that at trial should, I just handle that now or -- because

25    we have it in our order of proof to move that into trial as

**A0154**

1    trial evidence.  Do you want us to just handle that in the

2    ordinary course, or do you want to just grant that motion now?

3              THE COURT:  Mr. Darrow, any reason other than the ones

4    you previously raised that I've dealt with already as to why

5    that can't be an exhibit as well?

6              MR. DARROW:  Not facially, Your Honor.  But we would

7    reserve our ability to object to the extent that they intend to

8    use the record for the merits of Parole Plus ATD at any point

9    throughout the trial.

10             THE COURT:  I'm not sure what that means.

11             MR. DARROW:  I mean, we agree that it's, you know,

12   admissible for the reasons Your Honor has stated; but to the

13   extent that they try and discuss the merits of Parole ATD, we

14   would object to that at that point.

15             THE COURT:  Is that the same argument you made

16   previously?

17             MR. DARROW:  Yes.

18             THE COURT:  Okay.  All right.  Then with that ruling

19   having previously been made, that document, 87-1, will be the

20   supplemental record that I review and is an exhibit for

21   evidentiary purposes over your objection.  Okay?

22             MR. PERCIVAL:  Thank you, Your Honor.

23             THE COURT:  All right.  That's all I wanted to talk

24   about.

25             Mr. Percival, anything from the State that you want to

```
 1   talk about before we get going?

 2             MR. PERCIVAL:  No, Your Honor.

 3             THE COURT:  Mr. Darrow?

 4             MR. DARROW:  No, Your Honor.

 5             THE COURT:  All right.  Then, Mr. Percival, the floor

 6   is yours for any opening statements you want to make.

 7             MR. PERCIVAL:  Thank you, Your Honor.

 8             As a candidate, President Biden promised to end or

 9   substantially curtail the detention of migrants who arrive at

10   the border.  Over the next four days, the evidence is going to

11   show that President Biden kept his promise.  His administration

12   is breaking federal law, unlawfully releasing inadmissible

13   aliens and causing ongoing harm to the State of Florida and the

14   rest of the Nation.

15             Florida is going to begin its case by entering into

16   evidence two different video excerpts, Exhibit 61 and 62.  Those

17   excerpts are of President Biden's Secretary of Homeland

18   Security, Alejandro Mayorkas, testifying in front of Congress on

19   two occasions.

20             Exhibit 62 contains an excerpt of the Secretary's

21   testimony on May 26, 2021.  In that excerpt the Secretary states

22   that in his view, immigration detention should only be used for

23   aliens he deems to be a public safety risk or a flight risk.  He

24   also testifies that he is, quote, "concerned about the overuse

25   of detention," end quote.
```

**A0156**

1          The second exhibit, Exhibit 61, is part of Secretary

2    Mayorkas's testimony from almost a year later on May 4th, 2022.

3    In that testimony to Congress, the Secretary repeats his prior

4    view and discusses the pretrial detention standard in criminal

5    cases, not Section 1225(b) standard as the standard that ought

6    to be applied to immigration detention.  The Secretary then

7    states two different times, quote, "detention has been misused

8    in the immigration system for many years."

9          Florida is starting with these two exhibits because

10   Secretary Mayorkas makes immigration policy for the United

11   States, and there is no better evidence of a new nondetention

12   policy than the policymaker's own words.  But Florida has more

13   than the Secretary's words demonstrating a deliberate

14   nondetention policy.  The evidence will show that DHS has

15   systematically diminished resources for detention, not increased

16   them, in the face of a historic immigration search.

17         Exhibits like Exhibit 12, 13, and 15 will show that

18   ICE expected a surge post-COVID and in 2020 even requested more

19   resources to deal with that surge.  But other exhibits, like

20   Exhibit 25 through 28, will demonstrate that the Biden

21   Administration instead reduced detention resources accomplishing

22   the Secretary's stated desire to stop the overuse of detention.

23         And for family units, Exhibits 19 and 33 will show

24   that the Biden Administration abolished detention altogether.

25   The testimony of Chief Ortiz of Border Patrol and Director Price

1    of ICE ERO will confirm that soon after President Biden took

2    office DHS reduced detention capacity by almost half of what it

3    was in the last immigration surge, abolished family detention

4    altogether, and substantially narrowed the pathways designed to

5    alleviate resource constraints including the migrant protection

6    protocols and expedited removal.

7            Most significantly, Exhibit 98, which is a chain of

8    emails involving senior Border Patrol officials will show that

9    eight days after President Biden took office, these officials

10   warned the Administration that its new policies were going to

11   cause the mass release of inadmissible aliens.

12           Exhibit 98 explicitly states that, quote, "recent

13   policy changes," end quote, are part of the cause.  And Director

14   Price will confirm that DHS knew that its policies would cause

15   the mass release of aliens.

16           Further, Florida will introduce into evidence exhibits

17   and testimony that together show the evolution and the extent of

18   the nondetention policy.  Exhibits 1 through 4 will show that by

19   the middle of March 2021 there were massive increases in

20   releases under Section 1226(a), also known as Orders of

21   Recognizance, or NTA/OR releases.

22           And Exhibit 21, which is a March 2021 email, will show

23   that Border Patrol agents understood that they were authorized

24   to mass release aliens under Section 1226.  And Chief Ortiz will

25   confirm that Border Patrol was not using Section 1226(a) in this

A0158

1    manner prior to January 20th, 2021.

2            Around the same time that Border Patrol changed its

3    use of Section 12, it created a prosecutorial discretion policy.

4    Now, the evidence will show that this policy has changed several

5    times from its incarnation.  Florida will put into evidence

6    Exhibits 20, 40, 41, and 59.  These exhibits include the

7    original prosecutorial discretion memo, which is Exhibit 20; a

8    draft Notice to Report memo, Exhibit 59; and two different

9    Parole Plus ATD memos which are in the administrative record

10   that the Court has already admitted.

11           What this evidence shows is that the rationale for

12   releasing aliens at the border is constantly changing.

13   Sometimes it is lack of resources.  Sometimes it's COVID.  And

14   now defendants are resting on the vague term "disease

15   mitigation."  But what Florida's evidence will make clear is

16   that all of this is really about a desire to release rather than

17   detain which is what Secretary Mayorkas admitted when he

18   testified to Congress.

19           Florida expects the defendants will attempt to

20   distract from all of their unlawful conduct by arguing that

21   DHS's detention and parole practices have not changed since

22   President Biden was inaugurated.  But Secretary Mayorkas's

23   admission to Congress shows otherwise.

24           The deposition testimony of Chief Ortiz and Director

25   Price will confirm the Secretary's admissions.  And Exhibit 18,

A0159

1    a Border Patrol email from February 2021, will confirm the,

2    quote, "rapid changes," end quote, in policy that occurred

3    shortly after President Biden took office.

4            Likewise, Florida expects defendants to argue that the

5    historic nature of the search has made detention of all

6    inadmissible aliens impossible, but that is a problem of

7    defendants's own making.  Defendants reduced or eliminated the

8    lawful ways that aliens could be processed without releasing

9    them, and defendants have significantly reduced their detention

10   capacity in bad faith.

11           Further, evidence like Exhibit 47 and Chief Ortiz's

12   deposition testimony will show that defendants caused the surge

13   at the border and they know it.  Defendants' impossibility

14   defense is therefore contrived and created by their own

15   decisions.

16           Finally, Florida will prove that it is harmed by

17   defendants' unlawful policies.  In President Trump's last full

18   month in office, Border Patrol released 17 aliens at the

19   southwest border.  By March 2021, the monthly number was over

20   26,000.  In July 2021, the number of aliens released broke

21   60,000.  And at this point defendants are releasing over 100,000

22   inadmissible aliens per month rather than detaining them.

23           Since President Biden took office, over 1 million

24   aliens have been released at the southwest border.  And

25   according to Exhibit 10, which is a report created by defendants

A0160

1    in the summer of 2022, more than 150,000 of those aliens had

2    provided a Florida address or had their cases assigned to the

3    Miami docket.  That number is increasing every day and will

4    continue unless Florida obtains relief in this case.

5         Florida has stipulated to a set of facts with

6    defendants which establish how these unprecedented releases harm

7    the State.  In addition, Florida will present the testimony of

8    Jacob Oliva, senior chancellor of the Division of Public Schools

9    for the Florida Department of Education.

10        We're going to call him first, Your Honor, because

11   Mr. Oliva has just been appointed Secretary of Education for

12   Arkansas and begins his new job shortly.  Before his current

13   role in Florida, Mr. Oliva was both a teacher and an

14   administrator.  He dealt directly with student families, and he

15   personally dealt with the issues that individuals can cause for

16   schools when they lack English proficiency.

17        Mr. Oliva will also testify that the Department of

18   Education has a good, while imperfect, system for tracking

19   increases of these aliens in schools.  Again, this is not a

20   perfect proxy, but the agency tracks something called "immigrant

21   children and youth."

22        Immigrant children and youth are children who are not

23   born in the United States and were not educated in the United

24   States in the last three years.  Now, even though this

25   definition would include others, immigrants released under the

A0161

1   challenged policy are likely to have children that meet this

2   definition.  And the evidence will show major increases in the

3   enrollment of immigrant children and youth in Florida's public

4   schools since President Biden took office.

5          At the end of this case, we are going to ask the Court

6   to conclude that defendants have systemically created an

7   unlawful detention policy, and we are going to ask the Court to

8   vacate that policy, declare it unlawful, and enjoin defendants'

9   misuse of the parole authority.  Thank you.

10          THE COURT:  All right.  Mr. Darrow.  Ms. Ryan.

11          MS. RYAN:  Good morning, Your Honor.

12          No administration in the history of this country has

13   ever had the resources to detain every noncitizen who comes to

14   our border.  No administration has ever requested that much

15   funding.  Congress has never authorized that staggering amount

16   of funding that would require.  So every administration has had

17   to make a choice who to prosecute, who to detain, who to

18   release, how to most efficiently and effectively use the

19   resources that it has been provided.

20          Detention space is a finite resource.  It always has

21   been.  And it also requires many things:  actual facilities,

22   yes, but also beds, supplies, food, services, staff, law

23   enforcement officers.  And in order to have those things, the

24   Department of Homeland Security needs funding from Congress.

25          And you just heard about DHS decreasing its funding

1    and presidential requests, but in this trial you will hear how

2    it's Congress who decides how much detention space to provide.

3    And Congress has never provided enough funding to detain more

4    than a small percentage of the people that DHS seeks to remove.

5    So there must be decisions made.

6              The Department of Homeland Security prefers to detain

7    the bad guys, the terrorists, the flight risks, the drug mules,

8    the human traffickers.  Florida would seem to prefer that DHS

9    detain the families, the small children, the people who pose no

10   safety risk.  And that may be the role that Florida wants, but

11   the reality is that would never be feasible, let alone sensible,

12   policy.

13             And the mere fact that DHS has different priorities

14   than Florida does not mean that DHS is violating the law, nor

15   does it mean that there's an unwritten nondetention policy.  And

16   defendant will prove -- defendants will prove both of those

17   things during this trial.

18             You'll hear from three DHS witnesses during this

19   trial.  Customs and Border Protection, or CBP, is made up of two

20   parts:  the Office of Field Operations, which manages the

21   ports of entry, and Border Patrol, which patrols between the

22   ports of entry.  And you'll hear from both of those sections

23   during the trial.

24             First, from the Office of Field Operations, OFO,

25   you'll hear from Executive Director Matthew Davies.  He'll

**A0163**

1   explain the different processing pathways that an agent must

2   decide between and how complicated and complex that decision is,

3   how it's a case-by-case determination based on the specific

4   unique circumstances of the individual in front of the officer.

5          He'll discuss how noncitizens can claim asylum and

6   when they get transferred to ICE for further detention.

7   Essentially, Mr. Davies will give you an overview of the

8   immigration process relevant to this case and how OFO functions

9   in light of the operational realities.  And he'll tell you he's

10  not aware of any new policy communicated by this Administration

11  suggesting a preference for release or discouraging the

12  detention of noncitizens.

13         The next witness you'll hear from is Raul Ortiz, the

14  chief of the Border Patrol.  He'll explain the procedure that

15  Border Patrol uses when it encounters noncitizens unlawfully

16  crossing the border, how processing again is different for every

17  person depending on a number of factors.

18         You'll hear how the agents have to make intricate

19  ever-evolving decisions every single day to secure those

20  borders.  You just heard a lot about a surge of people coming

21  over the border; but Chief Ortiz has been with Border Patrol for

22  31 years, and he will put those numbers into context for you.

23         He'll tell you how surges have happened for decades

24  across multiple presidential administrations and what those

25  higher numbers actually mean for the agents on the ground.

**A0164**

1            And importantly, he'll tell you that since January of

2    2021, he has not been told about or disseminated any policies

3    changing the requirements for releasing someone or any policies

4    directing that noncitizens be released.

5            In addition to CBP, you'll also hear from ICE,

6    Immigration and Customs Enforcement.  Robert Guadian, who is the

7    deputy assistant director for Domestic Operations East in ICE's

8    Enforcement and Removal Operation section, which is a mouthful

9    of a title I know.  He will also be here to testify.

10           You'll hear how CBP can temporarily hold noncitizens;

11   but if further detention is warranted, they get transferred to

12   ICE ERO.  Mr. Guadian will explain that relationship between CBP

13   and ICE and how and when noncitizens get transferred.  He'll

14   tell you what's required to detain someone, the costs involved,

15   and the detailed balancing that an ICE officer has to undertake

16   to determine who to detain with limited resources.

17           You'll hear during this trial that ICE has recently

18   started using its family detention centers to house single

19   adults, and that's because families make up a small percentage

20   of people that DHS encounters.  So there are expenses and

21   limitations involved in detaining families.

22           And ICE made the decision to apply their detention

23   centers to single adults instead of families.  Mr. Guadian will

24   explain that change, why it is necessary, and why it is the best

25   use of resources at the moment.

**A0165**

1          You will also hear how it's reversible.  Should the

2     population coming over the border change, ICE can change with

3     it.  And unlike what Florida will try to likely imply during

4     this trial, you'll hear how -- just because you come over the

5     border in a family is not a get-out-of-jail-free card.  All

6     members of the family still go through processing, background

7     checks, security checks; and if a member of that family poses a

8     danger, they will be detained.

9          And you'll also hear that because of the limited

10    funding and the priorities that DHS has to undertake, ICE has

11    been investing more in alternatives to detention which cost less

12    than a tenth as much as detaining someone while still allowing

13    ICE to track their location and ensure that they show up for

14    immigration proceedings.

15         You'll hear that ATD has over a 90 percent compliance

16    rate and how the resources saved by using ATD allows ICE to

17    leave open detention space for noncitizens who pose a safety or

18    security threat.

19         And finally, Mr. Guadian will tell you that ICE does

20    not have any new policies enacted since this Administration

21    started calling for or preferring the release of noncitizens

22    transferred to them.  And, in fact, you'll hear how ICE is still

23    following the same parole guidance that was issued in 2009 and

24    followed by the last three administrations.

25         You may have noticed a pattern in what I just said

**A0166**

1    about those witnesses.  They are all going to tell you that

2    there are no new policies enacted by this Administration

3    directing, encouraging, or even hinting that DHS should simply

4    not detain people coming over the border.

5          All of the witnesses you'll hear from are high-level

6    supervisory positions.  They oversee thousands of agents and

7    officers.  Their jobs are to disseminate policy, enforce policy,

8    and making sure that their agents on the ground enact the

9    policies.  And not a single witness will tell you that they're

10   aware of any new policies to not detain people at the border

11   because there is no nondetention policy.

12         Florida wants you to infer that there is, but the

13   evidence will not support that inference, which brings us to an

14   important distinction that's central to this case that we would

15   like to you keep in mind while you hear the facts:  the

16   difference between an inference and an assumption.

17         An inference requires facts, things you can point to

18   that logically makes other facts more likely.  For example, if

19   somebody walked into this courtroom all wet carrying an

20   umbrella, we can infer that it's raining even if we don't see

21   the rain for ourselves.  That's a logical inference.

22         But an assumption is something presupposed built into

23   the premise that doesn't necessarily follow.  For example,

24   pointing to high numbers of people being released at the border

25   and saying therefore it must be a policy of this Administration

A0167

1    to release people, that's an assumption and is not supported by

2    the evidence, and we will show that during this trial.

3             Florida is also asking this Court to make assumptions

4    for its standing.  To have standing, Florida has to show that it

5    actually suffered an injury that is directly traceable to the

6    policies it is challenging and is redressable by this Court.

7    And to meet its burden, Florida has to show all three elements,

8    and it will not be able to do so.

9             It has already stipulated to the fact that it cannot

10   meet that's elements.  Quote, "Florida does in the tract alien

11   expenditures in a manner that allows it to identify expenditures

12   on specific aliens released under the challenged policies."

13   That's been stipulated.  That's enough to defeat their standing

14   claim because traceability is a required element.

15            And you should also pay attention as to whether they

16   show any evidence of redressability to you during this trial.

17   If they cannot trace their alleged injuries to the policies they

18   challenge, then they also cannot say how altering those policies

19   would affect their alleged injuries.  Proving all of those

20   elements is their burden; and if they fail to address

21   redressability, then they lack standing on that basis alone.

22            Every administration has had to make a choice based on

23   the resources it is provided by Congress.  Congress gives DHS a

24   limited amount of funding, but it has also given people the

25   right to come to this country and claim asylum.  And there's no

**A0168**

1   off switch for that; there's no "we are closed" sign that we can

2   put on the border.

3          So when there is another surge or resources are

4   strained and more people keep coming, Congress has directed DHS

5   to prioritize.  Florida may wish that DHS's priorities were

6   different, but that does not mean the decisions that DHS is

7   making violate the law.

8          As defendants have maintained throughout this case,

9   this is about different points of view and a political dispute

10  that needs to be resolved in the voting booth and not in a

11  courtroom.

12         Thank you, Your Honor.

13         THE COURT:  Thank you, Ms. Ryan.

14         All right.  Florida, your first witness.

15         MR. PERCIVAL:  Your Honor, before we call our first

16  witness, we would move Exhibit 62 into evidence.

17         THE COURT:  All right.  Any objection?

18         MR. DARROW:  Yes, Your Honor.  Exhibit 62 contains

19  quite a lot of hearsay.  There are questions from congress

20  members directed at Secretary Mayorkas which are hearsay, and

21  those questions sometimes include statements from, you know, a

22  second layer of hearsay recounting statements that those

23  congress members have heard.

24         MR. PERCIVAL:  Your Honor --

25         THE COURT:  I assume you're offering the answer he

1    gives rather than the question, correct?

2            MR. PERCIVAL:  Well, I have two answers.  One, I

3    believe, Your Honor, that Mr. Darrow is confusing Exhibit 61

4    and 62.  Exhibit 62 is actually just Mayorkas talking.  We've

5    cut the video to exclude the questions.  We're happy to address

6    that other issue.  I'm going to do 61 next.

7            MR. DARROW:  Sorry, I was referring to 61.

8            THE COURT:  So as to the -- which was the first number

9    you gave me?

10           MR. PERCIVAL:  62 is the first one we're offering, and

11   that is only Mayorkas talking.

12           THE COURT:  As to that one, any objection?

13           MR. DARROW:  No objection.  Just we would note that we

14   haven't seen the full -- we got the time stamps, but we haven't

15   actually seen the final video cuts.  So to the extent that the

16   video exceeds the time stamps that we saw, we would object at

17   that point.  Not that we expect that that's going to happen.  We

18   just wanted to note that.

19           MR. PERCIVAL:  Your Honor, we've faithfully edited the

20   video as we represented we would with counsel.

21           THE COURT:  Okay.  I trust that that should have been

22   worked out beforehand.  So Exhibit 62 will be received and why

23   don't we just go ahead --

24           MR. PERCIVAL:  May I publish, Your Honor?

25           THE COURT:  -- and deal with 61.

 1          *(PLAINTIFF EXHIBIT 62:  Received in evidence.)*

 2               MR. PERCIVAL:  Go ahead.

 3               THE COURT:  I'm sorry.

 4               MR. PERCIVAL:  I'm sorry.

 5               THE COURT:  Deal with the objection.  He's got an

 6     objection to the exhibit where there's questions from

 7     senators --

 8               MR. PERCIVAL:  Oh, you want me to deal with 61 and

 9     just play them both?

10               THE COURT:  No, just -- what's your response to his

11     argument so I can --

12               MR. PERCIVAL:  On 61?

13               THE COURT:  -- deal with that?

14               Yes, sir.

15               MR. PERCIVAL:  Your Honor, we're not offering the

16     questions for the truth of the matter asserted.  We just think

17     that you ought to see the whole exchange so you can understand

18     Secretary Mayorkas's answers.  And we only want you to consider

19     Secretary Mayorkas's answers.

20               THE COURT:  In view of that, is there still an

21     objection?

22               MR. DARROW:  I mean, we think that the questions paint

23     the answers, and it would be very difficult not to take into

24     consideration the truth of the matter asserted since they are

25     asserting statements about what's happening at the border.

**A0171**

```
 1            THE COURT:  All right.  I'm going to overrule the

 2    objection.  I can receive the exhibit certainly with his

 3    answers.  Those are not hearsay, and to the extent I've got to

 4    have the questions to get context for the answers.  And so

 5    certainly not going to take whatever a congressman says at face

 6    value for a variety of reasons.

 7            But anyway, they're both admissible and you can play

 8    them.

 9        (PLAINTIFF EXHIBIT 61:  Received in evidence.)

10            MR. PERCIVAL:  Okay.  Your Honor, we'll play them in

11    order.

12            Ms. Gerdts, please play Exhibit 62 first.

13            THE COURT:  If you'll just let me know when you change

14    to a different exhibit.

15        (Video recording played in open court.)

16            MR. PERCIVAL:  Sorry, Your Honor.  That was 62.  We're

17    now going to play Exhibit 61.

18            THE COURT:  Okay.  Thank you.

19        (Video recording played in open court.)

20            MR. PERCIVAL:  That's the end of the exhibit, Your

21    Honor.

22            THE COURT:  Okay.

23            And just to be clear, obviously all the information

24    that the senator provided there about people in camouflage,

25    that's not evidence and certainly nothing I'm going to consider,
```

```
 1    just the things tightly close to his -- the response that -- or

 2    the question that generated a response is relevant; but all that

 3    other stuff, I don't know if it's true or not.  It really has no

 4    bearing here.

 5             All right.  Yes, sir.

 6             MR. HART:  Your Honor, Joseph Hart for the State of

 7    Florida.  We would like to call our first witness, Mr. Jacob

 8    Oliva.

 9             THE COURT:  Okay.

10        JACOB OLIVA, PLAINTIFF WITNESS, DULY SWORN

11             DEPUTY CLERK:  Please state and spell your full name.

12             THE WITNESS:  Jacob, J-A-C-O-B, Oliva, O-L-I-V-A.

13             THE COURT:  Go ahead.

14                         DIRECT EXAMINATION

15    BY MR. HART:

16    Q.   Good morning, Mr. Oliva.  Could you please state where

17    you're currently employment.

18    A.   Yes, I currently am employed with the Florida Department of

19    Education.

20    Q.   And what is your role with the Department of Education?

21    A.   My title is senior chancellor.

22    Q.   And how long have you been employed at the Department of

23    Education?

24    A.   Just over five and a half years.

25    Q.   And what are your duties as the senior chancellor?
```

```
 1   A.    Primarily I support the working division of our
 2   Commissioner of Education and implement the strategic plan
 3   outlined by our State Board of Education.
 4            The portfolio that I directly oversee include
 5   different divisions such as the Division of Early Learning, the
 6   Office of Safe Schools, the Division of Public Schools, the
 7   Office of Independent Education and School Choice, and the
 8   office that's for assessment, research and measurement.
 9   Q.    And how long have you been the senior chancellor?
10   A.    About two years.
11   Q.    Have you held any other positions at the Department of
12   Education?
13   A.    I have.  Prior to being a senior chancellor, I was the
14   chancellor for the Division of Public Schools; and prior to that
15   I started off as a vice-chancellor.
16   Q.    And could you briefly describe your job duties in those two
17   positions?
18   A.    When I was with the vice-chancellor at the Department of
19   Education, I oversaw different bureaus.  There's different
20   layers throughout our organization.  Primarily, I supported the
21   Bureau of Exceptional Student Education; the Bureau of Student
22   Instructional Services; the Bureau for English Language
23   Learners, also known as SALA, which is Student Achievement
24   through Language Acquisition, in making sure that we were
25   supporting school districts and holding them accountable for all
```

A0174

```
 1   Florida statutes and state board rules.
 2   Q.   And could you describe the role of the Bureau of English
 3   Language Learners?
 4   A.   Sure.  So the SALA office, Student Achievement through
 5   Language Acquisition, helps oversee and monitor the use and
 6   assurances of a Title III grant that we receive some federal
 7   funds for it.  It's about $50 million a year.  And those dollars
 8   get directly allocated to school districts to support students
 9   that are acquiring English as a second language.
10        Not only do we monitor the support and oversight of
11   how those dollars are being used to make sure districts are
12   spending them in accordance of guidance with federal
13   expectations and assurances.  We also provide professional
14   development and support, working with school districts, helping
15   them utilize best strategies in evidence-based options for
16   students to acquire English and be successful in Florida
17   schools.
18   Q.   And prior to joining the Department of Education, what was
19   your line of work?
20   A.   So I spent about 17 years in public schools.  Pretty much
21   that entire career was in school district here in Florida called
22   Flagler County.  It's just north of Daytona Beach, south of
23   St. Augustine.
24        My first job in Flagler schools was a classroom
25   teacher.  I taught elementary education primarily working with
```

OLIVA - DIRECT

```
 1    students with exceptionalities in special education.  I also

 2    supported students that were in the ESOL program, English

 3    Speakers of Other Languages.

 4            Then I went into school administration.  I served as a

 5    elementary school principal.  I also served as a high school

 6    principal.  And then I worked at the district office and was the

 7    superintendent of schools for about four and a half years before

 8    joining the Department.

 9    Q.   Are you familiar with the Department of Education's budget

10    and expenditures?

11    A.   Yes.

12    Q.   What is the Florida Education and Finance Program?

13    A.   The Florida Education and Finance Program is also referred

14    to as the FEFP.  That's what we refer to it kind of out in --

15    throughout the agency and throughout the state.  It's a very

16    complicated formula that has several different categories that

17    get factored in together to basically determine how much funding

18    a school district's going to receive for the number of students

19    that are enrolled in that district based on the level of support

20    they need, such as the different programs or the courses that

21    students are enrolled in.  And those are the dollars that are

22    collected through the state, and it's how we allocate the state

23    budget that is authorized through the legislature and

24    distributed to school districts.

25    Q.   So the legislature allocates money and then that money is
```

```
1    distributed to the school districts?

2    A.    That is correct.  We receive our state budget through the

3    legislature; and then when the legislature votes on that through

4    the chambers, it goes to the governor for signature to become

5    law.

6    Q.    And is there any federal funding incorporated in this

7    expenditure?

8    A.    The Florida Education and Finance Program is state dollars.

9    It's primarily sales tax revenue and local property tax revenue.

10   Q.    And so approximately how much money did Florida spend per

11   student in the fiscal year 2020-2021?

12   A.    In the 2020-2021 school year, it was about $8,000 a

13   student.

14   Q.    And this $8,000 per student is all state funds?

15   A.    Yes, sir.

16   Q.    And approximately how much money in the aggregate did

17   Florida spent educating students in fiscal year 2020-2021?

18   A.    That was around 22 and a half billion dollars.

19   Q.    And if more students enroll in Florida schools after the

20   budget is already set by the legislature, how does that affect

21   schools in the state for that particular fiscal year?

22   A.    So when we get the state budget that's appropriated to the

23   state, those dollars go out to the school districts in a very

24   complicated formula.

25              We collect data from the school districts throughout
```

1    the year to determine how many students are enrolled in each

2    district, the courses they're in, the programs that they're in;

3    and those dollars are allocated to the State.  If more students

4    show up throughout the year and it changes the projection that

5    they have been allocated for and we get the actual numbers, a

6    redispersion of those funds would occur based on where those

7    students are.  If more students enroll in Florida schools, the

8    budget doesn't go up.  The budget is a set amount, which means

9    the per-student allocation would have to decrease based on

10   supporting the needs of additional students.

11   Q.   So if more students enrolled in the Florida schools during

12   a particular fiscal year after the budget had already set, would

13   that create a strain on schools' resources?

14   A.   It could be a significant strain on school resources

15   because schools are going to enroll students as they come in and

16   give them every piece of service that they need in order to be

17   successful.  Those services may cost dollars.  If students -- if

18   there are spikes of enrollment that were not projected for,

19   especially in certain parts of the state, those dollars are

20   going to be recalibrated; and some of those resources may move

21   from one district to another, which would face the district

22   that's getting a recalibration or a shortage in funding would

23   have to go through and make those necessary budget adjustments

24   in the middle of a school year.

25   Q.   And if more students enroll in Florida schools, how does

1    that affect the budget for the next fiscal year?

2    A.   When the legislature is looking at setting a state budget,

3    there's a very complicated forecasting formula and conferences

4    that look at projected revenues, and they look at historical

5    trends of students over time.

6           So if they see the trend line of students moving where

7    we're enrolling more students in the state of Florida, that

8    would be reflected in the future forecast for additional years

9    so that they can budget according to the state revenues to meet

10   the needs of that per-student allocation.

11   Q.   So if more students are enrolling in Florida schools, is

12   the state legislature likely to allocate more money in total?

13   A.   They would have to either allocate more money in total to

14   make up for the difference of those schools if they're going to

15   keep the per-student allocation; but if they don't increase the

16   state budget, then schools are just going to get less money.

17   Q.   And approximately how much money did Florida spend per

18   student in the fiscal year 2021 to 2022?

19   A.   That was pretty close to around 22 and a half billion,

20   maybe a little over.

21   Q.   And then how much money did Florida spend per student in

22   the fiscal year 2021-2022?

23   A.   It was about $7,800 a student.

24   Q.   And approximately how much money does Florida expect to

25   spent per student in the 2022-to-2023 fiscal year?

1    A.   It's around $8,200 a student.

2    Q.   And approximately how much money in the aggregate does

3    Florida expect to spend educating the fiscal year 2022 to 2023?

4    A.   It was about 24 and a half billion dollars.

5    Q.   Does the Department of Education record whether students

6    enrolling in Florida schools was ever apprehended at the border?

7    A.   It does not.

8    Q.   Does the Department of Education record whether a student

9    enrolling in Florida schools was admitted into the country via

10   parole?

11   A.   It does not.

12   Q.   Does the Department of Education have any way of knowing

13   how a student enrolling in Florida schools might have even

14   arrived in the United States?

15   A.   Not to my knowledge.

16   Q.   Does the Department of Education record the citizenship

17   status of students enrolling in Florida schools?

18   A.   It does not.

19   Q.   And why not?

20   A.   We are prohibited per federal law to ask for citizenship

21   status of any of our students and families.

22   Q.   And is Florida required to provide an education to all

23   students regardless of citizenship status?

24   A.   Florida has compulsory attendance laws that start between

25   ages 6 and 16.  So students within that age range are required

A0180

1  to go to school.

2  Q.   Are you familiar with the Every Student Succeeds Act?

3  A.   Yes, sir.

4  Q.   Does Florida receive -- excuse me.

5       Does the Department of Education receive federal

6  funding for children who qualify as, quote, "immigrant children

7  and youth," end quote, pursuant to Every Student Succeeds Act?

8  A.   Yes.

9  Q.   And how is immigrant children and youth defined in the act?

10  A.   Florida uses the federal definition for calculating that

11  data, and that is to define a student that has been born outside

12  of the United States and educated outside of the United States

13  for three or more years.

14  Q.   And what must DOE -- excuse me, the Department of Education

15  do in order to receive funding for educating immigrant children

16  and youth?

17  A.   With all of the entitlement dollars that we receive from

18  the federal government, the Department of Education has to fill

19  out assurances basically outlining what the intention of those

20  dollars are -- it's kind of like an application -- and where the

21  resources, the methodology for disbursing those resources, and

22  assigned assurances that we're going to use those dollars in

23  accordance to federal expectations.

24  Q.   Does the Department of Education have to track the number

25  of immigrant children and youth enrolling in Florida schools?

1   A.   The Department of Education collects that data from the

2   school district when they enroll -- when parents enroll

3   students.  If the parent chooses to share that information, the

4   schools would then have that and the districts would report that

5   to the State.

6   Q.   And so in your role at the Department, are you familiar

7   with the Department's efforts and processes to identify and

8   track immigrant children and youth enrolling in Florida schools?

9   A.   Yes.

10  Q.   And can you provide in more detail the identification

11  process and the process for collecting information?

12  A.   Sure.  So when a family shows up at a school, they'll go to

13  the registration office and fill out a packet of information

14  where they provide all the information on their children.

15  Hopefully they have transcripts in previous coursework.

16          Districts pretty regularly require proof of residency

17  to make sure they're attending the home's own school.  There are

18  some shot records that are asked for at the time of enrollment.

19          Then there's also some questions that include a home

20  language survey to see if a student may qualify for ESOL

21  students or to be an English Speaker of Other Language or

22  English Language Learner services.  But then also that

23  enrollment packet will ask if the child was born outside of the

24  United States and educated in a school outside the United States

25  for three or more years.

Case 3:21-cv-01066-TKW-ZCB   Document 148   Filed 01/20/23   Page 34 of 173
USCA11 Case: 23-11528   Document: 46   Date Filed: 06/12/2023   Page: 186 of 702

OLIVA - DIRECT

1    Q.   And does -- and how does the school districts -- what is

2    the process for the school districts submitting that information

3    to the Department?

4    A.   When the school direct's enrolling the student information,

5    it goes into a state database.  So we have a very complicated

6    reporting process.  So all of the school districts are required

7    to participate in our state survey system, and they send that

8    data to the Department where we collect that data throughout the

9    school year.

10   Q.   Does the Department audit this information?

11   A.   Yes, absolutely.

12   Q.   And does -- you said previously the Department will provide

13   this information to the federal government for purposes of

14   funding.  Does the federal government rely on this information?

15            MS. RYAN:  Objection.

16            THE COURT:  All right.  Rephrase it.

17   BY MR. HART:

18   Q.   Is the information you provide to the federal government

19   required by the federal government to obtain funding for the

20   State of Florida?

21   A.   Yes.  We submit the -- we share our data with the federal

22   government, and then the federal government then would use the

23   data that we submit in determining how they're going to

24   distribute funds to other states.

25   Q.   In your time at the Department, has the federal government

 1   ever denied the validity or challenged the substance of the

 2   information you or the Department provided to the government?

 3   A.   So the federal government audits states just as the state

 4   audits school districts.  So we participate in desktop

 5   monitoring and on-site visits in accordance to the schedule that

 6   the federal government follows.  So we would be monitoring for

 7   that as well.

 8   Q.   Has the federal government ever failed to provide funding

 9   to Florida during your time at the Department on the basis that

10   this information as collected by the State is incorrect?

11   A.   Not to my knowledge.

12   Q.   Is the process of identifying and tracking immigrant

13   children and youth part of the normal course of the Department's

14   operations?

15   A.   Yes.

16   Q.   Can you please turn to Exhibit 95 in your binder.  I think

17   it's to your right.  Mr. Oliva, you have the binder marked

18   with -- there's a couple different binders up there.

19   A.   Yeah.  It's the tab for 95, but it's stamped

20   Plaintiff's Exhibit 72.  So I don't know if that's right.

21          THE COURT:  Why don't you come up, Mr. Hart, and give

22   him the right document.

23          THE WITNESS:  Oh, wait.  Here we go.  I think I was

24   on 72.  I think I have 95 now.  This one says Plaintiff's

25   Exhibit 95.  Sorry about that.

A0184

```
1    BY MR. HART:
2    Q.   And just to make sure that we're talking about the right
3    document, is this document entitled "Enrollment by Immigrant
4    Status 2020-2021 through 2021-2022 Final Surveys 2, 3, and 5"?
5    A.   Yes, sir.
6    Q.   Are you familiar with this document?
7    A.   Yes, sir.
8    Q.   And what is this document?
9    A.   This is a document that is reporting data based on surveys.
10   The State of Florida -- when we talk about that robust data
11   sharing system that we have, we collect snapshots in time from
12   school districts, and there's some very important surveys.
13        And this one looks what is called Survey 2 and
14   Survey 3 which is where the State does an accurate snapshot of
15   every single student in the programs that the students are
16   enrolled in.  Survey 2 happens in October.  Survey 3 happens in
17   February.  Then survey 5 is the culmination of those surveys for
18   a final enrollment or allocation amount that happens in June to
19   July over the summer.
20   Q.   In this -- the information in this document particularly
21   refers to the immigrant children and youth information?
22   A.   Correct.  This is on the immigrant status.
23   Q.   And was this document created for purposes of this
24   litigation?
25   A.   I believe so.
```

A0185

1    Q.   Are you familiar with the underlying information in this

2    document?

3    A.   Yes.

4    Q.   And is this document a summary of records and information,

5    voluminous records and information, retained by the Department?

6    A.   Yes.

7    Q.   And do you use and rely upon the information in this

8    document in your current role with the Department?

9    A.   Yes.

10   Q.   And is the information in this document publicly available?

11   A.   Yes.

12   Q.   Is the information contained in this document a record made

13   at or near the time of its collection?

14   A.   I'm sorry.  Can you restate that?

15   Q.   Is the information retained in this document made at or

16   near the time of the collection by the schools and by the

17   Department?

18   A.   Yes.

19   Q.   And is it the regular practice of the Department to collect

20   and maintain and retain the information in this document?

21   A.   Yes.

22          MR. HART:  Your Honor, I'd like to enter into evidence

23   what will be Plaintiff's Exhibit 95.

24          THE COURT:  Any objection?

25          MS. RYAN:  No objection.

A0186

```
 1              THE COURT:  All right.  That will be received.
 2         (PLAINTIFF EXHIBIT 95:  Received in evidence.)
 3              MR. HART:  Your Honor, do you have a copy?
 4              THE COURT:  I do not have a copy.  I would like a
 5    copy.
 6              MR. HART:  Your Honor, if I may approach?
 7              MR. PERCIVAL:  We have a copy.
 8              THE COURT:  Just going forward, as you introduce them,
 9    bring them up to the clerk and she'll get them to me.
10              MR. HART:  Okay.  I believe the clerk has a binder.
11    Do you --
12              MR. PERCIVAL:  No, he doesn't, Joe.
13              MR. HART:  Would you like us to publish it on the
14    screen as well?
15              THE COURT:  That's fine.
16              Okay.  You can proceed while they're finding their
17    document.  I can see it.
18              MR. HART:  Thank you, Your Honor.
19    BY MR. HART:
20    Q.   Can you please define the term "immigrant status" as used
21    in this document?
22    A.   So the State of Florida uses the federal definition, and
23    it's for students that were born outside of the United States
24    and educated outside of the United States for three or more
25    years.
```

1    Q.   And does that definition stem from the Every Student

2    Succeeds Act?

3    A.   Yes, sir.

4    Q.   In your role at the Department are you familiar with the

5    costs associated with educating immigrant children, the

6    additional costs that might be associated?

7    A.   Yes.

8    Q.   And does federal funding cover all the costs associated

9    with immigrant children and youth enrolled in Florida schools?

10   A.   The dollars we received from federal government would not

11   cover the cost of total education for that student.  The dollars

12   that we receive from the federal government is to supplement the

13   State's investment in educating students.  In fact, we're

14   prohibited from supplanting the State investment with the use of

15   federal dollars.

16   Q.   And what are some of the costs or additional costs that

17   might be associated with educating immigrant children and youth?

18   A.   Well, each student is evaluated independently.  So part of

19   that registration packet in -- in the questionnaires parents are

20   asked to fill out, there will be some questions around student

21   language acquisition.  So there's a home language survey that

22   I'll ask the parents of the child, if English is the first

23   language they've learned, if the student speaks another language

24   besides English, if English isn't the only spoken language at

25   home.

**A0188**

1        And based on how the parents respond, there will be a

2   screen done on the students that will measure the student's

3   ability to speak, listen, read, and write.  Based on the results

4   of that assessment would determine the level of services that a

5   student may need.

6        Those services can range from small group instruction

7   to summer programs to after-school programs.  It could be very

8   intensive.  Some students may also qualify for ESOL services,

9   the English Speakers of Other Language services but also have

10  dyslexia.  They may have reading difficulties.  They may need

11  additional layers of support.

12       So every student has to be assessed individually, but

13  every student is going to be assigned the appropriate levels of

14  support that they are afforded to, to make sure that they're

15  successful in school.

16  Q.   So looking at this document, Survey 2 based on your prior

17  statement would have been in October of 2020, Survey 2 of the

18  2020-2021?

19  A.   That's correct.

20  Q.   And that states approximately 84,000 immigrant students?

21  A.   That's correct.

22  Q.   And Survey 3 would have been January of -- February of

23  2021?

24  A.   It would have been in February.

25  Q.   And that states 83,505 immigrant students?

OLIVA - DIRECT

```
 1   A.   That's correct.
 2   Q.   And Survey 5 would have been collected in the -- sometime
 3   during the summer, and it says -- summer of 2021, and it says
 4   95,000?
 5   A.   Right.  And that's typically referred to as the final
 6   number for the school year.
 7   Q.   And Survey 2 of 2021 would have been October of 2021, and
 8   it has about 90,000?
 9   A.   That's correct.
10   Q.   And Survey 3 would have been collected in January of 2022,
11   and it has 101,000?
12   A.   In February, yes.
13   Q.   And Survey 5 would have been in this past summer, and -- of
14   2022, and it has 112,375 immigrant students?
15   A.   That's correct.
16   Q.   So could you -- since January of 2021, approximately how
17   many more immigrant students have been enrolled in Florida
18   schools?
19   A.   Over the two years, it would be about 17,000.
20   Q.   And I notice down here there is a "not reported."  Could
21   you expand upon that column?
22   A.   So when a parent is enrolling their student and filling out
23   their registration packet, if they don't respond to certain
24   sections, when the data clerk is entering in that information,
25   if the parent chose to leave it blank, they would click the box
```

**A0190**

1    that says not reported by the parent during registration.

2              THE COURT:  Let me ask you a question before you

3    continue.  The 17,000 number that you gave, what are the two

4    components of that, to get to that?  What did you start with --

5    where did you get the January 2021 number and then what do you

6    subtract --

7              THE WITNESS:  Right.

8              THE COURT:  -- that from to get 17,000?

9              THE WITNESS:  So to get to 17,000, I look at the final

10   allocation which is Survey 5.  Survey 2 and Survey 3 are those

11   two different snapshots.  Survey 5 is kind of the average of the

12   school year because students come, students go.  Sometimes it's

13   not the same.  So final calculation for Survey 5 in 2020-2021 is

14   95,000.  Final calculation for Survey 5 in 2021-2022 is 112,000.

15             THE COURT:  But I thought I understood your testimony

16   to be that the Survey 5 is done at some point in the summer.

17             THE WITNESS:  That's correct.  Because it's a

18   culmination of what was submitted in Survey 2 and Survey 3

19   combined, so there's fluctuation.  That's why we -- we use

20   Survey 5 as final numbers for that school year.  That's what we

21   would report out.

22             THE COURT:  And so how does that summer of 2021

23   number -- I think his question was from January of 2021 -- I

24   thought Survey 3 was January -- or February of 2021.

25             THE WITNESS:  It is.  And that's why Survey 5 gets a

**A0191**

1    little bit nuanced because Survey 2 can be different students

2    that have received services throughout the year.  They may not

3    be in Survey 3.  Survey 3 could be different students from

4    Survey 2.  Survey 5 is a culmination of the number of students

5    served throughout the year.

6              THE COURT:  Okay.  Gotcha.  Thank you.

7              All right.  Go ahead, Mr. Hart.

8    BY MR. HART:

9    Q.   Could you remind us, how long did you say you worked in the

10   school system prior to joining the Department?

11   A.   About 17 years.

12   Q.   And in your time as a teacher and principal, did you

13   educate students who were born abroad?

14   A.   I educated students that qualify for English Speakers of

15   Other Language services.  Sometimes students shared with us that

16   they were born abroad, yes.

17   Q.   So you educated students for whom English was a second

18   language?

19   A.   Yes.

20   Q.   Did you educate students who knew no English?

21   A.   Yes.

22   Q.   In your experience, is it different educating a child with

23   no English skills versus educating a child who already has some

24   English skills?

25              MS. RYAN:  Objection, Your Honor, calls for expert

 1    opinion.

 2              THE COURT:  I think he's established a sufficient

 3    background, and I hope we're not going to spend too much time on

 4    this.

 5              MR. HART:  Yes, Your Honor.

 6              THE WITNESS:  Yeah, so if a student -- I taught fifth

 7    grade one year, and we had students that moved in from other

 8    countries that didn't speak any English.  And in my experience,

 9    when a student is older and coming in the school system -- and

10    even when I worked at the high school level -- there's a lot

11    more challenges in acquiring a second language than typically

12    younger students.  So depending on the age and the background

13    and the education that the child receives.  Sometimes students

14    might come from another country and have not been enrolled in

15    school.  They don't have the opportunity to be educated.  So

16    they can be significantly delayed in grade-level expectations.

17              MR. HART:  One second, Your Honor.

18    BY MR. HART:

19    Q.   Could you provide any information upon what extra resources

20    a state might spend on the students who are acquiring English as

21    a second language?

22    A.   So when a student qualifies for those services, there's

23    actually certifications that teachers receive to be qualified to

24    support those services.  So we have to invest in making sure we

25    find certified teachers, provide the training to teachers to

**A0193**

```
 1   earn that certification, make sure that they have the ability to

 2   implement the best strategies, evidence-based strategies for

 3   those children.  And typically the students that are

 4   significantly behind their peers would require intensive,

 5   sometimes one-on-one instruction that has to happen throughout

 6   the school day.  It may require after-school interventions, it

 7   may require summer interventions based on that child's needs.

 8            And additionally, the amount of resources:  buying

 9   more curriculum, finding translators.  Sometimes students are

10   speaking -- or families speak languages that nobody in the

11   school knows how to communicate, and they may have to

12   communicate with a translator to talk to the students and talk

13   to the families.  So it varies based on student need, but it --

14   the range can be very significant.

15            MR. HART:  Your Honor, that's all my questions for

16   now.

17            THE COURT:  All right.  Thank you.

18            MR. PERCIVAL:  Your Honor, do you want us to approach

19   with a copy?

20            THE COURT:  Yes.

21            Ms. Ryan.

22            MS. RYAN:  May I proceed, Your Honor?

23                           CROSS-EXAMINATION

24   BY MS. RYAN:

25   Q.   Good morning.
```

```
 1    A.    Good morning.

 2    Q.    You said the Department of Education defines an immigrant

 3    student as a child born abroad who was educated outside the

 4    United States in the last three academic years, correct?

 5    A.    Correct.

 6    Q.    So for the 2020-2021 school year, the total number of

 7    immigrant students in Florida was 95,084.  I can put the exhibit

 8    up.

 9    A.    I just want to clarify.  You're still talking about

10    Exhibit 95?

11    Q.    Yes.

12          And I can put that up on the screen as well if that

13    would be easier for Your Honor.

14          Okay.  So for the 2020-2021 school year, the total

15    number of immigrants at the end of the year was 95,084, correct?

16    A.    Yes, ma'am.

17    Q.    And for the 2021-2022 school year, the number was -- the

18    final number was one thousand twelve, three hundred

19    seventy-five, right?

20    A.    112,375.

21    Q.    But a child classified as an immigrant student is not

22    necessarily a noncitizen; is that right?

23    A.    It's not equal, no.

24    Q.    So those immigrant students could be green-card holders?

25    A.    They could.
```

**A0195**

1   Q.   They could be lawful permanent residents?

2   A.   They could.

3   Q.   They could be U.S. citizens who were born outside of U.S.

4   soil?

5   A.   They could.  But the likeliness of many of those students

6   not being a citizen is very high.

7   Q.   But you don't know?

8   A.   We don't collect that data at the state.

9   Q.   Because you don't track that information.

10  A.   The federal government prohibits us from tracking that

11  information.

12  Q.   They were approximately 2.8 million students in the Florida

13  school system last year?

14  A.   Roughly.  I would say yes.

15  Q.   Your final survey shows just over 3 million?

16  A.   That's correct.

17  Q.   So the immigrant students make up about 3 percent of the

18  total student body?

19  A.   That's correct.

20  Q.   But you don't know if any of them are noncitizens who

21  attempted to enter at the southwest border?

22  A.   We do not collect that information.

23  Q.   You don't know if they're applicants for admission?

24  A.   We don't collect that information.

25  Q.   You don't know if they were paroled?

1    A.   We don't collect that information.

2    Q.   You don't know if they were conditionally released pending

3    removal proceedings?

4    A.   We don't collect that.

5    Q.   In fact, it's possible that none of them fit those

6    definitions?

7    A.   We don't check -- there's no way for us to know.

8    Q.   On direct you testified about the mandatory school

9    requirements under Florida law.  And as an educator, you assume

10   that these parents are enrolling their students in public

11   schools; is that right?

12   A.   I don't assume.  I know firsthand they are.

13   Q.   But you have no idea how many applicant-for-admission

14   families are actually coming to Florida?

15   A.   We don't have that information.

16   Q.   You don't know how many of them are enrolling their

17   children in private schools?

18   A.   We don't -- we don't know that information.

19   Q.   You don't know how many are being homeschooled?

20   A.   The Department doesn't track that information.

21   Q.   You're just assuming that some applicants for admission

22   will come to Florida with children and some of them will enroll

23   their children in public schools?

24   A.   I'm not assuming.  I know firsthand.  I've met with these

25   families and seen these students in our classrooms.

1    Q.   We don't have any evidence of examples of those

2    applicant-for-admission families with children being enrolled

3    under the challenged policies, though, do we?

4    A.   We don't collect that data.

5    Q.   There's no specific programs administered by the Department

6    that are only available to noncitizen students, right?

7    A.   That's correct.

8    Q.   There's no new programs that had to be added because of

9    noncitizen students?

10   A.   That's correct.

11   Q.   There are no classes or schools that had to be created only

12   because of noncitizen students?

13   A.   I would say that schools are having to adjust to student

14   enrollment.  That would include students that may not be

15   citizens.

16   Q.   If a student, any student, needs help with English

17   proficiency, the State gets federal grant money for that,

18   correct?

19   A.   We receive an entitlement grant from the state -- or from

20   the federal government to support that, yes.

21   Q.   And to be clear, "any student" includes citizen students?

22   A.   Yes.

23   Q.   Because citizen students sometimes don't speak English.

24   A.   That's correct.

25   Q.   And the grant money that you get for those programs is

 1    separate and apart from the State's education budget?

 2    A.   It's to supplement the State's investment.

 3    Q.   And the amount received is based on the actual number of

 4    students who speak limited English?

 5    A.   It's part of.  It's a little bit more nuanced than that,

 6    but for intent and purposes, that -- we report to the federal

 7    government the number of students that qualify for ESOL

 8    services.  How the federal government determines that

 9    allocation, I'm not too familiar with their methodologies.

10    Q.   You report numbers and then you get money as a result?

11    A.   Yes.

12    Q.   You told a story on direct about when you taught fifth

13    grade and you had to teach students with English as a second

14    language, right?

15    A.   That's correct.

16    Q.   But that, to be clear, was under a different

17    administration?

18    A.   Yeah, that was decades ago.

19    Q.   So having students that don't speak English is not a new

20    problem that started in January of 2021?

21    A.   That is not new to the State of Florida.

22    Q.   On direct you talked about the average cost per student and

23    how that's calculated.  You referred to the FEFP.

24    A.   That's correct.

25    Q.   And that's the program that distributes money to the school

**A0199**

 1   districts, right?

 2   A.   Yeah, it's a complicated formula, yes.

 3   Q.   It calculates how much each district will get?

 4   A.   Pretty much, yes.

 5   Q.   And it's based on a number of factors including how many

 6   students they have and the services that those students require?

 7   A.   Correct.

 8   Q.   And then it also uses the cost per student?

 9   A.   What do you mean the cost?

10   Q.   The cost per student is included in that calculation,

11   correct?

12   A.   Yes.

13   Q.   Last year the cost per student you said was approximately

14   $7800?

15   A.   That's correct.

16   Q.   And for the current academic year, it's approximately

17   $8200.  So the total school funding for the Department of

18   Education for the 2021-2022 school year from the State was

19   $12.8 billion, correct?

20   A.   Total is about 22 and a half billion.

21   Q.   But that includes local funding?

22   A.   Correct.

23   Q.   And you have no idea how much of that 22 billion-dollars,

24   if any, was spent on applicants for admission paroled at the

25   southwest border since January of 2021, right?

**A0200**

1    A.    We are prohibited from collecting that information.

2    Q.    The answer could be zero because you just don't know,

3    right?

4    A.    I have seen these students, and I've met with the families,

5    so I can tell you with certainty it's not zero.

6    Q.    So you've spoken to actual families who said, "I'm an

7    applicant for admission who was paroled at the southwest border

8    since January of 2021 and I have come to Florida"?

9    A.    I have visited these schools and met with administrators

10   who are receiving influx of students from other countries that

11   have no formal spoken language and have sat in these classrooms

12   with these children and met some of these families to talk about

13   implementing strategies on how we can support them because they

14   don't have any background knowledge, any formal written

15   language, and they're coming to us at 10 to 12 years old and

16   they're significantly behind their peers.  And we're going to

17   ensure that we put them on a successful path to graduating from

18   Florida schools.

19   Q.    I appreciate that, but my question was:  You haven't spoken

20   to anyone who has said to you, "I'm an applicant for admission

21   who came over the southwest border and were paroled under the

22   current policies since January of 2021"?

23   A.    They have not used those terms specifically --

24   Q.    Okay.

25   A.    -- but they told me that they have come here recently from

A0201

```
 1    another country.
 2    Q.    So the Department of Education does not know if Florida is
 3    educating any applicants for admission or if it spends any money
 4    on them.  So you have no idea how the federal government
 5    detaining more applicants for admission would actually affect
 6    your school system, do you?
 7    A.    We don't collect that data.
 8              MR. HART:  Your Honor, objection, argumentative.
 9              THE COURT:  It's a little bit compound, too, but I
10    think he's answered it.  She's made her point.
11              MS. RYAN:  It's cross-examination, Your Honor.
12              THE COURT:  I know but you still can't ask a -- I
13    can't even count the number of parts to that question.  It was
14    extremely compound.  And had that been the objection, I would
15    have sustained it.  But it wasn't and you made your point
16    multiple times.
17    BY MS. RYAN:
18    Q.    You can't say if more applicants for admission were
19    detained whether that would impact the Department's budget, can
20    you?
21    A.    We don't collect that information.
22    Q.    The cost per student went up from last year to this year?
23    A.    That's correct.
24    Q.    Because the Department of Education got more money from the
25    state legislature?
```

```
 1   A.   Florida is open and the state legislature has been a

 2   benefit of the revenue that Florida has received thanks to the

 3   wonderful leadership.

 4   Q.   You previously testified -- I think you used the word

 5   "thriving," right?

 6   A.   Yes.

 7   Q.   So even though you had more students enrolling in schools

 8   this year compared to last year, you're also able to spend more

 9   money per student?

10   A.   That's correct.  The legislature allocated more dollars per

11   student.

12   Q.   And you said a lot of the State's revenue is coming from

13   sales tax and property tax.

14   A.   Primarily.

15   Q.   And the FEFP distributions shows that from -- distributions

16   from the State's general revenue fund?

17   A.   I'm sorry.  Can you restate that?

18   Q.   Yes, I can.

19        The FEFP distributions that we talked about, those

20   come from the State's general revenue fund which you said is

21   made up primarily of property tax and sales tax, correct?

22   A.   And it comes in a categorical set by the legislature of how

23   much is going to be spent.

24   Q.   Anyone who owns property in the State of Florida has to pay

25   for education, right?
```

**A0203**

1   A.   It's part of millage that's collected in property tax.

2   Q.   And anyone who shops in a store in Florida pays sales tax?

3   A.   That's correct.

4   Q.   Which is then used to pay for the school system?

5   A.   Unless you have a tax exemption.  I mean, there's nuances

6   to that.

7   Q.   And the State also takes in fees for services it provides

8   like marriage licenses, right?

9   A.   I'm not part of that.

10   Q.   And driver's licenses?

11   A.   That's not under the purview of the Department of

12   Education.

13   Q.   All those service fees go into the general revenue fund

14   that the state uses to pay for the school system, right?

15   A.   I don't oversee that.

16   Q.   So if applicants for admission paroled into the country

17   settle in Florida, they pay sales tax like everyone else, right?

18   A.   You used the word "assumptions" before, so I'm going to use

19   that with you.

20        I would assume.

21   Q.   Do you think that there's a tax exemption for applicants

22   for admission?

23   A.   I don't know.  I don't know who these people are.

24   Q.   If applicants for admission buy property they pay property

25   taxes?

1    A.    That's another assumption.

2    Q.    You have no reason to believe that because they're an

3    applicant for admission they would be exempt from property

4    taxes, do you?

5    A.    Not to my knowledge.

6    Q.    If they got married, they would need to pay for a marriage

7    license?

8    A.    I don't oversee these agencies.  I work for the Department

9    of Education.

10   Q.    If they want to drive, they pay for a license?

11   A.    I don't oversee the department of vehicles.

12   Q.    When they live in Florida and they pay sales tax and pay

13   property tax, they are contributing to the Florida school

14   system, right?

15   A.    If you say they're paying taxes, then they're paying taxes.

16   Q.    And those taxes pay for the school system.

17   A.    The dollars would go to the State, the State for

18   appropriation.

19   Q.    So not only do you not know what costs the State has

20   incurred from enrolling applicants for admission, you also don't

21   know whether that cost is greater than or less than any tax

22   revenue the State gets from the same population, do you?

23   A.    I can tell you when more students come to school, our

24   schools are going to welcome these students and make sure they

25   have all the services afforded to them to get a proper

A0205

1  education.

2  Q.   But as you just said, you don't know who any of these

3  people are, so you don't know if they're enrolled in your

4  schools, do you?

5  A.   I've already stated that I've met some of these families

6  and seen these students firsthand.

7  Q.   So a few minutes ago when you said you don't know who any

8  of these people are, was that accurate?

9          MR. HART:  Objection, Your Honor, argumentative.

10         THE COURT:  All right.  Sustained.

11         MS. RYAN:  Your Honor, I'm entitled to probe this

12  witness's credibility.  He said two different statements about

13  applicants for admission and whether he knows them or not.

14         THE COURT:  I've heard his testimony, and I've heard

15  enough of that.

16         MS. RYAN:  No further questions, Your Honor.

17         THE COURT:  Redirect?

18         MR. HART:  Yes, Your Honor.

19                **REDIRECT EXAMINATION**

20  BY MR. HART:

21  Q.   So opposing counsel discussed the knowledge of immigrant

22  status.  Can you just clarify once more why don't you know or

23  have information about the immigrant -- immigration status of

24  students enrolling in Florida schools?

25  A.   When a parent registers, they're asked questions on if

```
1    their child was born outside the United States -- and it also

2    gets nuanced because it doesn't include D.C. and Puerto Rico --

3    but basically were they born outside the United States and

4    participating in education for three or more years outside of

5    the United States.  If a parent chooses to disclose that

6    information, that student may be eligible to receive immigration

7    services; but we do not directly ask the families if they're a

8    citizen or an immigrant.

9    Q.   And you said you were prohibited by federal law from asking

10   about citizenship status?

11   A.   That is correct.

12   Q.   So the federal government prohibits the Department from

13   collecting that piece of information?

14   A.   That's correct.

15   Q.   And we talked earlier about federal grants, and just to

16   clarify, do federal grants cover all the resources the State

17   spends on students lacking English proficiency?

18   A.   It does not.

19   Q.   And can you provide just a little bit more detail as to why

20   these ESOL services are more expensive than your standard

21   education services?

22   A.   Students that typically qualify for ESOL students, they

23   need more intensive instruction and intervention which means we

24   have to hire additional resources for teachers that are licensed

25   to support these students.  They will work in the classroom with
```

```
 1   the general education teacher.  So sometimes you have two

 2   teachers in a classroom to support students that are learning an

 3   extra language.  They're providing one-on-one and small group

 4   instruction above and beyond the student learning day.

 5            And you have to acquire resources, you have to buy

 6   textbooks, sometimes in very -- in all different kinds of

 7   languages.  Sometimes you have to bring in translators, that can

 8   be very costly, to work with schools and families to make sure

 9   these students are set up based on the level of support they

10   need.

11   Q.   And so you mentioned earlier that you have personal

12   experience both as a teacher and in your current role with

13   providing resources to educate these students?

14   A.   Yes, I have.

15   Q.   Have you ever in your experience dealt with or overseen a

16   situation where a large amount of students who maybe don't know

17   English have enrolled in a school?

18   A.   In my experience even -- especially throughout this past

19   school year, through my role working with superintendents and

20   conversations with them, I've been to districts where they're

21   supporting large numbers of students where there may be a church

22   or a local family member that's taking in a hundred families in

23   the area, and then you have a hundred students enroll in a

24   school all at once.  That's a lot of additional resources,

25   because we also have to follow class-size mandates.
```

```
1              So when you go over class-size mandates, you have to

2    hire more teachers throughout the school year, you have to

3    provide those services find the -- buy that curriculum, and make

4    some necessary adjustments throughout the school year.

5    Q.   And so is it fair to say that when you have a situation as

6    you described, resources have to be pulled from one area to

7    accommodate and provide a proper education to these students?

8    A.   When the school budget is set, it's set for the year.  And

9    when you have to move resources around, it's going to impact a

10   student experience and other resources.  So if you have to hire

11   additional teachers or support for students that are acquiring

12   English as a second language, those consumables are going to

13   come from another classroom.

14             So now you're telling science teachers you have to

15   simulate labs because we can't -- we have to move those dollars

16   that we allocated for buying resources or current technical

17   programs.  It's a very big burden and challenge on school

18   administrators as well school districts to navigate and

19   fluctuate those challenges, but those students are going to get

20   the services they need in order to be successful.

21   Q.   And just to clarify, you've seen this in your role.  Have

22   you seen this reallocation of resources in the past two years?

23   A.   Absolutely.

24             MR. HART:  No further questions, Your Honor.

25             THE COURT:  All right.  Thank you, sir.  You're free
```

**A0209**

 1   to go.

 2        *(Witness excused.)*

 3             THE COURT:  Next witness.

 4             MR. GUARD:  Your Honor, John Guard, Chief Deputy

 5   General for the State of Florida.

 6             We have some exhibits, and then we're going to be

 7   playing videotape deposition of Chief Ortiz, and that's going to

 8   last about an hour and 45 minutes.  If you want -- this might be

 9   a good -- I guess this is my way of saying this might be a good

10   place to take a break because we're going to have about two

11   hours of deposition testimony.  Or we can do the exhibits and

12   then take a break.

13             THE COURT:  Let's do that.

14             MR. GUARD:  Okay.

15             Your Honor, Florida would offer what has previously

16   been marked for identification as Exhibits 1, 2, 3, 4,

17   Exhibit 10, 13, 15, 18, 22, 25, 26, 27, 28, 30, 31, 46, 47, 49,

18   97, and 98 into evidence.  I previously provided a list to

19   opposing counsel that we are going to move in at this time.

20             MR. PERCIVAL:  Your Honor, I apologize, one

21   clarification.  I think 40 and 41 were the administrative record

22   issues we dealt with before, so we'll withdraw those.

23             MR. GUARD:  I didn't say...

24             MR. PERCIVAL:  You said one of them.

25             MR. GUARD:  Oh, sorry.

1            THE COURT:  I don't think those were on the list that
2      I wrote down.
3            MR. GUARD:  Oh, I apologize.
4            THE COURT:  All right.  Mr. Darrow, walk through those
5      one by one, or are there a group of them that there is no
6      objection to?
7            MR. GUARD:  That's no objections up through, at least
8      my understanding, to Exhibits 1, 2, 3, 4, 10, 13, and 15.
9            THE COURT:  Is that correct, Mr. Darrow?
10           MR. DARROW:  That's correct, Your Honor.
11           THE COURT:  All right.  Then those will be received.
12           Why don't you tell me what they are.
13           MR. GUARD:  Sure, Your Honor.  I can -- would you like
14     a -- I have a list that happens to have that information.
15           THE COURT:  I know our deputy clerk would.
16           MR. GUARD:  May I approach?
17           THE COURT:  Sure.
18           MR. GUARD:  So Exhibits 1, 2, 3, and 4 are Customs and
19     Border Protection custody and transfer statistics for the fiscal
20     year 2020, 2021, 2022, and 2023.
21           Exhibit 10 is data produced by the United States
22     government regarding the number of aliens released at the
23     southwest border who gave addresses in Florida or who have been
24     added to the Miami docket for processing.
25           Exhibit 13 is the Department of Homeland Security's

```
 1    fiscal year 2021 budget and brief.
 2              Exhibit 15 is Immigration and Customs Enforcement
 3    budget overview for the fiscal year 2021, congressional
 4    justification.  And so those are those exhibits.
 5              THE COURT:  And at some point, is Florida going to
 6    tell me what portions of that they think is important and what
 7    all that means?  Because it looked like a big stack of stuff.
 8              MR. GUARD:  It is a big -- which I'm going to provide
 9    to the Court.  Yes, Your Honor, during some of the witness
10    testimony they're going to testify about different parts of
11    those documents.
12              THE COURT:  All right.  Well, those -- 1 through 4,
13    10, 13, and 15 -- will be received without objection.
14         (PLAINTIFF EXHIBITS 1-4, 10, 13, 15:  Received in
15    evidence.)
16              THE COURT:  All right.  Next one on your list was
17    Number 18.
18              MR. GUARD:  Exhibit 18 is a U.S -- it's an email
19    amongst U.S. Border Patrol officials dated February 16, 2021.
20              THE COURT:  All right.  And there are no objections to
21    that?
22              MR. DARROW:  Yes, Your Honor.  We object on the basis
23    of hearsay to that.  It's an email that recounts what the --
24              THE COURT:  Let me have it.
25              MR. GUARD:  Yes, Your Honor.  May I approach?
```

```
 1              THE COURT:  All right.  Go ahead, Mr. Darrow.
 2              MR. DARROW:  As you'll see, the email writer is
 3      recounting what he heard in a conversation where he just spoke
 4      with somebody else whose name has been redacted for privilege
 5      concerns.
 6              THE COURT:  I'm sure Mr. Guard will tell me that
 7      that's subject to -- it's either not hearsay because it's an
 8      admission or it's a statement of the party opponent.  Why is it
 9      not?
10              Even the hearsay within the hearsay, I assume you
11      wouldn't have redacted somebody's name if it wasn't an agency
12      employee.
13              MR. DARROW:  Because, Your Honor, it's not from one of
14      the named parties.  It wouldn't be a party admission.  And the
15      internal hearsay is not identified at all.
16              MR. GUARD:  I mean, Your Honor, this is -- the ERO is
17      a component of ICE who I believe is a named party in this
18      lawsuit.
19              THE COURT:  I'm looking at the bottom of the email
20      chain.  It's from chief -- name redacted, chief law enforcement
21      operations directorate, United States Border Patrol
22      headquarters.
23              That sounds like somebody that works for one of the
24      parties here, doesn't it?
25              MR. DARROW:  It is, Your Honor, but, you know, under
```

**A0213**

1    the APA, the named party is the agency.  It's not one of its

2    employees.

3            THE COURT:  It looks like it came from a public email.

4    It was not like he's sending it from his Gmail from home outside

5    of the course of his duties.  I think that comes in as an

6    admission or a statement of party opponent, whatever the proper

7    terminology is.

8            That will be received over your hearsay objection.

9        (PLAINTIFF EXHIBIT 18:  Received in evidence.)

10           THE COURT:  Number 22.

11           MR. DARROW:  Your Honor, if I may, that's just the

12   first layer of hearsay.  Then the second layer of hearsay is the

13   statement from somebody recounting, you know, I just spoke with

14   blank and that person told me.

15           THE COURT:  Right.  But you've redacted the name of

16   that person.  So I mean, if you thought it was a nonemployee,

17   you're going to redact nonemployee's names.  This is somebody at

18   ERO.

19           MR. DARROW:  We redacted lower ranking employees'

20   names, Your Honor.

21           THE COURT:  At ERO.  I mean, it's an agency employee

22   talking to another agency employee about agency business.

23           MR. DARROW:  But not every employee is, you know, a

24   party to the case.

25           THE COURT:  I just don't agree with you.  So that's

**A0214**

1    received over your objection.

2            All right.  Number 22.

3            MR. GUARD:  22 is another email between Border Patrol

4    employees in the course and scope of their employment under --

5    and so we're offering that.  It's dated May 21st of 2021.

6            THE COURT:  All right.  Let me see that one.  I assume

7    there's the same objection.

8            MR. DARROW:  Same objections, Your Honor.

9            MR. GUARD:  May I approach?

10           THE COURT:  Yes, sir.

11           MR. DARROW:  It also appears that the exhibit is

12   highlighted in parts, and so we object to the highlighting.

13           THE COURT:  I don't have any highlighting; I just have

14   a bunch of stuff that's been redacted.  Oh, I'm sorry, I do see

15   the highlighting.

16           Is that something you highlighted, Mr. Guard?

17           MR. GUARD:  It is not something that we highlighted,

18   Your Honor.  We can work on getting a substitute and see if we

19   can manipulate the PDF that we were given, or at least the PDF

20   that's in our file.

21           THE COURT:  So was it given to you highlighted?

22           MR. PERCIVAL:  I don't believe so, Your Honor, but we

23   can check and confirm.  We removed the highlighting that was in

24   the document that we had added during the deposition, but there

25   was some other highlighting that looks like it was there when it

```
 1    was scanned in.  But we can talk with counsel during the break
 2    and just make sure on this.
 3            THE COURT:  All right.  If the objection's the same,
 4    the ruling is the same.
 5            And I'm not particularly concerned about the
 6    highlighting or lack of highlighting.  I'll just recognize that
 7    that's something that came later in the process, not when it was
 8    created.  And if the parties are up in a twitter about that,
 9    they can give me an unhighlighted version, but I'm not going to
10    give any significance to the highlighting except to the extent
11    that becomes a pertinent piece of information I need to see
12    through other evidence.
13            (PLAINTIFF EXHIBIT 22:  Received in evidence.)
14            THE COURT:  All right.
15            MR. GUARD:  Next, Your Honor, we have Exhibit 25 which
16    is DHS's -- I think 25, which is DHS's fiscal year 2022 budget
17    and brief.  I don't think there's an objection that.
18            The next one is 26 which is the U.S. Immigration and
19    Customs Enforcement budget overview congressional justification
20    for fiscal year 2022.  Again, I don't believe there is an
21    objection.
22            Exhibit 27 is Department of Homeland Security's fiscal
23    year 2023 budget and brief.  And I don't believe that is an
24    objection to that.
25            And then twenty -- last one before we get to an
```

**A0216**

1    objection is 28 which is the U.S. Immigration and Customs

2    Enforcement budget overview, congressional justification for

3    fiscal year 2023.  And again I don't believe there is an

4    objection to that.

5              THE COURT:  Is that correct, Mr. Darrow?

6              MR. DARROW:  Yes.  No objections to that list, Your

7    Honor.

8              THE COURT:  I'll receive 25 through 28.  Again you're

9    going to have somebody come in and point me to things in the

10   budget you think are important.

11        (PLAINTIFF EXHIBITS 25 - 28:  Received in evidence.)

12             MR. GUARD:  Chief Ortiz's deposition testimony talks

13   about these documents and the important parts of these

14   documents.

15             THE COURT:  All right.  Next exhibit.

16             MR. GUARD:  The next exhibit is Exhibit 30, which is a

17   May 15th, 2022 email from a Border Patrol -- well, now former

18   employee, but at the time Border Patrol employee, Tony Barker.

19   Same -- 801(d)(2)(D), I think it's the same objection by

20   opposing counsel.

21             THE COURT:  Is there anything different about this

22   one?

23             MS. FUDIM:  Yes, Your Honor.  Elissa Fudim behalf of

24   the United States.  We're objecting to this one on the grounds

25   of hearsay.  And to anticipate your question of why this isn't a

**A0217**

1   statement by a party opponent, to address that, there is a

2   question posed to Mr. Barker and Mr. Barker is in this email

3   relaying, allegedly, supposedly, we don't know, the statement of

4   another person within the department.

5          If that statement were accurately quoted or

6   attributed, we knew that for a fact, then, yes, it would be a

7   statement by a party opponent.  But because we don't, it's a

8   second layer of hearsay, and it's therefore inadmissible, Your

9   Honor.

10          THE COURT:  All right.  Mr. Guard, may I have a copy

11   of it, please?

12          MR. GUARD:  May I approach?

13          THE COURT:  Yes, sir.

14          What is an SOC?

15          MR. GUARD:  I actually do not know, Your Honor, what

16   the SOC is.  What I do know is that Mr. Barker, who is a chief

17   at Border Patrol, is asking for a, quote, "to go into that

18   document," but from -- coming from the deputy commissioner of

19   the Border Patrol -- or Customs and Border Protection.

20          And then we have the relevant part and the reason why

21   we're introducing this document, is in that top email where the

22   quote that Mr. Barker is giving is:  "We must ensure that we are

23   detaining and removing the demographics that are amenable, or

24   else the flows will only compound more."

25          THE COURT:  So nobody knows what an SOC is?

**A0218**

1          MS. FUDIM:  I'm not sure, but I think it points to one

2    of the problems with the document.  If there's not a witness on

3    the stand to provide testimony to give context, that would, I

4    think, certainly go to one of the problems which potentially

5    then becomes relevance.

6          But the objection that I made was one to hearsay, and

7    I hear counsel to be responding with regard to the quote in the

8    first email more on a relevance basis.

9          MR. GUARD:  My objection --

10         MS. FUDIM:  The fact --

11         THE COURT:  Hold on.  Stop talking over each other.

12         Go ahead, Ms. Fudim.

13         MS. FUDIM:  The fact that this is a statement made by

14   one employee of the government attributing certain words to

15   another employee of the government without having him here to

16   testify makes the statement hearsay, notwithstanding any

17   exception that would normally apply to a statement by a party

18   opponent, Your Honor.

19         THE COURT:  And, Mr. Guard, I'm not -- I guess I'm not

20   even following on what's going on here, but your view of this

21   document is that Mr. Barker is providing this quote to somebody

22   to put in some thing?

23         MR. GUARD:  To put into a government document.  So

24   they evidently had whatever -- they had an exercise day --

25         THE COURT:  Well, hold on.  Stop.

A0219

```
 1                So that's what you think the quoted portion is, is
 2     Mr. Barker's words to be put into something?
 3                MR. GUARD:  It's not Mr. Barker's words.  Mr. Barker
 4     is giving a quote for the deputy commissioner of the U.S.
 5     Customs and Border Protection to Mr. Barker.  Border Patrol is
 6     one of the components.
 7                THE COURT:  Well, isn't that what I just said?
 8                MR. GUARD:  Well, it's not Mr. -- I think you said
 9     Mr. Barker's words.  I was just being -- trying to be precise.
10     It was -- it's the deputy commissioner's words.
11                THE COURT:  Mr. Barker was giving words to be
12     attributed to the deputy commissioner in some document?
13                MR. GUARD:  In a government document, yes, Your Honor.
14                THE COURT:  And what do you think it is, Ms. Fudim?
15                MS. FUDIM:  Well, I think the problem is I'm not in a
16     position to guess, Your Honor, and I would suggest that neither
17     is opposing counsel.
18                Mr. Barker did not provide -- is not coming to court
19     to testify, and there is going to be no explanation.  So for us
20     to sit and guess --
21                THE COURT:  Well, that all goes to the weight.  That
22     all goes to the weight, it seems to me.  And you may be very --
23     very right that that doesn't -- shouldn't get a lot of weight
24     because we're speculating to a point as to what -- who is saying
25     what to whom and why it's being said.  But I don't see that it's
```

1    inadmissible on that basis.

2            MS. FUDIM:  Well, I would suggest, Your Honor,

3    respectfully, that where it says the deputy commissioner said

4    within the policy section suggests that there was some other

5    document with a policy section or some other speech with a

6    policy section where the deputy commissioner said something and

7    now Mr. Barker is reiterating it here.  And I would submit that

8    that is hearsay.

9            And it also is bringing us in a gray area where I

10   believe we're all now speculating what it means.  And without a

11   witness, I think that that underscores the second problem with

12   the document, which is one of relevance and a lack of

13   foundation, Your Honor.

14           THE COURT:  All right.  Mr. Guard, anything further?

15           MR. GUARD:  Again, Your Honor, 801(d)(2)(D).  We think

16   it's clear in it.  Obviously the creator of this email,

17   Mr. Barker, incorporated that statement into the email.

18   Mr. Barker is an employee of the Border Patrol working in the

19   course and scope of his employment, and we think that gets past

20   hearsay.

21           Additionally, Chief Ortiz is going to testify about

22   the statement in this email and that he actually agrees with it.

23   But that's for a deposition that you will see.

24           THE COURT:  All right.  I don't see a hearsay problem.

25   I think you're going to have a hard time convincing me as to who

**A0221**

1    says what to whom -- whose words those were.  My initial

2    assumption is that this was Barker trying to give proper

3    language to somebody above him.  But that may be too much of a

4    leap.  So I think your objections go more to weight than their

5    admissibility, and they'll be dealt with accordingly.

6         (PLAINTIFF EXHIBIT 30:  Received in evidence.)

7             THE COURT:  All right.  Next exhibit.

8             MR. GUARD:  Exhibit 46, which is the -- a --

9             THE COURT:  Did you not do -- did we do 31, or was

10   that not on your list?

11            MR. GUARD:  Excuse me.  I skipped over it, Your Honor.

12   I apologize.

13            31 is a May 19th, 2022, memo from Chief Ortiz

14   regarding noncitizen releases from U.S. Border Patrol custody.

15            THE COURT:  No objection to that I understand,

16   correct?

17            MS. FUDIM:  Correct, Your Honor.

18            THE COURT:  All right.  That will be received.

19        (PLAINTIFF EXHIBIT 31:  Received in evidence.)

20            THE COURT:  All right.  Now 46.

21            MR. GUARD:  46 is -- I don't believe there's an

22   objection to it.  It's the U.S. -- it's a one-page exhibit.  It

23   has the U.S. Border Patrol Processing Pathways.

24            THE COURT:  All right.  Without objection that will be

25   received.

 1          *(PLAINTIFF EXHIBIT 46:  Received in evidence.)*

 2              MR. GUARD:  The next exhibit is Exhibit 47.  It is a

 3      document titled "U.S. Customs and Border Protection Overview of

 4      the Southwest Border."  I believe there is an objection to this

 5      one.

 6              MS. FUDIM:  Yes, Your Honor.  With regard to

 7      Number 47, hearsay.  There's reference at the bottom of the page

 8      to what migrants continue to --

 9              THE COURT:  Hold on just a second.  Let me get a copy

10      of the document.

11              MR. GUARD:  May I approach, Your Honor?

12              THE COURT:  Yes, sir.

13              All right.  Ms. Fudim, where is your concern?  What

14      was your concern?

15              MS. FUDIM:  Yes, Your Honor, at the bottom of the

16      document there's a hearsay statement with respect to what

17      migrants continue to say in the cite.

18              THE COURT:  I've got eight pages.  Bottom of what

19      page?

20              MS. FUDIM:  The first, Your Honor, excuse me.

21              And I believe with regard to prior rulings of the

22      Court, the Court previously kept out certain designations from

23      the depositions that were of similar nature referring to

24      statements made by migrant individuals on the same basis of

25      hearsay, Your Honor.

1              THE COURT:  Mr. Guard.

2              MR. GUARD:  Your Honor, this is not hearsay.  A, it's

3      an adoptive admission.  Customs and Border Protection is

4      preparing a report.  They have gathered this information and

5      they put this in the report as the reasons why immigrants are

6      flowing to the border.

7              THE COURT:  What you really want in is the migrant

8      perceptions of immigration policy shifts?  I mean, that's -- I

9      mean, the rest of it -- I assume.

10             MR. GUARD:  Yes, Your Honor.

11             THE COURT:  The rest of it really is common sense.

12             MR. GUARD:  Yes, Your Honor.

13             THE COURT:  I think Ms. Fudim is right that I tended

14     to not think that agency people could put themselves in the

15     minds of migrants and tell me their perception.  So why should

16     that ruling be any different here?

17             MR. GUARD:  Your Honor, you have policymakers making

18     decisions on courses and actions to take, and here they are --

19     in order to do that they have to rely on facts from

20     subordinates.  Subordinates have gathered facts, prepared a

21     report on what's going on at the border and why it is happening

22     and are presenting it to their higher-ups in this report, and

23     then they're making decisions on policies.

24             THE COURT:  But you want me to make a finding as to

25     the truth of that, that the migrants had perceptions that

A0224

```
 1   immigration policy shifted, right, ultimately?

 2           MR. GUARD:  Well, I think you're going to hear that

 3   from Chief Ortiz himself in deposition testimony.  But putting

 4   that aside -- if I can talk to my co-counsel before I say

 5   something.

 6           It goes to notice.  I guess I could also argue that --

 7   or as a nonhearsay purpose.  And obviously to the extent that

 8   they alter policy or believe it -- that's why I think it's an

 9   adoptive admission, because they put this together into a

10   document.

11           THE COURT:  All right.  I don't think that one

12   statement makes this document inadmissible, but it does seem to

13   me that that component, at least to the extent you're offering

14   it for its truth, would be hearsay.  And I think there are

15   probably nonhearsay purposes, so that portion could come in.

16   And you can argue that to me at the present time, but I don't

17   think that makes that one comment potentially being hearsay --

18   likely being hearsay makes this document inadmissible, does it?

19           MS. FUDIM:  Well, I would suggest that it does

20   because, Your Honor, counsel has the ability to redact documents

21   and present them to the Court in redacted fashion.  And to the

22   extent that we -- that there could be a ruling that Section U,

23   Drivers of Migration, which addresses migrants' perceptions of

24   push-and-pull factors is redacted.  We have no objection to the

25   remainder of the document.
```

**A0225**

1              But without redaction, I would say that yes, a hearsay

2     statement in a document that counsel has chosen not to redact

3     does in fact invalidate the document as a hearsay document.

4              Because I would suggest that the purpose that counsel

5     is trying to admit this for is, in fact, for migrant perceptions

6     of push-and-pull factors with respect to migration, which is an

7     issue that is important in this lawsuit, Your Honor, and frankly

8     I would be surprised if we don't see that cited in posttrial

9     briefing.

10             THE COURT:  Is that really in dispute, though?  And I

11    tend to agree with -- I agree with your argument, but I don't

12    agree that that makes the document inadmissible.

13             But, I mean, the fundamental question, is that really

14    in dispute that migrants make decisions?  Isn't that one of the

15    root causes that we've heard so much about?  When they've got a

16    bad situation in their country, they have a perception that the

17    situation in our country is better, that's one of the -- both

18    better and more amenable to them being here, isn't that really

19    an undisputed fact as to what brings them here?

20             MS. FUDIM:  I can't say that it is, Your Honor.  I

21    think that there are many -- and as the witnesses will

22    testify --

23             THE COURT:  But you can't say that it's not, can you?

24             MS. FUDIM:  I can't say either way, but we're here to

25    elicit facts, Your Honor --

```
1                THE COURT:  Okay.

2                MS. FUDIM:  -- without assumptions and witnesses

3    made --

4                THE COURT:  All right.  All right.  I've -- I'm sure

5    one of the myriad of witnesses that I'm going to hear from today

6    with all these titles and positions in the federal government

7    can attest to that commonsense factor.  And maybe they can't and

8    we will deal with that at the appropriate time.

9                But your document is not inadmissible, but I do note

10   that there is hearsay in there that you're going to have to

11   bring in somebody on the witness list that can tell me that

12   commonsense piece of information.

13               MR. GUARD:  Yes, Your Honor.

14       (PLAINTIFF EXHIBIT 47:  Received in evidence.)

15               MR. GUARD:  The next one is Plaintiff's Exhibit 49.

16   May I approach?

17               THE COURT:  Sure.

18               MR. GUARD:  49 is remarks given by the Secretary of

19   Department of Homeland Security, the commissioner of Customs and

20   Border Protection, and chief of Border Patrol in Del Rio, Texas.

21               THE COURT:  All right.  Is there any objection to

22   that?

23               MS. FUDIM:  I'll withdraw our objection to Exhibit 49.

24               THE COURT:  All right.  That will be received.

25       (PLAINTIFF EXHIBIT 49:  Received in evidence.)
```

1           MR. GUARD:  Exhibit 97 is a Public Health

2    Determination Order regarding suspending the right to introduce

3    certain persons from countries where quarantinable communicable

4    disease exists from April 6, 2022.

5           THE COURT:  Don't I have that in the administrative

6    record already?  That's the repeal of the Title 42 order?

7           MR. GUARD:  Yes, Your Honor.  If it is, I'll withdraw

8    that.

9           THE COURT:  Isn't that in the administrative record or

10   supplemental administrative record?

11          MR. GUARD:  We will check, Your Honor, and we'll

12   revisit it if we need it.  We're using it for just a single date

13   that's in the document.  But we'll check on a break, Your Honor.

14          THE COURT:  I'm looking at pages 122 through --

15          MR. GUARD:  I've been informed that it is in the

16   administrative -- supplemental administrative record, and we'll

17   just withdraw that.

18          THE COURT:  All right.  122 to 151.

19          Okay.  That's withdrawn.

20          198, that's the new exhibit?

21          MR. GUARD:  Yes, Your Honor.

22          THE COURT:  All right.  Is there any objection to

23   that?  Why don't you go ahead and give it to me.

24          MR. GUARD:  Yes, Your Honor.  May I approach?

25          MS. FUDIM:  Yes, Your Honor, we have an objection to

**A0228**

1   hearsay.  Not to the letter, but to the emails that follow it.

2   There are hearsay within hearsay statements.

3             And again to address what I suspect will be your

4   question with respect to are these not statements by a party

5   opponent, we would suggest again that the extent that

6   individuals are attributing third-party statements to other

7   people that we don't know if those attributions are accurate or

8   not, that would not make them fall within the exception.

9             Specifically I refer to the bottom of page that is

10  Bates numbered 812.  There's a statement there saying:  "Spoke

11  to Chief Hastings and RGB and Chief Skero in Del Rio earlier,

12  and they mentioned they have engaged their NGO, sheriffs,

13  federal law enforcement partners; and today they are discussing

14  it with mayors and county judges," dot, dot, dot, dot, dot.

15            THE COURT:  I respect Mr. Guard probably doesn't care

16  about that statement at all.

17            MR. GUARD:  I do not, Your Honor.

18            THE COURT:  And so to the extent that's the concern,

19  I'm happy to redact that.

20            MS. FUDIM:  Give me one moment, Your Honor.

21            That is our sole objection to the document on hearsay

22  grounds, Your Honor.

23            THE COURT:  Pardon me?  I'm sorry, I didn't hear you.

24            MS. FUDIM:  I said that is our sole objection to the

25  document on hearsay grounds, Your Honor.

```
 1            THE COURT:  All right.  So if that entire paragraph

 2   under the question mark down on the bottom of 812 is redacted,

 3   any objection -- other objection to the document?

 4            MS. FUDIM:  Yes, Your Honor.  With regard to relevance

 5   in terms of everything at the back of the document.  Certainly

 6   we may withdraw that objection if there is a witness on the

 7   stand that's going to speak to what's in this document and the

 8   relevance and what it means and what implications should be

 9   drawn from it, then we would withdraw.  But standing on its own,

10   we would assert a relevance objection, Your Honor.

11            MR. GUARD:  Eight days after Joe Biden was

12   inaugurated, Your Honor, officials of Border Patrol prepared

13   talking points or bullet points for the commissioner -- or the

14   acting commissioner of Customs and Border Protection about what

15   is going on at the border and what policy changes were going to

16   cause, including the mass release of single aliens and family

17   units.  The relevance appears on the face of the document

18   itself.

19            MS. FUDIM:  Respectfully, if I may respond, Your

20   Honor?

21            THE COURT:  Sure, why not.

22            MS. FUDIM:  Respectfully, Your Honor, counsel can't

23   lead the witness that provides the foundational testimony.

24   Nowhere on this document does it identify that these are talking

25   points.  If a witness wants to get on the stand --
```

1          THE COURT:  Are you really making that argument?  You

2     don't see that?

3          MS. FUDIM:  I don't see those words, Your Honor, but

4     perhaps -- if I'm missing them, then I apologize to the Court,

5     but I don't.  And if a witness --

6          THE COURT:  Let me tell you what I see in this

7     document.  We have Mr. Padilla, the chief of law enforcement

8     operations, send an email to Mr. Ortiz, who is the deputy chief

9     of Border Patrol, with a bunch of bullets.  The Border Patrol

10    chief, Mr. Ortiz, simply forwards that to COS, which I assume is

11    the chief of staff.  And then there's additional discussion up

12    the email chain about a meeting with the AC, which I assume is

13    the acting -- or AS, which I assume is the acting secretary that

14    day.

15         And if you've got an argument that that is anything

16    other than a document that is going to be presented to the

17    acting secretary, I'd like to hear it, but that sure seems like

18    what that is on its face.

19         MS. FUDIM:  Yes, Your Honor.  My position is simply

20    that I don't think that we can make those assumptions.

21    Mr. Ortiz is going to testify.  And I suspect if this document

22    is presented to him, he probably can lay the foundation for it.

23    But absent having Mr. Ortiz on the stand to connect those dots,

24    which may be --

25         THE COURT:  All right.  I'll tell you what I'll do.  I

A0231

 1   will hold it.  We're going to hear from Mr. Ortiz in person?

 2            MR. GUARD:  If he actually -- if they bring him and

 3   actually have him testify, yes, Your Honor.  And I kind of find

 4   it rich that they wrongfully pull the document and they are now

 5   claiming the need for a witness.

 6            THE COURT:  Okay.  If you want to waste our time by

 7   having him identify that and explain to you that that's what I

 8   just summarized from the face of the document, is not what it

 9   is, if you can -- if you think that's what he will come in to

10   testify to, I'll hold on to it and we'll hear -- I'll reserve

11   ruling on it.  But I certainly hope if you talk to Mr. Ortiz and

12   he tells you exactly what I just told you the face of the

13   document suggests that it is, you're not going to waste our time

14   with that.

15            MS. FUDIM:  We will speak to Mr. Ortiz and get back to

16   the Court.  I just don't have that information, and so I

17   can't --

18            THE COURT:  All right.  Well, you're --

19            MS. FUDIM:  -- state that on the record, Your Honor.

20            THE COURT:  I don't know how long you've been with the

21   government, but you're a sophisticated lawyer, and you can read

22   a document just as easily as I can.  And I can't imagine that

23   it's anything other than that.  But maybe Mr. Ortiz will say

24   that.  And in the event that that's the case, then I will -- I

25   will stand corrected.  Otherwise, it certainly seems to be an

**A0232**

1    admissible document to me.

2            And frankly, as I talked about when we had the hearing

3    on this at the pretrial conference, there's as much information

4    that is helpful to the federal government in those bullet points

5    as the information that Florida wants to highlight.  So to me,

6    this is a very important document and a very relevant document,

7    but I will give you an opportunity to suggest that there is no

8    foundation that can be laid to get to the point that I think

9    we're at.

10           MS. FUDIM:  Respectfully, Your Honor, just so the

11   record's clear, we do intend to show the witness -- or likely

12   will show the witness this document.  He will speak to it, but

13   it's our position that foundation is still a requirement for the

14   admission of documents.

15           And we mean no disrespect to the Court by suggesting

16   as much, but given that this witness --

17           THE COURT:  And I wholeheartedly --

18           MS. FUDIM:  -- will testify.

19           THE COURT:  -- agree with you.  I mean, we have to

20   have a foundation for a document; but if there's a no good faith

21   basis to believe that there's not a proper foundation for it,

22   there shouldn't be a need to go through the process to establish

23   the foundation.  That should be something the parties can

24   stipulate to.

25           And what you're suggesting to me by the fact that

**A0233**

1   you're continuing to argue the objection is that you're -- you

2   have a good faith basis to believe that the foundation for that

3   document couldn't be established for what it appears to be on

4   its face.  And I'm going to give you that opportunity to explore

5   that.  And if you're right, then perhaps that document won't be

6   admitted.  But if you're wrong and it is what it appears to be,

7   I expect you to come back in and say we have no objection, and

8   we'll go from there.

9         All right.

10        MR. GUARD:  That's the end of the list of exhibits,

11  Your Honor.  The next thing is we were -- I'm going to give Your

12  Honor a copy of the exhibits that were just admitted, and we are

13  going to play the deposition excerpts from Chief Ortiz, which

14  lasts about an hour and 45 minutes, again.  So good time to take

15  a break probably.

16        THE COURT:  It will be a good time to take a break.

17  So we will take a break for ten minutes.  We'll come back and

18  you'll have that cued up and ready to roll.

19        MR. GUARD:  Thank you, Your Honor.

20      *(Recess taken from 10:55 a.m. to 11:08 a.m.)*

21        THE COURT:  All right.  Mr. Guard, whose deposition am

22  I about to watch?

23        MR. GUARD:  You're about to watch the Border Patrol

24  Chief Raul Ortiz, and I'll recall that deposition up.

25        But before we begin, Your Honor, we prepared a chart

**A0234**

1   which converts -- I'm going to ask permission to approach in a

2   second -- that converts deposition exhibits into trial exhibits.

3   So I've already provided it to opposing counsel.

4            If I could approach.

5            THE COURT:  Sure.

6            MR. GUARD:  I provided the Court two copies.  One copy

7   I thought your law clerk might find helpful later on as this

8   case progresses.

9            And with that I would ask --

10           THE COURT:  Hold on.  Before we -- let me make sure I

11   understand what I'm looking at.

12           MR. GUARD:  Yes, Your Honor.

13           THE COURT:  So the first column has deposition exhibit

14   numbers, so he's going to be referred to a deposition exhibit of

15   that number.  Second column then will show me what trial exhibit

16   number he's actually talking about?

17           MR. GUARD:  Yes, Your Honor.

18           THE COURT:  Okay.  All right.  Let me do this.  I'm

19   going to mark that chart as Court Exhibit Number 1.

20           Any objection to that being received?

21           MS. RYAN:  No objection, Your Honor.

22           THE COURT:  All right.  Court Exhibit 1 will be

23   received.

24       *(COURT EXHIBIT 1:  Received in evidence.)*

25           THE COURT:  All right.  Let me take a minute and get

1    this pile of stuff organized in a way that -- I assume he talks

2    about these sequentially?

3            MR. GUARD:  Yes, Your Honor.

4            THE COURT:  By deposition number?

5            MR. GUARD:  Yes, Your Honor.

6            THE COURT:  All right.  And so some of them that

7    aren't on that list he's not going to talk about?

8            MR. GUARD:  He's not going to talk about, Your Honor.

9            And in the future we'll put them in deposition order

10   when we hand them up.  I apologize.

11           THE COURT:  Oh, no, that's fine.  I think we had to do

12   it to the way we did it to get through the exhibits.  But this

13   certainly is --

14           I think I'm missing Number 44, or I've misplaced it.

15           MR. GUARD:  Your Honor, 44 has not been admitted yet.

16           THE COURT:  All right.  Well, it's on your list here.

17           MR. GUARD:  My understanding is there actually is no

18   objection to 44, so we'll just --

19           THE COURT:  Is that correct?

20           MR. GUARD:  -- admit it.

21           MS. RYAN:  No objection, Your Honor.

22           THE COURT:  All right.  That will be received.

23        *(PLAINTIFF EXHIBIT 44:  Received in evidence.)*

24           MR. GUARD:  May I approach?

25           THE COURT:  Yes, sir.  All right.  We've got all those

1    exhibits in order, and we are ready to hear Mr. Ortiz's

2    deposition testimony played.

3              MR. GUARD:  Mr. Gerdts, if you'd please play it.

4         **VIDEO DEPOSITION OF PLAINTIFF WITNESS RAUL ORTIZ**

5         *(Video recording played in open court.)*

6              THE COURT:  Hold on a sec.

7              MR. PERCIVAL:  It gets louder, Your Honor.

8              THE COURT:  Pause it for a second.

9              Are y'all expecting the court reporter to transcribe

10   this because this is something that's not going to be coming in

11   as a separate exhibit?

12             MR. GUARD:  We can file the transcript if that would

13   be easier for the court reporter.  I know there's different

14   preferences depending on the judge on this be kind of testimony.

15   We can file a copy of -- a highlighted copy.  I think we already

16   have, actually, of the excerpts.

17        *(Off-the-record discussion between the Court and court*

18   *reporter.)*

19             THE COURT:  All right.  We'll do that.  Those were

20   attached to something.  What were they attached to?

21             MR. GUARD:  I believe the pretrial stipulation, Your

22   Honor.

23             MR. PERCIVAL:  They're filed, Your Honor, but you did

24   make objections, and if you want us to refile them to take out

25   the parts that you sustained the objection to.

1              THE COURT:  All right.  We'll cross that bridge when

2      we come to it.  I'm obviously going to take notes as I hear his

3      testimony as if he's a live witness.  But to save the court

4      reporter creating a second record, we'll figure out a way either

5      to have what's already in the record as the copy or file a

6      separate copy.  It's only electronic paper at this point, so it

7      probably doesn't matter that much one way or the other.

8              Okay.  Go ahead.  You can play it.

9      *(Video recording played in open court.)*

10             MS. RYAN:  Your Honor.

11     *(Pausing the video.)*

12             MS. RYAN:  I apologize for the interruption, but I

13     just want to clarify because these last couple of designations

14     or counter-designations have been included and played in the

15     context, but we are missing counter-designations for previous

16     designations.  We assumed they'd all be coming at the end, which

17     is why I did not raise this objection previously; but if they're

18     going to be coming in context for some and not all, then we

19     might be missing counter-designations in the video.

20             MR. PERCIVAL:  Your Honor, I want to compare notes,

21     but -- maybe we should take a break, but I'm pretty sure we

22     checked all these and they included their counter-designations.

23             THE COURT:  Why don't you spend a minute or to

24     chatting amongst yourselves and make that determination.

25     *(Pause in proceedings.)*

**A0238**

1          MS. CHRISTMAS:  Your Honor, I think Ms. Gerdts is

2    going to back it up two minutes.  I think there was a little bit

3    of a discrepancy over whether a portion was played, so we'll

4    just play through.  And counsel is going to note any

5    designations that we believe might be missed, and we'll circle

6    back.  And if there are any, we'll read them in to the Court at

7    the end.

8          THE COURT:  Okey-doke.

9          Does that satisfy you, Ms. Ryan?

10          MS. RYAN:  Yes.  Thank you.

11          MR. PERCIVAL:  Go back a little bit, Ms. Gerdts, and

12    I'll just have to use the transcript --

13          MS. GERDTS:  Go back two minutes.

14          MR. PERCIVAL:  What I'll do is I actually have all the

15    pages highlighted.

16          MS. GERDTS:  Okay.

17          MR. PERCIVAL:  So go back two minutes.  I'll figure

18    out where we are.

19          MS. GERDTS:  Okay.  Got it.

20          Are you ready?

21          MR. PERCIVAL:  Yeah, go ahead.

22        *(Video recording played in open court.)*

23          MR. PERCIVAL:  I apologize, Your Honor.

24          THE COURT:  I'd prefer not to go backwards.

25          MR. PERCIVAL:  Well, then let's just keep going.

1          MS. RYAN:  We'll make a note, Your Honor.  We'll

2     circle back with counsel at the end.

3          THE COURT:  Thank you.

4          *(Video recording played in open court.)*

5          THE COURT:  Pause it for a second.

6          How much longer do we have?

7          MR. GUARD:  Probably about 36 minutes, Your Honor.

8          THE COURT:  All right.  I think it's good time to take

9     a break and go to lunch.  It's 12:30-ish at this point.

10         So we'll break for an hour, and hopefully during that

11    time y'all will be able to get something to eat and also address

12    whatever the federal government's concern was about the portions

13    that weren't played, and we'll hear the rest of that testimony

14    on the video this afternoon.

15         What's your next witness after this video?

16         MR. GUARD:  After this video, Your Honor, I believe

17    we're doing another batch of documents, and then Mr. Barker, his

18    deposition, which is actually reading a deposition.

19         THE COURT:  Okay.  All right.  Well, we will come back

20    and do all that this afternoon.  We'll be in recess for an hour.

21         *(Luncheon recess taken from 12:32 to 1:33 p.m.)*

22               **A F T E R N O O N   S E S S I O N**

23         THE COURT:  Y'all can be seated.

24         All right.  Before we begin again with the chief's

25    deposition video, the next deposition you have is just on paper?

1           MR. GUARD:  Yes, Your Honor.

2           THE COURT:  And do you have other paper depositions or

3    video depositions?  What's next after that?

4           MR. GUARD:  Another paper deposition, I believe, and

5    then it's a video.  Video first of Mr. Guadian, and then a paper

6    deposition of Mr. Davies and a video deposition of Mr. Price.

7           THE COURT:  The video deposition is helpful in

8    allowing me to see demeanor and that sort of thing.  The paper

9    deposition obviously won't be because it's just going to be read

10   by somebody.  That said, it has been helpful going through the

11   deposition to be able to follow along with the exhibits as they

12   would have been introduced if this was a live witness.  So we

13   may try the reading of the deposition; and if the benefit I get

14   from it of having the corresponding testimony and exhibits to

15   follow along with don't outweigh the lack of excitement that

16   creates, we may dispense with the reading of depositions.  I'm

17   happy to watch depositions, but just so you know.

18          MR. GUARD:  The paper -- the paper depositions have

19   less exhibits.  I will tell the Court to preview that for the

20   Court.

21          THE COURT:  Like I said, we'll try it with the first

22   one.  If that doesn't seem like it's providing any benefit, I

23   may dispense with that.

24          From the Federal Government's perspective, all your

25   witnesses are live except for the State's -- couple of State

**A0241**

1   witness depositions you plan to read?

2          MS. RYAN:  And as well as the deposition of Mr. Barker

3   who's unavailable, and we were going to read that for Your Honor

4   during our case in chief.

5          THE COURT:  And the depositions that you plan to read,

6   do they have a lot of exhibits that will be helpful to kind of

7   follow along with, or do they fall in the category of more

8   testimony?

9          MS. RYAN:  More testimony, Your Honor.  We'll take a

10  look at the standing exhibits to double-check, but I believe

11  they're more testimony based.

12         THE COURT:  All right.  Does anyone have any

13  particular position one way or the other on that approach?

14         MR. GUARD:  No, Your Honor.  It's -- from the State of

15  Florida, it's up to your preferences.

16         MR. DARROW:  No position, Your Honor.  Whatever you

17  prefer.

18         THE COURT:  Okay.  You know, my initial thought was,

19  obviously I would prefer that they were sitting there and I can

20  see them and hear them and follow along as things were going

21  along.  That obviously is not feasible for a variety of

22  different reasons.  But the upside of doing it that way,

23  continuing to read these depositions, it at least creates a

24  small prospect of at the conclusion of the case, I will have all

25  the evidence, have heard all the evidence, and would be in a

1    position to shift from post-filings to closing argument and give

2    you an answer.  The likelihood of that is pretty slim under any

3    circumstances, so the orange may not be worth the squeeze, so to

4    speak.  But we'll cross that bridge probably as we get through

5    the State's first reading deposition.

6              All right.  Let's go back to Chief unless there is

7    something else we need to talk about.

8              MR. GUARD:  One more thing.  Counsel for the United

9    States raised that there were some missing designations.  We're

10   able to replay the portion of video that they thought was

11   missing, and it was actually played for the Court.  So I think

12   that situation has been completely resolved, and I just wanted

13   to let the Court know that.

14             MS. RYAN:  It has, Your Honor.

15             THE COURT:  Okay.  Very well.

16        *(Video recording played in open court.)*

17             MR. GUARD:  That is the end of Chief Ortiz's

18   deposition testimony, Your Honor.

19             THE COURT:  That included everything the Federal

20   Government wanted to -- or would have crossed on?

21             MS. RYAN:  Your Honor, that last question and answer

22   was missing the question and the first half of the answer that

23   we had counter-designated, pages 249, lines 3, through 250, 14.

24             THE COURT:  All right.  What did that say?

25             MR. PERCIVAL:  Could you show me your

 1   counter-designations?  Because I remember thinking this is odd,

 2   but I remember thinking this is what you countered.

 3          MS. RYAN:  Okay, sure.

 4          MR. PERCIVAL:  And that's why we did it that way.

 5          MS. RYAN:  Little tech issues over here.

 6          MR. GUARD:  Your Honor, I'm okay if you just want to

 7   read it into the record.

 8          MR. PERCIVAL:  Oh, yeah, that's fine.  If you guys

 9   just want to read it in, that's fine.

10          THE COURT:  That's fine.  Just somebody do that.

11          MS. RYAN:  Okay.  It's just the question and the first

12   half of that same answer.

13          MR. GUARD:  That's fine.

14          MS. RYAN:  Would you like us to or -- up to you.

15          MR. PERCIVAL:  Yeah, I can do it.  I don't really

16   care.

17          And finally --

18          Is the court reporter ready?  Sorry.

19          "And finally -- well, I may have two

20   questions.  You mentioned that you had been chasing

21   traffic since you had got on the job and had seen

22   previous surges, right?  Have you ever seen traffic

23   like this before?

24          "Answer:  Yes, in -- let me explain.  In

25   1991 when I started, we had about 4,000 Border

1   Patrol agents and the amount of apprehensions didn't

2   even come close to the amount of people that got

3   away from us.  There -- I mean, we couldn't even

4   count how many people got away from us.  So I can

5   tell you that, you know, those first couple of years

6   in my career weren't even close, and that was -- and

7   I was only one sector.  I didn't have the national

8   perspective, but I'm sure that played out in

9   multiple sectors.

10          "Two, the population that we're

11  experiencing now is a little bit different than

12  we've experienced in other surges."

13          Do you want me to keep going, Your Honor, so you can

14  see the context?  That was the omitted part, but it probably

15  hard to play.

16          MS. RYAN:  And that part that he just started reading

17  was played for Your Honor, so this comes before that last --

18          MR. PERCIVAL:  So what I'm about to read is where it

19  picks up.

20          THE COURT:  Okay.

21          MR. PERCIVAL:  Do you want me to keep going?  I can

22  just finish the question and answer.

23          "When I was assigned to South Texas in

24  '96, Arizona in 2000, Southern California in '98,

25  during those surges, that population wasn't turning

**A0245**

 1  themselves in to our Border Patrol agents.  They
 2  were all trying to evade apprehension.  What we're
 3  experiencing now, specifically in Yuma, Del Rio, and
 4  to some degree Rio Grand Valley, is, you know,
 5  75 percent of that population is turning themselves
 6  in.  And then roughly 25 or maybe a little bit more
 7  than that are actually trying to evade apprehension.
 8  This isn't a matter of us not having the ability to
 9  encounter those groups.  This is when you break down
10  the 1.8 million apprehensions that we've already
11  made so far this year.
12          "I would imagine quite a few of those
13  large groups are this no-threat humanitarian
14  population that, you know, should be processed at a
15  port of entry.  Are the individuals that are turning
16  themselves in, are they turning themselves in
17  because they believe they're going to be paroled?
18          "Mr. Darrow:  Objection.
19          "The Witness:  I would imagine that
20  they're turning themselves in because they think
21  they're going to be released, yes."
22          MS. RYAN:  That's fine, Your Honor.
23          THE COURT:  All right.  Thank you.
24          MS. RYAN:  We just want to remind, Your Honor.  Chief
25  Ortiz will be testifying in person in our case in chief.  And we

1    will be asking questions, but he will also probably address some

2    of these topics.  So I don't know if Your Honor wants to think

3    of that as the cross, but he will be here later in the week.

4              THE COURT:  Wonderful.  Look forward to having him.

5              All right.  What's Florida's next course of action?

6              MS. CHRISTMAS:  Yes, Your Honor.  Natalie Christmas

7    for the State.  We have some exhibits that we'd like to move in.

8              THE COURT:  Is that this pile over here?

9              MS. CHRISTMAS:  No.  I think that is the pile that we

10   moved in before that was not used for the deposition purposes.

11             MR. PERCIVAL:  Just one clarifying point, Your Honor.

12   Some of those exhibits are going to be used in future

13   depositions, so I wouldn't move them too far away.

14             MS. CHRISTMAS:  It's a lot of paper moving around.

15             THE COURT:  Okay.

16             MS. CHRISTMAS:  So the State would like to move in

17   Exhibits 14, 16, 20, 21, 43, 45, 53, 54, 55, 56, 57, 58, and 59.

18             And we can -- whatever, Your Honor thinks is easiest.

19   We can just walk through those one by one.  I think quite a few

20   of them have objections.  But I have --

21             THE COURT:  Bring me the whole piles.

22             MS. CHRISTMAS:  Yeah, I'll bring you -- may I

23   approach?

24             THE COURT:  All right.  Is there any low-hanging fruit

25   of no objections to any of this?

```
 1              MR. DARROW:  Yes, Your Honor, we have quite a few
 2    objections to a number of exhibits.
 3              THE COURT:  Are there any that --
 4              MS. CHRISTMAS:  Would you rather go exhibit by
 5    exhibit, or do you want to just --
 6              THE COURT:  Let's do it by exhibit.  I was just trying
 7    to pick off the ones that we could pick off.  But...
 8              All right.  Exhibit 14, is there an objection to that?
 9              MR. DARROW:  Yes, Your Honor.  Relevance and balancing
10    under Rule 402 and 403.  This document is the January 2021
11    statement on the suspension of MPP.  MPP is not challenged in
12    this case, and it's a wholly different thing.  The State of
13    Florida is claiming that the government is releasing people that
14    should be detained, and MPP was a third, totally different
15    processing outfit for people who were in removal proceedings.
16              THE COURT:  That's the Stay-in-Mexico program, right?
17              MR. DARROW:  Yes.  Yes, Your Honor.  And even to the
18    extent the Court thinks that MPP is relevant, this document is
19    no longer in operation.  The -- it was -- it's been superseded
20    twice, and the currently operative document for MPP is an
21    October 29th, 2021 memo that is currently in litigation in the
22    Northern District of Texas.
23              THE COURT:  All right.  In Florida's view the
24    relevance of it is it's the self-induced harm?
25              MS. CHRISTMAS:  Yes, Your Honor.  It's evidence that
```

**A0248**

1    the very early days of the Biden Administration that they were

2    eliminating processing pathways.  That's why we've presented the

3    January announcement, as opposed to the currently operative

4    document, is kind of a timeline piece for Your Honor.

5           THE COURT:  Are there others that fall into that

6    category?  Mr. Darrow, your objections are what they're

7    providing doesn't have anything to do with the policies they're

8    challenging?  Maybe I can give you an overriding ruling, and --

9           MR. DARROW:  Yes.  So just looking at this batch,

10   there's at least among the first number, the next two -- well,

11   no.  Exhibit 16, yeah, also falls in that category.  The Pekoske

12   Memo, that's the shorthand for the memo that was put out

13   regarding using prosecutorial discretion for arrest and charging

14   decisions.  It does not provide for any sort of guidance

15   regarding when people should be released from detention; and for

16   that reason, we also think that it falls under Rule 402, 403.

17          THE COURT:  All right.  Is that the same class of --

18          MS. CHRISTMAS:  Yes, Your Honor.  It's just an

19   early-day decision about the changes that the Biden

20   Administration was making to overall immigration enforcement,

21   while not always specific to the detention issues that we

22   address later on.  But it is relevant background to the changes

23   that were happening at the beginning and how the capacity for

24   DHS was shifting.

25          THE COURT:  I guess, Mr. Darrow, I'm struggling to

1    understand how this is not relevant.  If part of their theory of

2    this case is that the decisions were made early in the

3    Administration to emphasize things other than detention, why

4    isn't this type of information relevant to that?  That

5    emphasizing things other than the detention, meaning this broad

6    nondetention policy, why wouldn't this be relevant?

7              MR. DARROW:  Well, Your Honor, this is -- that's kind

8    of apples and oranges because what we're talking about in this

9    case is whether people who, you know, are subject to detention

10   should be released.  And this document is about whether we want

11   to seek removal of certain people.  It's not about, you know,

12   their detention decision so much as is this somebody who, you

13   know, we think we want to prioritize for removal because they're

14   a national security threat.

15             Also, it's not limited to people coming to the border.

16   Actually, that's not even its primary aim.  Its primary aim is

17   guidance for ICE on the interior enforcement when they are

18   looking at, you know, criminal aliens primarily to exert their

19   prosecutorial discretion to prioritize over noncitizens who

20   don't pose that degree of threat.

21             THE COURT:  You're talking specifically about

22   Exhibit 16?

23             MR. DARROW:  Yes, Your Honor.

24             THE COURT:  Okay.  I guess my question was still back

25   on Exhibit 14.

**A0250**

1            Generally speaking, it seems to me -- maybe this will

2     be the ruling.  It seems to me that evidence of processing

3     pathways that were eliminated seems to me to be relevant to both

4     the State's position that there is a nondetention policy as well

5     as rebutting the Government's -- the Federal Government's

6     defense that the only reason we're seeing so many releases is

7     because there's so many people coming, not anything we've done

8     to contribute to that.  And so in that regard, I certainly see

9     the relevance, and we'll receive over your objection Exhibit 14.

10           *(PLAINTIFF EXHIBIT 14:  Received in evidence.)*

11           THE COURT:  Ms. Christmas, if I understand what

12    Mr. Darrow is saying about Exhibit 16, this is talking about

13    removing folks that are already here.  The true prosecutorial

14    discretion decision, and that's the issue that's in -- at the

15    Supreme Court now, I think, isn't it?

16           MS. CHRISTMAS:  Yes, Your Honor.  The internal

17    enforcement of, you know, finding people who are here and

18    removing them is the issue before the Supreme Court right now.

19           This document does list as one of the priorities

20    people who have illegally crossed the border after the beginning

21    of the Administration -- I'm sorry, I'm trying to find that

22    exact phrase for you.

23           At the bottom of page 3.  And so it does list that

24    people who have crossed the border surreptitiously are a

25    priority for the Administration, and we've -- we have other

```
 1    evidence that we'll enter in later that shows that that may not

 2    have been exactly how it was applied as it went forward.

 3            But beyond that, Your Honor, I do think that it is

 4    relevant to understanding the very beginning of -- the early

 5    days of the Administration there was a shift in how the

 6    Administration viewed immigration as a whole.

 7            THE COURT:  Well, I can only solve -- I can't solve

 8    any of this problem, but I can only adjudicate part of the

 9    problem.  Other people are adjudicating their decisions not to

10    remove people as zealously as some people might think they

11    should.  And so it seems to me that if that's what this

12    memorandum is talking about, that has a better place in some

13    other case.  We're just dealing here with whether they ought to

14    be detaining people as the statute tells them to rather than

15    whether they should -- how they should exercise their true

16    prosecutorial discretion in deciding who to remove.

17            And so I will agree with Mr. Darrow's objection to

18    Government's Exhibit 16, subject to later on you showing me how

19    that has anything to do with admissions more so than it does

20    removals.

21            MS. CHRISTMAS:  Yes, Your Honor.

22            THE COURT:  All right.  What's your next one?

23            MS. CHRISTMAS:  Exhibit 20 which is the March 19th

24    memo regarding prosecutorial discretion.  I believe that any

25    objections to this were overruled at the pretrial conference.
```

1            MR. DARROW:  Yes, Your Honor.  The objection we had

2    was based on our general motion in limine to exclude evidence

3    pertaining to Notices to Report which, Your Honor, you've

4    already provided the ruling on.

5            THE COURT:  And I emphasized that today.  So that will

6    be admitted over your motion in limine and as clarified today.

7        *(PLAINTIFF EXHIBIT 20:  Received in evidence.)*

8            THE COURT:  All right, 21.

9            MS. CHRISTMAS:  The next exhibit is Exhibit 21.

10           THE COURT:  Is that just the memo that -- or the

11   email?

12           MS. CHRISTMAS:  Yes, the email, correct.

13           THE COURT:  That corresponded to the memorandum that

14   we talked about at the pretrial conference, one substituting for

15   the other?

16           MS. CHRISTMAS:  Yes, Your Honor.

17           THE COURT:  So same ruling there, Mr. Darrow.

18           MR. DARROW:  That had an addition of a hearsay

19   element.

20           THE COURT:  Oh, okay.

21           MR. DARROW:  Sorry, we withdrew that.

22           MS. CHRISTMAS:  I believe they withdrew it.

23           THE COURT:  All right.  So that will be received as

24   well.

25       *(PLAINTIFF EXHIBIT 21:  Received in evidence.)*

**A0253**

1          THE COURT:  43.

2          MS. CHRISTMAS:  The next one is a GAO report,

3   Government Accountability Office, regarding the southwest

4   border.  It addresses Parole Plus ATD and NTR policies and just

5   kind of an overview of how those policies were developed and

6   implemented.

7          MS. FUDIM:  Your Honor, we object to that document on

8   the basis of hearsay as well as hearsay within hearsay.

9          As to the first level, the Government Accountability

10  Office is an independent agency that works for Congress.  So

11  it's not a party in any sense of the word in this case.  So the

12  entire document, to the extent it's putting forth facts, is

13  hearsay.

14         In addition, there are a number of instances, and I

15  won't give the Court examples of all of them but perhaps one or

16  two, of additional layers of hearsay.  For example, on page --

17  it's Bates numbered page 36, but it says on it page number 31,

18  for example.  For example, it says, "Officials at one field

19  office said that on certain days 300 to 500 individuals may

20  report in person to the field office, most of whom do not have

21  appointments.  In such cases ERO officials stated," dot, dot,

22  dot, dot, dot.

23         On the following page which is Bates numbered page 37

24  but says on it, page 32, there's a sentence that says:  "Second,

25  officials at ERO headquarters and at each of the five field

1    offices we spoke with said they were concerned about ERO's lack

2    of personnel," dot, dot, dot, dot, dot.

3            There are many examples.  I won't bombard the Court

4    with them, but there are numerous examples within this document

5    of hearsay within hearsay.  But at the outset, the entire

6    document is also hearsay, Your Honor.

7            THE COURT:  What purpose are you offering this for?

8            MS. CHRISTMAS:  Oh, we're offering this to give

9    information to the Court regarding the Notice to Report -- the

10   development of the Notice to Report policy and the continuing

11   change into the Parole Plus ATD policy.

12           THE COURT:  So this is some governmental auditing

13   agency that --

14           MS. CHRISTMAS:  Yes, Your Honor.  The GAO is an agency

15   that reports to Congress and does investigations on their

16   behalf.  So I believe if you look at the second page, that it

17   says that they were asked to review Border Patrol and ICE's

18   implementation of the NTR and Parole Plus ATD processes, and it

19   then goes on to describe it.  And then there is a letter at the

20   beginning of the document to Senator -- a few senators who had

21   requested the investigation.

22           THE COURT:  I'm a little bit skeptical as to whether

23   this is something that has any evidentiary value.  I mean, my

24   task here is for you to present the information that was

25   apparently presented to the GAO and me make findings based upon

1    what I think is going on out there and how things developed.

2    And I know the Federal Government doesn't think that's relevant

3    to anything, but I seem to think it is.  But I don't think I

4    particularly care what the GAO did, so I'm not going to receive

5    that.

6              MS. CHRISTMAS:  Okay.

7              THE COURT:  45.

8              MS. CHRISTMAS:  45.

9              THE COURT:  This was the campaign website?

10             MS. CHRISTMAS:  Yes, this is the campaign website

11   document.

12             THE COURT:  Any objection to that?

13             MR. DARROW:  Yes, Your Honor.  We had objections based

14   on relevance and hearsay.  What the candidate said as a

15   candidate -- I mean, you know, what's the famous line from

16   former New York Governor Mario Cuomo, that you campaign in

17   poetry and govern in prose.  I mean, this has no relevance on

18   the actual actions taken by DHS.

19             THE COURT:  Well, it seems to me it certainly won't

20   determine the validity of the subsequent actions that were

21   taken, but I do see some level of relevance.  Just like in the

22   Muslim ban case, the Supreme Court acknowledged the various

23   statements that Candidate Trump, and even President Trump, said

24   about the purpose of the travel ban but ultimately didn't give

25   it any weight in determining whether the travel ban was legal or

```
 1   not.  But certainly at least if it was good enough for the
 2   Supreme Court to be aware of it's good enough for me to be aware
 3   of.  So I'll receive that document.
 4        (PLAINTIFF EXHIBIT 45:  Received in evidence.)
 5             MS. CHRISTMAS:  Yes, Your Honor.
 6             THE COURT:  You've got a series of executive orders.
 7             MS. CHRISTMAS:  Yes, I believe we discussed these at
 8   the pretrial conference, and you overruled the objections to
 9   Exhibits 54 through 58, which were only included because they're
10   referenced in the Executive Order, Exhibit 35.
11             THE COURT:  Is that right, Mr. Darrow?  Have I already
12   ruled on this?
13             MR. DARROW:  Yes, but we didn't discuss this at the
14   pretrial conference.  Our objection was on the basis that
15   statements by a previous administration can offer no insight on
16   what this administration is doing.  I think Your Honor had
17   mentioned that -- you know, some context beforehand is fine, but
18   some of these go all the way back to 2017 which seems like it's
19   going further back in history than we need for context of what
20   happened in January of 2021.
21             THE COURT:  And so the -- Exhibit 53 is a February
22   2021 Executive Order, so that would fall under, yes, Joseph R.
23   Biden.
24             MR. DARROW:  Your Honor, apologies.  That one we're
25   not objecting to.
```

A0257

```
1              THE COURT:  So 53 will be admitted.
2         (PLAINTIFF EXHIBIT 53:  Received in evidence.)
3              MS. CHRISTMAS:  Yes, Your Honor.
4              THE COURT:  And you're suggesting, Ms. Christmas, that
5    the relevance of 54 through --
6              MS. CHRISTMAS:  Through 58.  All of those --
7              THE COURT:  -- 58, are those are all executive orders
8    or presidential actions that are referenced in and repealed by?
9              MS. CHRISTMAS:  Exhibit 53, yes, Your Honor.
10             THE COURT:  Okay.  And you're offering them for what
11   purpose?
12             MS. CHRISTMAS:  Purely to understand what the -- you
13   know, because they're only referenced by name in Exhibit 53.  It
14   doesn't say we're repealing this policy that does X and Y, so
15   that the Court can see what that actually means.
16             THE COURT:  And for that limited purpose, what's the
17   objection?
18             MR. DARROW:  For that limited purpose, Your Honor, no
19   objection.
20             THE COURT:  Okay.  Then for that limited purpose --
21   you're not offering them to prove anything other than that, are
22   you?
23             MS. CHRISTMAS:  I don't believe so, Your Honor.
24             THE COURT:  All right.  Then they will be received for
25   that limited purpose.
```

A0258

1          *(PLAINTIFF EXHIBIT 54 - 58:  Received in evidence.)*

2                    THE COURT:  So that leaves us with 59.  Is that --

3                    MS. CHRISTMAS:  Yes.  59 is a June 2021 memo regarding

4          Notices to Report.  You might remember it from some previous

5          motions practice.

6                    THE COURT:  Can't say that I do, but does this fall

7          into that category of things you don't think are pertinent here

8          but I do because it may go to the question of whether there's a

9          nondetention policy as a whole?

10                   MR. DARROW:  That's one piece, Your Honor.  The other

11         piece is that we object to this under deliberative process

12         privilege.  This was not provided by us.  This was an email that

13         was independently obtained, and it's actually a draft that was

14         never sent.  And it is subject -- I don't know what happened,

15         but, you know, in the litigation in which it was produced, there

16         was a clawback request to claw it back because it's privileged

17         and should never have been disclosed.

18                   THE COURT:  I do remember it now.  What's your

19         response?

20                   MS. CHRISTMAS:  Yes, Your Honor.  This document was

21         produced to us by the Department of Homeland Security in FOIA

22         production.  And when we brought it to the attention of both the

23         counsel in our corresponding FOIA case and this case, the other

24         counsel in the other case did send us a clawback letter, but we

25         contested the ability to claw back FOIA documents.  That's not

1    in the FOIA statute, and so we pushed back on that.  And by that

2    time we had already filed it with the Court here.  And since

3    then, the Department of Homeland Security has not made any

4    attempts to recall the document or push any issues any further,

5    so we believe that the deliberative process privilege is waived.

6            THE COURT:  All right.  Mr. Darrow, what say you to

7    that?  I mean, this was -- wasn't produced in discovery by

8    mistake.  It was produced in response to a FOIA request.  Is

9    that fair?

10           MR. DARROW:  Right, that is fair.  Although it was an

11   erroneous production because it would have fallen within one of

12   the exemptions under FOIA which it should not have been produced

13   under, and that was what spurred the clawback letter once we

14   realized it had been produced and should not have been.  And in

15   this case, it would have been deliberative process privilege

16   which is why it wasn't produced here.

17           THE COURT:  What would make it deliberative process?

18           MR. DARROW:  Your Honor, because it's a draft.  It's

19   undated and unsigned.  It was -- it's not a final memo.  And the

20   fact that it was, you know, merely a draft floating around is

21   what makes it deliberative process.

22           THE COURT:  All right.  Well, I don't feel compelled

23   to weigh into a FOIA person's mistake.  The fact that it's a

24   draft to me really goes to the weight of the thing, rather than

25   the admissibility of it.  If there was a FOIA person here, there

```
 1   was some FOIA litigation going on, maybe I'd have to decide that

 2   question.  But the fact remains it was produced as a public

 3   record.  The draft nature of it obviously impacts the weight of

 4   it, but I'm not going to not receive it because it's -- simply

 5   was produced in error.  It was produced.

 6          All right.  So that will be received.

 7     (PLAINTIFF EXHIBIT 59:  Received in evidence.)

 8          THE COURT:  All right.  Anything else?

 9     (No response.)

10          THE COURT:  Yes, ma'am?

11          MS. PATEL:  Good afternoon, Your Honor.  The next part

12   of our presentation will be Tony Barker's deposition.

13          THE COURT:  Okay.

14          MS. PATEL:  And much like we had with Mr. Ortiz, we

15   have an exhibit chart that shows the corresponding deposition

16   exhibits with Florida's trial exhibits.  If I may approach.

17          THE COURT:  You may.

18          MS. PATEL:  I would like to note that two of the

19   exhibits that are listed in Mr. Barker's deposition Florida is

20   not offering as trial exhibits.

21          THE COURT:  Hold on.  I'm trying to find the two

22   exhibits.  Was that -- were those exhibits that were not

23   referenced in -- yes, they were not referenced in the last

24   deposition.

25          All right.  I've got them.
```

1          MS. PATEL:  Okay.

2                    **TONY BARKER, PLAINTIFF WITNESS,**

3                  **TESTIMONY READ INTO THE RECORD**

4          MS. PATEL:  "The Stenographer:  Hold on.  I'm going to

5     break because I didn't swear in the witness.  Here we go.

6          "Mr. Barker, would you raise your right hand for me

7     please.  Do you solemnly swear or affirm that the testimony that

8     you are about to give in this cause will be the truth, the whole

9     truth, and nothing but the truth?"

10         THE WITNESS:  I do.

11                        **DIRECT EXAMINATION**

12    BY MS. PATEL:

13    Q.   Okay.  And you understand that you are being deposed today

14    in both your corporate capacity and in your individual capacity?

15    A.   Yes.

16    Q.   Okay.  And so in order to -- just so you're clear, the

17    first part of this deposition will be me asking you questions in

18    your corporate capacity.  We will then switch to me asking you

19    questions in your individual capacity.

20         Does that make sense?

21    A.   Yes.

22    Q.   And then what was your next position within DHS?

23    A.   Sure.  So after that, my next move was here to Washington,

24    DC, as the deputy chief of operations at headquarters, U.S.

25    Border Patrol.  And that was in 2016 -- or, excuse me, that was

1    in 2020 rather.

2    Q.   And what were your job duties and responsibilities?

3    A.   So at that period of time, you know, in essence, I -- I

4    oversee, I'll say the operations, you know, or the liaison and

5    representation of the various sectors in the U.S. Border Patrol

6    through corridors.

7           And then, of course, you know, that thereby I can

8    brief headquarter's leadership in regard to what the fields'

9    needs are as well as the national intelligence component for the

10   U.S. Border Patrol.

11   Q.   Okay.  And in that position, were you implementing or were

12   you developing any policies?

13   A.   So in that -- in that role I was absolutely involved in the

14   development of policy advising, if you will, you know.  And, of

15   course, when a policy was decided, you know, then -- then, you

16   know, dissemination to the field with regards to implementation.

17          As far as the execution that happens in the field, I

18   was no longer involved in the execution phase but really just a

19   compilation in regards to development and then implementation.

20   Q.   Okay.  What type of policies did you help develop?

21   A.   I mean, you know, you know, as an example as we're, you

22   know, moving through and helping, you know, and the policies are

23   in constant, constant periods of reevaluation, right.

24   Q.   And then did you move to your current position at DHS?

25   A.   Right.  So it would have been, I don't know, probably right

BARKER - DIRECT

```
 1    around, say, February, March's time frame.  Somewhere right
 2    around in there.  2021, moved into the acting chief role.  It
 3    would have been somewhere right around there.  I can't remember
 4    the exact time frame.  Obviously I would have to look it up.
 5    Q.   And acting chief, is that of a specific unit?
 6    A.   No.  The same thing over operations at headquarters Border
 7    Patrol, and ultimately it's just, just overseeing that same
 8    functionality just at a different -- you know, instead of deputy
 9    level, at the principal level as the chief.
10    Q.   Okay.  And were you promoted again?
11    A.   Nope.  That's currently what I'm doing right now.
12    Q.   All right.
13    A.   We've reached the end of the road.
14    Q.   All right.  I have as your title the chief of law
15    enforcement operations director.  That's what we're referring
16    to?
17    A.   Yes.
18    Q.   Okay.  If the Border Patrol agent determines that they may
19    be violating law, meaning that they're here illegally, what
20    happens at that point?
21         MR. DARROW:  Objection to form.
22         You can answer.
23         THE WITNESS:  So if we determine that the individual
24    has entered a legally then, then most -- well, I'll say most
25    often well, we will -- we will take that person and arrest them.
```

```
 1    But again, you know, I think that it's -- I think it's critical
 2    to say up front, every circumstance is independent upon that
 3    circumstance of that encounter, right.  So it's every encounter
 4    is very unique.  We have to evaluate each of those circumstances
 5    per that individual.
 6    BY MS. PATEL:
 7    Q.   Okay.  What do you mean by that?
 8    A.   So, you know, it just -- it depends, right, the
 9    circumstances surrounding the encounter.  You know, as an
10    example, if I have somebody who just purely, you know, crossed
11    the border illegally, you know, who might have identification on
12    them, you know, you know, identifying them as born in a foreign
13    country -- we'll just use Guatemala as an example, you know --
14    and does not have any legal documentation to be legally present
15    in the United States, we'll apprehend them.
16         If we have another individual who's entered illegally
17    but they have created some degree of crime in the process,
18    granted we may apprehend them, but we may be turning them over
19    to a partner organization or agency for their prosecutorial
20    process, right?  It just depend upon the circumstances.
21         Or we can have somebody who has entered between the
22    ports of entry as a United States citizen and not necessarily
23    entering the United States illegally in the fashion where we
24    would apprehend them, but we will turn them over to Office of
25    Field Operations.
```

1          So those are just three examples of situations I

2    confronted myself in my own duties and roles and

3    responsibilities.  And again, kind of going back to we have

4    to -- each individual circumstance is evaluated, you know, by

5    the officer or the agent.  To broadbrush:  It is extremely

6    difficult.

7    Q.   Okay.  If someone has entered illegally without committing

8    any type of crime --

9    A.   Well, if they entered illegally they would have committed a

10   crime.

11   Q.   Well, so --

12   A.   Term of "illegal" means it's committing a crime.

13   Q.   Right.  If they entered illegally and then they committed a

14   crime.

15   A.   So we have two crimes?  I'm just trying to determine.

16   Q.   I'm sorry.  Maybe I'm not being clear.

17   A.   No.

18   Q.   So they entered illegally; and in doing so, they've

19   committed a crime?

20   A.   Yes.

21   Q.   At that point is that person arrested and taken to a

22   separate location for processing?

23   A.   So, yes, depending upon the circumstance.  It depends on

24   what their nationality is.  So, you know, we have -- we have the

25   Public Health Authority at Title 42 which we would detain

BARKER - DIRECT

1    somebody, process them, right, which is really just recording

2    the encounter, you know, and -- and then ultimately expel them.

3    You know, so it's not necessarily an arrest; it's an encounter.

4    So it's through the expulsion, right?

5              And in other circumstances where we cannot apply Title

6    42 to somebody, then, yes.  Then they are placed under arrest

7    and taken to a location, you know, most often in order to

8    process.  In certain circumstances, you know, we -- we even have

9    the ability to process directly in the field.

10             So taking somebody to a place is really subjective due

11   to the circumstances that -- that are present with that, that

12   exact individual.

13   Q.   Okay.  And when the person is taken into custody or arrest,

14   is there a warrant that's obtained first?

15   A.   No.  No, I mean, we -- I mean, don't get me wrong.  I mean,

16   we execute warrant for sure, you know, but -- but, you know, I

17   mean, we don't have warrants when we're encountering somebody

18   between the ports of entry.  You know, we -- obviously we don't

19   do that, so.

20   Q.   Okay.  Is a warrant obtained at some later point or date?

21   A.   It just depends.  I mean, we -- we have -- you know, we

22   have the ability to process somebody for a Warrant of Arrest

23   slash Notice to Appear where we've kept them in detention.  But,

24   you know, it's dependent upon the circumstances that are in

25   front of us.  Sometimes there's no warrant that is -- that is

**A0267**

1    generated for an individual, who -- who we are -- have arrested

2    in processing.

3    Q.   So under what circumstances would a warrant be generated?

4    A.   As an example, if somebody has a, you know, a criminal

5    history and we are, you know, going to be processing for

6    somebody, for, you know, a detention -- or prosecution is a

7    perfect example.  You know, we'll do a Warrant of Arrest slash

8    Notice to Appear or we'll have a warrant completed.

9    Q.   So when you say criminal history, are you referring to any

10   type of criminal history?

11   A.   It just depends.  So it depends on severity of the crime,

12   what the crime is.  You know, are they a CIMT, crime of moral --

13   of immoral turpitude.  You know, it just depends on what the

14   criminal history is.

15        But ultimately, no.  You know, somebody -- as an

16   example, somebody may have a criminal history for burglary who

17   we're absolutely going to, you know, try to prosecute and detain

18   and remove from the country.  Somebody has a criminal history of

19   speeding on their record, we may not be doing that.  It just

20   depends.  It's dependent upon the circumstances in front of us,

21   and it's dependent upon other circumstances as well.

22        You know, for instance, the ability for DOJ to

23   prosecute, for us to be able to detain.  There are several

24   circumstances that surround what the ability is.

25   Q.   Okay.  Does it matter whether the person committed a crime

1   in another country as opposed to the United States?

2   A.   It's dependent upon -- well, A, no.   So it's dependent upon

3   the -- the -- our ability to be able to prove the criminal

4   history, right, or to be able to gain the information.   Not

5   every country submits their information into a database which

6   we're able to see, right, international.   It's dependent upon

7   our ability to be able to see the information when a crime is

8   committed in an international -- on an international basis.

9   Q.   Okay.   So let's go back to Exhibit 7.   And I just want to

10  walk through each of these pathway dispositions with you.

11         The first one is Notice to Appear slash Own

12  Recognizance, NTA/OR.   So when would that be applied to a single

13  adult?

14  A.   Again, it just depends on the circumstances in front of

15  them.   You know, an individual who, you know, is claiming fear,

16  an individual who, you know, may have -- we'll say, you know,

17  issues to where they cannot be detained.   Fraihat being just as

18  an example, just one example.   You know, if we have no available

19  space in order to be able to remove single adults to -- you

20  know, in ICE custody, i.e., you know, that locale has no

21  available space open to them, we would end up placing a single

22  adult into an NTA/OR.   You know, those are all -- there's just a

23  variety of circumstances where -- where it can be applied.

24  Q.   Let me backtrack a little bit.   Do Border Patrol agents

25  have discretion in deciding which one of these pathways to use?

BARKER - DIRECT

```
 1   A.    Yes.

 2   Q.    Okay.

 3   A.    We have the discretion in order to be able to determine

 4   which pathway, but -- but, you know, again, there's -- this kind

 5   of goes back to your previous question.  Supervision is well

 6   engaged in the processing areas and monitoring, you know, who

 7   agents are processing, which pathways are assigned to

 8   individuals, and so on.

 9   Q.    Are there specific criteria that an officer would apply in

10   determining which pathway to use?

11   A.    It's based upon the circumstances of the individual in

12   front of them.

13   Q.    And what do you mean by that?

14   A.    So -- so, you know, as in -- I think it's Exhibit 6 you had

15   what appeared to be kind of almost like a decision tree, for

16   lack of better terms.  I think it was that number, so don't

17   quote me on it.  But, well, I guess you're going to quote me on

18   it.  But, you know, the -- that's -- that's like a decision

19   tree.  But ultimately the determination is based upon the

20   circumstances in front of the agent at the time of the

21   individual there.

22   Q.    So there are no set criteria that's applied?

23   A.    Well, I mean, of course.  Yes, there's set criteria.  I

24   mean, if a person has, you know, previously been deported so

25   that's going to be, for instance, a reinstatement of a previous
```

**A0270**

1    removal, if they have an order of removal that has not been

2    effectuated, that's going to be a bag and baggage.  I mean, so

3    you kind of see that again.

4          I go back to it's kind of like a decision tree.  It's

5    not a true decision tree.  So there are circumstances that are

6    involved in what you're applying that Title 8 pathway to those

7    individuals.

8    Q.   Okay.  Are there any other criteria?  You just named two.

9    A.   Yeah, I mean, there's going to be several, right?  So

10   national security, border security threat.  What's their

11   criminal history?  What's their immigration history?  Are they

12   applicable to, you know, to MPP?  Are they applicable to

13   detention?  Are they claiming fear?  Are they not claiming fear?

14   You know, are they a single adult?  Are they a family unit?

15   What's the detention availability for that person?

16         I mean, it's -- you know, does ICE have bed space, do

17   they not have bed space to detain.  I mean, these are all a

18   variety of different circumstances that are all taken into these

19   decisions.

20   Q.   Okay.  Does -- you mentioned whether or not they are or are

21   not family unit is one of the criteria.

22   A.   Absolutely.

23   Q.   And how is that criteria applied?

24   A.   So for family units, you know, if we're able to expel them,

25   if we're able to return them rapidly through ER, as an example

**A0271**

```
 1    then we will -- if those countries are able to or are accepting,

 2    you know, individuals back, right?  They're allowing us to

 3    return or remove individuals, then we will, right?  And we'll

 4    apply that specific pathway.

 5            You know, if they're from a country who is not

 6    accepting, you know, returns, removal, or expulsions from us and

 7    we have -- we have no bed space for detention, then we will

 8    utilize a release mechanism for families we have no availability

 9    to detain.

10    Q.   Okay.  You -- first you mentioned ER.  Were you referring

11    to expedited removal?

12    A.   Expedited removal.

13    Q.   And you also said when there is no bed space for detention.

14    Were you referring to bed space at a Border Patrol facility?

15    A.   So -- so we don't detain.  We will hold in a Border Patrol

16    facility, right, but ICE has detention and ICE does not

17    currently have any bed space for detention of family units.

18    Q.   And why is that?

19    A.   You'd have to ask ICE, ma'am.

20    Q.   Okay.  So does that mean that they will not accept any

21    family units?

22    A.   Meaning ICE?

23    Q.   Correct.

24    A.   Yeah, ICE has no current bed space for family units, to

25    detain family units.
```

**A0272**

1    Q.   And so how does that then impact CPB, CBP?

2    A.   So as we -- as we decide which pathway we are going to

3    apply to a family, we have to keep in mind that this family will

4    not be able to be detained outside of Border Patrol's detention

5    center, or holding center I'll say.

6    Q.   So does that mean that they have to be released into the

7    interior?

8    A.   Depending on the pathway.

9    Q.   In what circumstance would you not use expedited removal

10   for a particular family?

11   A.   As an example, if they claim fear, we will place them into

12   an NTA/OR process because we have no family detentions.  Like if

13   you place them into ERCF, we have no availability to detain

14   them, you know.  And so it's ultimately, if they claim fear,

15   we'll place them into NTA/OR and their claim of fear will be

16   heard on a nondetained docket.

17   Q.   Okay.  So in the interim, if the family cannot be detained

18   in ICE custody, where would they be located?

19   A.   Well, they're placed on an NTA/OR, so it's wherever they

20   would be destined to live at.  I mean, we have -- we, as in CBP,

21   so speaking strictly with the CBP path, you know, we -- after

22   they are released from our custody, they are relieved the

23   responsibility of -- of -- I'll say the monitoring of that

24   person falls to ICE.

25   Q.   Okay.  But if I understand correctly, families who are not

1  amenable to expedited removal as determined by CBP then get put

2  into a Notice to Appear/Own Recognizance track at which point

3  they can be paroled or bonded out.  Is that accurate?

4          MR. DARROW:  Objection, misstates the testimony.

5          You can answer.

6          THE WITNESS:  Yeah, that's -- that's not accurate.

7  It's my fault if I didn't explain it clearly enough.

8          So -- so there are a couple different pathways.  If we

9  have a family who we cannot -- is not amenable to expedited

10  removal, we cannot return to their home country, right, we

11  can't -- or is not amenable, we will place them into an NTA/OR

12  or a Parole ATD type of pathway for removal -- from release,

13  rather, from our custody.  I'll be very specific with my words.

14  From release from our custody.

15  BY MS. PATEL:

16  Q.   When you say release from your custody, does that mean that

17  they are, in fact, released from any custody, correct?

18  A.   So, you know, as a -- so they're not in custody, you know,

19  by the term of law.  No, they're not in custody anymore.

20  Q.   Okay.  So they get released and then they can go to

21  whatever final destination they choose within the United States.

22  Is that accurate?

23  A.   Correct.

24  Q.   Was there a family detention available before

25  January 20th of 2001?

    1    A.   ICE had two or three, two or three different family

    2    detention locations, but I cannot recall when they transitioned

    3    those locations to single adult detention.  I just can't

    4    remember the date.

    5    Q.   Do you remember who was president at the time?

    6             MR. DARROW:  Objection.  Family detention does not

    7    relate to any of the topics for which Chief Barker is

    8    designated.

    9             You can answer.

   10             THE WITNESS:  I -- I couldn't even tell you when.

   11    Again, I don't remember the date in which they switched, so I

   12    really refer you to ICE, to be honest, with regards to the date.

   13    BY MS. PATEL:

   14    Q.   All right.  You don't remember who was president?

   15             MR. DARROW:  Same objection.  Also objection, asked

   16    and answered.

   17             You can answer.

   18             THE WITNESS:  Yeah.  No, I have been through multiple

   19    administrations in my role and responsibility.  I cannot

   20    remember.  You'd have to ask ICE when they switched over and

   21    then find the applicable administration that was in office.

   22    BY MS. PATEL:

   23    Q.   And then does the determination as to whether a family is,

   24    in fact, a family unit, does that impact the decision as to

   25    which processing pathway to choose?

1    A.    Yes.

2    Q.    How so?

3    A.    Because if they're not a family unit, then they're an

4    unaccompanied child and a single adult.

5    Q.    If they are a family unit, how does that impact the

6    decision-making in terms of processing disposition?

7    A.    So if they're a family unit, knowing that there's no family

8    unit detention, you know, we will not utilize a pathway that

9    will -- that would intentionally place a family into -- into a

10   detention, right, situation.  You know, there's no point in

11   doing all the paperwork, you know, when there's no detention

12   available.

13   Q.    Okay.  So going back to Exhibit 7, which of these pathways

14   would be amenable to family units?

15   A.    Well, they would technically all be amenable to family

16   units, depending if we had detention or not.

17   Q.    Okay.  Well, you do not have detention, correct?

18   A.    Right.

19   Q.    And you --

20   A.    You mean right now?  You mean currently?

21   Q.    Currently, correct.

22   A.    Okay.  I gotcha, I gotcha.  So amenable to family units

23   right now, family unit right now would be NTA/OR, Parole ATD,

24   ER.  We could even do -- we could even reprocess somebody who

25   has a previous removal through an ER again.  Warrant of

 1   Arrest/Notice to Appear, meaning detention ultimately would not

 2   be applicable.  We can voluntary return a family.  We are not

 3   currently implementing or applying MPP to families.

 4          When I say ER, it's going to be dependent because the

 5   circumstances surrounding the ER is going to determine if -- if

 6   they're obviously amenable to ER or not, right?  You know, if --

 7   yeah, I guess that's the easiest way to explain it.

 8   Q.   All right.  So under what circumstances would CBP apply the

 9   NTA/OR to individuals?

10   A.   Single adults?

11   Q.   Correct.

12   A.   It kind of goes back to the question I answered on this

13   earlier, which is really, you know, depending upon the

14   circumstances of that single adult, you know.  Does ICE have

15   detention availability or not?  You know, does -- is that person

16   applicable to, you know, the Fraihat detention restriction where

17   it's not applicable to them.  You know, these are circumstances

18   where we would, you know, apply an NTA/OR to a single adult.

19   Q.   Okay.  Did you say a Fraihat detention?

20   A.   Yeah.  So Fraihat litigation is certain circumstances which

21   prohibit us detaining, and it's not us.  I'm using "us" as the

22   larger DHS entity.  I really kind of defer you to counsel and to

23   ICE in regards to that because that's their standards of

24   detention.  But when ICE tells us that they cannot detain a

25   certain individual, a single adult, they cannot detain a single

1    adult, then that detention pathway is removed obviously.

2    Q.   Okay.  Do those same factors, are they considered as to a

3    family unit?

4    A.   Well, there is no detention of family units currently

5    available.  So yeah, but it's implied, right, because there's no

6    detention.

7    Q.   Understood.  Under what circumstances would CBP apply

8    Parole Plus ATD to a family unit?

9            MR. DARROW:  Objection.  Parole ATD is beyond the

10   scope.  Also, we have another witness to discuss Parole ATD.

11           You can answer.

12           THE WITNESS:  So Parole ATD would be applied to a

13   Cuban, Nicaraguan, or a Venezuelan family unit as these three

14   demographic -- or these three country demographics or

15   citizenships, nationalities currently do not allow us to

16   repatriate those individuals.  So no returns, no removals, and

17   we have no current detention capability to be able to detain

18   families.  So therefore we may utilize the Parole ATD in certain

19   circumstances in the sectors who are impacted by flow with high

20   TIC times as well as high custody numbers.

21   Q.   Okay.  In what circumstances would a Warrant of

22   Arrest/Notice to Appear, in parentheses, detained, be applied to

23   an individual?

24   A.   There is a myriad of circumstances.  So this could be

25   from -- anything from, you know, from prosecuting on a simple

```
 1   1325, you know.  You know, 1324s if they're -- you know, if
 2   there's some time of criminality.  You know, again I'll
 3   broadbrush it in regards to if there's a national security or
 4   border security or criminal threat there where we're not --
 5   where we're seeking a prosecution or we're not -- you know,
 6   we're going to place somebody into a detention setting with ICE
 7   for removal as well, you know, due to whatever circumstance.
 8   Criminal ICE may be one where we're not necessarily going to
 9   prosecute for the 1325 but we're going to continue to detain and
10   remove.  Another example of that.
11           So these would all be circumstances where we would
12   issue a WA/NTA.  And that's just an example.  There's a myriad
13   of different reasons.
14   Q.   All right.  Is the November memo the only Parole Plus ATD
15   policy?
16   A.   Well, it's not a policy, but that's the only Parole ATD
17   guidance that we have out at this time, is the November.  That's
18   the -- what I consider the superseding memo.
19   Q.   Okay.  You're saying it's not a policy because it's
20   guidance?
21   A.   Yes, it's operational guidance.
22   Q.   Okay.  So is it also authorized by some other SOP?
23   A.   No, just the memo.
24   Q.   Sure.  Did you have any role in developing this policy?
25   A.   So the operational guidance, yes.  I mean, it -- it -- I
```

```
 1   was at that period of time, you know, engaged as we were looking

 2   to define triggers, if you will.  That's further down the

 3   document as to when, you know, Parole ATD would be utilized

 4   formally, you know, ceasing the utilization of Notice to Appear

 5   and migrating over to a Parole Plus ATD in the, you know -- so

 6   that -- that's my -- that was my involvement, if you will, in

 7   helping, I'll say, or being involved in crafting of this

 8   operational guidance memo.

 9   Q.   And prior to this operational guidance memo, were families

10   being paroled or released into the interior?

11   A.   Were families being -- are you talking about the Parole

12   Plus ATD aspect of families, you know, when we started utilizing

13   it in the July time frame?  Is that what you're asking for?  And

14   I'm just trying to understand your question.

15   Q.   What do you mean in the July time frame?

16   A.   So -- so, you know, basically when we started attaching

17   NTRs and -- excuse me, attaching Parole ATDs to those

18   individuals we were placing on parole would have been roughly

19   around in July.  This memo coming out, you know, I'll say

20   formalizing Parole ATD, if you will, under Chief Ortiz's

21   signature in November.  I guess that should probably be the more

22   direct answer for you.

23   Q.   Okay.  So this guidance or what is described in this

24   guidance starting -- started in July of when, 2021?

25   A.   Yes, yes.  So it would have been roughly that time frame
```

1   when we started, you know, collectively between CBP and ICE

2   utilizing the ATD portion of the parole, if you will.

3   Q.   Okay.  And then it wasn't formalized until November of

4   2021?

5           MR. DARROW:  Same objection.

6           You can answer from your personal capacity.

7           THE WITNESS:  That's when the memo was --

8   was completed.

9   BY MS. PATEL:

10  Q.   Okay.  Prior to this memo were there any trainings or

11  instructions provided to staff as to how to implement what is

12  the process that is described in this memo?

13          MR. DARROW:  Same objection.

14          You can answer from your personal capacity.

15          THE WITNESS:  You know, there -- there is the -- the

16  March 2021 NTR guidance that was put out, I believe, at that

17  period of time under Chief Rodney Scott's signature.  You know,

18  that -- that was -- that was the guidance at that period.

19  BY MS. PATEL:

20  Q.   So the NTR policy is reduced to writing.  NTR practice is

21  reduced to writing?

22  A.   I guess I'm not understanding what the question is.  It

23  doesn't -- is there a question, ma'am?  I apologize.

24  Q.   Yeah.  You were talking about the NTR guidance.  Is that a

25  written document?

1    A.   It's the one that's referring to the document you're --

2    you're seeing here, right?  Quote, "The prosecutorial discretion

3    and issuance of NTRs as issued in March of 2021," end quote.

4    Q.   Okay.  Were there any specific training that Border Patrol

5    officers received on the process described in this

6    November 2nd memo prior to this memo being formalized?

7               MR. DARROW:  Same objection.

8               You can answer from your personal capacity.

9               THE WITNESS:  So, there -- there -- you know, there's

10   a written guidance of NTR's, right, that came out in March 2021,

11   you know, and that is the processing, you know, I-385, G-56.

12   There was -- there's no written guidance.  Again, I'm going back

13   to attaching, you know, the monitoring mechanism of the ATD is

14   really ICE, so I defer you to ICE.

15              But, you know, during that time period, you know,

16   previous to November, like July 1 -- July I was just talking

17   about is when I started really, I'll say attaching the ATD

18   monitoring mechanisms to those who were -- who were getting

19   processed for -- for release, hence the creation of the Parole

20   ATD application.

21   Q.   Okay.  Was there any other mechanism that families were

22   being processed and released into the interior?

23   A.   So, you know, in certain circumstances, you know, the --

24   the Border Patrol has utilized parole for humanitarian reasons

25   as well.  An example of that would be, for instance, if

1    somebody, you know, has an extremely serious injury is a prime

2    example.  You know, they fall from a fence or, you know, you

3    know, had a tragic accident and, you know, a smuggling load or

4    something along those lines.  And I, just to give an example,

5    you know, we may -- we may place and effectuate humanitarian

6    parole of that individual.

7         You know, parole is applied on an -- on an individual

8    case-by-case basis and therefore, you know, is contingent upon

9    the circumstances surrounding that individual's, you know,

10   situation.

11   Q.   Okay.  Are there any other instances in which you would

12   provide humanitarian parole other than for medical reasons?

13   A.   Oh, of course, of course.  I mean, it -- it just depends on

14   the circumstances that are surrounding it.  You know, we've had

15   individuals who have, you know, shown up to, you know, at the

16   border with, you know, bullet wounds.  We've had -- I mean,

17   just, you know, there are just different circumstances, right?

18   I mean, the vast majority of them all medical related.

19   Q.   Okay.  I'm just trying to figure out whether there's like

20   an unfettered discretion and when to provide humanitarian parole

21   or whether there's any confines of criteria with respect to

22   that.

23   A.   So, you know, again I go back to the case-by-case basis,

24   right?  So there's -- it's not what I would consider as

25   unfettered by any means.  I mean, when we -- you take a look at

```
 1    each individual circumstance that's presented to us.  You know,

 2    we attempt to detain or remove those individuals.  You know, it

 3    may be other circumstances with that individual detention or

 4    capacity which drive us to utilize different pathways.

 5    Q.   So whether you use humanitarian parole could also be driven

 6    by detention capacity?

 7    A.   True.  Could be.

 8    Q.   How often does that happen?

 9    A.   So the -- you know, the circumstances which we face, and

10    it's actually noted in the memo that you just sent us with

11    COVID-19, would be -- would be a case in point of a, you know, a

12    humanitarian utilization of Parole ATD, right?  In order to be

13    able to rapidly decompress -- decompress our detention

14    facilities or, you know, our custody and holding numbers because

15    of the pandemic.

16            You know, I'll be honest with you.  We've lost 19

17    Border Patrol agents to COVID.  COVID deaths, you know, directly

18    associated with COVID that they have contracted on duty while

19    working in, you know, facilities which are -- which are well

20    over capacity.  And in that congregate setting, you know,

21    creating a significant life and safety risk to the agents,

22    officers, migrants, and professional staff that are all being

23    detained there.

24            So -- so I'll be honest.  Sitting here as the chief of

25    operations, having spent, you know, 21-plus years in a green
```

1    uniform working on the border, 19 deaths that are associated

2    with, you know, a public health pandemic due to overcrowding

3    within our facilities is something that we take direly

4    seriously, not only for the agents but for the migrants and the

5    professional staff working in that environment as well.

6    Q.   Okay.  I believe you previously testified that Border

7    Patrol agents have discretion as to whether to apply Parole Plus

8    ATD.  Is that accurate?

9    A.   Within the confines of the guidance that has been sent out,

10   which you obviously have it; you sent it to us.

11   Q.   Well, has parole been used more often?

12   A.   Again, it goes back to the processing time frames that we

13   spoke about early.  Again, it goes back to the detention

14   conditions, the high TIC times, the high capacity numbers, the

15   fact that we were no return mechanisms to certain demographics

16   like Cubans, Venezuelans, Nicaraguans.  It's those circumstances

17   which we talked about earlier.

18            I mean, the COVID pandemic, you know, the literal

19   death and dying of agents and officers as they try to do their

20   job, you know, in protecting the border, you know, and -- as

21   well as protecting the migrants and the professional staff that

22   are working every day as well.  So there are certain real --

23   there's certain applications of parole, like we've spoken, about

24   during those circumstances.  Again based upon the circumstance

25   of the individual in front of us as well.

A0285

1    Q.   I just want to -- a point of clarification.  For Parole

2    Plus ATD, when it comes to family units, is that applied to

3    families regardless of their nationality?

4    A.   So it -- Parole Plus ATD may be applied and -- and at this

5    point in time, you know, the nationalities in which we are

6    applying Parole ATD are Cubans, Venezuelans, and Nicaraguans

7    because we have no return rights to those countries either.  We

8    can't send them back.

9         If we have a return mechanism in order to be able to

10   send somebody back to another country, I'll just use Colombia as

11   an example, you know, we will process them accordingly and

12   return them to the best of our ability.

13        Guatemala is another prime example of a country, you

14   know, that we have return rights to, right?  So if we're able to

15   return somebody to their home country, then we will -- we will

16   place them into a removal-type proceeding.

17   Q.   Okay.  So as of right now it's only being applied to those

18   nationalities that you just mentioned.  Is that fair?

19   A.   So, yes, by and large to those -- those nationalities in

20   which -- in which we were -- you know, we are not able to return

21   to.  You know, there are countries -- Colombia is another

22   example to where through -- I'll say, political dynamics -- we

23   have recently gained the ability to start return or returning

24   to, but we had not previously.  So through negotiations gained

25   the ability to return to Colombia and hence now, you know,

**A0286**

```
 1   processing more Colombians to, you know, with a removal -- with
 2   a removal pathway.
 3   Q.   Were there other nationalities that you -- since Parole
 4   Plus ATD has been implemented, are there other nationalities to
 5   which it has been applied?
 6   A.   Not that I'm aware of off the top of my head.  I'm not -- I
 7   would have to ask.  I just don't know.  I don't know off the top
 8   of my head.
 9   Q.   Why does this document only reference detaining single
10   adults and omit any reference to family units?
11   A.   Because there's currently no family unit detention.
12   Q.   So it's because there's no ability to detain family units.
13   Am I understanding that correctly?
14   A.   So A, first off, I mean, that would be my -- I'm not the
15   author of the document, so that's just me assuming based on the
16   circumstances.  You know, you have to ask the Secretary as to
17   the family piece.  But the -- you know, obviously, yes,
18   detaining single adults only can.
19   Q.   Okay.  And so it looks like according to this chart, about
20   105,504 people were released on NTA or OR due to lack of space.
21   Is that accurate?
22   A.    I think -- so out of the report, as I'm looking at the -- I
23   think it's, what, 5,889, something around there.
24   Q.   Are you looking at -- oh, I'm sorry.  Are you on page -- I
25   think I told you page 13.  I meant page 12.
```

1               Can you look at page 12 for me?

2   A.   Okay.  All right.  I'm on page 12 now.

3   Q.   I'm looking at the top chart.

4   A.   Okay.  I gotcha.

5   Q.   Okay.  Can you actually explain to me what's in this chart?

6   A.   Let me just read real quick.

7               All right.  So these are going to be all individuals

8   who -- who we have -- just one second.  Just one second.  Let me

9   zoom out here.

10              Okay.  So these are going to be individuals who -- who

11  were processed for an NTA/OR and that -- that could have been

12  detained, and they were placed on an NTA/OR due to the fact that

13  ICE did not have space available for detention.  So then, of

14  course, the parole aspect is exactly the same thing, right?  So

15  they were processed for parole due to the fact that ICE did not

16  have space for detention.

17  Q.   Okay.  Is that as to both of the totals as listed in the

18  right-hand column, the 105,000 and the 101,000?  Because I see

19  that lack of space is --

20  A.   Yes.

21  Q.   -- also noted for that top row.

22  A.   Yeah.  I mean, I'm not the originator of the document.  Do

23  I know the numbers?  I mean, I think it's probably the way that

24  I'm reading it, is encompassing both of those aspects for lack

25  of space, but -- but I'd have -- you'd have to ask who pulled

1   it.

2   Q.   So I'm looking at the footnote below.  It essentially

3   infers or states that the lack-of-space category was kind of

4   added in by whoever was inputting the information.

5   A.   Yes.

6   Q.   Okay.  But that's not something that the agent necessarily

7   has to put in the descriptor.  Is that accurate?

8   A.   It is not a -- what I would consider as a prefill or a

9   checkbox or a dropdown.  You know what I mean?  So there's -- so

10  it has to be manually entered.

11  Q.   Okay.  Under the NTA/OR that we were previously discussing,

12  do you obtain a warrant for arrest?

13  A.   No.  I do not believe a warrant for arrest is in an NTA

14  packet.

15  Q.   Okay.  And in the Warrant for Arrest/NTA detained, in that

16  case a warrant for arrest is obtained, correct?

17  A.   Yes.

18  Q.   Under what circumstances would you get a warrant for

19  arrest?

20  A.   Most often when they're -- when they're getting detained

21  and prosecuted.

22  Q.   Are there any other --

23  A.   And if they're moving into a period of detention, right,

24  for administrative proceedings.

25  Q.   Is that the only instances in which you would get a warrant

1    of arrest?

2    A.   No.  I mean, there's numerous, right?  I mean, there's

3    numerous.  If -- if, you know, I mean, you know, we -- we get

4    warrants on a daily basis to be able to arrest criminals, you

5    know, within our -- within our operational space on a -- on a

6    daily basis.  You know, whether, you know, for -- for a myriad

7    of reasons, you know, criminal violations.

8    Q.   What about administrative warrants specifically?

9    A.   Yeah.  I mean, again, going back to the -- to the

10   detention.

11   Q.   Okay.  I just want to make sure I'm clear.

12           So for -- under what circumstance would you get an

13   administrative warrant of arrest?

14   A.   For the detention when somebody is remaining in custody

15   pending their removal proceedings.

16   Q.   Is that the only circumstance in which you would get an

17   administrative warrant of arrest?

18   A.   I'm sure there's others, but that's the one that -- that

19   comes to mind.

20           MS. PATEL:  Okay.  That concludes the Barker

21   deposition.

22           THE COURT:  Does that encompass the cross-designations

23   the defendants wanted?

24           MS. RYAN:  Yes, Your Honor.

25           THE COURT:  All right.

**A0290**

1              All right.  Ms. Patel and Ms. Christmas, you did a

2    fine job reading and answering that, but I'm not sure I can take

3    that anymore.  I think I'll just receive the documents and we'll

4    move forward.

5              MS. CHRISTMAS:  Understood, Your Honor.

6              MR. PERCIVAL:  I think Ms. Christmas is grateful as

7    well, Your Honor.

8              MS. CHRISTMAS:  Yes.

9              MS. RYAN:  Your Honor, would you like that to apply

10   for written deposition designations in our case as well?

11             THE COURT:  I think so, unless you have a great desire

12   to sit up there and read.

13             MS. RYAN:  No, I think that's fine you with us.

14             THE COURT:  Okay.

15             MS. RYAN:  So we'll make sure we have hard copies for

16   Your Honor.

17             THE COURT:  All right.  Thank you.

18             Let's take a short break and regroup, and you're going

19   to come back and at least we'll be watching a video next?

20             MR. PERCIVAL:  A batch of documents, Your Honor, and

21   then a video deposition.

22             THE COURT:  All right.  Wonderful.

23             All right.  Let's take ten.

24        *(Recess taken from 3:22 p.m. to 3:38 p.m.)*

25             THE COURT:  All right.  Y'all can be seated.

```
 1              All right.  What does the State have for us next?

 2              MR. HART:  Your Honor, Joe Hart for the State of

 3     Florida.  We're going to be moving into evidence three exhibits.

 4              If I may approach, I can just give you the stack.

 5              THE COURT:  All right.  And while you're doing that,

 6     I've marked and will receive as Court Exhibit 2, the

 7     cross-reference chart for Mr. Barker's deposition.

 8         (COURT EXHIBIT 2:  Received in evidence.)

 9              MR. PERCIVAL:  Your Honor, just one point the

10     organization with your papers up there.  We may attempt to

11     further demonstrate the relevance of Exhibit 16 over the next

12     half a day and maybe tomorrow.  So don't just let that go too

13     far because we don't want you to lose your copy.  I know you

14     denied our motion, but I want to make sure you still have it.

15              THE COURT:  I haven't thrown it away.

16              MR. HART:  Your Honor, the first exhibit we'd like to

17     move into evidence is Exhibit 23.  This is the written testimony

18     from Secretary Mayorkas to the senate committee on Homeland

19     Security and Government Affairs.  I believe there were

20     objections to this.

21              MR. PERCIVAL:  One moment, Your Honor.

22              THE COURT:  Is that the same hearing that I saw an

23     excerpt from the video this morning?

24              MR. HART:  Your Honor, I believe it is.  It was the

25     written follow-up questions.
```

```
 1              MS. FUDIM:  Just one question to counsel.

 2              Is this the exhibit wherein it was previously -- there

 3    was a bunch of testimony that you subsequently removed from what

 4    you were seeking to admit and get email correspondence regarding

 5    that?

 6              MR. GUARD:  Yes.

 7              MS. FUDIM:  Okay.  With that caveat, we don't object

 8    it this version of it which is a reduced version of -- at the

 9    time we issued the stipulation and inserted the objections, just

10    so the Court's aware, there were additional pages, but those

11    have been removed.  So as to the current version, we have no

12    objection.

13              THE COURT:  Okay.  And so for my information, these

14    are questions that senators submitted to the Secretary after the

15    meeting that he responded to in writing?

16              MR. HART:  Yes, Your Honor.

17              THE COURT:  Okay.  All right.  Then I will receive

18    that without objection.

19         (PLAINTIFF EXHIBIT 23:  Received in evidence.)

20              MR. HART:  Thank you, Your Honor.  The next exhibit we

21    would like to tender is Exhibit 24, and this is an October 20th,

22    2021 letter from Tae Johnson to Governor Ron DeSantis, and I

23    think there were objections to this as well.

24              MR. DARROW:  Yes, Your Honor.  Primary objections are

25    relevance and hearsay.  This letter is a response to a request
```

1    from the Governor to provide some information and address long

2    lines at ICE offices in Florida, which are irrelevant to whether

3    or not people are being lawfully detained and released at the

4    border.

5            That's 24?

6            MR. HART:  24, the letter from Tae Johnson to Governor

7    Ron DeSantis.

8            You're not -- not the --

9            MR. DARROW:  Oh, all right.

10           MR. HART:  -- 2022 letter.

11       *(Reporter clarification.)*

12           THE COURT:  She's not going to record y'all's chitchat

13   because I'm not paying attention to it either.

14           MR. DARROW:  All right.  Sorry, Your Honor.  We're

15   looking at the wrong letter from Tae Johnson.

16           THE COURT:  Okay.

17           MR. DARROW:  Sorry, Your Honor.  Bit of confusion.

18   We're not going to object to that.

19           THE COURT:  All right.  Then I will receive

20   Exhibit 24.

21       *(PLAINTIFF EXHIBIT 24:  Received in evidence.)*

22           MR. HART:  Thank you, Your Honor.

23           And the final exhibit we'd like to tender is a report

24   from the Department of Homeland and Security, Office of

25   Inspector General, regarding the title ICE spent funds on unused

1    beds, and it -- so it goes through and explains how ICE failed

2    to utilize all of their bed space that they procured under a

3    sole-source contract, and I think that there were objections to

4    this.

5              MS. FUDIM:  Yes, Your Honor.

6              Our objections to this report are similar to the

7    objection we raised regarding the Government Accountability

8    Office report that the information that's within the report is

9    hearsay by an independent agency reporting on the Department of

10   Homeland Security and that while underlying facts and

11   conclusions -- while the underlying facts may go to conclusions,

12   those are the conclusions that this Court should be making as

13   opposed to conclusions that are preserved with -- in the

14   document.

15             THE COURT:  Isn't the difference the GAO is some

16   third-party agency?  This, if I'm looking at the title

17   correctly, this is a component of Homeland Security, which I

18   think is a defendant in this case.  And so it's internal

19   investigation of itself.  Why would that not be an admission,

20   statement against a party opponent?  Why wouldn't that be a

21   nonhearsay statement on that basis?

22             MS. FUDIM:  My understanding, Your Honor, is that this

23   was a subcomponent oversight committee, and there was a

24   separation with regard to conclusions that were drawn here as

25   opposed to by the agency itself.  To the extent that I'm

**A0295**

1    mistaken about that, I will withdraw that objection; but that

2    was -- that had been my understanding.

3            I believe that there was also an 802 objection, but

4    give me one second to speak with co-counsel with regard to that,

5    if I may.

6        *(Off-the-record discussion between counsel.)*

7            MS. FUDIM:  Okay.  After conferring with my

8    colleagues, we will withdraw that portion of the objection, Your

9    Honor.

10           THE COURT:  So there's a portion of the objection

11   remaining?

12           MS. FUDIM:  For the record -- I see the way the

13   Court's going with this, but for the record our position is

14   portions of the document are hearsay, Your Honor.

15           THE COURT:  All right.  Mr. Hart, anything further you

16   want to add?

17           MR. HART:  We just stand on the fact that this is a

18   party admission and also, to the extent that it's not, would

19   fall under the 803.8(c) exception to hearsay as a public record

20   for a factual -- lawfully authorized factual investigation.

21           THE COURT:  All right.  You want to be heard on that,

22   Ms. Fudim?

23           MS. FUDIM:  I can't speak to that, so we'll withdraw

24   the objections that were articulated for the record.

25       *(Off-the-record discussion between The Court and Deputy*

1    *Clerk.)*

2              THE COURT:  This is Number 60.

3              It seems to me that when something comes to me under

4    the heading of Homeland Security Inspector General, that's a

5    component of that agency.  That agency is a party in this case,

6    so its statements against itself are nonhearsay when they're

7    being offered at -- its statements are nonhearsay when they're

8    being offered against them.

9              I think Mr. Hart is probably right.  There's a public

10   records exception to it.  They may want to argue that with

11   respect to the GAO office, but again, I still thing the GAO is a

12   whole separate kettle of fish.  But we'll get that if we ever

13   hear argument related to it.  So I'll receive it over your

14   objection.

15             MR. HART:  Thank you, Your Honor.

16       *(PLAINTIFF EXHIBIT 60:  Received in evidence.)*

17             MR. HART:  Your Honor, that's all the exhibits that we

18   would like to enter at this time and I think right now we're

19   going to play the --

20             Davies?

21             MR. PERCIVAL:  Guadian.

22             MR. HART:  -- Guadian video.

23             MR. PERCIVAL:  Your Honor, we have another exhibit --

24   an exhibit guide for you.

25             THE COURT:  Okay.

**A0297**

```
 1              MR. HART:  May I approach, Your Honor?

 2              THE COURT:  Come on.

 3              All right.  And I'll mark and receive this cheat sheet

 4    as the Court Exhibit 3.

 5         (COURT EXHIBIT 3:  Received in evidence.)

 6              MR. PERCIVAL:  And, Your Honor, just as you're putting

 7    your exhibits in order, for planning purposes, this is going to

 8    be about an hour, and then we have a couple batches of exhibits.

 9    But the next thing would be another video that's about an hour

10    and 45 minutes.  So just to give you a kind of sense --

11              THE COURT:  This video will be the last video that we

12    can watch today then.

13              MR. PERCIVAL:  Thank you, Your Honor.

14              THE COURT:  All right.  Go ahead and cue it up.  I'll

15    find what I'm looking for.

16              MR. PERCIVAL:  Your Honor, is that loud enough?  We

17    have to actually pause the program in order to adjust the

18    volume.

19              THE COURT:  I think it is.

20         **VIDEO DEPOSITION OF PLAINTIFF WITNESS ROBERT GUADIAN**

21         *(Video recording played in open court.)*

22              MR. DARROW:  Your Honor, I'm sorry to interrupt.

23              We don't have this section on the list of designated

24    testimony.  This is, I think -- it started around 1:13.  Now

25    we're around 1:18 or 1:19.
```

A0298

```
1              MR. PERCIVAL:  Your Honor.

2              MR. DARROW:  I was just going to say I apologize.  It

3    may be our records.  We have it going from 1:10 then the next

4    starts on page 140.

5              MS. CHRISTMAS:  We can confer.

6              MR. PERCIVAL:  It would make sense to confer for a few

7    minutes, Your Honor.

8              THE COURT:  Okay.  It will take less than a few

9    minutes, but go ahead.

10             While y'all are trying to figure that out, the cheat

11   sheet you gave me also refers to Trial Exhibit 29.

12             MR. PERCIVAL:  We withdrew that, Your Honor.

13             THE COURT:  Okay.  That explains why I don't have

14   that.

15        (Pause in proceedings.)

16             MS. RYAN:  Your Honor, Just for the record, we're

17   basing this off of ECF 128, which is the chart of designations

18   and cross-designations that we filed with Your Honor.

19             MR. PERCIVAL:  Your Honor, I think we're going to need

20   a break to deal with this.  I can work on a batch of documents

21   and we can come back to this, because we do have another batch

22   to get through if that's a good way to handle it, but I don't

23   want to waste your time while we stand here trying to sort this

24   out.

25             THE COURT:  I prefer my time not to be wasted.  So
```

```
 1    what is your suggestion?

 2            MR. PERCIVAL:  Well, I have another batch of documents

 3    to move into evidence that I was going to do in advance of

 4    Price.  So we could handle that now and then tomorrow we can

 5    play Guadian and Price for you back to back.

 6            THE COURT:  That sounds like a plan.

 7            MR. DARROW:  Yes, Your Honor.

 8            THE COURT:  Okay.  All right.  Let's do that.

 9            MR. PERCIVAL:  Your Honor, may I approach?

10            THE COURT:  You may.

11            MR. PERCIVAL:  And I'll just read them -- even though

12    you have them, Judge, I'll just read them off for the court

13    reporter.

14            It's Exhibits 5, 6, 7, 8, 9, 11, 12, 17, 19, 33, 42,

15    and 64.

16            And I believe that 5, 6, 7, 8, 9, 11, and 12 do not

17    have an objection.

18            MS. RYAN:  That's correct, Your Honor.

19            THE COURT:  All right.  We'll admit --

20            MR. PERCIVAL:  The first --

21            THE COURT:  -- those without objection.

22        (PLAINTIFF EXHIBIT 5 - 9:  Received in evidence.)

23            MR. PERCIVAL:  The first one we need to deal with is

24    Exhibit 17, and I do believe there was an objection to that.

25            THE COURT:  Okay.  You said Exhibit 17?
```

1          MR. PERCIVAL:  Yes, Your Honor.

2          THE COURT:  All right.  Why don't we do it this way.

3    Why don't you tell me what this is, what you're offering it for,

4    and they'll tell me what their objection is.

5          MR. PERCIVAL:  Yes, Your Honor.

6          So this is an email from January 27, 2021, from the

7    then-head of Enforcement and Removal Operations, which is the

8    job that Corey Price subsequently took over.  And what this

9    email is talking about is the effect of the Biden

10   Administration's new enforcement priorities on the total number

11   of what are called book-ins, which are the number of people who

12   are entering ICE custody.

13         And the purpose of the document is to show both a

14   general point of a reduction in enforcement but the broader

15   point that the interior enforcement priorities actually freed up

16   detention capacity that could be used at the southwest border.

17         The last sentence of the first paragraph, I think, is

18   really the --

19         THE REPORTER:  "Is really the..."?

20         MR. PERCIVAL:  Sorry.  The last sentence of the first

21   paragraph is where I'm directing the Court.

22         THE COURT:  All right.  Mr. Darrow.

23         MR. DARROW:  Two bases for objection, Your Honor.

24         The first, hearsay.  I imagine the Court's going to

25   rule as it has with other of our arguments regarding hearsay

1    because this is reporting what numbers that ERO ran.

2         The second objection is based on relevance.  This --

3    the memo priorities for enforcement is the Pekoske Memo that we

4    discussed a few minutes ago when the Court excluded that

5    document from the record.  And we would make the same argument

6    here that that is pertaining to prosecutorial discretion and the

7    decision to fully charge, not who to detain.

8         THE COURT:  I don't even understand this,

9    Mr. Percival.

10        MR. PERCIVAL:  Well, Mr. Price is going to be asked

11   about it.  But, Your Honor, what this is saying is that

12   book-ins, which is people coming into ICE custody, is expected

13   to be reduced by 50 percent.  In other words, they're expecting

14   the number of people entering ICE custody to be cut in half.

15   And certainly if the federal government is saying that its

16   detention resources are totally overwhelmed, it's certainly

17   relevant that they're doing other things that are freeing up

18   detention capacity.

19        THE COURT:  I'm going to hold that until I hear what

20   Mr. Price says, because, again, I'm reading that, and it doesn't

21   make any sense to me -- even the point you're trying to make

22   doesn't make sense to me, so maybe he'll provide context that

23   will help it make sense.

24        MR. PERCIVAL:  Understood, Your Honor.

25        THE COURT:  So I guess that would go to his relevance

1    objection more than the hearsay objection.

2            MR. PERCIVAL:  Fair enough, Your Honor.

3            The next one is 19.  Although it may make sense to

4    deal with 19 and 33 together because they're essentially two

5    versions of the same thing.

6            And what these are is court filings by the Department

7    of Justice on behalf of ICE, a defendant in this case, in a case

8    called *Flores*, which involves a consent decree relating to

9    certain issues about family detention.  And these are documents

10   in which essentially ICE is representing that it's eliminating

11   family detention.

12           MR. DARROW:  Your Honor, our objection is that while

13   *Flores* does have an impact on this case because it does set some

14   standards on family detention, the juvenile coordinator here is

15   looking at what -- the detention of uncompanied -- or in some

16   cases accompanied -- alien minors.  It's solely focused on

17   conditions of detention of alien minors, which are irrelevant to

18   the reason why *Flores* is relevant here, which is the limit on

19   family detention.

20           MR. PERCIVAL:  And, Your Honor, I'll just direct you,

21   for example, to the fifth page of Exhibit 19 that says:  "As of

22   February 26, 2021, all families are released from the Berks FRC.

23   The facility is in the process of negotiating with ICE a

24   transition to an adult facility and will no longer house

25   families."

1          THE COURT:  Are you reading from page 5 of the filing

2     or page 5 Bates stamp?

3          MR. PERCIVAL:  I'm sorry, Your Honor.  It is Bates 5

4     of the exhibit and ECF page 5, but it is page 4 of the internal

5     pagination of the document.  And it's like the third paragraph

6     down.

7          THE COURT:  And your -- again, this is a court filing,

8     so it's certainly something I could take judicial notice of, is

9     it not?

10         MR. DARROW:  Yes.

11         THE COURT:  But your argument is it's not relevant.  I

12    mean, I can take judicial of all kinds of court filings; but

13    only the ones that are relevant, I should.  So you really --

14    it's a relevance objection?

15         MR. DARROW:  Yes.  And it does mention the family

16    detention centers, but that is, you know, what I would say a

17    throwaway line in a larger document that deals specifically at

18    the juvenile coordinator looking into whether the government is

19    complying with the -- *Flores*' conditions for detaining children,

20    in particular, not whether ICE's, you know, spending its

21    resources on families versus single adults.

22         MR. PERCIVAL:  And, Your Honor, the way *Flores* has

23    been interpreted by the Ninth Circuit is to apply to both UACs

24    and accompanied children.  So the *Flores* consent decree actually

25    does have a bearing on family detention because the Court

**A0304**

```
 1    monitors the detention of the children along with families.  And

 2    I think that is also judicially noticeable, Your Honor.

 3              THE COURT:  It sounds like when we talk about

 4    throwaway lines, it raises my goes-to-the-weight antenna.  If

 5    you're saying there's -- acknowledge there's some conceivable

 6    relevance here but it's not the focus of it, that really sounds

 7    like it goes to the weight.

 8              I'm not going to be asked to do any sort of monitoring

 9    ever, am I?

10              MR. PERCIVAL:  I certainly hope not, Your Honor.

11    We're asking for vacatur.  Well, I guess we're asking for an

12    injunction on the parole piece, but we'll save that for the

13    posttrial order.

14              THE COURT:  All right.  I'll receive and/or take

15    judicial notice of 19 and 33 and consider that objection when

16    evaluating the weight of the statement or two that you want me

17    to consider in that.

18        (PLAINTIFF EXHIBITS 19, 33:  Received in evidence.)

19              MR. PERCIVAL:  Yes, Your Honor.  So was that on both

20    19 and 33?

21              THE COURT:  Yes.

22              MR. PERCIVAL:  I'm sorry.  They're basically the same

23    document.

24              42 is a Border Patrol press release from August 2022.

25    And essentially the reason we're offering this document, Your
```

1    Honor, is because there's some discussion in the depositions --

2    and this will come up in Mr. Price's as well -- although DHS

3    cannot detain family units, one of the things they will say is

4    that they have the option to expel under Title 42.  And this

5    document contains data on the proportions of family units in the

6    month of August, which was just the most recent month at the

7    time, the proportion of family units that are being processed

8    under Title 42 as opposed to Title 8 which results in a release.

9          And that's on the third page, I believe, of this

10   document.  And I can direct you to the bullet points.

11         THE COURT:  I'm looking at it.

12         The point you take from this is a relatively small

13   portion of the people being excluded under Title 42 are family

14   units?

15         MR. PERCIVAL:  Correct, Your Honor.  At times in this

16   litigation we've understood one of the defenses to be that the

17   lack of ability to detain family units is not significant

18   because Title 42 remains available.  But what this document

19   shows is that in the month of August 2022 only 12 percent of

20   family units were expelled under that authority.

21         THE COURT:  I thought the Federal Government's point

22   on family units was that they converted those spaces from family

23   units to single adult units because they were seeing more single

24   adults than families.  So isn't this kind of proving their

25   point?

1          MR. PERCIVAL:  Well, they're certainly entitled to

2     argue that, Your Honor, but I don't think that makes it not

3     relevant.  And I mean, we would say that if you look at the

4     total proportion of family unit detention to adult -- I mean,

5     that goes to argument, I guess, Your Honor, and I can make the

6     argument, but...

7          THE COURT:  Okay.  I'm just trying to understanding

8     the relevance you think this has.  But again, you may be right.

9     It may go more to the significance of it.

10         Mr. Darrow, what's your objection to this?

11         MR. DARROW:  Expulsions under Title 42 aren't being

12    challenged here.  That's a whole nother separate litigation

13    that's currently ongoing.  And, you know, there's a good reason

14    for that because there's a lot of exceptions from Title 42 that

15    this document doesn't go into and can't give us the context for

16    why, you know, large numbers in different categories of

17    noncitizens won't be expellable under Title 42.

18         THE COURT:  Again, it sounds like all of that goes to

19    the weight.  We are talking about -- I mean, I think he's tied

20    enough relevance in there with this argument about family units;

21    although, again, I'm not sure that this fully gets him where he

22    wants to go.  But with that understanding I'll receive the

23    document.

24         *(PLAINTIFF EXHIBIT 42:  Received in evidence.)*

25         THE COURT:  We got something out of the Code of

A0307

 1   Federal Regulations.  That looks interesting.

 2           What's this, Number 64?

 3           MR. PERCIVAL:  Sorry, Your Honor.  Just -- I realize

 4   we're not receiving argument right now, but when you said that

 5   it was a very small number of family units, I want to make sure

 6   you're seeing that the 6,000 is the Title 42 number.  And the

 7   45,609 at the bottom, that's the Title 8.  You have to add them

 8   together to get the total.  I just want to make sure I'm clear

 9   for the Court's understanding.

10           You put it aside.  I'm sorry.

11           THE COURT:  Okay.  Well, we'll figure out what it

12   means at the appropriate time.

13           All right.

14           MR. PERCIVAL:  And the last one, Your Honor is

15   Exhibit 64.  This as was a rule published in the Federal

16   Register and enacted by the defendants during the previous

17   administration, and it discusses a lot of issues specific to the

18   detention of family units.

19           You know, just for example, I'll read from the first

20   page, middle column, around the center of the first paragraph.

21   It says: "The final rule creates an alternative to the existing

22   licensed program requirement for ICE family residential centers

23   so that ICE may use appropriate facilities to detain family

24   units together during their immigration proceedings consistent

25   with applicable law."

1          So this document is just going to the fact that the

2    previous administration was making significant efforts to

3    increase their ability to detain family units and that there was

4    a change in policy with the new administration.

5          THE COURT:  Okay.  Is this something I can take

6    judicial notice of, or is it something that has to have an

7    evidentiary basis to be admitted.

8          MR. PERCIVAL:  Your Honor, I think you can take

9    judicial notice of it.  Mr. Guard in his deposition of Mr. Price

10   is going to ask about specific pages of it was the only reason

11   we made it an exhibit.  But if Your Honor wants to follow along

12   in the document and just take judicial notice of the Federal

13   Register, that's fine too.

14         THE COURT:  All right.  Ms. Ryan.

15         MS. RYAN:  Yes, Your Honor.  This -- we have a

16   relevance objection.  It's from 2019, and as Mr. Percival said,

17   it covers a lot of issues.  So if there are specific portions

18   that they're trying to enter, that's a different conversation.

19   But we think Your Honor can take judicial without entering all

20   144 pages of this.

21         THE COURT:  Well, I can probably assure you I'm not

22   going to read all 144 pages of this.

23         MR. PERCIVAL:  We're fine with judicial notice route,

24   Your Honor.  We just want you to be able to follow along with

25   the deposition.

**A0309**

1          THE COURT:  What fact -- or what, I guess legislative

2    fact, or what would I take judicial notice of?  That there was a

3    regulation adopted by the prior administration --

4          MR. PERCIVAL:  Published at --

5          THE COURT:  -- to accommodate detention of family

6    units?

7          MR. PERCIVAL:  I mean, I think we just want you to

8    take -- I guess we want you to take judicial notice that this

9    rule was enacted, and we would want to be able to cite to the

10   Federal Register, which is judicially noticeable, in our

11   proposed order.  For example, there's facts in here about

12   absconsion rates and findings of the Department.

13         THE COURT:  Well, that's a little bit different.

14   There's -- in the back of this, there is actually regulatory

15   language.  Is that regulatory language still on the books, or

16   has that been repealed?

17         MR. PERCIVAL:  I believe that portions of it were

18   invalidated by the Ninth Circuit and no further review was

19   sought.  We're not seeing it to show the state of the law, Your

20   Honor.  We're offering it to show some of the efforts of the

21   prior administration and how those efforts have changed and some

22   of the assumptions behind those efforts.

23         MS. RYAN:  Your Honor, if I may?

24         THE COURT:  Sure.

25         MS. RYAN:  As we've previously stated, actions taken

1    by the last administration are not relevant to the claim here.

2    The previous administration's executive orders Your Honor let in

3    just for the fact that they existed because they were referenced

4    in the document from this administration, sounds like Florida is

5    trying to get in the content of this rule that the previous

6    administration admitted, which is not relevant to the claims at

7    issue in this case.

8            THE COURT:  I guess I'm struggling, Mr. Percival, to

9    understand.  You know, the fact that the prior administration

10   took one approach and the fact that the current administration

11   takes a different approach, that may show evidence of a change

12   in policy.  One would expect that with a change in

13   administrations.  But I'm just not sure that that hook is enough

14   for me to dump this into the record and then make findings based

15   upon comments and responses and discussions that were had in the

16   rulemaking process.

17           MR. PERCIVAL:  Why don't we do this, Your Honor.  Why

18   don't you defer on it for now.  We're going to play the Corey

19   Price deposition, and we can revisit it with you after.

20           THE COURT:  Okay.  I will do that, but I'm going to

21   tell you, you've got a steep hill to climb for me to put 140

22   pages of Federal Register back and forth of a prior

23   administration into the record.

24           It's one thing for me to take judicial notice of the

25   fact that the prior administration did X, hearing evidence that

**A0311**

1    current administration is doing Y, taking those two facts,

2    drawing whatever inferences I can from that.  It's another thing

3    to hand me this pile of stuff and then at some point, one,

4    expect me to read it and, two, expect me to make findings from

5    something on page 48 in here.  I'm not sure that's the way this

6    process is supposed to work.

7              MR. PERCIVAL:  Understood, Your Honor.

8              THE COURT:  All right.  Then I'll -- you can move that

9    at a later point in time but with that caveat.

10             MR. PERCIVAL:  I believe that's the entire batch.

11             May I have a moment, Your Honor?

12             THE COURT:  Sure.

13             MR. HART:  Your Honor, I'd like to address the

14   defendant's previous discussion about the deposition testimony

15   that we were just playing for Mr. Guadian.

16             Florida designated pages 117 through 136 in our

17   designations on Docket Entry 125, and it appears that the -- the

18   docket entry, 128, that the defendants are relying upon failed

19   to include that particular designation made by Florida.  So the

20   portion of the video that we played is indeed in our deposition

21   excerpts filed with the Court.

22             THE COURT:  What is -- I don't have the docket open.

23   What is Number 125?

24             MR. HART:  125 is Florida deposition designations.

25             THE COURT:  And what is 128?

**A0312**

 1            MR. HART:  128 is the defendant's counter-designations

 2   and objections.

 3            THE COURT:  Okay.

 4            MR. HART:  And on that 128, defendants, I think, just

 5   overlooked pages 117 through -- I think 136, and I think that

 6   the discrepancy.

 7            THE COURT:  Ms. Ryan, does that clear it up for you?

 8            MR. DARROW:  Your Honor, I think there was some

 9   miscommunication which we haven't sorted out the basis of it,

10   but it's possible that we overlooked their filing.  But we were

11   doing ours based off of highlighted depositions that the parties

12   exchanged, and we didn't see any highlighting of that section

13   when we were doing our counter-designations.

14            It's, you know, possible that, you know, the documents

15   just got screwed up and we were looking at the wrong one, but --

16   I mean, maybe we can confer further among the parties.  I can

17   show them the highlighted...

18            THE COURT:  And I'm probably going to let you do that,

19   just -- who was that we were listening to?  Was it Guadian?

20            MR. HART:  Guadian.

21            THE COURT:  Guadian.  So what you're saying, Mr. Hart,

22   is that on Document 125, the document itself, the pages that

23   you've listed were what we were watching?

24            MR. HART:  Yes, sir.  Where we stopped was page 118.

25   And there's a section here where we list 117, line 3, through

1    136, line 9.

2            THE COURT:  Okay.  And then attached to that there was

3    a document, 125-4, which were the excerpts.  And what you're

4    telling me, Mr. Darrow, that's what you were focused on and you

5    didn't see the things that he's reading from?

6            MR. DARROW:  Actually, Your Honor, the thing I'm

7    talking about I don't believe we actually filed, the -- we

8    exchanged highlighted -- well, they sent over a highlighted

9    deposition, full transcript, with the portions that they were

10   going to designate.  Then we responded to that.  You know, we

11   internally have it, our own, and then filed the final filing

12   that was just the chart that we provided.

13           But I don't think we saw those pages on the document

14   that was originally sent over to us.  It's possible they were

15   added after the fact or -- I mean, I'm not saying anybody was

16   doing anything improper.  It's just --

17           MR. PERCIVAL:  I can clear that up.

18           MR. DARROW:  Okay.

19           MR. PERCIVAL:  So the parties initially served

20   highlighted copies of the depositions.  My understanding is that

21   we reserved the right to supplement those.  They were initial

22   designations.  So it sounds like we filed our final versions of

23   the designations and notwithstanding my email that said there

24   might be changes, Mr. Darrow relied on the previously

25   highlighted version, not on the filed version.

1           And I think because we filed it, we ought to be able

2    to play it, Your Honor.

3           THE COURT:  All right.  Well, let's do this.  We're at

4    as good a time anyway to break.  I'll let y'all see if that was

5    actually what happened.  Again, what I'm looking at is a docket

6    that shows they designated this.  But if there was something

7    going on behind the scenes that is not reflected on the docket

8    that created this confusion, then merely because it's on the

9    docket doesn't necessarily immunize myself whatever happened

10   behind the scenes.

11          And so, Mr. Darrow, if you'll go through -- they

12   clearly from a record purpose disclosed what they intended to

13   designate.  And so to the extent that you relied upon this

14   back-channel highlighted version instead of the later-produced

15   version, certainly I think you ought to have the opportunity to

16   go through the later-produced version, see if there's any

17   objections or any cross-designations that you need to do to

18   that.  And y'all can sort that out tonight so when we come back

19   tomorrow, everyone -- there will be nobody that's prejudiced by

20   what the record shows no prejudice should come from.

21          Does that make sense to everyone?

22          MR. PERCIVAL:  Yes, Your Honor.  And I will say, just

23   as a technical matter, it may be that if there's addition

24   portions we have to add, we may have to read them because

25   editing video is --

**A0315**

1          THE COURT:  That will be fun.

2          MR. PERCIVAL:  -- a little complicated.

3          THE COURT:  That's fine.

4          MR. PERCIVAL:  But I don't think it will be very much.

5          THE COURT:  All right.  Well, let's do that.

6          Anything else that we need to do or can do this

7     afternoon to make our day tomorrow more efficient?

8          MR. PERCIVAL:  I don't believe so.

9          MS. RYAN:  Yes, Your Honor.  Since Your Honor prefers

10    that we hand you deposition designations instead of reading them

11    on the stand, performing them for Your Honor, we wanted to know

12    what you preferred:  if you wanted highlighted excerpts, if

13    you wanted a complete transcript highlighted, redactions.  We

14    just want to be consistent with whatever is best for Your Honor.

15         THE COURT:  I'm not sure if I have a preference.  You

16    know, ideally we would only get what you want us to read.  But

17    because some of these pages -- some of the portions you want us

18    to read start on the middle of the page, probably it would be a

19    combination of -- or it would be highlighted excerpts I think

20    would be ideal.

21         MS. RYAN:  We do have the option of redacting the

22    lines that are not...

23         THE COURT:  That would be fine too.

24         MS. RYAN:  Okay.

25         THE COURT:  I don't see any need for us to have a

**A0316**

```
 1    250-page deposition when only 59 pages of it pages are something

 2    we ought to focus on.

 3              MS. RYAN:  Yes, Your Honor, so we will try to have

 4    those for you tomorrow in that format.

 5              THE COURT:  Okay.

 6              All right.  Anything else we can talk about tonight?

 7              MR. PERCIVAL:  And do you want paper copies of that or

 8    filed, Your Honor?

 9              THE COURT:  Yeah, I think we might as well get --

10    definitely want paper copies.  Yeah, definitely want paper

11    copies.

12              MR. PERCIVAL:  So we have highlighted paper copies

13    already prepared, Your Honor.  They only have the pages we've

14    designated, but they don't designate the rest of the -- or they

15    don't redact the rest of the text.  Would those be fine, or

16    would you like us to print new versions with redactions?

17              THE COURT:  That would be fine, as long as there's

18    some differentiation between what we should read and what

19    shouldn't read, whether it be because it's completely redacted

20    out what we shouldn't read or whether it's because it's just not

21    highlighted, either way is fine.  We'll know what to focus on

22    what not to.

23              MR. PERCIVAL:  Thank you.

24              MS. RYAN:  Your Honor, I think we just briefly should

25    take scheduling so that we can have our witnesses available to
```

```
 1    continue.

 2              THE COURT:  Sure.

 3              MR. DARROW:  As I understand from plaintiffs, they

 4    have two more videos.  They have to finish the Guadian video and

 5    the Price video, and it sounds like they may then rest around

 6    lunchtime.

 7              If that's accurate, Mr. Percival.

 8              MR. PERCIVAL:  Yeah, some of that depends on the

 9    objection that hasn't yet been withdrawn.  We would reserve the

10    right to call Raul Ortiz to lay a foundation for Exhibit 98,

11    Your Honor.

12              THE COURT:  All right.  It does sound like midday

13    tomorrow you'll be finished.

14              MR. PERCIVAL:  I believe so.

15              MS. RYAN:  So we'll have our first witness available

16    around lunchtime tomorrow.

17              THE COURT:  Okay.

18              MS. RYAN:  Since we are losing so much time with these

19    deposition designations, we are concerned that we will finish

20    our case on Wednesday, but one of plaintiff's witnesses is not

21    available until Thursday.

22              THE COURT:  Okay.

23              MS. RYAN:  So we just wanted to bring that to Your

24    Honor's attention that it may be a shorter day on Wednesday and

25    Thursday, but we were told she's physically unable to be here
```

1    until Thursday.

2              THE COURT:  Okay.  That's the case?

3              MR. PERCIVAL:  That's correct, Your Honor.

4              THE COURT:  Okay.  Well, if we have a shorter day, we

5    will have a shorter day, and much better than a longer day.

6              Well, this has been a very interesting day, and we

7    will regroup tomorrow.  If we start at 9:00 o'clock, will that

8    be sufficient time to get done what the State expects to get

9    done by lunch?

10             MR. PERCIVAL:  Yes, Your Honor.

11             THE COURT:  Well, let's do that.  I hope everyone has

12   a good evening, and we will be in recess until 9:00 tomorrow.

13        *(Proceedings adjourned at 4:40 p.m.)*

14                       * * * * * * * *

15        I hereby certify that the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
16   the above-entitled matter, pursuant to the provisions of Section
     753, Title 28, United States Code.

17

18                                        1/19/23

19   _____    _____
     Julie A. Wycoff, RMR, CRR       Date
     Official U.S. Court Reporter
20

21

22

23

24

25

```
 1                     I N D E X

 2

 3    Plaintiff Witnesses              Direct  Cross  Redirect

 4    JACOB OLIVA ............................24    45      57

 5    RAUL ORTIZ (BY VIDEO) ...................88

 6    TONY BARKER (READ INTO RECORD) ..........113

 7    ROBERT GUADIAN (BY VIDEO) ...............149

 8

 9

10                    PLAINTIFF EXHIBITS

11    Exhibit    Description                   Marked  Admitted

12    1 - 4      CBP custody and transfer stats    63      63

13    5 - 9      ICE Detention Data 2019-2023     151     151

14    10         Data on aliens released at SW border  63   63
                 who gave Florida addresses
15
      13         DHS fiscal year 2021 budget       63      63
16
      14         January 2021 statement on the    102     102
17               suspension of MPP

18    15         ICE budget overview for 2021      63      63

19    18         2/16/21 email amongst USBP officials  65   65

20    19         March 2021 Interim Report re:  Flores  156  156

21    20         March 19th memo regarding prosecutorial  104  104
                 discretion
22
      21         3/20/21 email re:  Prosecutorial  104     104
23               Discretion Authority

24    22         5/21/21 email amongst USBP officials  67   67

25    23         Written testimony from Sec'y Mayorkas  144  144
                 to senate committee
```

**A0320**

| | | | | |
|---|---|---|---|---|
| 24 | 10/20/21 letter from Tae Johnson to Gov. DeSantis | 145 | 145 |
| 25 | DHS fiscal year 2022 budget | 68 | 68 |
| 26 | ICE budget overview for 2022 | 68 | 68 |
| 27 | DHS fiscal year 2023 budget | 68 | 68 |
| 28 | ICE budget overview for 2023 | 68 | 68 |
| 30 | 5/15/22 email from Tony Barker | 73 | 73 |
| 31 | 5/19/22 memo from Chief Ortiz re noncitizen releases | 73 | 73 |
| 33 | 7/1/22 Annual Report re:  Flores | 156 | 156 |
| 42 | Border Patrol press release from August 2022 | 158 | 158 |
| 44 | 12/16/2014 memo re: parole of inadmissible aliens | 87 | 87 |
| 45 | Candidate Biden's plan | 108 | 108 |
| 46 | USBP Processing Pathways | 74 | 74 |
| 47 | U.S. Customs and Border Protection Overview of the Southwest Border doc | 78 | 78 |
| 49 | Remarks given by the Secretary of DHS | 78 | 78 |
| 53 | Executive Order 14010 re:  Migration | 109 | 109 |
| 54 - 58 | Executive orders or presidential actions | 110 | 110 |
| 59 | June 2021 memo re:  Notice to Report | 112 | 112 |
| 60 | DHS OIG report re:  ICE funds on unused beds | 148 | 148 |
| 61 | Video of Secretary Mayorkas before Senate committee | 23 | 23 |
| 62 | Video of Secretary Mayorkas before House committee | 22 | 22 |

**A0321**

| 1 | 95 | Enrollment by Immigrant Status document | 38 | 38 |
| 2 | | | | |
| 3 | 1 | Chart that converts depo exhibits to trial exhibits | 86 | 86 |
| 4 | | | | |
| | 2 | Cross-reference chart for Barker dep | 143 | 143 |
| 5 | | | | |
| | 3 | Cross-reference chart for Guadian dep | 149 | 149 |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |
| 25 | | | | |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA,**

    **Plaintiff,**

**v.**                                                    **Case No. 3:21-cv-1066-TKW-ZCB**

**UNITED STATES OF**
**AMERICA, et al.,**

    **Defendants.**

_____/

## <u>OPINION AND ORDER</u>

After due notice, the Court held a bench trial in this case on January 9-12, 2023. Based on the testimony and evidence presented at the trial, the parties' oral arguments and post-trial filings (Docs. 155, 156), and the supplemental administrative record for the Parole Plus Alternative to Detention (Parole+ATD) policy (Doc. 87-1), the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

### I.    Executive Summary

There is an immigration "crisis" at the Southwest Border. The Chief of the U.S. Border Patrol (USBP) candidly admitted it in his

**A0323**

testimony and the overwhelming weight of the evidence confirms it.  The crisis has been ongoing for over two years and shows no sign of abating.

The evidence establishes that the current status quo at the Southwest Border is unsustainable, but it is not the Court's job to solve the immigration crisis—that is the job of the political branches.[1]  Nor is it the Court's job to decide whether the policies challenged by Florida in this case (or the underlying immigration laws) are good or bad public policy—that too is the job of the political branches.  Instead, the Court's only job is to determine based on the evidence presented whether challenged policies comply with the immigration laws, as written.

\*   \*   \*

The Supreme Court has recognized that immigration officials have "broad discretion" in carrying out the immigration laws, *see Arizona v.*

---

[1]  It is noteworthy that the President made his first visit to the Southwest Border the day before the trial in this case started.  That visit was preceded by the announcement of a new immigration policy that is intended to dissuade aliens from continuing to simply show up at the Southwest Border.  However, it does not appear that this new policy will repeal the Parole+ATD policy or mandate detention of aliens who do show up at the Southwest Border in contravention of the new policy, and Defendants have not argued the new policy moots or otherwise has any bearing on this case.  Moreover, the legality the new policy has been already challenged by a group of 20 states, including Florida, in *Texas v. Department of Homeland Security*, Case No. 6:23-cv-007 (S.D. Tex.).

2

*United States*, 567 U.S. 387, 396 (2012).  But that discretion must be exercised within the confines established by Congress because, as the Supreme Court has repeatedly held, Congress—not the President or Executive Branch officials—has the "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens.[2]  *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 343 (1909).

Congress exercised that power by enacting the Immigration and Nationality Act (INA), which is codified as amended in 8 U.S.C. §1101 et seq.  Most pertinent to this case is 8 U.S.C. §1225, which establishes the policies and procedures for processing what the statute refers to as "applicants for admission"—that is, aliens arriving in the United States at ports of entry or other locations.

---

[2]  The Court uses the term "alien" because that is the term used by Congress in the immigration laws.  *See* 8 U.S.C. §1101(a)(3).  Also, "alien" is also more accurate than Defendants' preferred—and allegedly less "dehumanizing"—term, "non-citizen," because the statutory definition of "alien" excludes U.S. nationals even though nationals can be "non-citizens."  *See Miller v. Albright*, 523 U.S. 420, 467 n.2 (1998) (Ginsberg, J., dissenting) ("Nationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen.").

A0325

Under §1225(b)(1)(A), certain arriving aliens, including those who lack proper admission documents, are subject to expedited removal "without further hearing or review." However, if such an alien indicates an intention to apply for asylum or a fear of persecution, the alien "**shall be detained**" pending a final determination of asylum or credible fear of persecution. *See* 8 U.S.C. §1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV) (emphasis added). For all other arriving aliens, unless an immigration official determines that the alien is clearly and beyond a doubt entitled to be admitted, the alien "**shall be detained**" for removal proceedings. *See* 8 U.S.C. §1225(b)(2)(A) (emphasis added).

In 2018, in *Jennings v. Rodriguez*, the Supreme Court held that "§§1225(b)(1) and (b)(2) <u>mandate detention</u> of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." 138 S. Ct. 830, 845 (2018) (emphasis added). Last year, in *Biden v. Texas*, the Supreme Court assumed without deciding that the federal government was violating §1225(b)(2)(A) by not detaining aliens arriving at the Southwest Border, *see* 142 S. Ct. 2528, 2542 (2022), but the Court left unanswered the question of "whether the detention requirement in section 1225(b)(2)(A) is subject to principles of

4

law enforcement discretion, as the Government argues, or whether the Government's current practice simply violates that provision," *id.* at 2542 n.5.  This case requires that question to be answered.

The State of Florida contends that Defendants[3] are violating the statutory detention mandates in §1225(b)(1) and (b)(2) by releasing aliens arriving at the Southwest Border into the country *en masse* through various "non-detention policies," including the Parole+ATD policy and the exercise of "prosecutorial discretion" under 8 U.S.C. §1226(a).  Defendants respond that there is no overarching "non-detention policy"; that they have the discretion not to detain aliens notwithstanding the mandatory language in §1225(b)(1) and (b)(2); and that Florida does not have standing to challenge their discretionary decisions to release aliens into the country on parole or otherwise.

For the most part, the Court finds in favor of Florida because, as detailed below, the evidence establishes that Defendants have effectively turned the Southwest Border into a meaningless line in the sand and

---

[3] The United States of America and various federal immigration agencies and officials, including the Department of Homeland Security (DHS), Customs and Border Patrol (CBP), and Immigration and Customs Enforcement (ICE).  At times in this Opinion and Order, the Court refers to Defendants collectively as "DHS."

A0327

little more than a speedbump for aliens flooding into the country by prioritizing "alternatives to detention" over actual detention and by releasing more than a million aliens into the country—on "parole" or pursuant to the exercise of "prosecutorial discretion" under a wholly inapplicable statute—without even initiating removal proceedings. The evidence further establishes that Florida is harmed by the challenged policies because well over 100,000 aliens have been released into Florida under the policies and the state has incurred substantial costs in providing public services to aliens, including those who should have been detained under §1225(b)(1) and (b)(2) and would not have been in the state but for the challenged policies. However, the Court only has the authority to vacate the Parole+ATD policy because the overarching "non-detention policy" is not discrete "agency action" that is subject to judicial review under the Administrative Procedure Act (APA).

## II.    Findings of Fact

The Court adopts and incorporates by reference the facts agreed to by the parties, *see* Doc. 122 at 16-24 (¶¶1-63); Doc. 143 at 1-2 (¶¶71, 72)), but for sake of brevity, only the facts most pertinent to the Court's analysis are set forth below. The findings related to the merits of the

6

Parole+ATD policy are based on the documents in the supplemental administrative record, *see* Doc. 55; Doc. 117 at 2; Doc. 130 at 3-4 (¶8.b.i), whereas the findings on other issues are based on a thorough assessment of the weight and credibility of the entire evidentiary record.

## A.    Immigration Enforcement, Generally

DHS is the cabinet-level agency that is primarily responsible for implementing and enforcing the immigration laws.

CBP and ICE are component agencies within DHS.

CBP is generally responsible for immigration enforcement at the borders—with CBP's Office of Field Operations (OFO) having responsibility for the ports-of-entry and the USBP having responsibility between ports-of-entry.

ICE is generally responsible for immigration enforcement in the interior of the country—with ICE's Enforcement and Removal Operations (ERO) having responsibility for detaining and removing aliens.

7

A0329

CPB and ICE both have detention facilities, but the CBP facilities are only intended for temporary detention of up to 72 hours, after which continued detention requires a transfer to ICE custody.

The length of time that an arriving alien can be detained in CBP or ICE custody is also impacted by judicial decisions.  For example, the consent decree and subsequent orders in *Flores v. Garland*, No. 2:85-cv-4544 (C.D. Cal.), effectively limit the detention of minors (and, thus, family units) to 20 days—although the evidence establishes that period is more than enough time to at least initiate removal proceedings.

There is nothing inherently inhumane or cruel about detaining aliens pending completion of their immigration proceedings.  The CBP and ICE witnesses admitted as much in their testimony and there is no contrary evidence in the record.

Detention is the surest way to ensure that an alien will not abscond pending completion of their immigration proceedings.

B.    Alien Apprehensions and Releases at the Southwest Border

CBP maintains monthly data on the number of arriving aliens apprehended at the Southwest Border and the "processing disposition"

A0330

for those aliens.  *See* P.Ex.[4] 1 through 4 (monthly data from January 2020 through November 2022).  The data only includes "Title 8 apprehensions" and does not include aliens excluded under the "Title 42 Order."[5]

The data shows that in the three months before the COVID-19 pandemic (January through March 2020), about 25,000 aliens per month were being apprehended at the Southwest Border.  The monthly apprehensions dropped significantly (to less than 1,200) in April 2020 because of the pandemic and the Title 42 Order, and they remained at relatively low levels through January 2021.

Apprehensions returned to their pre-pandemic levels in February 2021 and increased dramatically thereafter.  By July 2021, monthly apprehensions reached 100,000, and for the most part, they have stayed at or above that level since then.

In the last three months for which there is data in the record (September to November 2022), monthly apprehensions averaged about

---

[4]  "P.Ex." refers to the exhibits introduced by Florida.  "D.Ex." refers to the exhibits introduced by Defendants.

[5]  As explained in more detail below, the Title 42 Order was issued by the Centers for Disease Control (CDC) to prohibit certain aliens from entering the country during the COVID-19 pandemic.

A0331

135,000.  These numbers are expected to increase significantly when the Title 42 Order is no longer in place.

USBP agents routinely arrest aliens in the field without a warrant, as authorized by 8 U.S.C. §1357.  An arrest warrant is not issued (if at all) until after the alien is in custody, and unless the alien is going to be detained for prosecution, the warrant is merely a Form I-200 "administrative warrant" that is issued in conjunction with a notice to appear (NTA).[6]

The monthly data also includes different categories of "processing dispositions."  The most pertinent dispositions for this case are Notice to Appear/Own Recognizance (NTA/OR), Parole+ATD,[7] and Warrant of Arrest/Notice to Appear (Warrant/NTA).

The Warrant/NTA category includes the aliens who were detained for prosecution or removal.  The other two categories are comprised of

---

[6]   The NTA is the document that formally initiates a removal proceeding against an alien.  *See* 8 C.F.R. §1239.1(a) ("Every removal proceeding conducted under [8 U.S.C. §1229a] to determine deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court.").

[7]   The data for fiscal year 2021 included releases on parole in the "other" category, but that category clearly included releases on Parole+ATD because the numbers in that category increased significantly starting in August 2021 after the Parole+ATD program was created.

10

aliens who have been released pending completion of their immigration proceedings, either under the Parole+ATD program, the predecessor Notice to Report (NTR) program, or "prosecutorial discretion" under §1226(a).

The data shows that the Warrant/NTA category has remained relatively consistent since the "surge" of arriving aliens started in March 2021. The data reflects that typically more than 20,000 arriving aliens per month are being detained.

The data also shows that a substantial number of aliens have been released each month since March 2021. For example, in the first month of the NTR program (March 2021) there were more than 26,000 releases categorized as NTA/OR, and by the time that program was terminated in November 2021, there had been over 256,000 releases under the NTA/OR category.

In total, between March 2021 and November 2022, the data shows that more than 1.16 million aliens have been released under the NTA/OR and Parole+ATD categories.

A0333

DHS has never had sufficient funding to apprehend and detain every alien illegally in the country. As a result, DHS must make "tough decisions" about which aliens to detain and which aliens to release.

The fact that DHS must make those "tough decisions" does not mean that it has free rein to adopt policies that contravene the clear mandates in the INA or create "processing pathways" that contort statutory language to effectuate its preferred policy of "alternatives to detention" over actual detention.

Likewise, the fact that prior Administrations (may have[8]) utilized similar "processing pathways" as those being challenged in this case does not make those policies lawful because, as Saint Augustine and William Penn said, "wrong is wrong even if everyone is doing it."

---

[8]   Defendants post-trial brief quoted and provided Internet links to "policy memoranda" and "guidance" issued by various immigration officials from 1992 to 2019 that purport to show that prior Administrations (including the Trump Administration) prioritized detention of aliens who posted a threat to public safety and used parole to release lower-risk inmates. *See* Doc. 156 at 22-24. Some of those documents are in the record (e.g., D.Ex. A, I, K), but others are not. Defendants argue that the Court can take judicial notice of all these documents under Fed. R. Evid. 201, but the Court declines to do so because Defendants had ample opportunity to present this evidence at trial if they thought it was important to their case, and at this stage of the case, the Court is not inclined to surf the Internet looking for these (or other) facts that might be relevant to the issues in this case.

A0334

That said, the detention policies that were in effect before January 20, 2021, provide necessary background and context for the current policies and they are relevant to the Court's assessment of whether, as Florida claims, the current Administration adopted a new "non-detention policy" that should have been formally adopted pursuant to the APA.

C.    Detention Policy During the Trump Administration

Shortly after taking office in January 2017, President Trump issued Executive Order 13767 (P.Ex. 54), which instructed DHS to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings."  This directive was intended to "terminat[e] the practice commonly known as 'catch and release' whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law."

The following month, then-DHS Secretary Kelly issued a memorandum to implement the directive in Executive Order 13767.  *See* D.Ex. K.  The memorandum acknowledged that because "detention of all [aliens subject to §1225(b)] may not be immediately possible" due to limited detention capacity, "detention resources should be prioritized

A0335

based upon potential danger and risk of flight if an individual alien is not detained." However, the memorandum made clear that "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry [i.e. 'catch-and-release'] shall end" because those policies "allow [aliens] to abscond and fail to appear at their removal hearings [and] undermine the border security mission."

The memorandum stated that "parole determinations will be made in accordance with current regulations and guidance" pending establishment of additional processing and detention facilities. However, the memorandum made clear that the parole authority "should be exercised <u>sparingly</u>" (emphasis added) on a case-by-case basis because "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration."

Consistent with the directives in Executive Order 13767 and Secretary Kelly's implementing memorandum, USBP Chief Raul Ortiz testified that aliens encountered at the Southwest Border during the

A0336

Trump Administration were only released under "very exigent circumstances." This was true both for releases under the parole authority in 8 U.S.C. §1182(d)(5) and "prosecutorial discretion" or NTA/OR releases under §1226(a).

USBP Chief Ortiz's testimony that aliens apprehended at the Southwest Border during the Trump Administration were rarely released is borne out by the data. For example, in February 2020 (before the COVID-19 pandemic), USBP apprehended around 30,000 aliens at the Southwest Border and only released 91. And, in the entire month of December 2020, USBP released only 17 aliens.

D. Changes in Detention Policy Under the Biden Administration

One of the issues presidential candidate Joe Biden campaigned on was taking a different approach to immigration enforcement and border security than President Trump. His official campaign website included an extensive discussion of immigration, titled "The Biden Plan for Securing Our Values as a Nation of Immigrants." P.Ex. 45 (hereafter "the Biden Plan").[9]

---

[9] The "Biden Plan" provides background and context for the events that follow, but it has no bearing on the legality of the challenged policies. *See Trump v. Hawaii*,

A0337

The Biden Plan described the border wall championed by President Trump as "a waste of money" and "not a serious policy solution," and it also promised to end the Migrant Protection Protocols (MPP) that was commonly known as the "Remain in Mexico" program.  And, most pertinent to this case, the Biden Plan promised to "[e]nd prolonged detention" by utilizing "alternatives to detention" that "enable migrants to live in dignity and safety while awaiting their court hearings."

President Biden was true to his word.  He issued a series of Executive Orders during his first two weeks in office, including one that set the stage for the termination of the "Remain in Mexico" program[10] and rescinded Executive Order 13767.   *See* P.Ex. 53 (Executive Order No. 14010).

Even before Executive Order 13767 was formally rescinded, DHS had already started to move away from it.  Most significantly, on President Biden's first day in office, the Acting Secretary of DHS issued

---

138 S. Ct. 2392, 2417–18 (2018) (acknowledging but not giving any significance to President Trump's campaign statements about a "Muslim travel ban" when evaluating the validity of his executive orders limiting travel from certain countries).

[10]   The termination of this program was the subject of the litigation that culminated in the Supreme Court's decision in *Biden v. Texas, supra*.

A0338

a memorandum rescinding the guidance implementing Executive Order 13767 and establishing more restrictive "enforcement priorities" that applied to a "broad range of … discretionary [immigration] enforcement decisions," including "whom to detain or release" and whether to issue an NTA.  *See* P.Ex. 16 ("the Pekoske Memo").[11]

On its face, the Pekoske Memo states that border security and removal of aliens illegally entering the United States was a priority, but CBP officials credibly testified that they understood that was not actually the case—at least for illegal border crossers who were not deemed to be a threat to public safety.  Indeed, USBP Chief Ortiz testified that it was his understanding based on communications from DHS officials that releases were no longer limited to "very exigent circumstances" and that USBP was now authorized to release aliens who were not deemed to be a threat to public safety into the country irrespective of the detention mandates in §1225(b).

Around the same time, DHS started closing family detention facilities—either by converting them to detention facilities for single

---

[11]  Substantially similar enforcement priorities to those in the Pekoske Memo are contained in the "guidelines" issued by the Secretary of DHS that are currently under review by the Supreme Court in *United States v. Texas*, No. 22-58.

A0339

adults or closing them altogether.  Although DHS claimed that it took these steps to address the increase in single adults that were being encountered at the border, the practical effect of closing the family detention facilities was to guarantee that family units arriving at the border would have to be released into the country rather than being detained.  This, in turn, contributed to the overcrowding of CBP facilities as family unit encounters increased during the first six months of the Biden Administration—from just over 7,000 in January 2021 to nearly 83,000 in July 2021.

Collectively, these actions were akin to posting a flashing "Come In, We're Open" sign on the southern border.[12]  The unprecedented "surge" of aliens that started arriving at the Southwest Border almost

---

[12]  The Court uses this analogy not only because it is a fair characterization of what Defendants did but also because Defendants elicited testimony and argued at trial that they could not simply hang a "Closed" sign on the border.

Moreover, although Defendants' argument that they could not simply "close" the border to arriving aliens may be technically accurate, it is somewhat disingenuous because 8 U.S.C. §1182(f) specifically authorizes the President to "suspend the entry of all aliens" whenever he finds that their entry would be "detrimental to the interests of the United States."  That statute "exudes deference," *Hawaii*, 138 S. Ct. at 2408, and if it is broad enough to authorize the President to "establish a naval blockade that would … deny illegal Haitian migrants the ability to disembark on our shores," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993), it would certainly seem to authorize the President to close the border to arriving aliens one it became apparent that CBP and ICE facilities were not going to be able to handle the "surge" of aliens coming to the border.

A0340

immediately after President Biden took office and that has continued unabated over the past two years was a predictable consequence of these actions. Indeed, USBP Chief Ortiz credibly testified based on his experience that there have been increases in migration "when there are no consequences" and migrant populations believe they will be released into the country.

High-ranking immigration agency officials were made aware of the impact of these actions on border security as early as January 28, 2021, when CBP officials prepared an email about the "release of migrants along border" in advance of a briefing with the Assistant Secretary of DHS. *See* P.Ex. 98.

The email explained that CBP was seeing "a stark increase in monthly illegal migration into the U.S., especially in the South Texas area" that was expected to "immediately overwhelm USBP's short-term detention capacity"; that "[t]he pause on processing pathways[13] … and recent policy changes have also impacted USBP's ability to expeditiously

---

[13]    The pathways referred to in the email—MPP, Asylum Cooperation Agreement (ACA), and Prompt Asylum Claim Review (PACR)—were formally terminated in the first weeks of the Biden Administration, although they had been "paused" towards the end of the Trump Administration due to the COVID-19 pandemic.

A0341

process and remove those encountered" (emphasis added). The email also warned that "USBP will be required to promptly process and release [aliens] due to lack of adjudication pathways and the necessity to maintain the health and safety of the workforce and those in detention during the pandemic."

The email did not specifically identify the "recent policy changes" that it was referring to, but USBP Chief Ortiz (who was on the email chain) testified that it was his understanding that the policy changes referred to in the email were the Pekoske Memorandum and move away from detention to "alternatives to detention." The record contains no contrary evidence on this point.

The email provides some support for Defendants' position that the need to release rather than detain aliens arriving at the Southwest Border was attributable, at least in part, to COVID-related issues, but it provides more support for Florida's position that Defendants' "pause on processing pathways … and recent policy changes" led to DHS's subsequent inability to comply with the statutory detention mandates in §1225(b)(1) and (b)(2).

A0342

The greater weight of the evidence establishes that the dramatic increases in the number of aliens being released at the Southwest Border was attributable to changes in detention policy, not increases in border traffic.  Indeed, this can be seen by comparing the apprehension and release data for February 2020 (the last month of the Trump Administration before the COVID-19 pandemic) and February 2021 (the first full month of the Biden Administration) because that data shows that nearly 8,800 aliens were released at the Southwest Border in February 2021 even though apprehensions in that month were 20% lower than in February 2020 when only 92 aliens were released.

There were undoubtedly geopolitical and other factors that contributed to the surge of aliens at the Southwest Border, but Defendants' position that the crisis at the border is not largely of their own making because of their more lenient detention policies is divorced from reality and belied by the evidence.  Indeed, the more persuasive evidence establishes that Defendants effectively incentivized what they call "irregular migration" that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not

21

A0343

excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done.

It is particularly noteworthy that USBP Chief Ortiz testified that the current surge differs from prior surges that he seen over his lengthy career in that most of the aliens now being encountered at the Southwest Border are turning themselves in to USBP officers rather than trying to escape the officers.  It is reasonable to infer (and just plain common sense) that aliens are doing this because they are aware that they will be expeditiously processed and released into the country.  Indeed, on this point, Chief Ortiz credibly opined based on his experience that the aliens are likely "turning themselves in because they think they're going to be released."

E.    NTR Policy

By the middle of March 2021, CBP facilities were becoming increasingly overcrowded as a result of the increases in border traffic, the

22

time it takes to issue an NTA to initiate removal proceedings, and CBP's failure to transfer aliens to ICE custody for continued detention—often because ICE refused to accept custody.

On March 19, 2021, in an effort to reduce overcrowding at CBP facilities, then-USBP Chief Rodney Scott issued memoranda authorizing the use of "prosecutorial discretion" to release arriving aliens into the country "without placing them in removal proceedings." *See* P.Ex. 20 ("the March Memo").

The March Memo stated that "[p]rocessing an alien for release without entering them into proceedings is not taken lightly," but the only authority cited in the memo for the policy was 8 C.F.R. §287.3.

That regulation does not come close to providing legal support for the March Memo because it expressly contemplates that the alien will be placed in some form of immigration proceeding if there is "prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws." 8 C.F.R. §287.3(b). The regulation does authorize the official examining the alien to take other action as "appropriate or required under the laws or regulations applicable to the particular case," *id.*, but the March Memo

23

did not identify any law or regulation that authorizes arriving aliens to be released without first being placed in some form of removal proceeding—and there is none.

The March Memo allowed USBP agents to release aliens into the country more quickly with only minimal processing and without initiating removal proceedings.  As one ICE official described it, USBP was releasing aliens at the border under the March Memo with nothing more than a "piece of paper that said 'go find somebody at ICE.'"  The "piece of paper" was a Notice to Report (NTR) and, thus, the Court refers to the March Memo as the NTR policy.

The NTR policy was aptly described by Florida in its original complaint as "immigration enforcement by the honor system" because, under the policy, arriving aliens were not placed in removal proceedings and, instead, they were simply released into the country with direction to self-report to an ICE office to be placed in removal proceedings.

Not surprisingly, "only a fraction … (approximately 30%)" of the aliens released under the NTR policy reported to ICE as directed.  This ultimately led DHS to establish a program called "Operation Horizon,"

A0346

pursuant to which ICE officials tried to locate the aliens who had not reported so they could be served with an NTA.

The "surge" of aliens continued unabated while the NTR policy was in effect, and by July 2021, CBP was apprehending more than 100,000 aliens per month at the Southwest Border. The mass release of aliens likewise continued over that period—with over 170,000 aliens being released between March and July 2021.

Instead moving away from "alternatives to detention" to dissuade aliens from continuing to come to the Southwest Border, Defendants doubled down on that approach to border enforcement by adopting the Parole+ATD policy.

## F.    Parole+ATD Policy

The Parole+ATD policy was formally adopted through a memorandum issued by USBP Chief Ortiz on November 2, 2021. *See* Doc. 87-1 at SAAR0093 ("the November Memo"). However, the administrative record for that policy establishes that USBP started using "parole" as a means of improving "processing efficiencies" several months prior.

25

A0347

Specifically, in an email dated July 31, 2021, an assistant chief of CBP stated that "[e]ffective immediately and until further notice [CBP] will begin to include considering certain non-citizens for processing utilizing the Parole pathway."  *Id.* at SAR0117 (emphasis in original). The email stated that CBP agents may "issue a Parole to family units or single adults on a case-by-case basis" after considering four factors:  (1) whether ICE will accept custody of the alien; (2) whether the alien poses a threat to national security, border security, or a heightened public safety risk; (3) the border sector's total detention capacity exceeds 75% and arrivals exceeded discharges over a 24-hour period; and (4) the average time-in-custody (TIC) of unprocessed aliens exceeds 48 hours and the arrivals over the next 24-hour period are projected to exceed the discharges.

An alien released on "parole" received an alien registration number but was not issued a NTA for removal proceedings.  The only condition of the "parole" was that the alien "REPORT TO THE [ICE] OFFICE NEAR YOUR FINAL DESTINATION WITHIN 60 DAYS OR FACE REMOVAL FROM THE UNITED STATES" (capitalization in original).  The 60-day period was subsequently reduced to 15 days.

26

The July 31 email did not mention COVID-19 or health issues as a reason for authorizing the use of "parole" as a processing "pathway," nor did the email mention §1182(d)(5) as authority for the "parole" determination.  Agents were directed to document "why" the alien was paroled on the I-213 form[14] by stating "[s]ubject was paroled due to time in custody constraints at the [CBP facility]."  Subsequently, in an effort "to strengthen the validity of the Parole" agents were directed to stamp the alien's I-94 form[15] "PAROLED" with the notation "212(d)(5)."[16]

The November Memo differed from the July 31 email in several material respects, most notably that it only applied to family units (and not single adults), it specifically referred to §1182(d)(5) as a source of authority for the policy, and it identified COVID-19 as a justification for the policy.

---

[14]  This form, titled "Record of Deportable/Inadmissible Alien," is prepared by immigration officials for aliens who will be placed in removal proceedings and contains basic biographical information about the alien; the date, place, time, and manner of entry to the United States; and immigration and criminal history.

[15]  This form, titled "Arrival/Departure Record," is provided to nonimmigrant aliens who are admitted into the country with a visa, are adjusting their status while in the country, or are extending their stay in the country.

[16]  "212(d)(5)" refers to section 212(d)(5) of the INA, which is codified in 8 U.S.C. §1182(d)(5).

27

A0349

The November Memo started by providing a post-hoc justification for CBP's use of NTRs—i.e., "to relieve overcrowding in congregate settings, thus better protecting both the workforce and noncitizens in [CBP] custody"—and the memo boasted that the use of NTRs "decreased processing times significantly" as compared to the "much more time consuming" issuance of a NTA.

Despite these benefits, the November Memo stated that CBP is ceasing the use of NTRs "[e]ffective immediately" and that it will "prioritize resources to issue noncitizens NTAs immediately." However, the memo also established "an alternative processing pathway," Parole+ATD, to use to "address urgent crowding and excessive [TIC] in USBP facilities."

From a practical standpoint, the Parole+ATD "pathway" described in the November Memo is indistinguishable from the NTR pathway because the memo explained that an alien released under Parole+ATD is not issued an NTA and only condition of the release on "parole" is that the alien "report to ICE within 15 days to be processed for an NTA."

The November Memo explained that the Parole+ATD pathway was necessary because of the "urgent humanitarian need to protect the

28

workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." The memo only authorized the use of this pathway in two sectors (Del Rio and Rio Grande Valley) when certain TIC and capacity issues were present, but it also stated that the CBP chief and commissioner could authorize its use in other sectors in which "capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release [family units] in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody."

The November Memo concluded by stating that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

In April 2022, CDC determined in the "Title 42 Order" that the public health order entered in August 2021 suspending the entry of certain aliens in the country under the Public Health Services Act should

A0351

be terminated because it was no longer justified by COVID-19 pandemic.[17]

Despite the CDC's determination that the pandemic no longer justified the Title 42 Order, CBP did not eliminate the Parole+ATD pathway. Instead, the Parole+ATD policy was effectively reauthorized in a July 18, 2022, memorandum jointly issued by CBP and ICE titled. "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations." Doc 87-1 at SAR0001, SAR0158 ("the July Memo").

The July Memo expands the Parole+ATD policy to single adults, rather than only family units. It also abandons the COVID-19 rationale in the November Memo, stating more generally that avoiding overcrowding in CBP facilities is necessary for "disease-mitigation."

The supplemental administrative record for the July Memo is comprised of 160 pages complied and certified by CBP (Doc. 87-1 at SAR0001-SAR0160) and 120 pages complied and certified by ICE (*id.* at SAR0161-SAR0280). Collectively, the supplemental administrative

---

[17]   The Supreme Court is currently considering a case involving the termination of the Title 42 Order, *see Arizona v. Mayorkas*, No. 22-592, as is the Fifth Circuit, *see Louisiana v. CDC*, No. 22-30303.

A0352

record contains "all of the non-privileged documents and materials considered by [CBP and ICE] in issuing the [November memo]."

The supplemental administrative includes considerably more information than the administrative record for the original Parole+ATD policy.[18] Of particular significance, the portion of the supplemental administrative record compiled by CBP includes the permanent injunction entered by a federal judge in the District of Arizona in April 2020 mandating conditions of confinement for certain individuals in CBP custody (hereafter "the *Nielsen* injunction"), the CDC notice explaining its decision to terminate the Title 42 Order in April 2022, and the preliminary injunction entered by a federal judge in the Western District of Louisiana in May 2022 enjoining the termination of the Title 42 Order.

The *Nielsen* injunction enjoined CBP from detaining aliens for more than 48 hours in Tucson Sector Border Patrol stations unless certain

---

[18] The original administrative record—which is included in the supplemental record (Doc. 87-1 at SAR0093-SAR0123)—was comprised of only 31 pages did not come close to justifying the establishment of the Parole+ATD "pathway." *See* Doc. 55 at 3 (describing the administrative record as "paltry" and noting that "an inadequate or incomplete record will presumably work in Florida's favor because if the parole + ATD policy is not sufficiently supported by the record, it will be invalidated"). Notably, the original administrative record did not include any information about COVID-19 that might justify the creation of a "pathway" to ameliorate the impacts of the virus and it only provided minimal information about capacity constraints or TIC statistics.

A0353

conditions of confinement were met for beds, showers, food, water, and medical needs. The injunction provided that compliance with its requirements could be temporarily excused in "exigent circumstances," but it stated that "[p]eriodic surges that occur along the border are a chronic condition that do not constitute Exigent Circumstances."

The CDC notice terminating the Title 42 Order recounted the history of the COVID-19 pandemic, detailed the current status of the pandemic, and outlined the "mitigation measures" being taken by CBP. The mitigation measures included vaccination of the CBP workforce and a program started in March 2022 to vaccinate aliens arriving at the southern border. The notice explained that the Title 42 Order was intended to be temporary and that it was not a substitute for processing aliens under the INA. The notice concluded that "the danger of further introduction, transmission, or spread of COVID-19 into the United States from covered noncitizens … has ceased to be a serious danger to the public health."

The portion of the supplemental administrative record complied by ICE included information about the percentage of aliens released under the Parole+ATD that checked in with ICE as directed, information about

32

the "Operation Horizon" program, and information about the processing backlog created by the failure to issue an NTA before the alien is released on parole.

This information reflected that as of May 2, 2022, approximately 65% of aliens released under the Parole+ATD policy checked-in with ICE as directed, which means that 35% (almost 50,000) did not.  Of the aliens who did not check-in, approximately 20% were "noncompliant" because they had not checked in with ICE within 60 days of their release.

The Operation Horizon program was created November 2021 to mail NTAs to aliens "who have been paroled or released under prosecutorial discretion by [CBP]."  As of April 22, 2022, the program had mailed more than 72,000 NTAs at a cost of over $15.3 million.

The information about Operation Horizon reflected that as of April 26, 2022, there had been over 226,000 aliens released under "prosecutorial discretion" under the NTR and Parole+ATD policies.  More than 110,000 of those aliens had not been issued NTAs and more than 66,000 were outside the period that they were supposed to have reported to ICE to be issued an NTA.

A0355

ICE officials estimated that it would take nearly 3 years (and $25 million) to clear the "backlog" and issue NTAs to these 110,000 aliens if the Parole+ATD policy was stopped at that point.  For every 30 days that the policy continued in place, approximately an additional year and $8 million were added to the time and cost of clearing the backlog.

In the first few months following the November Memo, CBP continued to use §1226(a) as its principal release mechanism.   For example, in November 2021, CBP released 34,705 aliens under §1226(a) (i.e., NTA/OR) and only 5,683 under Parole+ATD.

Parole+ATD became CBP's primary release mechanism starting in April 2022, when 39,918 aliens were released under Parole+ATD as compared to 22,523 released under §1226(a).

Defendants continue to make heavy use of Parole+ATD even though the COVID-19 pandemic has been over for quite some time and the November Memo creating the Parole+ATD "pathway" stated that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

A0356

In November 2022, which is the last month of data in the record, almost 89,000 aliens (out of the 141,000 apprehended) were released into the country under the Parole+ATD "pathway."

Although DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination.  Indeed, according to Defendants own witnesses, DHS has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports.  Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime <u>in the United States</u>, and because many of these aliens are coming to the United States for the first time, DHS has no idea whether they have criminal histories or not.

Use of "alternatives to detention" (ATD) are unquestionably more cost-effective for the federal government than actual detention.  It costs $125 per day to detain a single adult and $235 per day to detain a family unit, whereas enrolling an alien in an ATD costs less than $8 per day.

A0357

There are three primary types of ATD, but only one of which (ankle monitor with GPS monitoring) can fairly be characterized as detention-like. The other types of ATD simply involve the alien periodically "checking in" with ICE remotely though a smart phone app or over the telephone. The record does not reflect how many aliens are on each type of ATD.

The "absconder rate" for aliens on ATD is better than it was for aliens who were simply issued an NTR. But, in 2022, the absconder rate for aliens on ATD was still 14.8%, which equates to tens of thousands of unaccounted-for aliens in the country.

ATD is less effective in ensuring that aliens will not abscond during their immigration proceedings than detention. Indeed, ERO Director Corey Price acknowledged in his testimony that all forms of release have a risk of absconding and that the "surest way" to be able to remove inadmissible aliens is to "keep them in detention." This is common sense.

G.    Existence of a "Non-Detention Policy"

Florida contends that the Non-Detention Policy it is challenging in this case was created "in late January or early February of 2021 when

36

A0358

DHS leadership told CBP that strict limits on the release of aliens at the border were no longer in place and that aliens should only be detained if they are a public safety risk or flight risk."[19]

Defendants contend that there is no such policy and, to be sure, their witnesses testified that they received no blanket instruction not to detain aliens at the Southwest Border and that they are unaware of any formal policy that prioritizes release over detention. However, the more persuasive evidence establishes that aliens arriving at the Southwest Border are no longer being detained as a matter of course unless they are deemed to be a public safety risk or flight risk.

This is unquestionably a change from the policy that was in place during the Trump Administration, as USBP Chief Ortiz acknowledged in his testimony. Moreover, DHS Secretary Mayorkas effectively confirmed the change in policy (and, thus, the existence of the Non-Detention Policy challenged by Florida) when he testified to Congress in May 2022 that "detention has been misused in the immigration system for many years"

---

[19] The Court did not overlook Defendants' argument that Florida did not clearly articulate the precise nature of the "non-detention policy" that it claimed to exist until after the trial ended. However, Florida's description of the policy in its closing argument and its post-trial brief is consistent with how Florida described the policy in the Pre-trial Stipulation that supplanted the pleadings and framed the issues for trial. *See* Doc. 122 at 26.

A0359

and he explained that DHS is "increasing [its] use of alternatives to detention, and … using detention when it's a public safety imperative or an imperative to the continued appearance of individuals in immigration enforcement proceedings."

The fact over a million aliens have been released rather than detained at the Southwest Border since January 2021 is further evidence of a change in detention policy.   The testimony from Defendants witnesses that the increased number of aliens being released is attributable to something other than a change in policy (such as the post-pandemic increase in migration, either generally or from specific countries) is simply not credible and is contrary to the weight of the evidence.

Thus, notwithstanding Defendants' denials, the Court finds that the Non-Detention Policy challenged in this case does, in fact, exist.

## H.    Detention Capacity Reductions by Defendants

The evidence establishes that Defendants do not have sufficient detention capacity to detain all arriving aliens, but that does fact alone is not justify the Non-Detention Policy because, as discussed above, the policy itself contributed to "surge" of aliens arriving at the Southwest

A0360

Border, which, in turn, exacerbated to the capacity issues. Additionally, despite the historic increases in border traffic, President Biden terminated the "Remain in Mexico" program authorized by 8 U.S.C. §1225(b)(2)(C) and Defendants took steps to reduce detention capacity, including closing all of DHS's family detention facilities and requesting less detention capacity from Congress.

During the last immigration surge in 2019, DHS maintained sufficient capacity to detain an average daily population (ADP) of as high as 55,000.

In 2020 (during the Trump Administration), DHS anticipated that border traffic would increase again when the COVID-19 pandemic ended so it requested an increase to 60,000 ADP in its fiscal year 2021 budget request.

Shortly after President Biden took office, DHS requested a reduction to 32,500 ADP for fiscal year 2022. And for fiscal year 2023, DHS requested a further reduction to 25,000 ADP.

It is true that Congress is ultimately responsible for allocating the funds that are required to detain more aliens. However, DHS led Congress to believe that it did not need more detention capacity because

A0361

it represented in its fiscal year 2022 and 2023 budget requests that "a reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety."

The fact that DHS continued to ask for less detention capacity and more money for "alternatives to detention" is another indication that the Non-Detention Policy challenged by Florida exists because it confirms Defendants' prioritization of "alternatives to detention" over actual detention.

Thus, like a child who kills his parents and then seeks pity for being an orphan, it is hard to take Defendants' claim that they had to release more aliens into the country because of limited detention capacity seriously when they have elected not to use one of the tools provided by Congress in §1225(b)(2)(C) and they have continued to ask for less detention capacity in furtherance of their prioritization of "alternatives to detention" over actual detention.

Likewise, it is hard to take seriously Defendants' argument that there would be "disastrous consequences" if the challenged policies were enjoined or vacated because the evidence establishes Defendants have

A0362

chosen to combat the historic "surge" of aliens arriving at the border with one hand tied behind their back by not taking advantage of all of the statutory tools provided by Congress—such as returning aliens to a contiguous territory under §1225(b)(2)(C) or, potentially, closing the border to particular classes of aliens under §1182(f).

This is particularly true now that the COVID-19 pandemic is "over" and people are able to congregate at sporting events, concerts, and other crowded venues. Indeed, at this point, the health risks associated with overcrowding at CBP facilities is simply no excuse for releasing an arriving alien without first initiating removal proceedings.

## I.   Impact of the Challenged Policies on Florida

The immigration crisis at the Southwest Border most significantly affects border states and communities, but its impacts are not limited to those areas. Florida and other states are also impacted by the border crisis because arriving aliens are being released at the border into the interior of the country in historic numbers. Indeed, the stated purpose of the challenged policies is to "decompress" CBP's border facilities and shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations.

A0363

Since President Biden took office on January 20, 2021, USBP has released more than one million aliens at the Southwest Border. That figure does not include releases by OFO because OFO does not publicly report its releases, nor does it include releases by ICE because ICE does not distinguish between interior enforcement and border enforcement in its publicly released data. And that figure does not include "get aways"— i.e., aliens who get into the country without being apprehended. Thus, the actual number of additional aliens that have come into the country since President Biden took office is unknown.

DHS provided information in discovery estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida, Puerto Rico, and the Virgin Islands. That number does not account for aliens released after July 2022, which is notable because DHS's monthly releases have increased since then.

This evidence does not establish with absolute certainty the precise number of aliens who have been released into Florida under the challenged policies, but the Court has no trouble finding from this

A0364

evidence that well over 100,000 aliens released at the Southwest Border under the challenged policies ended up in Florida. [20]

Florida claims that it has expended millions of dollars of public funds on these aliens, but it is impossible to determine with any certainty how much was actually spent on aliens who are in the state as a result of the challenged policies because Florida does not track alien-related expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies.

The fact that Florida cannot tie a specific public expenditure to a specific alien impacted the weight the Court gave to the evidence from Florida's agency witnesses, but the Court did not discount that evidence in its entirety.

---

[20] During oral argument at the end of trial, Defendants' counsel suggested that the Court could only "assume" from this data that aliens released under the challenged policies were in Florida because the addresses were "self-reported" and an alien "may give a Florida address but may not reside there." However, when the Court pressed counsel on why the self-reported addresses were good enough for DHS to rely on to keep tabs on the released aliens but not good enough for the Court to rely on in making a finding that the aliens are where they said they were going to be, counsel was initially stumped (although the long pause and blank look on counsel's face does not come through in the transcript) before conceding that it would not be unreasonable to rely on this data to conclude that aliens released under the challenged policies were in Florida. *See* Doc. 151 at 192-94.

A0365

For example, the Court gave no weight to the evidence of public expenditures that pre-dated the challenged policies; expenditures that could not have applied to aliens who were released into Florida under the challenged policies because of eligibility requirements of the applicable statutory program (e.g., food stamps and standard Medicaid); or expenditures on programs that were fully funded by the federal government (e.g., refugee assistance program). However, the Court gave some weight to the other agency expenditure evidence (e.g., costs of incarceration, unemployment benefits, and emergency Medicaid) and it gave substantial weight to the testimony and evidence from the Florida Department of Education (DOE) witness.[21]

DOE does not maintain data about where and when alien students entered the country (or their immigration status) that would allow the Court to determine with absolute certainty that children of aliens

---

[21] The Court expressed a more jaded view of Florida's standing evidence during the oral argument after the close of evidence and the Court adheres to the view that some of Florida's standing evidence was "useless," some of it was "not particularly helpful," and some of it (namely, the DOE evidence) was fairly compelling. To the extent that there is any inconsistency in what the Court said at oral argument and what the Court is saying now about Florida's standing evidence, the findings in this Opinion and Order control because they are based on the Court's further consideration of the evidence based on the case law cited by the parties and discussed below.

44

released under the challenged polices enrolled in Florida schools. However, DOE does keep data on the number of "immigrant children and youth"[22] enrolled in Florida's public schools and that data provides sufficient information from which the Court can draw reasonable inferences about the number of alien children released under the challenged polices that are enrolled in Florida public schools.

In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools. That number increased by more than 17,000 in the 2021-22 school year, and although there is no direct evidence establishing exactly how many of these children were released into the country under the challenged policies, it can be reasonably inferred from the testimony of the DOE witness (who personally visited schools and met with families) that a good number of these children were released into Florida under the challenged policies.

---

[22] This term refers to individuals between the ages 3 and 21 who were not born in the United States and have not attended school in the United States in the last three academic school years. *See* 20 U.S.C. §7011(5).

45

Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time.

Thus, even considering the other factors that might have contributed to an increase in immigrant children and youth in Florida's public schools (e.g., the fact that Florida and its schools were more "open" than other states during the COVID-19 pandemic), the Court has no trouble finding that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the state financial harm.

The same is true with respect to the other programs under which Florida expends funds for aliens that are not fully reimbursed by the federal government—e.g., costs of incarceration, unemployment benefits, and emergency Medicaid—because it implausible that none of the more than 100,000 aliens released into Florida under the challenged policies have committed crimes or received benefits under those programs. Thus, although the evidence is not sufficient to establish with absolute certainty that Florida has expended public funds on specific aliens

46

released under the challenged policies, the evidence is sufficient for the Court to infer that it is more likely than not that it has done so.

It is unknown whether the costs that Florida spends on aliens released under the challenged policies are more or less than any revenue Florida derives from those aliens. However, there is no evidence (or at least none that the Court found credible) that aliens released into Florida under the challenged policies provide any meaningful amount of revenue to the state.

In sum, despite the shortcomings in the evidence presented by Florida on public expenditures, the Court finds that at least some of the aliens released under the challenged policies have caused the Florida to incur additional expenses. And, based on the large number of aliens released into Florida under the challenged policies and the breadth of the public benefits available to them (and the likelihood that at least some of them will commit crimes[23]), the Court further finds that these expenses will increase absent relief in this case.

---

[23] This is an unfortunate reality, as ERO Director Price acknowledged in his testimony. It is also not particularly surprising because, as noted above, DHS has no way of knowing whether the aliens being released under the challenged policies have

A0369

## III.   CONCLUSIONS OF LAW

Before getting to the merits of Florida's claims, the Court must address two "threshold" issues raised by Defendants—standing and justiciability.

### A.   Standing

Defendants have argued from the outset of this case that Florida lacks standing to sue over the challenged policies.  The Court has rejected this argument twice—first at the motion to dismiss stage, *see* Doc. 45 at 11-18, and again at the summary judgment stage, *see* Doc. 117 at 2; Doc. 119 at 21-26.  The third time is not the charm for Defendants.

#### 1.   *Article III Standing*

"Federal courts have authority under the Constitution to decide legal questions only in the course of resolving 'Cases' or 'Controversies.'" *Hawaii*, 138 S. Ct. at 2416 (quoting Art. III, §2).  "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Id.*

---

committed crimes in their home country unless that information happens to be shared by the home country or the alien self-reports his or her criminal history.

48

"Standing requires more than just a 'keen interest in the issue.'" *Id.* (quoting *Hollingsworth v. Perry,* 570 U.S. 693, 700 (2013)).   "It requires allegations—and, eventually, proof—that the plaintiff 'personal[ly]' suffered a concrete and particularized injury in connection with the conduct about which he complains."  *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016)).

To establish its "Article III standing," Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant [and not the result of independent action of some third party], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo*, 578 U.S. at 338; *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

An "injury in fact" must be "concrete and particularized, and actual or imminent, not conjectural of hypothetical."  *Lujan*, 504 U.S. at 560 (cleaned up).  However, injuries to "state sovereignty" can be real and concrete even though they are "intangible."  *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023).

Additionally, states are entitled to "special solicitude" in establishing standing because, as the Eleventh Circuit recently held,

49

"[s]tates 'are not normal litigants for purposes of invoking federal jurisdiction.'"  *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)); *see also Massachusetts*, 549 U.S. at 520; *Texas v. United States*, 787 F.3d 733, 753 (5th Cir. 2015) [hereafter *DAPA*],[24] *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016).

To invoke that special solicitude, a State must show (1) a procedural right and (2) a quasi-sovereign interest.  *See Massachusetts*, 549 U.S. at 519–20.   Once a State does so, the requirements of traceability and redressability are relaxed.

Here, Florida has procedural right under the APA, *see DAPA*, 787 F.3d at 751–52; *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021); and, Florida has a quasi-sovereign interests in its territory, in the presence of unauthorized aliens within that territory, and in the effect those aliens have on the public fisc, *see DAPA*, 787 F.3d at 752; *Arizona*,

---

[24] The Court did not overlook Defendants' argument that this case is more like *Arizona v. Biden*, 40 F.4th 375 (6th Cir. .2022), than *DAPA*, because this case is merely "a challenge to an amalgamation of policies and decisions."  *See* Doc. 156 at 74-75 n.21.  The Court finds this argument unpersuasive for three reasons:  first, although the challenged "non-detention policy" is a bit abstract, the Court found as a matter of fact that it exists; second, the Parole+ATD policy is indisputably an articulatable, concrete policy; and, third, the Eleventh Circuit's articulation of state standing and the special solicitude doctrine in *West Virginia* is more like the Fifth Circuit's decision in *DAPA* than to the Sixth Circuit's decision in *Arizona*.

A0372

567 U.S. at 422, 436 (Scalia, J., concurring in part and dissenting in part) (recognizing that controlling immigration "is an inherent attribute of sovereignty" and questioning whether the States, which "jealously guarded" their sovereignty during the Constitutional Convention, would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate"). Thus, Florida is entitled to special solicitude in the standing analysis.

If special solicitude is to have any meaning, it must apply in the immigration context because the states are dependent on the federal government to keep inadmissible aliens out of their territories since they ceded their sovereign right to do so to the federal government when they joined the Union. Thus, if the DHS ignores the detention mandates in the INA and releases aliens into the country that Congress said it should be detaining, then the sovereign interests of states are concretely harmed because they cannot do anything to keep those aliens out of the state.

Not only that, but Defendants' failure to detain arriving aliens as required by the INA also requires states to spend a considerable amount of public money—which is unquestionably a concrete harm. Indeed, on

A0373

that issue, the Supreme Court has recognized that states "bear[] many of the consequences of unlawful immigration," *Arizona*, 567 U.S. at 397, and that commonsensical proposition was also established by the evidence in this case—including the testimony of ERO Director Price that "that's been the way our immigration system has worked" for the 24 years that he's worked in the system.

Before applying the special solicitude standard to Florida's evidence, the Court briefly reviews how the Supreme Court applied special solicitude in *Massachusetts*. In that case, the states alleged that global warming would cause a "rise in sea levels," lead to "severe and irreversible changes to natural ecosystems," "increase . . . the spread of disease," and "contribute to the ferocity of hurricanes." *Massachusetts*, 549 U.S. at 521–22. The Supreme Court recognized that the states' traceability and redressability arguments were in many ways speculative—for example, "China and India" were likely to "offset any marginal domestic decrease" in greenhouse gas emissions. *Id.* at 523–24. Nonetheless, the Supreme Court applied the relaxed special solicitude standard and found that the states established their standing because the risk of harm to the states' sovereign interests in their territories

A0374

"would be reduced to some extent if [the states] receive the relief they seek." *Id.* at 526.

Florida's standing evidence in this case is far stronger than the states' evidence in *Massachusetts*, particularly with respect to impact of the challenged policies on its public education expenditures.

Like all states, Florida is required to include inadmissible aliens in the state's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *see also* §1003.21(1)(a), Fla. Stat. (requiring that all children ages six to sixteen attend school). And because Florida spends roughly $8,000 per student per year on primary and secondary education, an increase in alien children in the state will result in the state having to spend more money on education.

The evidence presented by Florida at trial, which the Court found credible and persuasive, established that Florida has and will continue to expend funds on aliens who were released under the challenged policies and would not otherwise be in the state. Specifically, the evidence showed that the number of "immigrant children and youth" enrolled in Florida schools have increased by more than 17,000 students since January 2021, which is corresponds to the timeframe within which

53

A0375

more than 100,000 aliens (including many family units with children) were released into Florida under the challenged policies. Although the Court recognizes that "immigrant children and youth" include aliens other than those released under the challenged policies, the increase of 17,000 such students since January 2021, along with the other evidence in this case, establishes to the Court's satisfaction that at least some aliens released under the challenged policies are enrolling their children in Florida's schools and it is reasonable to expect that they will continue to do so as long as the challenged polies are in place.

This evidence is sufficient to establish each of the required elements for standing—injury in fact, traceability, and redressability—as discussed below.

As to injury in fact, "[e]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *see also Plyler*, 457 U.S. at 228 n.23 (noting that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"). Florida's public education expenditures plainly qualify as economic detriment.

A0376

As to traceability, these additional public education costs are traceable to the challenged policies because the increase in alien children in Florida schools corresponded to the dramatic increase in the number of aliens being released into Florida under the challenged policies. The fact that Florida cannot tie specific education expenditure to particular children released under the challenged policy is not required *without* special solicitude, *see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280–81 (11th Cir. 2015) (agreeing that a plaintiff's injury need not "be traced to specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (quotations omitted)), so Florida certainly need not make this showing *with* the benefit of special solicitude, *see Texas v. United States*, 50 F.4th at 517–18 (applying the special solicitude standard and finding standing even though "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients").

Finally, as to redressability, "redressability and traceability overlap" in this case "as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Florida seeks

55

A0377

declaratory relief, vacatur under the APA, and, consistent with the limits on injunctive relief in 8 U.S.C. §1252(f), permanent injunctive relief limited to DHS's violations of §1182(d)(5).  Each form of relief would provide Florida at least partial redress.  *See Massachusetts*, 549 U.S. at 518 (recognizing that a litigant has standing when "there is some possibility that the requested relief will prompt the injury-causing party to reconsider" its unlawful decisions); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff need not show that its injuries will be completely redressed).  Specifically, vacatur under the APA would "deprive" the challenged policies "of force," *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)), and is akin to an injunction in that it will prevent DHS from continuing to apply the policies at the Southwest Border and it will preclude DHS from using "parole" to release aliens *en masse* without initiating removal proceedings.  This, in turn, will remedy (or at least reduce) the harm to Florida by reducing the number of aliens released into the state  *Cf. Chiles*, 865 F.2d at 1209–10 (finding that an injunction against the United States would remedy the injury to a local government caused by persons escaping from a federal detention center).

A0378

DHS contests redressability on the ground that released aliens who enroll their children in school are typically family units, and DHS's ability to detain family units for more than 20 days is limited by the *Flores* consent decree.  Thus, DHS argues, even absent the challenged policies, applicants for admission subject to mandatory detention under §1225(b) will be released after 20 days.  The Court finds this argument unpersuasive for two reasons.

First, if Florida prevails in its argument that §1225(b) mandates detention for aliens apprehended at the Southwest Border—and if DHS insists that *Flores* is causing the agency to violate that statute—one would expect DHS to bring that to the attention of the *Flores* court.  *Cf. Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016) (holding that *Flores* does not "grant release rights to parents"); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (clarifying that district courts may not enjoin the operation of §1225(b) on a class-wide basis).  To instead insist that DHS may consent to violate the law and that doing so eliminates Article III jurisdiction is just plain wrong.

Second, the evidence at trial showed that *Flores* does not categorically prevent DHS from detaining family units in a way that

A0379

would negate redressability. The purpose of the *Flores* 20-day presumption is to allow DHS to apply expedited removal to family units under §1225(b)(1), which can be completed in that short window. And even if DHS fails to complete removal in 20 days, the agency has ample time to at least *initiate* removal proceedings prior to release—which could result in those proceeding concluding sooner and thereby reducing the total time the aliens are enrolled in Florida's schools.

Accordingly, the Court finds that Florida has established Article III standing based on the funds it spends providing public education to alien children. Florida's remaining standing evidence, which is from four other state agencies, bolsters Florida's standing because the Court can infer from that evidence that Florida likely has and will continue to spend some amount of public funds on aliens released under the challenged policies.

The Court did not overlook Defendants' argument that Florida derives more revenue from aliens released into the state under the challenged policies than it incurs in costs. However, there is no evidence that revenues generated from aliens released under the challenged policies exceeded the costs incurred by Florida on those aliens. Moreover,

A0380

as the Fifth Circuit has explained, once the plaintiff has shown that it has suffered an injury, it is not the role of the Court to engage in the "accounting exercise" of weighing costs and benefits for standing purposes. *See Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022); *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (quoting *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

### 2.    *Statutory Standing*

In addition to Article III standing, Florida must also establish that it has "statutory" standing under the APA.  That requires Florida to show that its claims fall within the "zone of interests" of the statutes on which the claim is based—here, the INA.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interests test "is not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the benefit of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225.

Florida satisfies that test because "[i]t's clear that the INA aimed, at least in part, to protect States from" harms to their fisc.  *See Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022); *accord Cook Cnty., Ill. v. Wolf*, 962 F.3d

A0381

208, 220 (7th Cir. 2020) (holding that a county was within the zone of interests of the INA); *see also Demore v. Kim*, 538 U.S. 510, 517–21 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's failure to remove deportable aliens). Indeed, several provisions of the INA specifically seek to protect the States from the injuries the federal government causes when it fails to fulfill its duties. *See, e.g.*, 8 U.S.C. § 1231(i) (granting the States partial reimbursement for the costs of incarcerating criminal aliens).

\*   \*   \*

In sum, for the reasons stated above, the Court finds that Florida has standing under Article III and the APA to challenge the policies at issue in this case.

## B.   Justiciability

Defendants argue that Florida's claims are non-justiciable "political questions" and that the challenged policies are not subject to judicial review under the APA. The first argument is unpersuasive, but the second argument is in part.

60

## 1.   *Political Question*

Defendants "political question" argument relies primarily on *Chiles v. United States*, in which the Eleventh Circuit held that questions about whether the Executive Branch "is adequately guarding the borders of the United States" are nonjusticiable "political questions."  69 F.3d 1094, 1096–97 (11th Cir. 1995).  However, *Chiles* is distinguishable because, in that case, Florida officials were challenging the Attorney General's failure to perform his <u>general</u> duty under 8 U.S.C. §1103(a) (1993), "to control and guard the boundaries and borders of the United States against the illegal entry of aliens."  Here, by contrast, Florida is challenging Defendants' alleged noncompliance with statutes that contain <u>specific</u> requirements, including one, §1225(b), that "mandates" detention, *see Jennings*, 138 S. Ct. at 845, and another, §1182(c)(5), that according to the Supreme Court, is not "unbounded" and contains standards that are susceptible to judicial evaluation, *see Biden v. Texas*, 142 S. Ct. at 2543 ("Importantly, the [parole] authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'

61

And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained.").

Moreover, not every case that has significant political overtones (as this one certainly does) presents a non-justiciable political question. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (explaining that the doctrine "is one of 'political questions,' not one of 'political cases'"). Thus, although it would certainly be much easier for the Court to simply say that elections have consequences and that the parties' disagreement over proper immigration policy should be resolved in Congress or at the ballot box rather than in court, the Court sees no jurisdictional or prudential reason why it should not exercise its duty to "say what the law is" in this case and then let the political chips fall where they may.

That said, there is nothing particularly surprising about the fact that the Biden Administration had different immigration policy preferences and priorities than the Trump Administration. That fact alone does not make the challenged policies illegal because "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs.*

A0384

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better") (emphasis in original); *Dep't of Com.*, 139 S. Ct. at 2573 ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 979 (9th Cir. 2015) (Smith, J., dissenting) (noting that "[e]lections have legal consequences" and "policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the [APA]").  However, that does not mean that every policy change that is influenced by a change in Administrations is immune from judicial review because a new Administration may not simply "choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its

regulatory functions." *State Farm*, 463 U.S. at 59 n.* (Rehnquist, C.J., concurring in part and dissenting in part); *see also Fox Television*, 556 U.S. at 515 (explaining that an agency "may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").

## 2.   *APA Reviewability*

"The APA establishes a basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2567 ("The Administrative Procedure Act embodies a basic presumption of judicial review." (quotations omitted)).  To overcome that presumption, DHS argues that the challenged policies (a) are not "final agency action" under 5 U.S.C. §704 and (b) are "committed to agency discretion by law" under 5 U.S.C. §702(a)(1), and that (c) review is barred by §§1252(a)(2)(B)(ii) and 1226(e).  Each argument will be addressed in turn.

### a.   *Final Agency Action*

DHS presents two arguments as to why the challenged policies are not final agency action:  first, it argues that the challenged policies are

A0386

not agency action at all; and second, it argues that even the challenged policies are agency action, they are not final under the APA.

The APA defines "agency action" as "the whole or a part of an agency rule,[25] order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C §551(13); *see also* 5 U.S.C. §701(b)(2) (explaining that the APA incorporates the definition of "agency action" in 5 U.S.C §551).  An agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

### *i.      Non-Detention Policy*

Florida characterizes the Non-Detention Policy as Defendants' decision to replace the "very exigent circumstances" standard for releasing arriving aliens into the country with the "not a public safety or flight risk" standard.  The evidence undoubtedly shows DHS's expressed

---

25   A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. §551(4).

A0387

preference for release of arriving aliens over detention. However, the Non-Detention Policy is not a judicially reviewable agency action because the policy preference embodied in the policy was not imposed as a blanket mandate but rather it was implemented through a series of discrete policies, including the NTR policy and the various iterations of the Parole+ATD policy. Those discrete policies are (or were) subject to judicial review under the APA, but the overarching Non-Detention Policy is not. *See Biden v. Texas*, 142 S. Ct. at 2545 (holding that the lower court erred in reviewing an abstract decision instead of each individual operative agency action); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (rejecting a wholesale challenge to an entire "program" under the APA because that program was not an agency action, but rather was made up of many individually challengeable agency actions); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011–12 (9th Cir. 2021) (rejecting a broad APA challenge to immigration policies that the plaintiffs labelled a "program" to try to challenge them all in "one fell swoop," and instead requiring the plaintiffs to either "identify a particular action … that they wish to challenge under the APA, or … pursue their remedies before the agency or in Congress"); *Brnovich v.*

66

*Biden*, -- F. Supp. 3d --, 2022 WL 4448322, at *10 (D. Ariz. Sept. 23, 2022) (applying *Biden v. Texas* to reject a challenge to the defendants' "policy of programmatically mass-granting parole to unauthorized aliens" because the plaintiffs "d[id] not challenge a particular, discrete agency action, but rather some generalized and amorphous conception of Defendants' detention and parole policies"). Thus, the Non-Detention Policy is not subject to review under the APA.

### ii.    *Parole+ATD Policy*

Unlike the Non-Detention Policy, the Parole+ATD policy is a discrete agency action. The policy is contained in the July Memo, which is signed by the heads of ICE and CBP, and it instructs agents how to exercise their discretionary authority under the parole statute and sets criteria by which aliens are eligible or ineligible for parole. It is also "final" because it established "new marching orders" by which immigration officials would determine whether or not to detain arriving aliens, *see City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007), and it effectively determined Florida's obligations with respect to those aliens—including its constitutional obligation to provide education and its statutory obligations under Medicaid. The fact that

67

CBP officers retain discretion to detain or parole individuals does not negate the finality of the agency action embodied in the July Memo. *See Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614–15 (7th Cir. 2003). Thus, the Parole+ATD Policy is subject to judicial review under the APA.

### b.    Committed to Agency Discretion

The "committed to agency discretion" exception is read "quite narrowly" and applies only where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2568 (explaining that the agency's discretion must be "unbounded" for §701(a)(2) to apply). This exception does not apply to either of the challenged policies. Specifically, with respect to the Parole+ATD policy, Supreme Court indicated—albeit in dicta—that DHS's use of the parole authority in §1182(d)(5) is not categorically exempt from judicial review because the "exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. at 2543.

A0390

### c.      *Review Precluded by the INA*

Defendants' argument that judicial review of the challenged policies is precluded by the INA is essentially the same argument that they made—and the Court rejected—at the motion to dismiss stage.  *See* Doc. 45 at 26-27.  Defendants' arguments are no more persuasive now than they were then, and they are again rejected for the reasons stated in the Order denying Defendants' motion to dismiss.  *See also Jennings*, 138 S. Ct. at 841 (rejecting argument that §1226(e) precludes a challenge to the extent of the Government's detention authority under the statutory framework as a whole).

*    *    *

Having determined that Florida has standing to assert its claims and that the claims related to the Parole+ATD Policy are justiciable, the Court will now turn to the merits of the claims.  The Court will also discuss the merits of the Non-Detention Policy—both for sake of completeness and to avoid a remand if a higher court determines that the policy is judicially reviewable under the APA.

69

A0391

C.    Merits

The Court must separately analyze the claims related to the alleged "non-detention policy" and the claims related to the Parole+ATD policy because the former is based on the entire evidentiary record whereas the latter is based on the supplemental administrative record.[26]

---

[26]    The Court anticipated that the claims related to the Parole+ATD policy would be decided on cross-motions for summary judgment, but only Defendants sought summary judgment on that policy.  This created a procedural quandary because if the Court determined at the summary judgment stage that the Parole+ATD policy contravened the law or was not supported by the evidence in the supplemental administrative record, the Court could only deny Defendants' motion and it could not enter summary judgment in Florida's favor.

The Court sought to address this procedural quandary by scheduling oral argument on the parties' motions for summary judgment before trial to "give the parties an opportunity to address whether the Court could grant summary judgment for Florida on its challenge to the Parole + ATD policy under Fed. R. Civ. P. 56(f)(1) if the Court … determines that the record does not support the policy."  Doc. 110 at 1 (footnote omitted).  For various reasons, *see* Doc. 119 at 18-21, the oral argument could not be scheduled before trial, so the Court deferred review of the Parole+ATD policy "until at or after trial so all of the issues in this case can be resolved at the same time," Doc. 117 at 2.

At the conclusion of the trial, the Court afforded the parties an opportunity to present oral argument addressing both how the Court should view the evidence presented at trail and how the Court should assess the Parole+ATD policy based on the supplemental administrative record.  The oral argument lasted for more than five hours, and the Court extensively questioned both sides about the legality of the Parole+ATD policy and the evidentiary support for the policy in the supplemental record.  The Court finds that the oral argument (coupled with the opportunity to file post-trial briefs) afforded Defendants the "reasonable time to respond" contemplated by Rule 56(f)(1).

Thus, notwithstanding the fact that Florida did not file a motion for summary judgment with respect to the Parole+ATD policy, the Court can now grant judgment in favor of Florida on that policy if that is what the law requires.  Alternatively, if the Court determines that Defendants are entitled to summary judgment on the Parole+ATD motion, the Court can grant their motion.  On the latter point, the Court

A0392

### 1.  Non-Detention Policy[27]

The evidence establishes that in late January or early February of 2021, DHS made a discrete change in detention policy from "release only if there is a compelling reason to" to "release unless there is a compelling reason not to."  Specifically, before January 2021, DHS limited the release of aliens at the Southwest Border to very exigent circumstances, but under the new policy—what Florida characterizes as the Non-Detention Policy—DHS began instructing agents to release aliens at the Southwest Border unless the alien is a public safety or flight risk.

Florida claims that this Non-Detention Policy is (a) contrary to law and in excess of statutory authority in violation of 5 U.S.C. §706(2)(A) and (C); (b) arbitrary and capricious in violation of 5 U.S.C. §706(2)(A);

---

did not overlook that it previously "denied" Defendants' motion for summary judgment, *see* Doc. 117 at 2 (¶4), but upon reflection, that disposition should have stated that the motion was "denied in part and deferred in part" because, as the body of the Order denying the motion explains, the Court was deferring judicial review of the Parole+ATD policy until at or after trial, *id.* at 2.  That Order is hereby amended *nunc pro tunc* to reflect that disposition.

[27]  The Court recognizes that this discussion of the merits of the Non-Detention Policy is effectively dicta based on the conclusion that the policy is not "agency action" subject to judicial review.  However, because the "agency action" issue was a close question in the Court's mind, the Court elected to include a robust analysis of the merits of the Non-Detention Policy to avoid the need for a remand in the event that a higher court determines that the Court erred in concluding that the Non-Detention Policy was not "agency action."

A0393

and (c) promulgated without notice and comment as required by 5 U.S.C §553.  Each claim will be considered in turn.

### a.    *Contrary to Law (Count 1)*

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. §706(2)(A), or "in excess of statutory . . . authority, or limitations, or short of statutory right," *id.* at §706(2)(C).

Florida contends that the Non-Detention Policy is contrary to law because §1225(b) requires DHS to detain aliens apprehended crossing the Southwest Border, but the Non-Detention Policy instructs DHS's officials to release these aliens except under narrow circumstances.   DHS responds that detention under §1225(b) is discretionary, and that even if detention under that statute is mandatory, it has discretion to release arriving aliens under either §1226(a) or §1182(d)(5).

Under the INA, certain aliens are "deemed . . . applicant[s] for admission."  8 U.S.C. §1225(a)(1).  Specifically, applicants for admission include aliens "who arrive[] in the United States . . . whether or not at a designated port of arrival" and aliens "present in the United States who

A0394

ha[ve] not been admitted." *Id.* Section 1225 imposes certain duties on immigration officers to "[i]nspect" applicants for admission, regardless of whether the aliens are "arriving in the United States" or whether they are present without having "been admitted or paroled." 8 U.S.C. § 1225(b); *see also* 8 U.S.C. §1225(a)(3) (explaining that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected").

This broad definition of applicants for admission is a relatively recent addition to the INA. Before 1996, the INA only contemplated inspection of aliens arriving at ports of entry. *See* 8 U.S.C. § 1225(a), (b) (1995). Other aliens, such as those who entered illegally, were not subject to §1225(b). *See* 8 U.S.C. §1251(a)(1)(B) (1995) (explaining that an alien "who entered the United States without inspection . . . is deportable" rather than being subject to inspection and exclusion).

In 1996, however, Congress expanded §1225 by adding the broad definition of "applicant for admission" quoted above. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). In doing so, Congress subjected a broader category of aliens to the inspection regime that applied to aliens who showed up at a port of entry seeking admission. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by

73

immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting 8 U.S.C. §1225(a)(3)).

All parties agree, and the Court has found, that the aliens at issue in this case meet the statutory definition for applicants for admission and are subject to inspection under §1225.  *See* Doc. 87-1 at SAR0001 (explaining that what DHS refers to as "processing" of illegal border crossers is an "inspect[ion] . . . consistent with 8 U.S.C. §1225(a)").  The Court therefore turns to the three points of contention relevant to the lawfulness of the Non-Detention Policy: (1) whether detention of applicants for admission under §1225(b) is mandatory; (2) whether and when DHS may release applicants for admission at the Southwest Border under §1226(a); and (3) whether and when DHS may release these aliens under §1182(d)(5).

Section 1225(b) governs the inspection process for applicants for admission.  Certain applicants are subject to "expedited removal" under §1225(b)(1), pursuant to which they are to be removed "without further hearing" unless they seek asylum or establish a credible fear persecution in their home country.  All other applicants are subject to "standard"

74

removal proceedings under §1225(b)(2). The nuances of each type of proceeding are immaterial to the issues in the case because, regardless of the specific proceeding the applicant is subject to, he or she "shall be detained" pending immigration proceedings, *see* 8 U.S.C. §§1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), and the detention mandate continues "until [the applicable removal] proceedings are complete." *Jennings*, 138 S. Ct. at 842.

Notwithstanding the plain text of §1225(b) and the Supreme Court's holding in *Jennings*, DHS argues that detention of applicants for admission is discretionary. In DHS's view, §1225(b)'s mandatory language flows in only one direction—the statute prevents aliens from obtaining release, but it does not create obligations for DHS. In other words, DHS interprets the "shall" language in § 1225(b) to limit the rights of aliens but not to limit its discretion.

The Court rejects DHS's argument and concludes that §1225(b)'s "shall be detained" means what it says and that is a <u>mandatory</u> requirement. This conclusion flows directly from *Jennings* in which the Supreme Court explicitly stated that "§1225(b)(1) and (b)(2) … <u>mandate</u> detention," 138 S. Ct. at 842 (emphasis added), and explained that "the

75

word 'shall' usually connotes a requirement," *id.* at 844 (quotations omitted); *see also United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) (explaining that "[t]he word 'shall' does not convey discretion" and that "where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest"). This conclusion is confirmed by the heading for §1225(b)(1)(B)(iii)(IV), which describes that provision as creating "[m]andatory detention." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (explaining that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (quotations omitted)).

Moreover, Congress's use of the discretionary the word "may" in other similar provisions of the INA bolsters the Court's conclusion that §1225(b)'s detention requirements are mandatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)). For example, §1226(a) states that certain other aliens "*may* be arrested and detained" (emphasis added). And in other

76

provisions of §1225, Congress recognized the difference between a discretionary option and a mandatory command.  *See, e.g.*, 8 U.S.C. §1225(b)(2)(C) ("[T]he Attorney General *may* return the alien to [a contiguous territory] pending" removal. (emphasis added)).

DHS argument that "shall" in the detention statutes actually means "may" relies primarily on *Town of Castle Rock v. Gonzales* and the "deep-rooted nature of law-enforcement discretion."  545 U.S. 748, 761 (2005).[28]  But nothing in that case undermines the settled principles that the concept of law-enforcement discretion does not "set agencies free to disregard legislative direction" and that Congress is free to cabin enforcement discretion by providing "guidelines for the agency to follow in exercising its enforcement powers."  *Heckler v. Cheney*, 470 U.S. 821, 832-33 (1985); *see also Texas v. United States*, 40 F.4th 205, 225–26 (5th Cir. 2022) (distinguishing *Castle Rock* because it concerned a singular, individualized instance of nonenforcement, not any agency-wide policy of nonenforcement in the face of an "incontrovertibly mandatory" statutory

---

[28]    DHS also suggests that it has discretion to forego any immigration enforcement against a particular alien altogether, which in turn, would allow it to avoid §1225(b)'s detention requirements.  *See* Doc. 156 at 160.  However, even if that is true (and politically feasible), the evidence in this case establishes that DHS is initiating removal proceedings against the aliens subject to the challenged policies.

A0399

command to the contrary).  Here, as explained above, Congress cabined DHS's discretion in §1225(b) when it commanded the agency, in clear and unambiguous language, to detain applicants for admission pending removal proceedings.

Having concluded that §1225(b) is mandatory rather than discretionary, the Court turns to whether either of the release mechanisms DHS invokes are permissible.  As detailed in the findings of fact, DHS has applied the Non-Detention Policy in some instances by releasing aliens under §1226(a) and in other instances by releasing aliens under §1182(d)(5).

The Court begins with § 1226(a).  That statute begins by stating that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed."  It then states that, following such arrest, the Attorney General "may continue to detain the arrested alien" or "may release the alien" either "on bond" or on "conditional parole."  8 U.S.C. §1226(a)(2).

DHS contends that §1226(a) applies to aliens arriving at the Southwest Border once the alien reaches U.S. soil.  And because §1225(a)'s definition of applicants for admission also includes these

78

A0400

aliens, DHS contends that Congress gave the agency a choice—if DHS wants to detain an alien at the Southwest Border, it can apply §1225(b), but if DHS wants to release the alien, it can apply §1226(a).

The Court rejects DHS's argument for two reasons. First, §1226(a) does not apply to applicants for admission apprehended at the Southwest Border. Second, even if the statute could apply under some circumstances, the evidence at trial showed that DHS is initially processing applicants for admission at the Southwest Border under §1225, and there is nothing in the INA that contemplates that processing can switch between §1225 and §1226.

Starting with the first point, §1225(a) treats a specific class of aliens as "applicants for admission," and §1225(b) mandates detention of these aliens throughout their removal proceedings. Section 1226(a), by contrast, states in general terms that detention of aliens pending removal is discretionary unless the alien is a criminal alien.

As the Supreme Court stated in *Jennings*, §1226 applies to "certain aliens *already in the country*." 138 S. Ct. at 837–38 (emphasis added). And even if an alien crossing the Southwest Border fell within §1226(a)'s general language, §1225(b)'s specific mandatory language would trump

A0401

§1226(a)'s general permissive language.  Indeed, "it is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  And this canon squarely applies to §1225 and §1226, as it is "most frequently applied to statutes in which a general permission . . . is contradicted by a specific prohibition." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, DHS's position would render mandatory detention under §1225(b) meaningless.  Indeed, the 1996 expansion of §1225(b) to include illegal border crossers would make little sense if DHS retained discretion to apply §1226(a) and release illegal border crossers whenever the agency saw fit.  *Cf. Demore*, 538 U.S. at 518 (explaining that "wholesale failure[s]" by the federal government motivated the 1996 amendments to the INA).  In fact, as the Attorney General has explained, "section [1225] (under which detention is mandatory) and section [1226(a)] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens." *Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019); *see also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007) (holding that an alien who was apprehended within the

A0402

interior of the United States necessarily must have been paroled under §1226(a), not §1182(d)(5)(A), because he was not apprehended at the border as a §1225 arriving alien, as is required to be eligible for parole under §1182(d)(5)(A)).

That brings the Court to the second point. Even if DHS were correct that §1225(b) and §1226(a) overlap, and even if DHS were correct that it has discretion to decide which provision to apply, what DHS certainly may not do is initiate an inspection under §1225 and then, at some later time, attempt to shift the alien's detention to §1226(a).

DHS's initial apprehension and processing of applicants for admission at the Southwest Border is an "inspection" under §1225. During that inspection, if DHS decides to release an alien under §1226(a), it initiates a removal proceeding against the alien under 8 U.S.C. §1229a by serving a NTA and then relies on those pending removal proceedings as a basis to shift the alien's detention from §1225(b) to §1226(a). At closing argument, counsel for DHS described the agency's position that the decision to place an applicant for admission in standard removal proceedings under §1229a, instead of expedited removal proceedings under §1225(b)(1), causes §1226(a) to govern the alien's detention. The

81

problem with this argument (and what makes DHS's application of §1226(a) in this manner unlawful) is that §1225(b)(2), not §1226(a), governs the detention of applicants for admission whom DHS places in standard removal proceedings following in inspection under §1225. *See* 8 U.S.C. §1225(b)(2)(A) (explaining that if the immigration officer determines that the alien is not clearly and beyond a doubt entitled to admission, "the alien shall be detained for a proceeding under §1229a").

In *Jennings*, the plaintiffs made the same basic argument DHS advances here—i.e., that "for a proceeding" in §1225(b)(2) means "only until the *start* of applicable proceedings" and that §1226(a) governs detention once those proceedings begin. *See* 138 S. Ct. at 844. The Supreme Court, however, rejected the plaintiffs' position that §1226(a) governs the detention of applicants for admission once removal proceedings begin, holding that "(b)(2) mandate[s] detention of aliens *throughout the completion of applicable proceedings* and not just until the moment those proceedings begin." *Id.* at 845 (emphasis added).

Another problem with DHS's reliance on §1226 is that the statute is not even triggered unless an arrest warrant is issued. *See* 8 U.S.C. §1226(a) ("<u>On a warrant issued by the Attorney General</u>, an alien may be

82

arrested and detained pending a decision on whether the alien is to be removed from the United States.") (emphasis added).  If the alien has not been arrested on a warrant, then the subsequent provisions giving the Attorney General discretion to detain or release "the arrested alien" are likewise not triggered.  *See* 8 U.S.C. §1226(a)(1), (a)(2).

Here, the evidence establishes that DHS is not obtaining warrants for aliens apprehended at the Southwest Border.  Instead, it relies on the warrantless arrest authority in 8 U.S.C. §1357(a)(2) to take the aliens into custody for inspection and processing.  Even if DHS is putting an "administrative warrant" in the alien's file when the NTA is issued the alien is released,[29] that is not happening for aliens released under the Parole+ATD policy until (or if) they report to an ICE office for issuance of an NTA.  But, by that point, the decision to release the alien has already been made.

Additionally, as the Supreme Court noted in *Jennings*, what DHS claims to be doing makes little sense.  *See* 138 S. Ct. at 845 ("If respondents' interpretation of § 1225(b) were correct, then the

---

[29] Conflicting evidence on this point was presented at trial, but the Court credits the testimony of DHS's Rule 30(b)(6) witness who testified that a warrant (administrative or otherwise) is not obtained before the alien is released.

A0405

Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense."). The warrants required by §1226(a) are *arrest* warrants, but by the time DHS puts the "administrative warrant" in the alien's file (if it is even doing so), the alien has already been arrested under §1357 and the warrant is only being issued to the alien can be *released*. This sleight of hand—using an "arrest" warrant as de facto "release" warrant—is administrative sophistry at its worst.

Having concluded that §1225(b) requires detention of applicants for admission at the Southwest Border and that DHS may not release these aliens under §1226(a), the Court must next address whether DHS's releases under §1182(d)(5) are lawful. However, because Florida separately challenges the Parole+ATD policy, and because that policy explains how DHS is using §1182(d)(5) at the Southwest Border, the Court will address that question when it discusses the Parole+ATD policy. Suffice it to say at this point, if the Non-Detention Policy was "agency action" subject to judicial review, the Court would find that it is

A0406

unlawful insofar as it allows aliens arriving at the Southwest Border to be released under §1226(a).

\*   \*   \*

In sum, although the Non-Detention Policy is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C), Defendants are entitled to judgment in their favor on Count 1 of the second amended complaint because the Non-Detention Policy is not discrete "agency action" that is subject to judicial review.

### b. _Arbitrary and Capricious (Count 3)_

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."  5 U.S.C. §706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." _FCC v. Prometheus Radio Project_, 141 S. Ct. 1150, 1158 (2021).   Indeed, meaningful judicial review requires an agency to "disclose the basis of its action."  _See Dep't of Com._, 139 S. Ct. at 2573 (quotations omitted).

Here, Florida contends that DHS's refusal to acknowledge its change in policy renders the Non-Detention Policy arbitrary and

A0407

capricious.   The Court agrees.   As Justice Scalia explained in *Fox Television*, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."  556 U.S at 515.  And an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *Id.*  DHS's issuance of the Non-Detention Policy was a distinct change in detention policy, and DHS's failure to acknowledge that change, or to provide a decisional document or administrative record for this Court to review, is fatal because the Court has no way to assess whether the agency's actions are reasonable and reasonably explained.

Nevertheless, because the policy is not "agency action" subject to judicial review, Defendants are entitled to judgment in their favor on Count 3 of the second amended complaint.

### c.      *Notice and Comment (Count 5)*

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C §553).  The APA distinguishes

A0408

between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)). For similar reasons that the Non-Detention Policy is not final agency action subject to judicial review, it is not a substantive rule subject to notice and comment. Accordingly, Defendants are entitled to judgment in their favor on Count 5 of the second amended complaint.

### 2.   *Parole+ATD Policy*

The latest iteration of the Parole+ATD Policy is contained in the July Memo. As with the Non-Detention Policy, Florida claims that the Parole + ATD Policy is contrary to law, arbitrary and capricious, and subject to notice and comment. The legal standards that govern each of these claims are set forth above in the discussion of the Non-Detention Policy, and for the most part,[30] the Court reviews these issues based on

---

[30] The Court can look beyond the administrative record where the absence of evidence "effectively frustrates judicial review" by failing to present a clear picture of the agency's actions. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.1 (11th Cir. 1996). Here, there is undisputed extra-record evidence showing that DHS has been using Parole+ATD as its primary processing pathway since April 2022—with almost 89,000 releases under the policy in November 2022 alone. *See* Pl. Ex. 3, 4. This evidence blatantly

A0409

the supplemental administrative record prepared by DHS.  *See Fla.*
*Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

### a.     Contrary to Law (Count 2)

Florida argues that the July Memo is contrary to law because it
ignores the plain language of §1182(d)(5).   That statute provides in
pertinent part:

> The Attorney General may … in his discretion <u>parole</u> into the
> United States temporarily under such conditions as he may
> prescribe  <u>only on a case-by-case basis for urgent
> humanitarian reasons or significant public benefit</u> any alien
> applying for admission to the United States, … <u>and when the
> purposes of such parole shall … have been served the alien
> shall forthwith return or be returned to the custody from
> which he was paroled</u> and thereafter his case shall continue
> to be dealt with in the same manner as that of any other
> applicant for admission to the United States.

(emphasis added).

---

contradicts the statements in the July Memo that "Parole + ATD is a tool that should
be used sparingly" and that it is "not meant to be a primary processing tool."  Doc.
87-1 at SAR003.  Without considering this extra-record evidence, judicial review of
the Parole+ATD policy would be frustrated because the Court would not be able to
fairly assess whether the July Memo complies with the case-by-case requirement in
§1182(d)(5).  *See Biden v. Texas*, 142 S. Ct. at 2554 (Alito, J., dissenting) ("But the
number of aliens paroled each month under that provision—more than 27,000 in
April of this year—gives rise to a strong inference that the Government is not really
making these decisions on a case-by-case basis.").

A0410

For the reasons that follow, the Court concludes that the July Memo is contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

### i.     Return to Custody Requirement

The July Memo does not even acknowledge the requirement that an alien be returned to DHS custody when "the purposes of such parole shall . . . have been served." 8 U.S.C. §1182(d)(5)(A).  As counsel for DHS conceded during oral argument, the "purpose" of parole contemplated by the July Memo is moving aliens out of CBP facilities faster than would occur if the alien were processed consistent with the requirements of §1225.[31]   In doing so, the July Memo seeks to shift the inspection

---

[31]   DHS argues for the first time in its post-trial brief that decompression of CBP facilities was not the only purpose of the Parole+ATD policy.  *See* Doc. 156 at 102-04.  This argument is refuted by face of the July Memo, which states that "Parole+ATD is … a safety valve to address overcrowding" and is a "processing mechanism to address situations in where there is not appropriate detention space available, and there are operation concerns about the number of people present in … USBP facilities along the Southwest Border."  Doc. 87-1 at SAR0002.  Moreover, although the ATD component of the policy may help ensure compliance without court appearances, etc., the supplemental record as a whole leaves no doubt that the sole purpose of the policy was to relieve overcrowding at CBP border facilities by shifting the processing of "removal paperwork" to ICE field offices around the country.

contemplated by §1225 to an ICE field office in the interior of the country. That being the case, the purpose of the parole is served when the alien has his first encounter with ICE.   However, nothing in the July Memo or the supplemental administrative record contemplates a return to custody at that time or any time thereafter—indeed, the supplemental administrative record shows that aliens are all-but-guaranteed that they "will not be taken into custody" when they report to ICE for issuance of an NTA.  *See* Doc. 87-1 at SAR 0168.

Relatedly, §1182(d)(5) contemplates that the alien would have a "case" pending because it provides that once the purpose of parole has been served and the alien is returned to custody, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission."  However, the entire purpose of the Parole+ATD policy is to expedite the processing of aliens at CBP facilities without initiating an immigration proceeding against them.  Thus, at the time the alien is released under the Parole+ATD policy, he has no immigration "case" that can "continue to be dealt with" upon a return to custody.

90

A0412

### ii.    Case-by-Case Requirement

With respect to the second point, the "case-by-case" requirement in §1182(d)(5) requires DHS to conduct an individualized assessment of each alien to determine whether to grant parole.  This requirement was added to the statute in 1996 "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool."  *Texas v. Biden*, 20 F.4th at 947; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that the current language in the §1182(d)(5) was the result of amendments animated by concerns that the parole authority "was being used by the executive to circumvent congressionally established immigration policy").

The process set forth in the July Memo violates the case-by-case requirement because although the memo pays lip service to assessments of individual aliens, it is largely focused on DHS's *operational circumstances* rather than an individual alien's circumstances.  *See* Doc. 87-1 at SAR0002 (explaining that Parole+ATD should only be used "when justified by an urgent humanitarian reason or because it yields a significant public benefit <u>in the form of disease mitigation, as a safety valve to address overcrowding</u>" (emphasis added)).  Moreover, any case-

91

by-case consideration of the alien's circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety risk or flight risk, not on whether the alien meets the exceedingly high parole standard.

Additionally, the July Memo turns the parole standard on its head by providing *ineligibility* criteria rather than *eligibility* criteria.  In other words, the July Memo essentially establishes a presumption of parole when the relevant "triggers" are met.

The time estimates in the supplemental administrative record confirm that USBP is not conducting meaningful case-by-case analysis before placing releasing an individual under the Parole+ATD policy.  The supplemental administrative record indicates that the "processing time" for issuing a NTA is between 2 to 2.5 hours, whereas Parole+ATD only takes 15 to 30 minutes.  It is implausible that USBP could meaningfully assess an alien's individual circumstances in 15 to 30 minutes.

On this issue, the Court finds persuasive Justice Alito's discussion of the case-by-case requirement in *Biden v. Texas*, 142 S. Ct. at 2555 (Alito, J., dissenting).  There, Justice Alito explained that "simply . . . going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review."  *Id.*  Further, Justice Alito

A0414

noted that the number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis." *Id.* at 2554.  Notably, at the time Justice Alito made this observation, DHS was paroling 27,000 aliens per month—whereas DHS released more than three times that number of aliens under the Parole+ATD policy in November 2022.

*iii.   Urgent Humanitarian Reasons*
*or Significant Public Benefit Requirement*

The July Memo also violates §1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit."  Before 1996, §1182(d)(5)(A) permitted parole "for emergent reasons or reasons strictly in the public interest."  8 U.S.C. §1182(d)(5)(A) (1995).  The addition of "urgent" and "significant" required a higher level of exigency to justify a grant of parole.

The primary "public benefit" that the Parole+ATD policy sought to achieve was speeding up the inspection mandated by §1225 to "decompress" overcrowded CBP facilities.  However, even if there may be circumstances where an individual alien might be eligible for parole based on overcrowding and health and safety concerns, creating an

93

entirely new "processing pathway" to avoid the process mandated by §1225 is inconsistent with the narrow language in §1182(d)(5).

DHS argues that the standard in the July Memo conforms to standard in 8 C.F.R. §212.5, which Florida has not directly challenged and which provides that parole is "generally justified" for aliens "whose continued detention is not in the public interest" so long as "the aliens present neither a security risk nor a risk of absconding."  8 C.F.R. §212.5(b)(5).  The main problem with this argument is that it flips the INA on its head.  Section §1225(b) requires *detention* unless parole is justified based on "urgent humanitarian reasons" or "significant public benefit" under §1182(d)(5), whereas the regulation effectively allows any alien to be *released* on parole whenever continued detention is not "in the public interest"—whatever that means—and the alien is not a security or flight risk.  Another problem with this argument is that the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States.

A0416

The Court did not overlook Defendants' argument that the legislative history of the 1996 amendment to §1182(d)(5) shows that Congress chose the language that is now in the statute over more narrow alternative language that would have limited parole to specific circumstances. Putting aside the limited weight the legislative history is due, the Court fails to understand how the fact that Congress apparently rejected more narrow language so DHS had "flexibility to deal with compelling immigration situations" justifies the creation of an entirely new processing pathway that has led to the mass release of aliens in the country with minimal processing merely for sake of administrative expediency.

*   *   *

For these reasons, the July Memo is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C). Accordingly, Florida is entitled to judgment in its favor on Count 2 of the second amended complaint.

A0417

### b.    *Arbitrary and Capricious (Count 4)*

As explained above, the arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158.  The reviewing court must look to see "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And "[t]o determine if an agency considered all the relevant factors and important aspects of the problem, a court may look to the language of the relevant statutes, regulations, the administrative record, and even beyond the administrative record."  *Bidi Vapor LLC v. U.S. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022) (quotations and citations omitted).

Florida contends that the Parole+ATD policy is arbitrary and capricious because DHS: (1) failed to adequately consider the ever-worsening backlog caused by earlier iterations of the policy; (2) failed to acknowledge the extraordinary expansion of the agency's use of parole under §1182(d)(5) as compared to the agency's historical practice; (3)

A0418

ignored the evidence when it concluded that Parole + ATD will only be "used sparingly" and that it is "not meant to be a primary processing tool"; (4) failed to consider whether the Parole + ATD policy would increase migration flows; and (5) failed to acknowledge its decision to expand Parole + ATD to include single adults rather than only family units, much less explain why it did so.  The Court agrees with the first, third, and fifth points.

With respect to the first point (backlog), the supplemental administrative record contains estimates regarding the number of individuals released on Parole+ATD against whom DHS must still initiate removal proceedings.  These projections show that for every 90 days Parole + ATD continues, the policy creates a backlog that takes 5.5 years and $49 million to clear.  And this backlog only accounts for the time needed to *begin* removal proceedings—not the additional time required to complete those proceedings and remove aliens.  By these estimates, the backlog created by Parole+ATD will take *decades* to overcome.

The July Memo does not expressly discuss the backlog, much less explain why the problems created by the backlog did not outweigh the

A0419

perceived benefits of continuing the Parole+ATD program. The fact that the supplemental administrative record contains information about the backlog suggests that DHS was at least aware of it, but that does not satisfy DHS's obligation to explain its consideration of the problem so the Court can determine whether the decision to continue the Parole+ATD program notwithstanding the backlog it was creating was reasonable and reasonably explained. Indeed, putting aside the fact that the Court cannot conceive of a reason to continue a program that increased delays and costs associated with initiating immigration proceedings, the Court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

With respect to the third point (ignoring evidence), the July Memo asserted that Parole+ATD will only be "used sparingly" and that it is "not meant to be a primary processing tool." Those statements turned out to be untrue, and they were also contrary to "the evidence before the agency" when the July Memo was issued because in preceding month (June 2022), CBP released over 40,000 applicants for admission under that policy, which was more than 40% of total apprehensions at the Southwest

A0420

Border that month.  And that was before the July Memo *expanded* the eligibility for Parole+ATD to single adults rather than just family units.

With respect to the fifth point (expansion to single adults), the July Memo reflected a significant expansion of the Parole+ATD program because it no longer limited eligibility to family units.  The July Memo does not offer any explanation as to why the program was expanded or even acknowledge the policy change reflected in the expansion of the program.  Those failures render the July Memo arbitrary and capricious because "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515.

Accordingly, the July Memo is arbitrary and capricious, and Florida is entitled to judgment in its favor on Count 4 of the second amended complaint.

### c.    *Notice and Comment (Count 6)*

Florida claims that the July Memo is an agency rule affecting rights and obligations that was subject to notice and comment.  DHS responds that the July Memo is not subject to notice and comment because it is

A0421

merely an interpretive rule, a general statement of policy, or a statement of agency organization—all of which are excepted from notice and comment under 5 U.S.C. §553(b)(A).

The July Memo is subject to notice and comment because it establishes a generally applicable policy to determine whether aliens are detained or paroled, it instructs agents how to exercise their discretionary authority under §1182(d)(5), it sets criteria for granting parole, and it affects Florida's obligations to paroled aliens. *See Jean v. Nelson*, 711 F.2d 1455, 1476–77 (11th Cir. 1983 (rejecting government's argument that a new policy concerning detention and parole of Haitian immigrants was not subject to notice-and-comment rulemaking because "the fact that an agency need not employ rulemaking in order to exercise its discretion [under §1182(d)(5] on a case-by-case basis does not mean it cannot or has not resorted to a rule of general applicability which limits its discretionary function").[32]

---

[32] The Court did not overlook that this panel opinion was effectively vacated when the case was reheard en banc. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). However, the en banc opinion did not repudiate the panel's analysis of the notice-and-comment issue (the issue was moot at that point, *id.* at 984), and even if the panel opinion is not binding precedent, the Court finds its analysis of the notice-and-comment issue persuasive here.

A0422

None of the exceptions relied on by DHS exempt the Parole+ATD policy from notice-and-comment.

First, the July Memo is not an interpretive rule.  An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)[33] (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)).  The July Memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of §1182(d)(5), so it cannot be an interpretive rule.

Second, the July Memo is not merely a general statement of policy.  "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)).  The July Memo does none of these things.  It establishes a substantive change in policy

---

[33] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

A0423

that took effect immediately by creating a new "processing pathway" for aliens arriving at the Southwest Border.

Third, the July Memo is not a rule of agency organization. That exception applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted).  Here, the July Memo "alter[s] the standards imposed" on aliens and the criteria by which parole may be granted to affected parties. *Id.* at 1024 (emphasis removed).

Accordingly, the July Memo is subject to notice and comment and Florida is entitled to judgment in its favor on Count 6 of the second amended complaint.

### 3.  *Florida's Remaining Claims*

The Court does not consider Florida's constitutional claim (Count 8) or its claim that the Non-Detention Policy is agency action unlawfully withheld under 5 U.S.C. §706(1) (Count 7), because Florida concedes (and Defendants do not dispute) that the Court need not reach those claims.

A0424

That said, with respect to the constitutional claim, although Florida makes a compelling <u>political</u> case that the President and DHS leadership were derelict in their duties by releasing over a million aliens into the country in contravention of the detention mandates in the INA, Florida has not made a <u>legal</u> case under the Take Care Clause because (1) as Defendants persuasively argue in their post-trial brief, it is unclear whether there is even a private cause of action under the Take Care Clause, *see* Doc. 156 at 164-73, and (2) to the extent a private cause of action exists, Florida would have to show that the executive branch "completely abdicated" its statutory responsibilities, *see* Doc. 45 at 33-34 (deriving this standard from cases like *Heckler*), which it has not done here. Specifically, although the evidence established that Defendants have adopted policies that prioritize "alternatives to detention" over actual detention, they have not "completely abdicated" their detention responsibilities because the evidence establishes that they continue to detain a substantial number of arriving aliens each month.

## D.   Remedy

Having determined that the Parole + ATD Policy violates the APA on several grounds, the Court must consider the appropriate remedy.

A0425

Florida asks the Court to vacate the policy and issue declaratory relief. DHS argues that 8 U.S.C §1252(f)(1) bars both injunctive relief and APA vacatur and that declaratory relief would have to be narrowly tailored so as not to circumvent §1252(f)(1) or violate separation of powers principles. Alternatively, DHS argues that any remedy would need to be limited to Florida and the harm it suffered and not a "universal injunction."

Under the APA, a court must "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. §706(2). In the Eleventh Circuit, "[v]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted). Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining that "the ordinary result" of a successful APA claim is that "the rules are vacated" and not that "their application to the individual petitioners is proscribed" (quotation omitted)).

Even if the party-specific vacatur DHS seeks were a proper remedy under the APA, complete vacatur is "necessary to grant complete relief to" Florida here. *Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp.

A0426

3d 1144, 1177 (M.D. Fla. 2022). Once released at the Southwest Border, aliens are free to travel throughout the United States. If the Court were to adopt DHS's request—which would essentially involve DHS asking aliens where they are going and applying the challenged policies to aliens who don't respond with "Florida"—released aliens would be free to travel to Florida. *See id.* at 1178 (denying a request for partial vacatur where there were "no adequate assurances that the government can provide that its agents . . . will not violate this Court's order and deprive Plaintiffs of their relief"). Moreover, if DHS only detained applicants for admission who say they are traveling to Florida and released other aliens, the Court expects that it would not take long for immigration law violators to figure out how to ensure their own release.

DHS also argues that §1252(f)(1) precludes the Court from vacating either of the challenged policies. That statute provides in pertinent part that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." DHS contends that because vacatur of the policies would violate this statute because it would effectively enjoin or restrain the manner in which the referenced provisions of the INA operate.

A0427

The Supreme Court explained that §1251(f)(1) "generally prohibits lower courts from entering <u>injunctions</u> that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2065 (emphasis added); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (explaining that §1252(f)(1) is "nothing more or less than a limit on injunctive relief"). Neither the Supreme Court nor the Eleventh Circuit has decided whether this statute precludes vacatur under the APA, although the Supreme Court is poised to answer that question this Term in *United States v. Texas*, No. 22-58.

Vacatur is "a less drastic remedy" than an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010), and the Fifth Circuit concluded in the opinion currently on review at the Supreme Court that §1252(f)(1) does not preclude vacatur under the APA because vacatur "does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th at 220. The Court finds the Fifth Circuit's reasoning persuasive. Thus, the Court finds that

A0428

§1252(f)(1) does not strip it of the authority to vacate either of the challenged policies under the APA.

Moreover, even if the Supreme Court quashes the Fifth Circuit's decision, that will likely[34] only impact the availability of vacatur with respect to the Non-Detention Policy because that policy implicates DHS's exercise of its authority under §1225 and §1226, which are both in part IV of the INA.  By contrast, §1182(d)(5), which is the statute on which the Parole+ATD policy is based, is contained in part II of the INA, not part IV, and any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having "enjoin[ed] or restrain[ed]" the operation of that part.

Accordingly, vacatur of the Parole+ATD policy is not precluded by §1252(f)(1) and is the appropriate remedy under the circumstances.  A separate declaration that the Parole+ATD policy is unlawful is

---

[34] The Court says "likely" because it is possible that the Supreme Court might go along with the Solicitor General's argument (echoed by Defendants in their post-trial brief, *see* Doc. 156 at 186), and hold that 5 U.S.C. §706(2) does not authorize vacatur.  However, based on the Justices' comments at oral argument, that seems highly unlikely.

A0429

unnecessary because that is implicit in the Court's finding that the policy violated §706(2)(A) and (C) of the APA.

## IV.   CONCLUSION

In sum, for the reasons stated above, the Court finds that (1) the Non-Detention Policy exists but is not discrete "agency  action" that is subject to judicial review under the APA—although if it was, it would be subject to vacatur because it contravenes the INA; and (2) the Parole+ATD Policy is unlawful and is due to be vacated under the APA. Accordingly, it is

**ORDERED** that:

1. The deferred portion of Defendants' motion for summary judgment (Doc. 88) is **DENIED**.

2. The Parole+ATD Policy is **VACATED** under the APA, and that policy is **REMANDED** to DHS for further proceedings consistent with this Opinion and Order.

3. The Clerk shall enter a final judgment stating:

   Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion

108

A0430

and Order entered on this date.  Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice.

4. The Judgment is **STAYED** for 7 days from this date to allow Defendants to seek appellate review.

5. The Clerk shall close the case file.

**DONE and ORDERED** this 8th day of March, 2023.

_____
**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**

A0431

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 170/6

**U.S. Customs and
Border Protection**

**MAR 1 9 2021**

| | |
|---|---|
| MEMORANDUM FOR: | Troy A. Miller<br>Senior Official Performing the Duties of the Commissioner<br>U.S. Customs and Border Protection |
| FROM: | Rodney S. Scott **(b) (6)**<br>Chief<br>U.S. Border Patrol |
| SUBJECT: | Prosecutorial Discretion |

The U.S. Border Patrol (USBP) is experiencing a high-volume of encounters of persons illegally entering the United States along the southwest border. Due the prolonged detention of specific populations, like unaccompanied alien children (UAC), the USBP will exercise its discretionary authority to release subjects without placing them in removal proceedings, to prioritize our limited assets to national security events. Pursuant to 8 C.F.R. § 287.3, agents retain discretion to place a removable alien in proceedings. We will exercise prosecutorial discretion (PD) to release persons illegally in the U.S when at least one of the following triggers are met:

- When a USBP Sector reaches 100% of total permanent detention capacity;
- When a USBP Sector reaches 75% total permanent detention capacity and the number of subjects arriving in custody exceeds the discharge of persons out of custody;
- When the average time-in-custody (TIC) of unprocessed persons exceeds 24 hours in USBP custody and the number of subjects arriving in custody is projected to exceed the discharge of persons out of custody;
- When mandatory detention populations (e.g., UACs) meet 50% of total permanent detention capacity and placement into Health and Human Service / Office or Refugee Resettlement (HHS/ORR) exceeds 48 hours from the time of referral;
- When a USBP Sector notifies Immigration and Customs Enforcement Removal Operations (ICE/ERO) and referral was denied or when no response is received within 1 hours of notification;
- When the loss of Title 42 authorities is nationwide and any previous trigger is met; or
- When a Sector Chief Patrol Agent, in coordination with USBP HQ, determines the circumstances dictate the need to exercise prosecutorial discretion.

Agents already retain the discretion to not place a removable alien into proceedings. As a general rule, agents do not exercise this option. Due to the challenges set on by COVID-19, UAC encounters, custody challenges and finite resources, agents must consider the release of non-UACs. Agents will consider whether the subject poses a threat to National Security, Border Security, or heightened Public Safety risk, as outlined in the interim enforcement priorities, prior to making this decision. Custody decisions will be documented in the I-213 narrative. Under no

Prosecutorial Discretion
2

circumstances will an alien who claims to be, is suspected to be, or is determined to be a UAC as defined by 6 U.S.C. § 279(g)(2), be processed for release.

Processing an alien for release without entering them into proceedings is not taken lightly. Only under circumstances outlined above will agents categorically use their discretionary authority to release family units or single adults. All subjects processed for release will be searched and enrolled into the biometric system. Records checks will be run to insure no prior criminal or immigration history that would categorize them as a heightened security or safety risk prior to release. Subjects will have their biographic, family, entry, arrest, and release information documented on a narrative (I-213). The custody redetermination for subjects released will fall under "Prosecutorial Discretion" and any current removal proceedings in which the subject is enrolled in will be documented.

Once PD is exercised, persons will be released in accordance with local Sector protocols to the fullest extent possible.

1300 Pennsylvania Avenue NW
Washington, DC 20229

HQBOR 50/10-C

**NOV 0 2 2021**



U.S. Customs and
Border Protection

MEMORANDUM FOR:    All Chief Patrol Agents
All Deputy Chief Patrol Agents

FROM:    Raul L. Ortiz
Chief
U.S. Border Patrol

SUBJECT:    Parole Plus Alternative to Detention

This memorandum supersedes previous guidance relating to prosecutorial discretion and
issuance of Notices to Report (NTR), as issued in March 2021, and establishes conditions for the
implementation of parole plus Alternative to Detention (Parole + ATD), a processing pathway
that will replace the use of NTR unless that pathway is explicitly authorized by the U.S. Border
Patrol (USBP) Chief.

USBP takes very seriously its mission of creating a secure border while ensuring the health and
safety of migrants in its custody, as well as the health of the workforce. Earlier this year, when
encounters were consistently high, operational capacity strained, and COVID-19 acute, USBP
began issuing NTRs, a significantly faster mechanism for processing noncitizens, particularly
when used for family units (FMU). NTRs were used for certain noncitizens following initial
processing and collection of biometric and biographic information. The use of this processing
pathway enabled USBP to relieve overcrowding in congregate settings, thus better protecting
both the workforce and noncitizens in our custody. Importantly, use of an NTR decreased
processing times significantly compared with processing families for a Notice to Appear (NTA),
thus ensuring that families were more expeditiously moved out of U.S. Customs and Border
Protection (CBP) custody. The process of issuing NTAs is much more time consuming, given the
level of detail and interagency coordination required to establish A-files and finalize the charging
documents. Those released with NTRs, however, were directed to report to ICE for further
processing, including for an NTA, as appropriate.

Effective immediately, USBP is ceasing the use of NTRs. When noncitizens will be processed
for release from USBP facilities, USBP will prioritize resources to issue noncitizens NTAs
immediately. NTAs formally initiate immigration proceedings, and it is USBP's goal to
maximize NTA issuance from USBP facilities and eliminate the need for use of alternative
processing pathways in the future.

In circumstances where an alternate path is necessary to address urgent crowding and excessive
Time-In-Custody (TIC) in USBP facilities, Border Patrol has developed an alternative processing
pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD
programs to ensure individuals are accounted for after release from USBP facilities. Parole +
ATD is a rigorous enforcement process that is effective and includes accountability measures to

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

**A0434**

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 2

require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

To deal with situations in which capacity constraints or conditions in custody warrant the more expeditious processing, USBP may consider use of Parole + ATD on a case-by-case basis for FMUs when certain conditions, laid out below, exist. The use of Parole + ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field. Use of Parole + ATD is consistent with 8 U.S.C. § 1182(d)(5), which provides that certain noncitizens may be paroled temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit"—namely, the urgent humanitarian need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities.

All individual members of a FMU who are processed for Parole + ATD, will, as a condition of their parole, be required to report to ICE within 15 days to be processed for an NTA. Effective immediately:

In the Del Rio (DRT) and Rio Grande Valley (RGV) Sectors, Chief Patrol Agents may authorize the processing of FMUs for Parole + ATD on a case-by-case basis when the temporary staffing support to the sector is maximized, the seven-day average of encounters is greater than the sector's Fiscal Year 2019 May daily average,[1] and when one or more of the following is true:

- The average TIC in the sector exceeds 72 hours AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

- The sector exceeds 100% of the total non-COVID detention capacity AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

Outside of the DRT and RGV Sectors, any sector seeking to utilize the Parole + ATD pathway must obtain approval from the USBP Chief and the CBP Commissioner prior to implementation. The USBP Chief and CBP Commissioner may authorize the use of this pathway in situations in which capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release FMUs in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody, taking into account the factors identified above.

The use of Parole + ATD pathway in DRT and RGV Sectors will be reassessed by USBP HQ on a daily basis in accordance with the conditions established above.

---

[1] The Fiscal Year 2019 May daily average in RGV was 1,607 and in DRT was 276. This month saw the highest encounter numbers that year.

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 3

Parole + ATD may not be used for noncitizens who pose a national security or public safety threat. Furthermore, Parole + ATD may only be issued when an individual is not covered by or is excepted from, on a case-by-case basis, the U.S. Centers for Disease Control and Prevention (CDC) Title 42 Order.

In sectors in which the use of the Parole + ATD pathway has been approved, if parole is appropriate based on a consideration of the above factors (as well as any other applicable urgent humanitarian reasons or significant public benefit considerations), USBP agents may exercise their discretion to process the noncitizen(s) with Parole + ATD, after initial enrollment processing is complete, rather than issuing an NTA.

Under no circumstances will a noncitizen who claims to be, is suspected to be, or is determined to be a noncitizen unaccompanied child as defined by 6 U.S.C. § 279(g)(2), be processed through this pathway.

As the processing landscape and the nature of the current COVID-19 pandemic remains fluid and may change over time, updated guidance will be disseminated to the field via email to reflect the latest changes. In particular, when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternate pathway.

Staff may direct their questions to the Immigration, Prosecutions, and Custody Operations Unit at Headquarters by emailing ImmigrationProsecution&CustodyOPS@cbp.dhs.gov.

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:22-cv-9962 |
| | ) | |
| ALEJANDRO MAYORKAS, | ) | |
| Secretary of the United States | ) | |
| Department of Homeland Security, | ) | |
| in his official capacity; *et. al* | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DECLARATION OF MATTHEW J. HUDAK

I, Matthew J. Hudak, pursuant to 28 U.S.C. § 1746, and based upon my personal

knowledge, and documents and information made known or available to me as of the time of

signature from official records and reasonably relied upon in the course of my employment,

hereby declare as follows:

1. I am employed with the U.S. Customs and Border Protection (CBP) as the Deputy Chief

   of the United States Border Patrol (USBP) and have served with USBP since 1997. I have

   held this position since December 19, 2021. Prior to being the Deputy Chief of USBP, I

   was the Chief Patrol Agent of the Laredo Sector, which covers approximately 84,000

   square miles and 136 river miles along the international boundary with Mexico and

   managed a workforce of over 1,900 employees spread over one sector complex and nine

   stations. Prior to that, I was the Chief Patrol Agent of Big Bend Sector. I have also served

   in various other leadership positions in USBP, including Laredo Sector's Division Chief

1

for Operational Programs, Deputy Chief Patrol Agent of Del Rio Sector, Patrol Agent in Charge of the Laredo South Station, Assistant Patrol Agent in Charge of the Cotulla Station in the Laredo Sector, and as the Acting Patrol Agent in Charge (PAIC) of the Laredo Sector Intelligence Unit. I also established and led the Enforcement and Information Technology Division.

2. In my position as the Deputy Chief of USBP, I am responsible for executing the missions of the U.S. Department of Homeland Security, CBP, and USBP.  The USBP is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons and for preventing the illicit trafficking of people and contraband between ports of entry.  USBP has a workforce of 19,000 agents who patrol more than 6,000 miles of the United States land borders.  As Deputy Chief, I am also responsible for the daily operations of USBP, including the development and implementation of all nationwide policy decisions.

3. I am familiar with the *Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document*, Raul L. Ortiz, (May 10, 2023), as well as the implementing guidance to the field.

4. I am also familiar with the March 8, 2023, U.S. District Court for the Northern District of Florida, Pensacola Division, decision vacating the *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022) memorandum. CBP has not utilized Parole + Alternatives to Detention (ATD) since January 2, 2023, and has disseminated guidance to the field instructing that Parole + ATD not be utilized due to the court's vacatur.

2

5. I submit this declaration to inform the court of the operational challenges USBP has faced and the measures CBP has undertaken to increase the speed at which noncitizens depart CBP facilities, including by decreasing processing times during periods of high encounters since March 8, 2023.

6. USBP has taken numerous steps to address periods when there are high encounters, and in particular, in anticipation of the termination of the Centers for Disease Control and Prevention's Title 42 public health Order .

   a. CBP has been engaging in A-file digitization, to streamline review and expedite processing for Notice to Appear/Own Recognizance (i.e., the processing of noncitizens for removal proceedings under section 1229a of the Immigration and Nationality Act (INA) and release under section 1226(a) of the INA on a case-by-case basis) that was previously paper-based. This process is live in a number of sectors across the Southwest border, including El Centro, Yuma, San Diego, and Tucson.

   b. CBP is increasing mobile intake, which is an application installed on CBP Mobile devices that replaces the paper field intake forms used by USBP to document biographical data from the non-citizens encountered.  The application greatly reduces the time needed to perform this function as it transmits the information directly to the CBP database, Enforce 3rd Generation (e3) upon submission.

   c. CBP has relied upon DHS employees detailed to the Southwest border through the DHS volunteer force to respond to the border crisis and to stabilize the region. Volunteers are assigned to one of five roles that provide services to migrants and detainees: meal distribution, medical assessment, hospital watch, personal

3

A0439

property management, or high-capacity transport. These actions allow a greater number of immigration officers, including Border Patrol Agents, to be available to engage in activities such as processing noncitizens.

d.  CBP is engaging in virtual and mobile processing technologies to make processing functions more efficient. This includes the use of laptops and other mobile devices that allow agents to begin the processing and screening of migrants in the field when possible.

e.  CBP has been utilizing Border Patrol Processing Coordinators (BPPC), who are not immigration officers but are employed by USBP, to perform administrative tasks related to processing individuals apprehended by Border Patrol agents. This position may also assist in the transportation of individuals and property in USBP custody, as well as assisting with custodial watch of detainees in hospitals. The BPPC position allows Border Patrol agents to more effectively focus on their mission of border security and safeguarding the American public.

f.  CBP has also streamlined its Notice to Appear/Own Recognizance process to be able to utilize this processing pathway to the greatest extent possible, ensuring while all steps required for legally sufficient processing are taken, that the process only includes those steps legally and operationally required.

g.  USBP has received assistance from CBP's Office of Field Operations, the operational component of CBP that normally operates at the Ports of Entry, in multiple Southwest border sectors for transportation, security, and processing noncitizens initially apprehended by USBP.

4

7. Finally, the Biden Administration has deployed Department of Defense 1,500 military personnel to the Southwest border to assist CBP in non-immigration officer functions, such as ground-based detection, monitoring, data entry and warehouse support duties.

8. Understanding that there have been an increasing number of migrant encounters, and in anticipation of even higher encounter numbers in connection with the with the termination of Title 42, CBP has also taken action to increase its holding capacity.

   a. CBP has increased its soft-side facilities (SSF), to include opening two new SSF in El Paso and San Diego sectors in January 2023. DHS is seeking additional funding for SSF in the FY2024 budget.

   b. Yuma has recently increased their SSF capacity to accommodate a larger number of noncitizens for processing and an expansion is underway in El Paso.

9. I understand that Mexico currently is not accepting any returns under the Migrant Protection Protocols (MPP).

10. While USBP has been putting these additional steps mentioned above in place, encounters remain at a historic high. As of May 9, 2023, USBP was holding more than 27,000 noncitizens in custody. This is overcapacity in eight of nine Southwest border sectors. Currently, the USBP is on pace to surpass the 2.1 million encounters recorded in Fiscal Year (FY) 2022. During FY23 to date, USBP has encountered approximately 1.33 million 1noncitizens. The termination of Title 42 is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. Over the last week, the ten day average encounters is 9,087, with May 8, 9, 10 and all surpassing 10,000 apprehensions with a daily in custody average of 23,646. On balance, daily encounters have been outpacing daily bookouts, that is a final release from

5

a CBP holding facility, to include transfer to ICE custody, release, repatriation, or

expulsion from the United States, by approximately 950 noncitizens over the last seven

days.

11. At the current operational pace, and without any additional measures such as Parole with

Conditions, USBP could have over 45,000 individuals in custody by the end of the

month.

12. On May 10, 2023, Chief Ortiz signed the *Policy on Parole with Conditions in Limited*

*Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)*

memorandum given the increasing noncitizen encounters, high custody numbers, and

USBP's dedicated attempts in the last few months to increase throughput and decrease

processing times for each noncitizen.

13. This memorandum has numerous significant differences from the *Policy on the Use of*

*Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022)

memorandum.

   a.  Parole under this policy "is automatically terminated upon expiration of the

       period for which parole was authorized." Parole generally terminates in 60 days.

   b.  This memorandum emphasizes that Parole with Conditions is simply one

       available pathway and each decision for parole must be made on an individualized

       case-by-case basis.

   c.  This memorandum emphasizes that even where a Sector has been approved to

       utilize the Parole with Conditions, that it must be used only after a case-by-case

       individualized determination for each noncitizen. Such approval in no way

       permits blanket paroles from a Sector.

6

A0442

d. This memorandum has more stringent factors for a Sector to even be considered for approval to consider Parole with Conditions. Moreover, it requires that when the Sector has fallen below the 95% capacity mark, whether or not the time period for approval has run, the Sector should cease considering individuals for Parole with Conditions.

e. This memorandum emphasizes that parole decisions must be made based on the circumstances facing an individual, not just overall system efficiency concerns. The policy recognizes that individual noncitizens in USBP's custody are entitled to appropriate and safe detention conditions and focuses on the concerns for a noncitizen, including the urgent humanitarian reasons related to custody conditions, rather than the overall USBP concerns about potential overcrowding.

f. This memorandum is supported by the analysis of the DHS Office of Health Security with respect to the noncitizen's experience in overcrowded conditions and takes those concerns into consideration.

14. Although there has not been sufficient time to fully review the operationalization of the Parole with Conditions memorandum, initial indications are that these changes to Parole + ATD were operationally significant. For instance, not all sectors along the Southwest border have been approved to utilize the Parole with Conditions pathway.

15. The health and safety of individual noncitizens are at risk, posing an urgent humanitarian reason for parole. The DHS Chief Medical Officer has opined that "[b]ased upon the data, current conditions pose an increased risk of adverse health outcomes." *Southwest Border Facilities – Overcrowding Health Concerns,* DHS Acting Chief Medical Officer and Senior Medical Officer (May 9, 2023). Conditions, such as overcrowding and

7

increased movement of noncitizens between facilities, may result in adverse health outcomes of individual noncitizens, including the spread of communicable diseases (e.g., Measles, Varicella, etc.) among noncitizens held in these facilities. Noncitizens held in overcrowded facilities are not only vulnerable to communicable diseases, but this vulnerability is likely to be compounded by some aspects of the noncitizens' journey including poor health and nutrition, lack of access to health care, and/or inadequate water, sanitation, and hygiene services while migrating to the Southwest border.

16. While a solution to these high numbers may be to actively not apprehend noncitizens, CBP also needs to minimize unlawful border crossers who are observed making an unlawful entry into the United States, not apprehended, and not turned back.  Any potential active decision to allow for not to apprehend such individuals contravenes USBP's mission is to detect and prevent the illegal entry of individuals in the United States. Moreover, if USBP were to actively decline to detain such individuals, transnational criminal organizations and human smugglers will be able to direct noncitizen traffic to those areas, and there will be a serious life and safety concern for noncitizens.

17. It is critical to understand that when individuals are not apprehended by USBP there is a possibility that those individuals will simply enter the United States. Included within any such group that USBP is unable to apprehend could be those linked with terrorist organizations, those with criminal records, human smugglers, those actively trafficking other members of the same group (which could include children), and vulnerable children not accompanied by their parents, as well as those entering seeking protections like

8

asylum. Without processing individuals, it is impossible to know the demographics, vulnerabilities, and national or public safety risk of any person.

18. CBP is under obligation to provide certain short-term holding conditions in the Tucson Sector, pursuant to a court order in *Doe*. For instance, individuals must be provided mats, blankets, and the ability to privately wash or clean themselves within twelve hours of arriving at a USBP facility. They must also be provided a raised bed, a cloth blanket showers, adequate food, potable water and a medical assessment within forty-eight hours of arriving at a USBP facility.

19. CBP is also under obligation consistent with the longstanding *Flores* settlement to ensure that custody conditions for minors are safe and sanitary. Moreover, pursuant to this settlement, DHS must expeditiously release from its custody all minors, including those who enter with their parents.

20. Given all the above information, a court order determining that CBP cannot release individuals from USBP custody, exacerbate already very seriously concerning holding conditions, likely force operational conditions that causes CBP to violate the court orders in *Doe* and *Flores*, and have extremely dire and catastrophic consequences.

21. Indeed, given all of the steps that USBP has already undertaken to streamline the processing of individuals, increase processing capacity, surge resources and increase its capacity to temporarily detain people for processing, while we continue to assess all options as circumstances evolve, at present the alternatives appear limited. Should the Parole with Conditions memorandum be enjoined, it is possible that USBP will be left with only untenable options such as declining to fully process individuals at all and

9

potentially not even apprehending them to start. The public safety and national security

impacts of such an impact would be extraordinary.

22. I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief, as of the time of signature.

Executed this 11th day of May, 2023.

Matthew J. Hudak
Deputy Chief of the U.S. Border Patrol
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security

10

A0446

A0447

A0448

A0449

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                             Case No. 3:23-cv-9962

ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; RAUL ORTIZ, Chief of Border
Patrol, in his official capacity; the
UNITED STATES OF AMERICA,

    *Defendants*.

_____/

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY RELIEF

## INTRODUCTION

1.    Much ink has been spilled regarding Florida's dispute with the Biden Administration over the mass release of aliens at the Southwest Border.

2.    On March 8, 2023, after a year and a half of litigation, this Court vacated one of the Biden Administration's unlawful release policies under the Administrative Procedure Act (APA) and entered final judgment. *See* Op. & Order,

Doc. 157, *Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla. Mar. 8, 2023) (Wetherell, J.).[1]

3.    The vacated policy was known as the Parole Plus Alternatives to Detention Policy (Parole + ATD).

4.    Rather than seek an emergency stay, the Department of Homeland Security (DHS) sat on its hands for 58 days before even filing a notice of appeal.

5.    Now, with the Title 42 order set to expire on May 11, DHS apparently regrets that decision. The agency, entirely unprepared for the surge of migrants that will come to the Southwest Border when Title 42 ends, did not plan for this plainly foreseeable result.

6.    Today is May 10, the day before the Title 42 order expires, and the media reports that DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border.[2]

7.    That plan may violate the Court's vacatur. *See* Op. & Order at 108.[3] But it is unquestionably cynical, in bad faith, and contrary to both the Immigration and Nationality Act (INA) and the APA. It is also, unfortunately, consistent with the

---

[1] All further citations to "Op. & Order" refer to Judge Wetherell's March 8 Opinion and Order unless otherwise noted.

[2] https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-track-rcna83704.

[3] To ensure consistency between any motion to enforce the existing judgment and the relief sought in this case, Florida plans to move to transfer this case to Judge Wetherell.

1

game of whack-a-mole DHS has been playing with Florida and this Court for almost two years.

8.    Florida seeks a temporary restraining order, a preliminary injunction, an order postponing the effective date, and ultimately vacatur of the new policy.

## PARTIES

9.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

10.    Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

11.    Defendant Alejandro Mayorkas is the Secretary of DHS. DHS is the federal agency principally responsible for immigration enforcement. As most relevant here, DHS oversees U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE). Florida sues Secretary Mayorkas in his official capacity.

12.    Defendant Raul Ortiz is the Chief of Border Patrol, which is a component of CBP. Florida sues him in his official capacity.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361, and 5 U.S.C. §§ 702–03.

A0452

14.   The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 705–06, 28 U.S.C. §§ 1361 and 2201–02, the Constitution, and the Court's equitable powers.

15.   Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). *Florida v. United States*, No. 3:21-cv-1066, 2022 WL 2431443, at *2 (N.D. Fla. Jan. 18, 2022). Further, because this lawsuit principally concerns conduct related to Florida's previous challenge, which was litigated in this division, a substantial part of the events or omissions giving rise to Florida's claims occurred here.

## FACTUAL BACKGROUND

16.   On September 28, 2021, Florida filed its Complaint in *Florida v. United States*. Doc. 1, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla.).

17.   Florida initially challenged DHS's "prosecutorial discretion" policy, which involved the mass release of aliens at the Southwest Border without any processing or accountability. Shortly after Florida sued, DHS replaced that policy with the first Parole + ATD Policy (the November Parole + ATD Policy). Doc. 6-2, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla. Dec. 3, 2021).

A0453

18.     Eight months later, DHS rescinded the November Parole + ATD Policy and replaced it with the July Parole + ATD Policy. *See* Doc. 70, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla. July 20, 2021).

19.     It is plain from the record that DHS's practice of constantly changing its policies was based on DHS's conclusion that its policies were indefensible.

20.     As Judge Wetherell remarked during closing arguments, "it seemed to me that the real reason" for the policy change was that "doing prosecutorial discretion releases . . . was more challenging to defend than something based on a specific parole statute."

21.     Similarly, Judge Wetherell remarked at the pretrial conference that he "would hope it would be fairly obvious to everyone" that the prosecutorial discretion practice was "invalid."

22.     Judge Wetherell made similar comments with respect to the first iteration of Parole + ATD. Specifically, he said that he was "pretty clear" as the case progressed that if DHS "had not come up with a new memo and a new administrative record . . . it was dead on arrival." He further stated that it was "pretty obvious . . . that [DHS] created this new July memo to backfill the problem they had with a policy that was completely indefensible."

23.     On March 8, 2023, the Court vacated the July Parole + ATD Policy and remanded to DHS for further proceedings. Op. & Order at 108. The Court did not

A0454

vacate the prosecutorial discretion policy or the November Parole + ATD Policy because DHS insisted that it had abandoned those policies and any such challenges were therefore moot.

24.    DHS did not seek an emergency stay of the Court's order. Instead, DHS waited until the second to last business day before the deadline to file its notice of appeal. Doc. 159, No. 3:21-cv-1066-TKW-ZCB (N.D. Fla. May 5, 2023).

25.    Based on DHS's repeated representations to Florida and to the Court, both by its attorneys and by its employees and agents under oath, the Court's vacatur left DHS with Order of Recognizance releases under 8 U.S.C. § 1226(a) as the only available processing mechanism for Border Patrol to release aliens *en masse* at the Southwest Border. Notably, releases under § 1226(a) require DHS to first initiate removal proceedings against the alien as a precondition for release.

26.    On May 9, 2023—approximately two months after the Court vacated the July Parole + ATD Policy—the media began reporting that Border Patrol planned to restart the mass release of migrants at the Southwest Border upon the expiration of the Title 42 order on May 11, 2023.

27.    On May 10, a DHS spokesperson told the media that DHS plans to employ the "targeted use of parole [to] allow Border Patrol to focus its resources

A0455

most effectively [on] quickly process[ing] and remov[ing] individuals who do not have a legal basis to remain in the country."[4]

28.    In short, rather than seek a stay of the Court's judgment in good faith, the Biden Administration plans to continue its game of whack-a-mole with Florida and with this Court by promulgating yet another unlawful policy. And DHS apparently hopes that with final judgment entered in *Florida v. United States* and an appeal pending, Florida will have to start from scratch.

29.    As the Court already recognized, Florida is injured by DHS's mass release of aliens at the Southwest Border, including by paying education expenses, unemployment benefits, the costs of incarceration, emergency Medicaid, and other similar benefits. Op. & Order at 44, 53–58. And those injuries are irreparable because DHS has sovereign immunity.

30.    Florida therefore seeks the following relief.

## CLAIMS

## COUNT 1

### Agency action that is not in accordance with law and is in excess of authority in violation of the APA

31.    Florida repeats and incorporates by reference ¶¶ 1–30.

---

[4] https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-track-rcna83704.

A0456

32.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

33.     DHS's new policy violates 8 U.S.C. §§ 1225(b), 1226(a), and 1182(d)(5).

## COUNT 2

### Arbitrary and capricious agency action in violation of the APA

34.     Florida repeats and incorporates by reference ¶¶ 1–30.

35.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

36.     While DHS has not yet provided a copy of the new policy to Florida, it is impossible to imagine that DHS has engaged in reasoned decisionmaking. DHS should have sought an emergency stay of the Court's vacatur if it disagreed with the Court's ruling. DHS is instead thumbing its nose at a coequal branch of government.

## COUNT 3

### Failure to conduct notice and comment in violation of the APA

37.     Florida repeats and incorporates by reference ¶¶ 1–30.

38.     The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

A0457

39.     As the Court already explained, Op. & Order at 99–102, new release policies like the one at issue here are subject to notice and comment. Nor could DHS possibly have good cause given its own delay and poor planning.

### PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a)  Expedite this action.

b)  Enter a temporary restraining order preventing DHS from enforcing or implementing the new policy.

c)  Delay the effective date of the new policy under 5 U.S.C. § 705.

d)  Preliminarily and permanently enjoin Defendants from enforcing or implementing the new policy.

e)  Hold the new policy unlawful and set it aside under 5 U.S.C. § 706.

f)  Issue declaratory relief declaring the new policy unlawful.

g)  Award Florida costs and reasonable attorney's fees.

h)  Award such other relief as the Court deems equitable and just.

A0458

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Joseph E. Hart (FBN 124720)
COUNSELOR TO THE ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT BUREAU CHIEF

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

A0459

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**　　　　　　　　　　　　　　　**Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS, et al.**,

    **Defendants**.

_____/

## <u>TEMPORARY RESTRAINING ORDER</u>

This case is before the Court based on Florida's emergency motion for a temporary restraining order (TRO) (Doc. 2) and Defendants' response in opposition (Doc. 9).  No hearing is necessary to rule on the motion, and upon due consideration of the parties' filings and the entire case file, the Court finds for the reasons that follow that the motion is due to be granted.

### Background

The Southwest Border has been out of control for the past 2 years.  And it is about to get worse because, at midnight tonight, the Title 42 Order expires.[1]

---

[1] The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims.  The expiration of the Title 42 Order has been a long time coming because it was put in place by the Center for Disease Control to address public health concerns about COVID-19, and it is common knowledge that the COVID-19 pandemic has been "over" for quite some time.  *See Arizona v. Mayorkas*, 143 S. Ct. 478, 479 (2022) (Gorsuch, J., dissenting) (noting that there was no serious

The expiration of the Title 42 Order is expected to result in a "surge" of aliens seeking to enter the country because there are reportedly tens of thousands of aliens staged at the Southwest Border waiting for the Title 42 Order to expire so that they can seek to enter the country.  And that is on top of the tens of thousands of aliens that have reportedly crossed the border into the country each day over the past few weeks in anticipation of the Title 42 Order expiring.

The current situation at the border underscores the Court's recent finding that there is an immigration "crisis" at the Southwestern Border. *See Florida v. United States*, 2023 WL 2399883, at *1 (N.D. Fla. Mar. 8, 2023).  And, consistent with the Court's finding, President Biden reportedly acknowledged within the past few days that there has been "chaos at the border for a number of years" and warned that the situation at the Southwest Border is going to be "chaotic for a while" after the Title 42 Order expires.

The Biden Administration blames Congress for the immigration crisis and the chaos coming to the border.   Congress blames President Biden and his Administration.  In the *Florida* decision, the Court pinned much of the blame for the crisis at the border on the "non-detention policies" put in place by the Biden

---

dispute that the public-health justification undergirding the Title 42 orders has lapsed, that "the current border crisis is not a COVID crisis," and that "courts should not be in the business of perpetuating administrative edicts designed for one emergency only because elected officials have failed to address a different emergency").

A0461

Administration—but the Court noted that it is the responsibility of the political branches (collectively), not the Court, to solve the immigration crisis. *Id.*; *see also id.* at *21 (noting that the Court's job was to merely "to 'say what the law is' … and then let the political chips fall where they may").

The Court hoped that after issuing the decision in *Florida*, it would be able to go back to its normal docket and simply watch the political finger-pointing about the immigration crisis from afar. That, however, was not to be.

Yesterday afternoon, I was randomly assigned a new lawsuit filed by Florida against DHS Secretary Mayorkas, U.S. Border Patrol (USBP) Chief Ortiz, and the United States of America, alleging that "DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border." Doc. 1 at 2 (¶6) (citing an NBC news article[2] quoting a DHS spokesperson's summary of the plan). Florida claimed that this "new policy" violates this Court's decision in *Florida* that vacated DHS's "Parole+ATD policy" and is contrary to the Immigration and Nationality Act (INA). *Id.* (¶7). Among other things, Florida's complaint asks the Court to declare the new policy unlawful and enjoin DHS from enforcing or implementing it. *Id.* at 9.

This morning, Florida filed an emergency motion asking the Court to enter a TRO "preventing DHS from implementing the new parole policy or otherwise using

---

[2] *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT).

A0462

[8 U.S.C.] §1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Florida thereafter filed a copy of the challenged policy with the Court. *See* Doc. 5-1. Defendants were ordered to file a response to Florida's emergency motion on an expedited basis, which they did.

### The Challenged Policy

The policy challenged by Florida in this case is set forth in a memorandum issued by U.S. Border Patrol Chief Raul Ortiz yesterday, titled "Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)." The memorandum explains how U.S. Customs and Border Patrol (CBP) will exercise its parole authority under 8 U.S.C. §1182(d)(5) to release arriving aliens into the country "conditioned on [the alien], within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility for initiation of appropriate removal proceedings or requesting service, via designated online location, of a Notice to Appear (NTA) by mail." *See* Doc. 5-1 at 1.

The memorandum explains that CBP will exercise its parole authority under the policy when "there are conditions requiring the expeditious processing of [aliens] in exigent circumstances in order to ensure (1) appropriate and safe conditions for the health and safety of individual [aliens] in custody and (2) USBP's continued

4

ability to carry out its critical border security and enforcement mission." *Id.* at 2. The policy states that it is a "tool that should only be used when one of the limited triggers below are met." *Id.* The triggers include processing capacity and time-in-custody thresholds at CBP facilities and periods when there are more than 7,000 apprehensions per day across the Southwest Border. *Id.* at 4.[3]

When those triggers are met, the policy requires an "individual assessment" of the alien for parole eligibility. *Id.* at 5-6. That assessment includes, among other things, a "biometric identity verification," an evaluation of the alien's "immigration background," and "vetting of any national security or criminal concerns." *Id.* at 5. The policy also requires USBP to collect and document a physical address for each alien, *id.* at 6, but it does appear to require any action to verify the legitimacy of the address.

The memorandum states that the parole policy may not be used for aliens who "pose a national security risk, unmitigable flight risk, public safety threat," or who are unaccompanied children. *Id.* at 6. Nor may the policy be used if the alien is subject to the mandatory detention requirements in 8 U.S.C. §1226(c). *Id.*

---

[3] It is noteworthy that the affidavit submitted by Defendants explains that eight of nine sectors are already over capacity and predicts that there will be 12,000 to 14,000 encounters per day over the coming weeks, which suggests that these triggers will be readily met and that use of the challenged policy will be widespread and immediate.

A0464

The memorandum claims that the aliens "are not simply released into the community" because "they are required to schedule an appointment with ICE for the initiation of … removal proceedings, as appropriate, or, at a designated online location, request service of an NTA by mail," *id.* at 2, but the grant of parole under the challenged policy does not place any restrictions on where the aliens can go or require electronic monitoring or any other safeguard to track the aliens' locations once released into the country.  The memorandum states that the "initial" grant of parole "should generally be for 60 days," *id.* at 5, which suggests that there could be circumstances where parole could initially be granted for more than 60 days and/or that the parole could be extended through subsequent grants.

The memorandum states that the purpose of the parole is to "allow[] the [alien] to schedule an appointment to appear at an ICE facility for the initiation of appropriate removal proceedings of an NTA by mail," and it states that the parole is "automatically terminated upon expiration of the period for which parole was authorized."  *Id.*  The memorandum states that "CBP and ICE will equally share responsibility and work jointly to streamline and complete charging document issuance" for aliens paroled under the policy, *id.*, but it does not explain who is responsible for tracking down any aliens who do not check in with ICE as required as a condition of parole.

A0465

The memorandum concludes by asserting that the new parole policy is not subject to notice and comment under the Administrative Procedure Act (APA) because the situation at the border is "quickly evolving into exigent circumstances" and "urgent action" is required based on the "surge" that USBP is experiencing at the Southwest Border over the past week.  *Id.* at 6-7.  However, the memorandum does not explain how this surge was unexpected or why DHS waited until the day before the Title 42 Order was scheduled to end before issuing the new parole policy.

## Analysis

The Court has authority to issue a TRO under Fed. R. Civ. P. 65.

"A TRO … is appropriate where the movant demonstrates that (a) there is a substantial likelihood of success on the merits; (b) the TRO … is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO … would cause to the non-movant; and (d) the TRO … would not be averse to the public interest."  *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

A TRO "is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites," *see United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974)), but "the first two factors … are the most critical," *Niken v. Holder*, 556 U.S. 418, 435 (2009); *see also Schiavo*

7

*ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("The first of the four prerequisites to temporary injunctive relief is generally the most important.").

The Court finds for the reasons that follow that Florida has carried its burden of persuasion.

With respect to the first factor, the Court has no trouble concluding that Florida has a substantial likelihood of success on the merits because the challenged policy appears to be materially indistinguishable from the Parole+ATD policy vacated in *Florida*—both in its purpose (reducing overcrowding at border patrol facilities) and manner of operation (releasing aliens into the country without first issuing a charging document placing them in immigration proceedings and simply directing the aliens to report to ICE within a specified period for further processing).[4] The Court determined in *Florida* that the Parole+ATD policy was final agency action under the APA, that Florida had standing to challenge the policy, and that the policy violated the APA because it was contrary to law, arbitrary and capricious, and adopted without notice and comment.[5] The Court sees nothing materially different

---

[4] One curious difference is that, under the Parole+ATD policy, aliens were given only 15 days to report to an ICE facility to be issued an NTA, but under the new policy, aliens are given four times as long (60 days) to report to an ICE facility. The memorandum adopting the new policy does not explain the rationale for this extended period, and it would seem that the longer the alien is in the country, the greater the chance that he or she will disappear and the more difficult it will be to find him or her for removal proceedings.

[5] Defendants' arguments on these points (Doc. 9 at 15-19, 28-38) largely rehash the arguments that (rightly or wrongly) the Court rejected in *Florida*, and their new argument that "good cause" excuses compliance with notice and comment (*id.* at 32-36) is unpersuasive because

A0467

about the new policy or the parties' arguments that would compel a different result with respect to the policy challenged in this case.

One of the fundamental flaws with the Parole+ATD policy is that it did not contemplate that the alien would be returned to custody once the purposes of parole had been served, as required by the plain language of 8 U.S.C. §1182(d)(5).  *See Florida*, 2023 WL 2399883, at *29-30.  The same appears to be true of the challenged policy, which is primarily intended to relieve overcrowding at border patrol facilities by more quickly releasing aliens into the country for further processing when (or if) they report to an ICE facility.  The policy does not contemplate that the alien would be taken into custody at the ICE facility and, as was the case with the Parole+ATD policy, aliens released under the challenged policy would not have an immigration "case" that can "continue to be dealt with" after the purposes of the parole have been served.  *Id.* at *30.

---

Defendants have known for quite some time when the Title 42 Order was going to expire and what was likely to happen when it did.  *See Florida*, 2023 WL 2399883, at *3 (finding that the encounters at the border "are expected to increase significantly when the Title 42 Order is no longer in place"); *Arizona*, 143 S. Ct. at 479 (Gorsuch, J., dissenting) (noting in an opinion issued in December 2022 that "[e]ven the federal government acknowledges that the end of the Title 42 orders will likely have disruptive consequences") (internal quotations omitted).  Moreover, it appears that there was ample time for DHS to go through notice and comment if it wanted to—as it did with the new asylum rules initially noticed in February 2023 and finalized yesterday as part of DHS's strategy to deal with the expiration of the Title 42 Order.

A0468

The challenged policy appears to do a better job than the Parole+ATD policy in explaining how it conforms to the "case-by-case" requirement in §1182(d)(5).[6] However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the the evidence in *Florida*, which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports." *Id.* at *12; *see also id.* at *31 (rejecting DHS's argument that the Parole+ATD policy conforms to the parole regulation, 8 C.F.R. §212.5, because "the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States").  Moreover, whenever the policy discusses individual, case-

---

[6] That said, given that the stated purpose of the policy is to move aliens out of border patrol facilities and into the country more quickly, it seems unlikely that the "case-by-case" assessment will be meaningful. *See Florida*, 2023 WL 2399883, at *30 (finding that it was "implausible" that the border patrol could meaningfully assess an alien's individual circumstances in 15 to 30 minutes); *Biden v. Texas*, 142 S. Ct. 2528, 2254-55 (2022) (Alito, J., dissenting) (noting that "simply ... going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review" and that the sheer number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis").

A0469

by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

Additionally, the memo adopting the challenged policy does not reflect any consideration of the additional backlog that will likely be created by releasing aliens into the country without initiating immigration proceedings and then having to track them down to do so if they do not report to ICE—as DHS had to do in the "Operation Horizon" program discussed in the *Florida* decision. *Id.* at *11, *32.

The Court did not overlook Defendants' arguments as to why Florida is unlikely to succeed on the merits and why the new policy is different from the vacated Parole+ATD policy. *See* Doc. 9 at 20-36. However, the Court simply does not find those arguments persuasive. That said, the Court agrees with Defendants that the *Florida* decision "did not preclude DHS from using its parole authority in other ways," *id.* at 22, but what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in the *Florida* decision and then expect a different outcome when that policy is challenged.

11

A0470

With respect to the second factor, the evidence presented in *Florida* established that Florida suffers substantial harm—both to its sovereignty[7] and its public fisc—when the federal government releases aliens into the country on "parole" (or otherwise) rather than detaining them as required by the INA. *See Florida*, 2023 WL 2399883, at \*17-18. That same harm will flow from the new policy because, as was the case with the Parole+ATD policy vacated in *Florida*, the new policy is intended to "shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations." *Id.* at \*14. The harm to Florida is irreparable because it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), because the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also State of Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (observing that in an APA action, sovereign immunity bars the recovery of monetary damages from the federal government, thereby making the state's financial injury irreparable), and there is no

---

[7] The Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). And, as Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

A0471

way to remedy the impact on state sovereignty that flows from the Florida's inability to exclude aliens who were improperly "paroled" into the country from its territory.

The third and fourth factors "merge when the Government is the opposing party." *Niken*, 556 U.S. at 435.   "The public interest in enforcement of the immigration laws is significant," *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), and it is even more significant here because DHS's decision to "parole" aliens into the country without first initiating immigration proceedings is precisely what the Court told DHS it could not lawfully do in *Florida*. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[F]rustration of federal statutes and prerogatives are not in the public interest…."); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Becerra*, 544 F. Supp. 3d at 1304 (concluding that the state's high likelihood of success on the merits showed that injunctive relief preventing the likely unlawful agency action was in the public interest).

The Court did not overlook Defendants' argument that the new policy "comes in response to a moment of crisis at the border," Doc. 9 at 13, and that "[a]n order restricting DHS's parole authority on the eve of the crisis has the serious potential

A0472

to cause chaos and undermine the security of the border and the safety of border officials," *id.* at 5.   Putting aside the fact that even President Biden recently acknowledged that the border has been in chaos for "a number of years," Defendants' doomsday rhetoric rings hollow because, as explained in detail in *Florida*, this problem is largely one of Defendants' own making through the adoption an implementation of policies that have encouraged the so-called "irregular migration" that has become fairly regular over the past 2 years.

Nor did the Court overlook the assertion in the affidavit submitted by Defendants with their response in opposition to the motion for a TRO that "[t]he public safety and national security impacts of [enjoining the Parole with Conditions memorandum] would be extraordinary" because it would force USBP to "violate court orders" and possibly leave USBP with "only untenable options such as declining to fully process individuals at all and potentially not even apprehend them to start."   Doc. 9-2 at 9-10.   However, USBP has been in essentially that same position since March when the Court vacated the substantially identical Parole+ATD policy.   Moreover, the Court fails to see a material difference between what CBP will be doing under the challenged policy and what it claims that it would have to do if the policy was enjoined, because in both instances, aliens are being released into the country on an expedited basis without being placed in removal proceedings and with little to no vetting and no monitoring.

14

Finally, although the Government did not make the argument, the Court did not overlook that 8 U.S.C. §1252(f)(1) prohibits any court other than the Supreme Court from "enjoin[ing] or restrain[ing] the operation" of certain aspects of the INA. However, §1252(f)(1) specifically refers to Part IV of the INA, and the parole statute that Defendants purport to implement through the challenged policy is in Part II of the INA.  Thus, as explained in *Florida*, §1252(f)(1) does not preclude the Court from enjoining DHS's misuse of its parole authority.  2023 WL 2399883, at *35 (rejecting DHS's argument that §1252(f)(1) precludes the Court from enjoining the Parole+ATD policy and noting that "any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having 'enjoined or restrained' the operation of that part") (alterations adopted).

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a TRO enjoining the implementation and enforcement of DHS's newly adopted parole policy.  No bond is required.[8]  Accordingly, it is

---

[8] Rule 65(c) states that the court may issue a TRO "only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," but it is well established in this Circuit that "the amount of security required by the rule is a matter within the discretion of the trial court" and "the court 'may elect to require no security at all.'" *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (quoting *Corrigan Dispatch Co. v. Casaguzman, F.A.*, 569 F.2d 300, 303 (5th Cir. 1978)).  Here, Defendants do not identify any monetary costs or damages they might suffer if the new parole policy is temporarily enjoined, so the Court sees no

A0474

**ORDERED** that:

1.    DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."

2.    This TRO will take effect at 11:59 p.m. eastern time to correspond with the expiration of the Title 42 Order and to give Defendants an opportunity to seek an emergency stay from a higher court.

3.    This TRO will expire 14 days from the date of this Order. *See* Fed. R. Civ. P. 65(b)(2).

4.    A preliminary injunction hearing is scheduled for May 19, 2023,[9] at 9:00 a.m. in the United States Courthouse, 1 North Palafox Street, Courtroom 4 North, Pensacola, Florida.

---

reason to impose a bond as a condition of the TRO. *Accord Texas v. United States*, 524 F. Supp. 3d 598, 668 (S.D. Tex. 2021) (requiring no security bond for preliminary injunction barring DHS from pausing removals).

[9] The hearing was scheduled for this date because the Court has two long-overdue criminal trials scheduled for the following week. The Court understands that Fed. R. Civ. P. 65(b)(3) states that the preliminary injunction hearing is to "tak[e] precedence over all other matters except other matters of the same character," but the Court is not inclined to reschedule those trials when it has an earlier date available for the preliminary injunction hearing. And, if the May 19 date is not convenient to the parties, they can agree to a brief extension of the TRO under Rule 65(b)(2) to allow the preliminary injunction hearing to occur the following week—perhaps on May 30. Or, if the parties have no other evidence or argument that they think might change the Court's mind on application of the preliminary injunction factors, they can agree to convert this TRO into a preliminary injunction so they can seek appellate review sooner rather than later.

16

**DONE and ORDERED** this 11th day of May, 2023.

_____

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

A0476

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                            **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, et al.,

    **Defendants**.

_____/

## <u>ORDER DENYING STAY</u>

This case is before the Court based on Defendants' emergency motion to stay (Doc. 13) and Florida's response in opposition (Doc. 21). Upon due consideration of these filings, the parties' stipulation (Doc. 16), and the entire case file, the Court finds for the reasons that follow that the motion to stay is due to be denied.

### Background

On Wednesday, May 10, 2023, Florida filed suit against Defendants (collectively, "DHS"), alleging that "DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border." Doc. 1 at 2 (¶6) (citing an NBC news article[1] quoting a DHS spokesperson's summary of the plan). The following day,

---

[1] Julie Ainsley, *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704, *NBC News*, May 10, 2023.

A0477

Florida filed a motion for a temporary restraining order (TRO) "preventing DHS from implementing the new parole policy or otherwise using [8 U.S.C.] §1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Doc. 2 at 11. The motion was briefed on an expedited basis, and at 8:45 p.m. CDT on Thursday, May 11, the Court granted Florida's motion and entered a TRO. *See* Doc. 10.

The TRO "enjoined [DHS] from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum[2] from U.S. Border Patrol Chief Raul Ortiz, titled 'Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions).'" *Id.* at 16 (¶1). The Order took effect at 11:59 p.m. eastern time and, in accordance with Fed. R. Civ. P. 65(b)(2), it is only effective for a period of 14 days. *Id.* (¶¶2, 3). The Court scheduled a hearing for this Friday, May 19, to determine whether to convert the TRO into a preliminary injunction. *Id.* (¶4).

On Friday, May 12, at 10:36 p.m., DHS filed a single motion to stay both the TRO in this case and the March 2023 judgment in *Florida v. United States*, Case No. 3:21cv1066, which vacated a parole policy known as Parole+ATD. On Saturday, the Court summarily denied the motion to stay the judgment in the *Florida*

---

2 It is undisputed that this memorandum (Doc. 5-1) was what created the policy described in the NBC News article referenced in the complaint and that it is the policy challenged by Florida in this case. The parties refer to this policy as the "Parole with Conditions" policy.

A0478

case because it was "borderline frivolous" and it "defie[d] credibility" for DHS to claim that it would suffer irreparable harm if the judgment was not stayed since DHS waited 58 days to appeal the judgment (and 65 days to request a stay) and a DHS official submitted a sworn declaration in this case stating that DHS had stopped using the Parole+ATD policy in January 2023, before the Court vacated it.  *See Florida v. United States*, Case No. 3:21cv1066, ECF No. 165 (May 13, 2023).  However, the Court noted in a separate order (also entered on Saturday) that "there are different factual and procedural considerations at play" in this case and that "the motion [to stay] at least presents a non-frivolous argument as to why a stay of the TRO might be warranted."  Doc. 15 at 2.  Thus, the Court directed Florida to respond to the motion to stay on an expedited basis—by noon today.  *Id.* at 3 (¶1).

Florida timely filed its response, so the motion to stay in this case is now ripe for resolution.  No hearing is necessary to rule on the motion.

## Analysis

When ruling on a motion for a stay pending appeal,[3] the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed

---

[3]  An appeal has not yet been filed in this case.  It is unlikely that an appeal can be filed at this point because a TRO is generally not appealable and the Court intends to separately enter a preliminary injunction within a day or so, after considering the proposed orders (Docs. 22, 24) submitted by the parties earlier today.  *See McDougald v. Jenson*, 786 F.2d 1465, 1472-73 (11th Cir. 1986).  However, because the parties have stipulated that the Court can covert the TRO into a preliminary injunction without further proceedings—and because DHS threatened to seek relief in the Eleventh Circuit if the Court did not promptly rule on its motion to stay—the Court finds that it is in the interest of justice for the Court to rule on the motion to stay at this time even though no

on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 425-26 (2009)). "The first two factors … are the most critical." *Nken*, 556 U.S. at 434.

Here, as in the *Florida* case, the Court finds that none of the factors weigh in favor of granting a stay.

## Likelihood of Success on the Merits

With respect to the first factor (likelihood of success), for the same reason that the Court found in the TRO that Florida was likely to succeed on its challenge to the Parole with Conditions policy, the Court finds that DHS is not likely to succeed in its appeal of the order enjoining that policy.[4] The Parole with Conditions policy is "materially indistinguishable" from the Parole+ATD policy vacated in *Florida*, and

---

appeal has been filed. If and when DHS appeals the forthcoming preliminary injunction, this Order shall be deemed to have denied any request to stay the preliminary injunction.

[4] DHS argues that it only needs to show that it has a "substantial case on the merits" (rather than the normal "strong showing" of a likelihood of success on appeal) "because the balance of equities so overwhelmingly favors the government," Doc. 13 at 11 (citing *LabMD, Inc. v. Federal Trade Comm'n*, 678 F. App'x 816, 819 (11th Cir. 2016)). However, for the same reasons that DHS has not shown that it will be irreparably harmed if a stay is not granted, it has not shown that the balance of equities weighs in its favor. And even if the lower "substantial case on the merits" standard applies, the Court finds that DHS has not met that standard for the reasons discussed below.

A0480

for the same reasons that the narrow authority in the parole statute, 8 U.S.C. §1182(d)(5)(A),[5] did not authorize the Parole+ATD policy, it does not authorize the Parole with Conditions policy. *See Florida v. United States*, 2023 WL 2399883, at *29-31 (N.D. Fla. Mar. 8, 2023) (explaining why the Parole+ATD policy is "contrary to law").

Like the Parole+ATD policy, the Parole with Conditions policy is a "processing pathway" designed to relieve overcrowding at Border Patrol facilities and release large numbers of aliens into the country on "parole" without even initiating immigration proceedings. *See* Doc. 5-1 at 3 (explaining that the policy is an "additional mechanism[] to ensure that individual noncitizens are processed expeditiously and released from or transferred out of [U.S. Border Patrol] custody in a safe, swift, humane, and orderly fashion"). The Parole with Conditions policy operates in precisely the same manner as the Parole+ATD policy—by allowing immigration officials to "parole" arriving aliens into the country on the condition that they schedule an appointment at an Immigration and Customs Enforcement (ICE) facility (or check-in online) within a specified period to be placed in an

---

[5] This statute provides in pertinent part that "[t]he Attorney General may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, … and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. §1182(d)(5)(A).

A0481

immigration proceeding.[6]   And, like the Parole+ATD policy, the Parole with Conditions policy contravenes the plain language of the parole statute because even though it pays lip service to the "case-by-case" requirement in the statute, it does not require the alien to be "returned to custody" "forthwith" "when the purposes of such parole … have been served," and there is no "case" to "continue to be dealt with" even if the alien was returned to custody because an immigration "case" is not even initiated until the alien is issued a notice to appear when (or if) he or she reports to or checks-in with ICE.   Moreover, the fact that the Parole with Conditions policy allows "paroled" aliens to check-in with ICE online and receive a Notice to Appear by mail all but ensures that the aliens will not be taken back into custody after the purpose of the parole (i.e., being issued a Notice to Appear) has been served.

The Court did not overlook DHS's arguments that it is likely to succeed on appeal of the TRO because Florida lacks standing to challenge the Parole with Conditions policy and because Florida's substantive and procedural challenges to that policy under the Administrative Procedure Act (APA) are destined to fail.   The

---

[6]   As pointed out in the TRO, one difference between the Parole with Conditions policy and the Parole+ATD policy is that aliens were required to check-in with ICE in 15 days under the Parole+ATD policy, but they are given 60 days under the Parole with Conditions policy. *See* Doc. 10 at 8 n.4. Another difference is that the Parole+ATD policy required the alien to actually report to an ICE facility whereas the Parole with Conditions policy only requires the alien to "schedule an appointment" (or check-in online) with ICE.   Those differences do not do anything to help bolster the legality of the Parole with Conditions policy—and, if anything, they seem likely to cause more problems down the road and require DHS to spend additional time and money tracking down aliens who fail to check in with ICE as it was forced to do in the "Operation Horizon" program discussed in the *Florida* decision. *See Florida*, 2023 WL 2399883, at *11.

A0482

Court rejects those arguments because they are no more persuasive with respect to the Parole with Conditions policy than they were with respect to the materially identical Parole+ATD policy at issue in the *Florida* case, *see* 2023 WL 2399883, at *16-20, 29-31, 23-33, and the new "notice and comment" arguments are unpersuasive for the reasons stated in the TRO, *see* Doc. 10 at 8 n.5.  Moreover, as Florida argues, Doc. 21 at 10-11, DHS is unlikely to succeed on its argument that Florida lacks standing to challenge the Parole with Conditions policy because, based on the evidence presented in the *Florida* case, it is reasonable to expect that the Parole with Conditions policy will have the same impact on Florida as did the Parole+ATD and non-detention policies at issue in the *Florida* case.[7]

The Court also did not overlook DHS's argument that it is likely to succeed on appeal because the Court lacked the authority to issue a TRO based on 8 U.S.C. §§1252(f)(1) and 1252(a)(B)(ii).  Doc. 13 at 12-14.  Putting aside the fact that DHS did not make these arguments in its response in opposition to the TRO, the Court finds that these arguments are unpersuasive for the same reasons that the Court

---

[7] The Court did not overlook DHS's argument that the standing evidence in *Florida* related to a different policy and a different timeframe, *see* Doc. 16 at 3, but by the time that case went to trial, there was several years' worth of data showing the number of aliens who had been paroled or otherwise released into Florida.  Here, the Parole with Conditions policy was enjoined the day after it was implemented, but there is no reason to believe that the policy would not have similarly resulted in aliens who otherwise should have been detained being "paroled" into Florida if it had not been enjoined.

A0483

rejected them in the *Florida* case.  *See Florida*, 2023 WL 2399883, at *21, 34-35;

*Florida v. United States*, 2022 WL 2431414, at *11 (N.D. Fla. May 4, 2022).

   Finally, the Court did not overlook DHS's argument that it is likely to succeed

on appeal because the TRO is overbroad since Florida could be provided "'complete

relief' … by an order limited to precluding DHS's implementation of the [Parole

with Conditions policy] as to noncitizens indicating a final address in Florida."  *See*

Doc. 13 at 15.  The Court finds this argument unpersuasive for the same reason that

the Court determined in the *Florida* case that partial vacatur of the Parole+ATD

policy would not provide "complete relief" to Florida.  *See Florida*, 2023 WL

2399883, at *34 ("Once released at the Southwest Border, aliens are free to travel

throughout the United States.  If the Court were to adopt DHS's request—which

would essentially involve DHS asking aliens where they are going and applying the

challenged policies to aliens who don't respond with "Florida"—released aliens

would be free to travel to Florida.  Moreover, if DHS only detained applicants for

admission who say they are traveling to Florida and released other aliens, the Court

expects that it would not take long for immigration law violators to figure out how

to ensure their own release.") (internal citation omitted).

<u>Injury to the Movant if a Stay is Denied</u>

   With respect to the second factor (injury to the movant), the essence of DHS's

argument is that it will be unable to handle the expected post-Title 42 Order "surge"

8

of aliens arriving at the Southwest Boarder without the ability to quickly "parole" them into the country under the Parole with Conditions policy.  The Court finds that argument unpersuasive for several reasons.

First and foremost, the Court does not give much weight to the declaration relied on by DHS to support this argument because some of the representations in the declaration are directly contradicted by public statements made by the DHS Secretary.  For example, before the Title 42 Order expired, the DHS Secretary reportedly stated that only "a fraction of the people that we encounter" would be paroled into the country and that "the vast majority will be addressed in our border patrol facilities and our ICE detention facilities."[8]  And, after the Title 42 Order expired, the DHS Secretary reportedly stated that the number of aliens encountered at the Southwest Border "are markedly down over what they were prior to the end of Title 42."[9]  Thus, it appears that DHS's inability to release aliens under the Parole with Conditions policy is not as big of a deal as it was made out to be in the declaration attached to the motion to stay.[10]

_____

[8] These comments were reported in the NBC news article referenced in the complaint.  *See* note 1, *supra*.

[9] Nouran Salahieh, *End of Title 42 immigration policy brought fewer migrants than expected, but communities are still on high alert*, CNN, May 14, 2023 (https://www.cnn.com/2023/05/14/us/title-42-border-immigration-sunday/index.html).

[10] The parties were given an opportunity to explain why the Court could not at least take judicial notice of the public statements that have been attributed to the DHS Secretary about the lower-than-expected number of encounters in evaluating the weight of the evidence currently

A0485

Second, DHS made similar dire predictions in the *Florida* case. It argued that vacatur of the Parole+ATD policy would have "disastrous consequences … starting the day after [the policy] was ended." *Florida v. United States*, Case No. 3:21cv1066, ECF No 151 at 184. That, however, did not happen, and it has now come to light that DHS stopped using the Parole+ATD policy several months <u>before</u> the Court vacated it.[11] If the sky did not fall then, the Court has no reason to believe that the sky will fall now—despite what the DHS witness claims in his declaration.

---

before the Court. Florida stated that it had no objection to the Court doing so and DHS did not address the issue one way or the other. The Court sees no reason to ignore the Secretary's public comments because it is not entirely clear that the rules of evidence apply at this stage of the case and even though the court elsewhere expressed a "healthy degree of skepticism about the Secretary's comments," the Court also noted that "he is the ultimate boss of DHS" and his public comments give the Court "reason to question the veracity of statements in the [declaration] submitted by a lower-level DHS bureaucrat." *Florida v. United States*, Case No. 3:21cv1066, ECF No. 165, at 5 n.6 (May 13, 2023).

[11] DHS has not argued that the challenge to the Parole+ATD policy was moot or that there was not "case or controversy" with respect to the policy when the Court entered the Opinion and Order in *Florida*, and it would be hard-pressed to make that argument at this point. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (holding that a case may only become moot by a defendant's voluntary cessation of the challenged practice when the defendant meets the "'heavy burden of persuading' the court" that "the allegedly wrongful behavior could not reasonably be expected to recur") (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1285 (11th Cir. 2004) ("[A] challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated."); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267-70 (11th Cir. 2020) (similar); *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1265-67 (11th Cir. 2010) (holding that a case against a governmental actor was not moot because "the record neither yields absolute certainty that the challenged conduct has permanently ceased, nor … supports the conclusion that the … policy was 'unambiguously terminated'"). Judicial review of agency action should not be a game of "whack-a-mole" whereby the agency is able to avoid review of its actions by discontinuing its reliance on a policy only to replace it with another policy that has a different name but operates functionally the same.

10

A0486

Third, "self-inflicted injury" does not establish irreparable harm.  *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (citing 11A Charles Alan Wright, et al., Federal Practice and Procedure §2948.1 (2021), for the proposition that "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted").  The Court will not belabor this point here because, as thoroughly explained in the *Florida* decision, the TRO, and other orders entered over the past few days, the more persuasive evidence showed that Defendants brought the immigration "crisis" at the border on themselves (and the country) by adopting immigration policies that incentivized "irregular migration" by prioritizing "alternatives to detention" over actual detention and that they have known since early March that they would not be able to rely on "parole" as a "processing pathway" to avoid their statutory detention requirements and facilitate release without initiating immigration proceedings.[12]

<u>Injury to the Non-movant if a Stay is Granted</u>

With respect to the third factor (injury to the non-movant), issuance of a stay will injure Florida in the same way that it would have been injured if a TRO was not entered.  Specifically, as explained in the TRO:

---

[12]  The Court did not overlook DHS's argument that it surged resources to the border and have taken other steps (including adopting new asylum rules) to prepare for the expiration of the Title 42 Order and discourage aliens from simply showing up at the Southwest Border.  That is all well and good, but it begs the question as to why these steps were not taken long before now to slow or stop the flow of aliens into the country over the past two years.

A0487

the evidence presented in *Florida* established that Florida suffers substantial harm—both to its sovereignty[FN7] and its public fisc—when the federal government releases aliens into the country on "parole" (or otherwise) rather than detaining them as required by the INA. *See Florida* [*v. United States*], 2023 WL 2399883, at \*17-18 [(N.D. Fla. Mar. 8, 2023)]. That same harm will flow from the new policy because, as was the case with the Parole+ATD policy vacated in *Florida*, the new policy is intended to "shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations." *Id.* at \*14. The harm to Florida is irreparable because it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), because the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also State of Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (observing that in an APA action, sovereign immunity bars the recovery of monetary damages from the federal government, thereby making the state's financial injury irreparable), and there is no way to remedy the impact on state sovereignty that flows from … Florida's inability to exclude aliens who were improperly "paroled" into the country from its territory.

> [FN7] The Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). And, as Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

Doc. 10 at 12-13.

A0488

<u>Public Interest</u>

With respect to the fourth factor (public interest), "[t]he public interest in enforcement of the immigration laws is significant," *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), and "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021).  Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and "frustration of federal statutes and prerogatives are not in the public interest…."  *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Becerra*, 544 F. Supp. 3d at 1304 (concluding that the state's high likelihood of success on the merits showed that injunctive relief preventing the likely unlawful agency action was in the public interest).

Here, as discussed above, the evidence in the *Florida* case established that DHS was misusing its statutory parole authority by creating a new "processing pathway," Parole+ATD, pursuant to which aliens arriving at the Southwest Border would be released into the country with minimal vetting and without being placed into removal proceedings simply to expedite processing at CBP facilities.  The Parole with Conditions policy is materially indistinguishable in its purpose and effect, and just like the Parole+ATD policy, the Parole with Conditions policy

13

A0489

contravenes the narrow authority provided in the parole statute and undermines the general proposition that, under the plain language of 8 U.S.C. §1225(b), arriving aliens are supposed to be detained, not released (on parole or otherwise), during the pendency of their immigration cases.  Thus, staying the TRO and allowing the Parole with Conditions policy to be implemented would contravene the public interest.

The Court did not overlook DHS's argument that a stay is in the public interest because the Supreme Court has frequently stayed district court injunctions in immigration cases and has "necessarily determined [in those cases] that the Government's border-management interests outweighed the plaintiffs' interests." Doc. 13 at 5.  However, the Court does not read those decisions as standing for the proposition that a TRO must be stayed (or that a preliminary injunction cannot be entered) whenever the federal government claims that such action would interfere with its "border-management interests" even if (as the Court found in *Florida*, and appears to be the case here) the manner in which the federal government is "managing" the border contravenes the authority provided by Congress.

Nor did the Court overlook DHS's argument that a stay is in the public interest because it is entitled to "the utmost deference" when its border-enforcement policies are challenged.  *Id.* at 6-7.  The Court does not disagree with that general

A0490

proposition,[13] but as explained in the *Florida* decision, DHS's deference is not unbounded. *See* 2023 WL 2399883, at \*1 (explaining that the immigration officials' "'broad discretion' in carrying out the immigration laws … must be exercised within the confines established by Congress").

Finally, the Court did not overlook DHS's argument that a stay is in the public interest because, without a stay, the TRO will lead to overcrowding in CBP and ICE facilities—which will endanger the health and safety of aliens and border patrol staff and require DHS to resort to other forms of release or simply not apprehend aliens. *See* Doc. 13 at 7-10.   The Court finds this argument unpersuasive because, as discussed above, it appears that the number of post-Title 42 Order "encounters" of aliens arriving at the Southwest Border is considerably less than what was projected in the declaration on which this argument is based.   Moreover, putting aside the political ramifications of DHS officially stating that it might not apprehend or process aliens who entered the country illegally, the Court finds it highly implausible that DHS will do so or re-implement policies (such as the short-lived Notice to

---

[13] DHS cites *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1380-81 (S.D. Fla. 2002), aff'd, 321 F.3d 1336 (11th Cir. 2003), for the proposition that the "standard for reviewing Executive's policies under §1182(d)(5) is extremely deferential and [that the] court must avoid overriding the agency's policy determination, regardless of whether the court agrees with the policymaker's choice or approves of the policy reasons underlying it" (alterations adopted and internal quotations omitted).   To the extent DHS is suggesting that the Court vacated the Parole+ATD policy and/or enjoined the Parole with Conditions policy simply because the Court disagreed with the policy choices underlying that decision, the Court makes clear that those decisions were based on the Court's view of what <u>the law</u> required—nothing more, nothing less.

A0491

Report policy) that it effectively abandoned during the course of the *Florida* case and that its witnesses, including U.S. Border Patrol Chief Ortiz, had a hard time trying to defend from an operational perspective in light of the significant processing time and cost that was required to track down aliens who failed to report.

### Conclusion

In sum, for the reasons stated above, DHS's motion to stay the TRO (Doc. 13) is **DENIED**.  The Court will rule on DHS's request to convert the TRO into a preliminary injunction in the next day or so.

**DONE and ORDERED** this 15th day of May, 2023.

_____
**T. KENT WETHERELL, II
UNITED STATES DISTRICT JUDGE**

A0492

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                             **Case No. 3:23cv9962-TKW-ZCB**

**ALEJANDRO MAYORKAS**, **et al.**,

    **Defendants**.

_____/

## PRELIMINARY INJUNCTION

    This case involves a challenge to an immigration policy known as "Parole with Conditions."[1]  The case has proceeded at a breakneck pace since it was filed last Wednesday, with extensive briefing and multiple orders being issued on an expedited basis.  Currently, the issue before the Court is whether the temporary restraining order (TRO) issued last Thursday should be converted into a preliminary injunction that will remain in effect during the pendency of this case.  This, in turn, will allow Defendants (collectively, "DHS") to seek review of the Court's decision enjoining the challenged policy from a higher court—first, the Eleventh Circuit, and then, if necessary, the Supreme Court.

---

[1]  The policy is contained in a May 10, 2023, memorandum issued by U.S. Border Patrol (USBP) Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."  *See* Doc. 5-1.

## Background

For sake of brevity, the Court will not repeat here what it has said on multiple prior occasions about the ongoing immigration "crisis" at the Southwest Border and the circumstances that contributed to it. Suffice it to say, the Parole with Conditions policy is the latest in a series of policies adopted by DHS over the past two years to expedite the release of aliens arriving at the Southwest Border into the country instead of detaining them until their immigration proceedings are concluded as required by 8 U.S.C. §1225(b).

The Court vacated one of the prior policies—the "Parole+ATD" policy—in an earlier case filed by Florida against DHS. *See Florida v. United States*, Case No. 3:21cv1066, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023). DHS did not appeal the decision in that case until May 5, 2023—the next to last business day of the appeal period and five days before it adopted the Parole with Conditions policy.[2]

On Wednesday, May 10, Florida filed a complaint in this Court challenging the legality of the Parole with Conditions policy. The case was randomly assigned to me.

The next morning, Florida filed an emergency motion for a TRO. DHS was ordered to file a response that afternoon, which it did. That night, after considering

---

[2]  Florida filed a cross-appeal today, presumably so it can argue on appeal that the Court also should have vacated DHS's overriding "non-detention policy" that the Court found to be contrary to the immigration statutes but not subject to judicial review.

A0494

the parties' filings, the Court entered a TRO enjoining DHS from "implementing or enforcing" the Parole with Conditions policy. *See* Doc. 10.

Over the weekend, DHS filed a motion to stay the TRO. Florida was ordered to file a response by mid-day yesterday, which it did. Last night, the Court entered an order denying the stay. *See* Doc. 29.

The Court scheduled a hearing for this Friday, May 19, to consider whether to convert the TRO into a preliminary injunction, but the Court cancelled the hearing yesterday after the parties entered into a stipulation (Doc. 16) waiving their rights to a hearing and agreeing on the evidence that the Court could consider in deciding whether to convert the TRO into a preliminary injunction.

The Court has carefully considered the parties' filings in support of and in opposition to preliminary injunctive relief, including the parties' stipulation, the declarations and other evidence submitted by DHS (*see* Docs. 9-2, 13-1, 13-2, 26-1, 27), the USBP statistical data (*see* Doc. 28), the parties' proposed orders (*see* Docs. 22, 24), and the relevant portions of the trial record in the *Florida* case.[3]  The Court

---

[3]  The parties agreed that the Court may consider evidence from the trial record in the *Florida* case "only to the extent relevant here." Doc. 16 at 2. The parties agree that the evidence in the *Florida* case is relevant to the issue of standing, but DHS disputes whether that the evidence establishes standing here, and it also appears to dispute that evidence about the Parole+ATD policy at issue in *Florida* is relevant to the balancing of the equities in this case. *Id.* at 2-3. The Court rejected DHS's position on the issue of standing in the order denying a stay of the TRO, *see* Doc. 29 at 6-7, and the Court finds that the circumstances of the *Florida* case (including the vacatur of the Parole+ATD policy) are relevant to various injunction factors, as discussed below and in the prior orders entered in this case.

A0495

sees no need for a lengthy order because the Court has entered multiple orders over the past few days analyzing the facts under the same legal standard that governs the issuance of a preliminary injunction.  Thus, in the interest of brevity and an expeditious ruling, this order will simply incorporate by reference the analysis in those prior orders, except in a few instances where additional discussion is warranted based on the new data or arguments that were not specifically addressed in the prior orders.

### Analysis

The Court has the authority to issue a preliminary injunction under Fed. R. Civ. P. 65(a).

Both parties have asked the Court to enter a preliminary injunction.  Florida requested a preliminary injunction in its complaint and the parties agreed that its filings to date can be treated as its motion for preliminary relief, *see* Doc. 16 at 1; and even though DHS does not agree that a TRO should have been entered, it asked the Court to convert the TRO into a preliminary injunction so it can seek appellate review of the Court's decision to enjoin the Parole with Conditions policy, *see* Doc. 13 at 15-17.

To obtain a preliminary injunction, Florida has the burden to prove that "(a) there is a substantial likelihood of success on the merits; (b) the … preliminary injunction is necessary to present irreparable injury; (c) the threatened injury

4

A0496

outweighs the harm that the … preliminary injunction would cause to the non-movant; and (d) the … preliminary injunction would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). The Supreme Court has stated that "the first two factors … are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), but the Eleventh Circuit has suggested that "[t]he first of the four prerequisites to temporary injunctive relief is generally the most important," *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Here, as discussed below, all four factors weigh in favor of granting a preliminary injunction.

With respect to the first factor (substantial likelihood of success), Florida alleged in the complaint that the Parole with Conditions policy violates the Administrative Procedure Act (APA) because it is contrary to law (Count 1), arbitrary and capricious (Count 2), and was not adopted through "notice and comment" procedures (Count 3). The Court has no trouble finding that Florida has a substantial likelihood of ultimately showing that it has standing to challenge the Parole with Conditions policy and that it is likely to succeed on its claim that the policy is contrary to law for the reasons more fully stated in the TRO (*see* Doc. 10 at 8-11), the order denying a stay of the TRO (*see* Doc. 29 at 4-8), and the *Florida* decision invalidating the materially indistinguishable Parole+ATD policy (*see* 2023 WL 2399883 at *16-20, *29-31). The Court also finds that Florida has a substantial

5

A0497

likelihood of success on its "notice and comment" claim for the reasons stated in the TRO (*see* Doc. 10 at 8 n.5).[4]  The Court does not find persuasive any of DHS's arguments to the contrary on these points for the same reasons that the Court found in the order denying a stay of the TRO that DHS was not likely to succeed on its appeal.  *See* Doc. 29 at 4-8.

With respect to the second factor (irreparable harm to the movant), the Court finds that a preliminary injunction is necessary to prevent irreparable harm to Florida for the reasons stated in the TRO (*see* Doc. 10 at 12-13) and reaffirmed in the order denying a stay of the TRO (*see* Doc. 29 at 11-12).

With respect to the third factor (harm to the non-movant), the Court finds that the harm to Florida is not outweighed by the harm that the preliminary injunction will allegedly cause DHS because, as explained in the order denying a stay of the TRO, the Court is simply not persuaded that enjoining the Parole with Conditions policy is as big of a deal as DHS is making it.  *See* Doc. 10 at 8-11.  The finding on this point in the order denying a stay of the TRO is bolstered by the USBP data filed

---

[4]  The Court is not in a position to say at this point whether the Parole with Conditions policy is arbitrary and capricious because that determination will likely be made based on the administrative record, which has not yet been produced.  That said, the Court will be interested to see how DHS justifies the policy in light of the evidence in the *Florida* case showing that similar prior policies that relied on aliens to self-report to Immigration and Customs Enforcement facilities to receive charging documents forced DHS to expenditure of considerable time and money down the road to track down the substantial number of aliens who (not surprisingly) did not self-report.

A0498

after that order was posted,[5] which shows that encounters at the border have dropped significantly after the expiration of the Title 42 Order.  Indeed, as of two days ago, the number of aliens arriving the border was about one-third of the number predicted in the declaration that DHS relied on in support of its argument that the sky will fall if it cannot release aliens under the Parole with Conditions policy.  *Compare* Doc. 13-1 at 6 (¶11) (predicting "an average of 12,000-14,000 noncitizen [encounters] per day" after the Title 42 Order expires on May 11) *with* Doc. 28 at 4 (showing that alien encounters dropped from 9,649 on May 11, to 6,251 on May 12, to 4,335 on May 13, to 4,193 on May 14).  Likewise, contrary to the prediction in the declaration that USBP was projected to grow to "over 45,000 individuals in custody by the end of [May]," Doc 13-1 at 6 (¶12), the USBP data shows that the number of individuals in custody has declined every day since the Title 42 Order expired, and as of May 14, only 22,259 aliens were in custody, *see* Doc. 28 at 6.[6]

---

[5]  Technically, the USBP data was filed before the order was posted, but the Court put the order in the internal electronic folder to be posed by the Clerk and left the courthouse before seeing that the USBP data had been filed.  The USBP data would not have changed the Court's ruling on the motion to stay and, as discussed above, it bolsters the Court's decision not to give much weight to the declaration predicting dire consequences if USBP was prohibited from using the Parole with Conditions "processing pathway."

[6]  The Court did not overlook that the data shows an increase in the average time-in-custody (TIC) after the expiration of the Title 42 Order and the entry of the TRO, but the most recent figure is just slightly above the 72-hour period that USBP facilities are designed to accommodate, according to the evidence in the *Florida* case.  Also, the most recent TIC figure is well below the 20-day period in the *Flores* case that DHS repeatedly pointed to in the *Florida* case as compelling expedited release of children and family units.  Moreover, it is unclear whether these TIC figures include the amount of time aliens spend in custody between the completion of their processing and their physical release.  This may be significant because DHS claimed in its response to the Order

7

A0499

With respect to the fourth factor (public interest), the Court finds that a preliminary injunction is in the public interest for the reasons stated in the TRO (*see* Doc. 10 at 13-14) and the order denying a stay of the TRO (*see* Doc. 29 at 13-16), and because it would promote respect for the rule of law by not allowing DHS to achieve what amounts to an end-run around this Court's decision in *Florida* through the adoption of a functionally identical policy to the Parole+ATD policy invalidated in that case. *See* Doc. 10 at 11 (agreeing with DHS that the *Florida* decision did not preclude DHS from using its parole authority in other ways, but explaining that "what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in *Florida* and then expect a different outcome when the policy is challenged").

The Court did not overlook DHS's argument that the Court does not have the authority to enjoin the Parole with Conditions policy under the immigration statutes and/or that the TRO was overbroad and must be narrowed, but the Court finds those arguments unpersuasive for the reasons stated in the order denying a stay of the TRO. *See* Doc. 29 at 7-8. The Court also did not overlook Florida's request that the Court

---

to Show Cause that it did not violate the TRO by releasing more than 2,500 aliens after the TRO went into effect because "implementation" of the Parole with Conditions policy is complete when the alien is "fully processed" even though the alien may not be physically released until the following morning. *See* Doc. 26-1 at 3 (¶¶9-10) (claiming that aliens "have been granted parole effective as of the time they are fully processed" even though they may remain in physical custody longer because USBP "generally does not release individuals overnight"). Thus, if the TIC figures include the time that aliens sometimes remain in custody after they are "paroled," those figures are likely overstated to some degree.

8

treat its filings as both a request for preliminary injunction and a request for a stay under the APA, 5 U.S.C. §705, but the Court tends to agree with DHS that an APA stay is unavailable because the Parole with Conditions policy was already in effect when Florida filed its complaint and that statute refers to "postpon[ing]" the effective date of the agency action.[7]

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a preliminary injunction prohibiting DHS from "paroling" aliens into the country under the Parole with Conditions policy.  No bond is required for the reasons stated in the TRO. *See* Doc. 10 at 15 n.8.  A stay of the preliminary injunction is not warranted for the reasons stated in the order denying a stay of the TRO.  *See* Doc. 29 at 3 n.3.

Accordingly, it is **ORDERED** that:

1.    DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)," pending disposition of this case or further order of the Court.

---

[7]  That said, the Court need not definitively decide that issue because an APA stay would not give Florida any more relief than it is getting through the preliminary injunction

A0501

2.      The parties shall file a status report 14 days from the date of this Order

explaining how they intend to proceed with this case in this Court pending resolution

of DHS's expected appeal of the preliminary injunction, and unless the parties agree

that this case should be stayed pending appeal, the status report shall include a

proposed scheduling order.

**DONE and ORDERED** this 16th day of May, 2023.

_____

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

A0502

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

STATE OF FLORIDA,

                   *Plaintiff,*

     v.

The UNITED STATES OF AMERICA, *et al.*,

                   *Defendants.*

Civil Action No. 3:21-cv-01066

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, Patrick J. Lechleitner, pursuant to 28 U.S.C. §1746, declare under penalty of perjury as follows:

       1.      I am the Senior Official performing the duties of the Deputy Director for U.S. Immigration and Customs Enforcement ("ICE"). I have held this position since August 15, 2021. In this capacity, I am the second highest ranking official within ICE and oversee all of its component groups, including the day-to-day operations of the agency, an annual budget of over $8 billion, and more than 20,000 employees. Prior to this current position, I was the Acting Executive Associate Director for Homeland Security Investigations (HSI) from March 16, 2021 to July 30, 2021 and permanent Executive Associate Director for HSI from July 31 to present. I have also held positions at ICE Headquarters as the Assistant Director for HSI International Operations Division from March 3, 2019 through my acting time as EAD, and Acting Assistant

Director for the National Security Investigations Divisions, and the Deputy Assistant Director

overseeing HSI's Cyber Crimes Divisions. I was also the Special Agent in Charge for HSI

Washington, D.C. from March 7, 2017 until March 3, 2019. In total, I have over 20 years of

federal law enforcement experience with the U.S. Customs Service, and HSI with almost 5

additional years as a local police officer in Virginia prior to federal service.

    2.    The facts attested to herein are based upon my personal knowledge or upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

    3.    The documents listed in the accompanying Administrative Record Index and

contained in the files annexed hereto, constitute to the best of my knowledge and belief, a true

and complete copy of all non-privileged documents and materials considered by ICE in issuing

the July 18, 2022 Memorandum, titled *Policy on the Use of Parole Plus Alternatives to*

*Detention to Decompress Border Locations*.


I certify under penalty of perjury that the foregoing is true and correct.


Executed this 25th day of July, 2022 in Washington, D.C.

PATRICK J
LECHLEITNER

Digitally signed by PATRICK
J LECHLEITNER
Date: 2022.07.25 18:22:20
-04'00'

Patrick J. Lechleitner
Senior Official Performing the Duties of the
Deputy Director
U.S. Immigration and Customs Enforcement

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

*Plaintiff,*

v.

The UNITED STATES OF AMERICA, *et al.,*

*Defendants.*

Civil Action No. 3:21-cv-01066

**UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT ADMINISTRATIVE RECORD FOR JULY 18, 2022 POLICY ON THE USE OF PAROLE PLUS ALTERNTIVES TO DETENTION TO DECOMPRESS BORDER LOCATIONS**

**CERTIFIED INDEX TO ADMINISTRATIVE RECORD**

| DOCUMENT | PAGE |
|---|---|
| 1.  U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement, Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations (July 18, 2022). | SAR0158-161 |
| 2.  U.S. Border Patrol, Parole Plus Alternative to Detention (November 2, 2021). | SAR0162-164 |
| 3.  Operation Horizon Comms Plan: Mailing Initiative and NTAs (November 8, 2021). | SAR0165-169 |
| 4.  Capacity Report (April 8, 2022). | SAR0170-251 |
| 5.  [Redacted] FW: Op Horizon OT Update (April 25, 2022). | SAR0252-254 |
| 6.  FAMU Compliance Rates by Fiscal Year (April 26, 2022). | SAR0255-256 |

| 7. [Redacted] Re: Parole/ATD release (May 2, 2022). | SAR0257-260 |
| 8. Cost if P+ATD Halted 30-60-90 days_v2 (May 6, 2022). | SAR0261-266 |
| 9. [Redacted] FW: Projecting ICE Workload (May 6, 2022). | SAR0267-271 |
| 10. Ad-Hoc Non-FAMU Compliance Rates by FY (May 9, 2022). | SAR0272-273 |

FOR OFFICIAL USE ONLY

 **U.S. Immigration and Customs Enforcement**

 **U.S. Customs and Border Protection**

July 18, 2022

| | |
|---|---|
| MEMORANDUM FOR: | Raul L. Ortiz<br>Chief<br>U.S. Border Patrol |
| | Corey A. Price<br>Executive Associate Director<br>Enforcement and Removal Operations |
| FROM: | Chris Magnus<br>Commissioner<br>U.S. Customs and Border Protection |
| | Tae D. Johnson<br>Acting Director<br>U.S. Immigration and Customs Enforcement |
| SUBJECT: | Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations |

**Purpose**

To require that certain processing be completed, and certain capacity criteria be met, before noncitizens may be released from custody along the Southwest border via Parole plus Alternatives to Detention (Parole + ATD). This memorandum rescinds and replaces all prior guidance regarding the use of Parole + ATD, including but not limited to the November 2, 2021, memorandum from USBP Chief Raul L. Ortiz, titled *Parole Plus Alternative to Detention*.

**Background**

Undocumented noncitizens who are not expelled pursuant to the court-ordered implementation of the Centers for Disease Control & Prevention's Title 42 public health Order are inspected by U.S. Customs and Border Protection (CBP), U.S. Border Patrol (USBP) upon encounter, consistent with 8 U.S.C. § 1225(a); this is often referred to as "processing." Processing includes, among other things, identification, review of immigration and criminal history, an assessment of national security concerns, and an evaluation of what pathway is most appropriate for the individual noncitizen, to include removal proceedings under section 240 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1229. expedited removal, permitting an individual to voluntarily return, and/or parole.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 2

Pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the authority to parole certain noncitizens into the United States "temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." When, pursuant to an inspection of a noncitizen under 8 U.S.C. § 1225(a), CBP exercises its discretion to parole noncitizens on a case-by-case basis into the United States, including during the initiation of or to facilitate the initiation of removal proceedings under section 240 of the INA, those noncitizens may be eligible to be enrolled in the U.S. Immigration and Customs Enforcement (ICE) ATD program.

The goal of the ICE ATD program is, for a portion of the enrolled non-detained population, to increase compliance with release conditions, court appearances, and final orders of removal. ATD is an alternative to detention and allows ICE to exercise increased supervision over noncitizens who, on a case-by-case basis, are not detained, but are potentially subject to removal. The level of supervision and technology assigned to noncitizens enrolled in the ATD program is determined on a case-by-case basis based on each individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. ICE may adjust the level of supervision and technology required as the level of the noncitizen's compliance either increases or decreases.

Generally, CBP standards allow for short-term detention of fewer than 72 hours in CBP facilities, after which time CBP is expected to transfer the noncitizen to ICE if CBP believes continued custody is required. While this time period may sometimes be exceeded, CBP facilities are not structured or equipped for long-term detention. This yields numerous challenges, including the ability to provide appropriate medical care and to treat and control contagious illnesses. In sum, crowding in border facilities poses risks to both individuals in custody and those working there. Border encounters remain at historic highs. With a record number of displaced persons in the hemisphere, high encounter rates and the associated challenges are expected to continue. It is incumbent on CBP to transfer noncitizens to ICE or if discretion warrants, to release the noncitizen under appropriate conditions.

Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border. It is significantly more efficient—approximately 60 minutes faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed to issuing a Notice to Appear (NTA) or other charging document at the time of encounter. Use of Parole + ATD also allows ICE to exercise increased supervision over certain noncitizens who are released from CBP custody pending the initiation of removal proceedings. Those subject to Parole + ATD are not simply released into the community; they are subject to supervision and are subsequently issued an NTA under INA § 240.

That said, Parole + ATD is a tool that should be used sparingly—only when justified by an urgent humanitarian reason or because it yields a significant public benefit in the form of disease-mitigation, as a safety valve to address overcrowding.

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 3

**Policy**

Over the last several months, CBP and ICE have made deliberate efforts to prioritize the health
and safety of noncitizens and the workforce. The use of Parole + ATD provides one such tool—
allowing for the more rapid decompression of facilities that otherwise may be overcrowded in
ways that promote health and safety. That said, and as this guidance makes clear, the use of
Parole + ATD is not meant to be a primary processing tool; its use is permitted only in those
situations in which threshold criteria are met, and its use is subject to appropriate approvals and
oversight — thus ensuring that its application is limited to those situations in which the relevant
health and safety conditions justify its use.

*Threshold Criteria and Approval Process*

Parole + ATD may be authorized by the Commissioner of CBP only when the following criteria
exist:

- There are more than 15,000 noncitizens in USBP custody across all Southwest border
  sectors OR a sector or centralized processing center's in-custody total exceeds 100% of
  its full capacity; AND
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border
  over a 72-hour period.

When these scenarios exist, they create urgent crowding and excessive time-in-custody concerns
that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-
by-case basis for urgent humanitarian reasons or significant public benefit.

To use Parole + ATD in a specific border sector, the relevant USBP Sector Chief must request
approval from the Commissioner of CBP, through the USBP Chief.

Approval for Parole + ATD may be granted only on a sector-by-sector basis and Parole + ATD
may not be used for noncitizens transferred laterally from a sector that has not met the threshold
criteria above. Additionally, approval for use of Parole + ATD is time limited and must be
reassessed every week by the Commissioner or Deputy Commissioner. USBP is not authorized
to process noncitizens via Parole + ATD when these criteria are not met, absent extraordinary
circumstances as determined by the Commissioner of CBP.

*Individual Assessment*

Each noncitizen is individually processed consistent with 8 U.S.C. § 1225(a) after encounter.
This inspection process includes, but is not limited to, an assessment of the individual's
identification and immigration background, review of any national security or criminal concerns,
and consideration of which immigration processing pathway is best applicable to the individual
noncitizen. This memorandum applies only to those individuals who are expected to be placed
in removal proceedings under INA § 240.

Once the Parole + ATD initial threshold is met, each individual noncitizen should be assessed on
a case-by-case individualized basis to determine whether he or she is eligible for parole based on

FOR OFFICIAL USE ONLY

Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations
Page 4

an urgent humanitarian reason or whether there is a significant public benefit. In making this determination, agents shall consider individualized circumstances, such as an individual's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and other humanitarian or medical factors. Upon placing an individual in Parole + ATD, CBP will temporarily pause the completion of the removal paperwork under INA § 240, which will instead be completed at a later date.

Prior to a noncitizen's processing via Parole + ATD, CBP must conduct biometric identity verification and thoroughly evaluate any potential national security and public safety concerns. USBP must also collect and document a physical address for each noncitizen processed via Parole + ATD.

*Ineligible for Parole + ATD*

Parole + ATD may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat, or who claim to be, are suspected to be, or are determined to be unaccompanied children as defined by 6 U.S.C. § 279(g)(2) or appear likely to be subject to the mandatory detention requirements of INA § 236(c), 8 U.S.C. § 1226(c), if processed for removal proceedings pursuant to INA §240, 8 U.S.C. § 1229.

*Subsequent Processing*

CBP and ICE will work jointly to streamline and complete charging document issuance for individuals processed via Parole + ATD. Each agency is responsible for completing the processing for 50 percent of the total Parole + ATD caseload. The final processing and placement into removal proceedings pursuant to 8 U.S.C. § 1229 is expected to be the same, regardless of whether that paperwork occurs as a part of the Parole + ATD processing.

**Reporting and Oversight**

CBP must notify ICE in writing each time Parole + ATD is authorized in a sector to ensure that ICE has the appropriate staff and ATD capacity available in the applicable location(s). Such notification must occur before processing for Parole + ATD begins in the authorized border sector(s). In each case, ICE will determine the appropriate ATD enrollment conditions for the noncitizen, including but not limited to the type of technology used or frequency of required check-in appointments.

CBP will provide daily reporting to Department of Homeland Security Headquarters and ICE, detailing how many noncitizens were processed at the Southwest border with charging documents, voluntary return, and Parole + ATD, by sector. The daily reports will be used to identify any operational changes that are needed to modify the continued use of Parole + ATD at any given time.

Washington, DC 20229



U.S. Customs and
Border Protection

NOV 0 2 2021

MEMORANDUM FOR:    All Chief Patrol Agents
                   All Deputy Chief Patrol Agents

FROM:              Raul L. Ortiz
                   Chief
                   U.S. Border Patrol

SUBJECT:           Parole Plus Alternative to Detention

This memorandum supersedes previous guidance relating to prosecutorial discretion and
issuance of Notices to Report (NTR), as issued in March 2021, and establishes conditions for the
implementation of parole plus Alternative to Detention (Parole + ATD), a processing pathway
that will replace the use of NTR unless that pathway is explicitly authorized by the U.S. Border
Patrol (USBP) Chief.

USBP takes very seriously its mission of creating a secure border while ensuring the health and
safety of migrants in its custody, as well as the health of the workforce. Earlier this year, when
encounters were consistently high, operational capacity strained, and COVID-19 acute, USBP
began issuing NTRs, a significantly faster mechanism for processing noncitizens, particularly
when used for family units (FMU). NTRs were used for certain noncitizens following initial
processing and collection of biometric and biographic information. The use of this processing
pathway enabled USBP to relieve overcrowding in congregate settings, thus better protecting
both the workforce and noncitizens in our custody. Importantly, use of an NTR decreased
processing times significantly compared with processing families for a Notice to Appear (NTA),
thus ensuring that families were more expeditiously moved out of U.S. Customs and Border
Protection (CBP) custody. The process of issuing NTAs is much more time consuming, given the
level of detail and interagency coordination required to establish A-files and finalize the charging
documents. Those released with NTRs, however, were directed to report to ICE for further
processing, including for an NTA, as appropriate.

Effective immediately, USBP is ceasing the use of NTRs. When noncitizens will be processed
for release from USBP facilities, USBP will prioritize resources to issue noncitizens NTAs
immediately. NTAs formally initiate immigration proceedings, and it is USBP's goal to
maximize NTA issuance from USBP facilities and eliminate the need for use of alternative
processing pathways in the future.

In circumstances where an alternate path is necessary to address urgent crowding and excessive
Time-In-Custody (TIC) in USBP facilities, Border Patrol has developed an alternative processing
pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD
programs to ensure individuals are accounted for after release from USBP facilities. Parole +
ATD is a rigorous enforcement process that is effective and includes accountability measures to

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 2

require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

To deal with situations in which capacity constraints or conditions in custody warrant the more expeditious processing, USBP may consider use of Parole + ATD on a case-by-case basis for FMUs when certain conditions, laid out below, exist. The use of Parole + ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field. Use of Parole + ATD is consistent with 8 U.S.C. § 1182(d)(5), which provides that certain noncitizens may be paroled temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit"—namely, the urgent humanitarian need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities.

All individual members of a FMU who are processed for Parole + ATD, will, as a condition of their parole, be required to report to ICE within 15 days to be processed for an NTA. Effective immediately:

In the Del Rio (DRT) and Rio Grande Valley (RGV) Sectors, Chief Patrol Agents may authorize the processing of FMUs for Parole + ATD on a case-by-case basis when the temporary staffing support to the sector is maximized, the seven-day average of encounters is greater than the sector's Fiscal Year 2019 May daily average,[1] and when one or more of the following is true:

- The average TIC in the sector exceeds 72 hours AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

- The sector exceeds 100% of the total non-COVID detention capacity AND the number of subjects who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals booked out in the same period.

Outside of the DRT and RGV Sectors, any sector seeking to utilize the Parole + ATD pathway must obtain approval from the USBP Chief and the CBP Commissioner prior to implementation. The USBP Chief and CBP Commissioner may authorize the use of this pathway in situations in which capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release FMUs in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody, taking into account the factors identified above.

The use of Parole + ATD pathway in DRT and RGV Sectors will be reassessed by USBP HQ on a daily basis in accordance with the conditions established above.

---

[1] The Fiscal Year 2019 May daily average in RGV was 1,607 and in DRT was 276. This month saw the highest encounter numbers that year.

UNCLASSIFIED // LAW ENFORCEMENT SENSITIVE

Parole Plus Alternative to Detention
Page 3

Parole + ATD may not be used for noncitizens who pose a national security or public safety threat. Furthermore, Parole + ATD may only be issued when an individual is not covered by or is excepted from, on a case-by-case basis, the U.S. Centers for Disease Control and Prevention (CDC) Title 42 Order.

In sectors in which the use of the Parole + ATD pathway has been approved, if parole is appropriate based on a consideration of the above factors (as well as any other applicable urgent humanitarian reasons or significant public benefit considerations), USBP agents may exercise their discretion to process the noncitizen(s) with Parole + ATD, after initial enrollment processing is complete, rather than issuing an NTA.

Under no circumstances will a noncitizen who claims to be, is suspected to be, or is determined to be a noncitizen unaccompanied child as defined by 6 U.S.C. § 279(g)(2), be processed through this pathway.

As the processing landscape and the nature of the current COVID-19 pandemic remains fluid and may change over time, updated guidance will be disseminated to the field via email to reflect the latest changes. In particular, when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternate pathway.

Staff may direct their questions to the Immigration, Prosecutions, and Custody Operations Unit at Headquarters by emailing

**Comms Plan: Mailing Initiative and NTAs**
**FINAL 11.8.21**

**Overview:**
- ICE Field Offices will mail out approximately 78,000 packets that include:
  - Cover letter with general resources
  - Notice to Appear, Form I-862
  - Interview Notice, Form G-56
  - Informational materials on change of address, legal assistance, and more
- During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements.
- More than 1,400 ICE staff are supporting the initiative at ERO and HSI field offices across the country.

**Statement attributable to ICE spokesperson:**
"U.S. Immigration and Customs Enforcement is mailing charging documents to place noncitizens in removal proceedings who have been paroled or released under prosecutorial discretion by Customs and Border Protection (CBP).

"Noncitizens are being directed to their closest ICE Field Office and will be processed using the information collected by CBP as evidence of citizenship and removability.  During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements.

"Noncitizens must report to ICE and appear at their designation immigration court date as part of their immigration proceedings in order to comply with US law.  Action will be taken against those that do not appear consistent with the law and Department priorities.

"By mailing out these charging documents, ICE is initiating removal proceedings in a timely way."

**Additional Background (for reporters):**
- ICE has communicated to noncitizens via mail for decades.
- Other appropriate charging documents will be issued in person, as appropriate, on a case-by-case basis.
- When an individual reports to the ICE Field Office, they will be asked additional information and provide fingerprints.
- The noncitizen will receive instructions about next steps and information on how to find legal help and other resources.

**RTQs**
- **Why didn't noncitizens get this notice when they arrived in the US?**
  Earlier this year, when encounters were consistently high, operational capacity strained, and COVID-19 acute, CBP began issuing notices to report (NTR), a significantly faster mechanism for processing noncitizens, particularly when used for family units (FMU). NTRs were used for certain noncitizens following initial processing and collection of

A0514

biometric and biographic information. The use of this processing pathway enabled CBP to relieve overcrowding in congregate settings, thus better protecting both the workforce and noncitizens in CBP custody. Those released with NTRs, however, were directed to report to ICE for further processing, including for an NTA, as appropriate.

CBP is no longer issuing NTRs.  Instead, in circumstances where an alternate path is necessary to address urgent crowding and excessive Time-In-Custody (TIC) in CBP facilities, Border Patrol has developed an alternative processing pathway: the use of Parole + ATD. This pathway includes enrollment of FMUs in ICE ATD programs to ensure individuals are accounted for after release from CBP facilities. Parole + ATD is a rigorous enforcement process that is effective and includes accountability measures to require noncitizens to report to ICE for issuance of an NTA and continue through the formal immigration process.

- **How do you know where people are?**
  ICE is using the address provided to CBP when noncitizens were initially processed, the address that the noncitizen has provided to ICE directly, or through enrollment in the ATD program.

- **Why is ICE embarking on this initiative?**
  We are applying an organized and methodical approach to place noncitizens in removal proceedings who have been paroled or released by CBP. By mailing out these charging documents, ICE is relieving scheduling pressures on its Field Offices and initiating removal proceedings in a timely way. ICE Field Offices will mail out a packet that includes an NTA, an ICE appointment date, and more. During the ICE appointment, ICE will review the case with the noncitizen, take biometrics and photos, and establish any ongoing check-in requirements. More than 1,400 ICE staff are supporting the initiative at ERO and HSI field offices across the country.

- **Why does a noncitizen have to report to ICE?**
  Noncitizens must report to the ICE Field Office and show up at their immigration court dates. This preserves the integrity of the immigration system and provides noncitizens with the opportunity to seek relief or protection from removal. If a noncitizen has any questions about reporting, they can call ICE at 833-383-1465 where operators can help in several languages.

- **What is Form I-862?**
  Form I-862 (Notice to Appear, also known as an NTA) is provided to noncitizens to initiate removal proceedings under section 240 of the Immigration and Nationality Act. It includes, among other things, the immigration charges against the noncitizen and the date, time, and address of the Executive Office for Immigration Review (EOIR) immigration court where they are required to appear. It also notifies the noncitizen of the requirement that he or she provide a written record of any change of address or telephone number.

A0515

- **What is the plan/process to handle inquiries coming in to verify legitimacy of the letters? Report fraudulent ones?**
  ICE can validate call-in letters, NTRs, and parole documents issued to noncitizens using person-specific identifiers that are exclusive to an individual. To validate a letter, noncitizens or their representatives can call the local ICE field office or contact the ICE VESL at 833-383-1465 where operators can help in several languages.

- **What is the plan for the longer lines at the check-in stations (i.e., Houston) when/if people do quickly decide they need to rush to report in Florida (though unlikely)?**
  The operation is designed to mail out NTAs to individuals issued an NTR or paroled and placed on ATD at the southwest border and create a more orderly process for reporting to ICE. Individuals will be required to report in person to receive limited documentation in person along with appropriate biometrics collection. However, the mailed NTA will reduce the amount of time needed with ICE officers.

- **Are these letters going out in the native language of the individual recipients?**
  Yes, brochures and advisals will be made available in English, Spanish, Portuguese, and Haitian Creole.

- **What's happening to the noncitizen that passed the 60-day report window? Are they receiving this packet?**
  Over a matter of months, ICE will issue noncitizens who have been released with a notice to report or on immigration parole an NTA and G-56 by mail.

- **If we don't receive viable addresses of those past the 60-report window, what happens to those noncitizens?**
  DHS plans to conduct follow-up inquiries to locate and take appropriate action with these individuals. Those who do not report, like anyone who is in our country without legal status, are subject to removal by ICE.

- **How many NTAs are being mailed?**
  Approximately 78,000 NTA packages are being mailed over the course of a matter of months.

- **What if the NTA gets lost in the mail? What should the noncitizen do?**
  A noncitizen or their legal representative should contact the ICE VESL (833-383-1465).

- **What will a noncitizen receive in the mail from ICE?**
  The mailing contains an NTA that, among other things, includes the charges against the noncitizen (violations of immigration law). The mailing will also include legal access resources and explanatory materials about how to provide a change of address. For those individuals released by CBP without being given an NTA, ICE field offices will process assigned cases using the information collected by CBP as evidence of citizenship and removability. A noncitizen will receive the following documents in the mail:
  - Cover letter with general resources
  - Notice to Appear, Form I-862

- o Interview Notice, Form G-56
- o Informational materials on change of address, legal assistance, and more

- **What happens when a noncitizen arrives for their appointment at a field office?**
  When a noncitizen reports to an ICE Field Office, they can bring an attorney or someone to help them at the appointment. Unless they have committed a serious crime, or the government thinks they may be a risk to the United States, a noncitizen will not be taken into custody at the appointment. When they report to the ICE Field Office, an officer will confirm contact information, take biometrics, and explain the court process. The noncitizen will receive instructions about next steps and receive more information on how to find legal help and other resources.

- **How does a noncitizen change their address with ICE?**
  To change an address with ICE, a noncitizen should contact the ICE Victims Engagement and Services Line at 1-833-383-1465 or ice.gov/vesl. For cases already filed with EOIR, noncitizens are also required to change their address with the court by submitting a Change of Address, Form EOIR-33, with the EOIR.

- **Does ICE expect a large number of in absentia removal orders as a result of noncitizens not receiving their mailed NTA?**
  It is critical that all noncitizens contact the ICE VESL line to update their contact information with ICE if it changes. Failure to appear at a scheduled immigration court hearing may result in a judge ordering the individual removed in absentia.

- **Will people be placed on the dedicated docket?**
  Yes, they will be placed on the dedicated docket if they are part of a family group who was apprehended between the ports of entry after May 28, 2021, eligible for the ATD program, and residing in one of the 11 dedicated docket jurisdictions.

**Communications deliverables from ICE OPA:**
- RTQ
- Updates to ice.gov/check-in: adding video and example of sample packet
  - o Video (style: animation) explaining mailer's intent; will launch with Spanish and then add versions in Portuguese and Creole.
  - o Updated information on changing address already made.
- Focused media effort, pitching placed stories to Telemundo/Univision and Spanish radio in the following markets: Miami, Houston, New Orleans, Atlanta, Newark, Chicago, Boston, Washington, Los Angeles, and San Francisco.

**Draft Tick Tock (subject to change):**
**Thursday, November 4**
5:30-6:15PM ET      ICE/OPE host stakeholder call, "What to Expect from the Mailout NTA and Processing"

**Friday, November 5**

Ongoing                ICE/OPE CRO's to host calls in areas of responsibility for additional key
stakeholders

**Monday, November 8**
                       First round of packets drops in the mail
                       ICE/OPA begins pitching to targeted media (Telemundo/Univision)

**Tuesday, November 9**
                       Add video (English, Spanish) to ice.gov/check-in; Portuguese and Creole
to come by week's end.

| Capacity Date | Capacity Location | AOR | Number of Appointments | Noncitizen Count | Capacity |
|---|---|---|---|---|---|
| 2022-05-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | WICHITA ICE OFFICE | Chicago | 5 | 9 | 12.50 |
| 2023-01-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | CHICAGO FIELD OFFICE | Chicago | 73 | 169 | 97.19 |
| 2024-01-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-05-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 34 | 73 | 93.65 |
| 2023-02-01 | CHICAGO FIELD OFFICE | Chicago | 34 | 102 | 88.89 |
| 2023-04-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | CHICAGO FIELD OFFICE | Chicago | 36 | 99 | 83.82 |
| 2022-09-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 1 | 1 | 1.79 |
| 2022-09-01 | LOUISVILLE FIELD OFFICE | Chicago | 4 | 9 | 9.25 |
| 2022-09-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 38 | 82.86 |
| 2023-01-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-03-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 25 | 69 | 58.33 |
| 2022-05-01 | LOUISVILLE FIELD OFFICE | Chicago | 33 | 94 | 42.39 |
| 2022-05-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 40 | 85.07 |
| 2023-09-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 34 | 43.40 |
| 2022-09-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-11-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 36 | 87 | 88.39 |
| 2023-05-01 | MILWAUKEE FIELD OFFICE | Chicago | 19 | 49 | 77.27 |
| 2022-07-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 33 | 70 | 85.83 |
| 2023-01-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 40 | 78.08 |
| 2023-03-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-11-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 7 | 17 | 9.72 |
| 2023-04-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-12-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 24 | 59 | 88.43 |
| 2023-01-01 | CHICAGO FIELD OFFICE | Chicago | 35 | 99 | 98.21 |
| 2023-03-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | CHICAGO FIELD OFFICE | Chicago | 38 | 110 | 92.50 |
| 2022-11-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2024-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 25 | 57 | 66.88 |
| 2022-05-01 | CHICAGO FIELD OFFICE | Chicago | 67 | 158 | 98.05 |

| 2022-12-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-02-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 29 | 75 | 86.67 |
| 2022-04-01 | LOUISVILLE FIELD OFFICE | Chicago | 39 | 87 | 50.00 |
| 2022-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 12 | 29 | 58.62 |
| 2023-08-01 | MILWAUKEE FIELD OFFICE | Chicago | 14 | 41 | 55.56 |
| 2022-08-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 35 | 79 | 89.06 |
| 2023-04-01 | MILWAUKEE FIELD OFFICE | Chicago | 15 | 36 | 71.83 |
| 2022-06-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 48 | 113 | 93.60 |
| 2022-12-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 35 | 69.23 |
| 2023-04-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | LOUISVILLE FIELD OFFICE | Chicago | 12 | 38 | 20.69 |
| 2022-08-01 | MILWAUKEE FIELD OFFICE | Chicago | 21 | 50 | 79.78 |
| 2022-10-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-04-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 8 | 24 | 18.18 |
| 2023-02-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-11-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |

| 2023-03-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-12-01 | CHICAGO FIELD OFFICE | Chicago | 35 | 101 | 83.82 |
| 2023-02-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | CHICAGO FIELD OFFICE | Chicago | 42 | 127 | 88.95 |
| 2022-10-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2024-03-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 22 | 68 | 60.87 |
| 2022-04-01 | CHICAGO FIELD OFFICE | Chicago | 55 | 136 | 98.82 |
| 2023-11-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 33 | 81 | 89.06 |
| 2022-04-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 1 | 1 | 33.33 |
| 2023-03-01 | MILWAUKEE FIELD OFFICE | Chicago | 20 | 48 | 80.95 |
| 2022-05-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 55 | 155 | 97.22 |
| 2022-11-01 | MILWAUKEE FIELD OFFICE | Chicago | 16 | 41 | 60.00 |
| 2023-03-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | LOUISVILLE FIELD OFFICE | Chicago | 31 | 83 | 49.38 |
| 2022-07-01 | MILWAUKEE FIELD OFFICE | Chicago | 16 | 38 | 79.41 |
| 2022-11-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 35 | 85 | 93.75 |
| 2023-07-01 | MILWAUKEE FIELD OFFICE | Chicago | 12 | 37 | 78.49 |

| 2023-03-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-11-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-05-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 8 | 20 | 15.00 |
| 2023-01-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-04-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | WICHITA ICE OFFICE | Chicago | 1 | 1 | 1.19 |
| 2023-02-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 3 | 10 | 11.76 |
| 2022-10-01 | HSI/ERO SPRINGFIELD MO OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-01-01 | LOUISVILLE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-07-01 | CHICAGO FIELD OFFICE | Chicago | 31 | 97 | 97.06 |
| 2024-02-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-06-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 27 | 75 | 87.50 |
| 2023-10-01 | MILWAUKEE FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-03-01 | CHICAGO FIELD OFFICE | Chicago | 28 | 77 | 67.31 |
| 2022-11-01 | CHICAGO FIELD OFFICE | Chicago | 39 | 110 | 85.63 |
| 2022-04-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 43 | 127 | 96.69 |
| 2022-10-01 | MILWAUKEE FIELD OFFICE | Chicago | 17 | 41 | 82.86 |
| 2023-04-01 | CHICAGO FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-02-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | LOUISVILLE FIELD OFFICE | Chicago | 33 | 97 | 43.44 |
| 2022-06-01 | MILWAUKEE FIELD OFFICE | Chicago | 20 | 48 | 79.07 |
| 2022-10-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-12-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 32 | 82 | 89.06 |
| 2023-06-01 | MILWAUKEE FIELD OFFICE | Chicago | 13 | 39 | 72.22 |
| 2022-05-01 | WICHITA ICE OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-08-01 | ERO/HSI INDIANAPOLIS OFFICE | Chicago | 38 | 96 | 85.94 |
| 2023-02-01 | MILWAUKEE FIELD OFFICE | Chicago | 15 | 37 | 74.29 |
| 2023-04-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-10-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-04-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 9 | 25 | 73.08 |
| 2022-12-01 | ERO - KANSAS CITY FIELD OFFICE | Chicago | 0 | 0 | 0.00 |
| 2023-02-01 | SAINT LOUIS FILE CONTROL OFFICE | Chicago | 0 | 0 | 0.00 |
| 2022-09-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-05-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | MIDLAND ERO OFFICE | El Paso | 7 | 23 | 1.12 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ICE COLOCATION EL PASO | El Paso | 4 | 6 | 3.11 |
| 2022-05-01 | MIDLAND ERO OFFICE | El Paso | 10 | 28 | 3.18 |
| 2022-11-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-03-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-08-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-04-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-12-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |

A0525

| | | | | | |
|---|---|---|---|---|---|
| 2022-10-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-05-01 | ALBUQUERQUE OFFICE | El Paso | 1 | 1 | 1.75 |
| 2022-04-01 | MIDLAND ERO OFFICE | El Paso | 16 | 41 | 14.88 |
| 2022-08-01 | MIDLAND ERO OFFICE | El Paso | 3 | 8 | 2.16 |
| 2022-06-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-10-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-06-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2023-02-01 | ICE COLOCATION EL PASO | El Paso | 0 | 0 | 0.00 |
| 2022-11-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-04-01 | ALBUQUERQUE OFFICE | El Paso | 5 | 7 | 63.64 |
| 2023-03-01 | ALBUQUERQUE OFFICE | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | MIDLAND ERO OFFICE | El Paso | 0 | 0 | 0.00 |
| 2022-07-01 | MIDLAND ERO OFFICE | El Paso | 12 | 34 | 5.31 |
| 2023-01-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-09-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2022-05-01 | ROSWELL, NM ERO | El Paso | 0 | 0 | 0.00 |
| 2023-01-01 | WICOMICO DETENTION FACILITY | Baltimore | 1 | 2 | 2.26 |
| 2022-10-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 171 | 433 | 57.92 |
| 2023-02-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 2 | 6 | 1.19 |

| 2022-11-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2024-02-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-10-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-04-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 19 | 47 | 100.00 |
| 2022-05-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 21 | 58 | 100.00 |
| 2023-05-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-08-01 | WICOMICO DETENTION FACILITY | Baltimore | 14 | 35 | 100.00 |
| 2022-10-01 | WICOMICO DETENTION FACILITY | Baltimore | 2 | 6 | 8.05 |
| 2023-01-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 21 | 59 | 6.16 |
| 2022-09-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 238 | 539 | 77.87 |
| 2024-01-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-09-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 10 | 27 | 100.00 |
| 2023-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-05-01 | WICOMICO DETENTION FACILITY | Baltimore | 13 | 33 | 100.00 |
| 2022-09-01 | WICOMICO DETENTION FACILITY | Baltimore | 8 | 14 | 17.65 |
| 2022-12-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 165 | 442 | 59.55 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 0 | 0 | 0.00 |
| 2022-08-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 296 | 734 | 97.79 |
| 2023-07-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-02-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-03-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2024-04-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-12-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-07-01 | WICOMICO DETENTION FACILITY | Baltimore | 12 | 32 | 100.00 |
| 2022-06-01 | WICOMICO DETENTION FACILITY | Baltimore | 14 | 35 | 100.00 |
| 2023-08-01 | WICOMICO DETENTION FACILITY | Baltimore | 1 | 3 | 3.38 |
| 2022-11-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 160 | 410 | 54.06 |
| 2023-03-01 | BALTIMORE DISTRICT OFFICE | Baltimore | 2 | 6 | 0.96 |
| 2022-12-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2024-03-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-11-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2023-06-01 | WICOMICO DETENTION FACILITY | Baltimore | 0 | 0 | 0.00 |
| 2022-12-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |

A0528

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 14 | 36 | 10.64 |
| 2022-08-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 4 | 14 | 8.11 |
| 2023-01-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | HELENA FIELD OFFICE | Salt Lake City | 1 | 4 | 5.00 |

A0529

| | | | | | |
|---|---|---|---|---|---|
| 2022-05-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | PROVO OFFICE | Salt Lake City | 12 | 35 | 70.24 |
| 2023-01-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | PROVO OFFICE | Salt Lake City | 15 | 43 | 82.95 |
| 2022-05-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 120 | 209 | 36.33 |
| 2022-07-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | TWIN FALLS FIELD ERO | Salt Lake City | 1 | 1 | 2.88 |
| 2023-03-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 1 | 1 | 4.73 |
| 2022-11-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-04-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | BOISE FIELD OFFICE | Salt Lake City | 2 | 3 | 5.13 |
| 2022-08-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-12-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 34 | 84 | 95.16 |
| 2023-04-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-04-01 | RENO OFFICE | Salt Lake City | 4 | 8 | 10.34 |
| 2022-12-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | PROVO OFFICE | Salt Lake City | 13 | 37 | 87.50 |
| 2023-03-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 15 | 47 | 9.94 |
| 2022-10-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |

A0531

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 242 | 416 | 88.09 |
| 2022-06-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-08-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 2 | 6 | 3.39 |
| 2023-03-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-04-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | PROVO OFFICE | Salt Lake City | 2 | 8 | 16.67 |

| 2022-12-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-07-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | PROVO OFFICE | Salt Lake City | 15 | 40 | 79.55 |
| 2023-03-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-07-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 13 | 45 | 12.89 |
| 2022-09-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | IDAHO FALLS ICE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | HELENA FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |
| 2023-01-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | TWIN FALLS FIELD ERO | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | ST. GEORGE OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | BOISE FIELD OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | LAS VEGAS HSI, ERO AND OPLA | Salt Lake City | 2 | 5 | 3.32 |
| 2023-02-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-02-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | WEST VALLEY CITY OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 0 | 0 | 0.00 |
| 2022-11-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-06-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-05-01 | PROVO OFFICE | Salt Lake City | 16 | 37 | 86.25 |
| 2022-04-01 | OGDEN QUICK RESPONSE TEAM | Salt Lake City | 10 | 19 | 18.46 |
| 2023-02-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2023-03-01 | PROVO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-10-01 | RENO OFFICE | Salt Lake City | 0 | 0 | 0.00 |
| 2022-09-01 | PROVO OFFICE | Salt Lake City | 14 | 43 | 88.75 |
| 2023-02-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-05-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | LATHAM OFFICE | Buffalo | 1 | 2 | 4.17 |
| 2022-12-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 16 | 26 | 6.05 |
| 2022-06-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-09-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-01-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | LATHAM OFFICE | Buffalo | 1 | 1 | 2.42 |
| 2022-09-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-05-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |

| 2022-11-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-07-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-04-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-04-01 | SYRACUSE OFFICE | Buffalo | 15 | 22 | 100.00 |
| 2023-03-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-02-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-12-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-10-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | LATHAM OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-08-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2023-03-01 | BUFFALO FIELD OFFICE CO-LO SITE | Buffalo | 0 | 0 | 0.00 |
| 2022-06-01 | CHAMPLAIN ERO OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-11-01 | SYRACUSE OFFICE | Buffalo | 0 | 0 | 0.00 |
| 2022-07-01 | DALLAS FIELD OFFICE | Dallas | 70 | 159 | 14.54 |
| 2023-03-01 | DALLAS FIELD OFFICE | Dallas | 1 | 1 | 0.07 |
| 2022-11-01 | DALLAS FIELD OFFICE | Dallas | 1 | 3 | 0.25 |
| 2023-04-01 | DALLAS FIELD OFFICE | Dallas | 0 | 0 | 0.00 |
| 2022-09-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-05-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-01-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-02-01 | DALLAS FIELD OFFICE | Dallas | 4 | 4 | 0.33 |
| 2022-10-01 | DALLAS FIELD OFFICE | Dallas | 4 | 8 | 0.67 |
| 2022-12-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-03-01 | OKLAHOMA CITY - ERO | Dallas | 1 | 1 | 0.64 |
| 2023-01-01 | DALLAS FIELD OFFICE | Dallas | 3 | 3 | 0.25 |
| 2022-09-01 | DALLAS FIELD OFFICE | Dallas | 5 | 10 | 0.69 |
| 2023-04-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-11-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-06-01 | DALLAS FIELD OFFICE | Dallas | 168 | 379 | 100.00 |
| 2022-07-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-04-01 | DALLAS FIELD OFFICE | Dallas | 143 | 357 | 100.00 |
| 2022-05-01 | DALLAS FIELD OFFICE | Dallas | 169 | 439 | 100.00 |
| 2022-04-01 | OKLAHOMA CITY - ERO | Dallas | 14 | 37 | 10.05 |
| 2022-08-01 | DALLAS FIELD OFFICE | Dallas | 5 | 8 | 0.58 |
| 2022-12-01 | DALLAS FIELD OFFICE | Dallas | 2 | 4 | 0.28 |
| 2022-10-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-06-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2023-02-01 | OKLAHOMA CITY - ERO | Dallas | 0 | 0 | 0.00 |
| 2022-11-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-05-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-03-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-02-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-10-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-09-01 | HARLINGEN FIELD OFFICE | Harlingen | 1 | 3 | 1.37 |
| 2023-01-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-06-01 | HARLINGEN FIELD OFFICE | Harlingen | 1 | 1 | 0.46 |
| 2022-12-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-07-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2023-04-01 | HARLINGEN FIELD OFFICE | Harlingen | 0 | 0 | 0.00 |
| 2022-04-01 | HARLINGEN FIELD OFFICE | Harlingen | 8 | 18 | 3.95 |
| 2023-04-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-12-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-07-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-02-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-10-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-05-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 1 | 0.13 |
| 2023-03-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-11-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-06-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-01-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-08-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-04-01 | PHOENIX FIELD OFFICE | Phoenix | 9 | 19 | 0.70 |
| 2022-04-01 | TUCSON OFFICE | Phoenix | 2 | 4 | 6.67 |
| 2023-02-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-10-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-05-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-07-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-04-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-12-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-09-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 1 | 0.13 |
| 2022-09-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-01-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2022-08-01 | TUCSON OFFICE | Phoenix | 0 | 0 | 0.00 |
| 2023-03-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |

| 2022-11-01 | PHOENIX FIELD OFFICE | Phoenix | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-06-01 | PHOENIX FIELD OFFICE | Phoenix | 1 | 2 | 0.18 |
| 2022-04-01 | WESTERVILLE CO-LO OFFICE | Detroit | 21 | 55 | 84.87 |
| 2022-08-01 | WESTERVILLE CO-LO OFFICE | Detroit | 24 | 72 | 48.78 |
| 2022-06-01 | BLUE ASH BUILDING | Detroit | 12 | 29 | 42.86 |
| 2022-06-01 | CLEVELAND OFFICE | Detroit | 1 | 3 | 3.57 |
| 2023-01-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-09-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-01-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-01-01 | WESTERVILLE CO-LO OFFICE | Detroit | 1 | 1 | 1.89 |
| 2022-07-01 | WESTERVILLE CO-LO OFFICE | Detroit | 26 | 64 | 74.44 |
| 2023-04-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-05-01 | CLEVELAND OFFICE | Detroit | 1 | 3 | 3.85 |
| 2022-11-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-06-01 | DETROIT FIELD OFFICE | Detroit | 7 | 23 | 0.29 |
| 2022-05-01 | BLUE ASH BUILDING | Detroit | 21 | 62 | 86.72 |
| 2023-01-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | WESTERVILLE CO-LO OFFICE | Detroit | 1 | 3 | 2.04 |
| 2022-06-01 | WESTERVILLE CO-LO OFFICE | Detroit | 28 | 86 | 52.94 |
| 2022-10-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | BLUE ASH BUILDING | Detroit | 1 | 4 | 4.38 |
| 2022-05-01 | DETROIT FIELD OFFICE | Detroit | 25 | 68 | 3.24 |
| 2022-04-01 | BLUE ASH BUILDING | Detroit | 19 | 57 | 84.52 |
| 2023-03-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-04-01 | CLEVELAND OFFICE | Detroit | 5 | 8 | 15.85 |
| 2023-03-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-08-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-07-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-04-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-05-01 | WESTERVILLE CO-LO OFFICE | Detroit | 26 | 67 | 68.60 |
| 2022-09-01 | WESTERVILLE CO-LO OFFICE | Detroit | 4 | 8 | 7.96 |
| 2022-07-01 | BLUE ASH BUILDING | Detroit | 1 | 1 | 3.33 |
| 2022-04-01 | DETROIT FIELD OFFICE | Detroit | 28 | 61 | 4.16 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-09-01 | BLUE ASH BUILDING | Detroit | 0 | 0 | 0.00 |
| 2022-10-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-12-01 | WESTERVILLE CO-LO OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-11-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-02-01 | CLEVELAND OFFICE | Detroit | 0 | 0 | 0.00 |
| 2022-07-01 | DETROIT FIELD OFFICE | Detroit | 0 | 0 | 0.00 |
| 2023-03-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | SANTA ANA OFFICE | Los Angeles | 6 | 15 | 2.39 |
| 2023-01-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-01-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 127 | 351 | 100.00 |
| 2022-09-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 1 | 3 | 0.22 |
| 2023-03-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | SAN BERNARDINO OFFICE | Los Angeles | 1 | 3 | 0.24 |
| 2022-10-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-09-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 113 | 314 | 48.26 |
| 2023-04-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | SAN BERNARDINO OFFICE | Los Angeles | 10 | 20 | 2.39 |
| 2022-09-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-01-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 2 | 5 | 3.03 |
| 2023-01-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-03-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 1 | 2 | 0.17 |
| 2022-09-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-11-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-07-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-01-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-05-01 | SANTA ANA OFFICE | Los Angeles | 1 | 3 | 0.34 |
| 2023-02-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | SANTA ANA OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-02-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 102 | 256 | 100.00 |
| 2022-10-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |

| 2022-06-01 | CORTEZ CIRCLE OFFICE | Los Angeles | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | LOS ANGELES FIELD OFFICE | Los Angeles | 2 | 3 | 0.24 |
| 2022-04-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-06-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2023-04-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-12-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-08-01 | ERO PROCESSING CENTER | Los Angeles | 0 | 0 | 0.00 |
| 2022-10-01 | SAN BERNARDINO OFFICE | Los Angeles | 0 | 0 | 0.00 |
| 2022-04-01 | DOVER OFFICE | Philadelphia | 12 | 29 | 75.58 |
| 2022-11-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | DOVER OFFICE | Philadelphia | 16 | 35 | 73.75 |
| 2022-08-01 | DOVER OFFICE | Philadelphia | 16 | 36 | 93.75 |
| 2023-03-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | PHILIADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| 2023-02-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-03-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PITTSBURGH SUB OFFICE | Philadelphia | 5 | 11 | 20.00 |
| 2022-07-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 1 | 2 | 1.17 |
| 2022-10-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | DOVER OFFICE | Philadelphia | 15 | 37 | 72.50 |
| 2022-07-01 | DOVER OFFICE | Philadelphia | 14 | 27 | 95.83 |
| 2023-02-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| 2023-02-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 1 | 2 | 0.60 |
| 2022-06-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 4 | 4 | 2.96 |
| 2022-04-01 | YORK ERO FIELD OFFICE | Philadelphia | 2 | 7 | 6.10 |
| 2022-10-01 | DOVER OFFICE | Philadelphia | 12 | 32 | 94.44 |
| 2022-06-01 | DOVER OFFICE | Philadelphia | 16 | 38 | 96.88 |
| 2023-01-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-09-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-05-01 | CHARLESTON FIELD OFFICE | Philadelphia | 2 | 6 | 1.18 |
| 2022-12-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-03-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 1 | 3 | 1.50 |
| 2022-05-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 2 | 7 | 3.33 |
| 2023-01-01 | PITTSBURGH SUB OFFICE | Philadelphia | 1 | 1 | 1.92 |
| 2022-05-01 | DOVER OFFICE | Philadelphia | 14 | 37 | 68.75 |
| 2022-12-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-01-01 | DOVER OFFICE | Philadelphia | 9 | 26 | 50.96 |
| 2022-04-01 | CHARLESTON FIELD OFFICE | Philadelphia | 1 | 2 | 0.49 |
| 2022-09-01 | DOVER OFFICE | Philadelphia | 14 | 34 | 92.86 |
| 2023-04-01 | DOVER OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2023-04-01 | CHARLESTON FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-07-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2022-12-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-10-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-08-01 | PITTSBURGH SUB OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-06-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |

| 2023-03-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-04-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 0 | 0 | 0.00 |
| 2022-11-01 | PIKE COUNTY PRISON DETENTION CENTER | Philadelphia | 0 | 0 | 0.00 |
| 2023-02-01 | YORK ERO FIELD OFFICE | Philadelphia | 0 | 0 | 0.00 |
| 2022-04-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 48 | 121 | 71.01 |
| 2022-06-01 | PITTSBURGH SUB OFFICE | Philadelphia | 1 | 2 | 2.68 |
| 2023-01-01 | PHILADELPHIA OFFICE N 8TH ST. | Philadelphia | 2 | 2 | 1.56 |
| 2022-11-01 | WASHINGTON FIELD OFFICE | Washington | 2 | 3 | 2.18 |
| 2022-04-01 | WASHINGTON FIELD OFFICE | Washington | 56 | 137 | 96.44 |
| 2023-04-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-03-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-11-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-01-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | NORFOLK ASAC OFFICE | Washington | 1 | 1 | 0.98 |
| 2022-09-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-09-01 | WASHINGTON FIELD OFFICE | Washington | 1 | 2 | 1.42 |
| 2023-03-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-10-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-10-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-08-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-04-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-04-01 | NORFOLK ASAC OFFICE | Washington | 5 | 11 | 12.12 |
| 2022-06-01 | WASHINGTON FIELD OFFICE | Washington | 41 | 118 | 61.39 |
| 2022-08-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-02-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-09-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-01-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-03-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-11-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-05-01 | WASHINGTON FIELD OFFICE | Washington | 62 | 155 | 83.78 |
| 2023-01-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | WASHINGTON FIELD OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-04-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-12-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-08-01 | NORFOLK ASAC OFFICE | Washington | 0 | 0 | 0.00 |
| 2023-02-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-06-01 | NORFOLK ASAC OFFICE | Washington | 1 | 2 | 1.47 |
| 2022-10-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |

A0549

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 17 | 29 | 16.67 |
| 2022-06-01 | RICHMOND VA, HQ COOP OFFICE | Washington | 0 | 0 | 0.00 |
| 2022-07-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 1 | 3 | 1.48 |
| 2022-04-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 84 | 181 | 100.00 |
| 2023-04-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-12-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-06-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 2 | 3 | 1.41 |
| 2022-11-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2023-03-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-05-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 71 | 128 | 54.24 |
| 2023-02-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-10-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-09-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 2 | 5 | 2.33 |
| 2023-01-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-08-01 | SAN ANTONIO ERO RESIDENT OFFICE | San Antonio | 0 | 0 | 0.00 |
| 2022-11-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-11-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |

| 2022-07-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-06-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-04-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 3 | 5 | 0.20 |
| 2023-03-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-03-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-06-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-02-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-02-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-10-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-10-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-05-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-01-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-01-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-09-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-08-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-09-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 1 | 2 | 0.06 |
| 2022-12-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-12-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-08-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-07-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |
| 2022-05-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 3 | 7 | 0.19 |
| 2022-04-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
| 2023-04-01 | SAN DIEGO DISTRICT FIELD OFFICE | San Diego | 0 | 0 | 0.00 |

A0551

| 2023-04-01 | IMPERIAL OFFICE | San Diego | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-02-01 | SAINT PAUL ICE OFFICE | Saint Paul | 18 | 52 | 88.89 |
| 2022-08-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 52 | 93.75 |
| 2022-07-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | SAINT PAUL ICE OFFICE | Saint Paul | 37 | 109 | 95.21 |
| 2023-04-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | DES MOINES ICE OFFICE | Saint Paul | 1 | 3 | 5.56 |
| 2022-06-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 6 | 12 | 3.80 |
| 2023-03-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | OMAHA FIELD OFFICE | Saint Paul | 10 | 17 | 14.29 |
| 2022-11-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-01-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 4 | 33.33 |
| 2022-07-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | SAINT PAUL ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.59 |
| 2022-08-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 3 | 1.84 |
| 2022-09-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 56 | 96.15 |
| 2022-06-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | SAINT PAUL ICE OFFICE | Saint Paul | 36 | 99 | 93.04 |
| 2023-03-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | SIOUX CITY ERO BUILDING | Saint Paul | 2 | 7 | 8.57 |
| 2022-11-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SAINT PAUL ICE OFFICE | Saint Paul | 22 | 55 | 95.19 |
| 2022-07-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | DES MOINES ICE OFFICE | Saint Paul | 6 | 12 | 50.00 |
| 2023-01-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-07-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | GRAND FORKS ERO OFFICE | Saint Paul | 3 | 7 | 40.63 |
| 2022-11-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | NORTH PLATTE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | NORTH PLATTE OFFICE | Saint Paul | 2 | 5 | 3.03 |
| 2022-06-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.62 |
| 2022-07-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | NORTH PLATTE OFFICE | Saint Paul | 2 | 6 | 2.33 |
| 2023-02-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | SAINT PAUL ICE OFFICE | Saint Paul | 29 | 81 | 82.14 |
| 2023-02-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | SIOUX CITY ERO BUILDING | Saint Paul | 6 | 10 | 11.11 |
| 2022-10-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SAINT PAUL ICE OFFICE | Saint Paul | 27 | 58 | 87.50 |
| 2022-06-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | SAINT PAUL ICE OFFICE | Saint Paul | 23 | 71 | 87.97 |
| 2022-05-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 1 | 1 | 25.00 |
| 2022-12-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND FORKS ERO OFFICE | Saint Paul | 3 | 6 | 50.00 |
| 2022-10-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | NORTH PLATTE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | NORTH PLATTE OFFICE | Saint Paul | 7 | 11 | 6.67 |
| 2022-06-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | NORTH PLATTE OFFICE | Saint Paul | 9 | 32 | 20.00 |
| 2023-01-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 3 | 1.94 |
| 2023-03-01 | SAINT PAUL ICE OFFICE | Saint Paul | 26 | 56 | 90.00 |
| 2022-09-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2022-12-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-11-01 | SAINT PAUL ICE OFFICE | Saint Paul | 25 | 55 | 93.75 |
| 2022-08-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | SAINT PAUL ICE OFFICE | Saint Paul | 33 | 86 | 86.86 |
| 2022-04-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | SIOUX CITY ERO BUILDING | Saint Paul | 0 | 0 | 0.00 |
| 2023-04-01 | SIOUX FALLS ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-04-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 1 | 1 | 8.33 |
| 2022-11-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-07-01 | CEDAR RAPIDS IA RAC OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | DES MOINES ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |

| 2022-12-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-07-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-03-01 | OMAHA FIELD OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-05-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 5 | 7 | 6.91 |
| 2023-04-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | OMAHA FIELD OFFICE | Saint Paul | 1 | 2 | 2.70 |
| 2022-12-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-02-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-08-01 | GRAND FORKS ERO OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-06-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-10-01 | RAPID CITY ICE OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2023-01-01 | NORTH PLATTE OFFICE | Saint Paul | 1 | 2 | 0.62 |
| 2022-09-01 | GRAND ISLAND ERO/HSI OFFICE | Saint Paul | 0 | 0 | 0.00 |
| 2022-09-01 | NORTH PLATTE OFFICE | Saint Paul | 3 | 7 | 4.00 |
| 2022-12-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 14 | 41 | 32.93 |
| 2022-10-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | SAXON BUILDING | Boston | 4 | 14 | 11.30 |
| 2023-03-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | BURLINGTON MA OFFICE | Boston | 3 | 8 | 0.79 |
| 2023-01-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-08-01 | BURLINGTON MA OFFICE | Boston | 1 | 2 | 0.22 |

| 2022-11-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-04-01 | BURLINGTON MA OFFICE | Boston | 69 | 181 | 20.23 |
| 2023-02-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | HARTFORD SUB OFFICE | Boston | 9 | 22 | 6.84 |
| 2022-06-01 | HARTFORD SUB OFFICE | Boston | 5 | 11 | 6.87 |
| 2022-05-01 | SAXON BUILDING | Boston | 26 | 65 | 58.37 |
| 2023-02-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-05-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 19 | 60 | 87.30 |
| 2022-09-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | BURLINGTON MA OFFICE | Boston | 2 | 6 | 0.67 |
| 2022-09-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | BURLINGTON MA OFFICE | Boston | 1 | 1 | 0.16 |
| 2022-05-01 | HARTFORD SUB OFFICE | Boston | 4 | 4 | 5.13 |
| 2023-01-01 | HARTFORD SUB OFFICE | Boston | 1 | 2 | 1.52 |
| 2022-09-01 | HARTFORD SUB OFFICE | Boston | 9 | 24 | 6.28 |
| 2022-08-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 23 | 60 | 100.00 |
| 2023-02-01 | HARTFORD SUB OFFICE | Boston | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | SAXON BUILDING | Boston | 1 | 2 | 2.37 |
| 2022-08-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-04-01 | SAXON BUILDING | Boston | 27 | 60 | 97.24 |
| 2023-01-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-08-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-04-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-01-01 | BURLINGTON MA OFFICE | Boston | 1 | 5 | 0.50 |
| 2023-04-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-12-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-06-01 | BURLINGTON MA OFFICE | Boston | 1 | 3 | 0.28 |
| 2022-12-01 | HARTFORD SUB OFFICE | Boston | 2 | 4 | 2.89 |
| 2022-10-01 | MANCHESTER ICE | Boston | 1 | 3 | 1.85 |
| 2022-05-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 21 | 68 | 100.00 |
| 2022-08-01 | HARTFORD SUB OFFICE | Boston | 25 | 74 | 27.57 |
| 2022-04-01 | HARTFORD SUB OFFICE | Boston | 32 | 72 | 55.22 |
| 2022-10-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 80 | 100.00 |
| 2023-04-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | SAXON BUILDING | Boston | 1 | 2 | 2.09 |
| 2023-04-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | SAXON BUILDING | Boston | 0 | 0 | 0.00 |
| 2022-07-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2023-02-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2022-10-01 | BURLINGTON MA OFFICE | Boston | 1 | 1 | 0.17 |
| 2022-12-01 | BURLINGTON MA OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-09-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |

| Date | Office | Region | | | |
|---|---|---|---|---|---|
| 2022-11-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-05-01 | BURLINGTON MA OFFICE | Boston | 2 | 6 | 0.45 |
| 2022-05-01 | MANCHESTER ICE | Boston | 0 | 0 | 0.00 |
| 2023-03-01 | ST. ALBANS OFFICE | Boston | 0 | 0 | 0.00 |
| 2022-11-01 | HARTFORD SUB OFFICE | Boston | 6 | 11 | 0.85 |
| 2022-04-01 | MANCHESTER ICE | Boston | 4 | 9 | 7.22 |
| 2022-07-01 | HARTFORD SUB OFFICE | Boston | 8 | 22 | 5.54 |
| 2022-04-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 17 | 61 | 100.00 |
| 2022-07-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 62 | 100.00 |
| 2022-06-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 21 | 72 | 100.00 |
| 2022-11-01 | SCARBOROUGH ERO SUB OFFICE | Boston | 20 | 74 | 100.00 |
| 2023-03-01 | TAMPA SUB OFFICE | Miami | 45 | 81 | 91.30 |
| 2023-02-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-06-01 | TAMPA SUB OFFICE | Miami | 37 | 88 | 96.15 |
| 2022-11-01 | TAMPA SUB OFFICE | Miami | 36 | 76 | 92.59 |
| 2022-10-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 32 | 51 | 89.39 |
| 2022-07-01 | TAMPA SUB OFFICE | Miami | 35 | 76 | 90.28 |
| 2022-06-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2024-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-07-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-03-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2024-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 7 | 12 | 4.19 |
| 2022-11-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-05-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 85 | 100.00 |
| 2023-10-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 80 | 100.00 |
| 2024-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 65 | 100.00 |
| 2022-10-01 | MIRAMAR ERO OFFICE | Miami | 100 | 252 | 100.00 |
| 2023-04-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 74 | 100.00 |
| 2023-09-01 | MIRAMAR ERO OFFICE | Miami | 100 | 251 | 100.00 |
| 2024-02-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 52 | 100.00 |
| 2022-09-01 | MIRAMAR ERO OFFICE | Miami | 105 | 265 | 100.00 |
| 2022-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 25 | 67 | 100.00 |
| 2023-03-01 | ORLANDO CO-LO OFFICE | Miami | 35 | 82 | 100.00 |
| 2023-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 64 | 100.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2024-01-01 | MIRAMAR ERO OFFICE | Miami | 105 | 249 | 100.00 |
| 2022-11-01 | ORLANDO CO-LO OFFICE | Miami | 42 | 93 | 100.00 |
| 2023-02-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 76 | 100.00 |
| 2023-06-01 | ORLANDO CO-LO OFFICE | Miami | 29 | 71 | 100.00 |
| 2023-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 67 | 100.00 |
| 2024-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 46 | 100.00 |
| 2022-06-01 | ORLANDO CO-LO OFFICE | Miami | 55 | 122 | 88.94 |
| 2022-05-01 | TAMPA SUB OFFICE | Miami | 43 | 98 | 97.73 |
| 2022-10-01 | TAMPA SUB OFFICE | Miami | 33 | 79 | 92.59 |
| 2022-09-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 18 | 36 | 77.14 |
| 2022-05-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-02-01 | TAMPA SUB OFFICE | Miami | 34 | 68 | 89.47 |
| 2023-01-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2025-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-07-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2024-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-03-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-11-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |

| 2023-02-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-10-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 21 | 52 | 100.00 |
| 2023-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 49 | 100.00 |
| 2024-02-01 | MIRAMAR ERO OFFICE | Miami | 100 | 231 | 100.00 |
| 2022-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 67 | 100.00 |
| 2023-03-01 | MIRAMAR ERO OFFICE | Miami | 115 | 268 | 100.00 |
| 2023-07-01 | ORLANDO CO-LO OFFICE | Miami | 26 | 64 | 100.00 |
| 2024-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 52 | 100.00 |
| 2022-06-01 | MIRAMAR ERO OFFICE | Miami | 109 | 306 | 100.00 |
| 2022-11-01 | MIRAMAR ERO OFFICE | Miami | 98 | 242 | 100.00 |
| 2023-02-01 | MIRAMAR ERO OFFICE | Miami | 95 | 226 | 100.00 |
| 2022-09-01 | ORLANDO CO-LO OFFICE | Miami | 45 | 99 | 86.19 |
| 2023-06-01 | MIRAMAR ERO OFFICE | Miami | 104 | 252 | 100.00 |
| 2023-11-01 | ORLANDO CO-LO OFFICE | Miami | 28 | 57 | 100.00 |
| 2024-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 57 | 100.00 |
| 2023-01-01 | ORLANDO CO-LO OFFICE | Miami | 44 | 95 | 100.00 |
| 2022-05-01 | ORLANDO CO-LO OFFICE | Miami | 48 | 106 | 86.11 |
| 2023-05-01 | MIRAMAR ERO OFFICE | Miami | 111 | 248 | 100.00 |
| 2023-10-01 | MIRAMAR ERO OFFICE | Miami | 105 | 233 | 100.00 |
| 2024-03-01 | ORLANDO CO-LO OFFICE | Miami | 27 | 48 | 100.00 |
| 2022-07-01 | MIRAMAR ERO OFFICE | Miami | 100 | 272 | 100.00 |

| 2022-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 58 | 100.00 |
|---|---|---|---|---|---|
| 2023-04-01 | MIRAMAR ERO OFFICE | Miami | 100 | 213 | 100.00 |
| 2022-04-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | TAMPA SUB OFFICE | Miami | 42 | 75 | 93.52 |
| 2022-12-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | TAMPA SUB OFFICE | Miami | 40 | 93 | 94.74 |
| 2022-09-01 | TAMPA SUB OFFICE | Miami | 38 | 80 | 91.23 |
| 2022-08-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2024-09-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-02-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2022-10-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-09-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-04-01 | MIRAMAR ERO OFFICE | Miami | 101 | 231 | 100.00 |
| 2022-06-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 33 | 90 | 100.00 |
| 2023-07-01 | MIRAMAR ERO OFFICE | Miami | 100 | 227 | 100.00 |
| 2023-12-01 | ORLANDO CO-LO OFFICE | Miami | 21 | 48 | 100.00 |

A0564

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | MIRAMAR ERO OFFICE | Miami | 115 | 311 | 100.00 |
| 2022-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 60 | 100.00 |
| 2023-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 65 | 100.00 |
| 2022-08-01 | ORLANDO CO-LO OFFICE | Miami | 51 | 109 | 98.75 |
| 2023-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 50 | 100.00 |
| 2023-11-01 | MIRAMAR ERO OFFICE | Miami | 105 | 283 | 100.00 |
| 2024-04-01 | ORLANDO CO-LO OFFICE | Miami | 8 | 12 | 100.00 |
| 2023-01-01 | MIRAMAR ERO OFFICE | Miami | 100 | 231 | 100.00 |
| 2022-04-01 | ORLANDO CO-LO OFFICE | Miami | 40 | 95 | 97.04 |
| 2023-05-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 61 | 100.00 |
| 2023-10-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 66 | 100.00 |
| 2024-03-01 | MIRAMAR ERO OFFICE | Miami | 106 | 221 | 100.00 |
| 2022-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 69 | 100.00 |
| 2022-12-01 | ORLANDO CO-LO OFFICE | Miami | 46 | 94 | 100.00 |
| 2023-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 24 | 53 | 100.00 |
| 2023-08-01 | ORLANDO CO-LO OFFICE | Miami | 36 | 90 | 100.00 |
| 2024-02-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 49 | 100.00 |
| 2023-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 30 | 73 | 100.00 |
| 2023-04-01 | TAMPA SUB OFFICE | Miami | 7 | 15 | 83.33 |
| 2023-03-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | TAMPA SUB OFFICE | Miami | 39 | 81 | 92.98 |
| 2022-11-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |

| 2022-06-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 8 | 15 | 25.56 |
|---|---|---|---|---|---|
| 2022-08-01 | TAMPA SUB OFFICE | Miami | 42 | 89 | 94.93 |
| 2022-07-01 | SAN PATRICIO OFFICE CENTER | Miami | 0 | 0 | 0.00 |
| 2023-01-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2025-04-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-09-01 | TALLAHASSEE OFFICE COMMMONWEALTH | Miami | 0 | 0 | 0.00 |
| 2024-12-01 | JACKSONVILLE CO-LO OFFICE | Miami | 0 | 0 | 0.00 |
| 2022-08-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-05-01 | MIRAMAR ERO OFFICE | Miami | 115 | 310 | 100.00 |
| 2022-05-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2023-04-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-12-01 | DEPORTATION PROCESSING CENTER | Miami | 0 | 0 | 0.00 |
| 2022-06-01 | JACKSONVILLE CO-LO OFFICE | Miami | 25 | 70 | 100.00 |
| 2023-11-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 48 | 100.00 |
| 2024-04-01 | MIRAMAR ERO OFFICE | Miami | 25 | 46 | 100.00 |
| 2022-10-01 | ORLANDO CO-LO OFFICE | Miami | 42 | 80 | 100.00 |
| 2023-01-01 | JACKSONVILLE CO-LO OFFICE | Miami | 22 | 55 | 100.00 |
| 2023-09-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 77 | 100.00 |

| 2024-03-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 54 | 100.00 |
| 2022-12-01 | MIRAMAR ERO OFFICE | Miami | 109 | 259 | 100.00 |
| 2023-08-01 | MIRAMAR ERO OFFICE | Miami | 115 | 268 | 100.00 |
| 2024-01-01 | ORLANDO CO-LO OFFICE | Miami | 31 | 56 | 100.00 |
| 2023-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 26 | 67 | 100.00 |
| 2023-12-01 | MIRAMAR ERO OFFICE | Miami | 100 | 251 | 100.00 |
| 2024-07-01 | JACKSONVILLE CO-LO OFFICE | Miami | 28 | 50 | 100.00 |
| 2022-08-01 | JACKSONVILLE CO-LO OFFICE | Miami | 28 | 80 | 100.00 |
| 2022-07-01 | ORLANDO CO-LO OFFICE | Miami | 46 | 99 | 98.82 |
| 2023-04-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-10-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-10-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-07-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 60 | 169 | 100.00 |
| 2023-03-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.19 |
| 2022-08-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.19 |
| 2022-06-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 63 | 168 | 100.00 |
| 2022-04-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 227 | 550 | 68.04 |
| 2022-09-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-09-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-04-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 51 | 131 | 100.00 |
| 2023-02-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2022-07-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 5 | 0.70 |
| 2023-03-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 1 | 2 | 0.58 |

| 2023-01-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 1 | 1 | 0.20 |
|---|---|---|---|---|---|
| 2022-05-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 63 | 173 | 100.00 |
| 2023-01-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 2 | 5 | 1.55 |
| 2022-12-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2023-04-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-12-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 3 | 0.47 |
| 2022-06-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 21 | 46 | 6.14 |
| 2022-08-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 45 | 129 | 40.85 |
| 2022-11-01 | MOUNT LAUREL NJ ERO/HSI | Newark | 0 | 0 | 0.00 |
| 2023-02-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 0 | 0 | 0.00 |
| 2022-11-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 2 | 4 | 0.60 |
| 2022-05-01 | PETER W. RODINO JR FEDERAL BLDG | Newark | 223 | 663 | 76.64 |
| 2023-10-01 | HOUSTON FIELD OFFICE | Houston | 39 | 96 | 7.91 |
| 2023-06-01 | HOUSTON FIELD OFFICE | Houston | 37 | 102 | 7.68 |
| 2022-04-01 | HOUSTON FIELD OFFICE | Houston | 134 | 286 | 81.13 |
| 2022-06-01 | HOUSTON FIELD OFFICE | Houston | 85 | 244 | 100.00 |
| 2024-02-01 | HOUSTON FIELD OFFICE | Houston | 39 | 117 | 8.38 |
| 2023-01-01 | HOUSTON FIELD OFFICE | Houston | 80 | 183 | 100.00 |
| 2022-08-01 | HOUSTON FIELD OFFICE | Houston | 95 | 243 | 100.00 |
| 2024-04-01 | HOUSTON FIELD OFFICE | Houston | 0 | 0 | 0.00 |
| 2023-05-01 | HOUSTON FIELD OFFICE | Houston | 44 | 107 | 7.12 |
| 2024-01-01 | HOUSTON FIELD OFFICE | Houston | 43 | 123 | 7.60 |
| 2023-09-01 | HOUSTON FIELD OFFICE | Houston | 36 | 95 | 6.94 |

| 2022-12-01 | HOUSTON FIELD OFFICE | Houston | 80 | 183 | 100.00 |
|---|---|---|---|---|---|
| 2023-12-01 | HOUSTON FIELD OFFICE | Houston | 35 | 99 | 7.17 |
| 2023-08-01 | HOUSTON FIELD OFFICE | Houston | 45 | 114 | 6.20 |
| 2023-04-01 | HOUSTON FIELD OFFICE | Houston | 35 | 91 | 7.11 |
| 2022-10-01 | HOUSTON FIELD OFFICE | Houston | 81 | 190 | 100.00 |
| 2022-09-01 | HOUSTON FIELD OFFICE | Houston | 80 | 205 | 100.00 |
| 2023-11-01 | HOUSTON FIELD OFFICE | Houston | 39 | 95 | 7.88 |
| 2022-05-01 | HOUSTON FIELD OFFICE | Houston | 88 | 247 | 100.00 |
| 2023-07-01 | HOUSTON FIELD OFFICE | Houston | 32 | 94 | 5.26 |
| 2023-03-01 | HOUSTON FIELD OFFICE | Houston | 56 | 110 | 10.31 |
| 2024-03-01 | HOUSTON FIELD OFFICE | Houston | 2 | 5 | 0.43 |
| 2022-07-01 | HOUSTON FIELD OFFICE | Houston | 75 | 171 | 100.00 |
| 2022-11-01 | HOUSTON FIELD OFFICE | Houston | 85 | 195 | 100.00 |
| 2023-02-01 | HOUSTON FIELD OFFICE | Houston | 75 | 159 | 100.00 |
| 2022-10-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-07-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 50 | 90.91 |
| 2023-03-01 | ATLANTA FEDERAL OFFICE | Atlanta | 22 | 61 | 84.48 |
| 2024-03-01 | ATLANTA FEDERAL OFFICE | Atlanta | 12 | 33 | 75.00 |
| 2024-01-01 | CHARLOTTE ERO OFFICE | Atlanta | 1 | 2 | 0.99 |
| 2022-10-01 | ATLANTA FEDERAL OFFICE | Atlanta | 26 | 59 | 98.33 |
| 2022-09-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 1 | 3 | 1.79 |
| 2023-02-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-05-01 | ATLANTA FEDERAL OFFICE | Atlanta | 32 | 87 | 85.55 |

| 2023-11-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 53 | 88.46 |
|---|---|---|---|---|---|
| 2022-05-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 51 | 140 | 96.67 |
| 2024-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-06-01 | ATLANTA FEDERAL OFFICE | Atlanta | 31 | 73 | 100.00 |
| 2023-11-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-10-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-11-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 58 | 100.00 |
| 2023-02-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 67 | 100.00 |
| 2023-02-01 | ATLANTA FEDERAL OFFICE | Atlanta | 19 | 51 | 82.26 |
| 2024-02-01 | ATLANTA FEDERAL OFFICE | Atlanta | 15 | 38 | 81.71 |
| 2023-07-01 | CHARLOTTE ERO OFFICE | Atlanta | 17 | 37 | 33.02 |
| 2022-09-01 | ATLANTA FEDERAL OFFICE | Atlanta | 33 | 87 | 80.77 |
| 2022-08-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 56 | 144 | 91.88 |
| 2023-01-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 29 | 75 | 98.74 |
| 2023-10-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 52 | 86.92 |
| 2022-04-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 38 | 115 | 83.94 |
| 2023-06-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 64 | 98.11 |
| 2023-09-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2024-03-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-07-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 64 | 100.00 |
| 2022-08-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 74 | 100.00 |
| 2022-11-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 65 | 100.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-01-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 73 | 100.00 |
| 2023-04-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-08-01 | ATLANTA FEDERAL OFFICE | Atlanta | 36 | 90 | 94.83 |
| 2022-07-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 56 | 133 | 97.32 |
| 2022-12-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-09-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 53 | 89.17 |
| 2023-05-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 65 | 91.38 |
| 2023-01-01 | ATLANTA FEDERAL OFFICE | Atlanta | 22 | 60 | 92.31 |
| 2024-01-01 | ATLANTA FEDERAL OFFICE | Atlanta | 20 | 44 | 93.10 |
| 2023-08-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2024-02-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-12-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 55 | 100.00 |
| 2024-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-11-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2023-08-01 | ATLANTA FEDERAL OFFICE | Atlanta | 26 | 73 | 97.33 |
| 2023-04-01 | ATLANTA FEDERAL OFFICE | Atlanta | 19 | 51 | 85.00 |
| 2022-12-01 | ATLANTA FEDERAL OFFICE | Atlanta | 23 | 59 | 90.77 |
| 2023-03-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 0 | 0 | 0.00 |
| 2022-07-01 | ATLANTA FEDERAL OFFICE | Atlanta | 25 | 69 | 95.83 |
| 2023-12-01 | ATLANTA FEDERAL OFFICE | Atlanta | 18 | 43 | 84.03 |
| 2022-06-01 | CHARLESTON ERO/HSI OFFICE | Atlanta | 53 | 140 | 96.67 |
| 2022-06-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 68 | 100.00 |
| 2023-12-01 | CHARLOTTE ERO OFFICE | Atlanta | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 30 | 80 | 100.00 |
| 2022-05-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 64 | 100.00 |
| 2023-06-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 67 | 100.00 |
| 2023-05-01 | CHARLOTTE ERO OFFICE | Atlanta | 29 | 81 | 100.00 |
| 2022-10-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 55 | 100.00 |
| 2023-04-01 | CHARLOTTE ERO OFFICE | Atlanta | 24 | 57 | 100.00 |
| 2022-09-01 | CHARLOTTE ERO OFFICE | Atlanta | 26 | 68 | 100.00 |
| 2023-03-01 | CHARLOTTE ERO OFFICE | Atlanta | 28 | 55 | 100.00 |
| 2022-05-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| 2022-10-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-07-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | CRAIG OFFICE | Denver | 1 | 2 | 5.88 |
| 2022-12-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |

| 2022-08-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-05-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | FLORENCE OFFICE | Denver | 1 | 1 | 0.70 |
| 2022-06-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 1 | 1 | 0.53 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | ERO - FREDERICK CO OFFICE | Denver | 1 | 2 | 7.14 |
| 2022-07-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-01-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-09-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-05-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-05-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | ALAMOSA OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 5 | 7 | 3.47 |
| 2023-02-01 | CASPER SUB-OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-02-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-06-01 | CRAIG OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-10-01 | DENVER FOD AND CHIEF COUNSEL OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | DURANGO OFFICE ERO | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-07-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-08-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-08-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2022-04-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2022-11-01 | ERO - FREDERICK CO OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-04-01 | FLORENCE OFFICE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | GLENWOOD SPRING QUICK RESPONSE TEAM | Denver | 0 | 0 | 0.00 |
| 2022-12-01 | GRAND JUNCTION RESIDENT AGENT IN CHARGE | Denver | 0 | 0 | 0.00 |
| 2023-03-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 4 | 20.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-06-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | BATON ROUGE RAC OFFICE | New Orleans | 17 | 33 | 54.35 |
| 2022-12-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | BOSSIER CITY | New Orleans | 4 | 13 | 3.13 |
| 2022-06-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 14 | 100.00 |
| 2022-04-01 | FORT SMITH RAC OFFICE | New Orleans | 2 | 4 | 13.16 |
| 2022-05-01 | MONTGOMERY ERO OFFICE | New Orleans | 1 | 3 | 50.00 |
| 2023-04-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | FAYETTEVILLE ERO OFFICE | New Orleans | 4 | 11 | 100.00 |
| 2022-05-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 11 | 100.00 |
| 2023-03-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 10 | 20.00 |
| 2022-07-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 14 | 50.00 |
| 2022-12-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | GULFPORT RAC OFFICE | New Orleans | 1 | 1 | 3.03 |
| 2022-09-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 16 | 37 | 20.31 |
| 2022-08-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

| Date | Office | Location | | | |
|---|---|---|---|---|---|
| 2022-10-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 37 | 106 | 49.06 |
| 2022-06-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 20 | 16.67 |
| 2022-08-01 | NEW ORLEANS OFFICE | New Orleans | 19 | 45 | 18.63 |
| 2022-11-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 6 | 100.00 |
| 2022-12-01 | NASHVILLE SAC OFFICE | New Orleans | 14 | 33 | 76.67 |
| 2024-04-01 | NASHVILLE SAC OFFICE | New Orleans | 2 | 8 | 83.33 |
| 2023-02-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | NASHVILLE SAC OFFICE | New Orleans | 17 | 36 | 67.95 |
| 2023-12-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 21 | 20.83 |
| 2022-10-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | NASHVILLE SAC OFFICE | New Orleans | 38 | 92 | 80.92 |
| 2023-08-01 | NASHVILLE SAC OFFICE | New Orleans | 10 | 26 | 33.33 |
| 2022-12-01 | NEW ORLEANS OFFICE | New Orleans | 22 | 44 | 23.56 |
| 2023-04-01 | GULFPORT RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

A0579

| 2023-02-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-09-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 1 | 51.02 |
| 2023-04-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | BATON ROUGE RAC OFFICE | New Orleans | 22 | 42 | 80.00 |
| 2023-04-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | FAYETTEVILLE ERO OFFICE | New Orleans | 2 | 4 | 100.00 |
| 2023-01-01 | GULFPORT RAC OFFICE | New Orleans | 2 | 2 | 5.88 |
| 2023-03-01 | KNOXVILLE RAC OFFICE | New Orleans | 1 | 2 | 1.42 |
| 2022-12-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 1 | 2 | 1.42 |
| 2022-11-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | GULFPORT RAC OFFICE | New Orleans | 1 | 3 | 10.00 |

| 2022-10-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 1 | 1 | 2.29 |
|---|---|---|---|---|---|
| 2022-08-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 22 | 50 | 20.00 |
| 2022-07-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | NEW ORLEANS OFFICE | New Orleans | 166 | 309 | 100.00 |
| 2022-06-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 9 | 100.00 |
| 2022-04-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 31 | 73 | 44.07 |
| 2023-04-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | LAFAYETTE RAC OFFICE | New Orleans | 11 | 16 | 100.00 |
| 2022-04-01 | MONTGOMERY ERO OFFICE | New Orleans | 4 | 10 | 55.56 |
| 2022-10-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | NASHVILLE SAC OFFICE | New Orleans | 14 | 30 | 83.33 |
| 2024-03-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 21 | 20.83 |
| 2023-01-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | NASHVILLE SAC OFFICE | New Orleans | 13 | 33 | 91.67 |
| 2023-11-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 24 | 33.33 |
| 2023-04-01 | NEW ORLEANS OFFICE | New Orleans | 1 | 1 | 31.25 |
| 2022-09-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-07-01 | NASHVILLE SAC OFFICE | New Orleans | 7 | 21 | 22.22 |
| 2022-11-01 | NEW ORLEANS OFFICE | New Orleans | 17 | 36 | 20.70 |
| 2022-05-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |

| 2023-02-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2023-03-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 24 | 30.00 |
| 2022-07-01 | NEW ORLEANS OFFICE | New Orleans | 20 | 50 | 23.30 |
| 2023-01-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | BATON ROUGE RAC OFFICE | New Orleans | 24 | 48 | 83.61 |
| 2022-08-01 | BOSSIER CITY | New Orleans | 6 | 15 | 3.45 |
| 2023-03-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | BATON ROUGE RAC OFFICE | New Orleans | 2 | 5 | 22.58 |
| 2022-10-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |

A0582

| 2022-12-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | GULFPORT RAC OFFICE | New Orleans | 4 | 8 | 60.00 |
| 2022-05-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 3 | 4 | 7.58 |
| 2022-06-01 | LITTLE ROCK ERO OFFICE | New Orleans | 1 | 1 | 1.85 |
| 2022-07-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 25 | 70 | 39.34 |
| 2022-06-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | JACKSON RAC OFFICE | New Orleans | 2 | 6 | 100.00 |
| 2023-03-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 1 | 3 | 7.41 |
| 2022-10-01 | LAFAYETTE RAC OFFICE | New Orleans | 1 | 2 | 27.27 |
| 2023-01-01 | MOBILE RAC OFFICE | New Orleans | 2 | 2 | 25.00 |
| 2023-02-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | GULFPORT RAC OFFICE | New Orleans | 2 | 2 | 5.88 |
| 2022-05-01 | KNOXVILLE RAC OFFICE | New Orleans | 3 | 8 | 6.75 |
| 2022-11-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 15 | 38 | 14.21 |
| 2022-12-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | LAFAYETTE RAC OFFICE | New Orleans | 10 | 20 | 100.00 |
| 2022-06-01 | NASHVILLE SAC OFFICE | New Orleans | 18 | 41 | 95.16 |
| 2023-10-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 27 | 40.00 |

A0583

| | | | | | |
|---|---|---|---|---|---|
| 2023-02-01 | NEW ORLEANS OFFICE | New Orleans | 6 | 9 | 5.08 |
| 2022-08-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-06-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 26 | 36.67 |
| 2022-10-01 | NEW ORLEANS OFFICE | New Orleans | 18 | 38 | 21.48 |
| 2023-01-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 22 | 25.00 |
| 2022-06-01 | NEW ORLEANS OFFICE | New Orleans | 136 | 274 | 97.29 |
| 2022-09-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | GULFPORT RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | NASHVILLE SAC OFFICE | New Orleans | 16 | 29 | 87.50 |
| 2024-02-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 24 | 30.00 |
| 2023-04-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | BATON ROUGE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-06-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 0 | 0 | 0.00 |
| 2023-02-01 | BATON ROUGE RAC OFFICE | New Orleans | 1 | 1 | 60.98 |
| 2022-04-01 | CHATTANOOGA RAC OFFICE | New Orleans | 5 | 11 | 91.67 |

A0584

| | | | | | |
|---|---|---|---|---|---|
| 2022-07-01 | BOSSIER CITY | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | LAFAYETTE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-12-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | BATON ROUGE RAC OFFICE | New Orleans | 3 | 6 | 36.00 |
| 2023-01-01 | KNOXVILLE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | LITTLE ROCK ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | BOSSIER CITY | New Orleans | 1 | 3 | 5.77 |
| 2022-05-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-07-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | NEW ORLEANS OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | GULFPORT RAC OFFICE | New Orleans | 6 | 9 | 100.00 |
| 2022-04-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 3 | 9 | 28.57 |
| 2022-08-01 | LAFAYETTE RAC OFFICE | New Orleans | 7 | 17 | 62.50 |
| 2022-04-01 | MOBILE RAC OFFICE | New Orleans | 2 | 3 | 9.43 |
| 2023-01-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-03-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | GULFPORT RAC OFFICE | New Orleans | 5 | 11 | 22.22 |
| 2022-04-01 | KNOXVILLE RAC OFFICE | New Orleans | 12 | 29 | 19.46 |
| 2022-10-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 12 | 29 | 12.24 |
| 2022-09-01 | CHATTANOOGA RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-10-01 | MOBILE RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-11-01 | MONTGOMERY ERO OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-04-01 | HOMEWOOD AL ERO/HSI OFFICE | New Orleans | 10 | 26 | 35.48 |

A0585

| | | | | | |
|---|---|---|---|---|---|
| 2022-04-01 | LITTLE ROCK ERO OFFICE | New Orleans | 11 | 26 | 36.11 |
| 2022-06-01 | MEMPHIS ERO OFFICE BUSINESS PARK | New Orleans | 36 | 90 | 47.37 |
| 2022-07-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-04-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-05-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 28 | 43.33 |
| 2022-09-01 | NEW ORLEANS OFFICE | New Orleans | 23 | 45 | 24.44 |
| 2022-12-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2023-01-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 23 | 26.67 |
| 2022-04-01 | NEW ORLEANS OFFICE | New Orleans | 122 | 232 | 93.06 |
| 2023-04-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-08-01 | FORT SMITH RAC OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-09-01 | NASHVILLE SAC OFFICE | New Orleans | 18 | 35 | 67.95 |
| 2024-01-01 | NASHVILLE SAC OFFICE | New Orleans | 9 | 21 | 20.00 |
| 2022-11-01 | ETOWAH ERO + 287G OFFICE | New Orleans | 0 | 0 | 0.00 |
| 2022-05-01 | NASHVILLE SAC OFFICE | New Orleans | 45 | 112 | 86.26 |
| 2023-09-01 | NASHVILLE SAC OFFICE | New Orleans | 8 | 23 | 29.17 |
| 2023-01-01 | NEW ORLEANS OFFICE | New Orleans | 20 | 35 | 21.48 |
| 2023-03-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | SPOKANE OFFICE | Seattle | 1 | 4 | 10.71 |
| 2022-07-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |

| 2022-04-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-08-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | RICHLAND OFFICE | Seattle | 1 | 1 | 0.97 |
| 2022-08-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

| 2022-04-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-11-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | EUGENE OFFICE | Seattle | 1 | 5 | 100.00 |
| 2022-07-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | PORTLAND OFFICE | Seattle | 2 | 6 | 0.58 |
| 2022-09-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

| 2023-02-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-06-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-03-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-11-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-07-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | SEATTLE FIELD OFFICE | Seattle | 12 | 24 | 8.20 |
| 2023-04-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-04-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-12-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-04-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 1 | 1 | 7.14 |
| 2022-12-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | SPOKANE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-08-01 | SEATTLE FIELD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-09-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | ANCHORAGE OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | MEDFORD OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-05-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | WENATCHEE INVESTIGATIONS OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | YAKIMA OFFICE - ERO | Seattle | 0 | 0 | 0.00 |
| 2022-10-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-01-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-06-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | PORTLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2023-02-01 | RICHLAND OFFICE | Seattle | 0 | 0 | 0.00 |
| 2022-09-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 60 | 150 | 86.35 |
| 2022-05-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 124 | 330 | 96.99 |
| 2023-02-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 49 | 148 | 86.00 |
| 2022-06-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2023-03-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | SACRAMENTO SUB OFFICE | San Francisco | 1 | 1 | 0.59 |
| 2023-03-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 78 | 198 | 96.71 |
| 2023-01-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 11 | 28 | 44.30 |
| 2022-09-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 51 | 154 | 90.29 |
| 2022-05-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 74 | 172 | 93.21 |
| 2023-02-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-10-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-06-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-05-01 | SACRAMENTO SUB OFFICE | San Francisco | 8 | 8 | 6.50 |
| 2023-03-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 61 | 170 | 94.68 |
| 2022-05-01 | STOCKTON OFFICE | San Francisco | 3 | 6 | 46.88 |
| 2022-08-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 58 | 164 | 95.31 |
| 2022-04-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 54 | 134 | 80.80 |
| 2023-04-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

| 2022-05-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
|---|---|---|---|---|---|
| 2022-04-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-01-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-09-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-05-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | SACRAMENTO SUB OFFICE | San Francisco | 19 | 27 | 13.41 |
| 2023-01-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 57 | 149 | 82.51 |
| 2022-06-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 75 | 175 | 90.61 |
| 2023-03-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-02-01 | SAN FRANCISCO FIELD OFFICE | San Francisco | 46 | 139 | 86.06 |
| 2022-04-01 | STOCKTON OFFICE | San Francisco | 5 | 8 | 77.78 |
| 2022-07-01 | HONOLULU FIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| 2022-12-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-05-01 | BAKERSFIELD OFFICE | San Francisco | 1 | 2 | 0.56 |
| 2022-12-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-11-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | BAKERSFIELD OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-07-01 | STOCKTON OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | TAMUNING OFFICE GUAM | San Francisco | 0 | 0 | 0.00 |
| 2022-04-01 | FRESNO OFFICE ERO | San Francisco | 3 | 3 | 0.76 |
| 2022-06-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2023-04-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2023-03-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-08-01 | FRESNO OFFICE ERO | San Francisco | 0 | 0 | 0.00 |
| 2022-10-01 | SACRAMENTO SUB OFFICE | San Francisco | 0 | 0 | 0.00 |
| 2022-12-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.11 |
| 2022-04-01 | NEW YORK FIELD OFFICE | New York City | 421 | 1217 | 70.28 |
| 2022-08-01 | NEW YORK FIELD OFFICE | New York City | 217 | 595 | 36.13 |
| 2023-04-01 | NEW YORK FIELD OFFICE | New York City | 0 | 0 | 0.00 |
| 2022-11-01 | NEW YORK FIELD OFFICE | New York City | 6 | 18 | 0.24 |
| 2022-07-01 | NEW YORK FIELD OFFICE | New York City | 195 | 533 | 34.33 |
| 2023-02-01 | NEW YORK FIELD OFFICE | New York City | 0 | 0 | 0.00 |
| 2022-06-01 | NEW YORK FIELD OFFICE | New York City | 292 | 831 | 47.14 |

| 2023-03-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.11 |
|---|---|---|---|---|---|
| 2022-10-01 | NEW YORK FIELD OFFICE | New York City | 166 | 424 | 91.70 |
| 2023-01-01 | NEW YORK FIELD OFFICE | New York City | 1 | 1 | 0.13 |
| 2022-09-01 | NEW YORK FIELD OFFICE | New York City | 164 | 461 | 36.72 |
| 2022-05-01 | NEW YORK FIELD OFFICE | New York City | 435 | 1251 | 58.12 |

**Capacity (%) Key:**

| | |
|---|---|
| | Greater Than 75% |
| | Between 50% and 75% |
| | Between 25% and 50% |
| | Less Than 25% |

AOR (All)

**Capacity (%)**

| Row Labels / Column Labels | 04-2022 | 05-2022 | 06-2022 | 07-2022 | 08-2022 | 09-2022 | 10-2022 | 11-2022 | 12-2022 | 01-2023 | 02-2023 | 03-2023 | 04-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WICOMICO DETENTION FACILITY | 100 | 100 | 100 | 100 | 17.65 | 8.05 | | | 2.26 | | | | |
| MOUNT LAUREL NJ ERO/HSI | 100 | 100 | 100 | 40.85 | | | | 1.55 | 0 | 0.58 | | | |
| LAFAYETTE RAC OFFICE | 100 | 100 | 100 | 62.5 | 0 | 27.27 | | | | | | | |
| BALTIMORE DISTRICT OFFICE | 100 | 100 | | 97.78 | 77.83 | 57.92 | 54.06 | 59.55 | 6.16 | 1.19 | 0.96 | | |
| SCARBOROUGH ERO SUB OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 32.93 | | | | | | |
| CHARLOTTE ERO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 33.02 |
| JACKSONVILLE CO-LO OFFICE | 100 | 100 | 100 | 14.54 | 0.58 | 0.69 | 0.67 | 0.25 | 0.28 | 0.25 | 0.33 | 0.07 | |
| DALLAS FIELD OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| MIRAMAR ERO OFFICE | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| EUGENE OFFICE | 100 | 100 | | | | | | | | | | | |
| SAN ANTONIO ERO RESIDENT OFFICE | 100 | 54.24 | 1.41 | 1.48 | 0 | 2.33 | | | | | | | |
| FAYETTEVILLE ERO OFFICE | 100 | 100 | | | | | | | | | | | |
| SYRACUSE OFFICE | 100 | 0 | 0 | | | 0 | 0 | | 0 | 0 | | 0 | |
| GULFPORT RAC OFFICE | 100 | 100 | 100 | 100 | 60 | 0 | 10 | 3.03 | 22.22 | 5.88 | 5.88 | 0 | 20 |
| JACKSON RAC OFFICE | 100 | | | | | | | | | | | | |
| LOS ANGELES FIELD OFFICE | 100 | 100 | 48.26 | 0.22 | 0.24 | 0 | 0.17 | 0 | | 0 | 0 | | |
| CHICAGO FIELD OFFICE | 98.32 | 98.75 | 92.59 | 97.06 | 88.58 | 93.5 | 85.83 | 86.65 | 93.87 | 98.11 | 98.89 | 67.31 | 0 |
| ATLANTA FEDERAL OFFICE | 98.74 | 91.55 | 100 | 93.83 | 94.33 | 92.77 | 98.15 | 100 | 90.77 | 93.31 | 82.58 | 94.08 | 85 |
| SAXON BUILDING | 97.58 | 58.37 | 11.3 | 2.09 | 0 | 0 | 0 | 2.37 | 0 | | | | |
| ORLANDO CO-LO OFFICE | 97.04 | 96.11 | 98.94 | 98.82 | 98.79 | 98.19 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| SAN FRANCISCO FIELD OFFICE | 96.71 | 96.99 | 90.31 | 90.8 | 93.01 | 88.35 | 82.11 | 90.39 | 86 | 80.04 | 94.98 | 44.3 | |
| ERO/HSI INDIANAPOLIS OFFICE | 96.69 | 97.12 | 93.4 | 93.83 | 93.96 | 92.66 | 88.86 | 89.06 | 93.71 | 96.42 | 58.33 | | |
| WASHINGTON FIELD OFFICE | 96.43 | 94.39 | 61.39 | 0 | 0 | 1.42 | 0 | 2.18 | 0 | | | | |
| LAS VEGAS HSI, ERO AND OPLA | 95.16 | 8.12 | 3.32 | 0 | 3.35 | 0 | 0 | 0 | | | | | |
| TAMPA SUB OFFICE | 94.74 | 87.73 | 96.15 | 50.24 | 44.93 | 91.23 | 92.94 | 92.38 | 92.08 | 93.92 | 89.47 | 31.37 | 93.3 |
| NEW ORLEANS OFFICE | 93.26 | 100 | 37.28 | 23.3 | 18.63 | 24.04 | 23.48 | 20.7 | 23.56 | 21.48 | 5.08 | 0 | 31.25 |
| CHATTANOOGA RAC OFFICE | 91.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| ERO - KANSAS CITY FIELD OFFICE | 88.45 | 93.86 | 87.5 | 60.87 | 66.48 | 1.79 | 0 | 0 | 0 | 0 | 0 | | |
| WEST VALLEY CITY OFFICE | 88.06 | 36.13 | 10.64 | 12.89 | 9.94 | 0 | 0 | 4.73 | 0 | | | | |
| WESTERVILLE CO-LO OFFICE | 84.37 | 68.6 | 52.94 | 74.44 | 48.76 | 7.96 | 2.04 | 0 | 1.89 | 0 | | | |
| BLUE ASH BUILDING | 84.17 | 96.8 | 42.86 | 3.33 | 0 | 0 | 0 | 4.38 | 0 | 0 | | | |
| CHARLESTON ERO/HSI OFFICE | 83.94 | 98.47 | 96.43 | 97.17 | 91.88 | 1.79 | 0 | 0 | 0 | 0 | | | |
| BATON ROUGE RAC OFFICE | 83.65 | 100 | 54.35 | 36 | 22.58 | 51.02 | 0 | 0 | 100 | 60.98 | 0 | 0 | |
| SAINT PAUL ICE OFFICE | 82.16 | 93.04 | 96.23 | 96.86 | 97.93 | 96.15 | 93.75 | 95.71 | 87.5 | 85.58 | 98.08 | 0 | 0 |
| HOUSTON FIELD OFFICE | 81.13 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 10.31 | 7.11 | 7.12 |
| NASHVILLE SAC OFFICE | 80.92 | 86.26 | 95.08 | 73.87 | 67.95 | 67.95 | 85.1 | 83.63 | 74.83 | 26.67 | 25 | 30 | 16.67 |
| STOCKTON OFFICE | 77.08 | 46.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| TALLAHASSEE OFFICE COMMONWEALTH | 77.14 | 98.57 | 25.56 | 0 | 0 | 0 | 0 | | | | | | |
| DOVER OFFICE | 75.84 | 68.75 | 96.88 | 93.83 | 93.79 | 92.86 | 94.97 | 72.5 | 73.75 | 50.94 | 0 | | |
| SAINT LOUIS FILE CONTROL OFFICE | 73.08 | 55 | 18.18 | 9.72 | 11.76 | 0 | 0 | 0 | 0 | | | | |
| PHILADELPHIA OFFICE N 8TH ST. | 71.01 | 1.32 | 2.86 | 1.17 | 0 | 0 | 0 | 0 | 1.56 | 1.3 | 0 | | |
| NEW YORK FIELD OFFICE | 70.28 | 58.12 | 47.14 | 34.33 | 36.13 | 36.72 | 91.3 | 0.24 | 0.11 | 0.13 | 0 | 0.11 | |
| PROVO OFFICE | 70.24 | 86.27 | 79.55 | 87.5 | 82.95 | 88.75 | 16.67 | 0 | 0 | | | | |
| PETER W. RODINO JR FEDERAL BLDG | 68.04 | 76.56 | 6.54 | 0.7 | 0.19 | 0 | 0 | 0.6 | 0.47 | 0.2 | 0.19 | | |
| ALBUQUERQUE OFFICE | 63.64 | 1.75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| MILWAUKEE FIELD OFFICE | 58.62 | 93.83 | 99.07 | 78.03 | 78.78 | 92.98 | 60 | 69.23 | 74.73 | 74.25 | 91.67 | 72.92 | 96.88 |
| MONTGOMERY ERO OFFICE | 55.56 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| HARTFORD SUB OFFICE | 55.22 | 5.13 | 6.87 | 5.54 | 27.57 | 6.28 | 6.84 | 0.85 | 2.89 | 1.52 | 0 | | |
| LOUISVILLE FIELD OFFICE | 50 | 42.39 | 43.44 | 49.38 | 20.89 | 9.25 | 0 | 0 | 0 | 0 | | | |
| GRAND FORKS ERO OFFICE | 50 | 40.63 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| DES MOINES ICE OFFICE | 50 | 5.56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| MEMPHIS ERO OFFICE BUSINESS PARK | 44.07 | 49.06 | 47.37 | 39.14 | 20 | 20.31 | 12.24 | 14.21 | 1.42 | 0 | 0 | | |
| LITTLE ROCK ERO OFFICE | 36.11 | 0 | 1.85 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| HOMEWOOD AL ERO/HSI OFFICE | 35.48 | 7.58 | 0 | 0 | 0 | 2.29 | 0 | 0 | 0 | 0 | | | |
| HSI/ERO SPRINGFIELD MO OFFICE | 33.33 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| ETOWAH ERO + 287G OFFICE | 28.57 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7.41 | 0 | | | |
| BURLINGTON MA OFFICE | 20.23 | 0.45 | 0.28 | 0.67 | 0.22 | 0 | 0.17 | 0 | 0.5 | 0.16 | 0.79 | | |
| PITTSBURGH SUB OFFICE | 20 | 2.68 | 0 | 0 | 0 | 0 | 0 | 1.92 | 0 | | | | |
| NORTH PLATTE OFFICE | 20 | 2.33 | 0 | 1.84 | 4 | 6.67 | 0.62 | 0.59 | 0.62 | 1.94 | 1.03 | 33.33 | |
| KNOXVILLE RAC OFFICE | 19.46 | 6.75 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.42 | | | |
| OGDEN QUICK RESPONSE TEAM | 18.46 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| RICHMOND VA, HQ COOP OFFICE | 16.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| CLEVELAND OFFICE | 15.85 | 3.85 | 3.57 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| MIDLAND ERO OFFICE | 14.88 | 3.18 | 1.12 | 5.31 | 2.16 | 0 | 0 | 0 | 0 | | | | |
| OMAHA FIELD OFFICE | 14.29 | 0 | 0 | 0 | 2.7 | 0 | 0 | 0 | 0 | | | | |
| SACRAMENTO SUB OFFICE | 13.41 | 6.5 | 0 | 0 | 0 | 0 | 0 | 0.59 | 0 | 0 | | | |
| FORT SMITH RAC OFFICE | 13.16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| WICHITA ICE OFFICE | 12.5 | 0 | 1.19 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| NORFOLK ASAC OFFICE | 12.12 | 0.98 | 1.47 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| SIOUX CITY ERO BUILDING | 11.11 | 8.57 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| SPOKANE OFFICE | 10.71 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| RENO OFFICE | 10.34 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| OKLAHOMA CITY - ERO | 10.05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.64 | | | | |
| MOBILE RAC OFFICE | 9.43 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| CEDAR RAPIDS IA RAC OFFICE | 8.33 | 25 | 0 | 0 | 0 | 0 | 0 | 0 | 25 | 0 | | | |
| SEATTLE FIELD OFFICE | 8.2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| MANCHESTER ICE | 7.22 | 0 | 0 | 0 | 0 | 1.85 | 0 | 0 | 0 | | | | |
| ERO - FREDERICK CO OFFICE | 7.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| WENATCHEE INVESTIGATIONS OFFICE | 7.14 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| TUCSON OFFICE | 6.67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |
| YORK ERO FIELD OFFICE | 6.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | |

A0596

| Office | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BUFFALO FIELD OFFICE CO-LO SITE | 6.05 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CRAIG OFFICE | 5.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BOISE FIELD OFFICE | 5.13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HELENA FIELD OFFICE | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DETROIT FIELD OFFICE | 4.16 | 3.24 | 0.29 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HARLINGEN FIELD OFFICE | 3.95 | 0 | 0.46 | 0 | 0 | 1.37 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GRAND ISLAND ERO/HSI OFFICE | 3.8 | 6.91 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DENVER FOD AND CHIEF COUNSEL OFFICE | 3.47 | 0.53 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BOSSIER CITY | 3.13 | 5.77 | 0 | 3.45 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ICE COLOCATION EL PASO | 3.11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CORTEZ CIRCLE OFFICE | 3.03 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TWIN FALLS FIELD ERO | 2.88 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| LATHAM OFFICE | 2.42 | 0 | 0 | 0 | 0 | 4.17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SANTA ANA OFFICE | 2.39 | 0.34 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN BERNARDINO OFFICE | 2.39 | 0.24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RICHLAND OFFICE | 0.97 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FRESNO OFFICE ERO | 0.76 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PHOENIX FIELD OFFICE | 0.7 | 0.13 | 0.18 | 0 | 0.13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FLORENCE OFFICE | 0.7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PIKE COUNTY PRISON DETENTION CENTER | 0.6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PORTLAND OFFICE | 0.58 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHARLESTON FIELD OFFICE | 0.49 | 1.18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN DIEGO DISTRICT FIELD OFFICE | 0.2 | 0.19 | 0 | 0 | 0.06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ALAMOSA OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TAMUNING OFFICE GUAM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DURANGO OFFICE ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ROSWELL, NM ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IDAHO FALLS ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ANCHORAGE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| BAKERSFIELD OFFICE | 0 | 0.56 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SIOUX FALLS ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| IMPERIAL OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEDFORD OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CASPER SUB-OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST. ALBANS OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RAPID CITY ICE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ST. GEORGE OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SAN PATRICIO OFFICE CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DEPORTATION PROCESSING CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GRAND JUNCTION RESIDENT AGENT IN CHARGE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CHAMPLAIN ERO OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| YAKIMA OFFICE - ERO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| GLENWOOD SPRING QUICK RESPONSE TEAM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ERO PROCESSING CENTER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HONOLULU FIELD OFFICE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

A0598

USCA11 Case: 23-11528    Document: 46    Date Filed: 06/12/2023    Page: 603 of 702

**From:**
**To:** ███████
**Cc:**
**Subject:** FW: Op Horizon OT update
**Date:** Monday, April 25, 2022 3:18:00 PM

See below for Op Horizon employee count and $ spent.

**From:** ███████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 3:07 PM
**To:** ███████ @ice.dhs.gov>; ███████
███████ @ice.dhs.gov>
**Cc:** ███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>;
███████ @ice.dhs.gov>; ███████
███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>; ███████
███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

███████ the total is $15,394,778 for YTD ATD OT expenses related to Operation Horizon.
███████
███████

Based on the revised OT and NTA totals the cost per is listed in the table below.

| Operation Horizon | |
|---|---|
| | |
| OT Cost | $15,394,778.00 |
| NTAs issued | 72,132 |
| Cost per NTA | $213.43 |

**From:** ███████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 11:04 AM
**To:** ███████ @ice.dhs.gov>
**Cc:** ███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>;
███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>;
███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>; ███████
███████ @ice.dhs.gov>; ███████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

Thanks!

**From:** ███████ @ice.dhs.gov>

**Sent:** Friday, April 22, 2022 10:58 AM
**To:** ████████████████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>; ████████████████ @ice.dhs.gov>;
████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>;
████████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>; Billings,
████████████ @ice.dhs.gov>; ████████████████ @ice.dhs.gov>
**Subject:** FW: Op Horizon OT update

████ ,

████████████████████ The total number of NTAs was 72,132 NTAs, based on an average of 2,500 ICE employees per Phase.

Let me know if you need anything else.

---

**From:** ████████████████ @ice.dhs.gov>
**Date:** Friday, Apr 22, 2022, 8:00 AM
**To:** ████████████ @ice.dhs.gov>, ████████████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>, ████████████████ @ice.dhs.gov>,
████████████ @ice.dhs.gov>, ████████████ @ice.dhs.gov>, ████████
████████ @ice.dhs.gov>, ████████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

We had 2,520 ICE volunteers who participated OH1.  2,700 DHS employees: 2,663 ICE personnel who participated in OH2.   The volunteers only worked on this effort via OT, which  is  $19,952,680 for FY22.

I'm adding ████ who can get us the number of charging docs/NTAs issued as part of OH total.

████████████████████████████████████

---

**From:** ████████████████ @ice.dhs.gov>
**Sent:** Friday, April 22, 2022 9:52 AM
**To:** ████████████ @ice.dhs.gov>; ████████████
████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>;
████████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>; ████
████████ @ice.dhs.gov>
**Subject:** RE: Op Horizon OT update

████████████████████████████████████
████████████████████████████████
██████████████████████

A0603

| FY14 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 663 | 67.4% |
| Failure Rate | 321 | 32.6% |
| Absconder Rate* | 308 | 31.3% |
| **Total Terminations** | **984** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY19 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 41,853 | 71.2% |
| Failure Rate | 16,926 | 28.8% |
| Absconder Rate* | 15,837 | 26.9% |
| **Total Terminations** | **58,779** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY15 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 2,641 | 69.6% |
| Failure Rate | 1,155 | 30.4% |
| Absconder Rate* | 973 | 25.6% |
| **Total Terminations** | **3,796** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY20 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 12,750 | 53.4% |
| Failure Rate | 11,144 | 46.6% |
| Absconder Rate* | 9,311 | 39.0% |
| **Total Terminations** | **23,894** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY16 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 5,620 | 65.9% |
| Failure Rate | 2,911 | 34.1% |
| Absconder Rate* | 2,636 | 30.9% |
| **Total Terminations** | **8,531** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY21 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 19,783 | 77.9% |
| Failure Rate | 5,604 | 22.1% |
| Absconder Rate* | 4,525 | 17.8% |
| **Total Terminations** | **25,387** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY17 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 14,857 | 73.3% |
| Failure Rate | 5,402 | 26.7% |
| Absconder Rate* | 4,651 | 23.0% |
| **Total Terminations** | **20,259** | **100.0%** |

| FY22 thru March FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 26,567 | 82.1% |
| Failure Rate | 5,796 | 17.9% |
| Absconder Rate* | 4,792 | 14.8% |
| **Total Terminations** | **32,363** | **100.0%** |

**A0604**

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY18 FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 21,319 | 70.1% |
| Failure Rate | 9,106 | 29.9% |
| Absconder Rate* | 8,316 | 27.3% |
| **Total Terminations** | **30,425** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate

| FY14-FY22 thru March FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 146,053 | 71.4% |
| Failure Rate | 58,365 | 28.6% |
| Absconder Rate* | 51,349 | 25.1% |
| **Total Terminations** | **204,418** | **100.0%** |

Data from BI Inc. Participants Report, 3/31/2022

*Absconder rate is a subset of failure rate



**From:** Houser, Jason P
**To:**
**Cc:**
**Subject:** RE: Parole/ATD releases
**Date:** Monday, May 2, 2022 4:00:38 PM

Got it.

Much appreciated

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)

Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**From:** @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:59 PM
**To:** Houser, Jason P
**Cc:** @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

19,158 NTRs are over the 60 day mark (non-compliant) of 93,964 NTRs issued.  That's 20%.

**From:** Houser, Jason P
**Sent:** Monday, May 2, 2022 3:48 PM
**To:** @ice.dhs.gov>
**Cc:** @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)



Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U///FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**From:** ██████████████████████@ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:35 PM
**To:** Houser, Jason P ████████████████████
**Cc:** ████████████████████@ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

Yeah, that's what it is looking like.

**From:** Houser, Jason P ████████████████████
**Sent:** Monday, May 2, 2022 3:32 PM
**To:** ████████████████████@ice.dhs.gov>
**Cc:** ████████████████████@ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

So still 12 percent?

████████████████████

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)
████████████████████
████████████████████
████████████████████
████████████████████

Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U///FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

**A0607**

**From:** ████████████████████ @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:30 PM
**To:** Houser, Jason P ████████████████
**Cc:** ████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

11, 008 P+ATD with no check-in over 60 Days.

---

**From:** Houser, Jason P ████████████████
**Sent:** Monday, May 2, 2022 3:13 PM
**To:** ████████████████████ @ice.dhs.gov>
**Cc:** ████████████ @ice.dhs.gov>
**Subject:** RE: Parole/ATD releases

Any number on those non complaint?

If not, no worries.

Thanks ████

Jason P Houser
Chief of Staff
Immigration & Customs Enforcement (ICE)



Warning: This email and any attachments are UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this email should be furnished to the media, either in written or verbal form. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

---

**From:** ████████████████████ @ice.dhs.gov>
**Sent:** Monday, May 2, 2022 3:11 PM
**To:** Houser, Jason P ████████████████
**Cc:** ████████████ @ice.dhs.gov>
**Subject:** Parole/ATD releases

Per request:

For P+ATD releases,

Check-ins are 91,311 (65%)
No check-ins are 49,576 (35%)

| | | |
|---|---|---|
| Current Backlog: | | 110,708 |
| Processing Rate: | | 109 |
| Influx Rate: | | 1300 |
| Daily NTA Per Officer: | | 2.6 |
| Officers: | | 42 |
| Loaded Rate | $ | 73.24 |
| Officer Rate per Day: | $ | 585.92 |
| Cost per Day: | $ | 24,563.57 |

| | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional Days P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 | 217,898 |
| Days To Clear Backlog | 1016 | 1343 | 1671 | 1999 |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104,152.37 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155,678.77 |

A0610

**From:** ███████████
**Sent:** Friday, May 6, 2022 8:15 AM
**To:** ██████; Houser, Jason P; ████████████; Price, Corey A; ███████
**Subject:** FW: Projecting ICE workload
**Attachments:** Cost if P+ATD Halted 30-60-90-days_v2.xlsx

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

ICE Unified Coordination Group Representative
DHS Southwest Border Coordination Center (SBCC)

**From:** ████████████████ @ice.dhs.gov>
**Sent:** Thursday, May 5, 2022 10:03 AM
**To:** ███████████ @ice.dhs.gov>; █████████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>; ████████████ @ice.dhs.gov>
**Subject:** FW: Projecting ICE workload

Please see the and below snapshot of SOA's cost and time to process projections based on current processing rates.

████████████████████████████████████████ Basically every 30 days P+ATD continues this costs us about a year and $8 million dollars.

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

|  | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 |  |
| Days To Clear Backlog | 1016 | 1343 | 1671 |  |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155 |

| | | |
|---|---|---|
| Current Backlog: | | 110,708 |
| Processing Rate: | | 109 |
| Influx Rate: | | 1300 |
| Daily NTA Per Officer: | | 2.6 |
| Officers: | | 42 |
| Loaded Rate | $ | 73.24 |
| Officer Rate per Day: | $ | 585.92 |
| Cost per Day: | $ | 24,563.57 |



U.S. Immigration and Customs Enforcement
Office of Enforcement & Removal Operations

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.



**From:** ██████████████████████ @ice.dhs.gov>
**Sent:** Wednesday, May 4, 2022 6:46 PM
**To:** ██████████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>; ████████
██████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>;
██████ @ice.dhs.gov>; ██████████ @ice.dhs.gov>
**Cc:** ██████████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Good evening ██████,

Attached and below is the first iteration of estimates for the dedicated cost and time to clear the backlog of P+ATD non-citizens that require NTA issuance assuming current CBP P+ATD rates and no additional resources to work the backlog:

Stop P+ATD now: 2.8 years to clear and $25M
Stop P+ATD in 30 days: 3.7 years to clear and $33M
Stop P+ATD in 60 days: 4.6 years to clear and $41M
Stop P+ATD in 90 days: 5.5 years to clear and $49M

A0612

| | P+ATD Halted Immediately | 30 Additional Days P+ATD | 60 Additional Days P+ATD | 90 Additional P+ATD |
|---|---|---|---|---|
| Backlog | 110,708 | 146,438 | 182,168 | |
| Days To Clear Backlog | 1016 | 1343 | 1671 | |
| Cost to Clear Backlog | $ 24,948,473.60 | $ 33,000,366.52 | $ 41,052,259.45 | $ 49,104 |
| Net Additional Cost (Compared to Baseline) | $ - | $ 8,051,892.92 | $ 16,103,785.85 | $ 24,155 |

Please let us know if you have questions or need more information.

Thank you



**v/r**



Enforcement Removal Operations
U.S. Immigration and Customs Enforcement

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

From:
Sent: Monday, May 2, 2022 6:13 PM
To: ████████ @ice.dhs.gov> ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>
Subject: RE: Projecting ICE workload

Good evening ████,

A0613

Attached is the analysis for the time required to clear the backlog of P+ATD NTAs required by ERO.

Under current conditions (processing rate of 109 CDIs per day and influx rate of 1,226 P+ATD cases per day), the number of cases would never be cleared.

If the P+ATD program was halted today, it would take 33.4 months to clear the current backlog.

Please let me know if you have questions or need more information.

Thank you

**v/r**

Enforcement Removal Operations
U.S. Immigration and Customs Enforcement

<span style="color:#8B0000">**Warning:** This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.</span>

**From:**
**Sent:** Wednesday, April 27, 2022 3:15 PM
**To:** @ice.dhs.gov>; @ice.dhs.gov>; @ice.dhs.gov>; @ice.dhs.gov>; @ice.dhs.gov>; @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Good evening ,

Total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21) : 226,297

Released yesterday on Parole + ATD (4/26/22) : 1,542

CBP Avg releases/day on Parole + ATD (based on last 30 days): 1,226

Total ERO has processed (CDIs Issued): 115,589
-       Processed through Operation Horizon: 64,165

Total outstanding for processing (CDIs Not Issued): 110,708
-       Inside Reporting Window: 44,220
-       Outside Reporting Window: 66,488

Please let us know if you have questions or need more information.

Thank you

**v/r**

Enforcement Removal Operations
U.S. Immigration and Customs Enforcement

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

**From:**                        @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 3:33 PM
**To:**                              @ice.dhs.gov>;                              @ice.dhs.gov>;
                      @ice.dhs.gov>;                      @ice.dhs.gov>;

A0615

████████ @ice.dhs.gov>; ██████████████████ @ice.dhs.gov>

**Subject:** RE: Projecting ICE workload

████ ,

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

Thanks,

████

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** ████████████████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 4:16 PM
**To:** ████████████ @ice.dhs.gov>, ██████████████████ @ice.dhs.gov>, ████████ @ice.dhs.gov>, ████████████ @ice.dhs.gov>, ████████████ @ice.dhs.gov> █
████████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Ma'am

████████████████████

█████████████████████████████████████
█
████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██

**v/r**

████████████████████
██████████
████████████████

**Enforcement Removal Operations**

U.S. Immigration and Customs Enforcement

**Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.**

**From:** ███████████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 3:46 PM
**To:** ████ ████████ @ice.dhs.gov>, ████████ @ice.dhs.gov>, ████████
████ @ice.dhs.gov>, ████████ @ice.dhs.gov>, ████
████ @ice.dhs.gov>, ████████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

Adding ████████████ .

████████████████
████████████

Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
████████████

**From:** ████████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 3:34 PM
**To:** ████ ████████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████████
████ @ice.dhs.gov>; ████████ @ice.dhs.gov>; ████
████ @ice.dhs.gov>
**Subject:** FW: Projecting ICE workload

████ et al.

████████████████████

Total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21): **239,058**
Released yesterday on Parole + ATD: **1452**

CBP Avg releases/day on Parole + ATD: <mark>833</mark>

Total ERO has processed: ██████

Total outstanding for processing: ██████

        Inside and outside of reporting window

Estimated man hours to process: ██████

██████ .

██████

██████

██████

Happy to chat if it's easier.

Thanks,

██

██████

U.S. Immigration and Customs Enforcement
Office of Enforcement & Removal Operations

██████

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.

**From:** ██████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 1:02 PM
**To:** ██████ @ice.dhs.gov>; ██████ @ice.dhs.gov>
**Cc:** ██████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

██████

Sent with BlackBerry Work
(www.blackberry.com)

**From:** ███████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 12:43 PM
**To:** ███████████ @ice.dhs.gov>, ███████████ @ice.dhs.gov>
**Cc:** ███████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

███████████████████████████████████████████████████████████

███████████ total PD release cases since 3/21/2021 (NTR, NTR+, now Parole + ATD began 8/6/21):  **239,058**
Released yesterday on Parole + ATD: **1452**
CBP Avg releases/day on Parole + ATD: **833**
Total ERO has processed: █
Total outstanding for processing: █████████████████████████
Estimated man hours to process: ██████████████████████████

████████████████████████████████████████████████████████████
██████████ .

██████████████████

DHS Southwest Border Coordination Center
Washington, DC
██████████████

---

**From:** ███████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 11:49 AM
**To:** ███████████ @ice.dhs.gov>; ███████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

10-4, I can get that worked in and an overall number as well.

---

**From:** ███████████ @ice.dhs.gov>
**Sent:** Tuesday, April 26, 2022 11:48 AM
**To:** ███████████ @ice.dhs.gov>; ███████████ @ice.dhs.gov>
**Subject:** RE: Projecting ICE workload

███████████████████████████████████████████████████████████

Sent with BlackBerry Work
(www.blackberry.com)

---

**From:** ███████████ @ice.dhs.gov>
**Date:** Tuesday, Apr 26, 2022, 11:46 AM
**To:** ███████████ @ice.dhs.gov>, ███████████ @ice.dhs.gov>
**Subject:** Projecting ICE workload

A0619



**Southwest Border Coordination Center**
**Enforcement and Removal Operations**
**Immigration and Customs Enforcement**

| FY14 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 17,779 | 89.5% |
| Failure Rate | 2,081 | 10.5% |
| Absconder Rate* | 1,394 | 7.0% |
| Total Terminations | 19,860 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY15 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 11,019 | 88.4% |
| Failure Rate | 1,439 | 11.6% |
| Absconder Rate* | 1,105 | 8.9% |
| Total Terminations | 12,458 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY16 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 11,013 | 85.7% |
| Failure Rate | 1,834 | 14.3% |
| Absconder Rate* | 1,571 | 12.2% |
| Total Terminations | 12,847 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY17 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 13,043 | 81.9% |
| Failure Rate | 2,879 | 18.1% |
| Absconder Rate* | 2,418 | 15.2% |
| Total Terminations | 15,922 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

| FY19 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 20,962 | 85.8% |
| Failure Rate | 3,482 | 14.2% |
| Absconder Rate* | 3,006 | 12.3% |
| Total Terminations | 24,444 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY20 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 8,402 | 72.7% |
| Failure Rate | 3,154 | 27.3% |
| Absconder Rate* | 2,427 | 21.0% |
| Total Terminations | 11,556 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY21 Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 12,608 | 82.5% |
| Failure Rate | 2,667 | 17.5% |
| Absconder Rate* | 2,070 | 13.6% |
| Total Terminations | 15,275 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY22 thru April Non-FAMU Compliance Metrics | | |
|---|---|---|
| Metric | Count | % |
| Success Rate | 55,438 | 93.2% |
| Failure Rate | 4,061 | 6.8% |
| Absconder Rate* | 3,358 | 5.6% |
| Total Terminations | 59,499 | 100.0% |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

*Absconder rate is a subset of failure rate

| FY18 Non-FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 16,037 | 80.9% |
| Failure Rate | 3,778 | 19.1% |
| Absconder Rate* | 3,177 | 16.0% |
| **Total Terminations** | **19,815** | **100.0%** |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate

| FY14-FY22 thru April Non-FAMU Compliance Metrics | | |
|---|---|---|
| **Metric** | **Count** | **%** |
| Success Rate | 166,301 | 86.8% |
| Failure Rate | 25,375 | 13.2% |
| Absconder Rate* | 20,526 | 10.7% |
| **Total Terminations** | **191,676** | **100.0%** |

Data from BI Inc. Participants Report, 4/30/2022

*Absconder rate is a subset of failure rate



A0622

**U.S. Customs and Border Protection**

CBP **Directive No.** 3340-043        **Date:** September 3, 2008

                                    **ORIGINATING OFFICE**: OFO: APP
                                    **SUPERSEDES:**
                                    **REVIEW DATE:** September 2011

## SUBJECT:    THE EXERCISE OF DISCRETIONARY AUTHORITY

**1. Purpose.** To provide guidance and direction to promote the fair, objective and consistent application of U.S. Customs and Border Protection (CBP) discretionary authority in the enforcement of immigration laws nationwide.

**2. Policy.**

2.1     It is the policy of CBP to protect the United States of America from threats posed by terrorist organizations and to prevent terrorists as well as suspected terrorists, terrorist funding, weapons, and instruments, including Weapons of Mass Effects (WME), and their precursors from entering the United States.

2.2     It is the policy of CBP, consistent with the Immigration and Nationality Act (INA) to verify the identity, citizenship and admissibility of persons seeking entry into the United States. Where there is a belief, based on an evaluation of available information, that an alien may have ties to or presents a threat related to terrorism, has criminality rendering him or her inadmissible, or is likely to add to the illegal population of the United States, the alien will be denied admission where there is a legal basis to do so.

2.3     It is the policy of CBP that, through the use of all authorities and sanctions provided by law and procedure, enforcement actions will be vigorously pursued against any individual where there exists any reasonable suspicion of association with terrorism, criminality, illegal migration, smuggling or any other activity contrary to national interests or in violation of U.S. statutes.

2.4     It is the policy of CBP to consider the exercise of discretionary measures in favor of aliens who are inadmissible due to a minor or technical violation of the INA. This includes the use of the waiver and parole processes to allow such aliens into the United States, where appropriate and permissible by law. In keeping with the CBP strategy of risk management, CBP will focus resources on those cases that pose the greatest risk.

2.5     It is the policy of CBP that in individual cases involving technical inadmissibility, minor violations, and apparent bona fide travel, where refusal of admission or withdrawal of application for admission would involve detention or undue hardship, it is appropriate to expansively consider the exercise of discretionary authority. This principle must be applied on a case-by-case basis and may not be interpreted to provide relief from the visa requirement in any systemic manner to any particular class of aliens.

2.6     It is the policy of CBP that supervisors and managers will responsibly assess every case involving a prospective adverse action. This will ensure that CBP's legal and discretionary authority is being exercised judiciously and in a manner consistent with the facts of the case.

**3.  Authority/References.**  Immigration and Nationality Act (INA); Title 8 United States Code (USC); Title 19 USC; Title 8 Code of Federal Regulations (CFR); Inspector's Field Manual (IFM) Chapters 16.1 (Parole); 17.1 (Deferred Inspection); 17.2 (Withdrawal of Application for Admission); and 17.5 (Waivers).

**4.  Definitions.**

4.1      "Admission," means, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by a CBP officer.

4.2      "Brief overstay," generally means an overstay of approved nonimmigrant status, unintentional in nature or beyond the control of the alien, covering a period of ███████████ or less.

4.3      "Hardship," must be determined based on the factors presented.  Applicants must be encouraged to describe and document all applicable factors, since there is no guarantee that any particular reason will result in a finding that an adverse action would cause extreme or undue hardship.

4.4      "Minor or technical violation," means a single infraction of a CBP statute that does not rise to a level of such a serious nature that would preclude the offering of a form of discretion.

4.5      "Significant public benefit," means that the inadmissibility of an alien is outweighed by the public interest in allowing the alien to enter the United States.

4.6      "Unforeseen emergency," as used in 8 CFR § 212.1(g) generally means:

4.6.1    An alien arriving for a medical emergency (an injury or illness that requires immediate medical attention to prevent life-threatening or disabling conditions);

4.6.2    An emergency or rescue worker arriving in response to a community disaster or catastrophe in the United States;

4.6.3    An alien accompanying or following to join a person arriving for a medical emergency;

4.6.4    An alien arriving to visit a spouse, child, parent, or sibling who within the past 5 days has unexpectedly become critically ill or who within the past 5 days has died; or,

4.6.5    An alien whose passport or visa was lost or stolen within 48 hours of departing the last port of embarkation for the United States.

**5.  Responsibilities.**

5.1      The Assistant Commissioner, Office of Field Operations, is responsible for policy oversight, which includes the formulation and implementation of guidelines and procedures.

5.2    The Executive Director, Admissibility and Passenger Programs (APP), is responsible for the formulation and implementation of the guidelines set forth by the Assistant Commissioner. In addition, the Executive Director, APP, will be responsible for conducting national reviews to ensure compliance with implemented guidelines outlined in this directive.

5.3    Directors, Field Operations (DFOs) are responsible for the overall management and implementation of this program. DFOs will also be responsible for the overall monitoring of the exercise of discretionary authority within their areas of responsibility.

5.4    Port Directors (PDs) are responsible for performing periodic reviews of cases to ensure that the exercise of discretionary authority is being applied in accordance with this directive. PDs are also responsible to ensure that any exercise of discretionary authority is fully warranted.

5.5    Field managers and supervisors are responsible for ensuring that the Discretionary Checklist is utilized in every case involving a prospective adverse action.  They are further responsible for assessing every case involving a prospective adverse action to ensure that any exercise of discretionary authority is done judiciously and in a manner consistent with the facts of the case.

5.6    Supervisors are responsible for ensuring that the Discretionary Checklist is completed during case processing.  Supervisors are further responsible for ensuring that CBP officers under their supervision are familiar with the policies and procedures established by this directive.

5.7    CBP officers are responsible for knowing, understanding and adhering to the contents of this directive.  CBP officers are further responsible for accurately presenting all facts and circumstances resulting from an inspection that may involve a prospective adverse action to the appropriate level of management, through the chain of command.

5.8    CBP officers are responsible for immediately forwarding information to the appropriate level of management, through the chain of command, regarding time-critical situations, including medical emergencies.

## 6.  Port of Entry Environments.

6.1    Land Border and Preclearance Ports of Entry

6.1.1    In these environments, an inadmissible alien can normally be returned to a contiguous country immediately or without the need to arrange for additional transportation or to be taken into federal custody.  Ports may need to consider additional factors where refused aliens must be transported to a designated return location.

6.1.2    In these environments, it is generally reasonable to refuse admission, or accept a withdrawal of application, as it would not create an undue hardship on an alien.  If necessary, an alien can access a United States Embassy or Consulate in an attempt to correct any documentary deficiencies, or can secure additional evidence to support a subsequent application for admission.

6.1.3   Despite the ease with which aliens may be refused admission in these environments, CBP supervisors and officers must continue to evaluate each case to adequately determine if the exercise of discretionary authority is warranted.

6.2      Air and Sea Ports of Entry

6.2.1   In these environments, there is less flexibility due to external circumstances that must be considered, such as transportation schedules and carrier liabilities.

6.2.2   When a violation is technical or minor in nature, and the purpose for travel is determined to be bona fide, discretionary guidelines shall be applied expansively to minimize hardship on an alien ███████████████████████████████████████. This does not preclude the use of restraints or detention where there is an articulable concern for officer safety.

**7.  Discretionary Checklist**

7.1      The attached Discretionary Checklist serves as an aid to frontline personnel and managers in exercising discretionary authority.  It also ensures that the INA is consistently applied and that each applicant's admissibility is viewed as a unique, individual case.

7.2      The Discretionary Checklist should be completed by the inspecting CBP officer and reviewed by a first and/or second line supervisor.

7.3      The Discretionary Checklist should be maintained as a part of the alien's port file or A-file (if one exists), regardless of whether discretionary authority is exercised or denied.  The checklist should explain why discretion was approved or denied.

7.4      Discretionary authority should generally not be exercised if the alien is unable to establish his or her identity or citizenship.

7.5      Discretionary authority should generally not be exercised if the alien has terrorist ties or affiliations, significant criminal history, or is likely to contribute to the illegal population of the United States. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

7.6      The factors outlined below should be considered when deciding whether to exercise discretion.  Not every factor will apply in every case.

7.6.1   The nature of the inadmissibility should be reviewed to determine if it is a minor or technical concern as opposed to more serious fraud, criminal or security grounds.

7.6.2   All potential grounds of inadmissibility should be reviewed.  Generally, if there are multiple grounds of inadmissibility, it is not merely a minor or technical concern.

7.6.3   Previous violations or determinations of inadmissibility should be reviewed ███████
████████████████████████

7.6.4   Previous grants of parole or waiver should be reviewed ███████████████████████
████████████████████

7.6.5   An alien's stated purpose of entry should be reviewed ██████████████████████
████████████████████████

7.6.6   An alien's stated family or business ties in the United States should be reviewed and verified to the extent possible.  Such ties must be carefully considered as they may support a legitimate reason for entry, or provide evidence indicating intentions to contribute to the illegal population of the United States.

7.6.7   An alien's current and previous immigration status and length of residence in the United States (if applicable) should be reviewed to assess compliance with previous admissions.

7.6.8   An alien's good faith efforts to obtain correct information or documents prior to arrival should be reviewed and verified to the extent possible.

7.6.9   An alien's knowledge or ignorance of correct procedures or admissibility requirements should be reviewed to determine if a violation is inadvertent, or caused by unfamiliarity with the laws and/or language of the United States.

7.6.10  Advance opportunity to obtain travel documents should be reviewed to determine if the situation provided sufficient time for an alien to comply.  In some cases, an alien may have been aware of the documentary requirements, but may have a plausible reason for not complying.

7.6.11  Any suspected intentions to circumvent admissibility requirements should be reviewed to determine the underlying reason for inadmissibility, and the extent to which the alien was aware of any inability or unlikelihood of being granted a visa or admission to the United States.

7.6.12  Misrepresentations[1] made during the inspection process should be reviewed and treated with the seriousness they deserve.  While certain misrepresentations may subject an alien to Expedited Removal provisions, other misrepresentations may be less severe, and may be made due to fear or distrust of authority, or for cultural reasons.  Where inconsistencies in critical information exist due to misrepresentation, the exercise of discretionary authority is less likely to be appropriate.

---

[1] 

7.6.13  An alien may not be aware that a previous brief overstay has resulted in either the voidance of a visa, or future ineligibility to enter the United States under the Visa Waiver Program (VWP).  In such cases, the alien should be informed of the consequences of his or her previous overstay but discretion may still be considered.

7.6.14  An alien's claim of official misinformation, especially from government officials, should be reviewed to determine the credibility, and verified to the extent possible.

7.6.15  An alien's willingness to cooperate with CBP processing should be reviewed ██████████████████████

7.6.16  An alien's age and health should be reviewed to determine if he or she requires assistance, as an infant, child, or elderly person, or if he or she is experiencing a life-threatening or long-term illness.  Such conditions may impact an alien's ability to travel, be detained or be restrained, and may also affect his or her ability to understand or comply with entry requirements.

7.6.17  Any political or media sensitivities should be reviewed to determine if the alien presents high-profile or sensitive issues.  Discretionary authority should not be exercised solely to avoid adverse publicity.

7.6.18  An alien's potential to pose a threat of future terrorist, criminal or violent acts in the United States should be considered.

7.6.19  Any other humanitarian or public interest considerations should be reviewed by the appropriate supervisor to determine if an officer should allow withdrawal of application for admission, or pursue Expedited Removal or removal proceedings before an Immigration Judge.

## 8.  Forms of Discretion.

### 8.1    Waivers.

8.1.1    Generally, waivers approved at ports of entry will be for documentary deficiencies and will be documented using Form I-193, *Application for Waiver of Passport and/or Visa*.  If an alien is inadmissible for reasons other than documentary deficiencies, such a waiver is not appropriate and cannot be approved at the port of entry.  In such cases, parole may be considered as a discretionary means to allow the alien into to the United States.

8.1.2    The authority to approve such waivers under INA § 211(b) and INA § 212(d)(4)(A) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.1.3    The Form I-193 application fee may be waived for aliens granted a waiver for the first time under INA § 211(b) or INA § 212(d)(4).  Such determination shall be made by port management at the GS-13 level and above, or a port director at the GS-12 level.  Previous beneficiaries of a fee-exempt waiver may be considered for subsequent fee-exempt waivers on a case-by-case basis.

8.1.4    Ports of entry encountering returning lawful permanent residents lacking evidence of alien registration, and thus inadmissible under INA § 212(a)(7)(A)(i), may offer a visa waiver pursuant to INA § 211(b), if otherwise admissible.

8.1.4.1 If a lawful permanent resident claims his or her evidence of registration has been lost or stolen, the port may accept Form I-90, with fee.

8.1.5    Ports of entry encountering nonimmigrant aliens seeking admission to the United States determined to be inadmissible under INA § 212(a)(7)(B), may offer a waiver pursuant to INA § 212(d)(4).

8.1.5.1 Waivers approved pursuant to INA § 212(d)(4) should generally be for unforeseen emergency situations.  Such waivers may also be approved for aliens who fall outside the scope of an unforeseen emergency on a case-by-case basis where it is determined that humanitarian factors support the decision.  The following scenarios are a few examples of situations in which a waiver may be appropriate.

8.1.5.2 An alien is not in possession of a proper visa due to governmental error (e.g., the consulate issued an L-2 instead of an L-1 nonimmigrant visa).

8.1.5.3 An alien is not in possession of a proper visa, but has the requisite documentation for an employment based nonimmigrant visa (e.g., presents an I-797 confirming that a petition has been approved; however, the nonimmigrant visa presented has expired).  Note: CBP cannot waive the underlying documentary requirement for another agency (such as a Department of Labor (DOL) labor certification or petition).

8.1.5.4 An alien with a brief overstay that rendered his or her visa invalid pursuant to INA § 222(g).

8.1.5.5 An alien issued a valid and appropriate visa, but who is unable to present the visa at the time of his or her application for admission.  This often occurs when the visa is contained in a previously issued passport that is not in the alien's possession.

8.1.5.6 Representatives of foreign information media without appropriate visas.

8.2    **Parole.**

8.2.1    Generally, cases requiring parole authorization will present more complex circumstances than those in which a waiver would be considered.  Parole authority is normally exercised when

an alien is inadmissible for reasons other than simple documentary deficiencies. Parole is not regarded as an "admission;" therefore, paroled aliens remain subject to proceedings as inadmissible (under INA § 212), rather than removable (under INA § 237), aliens.

8.2.2    The authority to approve a parole under INA § 212(d)(5) is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level.

8.2.3    If a parole is provided as a benefit to an alien, the prescribed fee should generally be collected. However, if a parole is provided in the interest of the government, the fee should be waived.

8.2.4    Since there is no application form for a parole, CBP officers must document all approved port of entry paroles in ███████████████████████

8.2.4.1 Aliens presenting a valid, approved Form I-512, *Authorization for Parole of an Alien into the United States*, need not be documented ████████████

8.2.4.2 Port of entry paroles involving emergency or other time-critical situations should be documented ███████████████████████████████████████████████████

8.2.4.3 In time-critical situations, an alien may be allowed to enter the United States ███████████████████████████████████████████████

8.2.5    Ports of entry may grant paroles for deferred inspection, referral for removal proceedings, to facilitate an alien's departure, and in other situations deemed to be in the public interest.

8.2.6    The following situations are a few examples in which parole may be appropriate.

8.2.6.1 An inadmissible alien in need of emergency medical treatment.

8.2.6.2 Emergency workers responding to a natural disaster or other emergency situation.

8.2.6.3 **Medical evacuation** — often termed **MEDEVAC** or **medivac** (land and air ambulance) crew and/or patients.

8.2.6.4 A minor accompanying a detained parent.

8.2.6.5 A missing or abducted minor located and paroled to another agency.

8.2.6.6 Sick or injured crewmembers, including shipwreck or plane crash survivors.

8.2.6.7 An unaccompanied minor who is being released pursuant to an order of preference found in 8 CFR § 212.5(b)(3) or 8 CFR § 236.3(b)(1).

8.2.6.8 Significant Public Benefit Parole, including silent parole, requested by other law enforcement agencies. ██████████████████████████████████████

8.2.6.9    In situations involving minor or inadvertent violations and apparent bona fide travel with no other violations, such as a brief overstay of a VWP admission that rendered an alien statutorily ineligible to apply for admission under the VWP, ██████████████

8.2.6.10  Foreign students on field trips, aliens attending cultural events, and aliens coming for non-emergency medical treatment determined to be inadmissible for reasons other than documentary deficiencies may also be issued a port of entry parole.  When a documentary deficiency is the only apparent ground of inadmissibility, a waiver should be pursued prior to parole consideration.

8.2.7    Aliens placed into expedited removal proceedings must normally be detained until removed from the United States.  However, parole may be permitted if there is a medical emergency, or if it is necessary for legitimate law enforcement purposes, such as for criminal prosecution, or to testify in court.

8.3    **Deferred Inspection**.

8.3.1    A deferred inspection may be used when an immediate decision concerning admissibility cannot be made at a port of entry and when it appears likely that the issues surrounding admissibility can be resolved favorably at the onward port of entry.  Deferred inspections may be necessary to review an existing file, or some other documentary evidence essential to clarifying admissibility.

8.3.2    As a form of parole, the authority to approve a deferred inspection is currently delegated to port management at the GS-13 level and above, and port directors at the GS-12 level. ██

8.3.3   ████████████████████████████████████

8.3.4   ████████████████████████████████████

8.3.5    CBP processing shall be deferred for a specific purpose, and not as a way to transfer a difficult case to another office.

8.3.6   CBP processing shall be deferred to the office having jurisdiction over the area where the alien will be staying while in the United States.

8.3.7   CBP processing shall not be deferred where the alien is not expected to establish his or her admissibility. ████████████████████████████████████
████████████████████████████████

8.3.8   An inspection shall not be deferred if, based on the totality of circumstances and the presence of articulable facts, there are concerns that the alien may abscond or fail to report for CBP processing as directed.

8.3.9   An inspection may be deferred on behalf of an alien who is the beneficiary of an immediate relative petition, and who has an adjustment of status application pending with U.S. Citizenship and Immigration Services (USCIS), if the only reason for inadmissibility is the alien's failure to have a valid advance parole, and there is a likelihood that USCIS will exercise discretion and allow the alien's adjustment of status application to continue to a final decision.

8.3.10  The deferred inspection provision contained in 8 CFR § 235.2(a) shall not apply to an applicant for admission under INA § 217, except that the removal of a VWP applicant may only be deferred if the alien is paroled for criminal prosecution or punishment. This is the only provision for deferred removal under the Visa Waiver Program.

8.4     **Withdrawal of Application for Admission**.

8.4.1   A nonimmigrant applicant for admission who does not appear to be admissible may be offered the opportunity to withdraw his or her application for admission pursuant to INA § 235(a)(4), rather than being placed in proceedings pursuant to INA § 240 or removed under INA § 235(b)(1).

8.4.2   An alien cannot, as a matter of right, withdraw his or her application for admission, but may be permitted to withdraw if it is determined to be in the best interest of justice that a removal order not be issued. All withdrawals of application for admission ████████████████
████████████████████████████ should be approved by a first-line supervisor.

8.4.2.1 At land border ports of entry, aliens who refuse to pay the fee required for issuance of an entry document (I-94 or I-94W), and aliens who seek immediate return to the country of departure with documented intentions of obtaining or extending status in that country, but who are otherwise admissible, ████████████████████████████████████
████████████████████████████████████████

8.4.3   Prior to permitting an alien to withdraw his or her application for admission, the alien must demonstrate both the intent and the means to depart immediately from the United States.

8.4.4   Withdrawal is strictly voluntary and may not be coerced in any way. If withdrawal is offered, but not voluntarily accepted, appropriate removal proceedings should be initiated.

8.4.5    In exercising discretion to permit a withdrawal of application for admission, carefully consider all the facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice, or conversely, if justice would be ill-served if an order of removal were issued.

8.4.6    In light of the serious consequences of an expedited removal order, including a minimum 5-year bar on re-entry to the United States, the decision to permit withdrawal should be based on a careful consideration of relevant mitigating and aggravating factors in order to reach a reasonable decision.

8.4.7    Withdrawal of application for admission should not be permitted in situations involving obvious, deliberate fraud on the part of the applicant, or when especially egregious CBP violations are uncovered (e.g., long-term or repeated overstays, unauthorized employment).

8.5    **Voluntary Return.**

8.5.1    Voluntary Return (VR) is an act of discretion that can be applied to non-arriving aliens in circumstances analogous to those where withdrawal of application for admission is allowed, and should be approved by a first-line supervisor.

8.5.2    Usually, when an alien has demonstrated his or her intent to depart the United States, it serves no purpose to issue a Notice to Appear, because the alien is already executing the ultimate objective, which is removal from the United States.  There is generally no reason to burden the immigration court with these cases.

8.5.3    When feasible, Voluntary Return cases should be documented ███████████████ ███████████████████████████, facts should be articulated documenting the unlawful presence, and an A-file ████████████████████████.  Without these actions, it may be difficult to sustain a future ground of inadmissibility regarding the alien's unlawful stay.

8.5.4    In circumstances where CBP officers encounter outbound illegal aliens and there is insufficient time before the departure flight to collect biometrics, CBP officers may use available biographic data alone to create ████████████████████████.

8.6    **Detention.**

8.6.1    When an alien does not pose a potential risk to the United States and transfer to a detention facility may cause undue hardship, parole and/or continued detention at the port of entry should be considered, when feasible.  When an alien is permitted to withdraw an application for admission, or is being refused admission under INA § 217, it is particularly important to carefully consider the consequences of transfer to a detention facility in each case.

8.7    **Fee Collection**.

8.7.1    When a form of discretion under consideration requires the payment of an associated fee (such as waiver applications and certain paroles), CBP should determine if the action taken is solely for the benefit of the alien.  If the discretionary action is taken for reasons of significant public benefit, CBP should not charge a fee.

8.7.2    Situations resulting from an action at the port of entry in which it would not be appropriate to charge a fee include the following:

8.7.2.1 Parole for criminal prosecution;

8.7.2.2 Parole for incarceration after conviction for a crime;

8.7.2.3 Parole into the custody of another agency;

8.7.2.4 Parole for INA § 240 proceedings, if detention is not appropriate or feasible;

8.7.2.5 Parole of a stowaway for a medical emergency or legitimate law enforcement objective;

8.7.2.6 Parole of a witness in a judicial, administrative or legislative proceeding being conducted, or to be conducted in the United States;

8.7.2.7 Parole for deferred inspection; and,

8.7.2.8 Parole for deportation from another country through the United States.

8.7.3    Nothing in this directive is intended to diminish the authority of port management to waive fees under other circumstances, where appropriate, in accordance with 8 CFR § 103.7(c).

**9.  No Private Right Created.**  The procedures set forth in this Directive are for CBP internal use only and create no private rights, benefits, or privileges for any private person or party.


/s/
Assistant Commissioner
Office of Field Operations

Law Enforcement Sensitive / For Official Use Only

13

**Discretionary Authority Checklist for Alien Applicants**

| | |
|---|---|
| **Applicant's Name:** | **Port #:** |
| **Date of Birth:** | **Date of Action:** |
| **Citizenship:** | **Passport / A-#:** |

**1) Identity / Citizenship:**

Identity sufficiently determined:   Yes ☐ No ☐
Citizenship sufficiently determined: Yes ☐ No ☐

**2) Age, Health and Notoriety of Applicant:**

Are age or health relevant factors?   Yes ☐ No ☐
Is the applicant a public figure?   Yes ☐ No ☐
Congressional or media interest?   Yes ☐ No ☐

*\*\*NOTE: Discretionary authority should generally not be exercised if identity or citizenship can not be established.*
**REMARKS (to include origin, destination and intended length of stay):**

**3) Intended Purpose of Entry:**

Emergency:   Yes ☐ No ☐
Medical:   Yes ☐ No ☐
Pleasure:   Yes ☐ No ☐
Business/Official:   Yes ☐ No ☐
Other:   Yes ☐ No ☐

**4) Database queries:**

**5) Previous Immigration Violations or Inadmissibility:**

Previous Immigration Violation(s): Yes ☐ No ☐
Previous Inadmissibility:   Yes ☐ No ☐
Previous Beneficiary of Discretion: Yes ☐ No ☐

**6) Nature of Inadmissibility:**

**REMARKS:**

**7) Threat posed to the United States:**

*\*\*NOTE: Discretionary authority should generally not be exercised if a threat is posed to the United States.*
**REMARKS:**

A0635

**8) Other Factors to Consider:**

| | |
|---|---|
| Legitimate reason for entering the United States: | Yes ☐ No ☐ |
| Documentary (Passport / Visa) deficiency only: | Yes ☐ No ☐ |
| Credible claim of official misinformation: | Yes ☐ No ☐ |
| Relationship to a U.S. employer or resident: | Yes ☐ No ☐ |
| Intent to circumvent admissibility requirements: | Yes ☐ No ☐ |
| Misrepresentations made during processing: | Yes ☐ No ☐ |
| Minor children accompanying or already in the United States: | Yes ☐ No ☐ |
| Unaware of visa voidance or consequences of VWP overstay: | Yes ☐ No ☐ |
| Relief available through the parole or waiver process: | Yes ☐ No ☐ |

**REMARKS:**

**Examining CBP Officer:**

**Applicable Ground(s) of Inadmissibility:**

**Applicable Discretionary Action(s):**

| | | |
|---|---|---|
| Withdrawal of Application for Admission: | Yes ☐ No ☐ | |
| Parole to Depart Foreign / Voluntary Return: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Humanitarian Parole: | Yes ☐ No ☐ | Length of parole sought: _____ |
| Waiver of Passport Requirement: | Yes ☐ No ☐ | Period of admission sought: _____ |
| Waiver of Non-Immigrant Visa Requirement: | Yes ☐ No ☐ | |
|     Classification: _____ | | Period of admission sought: _____ |
| Waiver of Immigrant Visa Requirement: | Yes ☐ No ☐ | |
| Waiver of processing fee (if applicable): | Yes ☐ No ☐ | |
| Deferred Inspection: | Yes ☐ No ☐ | Deferral Period and Location: _____ |

**Supervisory CBP Officer:**

**Recommendation:**

| | |
|---|---|
| Approve: | Yes ☐ No ☐ |
| Disapprove: | Yes ☐ No ☐ |

**Justification for recommendation (to include alternatives, if disapproval is recommended):**

**Reviewing 2nd Line Manager:**
(GS13 or Above)

**Decision:**

Approved: ☐          Disapproved: ☐

**Justification for decision (to include final disposition, if disapproved):**

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture**

| | |
|---|---|
| **DISTRIBUTION:** | **ICE** |
| **DIRECTIVE NO.:** | **11002.1** |
| **ISSUE DATE:** | **December 8, 2009** |
| **EFFECTIVE DATE:** | **January 4, 2010** |
| **SUPERSEDES:** | **See section 3.** |
| **FEA NUMBER:** | **601-05** |

1. **PURPOSE.** The purpose of this ICE policy directive is to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States. This directive provides guidance to Detention and Removal Operations (DRO) Field Office personnel for exercising their discretion to consider the parole of arriving aliens processed under the expedited removal provisions of section 235 of the Immigration and Nationality Act (INA) who have been found to have a "credible fear" of persecution or torture by U.S. Citizenship and Immigration Services (USCIS) or an immigration judge of the Executive Office for Immigration Review. This directive establishes a quality assurance process that includes record-keeping requirements to ensure accountability and compliance with the procedures set forth herein.

1.1. This directive does not apply to aliens in DRO custody under INA § 236. This directive applies only to arriving aliens who have been found by USCIS or an immigration judge to have a credible fear of persecution or torture.

2. **AUTHORITIES/REFERENCES.**

2.1. INA §§ 208, 212(d)(5), 235(b), and 241(b)(3); 8 U.S.C. §§ 1158, 1182(d)(5), 1225(b), and 1231(b)(3); 8 C.F.R. §§ 1.1(q), 208.30(e)-(f), 212.5 and 235.3.

2.2. Department of Homeland Security Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Custom Enforcement" (Nov. 13, 2004).

2.3. ICE Delegations of Authority to the Directors, Detention and Removal and Investigations and to Field Office Directors, Special Agents in Charge and Certain Other Officers of the Bureau of Immigration and Customs Enforcement, No. 0001 (June 6, 2003).

3. **SUPERSEDED POLICIES AND GUIDANCE.** The following ICE directive is hereby superseded:

3.1. ICE Policy Directive No. 7-1.0, "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture" (Nov. 6, 2007).

A0637

4.    **BACKGROUND.**

4.1.    Arriving aliens processed under the expedited removal provisions of INA §235(b) may pursue asylum and related forms of protection from removal if they successfully demonstrate to USCIS or an immigration judge a credible fear of persecution or torture.

4.2.    Arriving aliens who establish a credible fear of persecution or torture are to be detained for further consideration of the application for asylum. INA § 235(b)(1)(B)(ii). Such aliens, however, may be paroled on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit," provided the aliens present neither a security risk nor a risk of absconding. 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c) (providing that aliens referred for INA § 240 removal proceedings, including those who have a credible fear of persecution or torture, may be paroled under § 212.5(b) standards).

4.3.    The applicable regulations describe five categories of aliens who may meet the parole standards based on a case-by-case determination, provided they do not present a flight risk or security risk: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; and (5) aliens whose continued detention is not in the public interest. *See* 8 C.F.R. § 212.5(b). *But compare* 8 C.F.R. § 235.3(b)(4)(ii) (stating that arriving aliens who have not been determined to have a credible fear will not be paroled unless parole is necessary in light of a "medical emergency or is necessary for a legitimate law enforcement objective").

4.4.    While the first four of these categories are largely self-explanatory, the term "public interest" is open to considerable interpretation. This directive explains how the term is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear. The directive also mandates uniform record-keeping and review requirements for such decisions. Parole remains an inherently discretionary determination entrusted to the agency; this directive serves to guide the exercise of that discretion.

5.    **DEFINITIONS:**

5.1.    **Arriving Alien.** For purposes of this directive, "arriving alien" has the same definition as provided for in 8 C.F.R. § 1.1(q) and 1001.1(q).

5.2.    **Credible Fear.** For purposes of this directive, with respect to an alien processed under the INA § 235(b) "expedited removal" provisions, "credible fear" means a finding by USCIS or an immigration judge that, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts

2

as are known to the interviewing USCIS officer or immigration judge, there is a significant possibility that alien could establish eligibility for asylum under INA § 208, withholding of removal under INA § 241(b)(3), or protection from removal under the Convention Against Torture.

5.3.   **Parole.** For purposes of this directive, "parole" is an administrative measure used by ICE to temporarily authorize the release from immigration detention of an inadmissible arriving alien found to have a credible fear of persecution or torture, without lawfully admitting the alien. Parole does not constitute a lawful admission or a determination of admissibility, *see* INA §§ 212(d)(5)(A), 101(a)(13)(B), and reasonable conditions may be imposed on the parole, *see* 8 C.F.R. § 212.5(d). By statute, parole may be used, in the discretion of ICE and under such conditions as ICE may prescribe, only for urgent humanitarian reasons or for significant public benefit. As interpreted by regulation, "urgent humanitarian reasons" and "significant public benefit" include the five categories set forth in 8 C.F.R. § 212.5(b) and listed in paragraph 4.3 of this directive, including the general category of "aliens whose continued detention is not in the public interest."

6.   **POLICY.**

6.1.   As soon as practicable following a credible fear determination by USCIS for an arriving alien detained by DRO, DRO shall provide the alien with the attached *Parole Advisal and Scheduling Notification.* This form informs the alien that he or she will be interviewed for potential parole from DRO custody and notifies the alien of the date of the scheduled interview and the deadline for submitting any documentary material supporting his or her eligibility for parole. The contents of the notification shall be explained to such aliens in a language they understand. In determining whether detained arriving aliens found to have a credible fear should be paroled from custody, DRO shall proceed in accordance with the terms of this directive.

6.2.   Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case. However, when an arriving alien found to have a credible fear establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors (as described in paragraph 8.3 of this directive), parole the alien on the basis that his or her continued detention is not in the public interest. DRO Field Offices shall uniformly document their parole decision-making processes using the attached *Record of Determination/Parole Determination Worksheet.*

6.3.   Consistent with the terms of this directive, DRO shall maintain national and local statistics on parole determinations and have a quality assurance process in place to monitor parole decision-making, as provided for in sections 7 and 8 of this directive.

6.4.   In conducting parole determinations for arriving aliens in custody after they are found to have a credible fear of persecution or torture, DRO shall follow the procedures set forth in section 8 of this directive.

6.5.   DRO shall provide every alien subject to this directive with written notification of the parole decision, including a brief explanation of the reasons for any decision to deny parole. When DRO denies parole under this directive, it should also advise the alien that he or she may request redetermination of this decision based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding. DRO shall ensure reasonable access to translation or interpreter services if notification is provided to the alien in a language other than his or her native language and the alien cannot communicate effectively in that language.

6.6.   Written notifications of parole decisions shall be provided to aliens subject to this directive and, if represented, their representative within seven days of the date an alien is initially interviewed for parole or the date the alien requests a parole redetermination, absent reasonable justification for delay in providing such notification.

6.7.   A decision to grant or deny parole shall be prepared by a DRO officer assigned such duties within his or her respective DRO Field Office. The decision shall pass through at least one level of supervisory review, and concurrence must be finally approved by the Field Office Director (FOD), Deputy FOD (DFOD), or Assistant FOD (AFOD), where authorized by the FOD.

7.   **RESPONSIBILITIES.**

7.1.   The **DRO Director** is responsible for the overall management of the parole decision-making process for arriving aliens in DRO custody following determinations that they have a credible fear of persecution or torture.

7.2.   The **DRO Assistant Director for Operations** is responsible for:

1) Ensuring considered, consistent DRO parole decision-making and recordkeeping nationwide in cases of arriving aliens found to have a credible fear;

2) Overseeing monthly tracking of parole statistics by all DRO Field Offices for such cases; and

3) Overseeing an effective national quality assurance program that monitors the Field Offices to ensure compliance with this directive.

7.3.   **DRO Field Office Directors** are responsible for:

1) Implementing this policy and quality assurance processes;

4

2) Maintaining a log of parole adjudications for credible fear cases within their respective geographic areas of responsibility, including copies of the *Record of Determination/Parole Determination Worksheet*;

3) Providing monthly statistical reports on parole decisions for arriving aliens found to have a credible fear;

4) Making the final decision to grant or deny parole for arriving aliens found to have a credible fear within their respective areas of responsibility or, alternatively, delegating such responsibility to their DFODs or AFODs (in which case, FODs nevertheless retain overall responsibility for their office's compliance with this directive regardless of delegating signatory responsibility to DFODs or AFODs); and

5) Ensuring that DRO field personnel within their respective areas of responsibility who will be assigned to make parole determinations are familiar with this directive and corresponding legal authorities.

7.4. **DRO Deputy Field Office Directors** are responsible for reviewing, and forwarding for their respective FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, DFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.5. **Assistant Field Office Directors** are responsible for reviewing, and forwarding for their respective DFODs' or FODs' approval, parole decisions prepared by their subordinates in the cases of arriving aliens found to have a credible fear of persecution or torture. Alternatively, AFODs delegated responsibility under paragraph 7.3 of this directive are responsible for discharging final decision-making authority over parole determinations in such cases within their respective areas of responsibility.

7.6. As applicable, **DRO field personnel** so assigned by their local chains-of-command are responsible for providing detained arriving aliens found to have a credible fear with the attached *Parole Advisal and Scheduling Notification* and for fully and accurately completing the attached *Record of Determination/Parole Determination Worksheet* in accordance with this directive and corresponding legal authorities.

8. **PROCEDURES.**

8.1. As soon as practicable following a finding that an arriving alien has a credible fear, the DRO Field Office with custody of the alien shall provide the attached *Parole Advisal and Scheduling Notification* to the alien and explain the contents of the notification to the alien in a language he or she understands, through an interpreter if

5

necessary. The Field Office will complete the relevant portions of the notification, indicating the time when the alien will receive an initial interview on his or her eligibility for parole and the date by which any documentary evidence the alien wishes considered should be provided, as well as instructions for how any such information should be provided.

8.2    Unless an additional reasonable period of time is necessary (e.g., due to operational exigencies or an alien's illness or request for additional time to obtain documentation), no later than seven days following a finding that an arriving alien has a credible fear, a DRO officer familiar with the requirements of this directive and corresponding legal authorities must conduct an interview with the alien to assess his or her eligibility for parole. Within that same period, the officer must complete the *Record of Determination/Parole Determination Worksheet* and submit it for supervisory review. If the officer concludes that parole should be denied, the officer should draft a letter to this effect for the FOD's, DFOD's, or AFOD's signature to be provided to the alien or the alien's representative and forward this letter for supervisory review along with the completed *Record of Determination/Parole Determination Worksheet*. The letter must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request redetermination of parole based upon changed circumstances or additional evidence relevant to the alien's identity, security risk, or risk of absconding.

8.3.    An alien should be paroled under this directive if DRO determines, in accordance with paragraphs (1) through (4) below, that the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release of the alien.

1) Identity.

a) Although many individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation, asylum-related fraud is of genuine concern to ICE, and DRO must be satisfied that an alien is who he or she claims to be before releasing the alien from custody.

b) When considering parole requests by an arriving alien found to have a credible fear, Field Office personnel must review all relevant documentation offered by the alien, as well as any other information available about the alien, to determine whether the alien can reasonably establish his or her identity.

c) If an alien lacks valid government-issued documents that support his or her assertion of identity, Field Office personnel should ask whether the alien can obtain government-issued documentation of identity.

6

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

    d) If the alien cannot reasonably provide valid government-issued evidence of identity (including because the alien reasonably does not wish to alert that government to his or her whereabouts), the alien can provide for consideration sworn affidavits from third parties. However, third-party affiants must include copies of valid, government issued photo-identification documents and fully establish their own identities and addresses.

    e) If government-issued documentation of identity or third-party affidavits from reliable affiants are either not available or insufficient to establish the alien's identity on their own, Field Office personnel should explore whether the alien is otherwise able to establish his or her identity through credible statements such that there are no substantial reasons to doubt the alien's identity.

2) <u>Flight Risk</u>.

    a) In order to be considered for release, an alien determined to have a credible fear of persecution or torture must present sufficient evidence demonstrating his or her likelihood of appearing when required.

    b) Factors appropriate for consideration in determining whether an alien has made the required showing include, but are not limited to, community and family ties, employment history, manner of entry and length of residence in the United States, stability of residence in the United States, record of appearance for prior court hearings and compliance with past reporting requirements, prior immigration and criminal history, ability to post bond, property ownership, and possible relief or protection from removal available to the alien.

    c) Field Office personnel shall consider whether setting a reasonable bond and/or entering the alien in an alternative-to-detention program would provide reasonable assurances that the alien will appear at all hearings and depart from the United States when required to do so.

    d) Officers should exercise their discretion to determine what reasonable assurances, individually or in combination, are warranted on a case-by-case basis to mitigate flight risk. In any event, the alien must be able to provide an address where he or she will be residing and must timely advise DRO of any change of address.

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

3) <u>Danger to the Community</u>.

    a) In order for an alien to be considered for parole, Field Office personnel must make a determination whether an alien found to have a credible fear poses a danger to the community or to U.S. national security.

    b) Information germane to the determination includes, but is not limited to, evidence of past criminal activity in the United States or abroad, of activity contrary to U.S. national security interests, of other activity giving rise to concerns of public safety or danger to the community (including due to serious mental illness), disciplinary infractions or incident reports, and any criminal or detention history that shows that the alien has harmed or would likely harm himself or herself or others.

    c) Any evidence of rehabilitation also should be weighed.

4) <u>Additional Factors</u>.

    a) Because parole remains an inherently discretionary decision, in some cases there may be exceptional, overriding factors that should be considered in addition to the three factors discussed above. Such factors may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests.

    b) Field Office personnel may consider such additional factors during the parole decision-making process.

8.4. Assigned DRO officers should, where appropriate, request that parole applicants provide any supplementary information that would aid the officers in reaching a decision. The *Record of Determination/Parole Determination Worksheet* should be annotated to document the request for supplementary information and any response from the detainee.

8.5. After preparing and signing the *Record of Determination/Parole Determination Worksheet*, and in the case of a denial of parole, drafting a written response to the alien, the assigned DRO officer shall forward these materials and the parole request documentation to his or her first-line supervisor for review and concurrence.

8.6. Upon his or her concurrence, the first-line supervisor shall sign the *Record of Determination/Parole Determination Worksheet* where indicated and forward it, along with any related documentation, to the FOD (or, where applicable, the DFOD or AFOD) for final approval.

8.7. The FOD (or, where applicable, the DFOD or AFOD) shall review the parole documentation, consult with the preparing officer and supervisor as necessary, and

8

either grant or deny parole by signing the *Record of Determination/Parole Determination Worksheet* where indicated and, in the case of a denial, signing the written response to the alien.

8.8. Following a final decision by the FOD to deny parole (or, where applicable, the DFOD or AFOD), the Field Office shall provide the written response to the alien or, if represented, to the alien's legal representative, indicating that parole was denied. If parole is granted, the Field Office shall provide the alien with a date-stamped I-94 Form bearing the following notation: **"Paroled under 8 C.F.R. § 212.5(b). Employment authorization not to be provided on this basis."**

8.9. If an alien makes a written request for redetermination of an earlier decision denying parole, the Field Office may, in its discretion, reinterview the alien or consider the request based solely on documentary material already provided or otherwise of record.

8.10. The supporting documents and a copy of the parole decision sent to the alien (if applicable), the completed *Record of Determination/Parole Determination Worksheet*, and any other documents related to the parole adjudication should be placed in the alien's A-file in a record of proceeding format. In addition, a copy of the *Record of Determination/Parole Determination Worksheet* shall be stored and maintained under the authority of the FOD for use in preparing monthly reports.

8.11. On a monthly basis, FODs shall submit reports to the Assistant Director for Operations, or his or her designee, detailing the number of parole adjudications conducted under this directive within their respective areas of responsibility, the results of those adjudications, and the underlying basis of each Field Office decision whether to grant or deny parole. The Assistant Director for Operations, or his or her designee, in conjunction with appropriate DRO Headquarters components, will analyze this reporting and collect individual case information to review in more detail, as warranted. In particular, this analysis will rely on random sampling of all reported cases for in-depth review and will include particular emphasis on cases where parole was not granted because of the presence of additional factors, per paragraph 8.3(4) of this directive. Any significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action.

8.12. At least once every six months, the Assistant Director for Operations, or his or her designee, shall prepare a thorough and objective quality assurance report, examining the rate at which paroled aliens abscond and the Field Offices' parole decision-making, including any noteworthy trends or corrective measures undertaken based upon the monthly quality assurance analysis required by paragraph 8.11 of this directive.

9

A0645

9.    **ATTACHMENTS.**

- *Parole Advisal and Scheduling Notification.*
- *Record of Determination/Parole Determination Worksheet.*

10.    **NO PRIVATE RIGHTS CREATED.** This directive is an internal policy statement of ICE. It is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**Approved:** _____

John Morton
Assistant Secretary
U.S. Immigration and Customs Enforcement

Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture

A0646

U.S. Department of Homeland Security
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

**JAN 1 1 2005**

MEMORANDUM FOR:    ALL SPECIAL AGENTS IN CHARGE
                          ALL FIELD OFFICE DIRECTORS

FROM                  Marcy M. Forman
                          Director
                          Office of Investigations

                          Victor X. Cerda
                          Acting Director
                          Detention and Removal Operations

SUBJECT:               ICE Transportation, Detention and Processing Requirements

The attached memorandum dated October 18, 2004, from Border and Transportation Under Secretary Asa Hutchinson entitled *"Detention Prioritization and Notice to Appear Documentary Requirements"* is re-circulated with this guidance. This memorandum applies to all components within US Immigration and Customs Enforcement (ICE).

To assist the field locations in implementation of the aforementioned memorandum, the Office of Investigations (OI) and the Office of Detention and Removal Operations (DRO) are providing this joint guidance to the Special Agents in Charge (SAC) and Field Office Directors (FOD).

The following guidance will assist the SACs and FODs while conducting immigration enforcement operations:

- The arresting office is responsible to ensure all aliens in ICE custody are served with appropriate processing papers that will facilitate the most expedient removal process (i.e. stipulated removal, reinstatement, administrative, expedited, notice to appear) as soon as possible after being taken into custody, but no longer than forty-eight (48) hours in the absence of exceptional circumstances.

- OI and DRO personnel will notify their respective management when a detained alien has not been processed/served within 48 hours of being in Immigration and Customs Enforcement (ICE) custody. The SAC/FOD or designee will ensure that the aliens are processed and served immediately. **All aliens will be served in an expeditious manner.**

FOR OFFICIAL USE ONLY
LAW E xxxxxxxxxxxxxxx NSITIVE

www.ice.gov



- DRO will continue to provide the transportation support to OI of aliens prior to processing, from jails, roadside smuggling loads, drop houses and other significant enforcement operations as conducted in past local procedures. SACs and FODs should ensure proper communication and understanding of the local level of transportation support.

- DRO does not have the legal authority to transport United States Citizens (USCs) or Lawfully Admitted Permanent Residents (LAPRs) for criminal proceedings. However, DRO will transport LAPRs and/or illegal aliens that may be presented as material witnesses, after they have been processed for a Notice To Appear (NTA). DRO will not detain an alien solely on the basis of a material witness warrant. If such is occurring, both the SAC and FOD should address this issue with the local U.S. Attorney's Office.

- Should the FOD or designee determine that an alien, categorized as a Mandatory Detention or High Priority #1-6 detention, as described on page 2 of the attached memorandum *"Detention Prioritization and Notice to Appear Documentary Requirements"*, be released at the time of processing, the DRO office will provide a written denial to the SAC for inclusion in the alien's A-File. This should only occur when the national bed space population is at capacity and such situation should be reported by the FOD to HQDRO prior to such release.

- The A-file should be completed and accompany the aliens when they are turned over to DRO or with the least possible delay. If the A-file is not available or the A-file needs to be retained for prosecution purposes, the processing agent will create a temporary file (T-file), which will include the original NTA and copies of all other required documentation for DRO use and tracking. T-Files should be used in extremely limited circumstances.

- In the event that the Judgment & Conviction (J&C) documents are necessary for an alien's removal hearing and are unavailable when the A-file is transferred to DRO, the processing agent must ensure that the J&C documents have been requested by annotating the request in the A-file. The processing agent is responsible for ensuring that the J&Cs are forwarded to DRO for inclusion in the A-File in a timely manner.

OI & DRO Headquarters staffs are working together to ensure uniformity and that a spirit of cooperation exists during this transition period. It should be emphasized however that local communication and coordination between SAC and FOD offices should occur to ensure proper implementation and monitoring of these requirements.

Attachment

FOR xxxxxxxxxxxxx ONLY
LAW EN NSITIVE



U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

OCT 18 2004

MEMORANDUM TO:   Robert C. Bonner
Commissioner
U.S. Customs and Border Protection

Michael J. Garcia
Assistant Secretary
U.S. Immigration and Customs Enforcement

FROM:   Asa Hutchinson
Under Secretary for Border and Transportation Security

RE:   Detention Prioritization and Notice to Appear Documentary
Requirements

This memorandum provides priorities for the detention of aliens and outlines
documentary requirements that must be met when transferring custody of aliens to
Immigration and Customs Enforcement (ICE), Office of Detention and Removal
Operations (DRO). The guidance in this memo supercedes all outstanding guidance
regarding priorities for the detention of aliens within Border and Transportation Security
(BTS). All BTS personnel must adhere to legal authorities and the procedures set forth
below in making decisions regarding whether to detain an alien.[1]

## _I. Detention Priorities_

The following guidelines provide priority categories for the detention of aliens subject to
detention. An alien being considered for detention should be placed in the highest
numbered priority within the top category possible (i.e., an alien found to have a credible
fear of persecution with an aggravated felony conviction would still meet the
requirements of Mandatory, #2). In the case of mandatory detention, the Director of ICE
DRO is to heed the guidelines strictly. In all other cases, the DRO Director retains the
discretionary authority with respect to allocation of bed space and other detention-related
resources. In all cases, the DRO Director is to heed these guidelines to the greatest
extent possible when determining detention priorities.

---

[1]  This policy does not supercede any requirement to release an alien under _Zadvydas v. Davis_, 533 U.S.
678 (2001) and implementing guidance in 8 CFR §§ 241.4, 241.13 and § 241.14 nor does it apply to
unaccompanied juveniles.

FOR OFFICIAL USE ONLY    www.dhs.gov
LAW ENFORCEMENT SENSITIVE

ICE.09041000100
A0649



All such aliens must be detained unless they fall within one of the exceptions to mandatory detention. There are no priority designations among categories of cases subject to mandatory detention. Questions as to whether a given alien falls under one of these categories and must be detained should be directed to local legal counsel.

## Mandatory

- Aliens subject to mandatory detention under INA 236A[2]
- Aliens in expedited removal (INA § 235) with limited exceptions[3]
- Aliens subject to mandatory detention in removal and deportation proceedings under INA 236(c)[4]
- Aliens who have final orders of removal subject to mandatory detention under INA 241(a)(2), whether ordered removed pursuant to INA 238 or 240 proceedings[5]

## High Priority

1. National Security Interest aliens including aliens who are subject to an ongoing national security investigation or who, by virtue of specific information or intelligence specific to the alien in question raise a national security concern, as identified either by 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection (CBP).[6]
2. Continued detention of aliens with final administrative orders past 180 days on account of special circumstances (i.e. 8 CFR 241.14).
3. Aliens who have been issued final removal orders over 90-days old, where removal is foreseeable.
4. Aliens who present an articulable danger to the community (claimant agency must be able to articulate the danger)
5. Aliens who exhibit specific, articulable intelligence-based risk factors for terrorism or national security concern not solely based on the alien's race, ethnicity, nationality or religion (as identified by either 1) the Joint Terrorism Task Force, 2) Immigration and Customs Enforcement, or 3) by U.S. Customs and Border Protection.
6. Aliens associated with ongoing significant criminal investigations;

---

[2] Prior approval of the ICE National Security Unit and the ICE Office of the Principal Legal Advisor is required before charges may be brought under either INA § 212(a)(3) or INA § 237(a)(4).

[3] Not all aliens in expedited removal proceedings are subject to mandatory detention, however. See, for example 8 CFR § § 235.3(b)(2)(iii), 235.3(b)(4)(ii), and 235.3(b)(5)(i) allowing for parole in limited circumstances of medical emergency, or where necessary for a legitimate law enforcement objective.

[4] Note that INA 236(c)(2) authorizes release to provide for protection of a witness, etc., where the alien does not pose a danger to the safety of others or to property and is likely to appear for any scheduled proceedings.

[5] This includes aliens ordered removed under INA 240 and criminal aliens ordered removed under INA 238. These aliens may not be released under any circumstances during the 90-day removal period set forth in INA 241(a)(2). Following the 90-day period, the continued detention of such aliens should be determined pursuant to criteria in Zadvydas, *supra* and implementing guidance in 8 CFR §§ 241.4, 241.13, and 241.14.

[6] ICE and CBP shall track all cases where the two bureaus disagree on whether a particular alien poses a national security threat. CBP and ICE shall review these cases on a quarterly basis.

2

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

7. Remaining criminal aliens not subject to 236(c) ;
8. Aliens whose detention is essential to national border enforcement initiatives;

**Medium Priority**

1. Suspected alien and narcotics smugglers
2. Aliens who committed fraud
3. Inadmissible, non-criminal aliens (other than expedited removal cases)

**Lower Priority**

1. Worksite enforcement arrests
2. Final orders (beyond 179 days-not likely to remove)
3. Aliens placed in expedited removal found to have a credible fear and referred for full 240 proceedings.
4. Other aliens not subject to required detention

II. Documentary requirements.

Each component must ensure apprehended aliens are processed efficiently and placed in the appropriate and most expedient removal process. (e.g. stipulated, reinstatement, administrative, expedited)  At a minimum, the following documents must be completed by the apprehending entity and presented to DRO to ensure each case moves swiftly through the removal process:

- Original charging documents;
- Completed Form I-213 (Record of Deportable/Inadmissible Alien) or approved equivalent;
- 2 completed Forms FD-249 (fingerprint cards);
- R-84 Form with prints and biographical information completed;
- Print out of results, including negative responses, of name search in IBIS "SQ11" function.
- IAFIS printout relating to criminal history; if IAFIS is not available, print out of results, including negative responses, based on name search in either NCIC or NLETS.
- Record of Fingerprint Identification Number (FIN) generated by the Automated Biometric Identification System (IDENT);
- 4 photographs;
- Completed Form I-217 (Information for Travel Document or Passport if required);
- Documentation of Consular Notification;
- Certified conviction records, when applicable.  In the event that conviction records are not immediately available, the arresting officer must provide written notification to the file that a Certified Copy of the Conviction Document has been requested, and include in the administrative file the following information:  the exact date and jurisdiction where the alien was convicted, the name and telephone number of the referring officer and the supervisor, the name and contact

3

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVI



information of the agency official responsible for procuring the conviction record. Furthermore, the arresting agency must produce the actual conviction record within 30 days of issuance of the NTA;[7]

- Documentation reflecting that appropriate record checks (Central Index System (CIS), Non-Immigrant Information System (NIIS), National Crime Information Center (NCIC), IDENT, Interagency Border Inspection System (IBIS), etc.) have been completed;
- Completed Form I-203 or I-203A [Order to Detain or Release Alien(s)] bearing the appropriate official's signature must accompany each detainee presented for detention;
- Notice of Custody Determination (Form I-286), indicating date and time custody decision was made and probable charges against alien;
- And any other relevant documents pertaining to the detainee.

To ensure maximum efficiency in the use of the Department's finite detention bed resources, it is imperative that this documentation is prepared and presented. Custody responsibility will not be transferred to ICE/Detention and Removal Operations (DRO) until ICE/DRO verifies that all of the above required documentation has either been provided or has been waived by an ICE/DRO authorizing official at the detention site. The arresting or delivering officer will ensure that detainees turned over to the custody of ICE/DRO are accompanied by any personal items, identity documents, baggage and/or prescription medications in that detainee's possession at the time of arrest.

The requirements I issued in my memorandum of March 30, 2004, *Guidance on ICE Implementation of Policy and Practice Changes Recommended by the Department of Justice Inspector General*, remain in effect. You are responsible for ensuring implementation of these requirements.



---

[7] CBP shall establish within 30 days of this memorandum points of contact in each field office to coordinate obtaining conviction records for cases where the conviction record is not timely produced. Contact information shall be provided to the DRO Field Office Directors and the ICE Chief Counsels.

4

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE



**Darrow, Joseph A. (CIV)**

| | |
|---|---|
| **From:** | ERO Assistant Directors <EROAssistantDirectors@ice.dhs.gov> |
| **Sent:** | Wednesday, November 17, 2021 4:35 PM |
| **Subject:** | Parole of Arriving Noncitizens Considered for Release |

# Assistant Director
# for Field Operations

Enforcement and Removal Operations



**To:** **Field Office Directors and Deputy Field Office Directors**

**Subject:** **Parole of Arriving Noncitizens Considered for Release**

*Please forward this message to Officers in Charge and Assistant Field Office Directors*

As a reminder, parole pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA) is the *only* release mechanism for arriving noncitizens, including arriving noncitizens who are subject to expedited removal. Accordingly, ERO must **not release these noncitizens**: (i) on an order of release on recognizance (OREC) or on a bond pursuant to INA section 236(a), or (ii) on an order of supervision (OSUP) pursuant to INA section 241(a)(3).  Instead, such noncitizens may only be released from custody **on discretionary parole** pursuant to INA § 212(d)(5) and 8 C.F.R. § 212.5, subject to reasonable conditions. These include arriving noncitizens subject to expedited removal who are found to have a credible fear. They must continue to be considered for parole according to ICE Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution of Torture* (Dec. 8, 2009).

**Michael W. Meade**
Acting Assistant Director
Field Operations
**Enforcement and Removal Operations**
**U.S. Immigration and Customs Enforcement**

This message expires one year from the date it was sent, pursuant to ERO policy.

*Serving with Integrity.*
**I**ntegrity • **C**ourage • **E**xcellence



NOTICE: This communication is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in

1

A0653

accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this communication should be furnished to the media, either in written or verbal form.

A0654

U.S. Department of Homeland Security
Washington, DC 20528



Homeland
Security

February 20, 2017

MEMORANDUM FOR:      Kevin McAleenan
                     Acting Commissioner
                     U.S. Customs and Border Protection

                     Thomas D. Homan
                     Acting Director
                     U.S. Immigration and Customs Enforcement

                     Lori Scialabba
                     Acting Director
                     U.S. Citizenship and Immigration Services

                     Joseph B. Maher
                     Acting General Counsel

                     Dimple Shah
                     Acting Assistant Secretary for International Affairs

                     Chip Fulghum
                     Acting Undersecretary for Management

FROM:                John Kelly
                     Secretary

SUBJECT:             **Implementing the President's Border Security and
                     Immigration Enforcement Improvements Policies**

     This memorandum implements the Executive Order entitled "Border Security and
Immigration Enforcement Improvements," issued by the President on January 25, 2017, which
establishes the President's policy regarding effective border security and immigration
enforcement through faithful execution of the laws of the United States. It implements new
policies designed to stem illegal immigration and facilitate the detection, apprehension, detention,
and removal of aliens who have no lawful basis to enter or remain in the United States. It
constitutes guidance to all Department personnel, and supersedes all existing conflicting policy,
directives, memoranda, and other guidance regarding this subject matter—to the extent of the
conflict—except as otherwise expressly stated in this memorandum.

A. **Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.**

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1. When removing the alien from the United States pursuant to statute or regulation;

2. When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (DHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3. When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4. When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

2

5.  When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6.  When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

**B. Hiring More CBP Agents/Officers**

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall—while ensuring consistency in training and standards—immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

3

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### C. Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

### D. Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

4

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

### E. Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

### F. Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise—and using materials originating in the United States to the maximum extent permitted by law—shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

### G. Expanding Expedited Removal Pursuant to Section 235(b)(1)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

5

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).

[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.

[3] *Id.*

6

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

### H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

### I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

7

**A0661**

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

**J.  Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims**

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] *See* INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] *See* INA § 235(b)(1)(B)(v).
[6] *See id.*
[7] *Id.*

8

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

**K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA**

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

9

**A0663**

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

### L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).

[9] *See* 8 U.S.C. § 1232(b)(3).

[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

10

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

### M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

### N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

11

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border—including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

## O. Public Reporting of Border Apprehensions Data

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

A0666

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

**P.  No Private Right of Action**

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

13

A0667

APPEAL

## U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:21–cv–01066–TKW–ZCB

STATE OF FLORIDA v. UNITED STATES et al
Assigned to: JUDGE T KENT WETHERELL II
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Case in other court:  ELEVENTH CIRCUIT COURT OF
                APPEALS, 23–11528–C
Cause: 46:1156 Administrative Procedure Act

Date Filed: 09/28/2021
Date Terminated: 03/08/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF FLORIDA**                    represented by **ANITA J PATEL**
FLORIDA ATTORNEY GENERALS
OFFICE
COMPLEX LITIGATION
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
850–414–3694
Email: anita.patel@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**BILAL AHMED FARUQUI**
OFFICE OF THE ATTORNEY
GENERAL
THE CAPITOL PL–01
TALLAHASSEE, FL 32399–1050
850–414–3757
Email: Bilal.Faruqui@myfloridalegal.com
*TERMINATED: 12/19/2022*

**HENRY CHARLES WHITAKER**
FLORIDA OFFICE OF THE ATTORNEY
GENERAL
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399–1050
850–414–3688
Email: henry.whitaker@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JOSEPH EDWARD HART**
OFFICE OF THE ATTORNEY
GENERAL
EXECUTIVE STAFF
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399–1050
850–245–0160
Email: joseph.hart@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**KAREN ANN BRODEEN**
OFFICE OF THE ATTORNEY
GENERAL – TALLAHASSEE FL
THE CAPITOL STE PL–01
400 S MONROE ST
TALLAHASSEE, FL 32399
850–414–3665
Fax: 850–488–4872
Email: karen.brodeen@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

A0668

**NATALIE CHRISTMAS**
FLORIDA ATTORNEY GENERALS
OFFICE
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
850–245–0147
Email: natalie.christmas@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JAMES HAMILTON PERCIVAL , II**
FLORIDA ATTORNEY GENERALS
OFFICE
OFFICE OF THE ATTORNEY
GENERAL
Pl–01
THE CAPITOL
TALLAHASSEE, FL 32399
850–414–3300
Email: james.percival@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES**                              represented by  **ELISSA FUDIM**
DOJ–CIV
CIVIL DIVISION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202–451–7460
Email: elissa.p.fudim@usdoj.gov
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
DOJ–CIV
OFFICE OF IMMIGRATION
LITIGATION
PO BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044
202–532–5802
Email: erin.t.ryan@usdoj.gov
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
DOJ–USAO
CIVIL DIVISION – IMMIGRATION
LITIGATION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202–598–7537
Email: joseph.a.darrow@usdoj.gov
*ATTORNEY TO BE NOTICED*

**MARIE ARMSTRONG MOYLE**
DOJ–USAO
111 N ADAMS STREET
4TH FLOOR
TALLAHASSEE, FL 32301
850–942–8430
Email: marie.moyle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**TROY MILLER**                              represented by    **ELISSA FUDIM**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **ERIN T RYAN**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **JOSEPH ANTON DARROW**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**US CUSTOMS AND BORDER**                    represented by    **ELISSA FUDIM**
**PROTECTION**                                                 (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **ERIN T RYAN**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **JOSEPH ANTON DARROW**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**UR M JADDOU**                              represented by    **ELISSA FUDIM**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **ERIN T RYAN**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **JOSEPH ANTON DARROW**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**US CITIZENSHIP AND**                       represented by    **ELISSA FUDIM**
**IMMIGRATION SERVICES**                                       (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **ERIN T RYAN**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **JOSEPH ANTON DARROW**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**ALEJANDRO MAYORKAS**                       represented by    **ELISSA FUDIM**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **ERIN T RYAN**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**A0670**

JOSEPH ANTON DARROW
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOMELAND
SECURITY**

represented by **ELISSA FUDIM**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**TAE D JOHNSON**

represented by **ELISSA FUDIM**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US IMMIGRATION AND CUSTOMS
ENFORCEMENT**

represented by **ELISSA FUDIM**
(See above for address)
*ATTORNEY TO BE NOTICED*

**ERIN T RYAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JOSEPH ANTON DARROW**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Immigration Reform Law Institute**

represented by **MATT A CRAPO**
IMMIGRATION REFORM LAW
INSTITUTE – WASHINGTON DC
25 MASSACHUSETTS AVENUE NW
SUITE 335
WASHINGTON, DC 20001
571–435–3582
Email: mcrapo@irli.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/28/2021 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AFLNDC–6362480.), filed by STATE OF FLORIDA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons) (PERCIVAL, JAMES) (Entered: 09/28/2021) |

| 09/28/2021 | 2 | DOCKET ANNOTATION BY COURT: The parties in the above−referenced case were added to the docket incorrectly and will be corrected by the clerk. Party names are to be entered in all caps and without punctuation. For future reference: Please review the procedure for adding/creating new parties in the "Style Guide for Electronic Case Filing" and/or chapter 10 of the "CM/ECF Attorney User's Guide," available at www.flnd.uscourts.gov. (mb) (Entered: 09/28/2021) |
| 09/28/2021 | 3 | Summons Issued as to UNITED STATES (Attachments: # 1 Summons − ALEJANDRO MAYORKAS, # 2 Summons − TAE JOHNSON, # 3 Summons − TROY MILLER, # 4 Summons − UR M JADDOU, # 5 Summons − US CITIZEN AND IMMIGRATION SERVICES, # 6 Summons − US CUSTOMS AND BORDER PROTECTION, # 7 Summons − US DEPT OF HOMELAND SECURITY, # 8 Summons − US IMMIGRATION AND CUSTOMS ENFORCEMENT), U.S. Attorney and U.S. Attorney General. (mb) (Entered: 09/28/2021) |
| 10/18/2021 | 4 | NOTICE *of Service* by STATE OF FLORIDA re 3 Summons Issued as to USA, 1 Complaint (Attachments: # 1 Exhibit A. Certified Mail Receipts, # 2 Exhibit B. Delivery Confirmation) (PERCIVAL, JAMES) (Entered: 10/18/2021) |
| 12/03/2021 | 5 | MOTION to Transfer Case to Tallahasee Division by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (Attachments: # 1 Memorandum in Support of Motion to Transfer, # 2 Exhibit A − November 2, 2021 CBP Memorandum) (DARROW, JOSEPH) Modified on 12/6/2021: terminated due to Amended Motion(jfj). (Entered: 12/03/2021) |
| 12/03/2021 | 6 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *AND LACK OF JURISDICTION* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Memorandum in Support of Defendants' Motion to Dismiss, # 2 Exhibit A − November 2, 2021 CBP Memorandum, # 3 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 12/03/2021) |
| 12/03/2021 | 7 | Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (Attachments: # 1 Memorandum in Support of Motion to Transfer Venue, # 2 Exhibit A − November 2, 2021 CBP Memorandum, # 3 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 12/03/2021) |
| 12/03/2021 | | Set Deadlines Re: 6 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND LACK OF JURISDICTION (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (jfj) (Entered: 12/03/2021) |
| 12/10/2021 | 8 | NOTICE of Appearance by NATALIE CHRISTMAS on behalf of STATE OF FLORIDA (CHRISTMAS, NATALIE) (Entered: 12/10/2021) |
| 12/10/2021 | 9 | Joint MOTION for Extensions of Time and Leave to File a Reply Brief by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 12/10/2021) |
| 12/13/2021 | 10 | ORDER Granting 9 Parties' Joint Motion for Extension of Time and Leave to File Reply Brief. Plaintiff shall have until December 27, 2021, to respond to Defendants' motion to transfer. Defendants may file a reply in support of the motion to transfer on or before January 10, 2022. The reply shall be limited to 3,200 words. Plaintiff shall have 14 days after the Court rules on the motion to transfer to respond to Defendants' motion to dismiss or to file an amended complaint. Signed by JUDGE T KENT WETHERELL II on 12/13/21. (jfj) (Entered: 12/13/2021) |

| 12/13/2021 | | Set Deadlines/Hearings. (Internal deadline for referral to judge if response not filed earlier: re: Plaintiff's Response to Defendant's Motion to Transfer due by **12/27/2021**) . Defendant's Reply in Support of Motion to Transfer due by **1/10/2022**. (jfj) (Entered: 12/13/2021) |
|---|---|---|
| 12/27/2021 | 11 | RESPONSE in Opposition re 7 Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* filed by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 12/27/2021) |
| 01/10/2022 | 12 | REPLY to Response to Motion re 7 Amended MOTION to Transfer Case to Tallahasee Division *(amended to include proposed order)* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 01/10/2022) |
| 01/11/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 12 Reply to Response to Motion, 11 Response in Opposition to Motion, 7 Amended MOTION to Transfer Case to Tallahasee Division (jfj) (Entered: 01/11/2022) |
| 01/18/2022 | 13 | ORDER DENYING MOTION TO TRANSFER VENUE. Defendants' amended motion to transfer venue (Doc. 7 ) is DENIED. Plaintiff has 14 days from the date of this Order to respond to Defendants' motion to dismiss (Doc. 6 ) or to file an amended complaint. Signed by JUDGE T KENT WETHERELL II on 01/18/22. (Plaintiff to file response to motion to dismiss or an amended complaint by **2/1/2022**.) (jfj) (Entered: 01/18/2022) |
| 01/27/2022 | 14 | NOTICE of Appearance by MARIE ARMSTRONG MOYLE on behalf of UNITED STATES (MOYLE, MARIE) (Entered: 01/27/2022) |
| 02/01/2022 | 15 | NOTICE of Appearance by HENRY CHARLES WHITAKER on behalf of STATE OF FLORIDA (WHITAKER, HENRY) (Entered: 02/01/2022) |
| 02/01/2022 | 16 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 02/01/2022) |
| 02/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 16 FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF. (jfj) (Entered: 02/01/2022) |
| 02/02/2022 | 17 | ORDER. Defendants' 6 motion to dismiss is DENIED as moot. Defendants shall have 14 days from the date of this Order to answer or otherwise respond to the 16 amended complaint. Signed by JUDGE T KENT WETHERELL II on 02/02/22.(Answer due by **2/16/2022**.) (jfj) (Entered: 02/02/2022) |
| 02/07/2022 | 18 | Consent MOTION for Extension of Time to File Answer re 17 Order,, Set Deadlines/Hearings, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 02/07/2022) |
| 02/08/2022 | 19 | ORDER GRANTING EXTENSION OF TIME re 18 Consent MOTION for Extension of Time to File Answer. Defendants shall have until March 2, 2022, to answer or otherwise respond to the amended complaint. Signed by JUDGE T KENT WETHERELL II on 02/08/22. (jfj) (Entered: 02/08/2022) |
| 02/24/2022 | 20 | MOTION to Stay *Case Pending Supreme Court's Decision in Texas v. Biden* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Supplement Memorandum in Support of Motion to Stay Case) (DARROW, JOSEPH) (Entered: 02/24/2022) |

| | | |
|---|---|---|
| 02/24/2022 | | Set Deadlines/Hearings re 20 Motion to Stay the Case Pending the Supreme Court's Decision in Texas v. Biden. (Internal deadline for referral to judge if response not filed earlier: **3/10/2022**). (alb) (Entered: 02/25/2022) |
| 03/01/2022 | 21 | MOTION for Extension of Time to File Answer re 16 Amended Complaint *Unopposed Motion for Extension of Time by Five Days to File Answer or Response to First Amended Complaint* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 03/01/2022) |
| 03/02/2022 | 22 | ORDER GRANTING EXTENSION OF TIME. Defendants' unopposed motion for extension of time (Doc. 21 ), is GRANTED, and Defendants shall have until **March 7, 2022**, to answer or otherwise respond to the amended complaint. Signed by JUDGE T KENT WETHERELL II on 03/02/22. (jfj) (Entered: 03/02/2022) |
| 03/07/2022 | 23 | MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response not filed earlier: **3/21/2022**). (Attachments: # 1 Memorandum in Support of Motion, # 2 Proposed Order) (DARROW, JOSEPH) (Entered: 03/07/2022) |
| 03/09/2022 | 24 | RESPONSE in Opposition re 20 MOTION to Stay *Case Pending Supreme Court's Decision in Texas v. Biden* filed by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 03/09/2022) |
| 03/10/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 20 MOTION to Stay Case Pending Supreme Court's Decision in Texas v. Biden and 24 Response in Opposition to Motion. (jfj) (Entered: 03/10/2022) |
| 03/11/2022 | 25 | ORDER DENYING STAY. Defendants' motion to stay 20 is DENIED. Signed by JUDGE T KENT WETHERELL II on 03/11/22. (jfj) (Entered: 03/11/2022) |
| 03/11/2022 | 26 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **3/25/2022**. Rule 26 Meeting Report due by **4/25/2022**. Discovery due by **7/11/2022**. Signed by JUDGE T KENT WETHERELL II on 03/11/22. (jfj) (Entered: 03/11/2022) |
| 03/16/2022 | 27 | NOTICE of Appearance by KAREN ANN BRODEEN on behalf of STATE OF FLORIDA (BRODEEN, KAREN) (Entered: 03/16/2022) |
| 03/17/2022 | 28 | Consent MOTION for Extension of Time to File Response/Reply as to 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 03/17/2022) |
| 03/18/2022 | 29 | ORDER GRANTING EXTENSION OF TIME re 28 Consent MOTION for Extension of Time. The motion is GRANTED, and Plaintiff shall have until March 28, 2022, to file its response to Defendants' motion to dismiss. Signed by JUDGE T KENT WETHERELL II on 03/18/22. (Response to motion due by by **3/28/2022**.) (jfj) (Entered: 03/18/2022) |
| 03/22/2022 | 30 | NOTICE of Appearance by ERIN T RYAN on behalf of DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (RYAN, ERIN) (Entered: 03/22/2022) |
| 03/25/2022 | 31 | RESPONSE to Motion re 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 03/25/2022) |
| 03/28/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 23 MOTION to Dismiss for Lack |

A0674

| | | |
|---|---|---|
| | | of Jurisdiction *And Failure To State A Claim* and 31 Response to Motion. (jfj) (Entered: 03/28/2022) |
| 03/28/2022 | 32 | Consent MOTION for Leave to File re 31 Response to Motion, 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim Motion for Leave to File Reply in Support of Motion to Dismiss the Amended Complaint* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 03/28/2022) |
| 03/28/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 32 CONSENTED–TO MOTION FOR LEAVE TO FILE REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT. (jfj) (Entered: 03/28/2022) |
| 03/29/2022 | 33 | ORDER AUTHORIZING REPLY. Upon due consideration of Defendants' unopposed motion for leave to file reply (Doc. 32 ), it is ORDERED that the motion is GRANTED, and Defendants shall have 7 days from the date of this Order to file a reply in support of their motion to dismiss. The reply shall comply with the word limit in Local Rule 7.1(I). Signed by JUDGE T KENT WETHERELL II on 03/29/22. (Reply due by **4/5/2022**.) (jfj) (Entered: 03/29/2022) |
| 03/31/2022 | 34 | MOTION to Appear Pro Hac Vice by Matt A. Crapo.( Filing fee $ 208 receipt number AFLNDC–6890907.) by Immigration Reform Law Institute. (Attachments: # 1 Certificate of Good Standing) (CRAPO, MATT) (Entered: 03/31/2022) |
| 04/01/2022 | 35 | ORDER re 34 Motion to Appear Pro Hac Vice. The motion is GRANTED, and attorney Matt A. Crapo is authorized to appear pro hac vice for potential amicus curiae Immigration Reform Law Institute. Signed by JUDGE T KENT WETHERELL II on 04/01/22. (jfj) (Entered: 04/01/2022) |
| 04/01/2022 | 36 | Consent MOTION for Leave to File *Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss* by Immigration Reform Law Institute. (Attachments: # 1 Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss) (CRAPO, MATT) (Entered: 04/01/2022) |
| 04/03/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 36 Consent MOTION for Leave to File *Brief of Immigration Reform Law Institute as Amicus Curiae in Opposition to Defendants' Motion to Dismiss* (jfj) (Entered: 04/03/2022) |
| 04/04/2022 | 37 | ORDER. The motion is GRANTED, and the Immigration Reform Law Institute's amicus brief (Doc. 36 –1) is accepted. Defendants shall address the arguments raised in the amicus brief in their reply in support of their motion to dismiss, and on the Court's own motion, the deadline for the reply is extended by 7 days to April 12, 2022. No further extensions will be granted. Signed by JUDGE T KENT WETHERELL II on 04/04/22. (Reply due by **4/12/2022**.) (jfj) (Entered: 04/04/2022) |
| 04/06/2022 | 38 | REPORT of Rule 26(f) Planning Meeting. (CHRISTMAS, NATALIE) (Entered: 04/06/2022) |
| 04/06/2022 | 39 | FINAL SCHEDULING ORDER Re: 38 Report of Rule 26(f) Planning Meeting: Discovery due by **7/11/2022**. Dispositive Motions to be filed by **8/1/2022**. Signed by JUDGE T KENT WETHERELL II on 04/06/22. (jfj) (Entered: 04/06/2022) |
| 04/12/2022 | 40 | REPLY to Response to Motion re 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim*, 32 Consent MOTION for Leave to File re 31 Response to Motion, 23 MOTION to Dismiss for Lack of Jurisdiction *And Failure To State A Claim Motion for Leave to File Reply in Support of Motion to Dismiss the Amended Complaint Defendants' Reply in Support of Motion to Dismiss the First Amended Complaint* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS |

A0675

| | | ENFORCEMENT. (DARROW, JOSEPH) (Entered: 04/12/2022) |
|---|---|---|
| 04/13/2022 | 41 | RULE 26 Disclosures by STATE OF FLORIDA. (CHRISTMAS, NATALIE) (Entered: 04/13/2022) |
| 04/13/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 23 MOTION to Dismiss for Lack of Jurisdiction And Failure To State A Claim, 31 Response to Motion, and 40 Reply to Response to Motion. (jfj) (Entered: 04/13/2022) |
| 04/19/2022 | 42 | NOTICE of Supplemental Authority by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit Stay Decision in Arizona v. Biden, No. 22–3272 (6th Cir. Apr. 12, 2022)) (DARROW, JOSEPH) (Entered: 04/19/2022) |
| 04/20/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 42 NOTICE OF SUPPLEMENTAL AUTHORITY. (jfj) (Entered: 04/20/2022) |
| 04/20/2022 | 43 | NOTICE of Supplemental Authority Response by STATE OF FLORIDA re 42 Notice (Other), (CHRISTMAS, NATALIE) (Entered: 04/20/2022) |
| 04/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 43 FLORIDA'S RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY. (jfj) (Entered: 04/21/2022) |
| 04/21/2022 | 44 | RULE 26 Disclosures by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 04/21/2022) |
| 05/04/2022 | 45 | ORDER DENYING MOTION TO DISMISS. Defendants' motion to dismiss (Doc. 23) is DENIED. Defendants shall have 14 days from the date of this Order to answer the amended complaint. See Fed. R. Civ. P. 12(a)(4)(A). Signed by JUDGE T KENT WETHERELL II on 05/04/22. (Answer due 5/18/22.) (jfj) (Entered: 05/04/2022) |
| 05/05/2022 | 46 | NOTICE of Appearance by ANITA J PATEL on behalf of STATE OF FLORIDA (PATEL, ANITA) (Entered: 05/05/2022) |
| 05/19/2022 | 47 | MOTION to Supplement the Administrative Record for the Parole + ATD Policy by STATE OF FLORIDA. (Attachments: # 1 Certified Administrative Record, # 2 CBP Email re CDC Guidance, # 3 Email re FL Lawsuit, # 4 Enforcement Priorities AR Index, # 5 MPP AR Index, # 6 Epoch Times Article) (CHRISTMAS, NATALIE) (Entered: 05/19/2022) |
| 05/19/2022 | 48 | Joint MOTION for Extension of Time to Complete Discovery by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/19/2022) |
| 05/19/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy, MOTION to Supplement the Administrative Record for the Parole + ATD Policy, 48 Joint MOTION for Extension of Time to Complete Discovery. (alb) (Entered: 05/19/2022) |
| 05/20/2022 | 49 | ORDER re 48 Joint MOTION for Extension of Time to Complete Discovery 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy. The joint motion to enlarge time to complete discovery is GRANTED and the discovery deadline is extended to August 10, 2022. All deadlines in the scheduling order tied to the discovery deadline are extended likewise. Defendants shall have 7 days from the date of this Order to respond to Plaintiff's motion to supplement the administrative record. (Internal deadline for referral to judge if response not filed earlier: 5/27/2022). Dispositive Motions to be filed by 8/31/2022. Discovery due by 8/10/2022.) Signed by JUDGE T KENT WETHERELL II on 05/20/2022. (alb) (Entered: 05/20/2022) |

| 05/20/2022 | 50 | Consent MOTION for Extension of Time to File Answer re 16 Amended Complaint *respectfully requesting a brief nunc pro tunc extension of time to answer* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 05/20/2022) |
|---|---|---|
| 05/22/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 50 DEFENDANTS' CONSENT MOTION FOR A NUNC PRO TUNC EXTENSION OF TIME TO ANSWER THE COMPLAINT. (jfj) (Entered: 05/22/2022) |
| 05/23/2022 | 51 | ORDER GRANTING EXTENSION OF TIME re 50 Consent MOTION for Extension of Time. The motion is GRANTED, and Defendants shall have until **May 24, 2022**, to answer the amended complaint. Signed by JUDGE T KENT WETHERELL II on 05/23/22. (jfj) (Entered: 05/23/2022) |
| 05/23/2022 | 52 | ORDER REASSIGNING CASE. Case reassigned to MAGISTRATE JUDGE ZACHARY C BOLITHO for all further proceedings. MAGISTRATE JUDGE ELIZABETH M TIMOTHY no longer assigned to case. Signed by CHIEF JUDGE MARK E WALKER on 5/23/2022. (erl)**Please use the new judge's initials for all future filings: 3:21cv1066–TKW–ZCB. (Entered: 05/24/2022) |
| 05/24/2022 | 53 | ANSWER to 16 Amended Complaint by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 05/24/2022) |
| 05/27/2022 | 54 | RESPONSE in Opposition re 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy MOTION to Supplement the Administrative Record for the Parole + ATD Policy filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 05/27/2022) |
| 05/30/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 47 MOTION to Supplement the Administrative Record for the Parole + ATD Policy and 54 DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTIONTO SUPPLEMENT THE ADMINISTRATIVE RECORD. (jfj) (Entered: 05/30/2022) |
| 06/06/2022 | 55 | ORDER DENYING MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD. Florida's motion to supplement the administrative record for the parole + ATD policy (Doc. 47 ) is DENIED. Signed by JUDGE T KENT WETHERELL II on 06/06/22. (jfj) (Entered: 06/06/2022) |
| 06/10/2022 | 56 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 06/10/2022) |
| 07/01/2022 | 57 | MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* by DEPARTMENT OF HOMELAND SECURITY. (Attachments: # 1 Exhibit A) (RYAN, ERIN) (Entered: 07/01/2022) |
| 07/05/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 57 DEFENDANTS' MOTION FOR A PROTECTIVE ORDER WITH RESPECT TO TOPICS 3, 9, 14, AND 15 LISTED IN PLAINTIFF'S NOTICE OF 30(b)(6) DEPOSITION. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/05/2022) |
| 07/05/2022 | 58 | ORDER entered re 57 Motion for Protective Order. Defendants request an order directing Plaintiff to file any response to their Motion for a Protective Order within seven days and indicate that Plaintiff has consented to filing its opposition within that time frame. (See Doc. 57 at 3). Accordingly, Plaintiffs response to Defendants' Motion for a Protective Order is due on or before July 8, 2022. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/5/2022. (hmw) (Entered: 07/05/2022) |

| | | |
|---|---|---|
| 07/06/2022 | | Set Deadlines re: 57 Motion for Protective Order. (Internal deadline for referral to judge if response not filed earlier: **7/8/2022**). (jfj) (Entered: 07/06/2022) |
| 07/07/2022 | 59 | RESPONSE in Opposition re 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* filed by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/07/2022) |
| 07/07/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice*, 59 Response in Opposition to Motion. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/07/2022) |
| 07/08/2022 | 60 | MOTION to Compel *Production of Documents* by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/08/2022) |
| 07/08/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 60 MOTION to Compel *Production of Documents*. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 07/08/2022) |
| 07/08/2022 | | Set Deadlines re: 60 MOTION to Compel Production of Documents by STATE OF FLORIDA. (Internal deadline for referral to judge if response not filed earlier: **7/22/2022**). (jfj) (Entered: 07/08/2022) |
| 07/08/2022 | 61 | Minute Entry for proceedings held before MAGISTRATE JUDGE ZACHARY C BOLITHO:Motion Hearing held on 7/8/2022 re 57 MOTION for Protective Order *for certain topics listed in plaintiff's 30(b)(6) deposition notice* filed by DEPARTMENT OF HOMELAND SECURITY and [59 State of Florida's Response in Opposition. (Court Reporter DCR.) (kli) (Entered: 07/08/2022) |
| 07/08/2022 | 62 | STATUS REPORT *Parties' Joint Notice Regarding Defendants' Motion for Protective Order* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 07/08/2022) |
| 07/11/2022 | 63 | ORDER entered 60 Motion to Compel. Plaintiff requests an order directing Defendant the Department of Homeland Security (DHS) to file any response to the Motion to Compel within seven days. Plaintiff indicates that DHS consents to filing its opposition within that time frame. (See Doc. 60 at 2, 10). Accordingly, DHS's response to Plaintiffs Motion to Compel is due on or before July 15, 2022. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/11/2022. (hmw) (Entered: 07/11/2022) |
| 07/11/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 62 JOINT NOTICE REGARDING DEFENDANTS' MOTION FOR A PROTECTIVE ORDER WITH RESPECT TO TOPICS 3, 9, 14, AND 15 LISTED IN PLAINTIFF'S NOTICE OF 30(b)(6) DEPOSITION. (jfj) (Entered: 07/11/2022) |
| 07/11/2022 | | Set Deadlines re: 60 Motion to Compel. (Internal deadline for referral to judge if response not filed earlier: **7/15/2022**). (jfj) (Entered: 07/11/2022) |
| 07/12/2022 | 64 | ORDER. Defendants' Motion for Protective Order (Doc. 57 ) is: GRANTED with respect to Topic 3; DENIED with respect to Topic 9; DENIED with respect to Topic 14; GRANTED with respect to Topic 15. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 07/12/22. (jfj) (Entered: 07/12/2022) |
| 07/12/2022 | 65 | NOTICE of Appearance by BILAL AHMED FARUQUI on behalf of STATE OF FLORIDA (FARUQUI, BILAL) (Entered: 07/12/2022) |
| 07/13/2022 | 66 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/13/2022) |
| 07/15/2022 | 67 | RESPONSE in Opposition re 60 MOTION to Compel *Production of Documents* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US |

| | | |
|---|---|---|
| | | CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J) (RYAN, ERIN) (Entered: 07/15/2022) |
| 07/18/2022 | 68 | ORDER. The Court ORDERS counsel to confer telephonically or in person regarding the issues raised in the 60 Motion to Compel. That conference shall occur on or before July 20, 2022. During that conference, the Court expects counsel to endeavor in good faith to resolve any remaining issues raised in the Motion to Compel. By 5:00 p.m. on July 20, 2022, counsel should file a joint notice advising the Court of the status of the issues raised in the Motion to Compel. The notice should include the date that the in person or telephonic conference occurred, as well as the duration of the conference. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 07/18/22. (Joint Notice due by **7/20/2022 5:00 pm.**) (jfj) (Entered: 07/18/2022) |
| 07/20/2022 | 69 | STATUS REPORT *Joint Status Report Regarding Plaintiff's Motion to Compel* by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/20/2022) |
| 07/20/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 69 JOINT STATUS REPORT REGARDING PLAINTIFF'S MOTION TO COMPEL. (jfj) (Entered: 07/20/2022) |
| 07/20/2022 | 70 | MOTION re 49 Order,,,, Set Deadlines/Hearings,,, by STATE OF FLORIDA. (Attachments: # 1 Exhibit 1. Barker Deposition, # 2 Exhibit 2. July 18 Memo) (PERCIVAL, JAMES) (Entered: 07/20/2022) |
| 07/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 70 FLORIDA'S UNOPPOSED MOTION TO EXTEND DEADLINE TO AMEND PLEADINGS AND ALL REMAINING DEADLINES AND FOR A NEW TRIAL DATE. (jfj) (Entered: 07/21/2022) |
| 07/21/2022 | 71 | ORDER EXTENDING DEADLINES AND RESCHEDULING TRIAL. Upon due consideration of Plaintiff's unopposed motion to extend deadlines and for a new trial date (Doc. 70 ), it is ORDERED that the motion is GRANTED, and: The deadline for amending the pleadings is extended to August 12, 2022. The discovery deadline is extended to September 12, 2022, and all deadlines in the scheduling order (Doc. 39 ) tied to the discovery deadline are extended likewise. The Court has blocked January 9–11, 2023, on its calendar for a potential bench trial, and counsel shall do so as well. (SEE FULL ORDER.) Signed by JUDGE T KENT WETHERELL II on 07/21/22. (Discovery due by **9/12/2022**. Dispositive Motions to be filed by **10/3/2022**.) (jfj) (Entered: 07/21/2022) |
| 07/21/2022 | 72 | ORDER denying 60 Motion to Compel. Pursuant to the Joint Status Report Regarding Plaintiff's Motion to Compel (Doc. 69), the parties have resolved the issues raised in the motion. In light of this, the Court denies Plaintiff's Motion to Compel (Doc. 60) as moot. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 7/21/2022. (hmw) (Entered: 07/21/2022) |
| 07/21/2022 | 73 | RULE 26 Disclosures by STATE OF FLORIDA. (PATEL, ANITA) (Entered: 07/21/2022) |
| 08/12/2022 | 74 | SECOND AMENDED COMPLAINT *by written consent* against DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT, filed by STATE OF FLORIDA. (Attachments: # 1 Redline) (CHRISTMAS, NATALIE) (Entered: 08/12/2022) |
| 08/15/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 74 Second Amended Complaint. (jfj) (Entered: 08/15/2022) |

| | | |
|---|---|---|
| 08/19/2022 | 75 | MOTION to Quash , MOTION for Protective Order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (RYAN, ERIN) (Entered: 08/19/2022) |
| 08/22/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 75 MOTION to Quash MOTION for Protective Order. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 08/22/2022) |
| 08/22/2022 | 76 | NOTICE OF HEARING. Telephonic Status Conference set for **8/31/2022 at 03:00 PM** in U.S. Courthouse Pensacola before MAGISTRATE JUDGE ZACHARY C BOLITHO. <br><br>*NOTE: If you have questions in advance of the hearing, feel free to contact me at (850) 470−8141 or via email Sylvia_Williams@flnd.uscourts.gov.* <br><br>*/s/ Sylvia Williams* <br>Courtroom Deputy Clerk (sdw) (Entered: 08/22/2022) |
| 08/22/2022 | 77 | MEMORANDUM Conference Call Instructions. (sdw) (Entered: 08/22/2022) |
| 08/22/2022 | | Set Deadlines re 75 Motion to Quash: (Response due **8/26/2022**. Reply due by **8/30/2022**.) (jfj) (Entered: 08/22/2022) |
| 08/26/2022 | 78 | RESPONSE in Opposition re 75 MOTION to Quash MOTION for Protective Order filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit A. DHS Leadership Webpage, # 2 Exhibit B. Barker 30b6 Transcript Vol. II, # 3 Exhibit C. Ortiz Individual Transcript, # 4 Exhibit D. Guadian 30b6 Transcript, # 5 Exhibit E. Barker Individual Transcript, # 6 Exhibit F. Barker Email Exchange) (PERCIVAL, JAMES) (Entered: 08/26/2022) |
| 08/26/2022 | 79 | ANSWER to 74 Amended Complaint, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 08/26/2022) |
| 08/30/2022 | 80 | REPLY to Response to Motion re 75 MOTION to Quash MOTION for Protective Order filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit F, # 2 Exhibit G) (RYAN, ERIN) (Entered: 08/30/2022) |
| 08/30/2022 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 75 MOTION to Quash MOTION for Protective Order, 78 Response in Opposition to Motion, 80 Reply to Response to Motion. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 08/30/2022) |
| 08/31/2022 | 81 | Minute Entry for proceedings held before MAGISTRATE JUDGE ZACHARY C BOLITHO: Telephonic Motion Hearing held on 8/31/2022 re 75 MOTION to Quash MOTION for Protective Order . Order to be entered. (Court Reporter CD.) (sdw) (Entered: 08/31/2022) |
| 09/02/2022 | 82 | ORDER granting in part and denying in part 75 Motion to Quash, Motion for Protective Order. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 9/2/2022. (hmw) (Entered: 09/02/2022) |
| 09/15/2022 | 83 | NOTICE OF TELEPHONIC HEARING. Telephonic Status Conference set for **9/21/2022 03:00 PM CT** before JUDGE T KENT WETHERELL II. All parties are directed to call the AT&T Conference Line. (SEE FULL NOTICE.) (jfj) (Entered: 09/15/2022) |

| 09/21/2022 | 84 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephonic Status Conference held on 9/21/2022. Defense request to increase word limit to 11,000 words on Summary Judgment – Granted. Parties to file exhibits in hard copy with Response (Court Reporter Julie Wycoff). (pmc) (Entered: 09/21/2022) |
|---|---|---|
| 10/03/2022 | 85 | NOTICE *of Filing Summary Judgment Exhibits* by STATE OF FLORIDA (Attachments: # 1 Exhibit Kynoch Declaration, # 2 Exhibit Stanford Declaration, # 3 Exhibit Lloyd Declaration, # 4 Exhibit Oliva Declaration, # 5 Exhibit Bottcher Declaration, # 6 Exhibit Heckman Declaration, # 7 Exhibit CBP FY 2021 Statistics, # 8 Exhibit CBP FY 2022 Statistics, # 9 Exhibit Letter to Governor DeSantis, # 10 Exhibit ICE Data, # 11 Exhibit Defs' Response to Plf's Interrogatories, # 12 Exhibit Email re Prosecutorial Discretion, # 13 Exhibit Price Deposition, # 14 Exhibit Barker Deposition, # 15 Exhibit Guadian Deposition) (CHRISTMAS, NATALIE) (Entered: 10/03/2022) |
| 10/03/2022 | 86 | MOTION for Partial Summary Judgment by STATE OF FLORIDA. (Internal deadline for referral to judge if response to summary judgment not filed earlier: **10/24/2022**). (CHRISTMAS, NATALIE) (Entered: 10/03/2022) |
| 10/03/2022 | 87 | NOTICE *of Filing of Defendants' Summary Judgment Exhibits* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21) (RYAN, ERIN) (Entered: 10/03/2022) |
| 10/03/2022 | 88 | MOTION for Summary Judgment *As To All Claims* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Internal deadline for referral to judge if response to summary judgment not filed earlier: **10/24/2022**). (Attachments: # 1 Supplement Memorandum of Law in Support of Motion for Summary Judgment, # 2 Text of Proposed Order) (DARROW, JOSEPH) (Entered: 10/03/2022) |
| 10/06/2022 | 89 | MOTION *to reopen discovery for limited purposes* by STATE OF FLORIDA. (Attachments: # 1 Exhibit Scott Memo, # 2 Exhibit Discovery Response, # 3 Exhibit Discovery Email) (PERCIVAL, JAMES) (Entered: 10/06/2022) |
| 10/06/2022 |  | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 89 MOTION to reopen discovery for limited purposes. (Motion contains request for an order expediting response time.) (jfj) (Entered: 10/06/2022) |
| 10/06/2022 | 90 | NOTICE *of Intent to Oppose Motion to Reopen Discovery and Request for Expedited Response* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT re 89 MOTION *to reopen discovery for limited purposes* (DARROW, JOSEPH) (Entered: 10/06/2022) |
| 10/06/2022 |  | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 90 NOTICE OF INTENT TO OPPOSE MOTION TO REOPEN DISCOVERY FOR LIMITED PURPOSES. (jfj) (Entered: 10/06/2022) |
| 10/17/2022 | 91 | NOTICE of Appearance by JOSEPH EDWARD HART on behalf of STATE OF FLORIDA (HART, JOSEPH) (Entered: 10/17/2022) |
| 10/20/2022 | 92 | RESPONSE in Opposition re 89 MOTION *to reopen discovery for limited purposes* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER |

| | | |
|---|---|---|
| | | PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (DARROW, JOSEPH) (Entered: 10/20/2022) |
| 10/20/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 89 MOTION to reopen discovery for limited purposes, 92 DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN DISCOVERY. (jfj) (Entered: 10/20/2022) |
| 10/20/2022 | 93 | AMENDED DOCUMENT by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. Amendment to 92 Response in Opposition to Motion, *Defendants' Corrected Response in Opposition to Plaintiff's Motion to Reopen Discovery for Limited Purposes*. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (DARROW, JOSEPH) (Entered: 10/20/2022) |
| 10/21/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 93 Amended DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN DISCOVERY. (jfj) (Entered: 10/21/2022) |
| 10/21/2022 | 94 | ORDER DENYING MOTION TO REOPEN DISCOVERY. This case is before the Court based on Plaintiff's motion to reopen discovery (Doc. 89 ) and Defendants' amended response in opposition (Doc. 93 ). Upon due consideration of these filings, their attachments, and the entire case file, the Court finds no good cause to reopen discovery. Accordingly, it is ORDERED that Plaintiff's motion to reopen discovery is DENIED. Signed by JUDGE T KENT WETHERELL II on 10/21/22. (jfj) (Entered: 10/21/2022) |
| 10/24/2022 | 95 | NOTICE *of Filing Exhibits in Opposition to Summary Judgment* by STATE OF FLORIDA re 88 MOTION for Summary Judgment *As To All Claims* (Attachments: # 1 Exhibit Custody and Transfer Statistics FY2020, # 2 Exhibit Biden Campaign Immigration Plan, # 3 Exhibit Flores July 2022 ICE JC Annual Report, # 4 Exhibit May 5 2021 Email re FMUAs, # 5 Exhibit August 2022 Operational Update, # 6 Exhibit FY 2021 DHS Budget in Brief, # 7 Exhibit FY 2023 ICE Budget Justification, # 8 Exhibit Webpage for FY 2023 Budget Justifications, # 9 Exhibit FY 2022 ICE Budget Justification, # 10 Exhibit Border Report, # 11 Exhibit Operation Horizon Phase One Plan, # 12 Exhibit Operation Horizon Phase Two Plan, # 13 Exhibit CBP Processing Pathways, # 14 Exhibit August 1 2022 Email from Joseph Darrow, # 15 Exhibit February 2021 Email re FRC Changes, # 16 Exhibit GAO Report, # 17 Exhibit Barker Depo 1 Excerpts, # 18 Exhibit Barker Depo 2 Excerpts, # 19 Exhibit Guadian Depo Excerpts, # 20 Exhibit Ortiz Depo Excerpts, # 21 Exhibit Price Depo Excerpts, # 22 Exhibit ICE Training Video 1, # 23 Exhibit ICE Training Video 2, # 24 Exhibit Custody and Transfer Statistics FY2022 (Updated)) (PERCIVAL, JAMES) (Entered: 10/24/2022) |
| 10/24/2022 | 96 | NOTICE *of Filing of Exhibits in Support of Defendants' Opposition to Plaintiff's Partial Motion for Summary Judgment* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1 – Excerpts of Individual Deposition of Corey Price) (DARROW, JOSEPH) (Entered: 10/24/2022) |
| 10/24/2022 | 97 | RESPONSE in Opposition re 86 MOTION for Partial Summary Judgment filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 10/24/2022) |
| 10/24/2022 | 98 | RESPONSE in Opposition re 88 MOTION for Summary Judgment *As To All Claims* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 10/24/2022) |

| 10/25/2022 | | Set Deadline re: 97 DEFENDANTS' OPPOSITION TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT. Reply due by **10/31/2022**. (jfj) (Entered: 10/25/2022) |
|---|---|---|
| 10/25/2022 | | Set Deadline re: 98 FLORIDA'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (Reply due by **10/31/2022**.) (jfj) (Entered: 10/25/2022) |
| 10/25/2022 | 99 | DOCKET ANNOTATION BY COURT: Re 95 NOTICE of Filing Exhibits in Opposition to Summary Judgment by STATE OF FLORIDA. (CD containing Exhibits 22 & 23 received on 10/25/22 and are located in file in Clerk's Office.) (jfj) Modified on 11/2/2022. CD provided to Chambers. (jfj). Modified on 1/19/2023. CD returned to Clerk's Office. (jfj). (Entered: 10/26/2022) |
| 10/27/2022 | 100 | MOTION for Leave to File Excess Pages *requesting 400 extra words for Defendants' summary judgment reply brief* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 10/27/2022) |
| 10/27/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 100 MOTION for Leave to File Excess Pages *requesting 400 extra words for Defendants' summary judgment reply brief*. (jfj) (Entered: 10/27/2022) |
| 10/28/2022 | 101 | MOTION to File Amicus Brief *in opposition to Defendants' motion for summary judgment* by Immigration Reform Law Institute. (Internal deadline for referral to judge if response not filed earlier: **11/14/2022**). (Attachments: # 1 Brief of amicus curiae Immigration Reform Law Institute in opposition to Defendants motion for summary judgment) (CRAPO, MATT) (Entered: 10/28/2022) |
| 10/28/2022 | 102 | ORDER EXPANDING WORD LIMIT. Upon due consideration of Defendants' motion for enlargement of the word limit for reply (Doc. 100 ), it is ORDERED that the motion is GRANTED, and Defendants may file a reply of up to 3,600 words. Signed by JUDGE T KENT WETHERELL II on 10/28/22. (jfj) (Entered: 10/28/2022) |
| 10/28/2022 | 103 | DOCKET ANNOTATION BY COURT: Binder containing documents 85 & 86 received and Binder containing documents 95 & 98 received. Both binders will be provided to Chambers. (jfj) (Entered: 10/28/2022) |
| 10/28/2022 | 104 | ORDER ACCEPTING AMICUS BRIEF. The motion for leave to file an amicus brief (Doc. 101 ) is GRANTED, and the Immigration Reform Law Institute's amicus brief (Doc. 101−1) is accepted. The parties may address the arguments raised in the amicus brief in their replies by the deadline established in the existing briefing schedule. Signed by JUDGE T KENT WETHERELL II on 10/28/22. (jfj) (Entered: 10/28/2022) |
| 10/31/2022 | 105 | REPLY to Response to Motion re 86 MOTION for Partial Summary Judgment filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit August 23, 2022 Email) (PERCIVAL, JAMES) (Entered: 10/31/2022) |
| 10/31/2022 | 106 | NOTICE *of Filing of Exhibits in Support of Defendants' Reply in Support of their Motion for Summary Judgment* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit 1 – Excerpt of Rule 30(b)(6) Deposition of Tony Barker, # 2 Exhibit 2 – ICE Detention Statistics) (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 10/31/2022 | 107 | REPLY to Response to Motion re 88 MOTION for Summary Judgment *As To All Claims* filed by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 10/31/2022 | 108 | NOTICE *of Filing of Acronym Chart for Administrative Record* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO |

A0683

| | | |
|---|---|---|
| | | MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (DARROW, JOSEPH) (Entered: 10/31/2022) |
| 11/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 86 MOTION for Partial Summary Judgment, 97 Response in Opposition to Motion, 105 Reply to Response to Motion. (jfj) (Entered: 11/01/2022) |
| 11/01/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 88 MOTION for Summary Judgment *As To All Claims*, 98 Response in Opposition to Motion, 107 Reply to Response to Motion. (jfj) (Entered: 11/01/2022) |
| 11/02/2022 | 109 | DOCKET ANNOTATION BY COURT: Spiral bound copies of documents 87 , 88 , 96 , 97 , and 106 received and have been provided to Chambers. (Entered: 11/02/2022) |
| 11/08/2022 | 110 | ORDER. It is ORDERED that within 7 days from the date of this Order, the parties shall confer and advise the Court of multiple mutually agreeable dates and times between November 28 and December 16, 2022, for an in–person oral argument on the summary judgment motions. The Court anticipates reserving 3 hours for the argument and the potential pretrial conference, unless the parties believe that additional time is needed. Signed by JUDGE T KENT WETHERELL II on 11/08/22. (Parties to advise Court by **11/15/2022**.) (jfj) (Entered: 11/08/2022) |
| 11/15/2022 | 111 | NOTICE *of Compliance* by STATE OF FLORIDA re 110 Order,,, Set Deadlines/Hearings,, (PERCIVAL, JAMES) (Entered: 11/15/2022) |
| 11/15/2022 | 112 | MOTION alternative pretrial scheduling order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 11/15/2022) |
| 11/15/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 111 JOINT NOTICE OF COMPLIANCE WITH THE COURT'S NOVEMBER 8 ORDER. (jfj) (Entered: 11/15/2022) |
| 11/15/2022 | 113 | RESPONSE in Opposition re 112 MOTION alternative pretrial scheduling order filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 11/15/2022) |
| 11/15/2022 | 114 | NOTICE OF TELEPHONIC HEARING set for **11/18/2022 at 2:00 PM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II (see Notice for Instructions). (pmc) (Entered: 11/15/2022) |
| 11/16/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 112 MOTION alternative pretrial scheduling order, 113 Response in Opposition to Motion. (jfj) (Entered: 11/16/2022) |
| 11/17/2022 | 115 | MOTION to Supplement the Summary Judgment Record by STATE OF FLORIDA. (Attachments: # 1 Exhibit March 19 Memo, # 2 Exhibit Lankford Letter) (CHRISTMAS, NATALIE) (Entered: 11/17/2022) |
| 11/17/2022 | | Set Deadlines/Hearings re 115 Florida's Motion to Supplement the Summary Judgment Record. (Internal deadline for referral to judge if response not filed earlier: **12/1/2022**). (alb) (Entered: 11/18/2022) |
| 11/18/2022 | 116 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephone Conference held on 11/18/2022. Court grants 115 Motion to Supplement and will accept the memo at doc 115–1 to substitute the 3/20/2021 email on Summary Judgment. Court will enter an order summarizing the rulings denying both 86 , 88 Motions for Summary Judgment. Court denies 112 Motion, Pre–trial conference set for 12/16/2022 at 9am. (3 hours reserved). Bench trial scheduled for 1/9/2023 (4 days); (Court Reporter Julie Wycoff). (Modified, Document 116 replaced on 11/18/2022) (pmc). (Entered: 11/18/2022) |

| 11/18/2022 | 117 | ORDER RULING ON PENDING MOTIONS AND ESTABLISHING PRETRIAL CONFERENCE DATE. Plaintiff's motion to supplement the summary judgment record (Doc. 115 ) is GRANTED, and the memorandum attached to the motion (Doc. 115–1) is included in the summary judgment record with the limitation described above. Defendants' motion for alternative pretrial scheduling order (Doc. 112 ) is DENIED. Plaintiff's motion for partial summary judgment (Doc. 86 ) is DENIED. Defendants' motion for summary judgment is (Doc. 88 ) is DENIED. An in–person pretrial conference is scheduled for December 16, 2022 at 9:00 a.m. (central time) in Pensacola. Signed by JUDGE T KENT WETHERELL II on 11/18/22. (Pretrial Conference set for **12/16/2022 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II.) (jfj) (Entered: 11/21/2022) |
|---|---|---|
| 11/18/2022 | 118 | ORDER SCHEDULING TRIAL AND PRETRIAL CONFERENCE AND ESTABLISHING PRETRIAL DEADLINES AND PROCEDURES: Bench Trial set for **1/9/2023 at 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. Pretrial Conference set for **12/16/2022 at 09:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. Attorney Conference to take place by **11/25/2022**. Pretrial Stipulation due by **12/9/2022**. Motions in limine and other pretrial motions due by **12/2/2022**. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 11/18/22. (jfj) (Entered: 11/21/2022) |
| 11/29/2022 | 119 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, TELEPHONIC STATUS CONFERENCE, held on 11/18/22, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **12/6/2022**. Release of Transcript Restriction set for **3/6/2023**. (jaw) (Entered: 11/29/2022) |
| 12/02/2022 | 120 | MOTION in Limine *Defendants' Omnibus Motions in Limine* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A – Nov. 18, 2022 Hearing Transcript) (DARROW, JOSEPH) (Entered: 12/02/2022) |
| 12/05/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 120 MOTION in Limine *Defendants' Omnibus Motions in Limine* (jfj) (Entered: 12/05/2022) |
| 12/07/2022 | 121 | NOTICE of Appearance by ELISSA FUDIM on behalf of DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (FUDIM, ELISSA) (Entered: 12/07/2022) |
| 12/09/2022 | 122 | PRETRIAL Stipulation by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/09/2022) |
| 12/09/2022 | 123 | RESPONSE in Opposition re 120 MOTION in Limine *Defendants' Omnibus Motions in Limine* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/09/2022) |
| 12/11/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 122 Pretrial Memorandum, 120 MOTION in Limine *Defendants' Omnibus Motions in Limine*, 123 Response in Opposition to Motion. (jfj) (Entered: 12/11/2022) |
| 12/12/2022 | 124 | ORDER. Any objections to Rule 26(a)(3) designations shall be filed before the pretrial conference or they may be deemed waived. Signed by JUDGE T KENT |

| | | |
|---|---|---|
| | | WETHERELL II on 12/12/2022. (alb) (Entered: 12/12/2022) |
| 12/13/2022 | 125 | NOTICE *of Deposition Designations* by STATE OF FLORIDA (Attachments: # 1 Exhibit Price Depo, # 2 Exhibit Ortiz Depo, # 3 Exhibit Barker Depo, # 4 Exhibit Guadian Depo, # 5 Exhibit Davies Depo) (HART, JOSEPH) (Entered: 12/13/2022) |
| 12/13/2022 | 126 | NOTICE *of Deposition Designations at Trial* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit A – Barker July 13, 2022 Depo, # 2 Exhibit B – Barker Aug 25, 2022 Depo) (RYAN, ERIN) (Entered: 12/13/2022) |
| 12/15/2022 | 127 | NOTICE *of Filing Objections and Counter Designations* by STATE OF FLORIDA re 126 Notice (Other), (Attachments: # 1 Exhibit Barker July Deposition Counter Designations, # 2 Exhibit Barker August Deposition Counter Designations) (PERCIVAL, JAMES) (Entered: 12/15/2022) |
| 12/15/2022 | 128 | NOTICE *of Objections and Counter Designations* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT re 125 Notice (Other) (Attachments: # 1 Barker designation excerpts, # 2 Davies designation excerpts, # 3 Guadian designation excerpts, # 4 Ortiz designation excerpts, # 5 Price designation excerpts) (RYAN, ERIN) (Entered: 12/15/2022) |
| 12/16/2022 | 129 | Consent MOTION to Withdraw as Attorney by STATE OF FLORIDA. (FARUQUI, BILAL) (Entered: 12/16/2022) |
| 12/16/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 129 Consent MOTION to Withdraw as Attorney (jcw) (Entered: 12/16/2022) |
| 12/16/2022 | 131 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Final Pretrial Conference held on 12/16/2022. Bench Trial remains scheduled for 1/9/2023 at 9:00 AM. See Final Pretrial Order entered (Court Reporter Julie Wycoff). (pmc) (Entered: 12/20/2022) |
| 12/19/2022 | 130 | FINAL PRETRIAL ORDER re granting 129 Motion to Withdraw as Attorney; granting in part and denying in part 120 Motion in Limine. The bench trial will begin at 9:00 a.m. on Monday, **1/9/2023**, as previously ordered. [See Order] Signed by JUDGE T KENT WETHERELL II on 12/19/2022. (jcw) (Entered: 12/19/2022) |
| 12/22/2022 | 132 | Consent MOTION for Protective Order by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order Proposed Stipulated Protective Order) (DARROW, JOSEPH) (Entered: 12/22/2022) |
| 12/22/2022 | 133 | STIPULATED PROTECTIVE ORDER RE: 132 UNOPPOSED MOTION FOR PROTECTIVE ORDER. This protective order is entered into between the Parties in this litigation to facilitate the Court–ordered disclosure of the address and telephone number of non–party Tony Barker (Mr. Barker's Contact Information) by Defendants to Plaintiff. See ECF No. 130 . (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 12/22/22. (jfj) (Entered: 12/22/2022) |
| 12/27/2022 | 134 | Consent MOTION for Clarification re 130 Pretrial Order, by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 12/27/2022) |
| 12/28/2022 | 135 | ORDER OF CLARIFICATION re 134 Consent MOTION for Clarification. Accordingly, it is ORDERED that Plaintiff's motion for clarification is GRANTED, and the final pretrial order is clarified as reflected above. Signed by JUDGE T KENT WETHERELL II on 12/28/2022. (jcw) (Entered: 12/28/2022) |

| | | |
|---|---|---|
| 01/02/2023 | 136 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, PRETRIAL HEARING, held on 12/16/22, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850.549.5886 julieawycoff@gmail.com.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **1/9/2023**. Release of Transcript Restriction set for **4/10/2023**. (jaw) (Entered: 01/02/2023) |
| 01/03/2023 | 137 | MOTION re 122 Pretrial Memorandum *motion to amend Defendants' witness list* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) Modified/Terminated on 1/9/2023. Order 141 granting motion filed 01/05/23. (jfj). (Entered: 01/03/2023) |
| 01/04/2023 | 138 | MOTION to Amend Exhibit List re 122 Pretrial Memorandum by STATE OF FLORIDA. (Attachments: # 1 Exhibit January 28 email, # 2 Exhibit Florida's FOIA request) (PERCIVAL, JAMES) (Entered: 01/04/2023) |
| 01/04/2023 | 139 | RESPONSE in Opposition re 137 MOTION re 122 Pretrial Memorandum *motion to amend Defendants' witness list* filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit Emails between counsel, # 2 Exhibit Emails between counsel) (PERCIVAL, JAMES) (Entered: 01/04/2023) |
| 01/04/2023 | 140 | NOTICE OF TELEPHONIC HEARING. TAKE NOTICE that a telephonic hearing in this case has been set before Judge T. Kent Wetherell as described below: DATE: Thursday, January 5, 2023, TIME: 10:00 A.M. C.T. (SEE FULL NOTICE) Signed by JUDGE T KENT WETHERELL II on 01/04/23. (Telephonic hearing set for **1/5/2023 10:00 AM** before JUDGE T KENT WETHERELL II.) (jfj) (Entered: 01/04/2023) |
| 01/04/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 138 FLORIDA'S MOTION TO SUPPLEMENT ITS EXHIBIT LIST, 137 DEFENDANTS' MOTION TO AMEND THEIR TRIAL WITNESS LIST, 139 Response in Opposition to Motion. (jfj) (Entered: 01/04/2023) |
| 01/05/2023 | 141 | ORDER. Defendants' 138 motion to amend witness list is GRANTED. (Please see order.) Signed by JUDGE T KENT WETHERELL II on 01/05/2023. (alb) (Entered: 01/05/2023) |
| 01/05/2023 | 142 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Telephonic Hearing held on 1/5/2023, 138 Motion to Amend Exhibit list – Granted, 137 Motion to Amend Witness list – Granted. Order to be entered (Court Reporter Julie Wycoff). (pmc) (Entered: 01/05/2023) |
| 01/08/2023 | 143 | NOTICE *of Supplemental Deposition Designations, Objections, and Stipulations* by STATE OF FLORIDA (Attachments: # 1 Bottcher Excerpts, # 2 Heckman Excerpts) (PERCIVAL, JAMES) (Entered: 01/08/2023) |
| 01/09/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 143 JOINT NOTICE OF SUPPLEMENTAL DEPOSITION DESIGNATIONS, OBJECTIONS, AND STIPULATIONS. (jfj) (Entered: 01/09/2023) |
| 01/09/2023 | 144 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 1) 1/9/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/10/2023) |
| 01/10/2023 | 145 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 2) 1/10/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/11/2023) |

| | | |
|---|---|---|
| 01/11/2023 | 146 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 3) 1/11/2023, evidence entered. Trial continues (Court Reporter Julie Wycoff). (pmc) (Entered: 01/12/2023) |
| 01/12/2023 | 147 | Minute Entry for proceedings held before JUDGE T KENT WETHERELL II: Bench Trial (Day 4) 1/12/2023, evidence entered (2 boxes Exhibits). Trial concluded, Counsel to file briefs by 2/9/2023. Order to be entered on findings (Court Reporter Julie Wycoff). Attachment: # 1 Exhibit Lists. (pmc) (Entered: 01/17/2023) |
| 01/20/2023 | 148 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL – DAY 1, held on 1/9/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/20/2023 | 149 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL – DAY 2, held on 1/10/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/20/2023 | 150 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL – DAY 3, held on 1/11/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> Redaction Request due **1/27/2023**. Release of Transcript Restriction set for **4/27/2023**. (jaw) (Entered: 01/20/2023) |
| 01/24/2023 | 151 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, BENCH TRIAL – DAY 4, held on 1/12/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com. <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> Redaction Request due **1/31/2023**. Release of Transcript Restriction set for **5/1/2023**. (jaw) (Entered: 01/24/2023) |

A0688

| 01/27/2023 | 152 | Consent MOTION for Extension of Time to File *the parties' post–trial briefs* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (RYAN, ERIN) (Entered: 01/27/2023) |
|---|---|---|
| 01/27/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 152 Consent MOTION for Extension of Time to File the parties' post–trial briefs. (jfj) (Entered: 01/27/2023) |
| 01/30/2023 | 153 | ORDER GRANTING EXTENSION OF TIME. Upon due consideration of Defendants' consent motion for extension of time (Doc. 152 ), it is ORDERED that the motion is GRANTED, and the parties shall have until February 16, 2023, to file their proposed findings of fact and conclusions of law. Signed by JUDGE T KENT WETHERELL II on 01/30/23. (Proposed Findings of Fact and Conclusions of Law due by **2/16/2023**.) (jfj) (Entered: 01/30/2023) |
| 02/14/2023 | 154 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, TELEPHONIC HEARING, held on 1/5/23, before Judge T. Kent Wetherell, II. Court Reporter/Transcriber Julie A. Wycoff, Telephone number 850/549–5886; julieawycoff@gmail.com.<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>Redaction Request due **2/21/2023**. Release of Transcript Restriction set for **5/22/2023**. (jaw) (Entered: 02/14/2023) |
| 02/16/2023 | 155 | Proposed Findings of Fact by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 02/16/2023) |
| 02/16/2023 | 156 | Proposed Findings of Fact by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A – Complaint in Smith v. Meese) (DARROW, JOSEPH) (Entered: 02/16/2023) |
| 02/17/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 155 Proposed Findings of Fact, 156 Proposed Findings of Fact. (jfj) (Entered: 02/17/2023) |
| 03/08/2023 | 157 | OPINION AND ORDER. The deferred portion of Defendants' motion for summary judgment (Doc. 88 ) is DENIED. The Parole+ATD Policy is VACATED under the APA, and that policy is REMANDED to DHS for further proceedings consistent with this Opinion and Order. The Clerk shall enter a final judgment. The Judgment is STAYED for 7 days from this date to allow Defendants to seek appellate review. The Clerk shall close the case file.(SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 03/08/23. (jfj) (Entered: 03/08/2023) |
| 03/08/2023 | 158 | CLERK'S JUDGMENT re 157 Order. Pursuant to and at the direction of the Court, Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion and Order entered on this date. Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice. (90 Day Exhibit Return Deadline set for **6/6/2023**) (jfj) (Entered: 03/08/2023) |
| 05/05/2023 | 159 | NOTICE OF APPEAL as to 158 Clerk's Judgment,, 157 Order,, by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. ( (DARROW, JOSEPH) |

| | | |
|---|---|---|
| | | (Entered: 05/05/2023) |
| 05/09/2023 | 160 | Appeal Instructions re: 159 Notice of Appeal: The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh−circuit−transcript−information−form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **5/23/2023**. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | 161 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 159 Notice of Appeal. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | | Set Deadlines re 159 Notice of Appeal: Clerk to check status of Appeal on **8/3/2023**. Certificate of Readiness (FRAP 11) due by **5/23/2023**. (jfj) (Entered: 05/09/2023) |
| 05/09/2023 | 162 | USCA PROCEDURAL LETTER re: 159 NOTICE OF APPEAL as to 158 Clerk's Judgment, 157 Order. USCA Appeal # 23−11528−C. (jfj) (Entered: 05/12/2023) |
| 05/12/2023 | 163 | Emergency MOTION to Stay re 158 Clerk's Judgment,, 157 Order,, *and Temporary Restraining Order in No. 23−9962 Pending Appeal* by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Exhibit A − May 12, 2023 Declaration of Matthew Hudak, # 2 Exhibit B − May 12, 2023 Declaration of Daniel Bible, # 3 Proposed Order) (DARROW, JOSEPH) (Entered: 05/12/2023) |
| 05/13/2023 | 164 | RESPONSE to Motion re 163 Emergency MOTION to Stay re 158 Clerk's Judgment,, 157 Order,, *and Temporary Restraining Order in No. 23−9962 Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/13/2023) |
| 05/13/2023 | 165 | ORDER DENYING STAY. ORDERED that Defendants' emergency motion to stay (Doc. 163 ) is DENIED. Signed by JUDGE T KENT WETHERELL II on 5/13/2023. (pmc) (Entered: 05/13/2023) |
| 05/16/2023 | 166 | NOTICE OF CROSS APPEAL by STATE OF FLORIDA. Filing fee $ 505, receipt number AFLNDC−7872142. (CHRISTMAS, NATALIE) (Entered: 05/16/2023) |
| 05/17/2023 | 167 | Appeal Instructions re: 166 Notice of Cross Appeal: The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh−circuit−transcript−information−form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **5/30/2023**. (jfj) (Entered: 05/17/2023) |
| 05/17/2023 | 168 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 166 Notice of Cross Appeal. (jfj) (Entered: 05/17/2023) |
| 05/17/2023 | | Set Deadlines re 166 Notice of Cross Appeal: Clerk to check status of Appeal on **8/14/2023**. Certificate of Readiness (FRAP 11) due by **5/31/2023**. (jfj) (Entered: 05/17/2023) |
| 05/18/2023 | 170 | USCA PROCEDURAL LETTER re: 166 NOTICE OF CROSS APPEAL by STATE OF FLORIDA. USCA Appeal # 23−11528−C. (jfj) (Entered: 05/22/2023) |
| 05/19/2023 | 169 | TRANSCRIPT REQUEST by DEPARTMENT OF HOMELAND SECURITY, UR M JADDOU, TAE D JOHNSON, ALEJANDRO MAYORKAS, TROY MILLER, UNITED STATES, US CITIZENSHIP AND IMMIGRATION SERVICES, US CUSTOMS AND BORDER PROTECTION, US IMMIGRATION AND CUSTOMS ENFORCEMENT Court Reporter:Julie Wycoff (DARROW, JOSEPH) (Entered: 05/19/2023) |
| 05/20/2023 | 171 | ORDER of USCA as to 166 Notice of Cross Appeal filed by STATE OF FLORIDA. Defendants−Appellees−Cross−Appellees' motions to consolidate and to expedite the appeal are GRANTED. (USCA #23−11528) (jfj) (Entered: 05/22/2023) |

| 05/22/2023 | 172 | TRANSCRIPT REQUEST by STATE OF FLORIDA Court Reporter:Julie Wycoff (WHITAKER, HENRY) (Entered: 05/22/2023) |
|---|---|---|
| 05/23/2023 | 173 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: <u>166</u> Notice of Cross Appeal, <u>159</u> Notice of Appeal. Appeal No. 23–11528–C. The entire record on appeal is available electronically. (jfj) (Entered: 05/23/2023) |

APPEAL

## U.S. District Court
## Northern District of Florida (Pensacola)
## CIVIL DOCKET FOR CASE #: 3:23–cv–09962–TKW–ZCB

STATE OF FLORIDA v. MAYORKAS et al
Assigned to: JUDGE T KENT WETHERELL II
Referred to: MAGISTRATE JUDGE ZACHARY C BOLITHO
Case in other court:  Eleventh Circuit Court of Appeals,
                  23–11644–G
Cause: 05:551 Administrative Procedure Act

Date Filed: 05/10/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
    Administrative Procedures Act/Review or
    Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**STATE OF FLORIDA**

represented by

**ANITA J PATEL**
FLORIDA ATTORNEY GENERALS
OFFICE
COMPLEX LITIGATION
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
850–414–3694
Email: anita.patel@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**DANIEL WILLIAM BELL**
FLORIDA ATTORNEY GENERALS
OFFICE
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
786–473–2923
Email: daniel.bell@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**DARRICK WILLIAM MONSON**
FLORIDA ATTORNEY GENERAL'S
OFFICE
OFFICE OF THE SOLICITOR GENERAL
107 W GAINES STREET
TALLAHASSEE, FL 32399
850–414–3683
Email: darrick.monson@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**HENRY CHARLES WHITAKER**
FLORIDA OFFICE OF THE ATTORNEY
GENERAL
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399–1050
850–414–3688
Email: henry.whitaker@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JOHN MATTHEW GUARD**
FLORIDA ATTORNEY GENERAL'S
OFFICE
EXECUTIVE STAFF
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
850–245–0140
Email: john.guard@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JOSEPH EDWARD HART**
OFFICE OF THE ATTORNEY

GENERAL
EXECUTIVE STAFF
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399–1050
850–245–0160
Email: joseph.hart@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**NATALIE CHRISTMAS**
FLORIDA ATTORNEY GENERALS
OFFICE
PL–01 THE CAPITOL
TALLAHASSEE, FL 32399
850–245–0147
Email: natalie.christmas@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JAMES HAMILTON PERCIVAL , II**
FLORIDA ATTORNEY GENERALS
OFFICE
OFFICE OF THE ATTORNEY
GENERAL
Pl–01
THE CAPITOL
TALLAHASSEE, FL 32399
850–414–3300
Email: james.percival@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ALEJANDRO MAYORKAS**                 represented by    **JOSEPH ANTON DARROW**
DOJ–USAO
CIVIL DIVISION – IMMIGRATION
LITIGATION
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044
202–598–7537
Email: joseph.a.darrow@usdoj.gov
*ATTORNEY TO BE NOTICED*

**SARAH B FABIAN**
DOJ–CIV
OFFICE OF IMMIGRATION
LITIGATION
BEN FRANKLIN STATION
PO BOX 868
WASHINGTON, DC 20044
202–532–4824
Email: sarah.b.fabian@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**RAUL ORTIZ**                         represented by    **JOSEPH ANTON DARROW**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARAH B FABIAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES**                     represented by  **JOSEPH ANTON DARROW**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **SARAH B FABIAN**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/10/2023 | 1 | COMPLAINT *for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, and Declaratory Relief* against All Defendants ( Filing fee $ 402 receipt number AFLNDC−7864201.), filed by State of Florida. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Proposed Summons) (PERCIVAL, JAMES) (Entered: 05/10/2023) |
| 05/10/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 1 COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY RELIEF. (jfj) (Entered: 05/10/2023) |
| 05/11/2023 | 2 | Emergency MOTION for Temporary Restraining Order by State of Florida. (Attachments: # 1 Exhibit Emails with Counsel) (PERCIVAL, JAMES) (Entered: 05/11/2023) |
| 05/11/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 2 Emergency MOTION for Temporary Restraining Order. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 3 | ORDER REQUIRING EXPEDITED RESPONSE. Florida shall email a copy of this Order on the attorneys who represented the defendants in Florida. Defendants shall have until 4:00 p.m. eastern time to respond to Florida's emergency motion for a TRO (Doc. 2 ). The response shall be e−filed through CM/ECF and emailed to flnd_wetherell@flnd.uscourts.gov. Signed by JUDGE T KENT WETHERELL II on 05/11/23. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 4 | Summons Issued as to Alejandro Mayorkas, Raul Ortiz, United States. (Attachments: # 1 Summons, # 2 Summons) (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 5 | NOTICE *of Filing Copy of Challenged Policy* by State of Florida re 2 Emergency MOTION for Temporary Restraining Order (Attachments: # 1 Exhibit The Challenged Policy) (PERCIVAL, JAMES) (Entered: 05/11/2023) |
| 05/11/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 5 Notice. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 6 | NOTICE of Appearance by JOSEPH ANTON DARROW on behalf of All Defendants (DARROW, JOSEPH) (Entered: 05/11/2023) |
| 05/11/2023 | 7 | MOTION for Extension of Time to File Response/Reply as to 3 Order, *Notice of Receiving Complaint and TRO* by Alejandro Mayorkas, Raul Ortiz, United States. (Attachments: # 1 Exhibit A − May 10, 2023 Memorandum) (DARROW, JOSEPH) (Entered: 05/11/2023) |
| 05/11/2023 | 8 | ORDER. Defendants' motion for extension of time (Doc. 7 ) is GRANTED in part, and Defendants shall have until 5:00 p.m. eastern time today to respond to Plaintiff's emergency motion for a TRO. Signed by JUDGE T KENT WETHERELL II on 05/11/23. (jfj) (Entered: 05/11/2023) |
| 05/11/2023 | 9 | RESPONSE in Opposition re 2 Emergency MOTION for Temporary Restraining Order filed by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit A − Policy on Parole With Conditions, # 2 Exhibit B − Matthew Hudak Declaration) (DARROW, JOSEPH) (Entered: 05/11/2023) |

| 05/11/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 9 OPPOSITION TO EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER. (jfj) (Entered: 05/11/2023) |
|---|---|---|
| 05/11/2023 | 10 | TEMPORARY RESTRAINING ORDER re 2 Emergency MOTION for Temporary Restraining Order. ORDERED that: DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)." This TRO will take effect at 11:59 p.m. eastern time to correspond with the expiration of the Title 42 Order and to give Defendants an opportunity to seek an emergency stay from a higher court. This TRO will expire 14 days from the date of this Order. See Fed. R. Civ. P. 65(b)(2). A preliminary injunction hearing is scheduled for May 19, 2023, at 9:00 a.m. in the United States Courthouse, 1 North Palafox Street, Courtroom 4 North, Pensacola, Florida. Signed by JUDGE T KENT WETHERELL II on 5/11/2023. (pmc) (Entered: 05/11/2023) |
| 05/11/2023 | | Set Hearing: Preliminary Injunction Hearing set for **5/19/2023 at 9:00 AM** in U.S. Courthouse Pensacola before JUDGE T KENT WETHERELL II. (pmc) (Entered: 05/11/2023) |
| 05/12/2023 | 11 | MOTION to Compel Production of Administrative Record and for Limited Discovery by STATE OF FLORIDA. (Attachments: # 1 Exhibit Conferral with counsel) (PERCIVAL, JAMES) (Entered: 05/12/2023) |
| 05/12/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 11 MOTION to Compel Production of Administrative Record and for Limited Discovery. (alb) Modified on 5/12/2023 (jfj) Motion now referred to Magistrate Judge. (Entered: 05/12/2023) |
| 05/12/2023 | | ACTION REQUIRED BY MAGISTRATE JUDGE: Chambers of MAGISTRATE JUDGE ZACHARY C BOLITHO notified that action is needed Re: 11 TIME SENSITIVE MOTION FOR LIMITED DISCOVERY AND TO COMPEL PRODUCTION OF THE ADMINISTRATIVE RECORD. Referred to ZACHARY C BOLITHO. (jfj) (Entered: 05/12/2023) |
| 05/12/2023 | 12 | ORDER entered re Florida's 11 Motion to Compel Production of Administrative Record and for Limited Discovery. Defendants shall have until May 15, 2023 at 12:00 p.m. (EST) to respond to Florida's motion. The Court will hold a telephone hearing on Florida's motion on May 15, 2023 at 3:30 p.m. (EST). Call–in instructions will be circulated by the Court the morning of May 15, 2023. Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 5/12/2023. (hmw) (Entered: 05/12/2023) |
| 05/12/2023 | 13 | Emergency MOTION to Stay re 10 Temporary Restraining Order,,, *and Vacatur Pending Appeal* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit A – May 12, 2023 Declaration of Matthew Hudak, # 2 Exhibit B – May 12, 2023 Declaration of Daniel Bible, # 3 Text of Proposed Order Proposed Order) (DARROW, JOSEPH) (Entered: 05/12/2023) |
| 05/13/2023 | 14 | RESPONSE to Motion re 13 Emergency MOTION to Stay re 10 Temporary Restraining Order,,, *and Vacatur Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/13/2023) |
| 05/13/2023 | 15 | ORDER SHORTENING RESPONSE PERIOD – Plaintiff shall have until noon central time on Monday, May 15, 2023, to respond to Defendants' motion to stay 13 and explain why the TRO should not be converted into a preliminary injunction. By that same deadline, **5/15/2023**, each party may submit a proposed preliminary injunction for the Court's consideration in the event the Court decides to deny the motion to stay and grant Plaintiff's request to convert the TRO into a preliminary injunction. (Internal deadline for referral to judge if response not filed earlier: **5/15/2023**). Signed by JUDGE T KENT WETHERELL II on 5/13/2023. (erl) (Entered: 05/13/2023) |
| 05/14/2023 | 16 | NOTICE *of Joint Stipulation Regarding Further Proceedings* by STATE OF FLORIDA (PERCIVAL, JAMES) (Entered: 05/14/2023) |

| 05/15/2023 | 17 | ORDER TO SHOW CAUSE. It has come to the Court's attention that there are published news reports stating that DHS "paroled" 2,500 aliens after the Court entered its temporary restraining order. No later than 2:00 p.m. central time today, Defendants shall file a report with the Court addressing the allegations in the article referenced above, and if the allegations are true, Defendants shall show cause why they should not be held in contempt for violating the temporary restraining order. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 05/15/23. (Show Cause Response due by 2:00 p.m. central time on **5/15/2023**. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 18 | ORDER. The preliminary injunction hearing scheduled for May 19, 2023, is cancelled. The parties shall confer in an effort to reach a stipulation regarding the number of daily encounters during the days or weeks leading up to the expiration of the Title 42 Order and the number of daily encounters since. The stipulation shall be filed as soon as possible today, preferably by the deadline for the proposed preliminary injunctions. If the parties cannot reach a stipulation, they shall explain in their proposed preliminary injunctions why the Court cannot take judicial notice of the statements that have been attributed to the DHS Secretary about the lower– than–expected number of encounters in evaluating the weight of the evidence currently before the Court and in determining whether to stay the TRO and/or enter a preliminary injunction. (SEE FULL ORDER) Signed by JUDGE T KENT WETHERELL II on 05/15/23. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 19 | According to the parties' 16 Notice of Joint Stipulation Regarding Further Proceedings, Florida has withdrawn its 11 Motion to Compel Production of Administrative Record and for Limited Discovery without prejudice to filing a similar motion later in the proceedings as may be appropriate. The Clerk of Court, therefore, is directed to terminate the motion 11 . The hearing scheduled for today at 3:30pm (EST) is canceled. (See Doc. 12). Signed by MAGISTRATE JUDGE ZACHARY C BOLITHO on 5/15/2023. (hmw) (Entered: 05/15/2023) |
| 05/15/2023 | 20 | NOTICE of Appearance by SARAH B FABIAN on behalf of All Defendants (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 21 | RESPONSE in Opposition re 13 Emergency MOTION to Stay re 10 Temporary Restraining Order,,, *and Vacatur Pending Appeal* filed by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 22 | NOTICE *of Filing Proposed Order* by STATE OF FLORIDA (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 23 | NOTICE of Appearance by DANIEL WILLIAM BELL on behalf of STATE OF FLORIDA (BELL, DANIEL) (Entered: 05/15/2023) |
| 05/15/2023 | 24 | NOTICE *filing Proposed Order* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 25 | NOTICE by STATE OF FLORIDA re 21 Response in Opposition to Motion, 22 Notice (Other) (PERCIVAL, JAMES) (Entered: 05/15/2023) |
| 05/15/2023 | 26 | RESPONSE TO ORDER TO SHOW CAUSE by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (Attachments: # 1 Exhibit) (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 27 | NOTICE *Declaration – Attachment A* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 26 Response to Order to Show Cause (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 21 FLORIDA'S RESPONSE TO DEFENDANTS' EMERGENCY STAY MOTION, 22 FLORIDA'S PROPOSED ORDER, 25 Notice (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 24 NOTICE filing Proposed Order by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 26 Response to Order to Show |

| | | |
|---|---|---|
| | | Cause, 27 NOTICE Declaration – Attachment A by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 26 Response to Order to Show Cause. (jfj) (Entered: 05/15/2023) |
| 05/15/2023 | 28 | NOTICE *Joint Notice of Compliance with ECF No. 18* by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 18 Order,,, (FABIAN, SARAH) (Entered: 05/15/2023) |
| 05/15/2023 | 29 | ORDER DENYING STAY. DHS's motion to stay the TRO (Doc. 13 ) is DENIED. The Court will rule on DHS's request to convert the TRO into a preliminary injunction in the next day or so. Signed by JUDGE T KENT WETHERELL II on 5/15/2023. (pmc) (Entered: 05/15/2023) |
| 05/16/2023 | 30 | PRELIMINARY INJUNCTION. DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)," pending disposition of this case or further order of the Court. The parties shall file a status report 14 days from the date of this Order explaining how they intend to proceed with this case in this Court pending resolution of DHS's expected appeal of the preliminary injunction, and unless the parties agree that this case should be stayed pending appeal, the status report shall include a proposed scheduling order. Signed by JUDGE T KENT WETHERELL II on 05/16/23. (Status Report due by **5/30/2023**.) (jfj) (Entered: 05/16/2023) |
| 05/16/2023 | 31 | ORDER. The Order to Show Cause is discharged as to the 2,576 aliens released under the Parole with Conditions policy after the TRO went into effect, but DHS shall file periodic reports on the status of those aliens containing the information described above. The first report is due 60 days from the date of this Order, which roughly corresponds to the period within which those aliens are required report to ICE to be issued NTAs under the Parole with Conditions policy. Consideration of the Order to Show Cause is deferred as to the 167 aliens who may have released under the Parole with Conditions policy even though their processing may not have been fully complete when the TRO took effect, and DHS shall file supplemental information about the circumstances of those aliens' releases on or before Friday, May 19, 2023. Signed by JUDGE T KENT WETHERELL II on 05/16/23. (Report due by **7/17/2023**.) (jfj) (Entered: 05/16/2023) |
| 05/17/2023 | 32 | NOTICE OF APPEAL as to 30 Preliminary Injunction,,,, Set Deadlines/Hearings,,, by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES. ( (DARROW, JOSEPH) (Entered: 05/17/2023) |
| 05/18/2023 | 33 | Appeal Instructions re: 32 Notice of Appeal : The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh–circuit–transcript–information–form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **5/31/2023**. (jfj) (Entered: 05/18/2023) |
| 05/18/2023 | 34 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 32 Notice of Appeal. (jfj) (Entered: 05/18/2023) |
| 05/18/2023 | | Set Deadlines re 32 Notice of Appeal: Clerk to check status of Appeal on **8/15/2023**. Certificate of Readiness (FRAP 11) due by **6/1/2023**. (jfj) (Entered: 05/18/2023) |
| 05/18/2023 | 37 | USCA PROCEDURAL LETTER re: 32 NOTICE OF APPEAL as to 30 Preliminary Injunction. USCA Appeal # 23–11644–G (jfj) (Entered: 05/22/2023) |
| 05/19/2023 | 35 | RESPONSE by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES re 31 Order,,,, Set Deadlines/Hearings,,, . (Attachments: # 1 Exhibit BeMiller Declaration) (FABIAN, SARAH) (Entered: 05/19/2023) |
| 05/22/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 35 DEFENDANTS' FURTHER RESPONSE TO ORDER TO SHOW CAUSE. (jfj) (Entered: 05/22/2023) |
| 05/22/2023 | 36 | ORDER. This case is before the Court based on Defendants' further response to the Order to Show Cause (Doc. 35 ). The Order to Show Cause (Doc. 17 ) is discharged, |

| | | |
|---|---|---|
| | | subject to the follow– up reporting required for the 2,752 aliens released under the Parole with Conditions policy after the TRO took effect. See Doc. 31 at 4 (1). Signed by JUDGE T KENT WETHERELL II on 05/22/23. (jfj) (Entered: 05/22/2023) |
| 05/25/2023 | 38 | Consent MOTION to Extend Time *to File a Status Report* by STATE OF FLORIDA. (PERCIVAL, JAMES) (Entered: 05/25/2023) |
| 05/25/2023 | 39 | NOTICE *of Proof of Service* by STATE OF FLORIDA (Attachments: # 1 Exhibit Certified Mail Receipts, # 2 Exhibit USPS Tracking) (CHRISTMAS, NATALIE) (Entered: 05/25/2023) |
| 05/25/2023 | 40 | NOTICE of Appearance by DARRICK WILLIAM MONSON on behalf of STATE OF FLORIDA (MONSON, DARRICK) (Entered: 05/25/2023) |
| 05/26/2023 | 41 | ORDER GRANTING EXTENSION OF TIME. Upon due consideration of Plaintiff's consent motion for extension of time (Doc. 38 ), it is ORDERED that the motion is GRANTED, and the deadline for the parties to file their status report / proposed case management schedule is extended to the later of June 6, 2023, or 7 days after the Eleventh Circuit rules on Defendants' emergency motion for a stay. Signed by JUDGE T KENT WETHERELL II on 05/26/23. (Status Report due by **6/6/2023**, or 7 days after the Eleventh Circuit rules on Defendants' emergency motion for a stay.) (jfj) (Entered: 05/26/2023) |
| 05/30/2023 | 42 | TRANSCRIPT REQUEST by ALEJANDRO MAYORKAS, RAUL ORTIZ, UNITED STATES (DARROW, JOSEPH) (Entered: 05/30/2023) |
| 05/31/2023 | 43 | FIRST AMENDED COMPLAINT against All Defendants All Defendants., filed by STATE OF FLORIDA. (Attachments: # 1 Exhibit Red Line Showing Changes) (PERCIVAL, JAMES) (Entered: 05/31/2023) |
| 05/31/2023 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE T KENT WETHERELL II notified that action is needed Re: 43 AMENDED COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND DECLARATORY RELIEF. (jfj) (Entered: 05/31/2023) |
| 05/31/2023 | 44 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 32 Notice of Appeal, Appeal No. 23–11644–G. The entire record on appeal is available electronically. (jfj) (Entered: 05/31/2023) |

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW