Nos. 23-11528, 23-11644

# In the United States Court of Appeals for the Eleventh Circuit

STATE OF FLORIDA,
*Plaintiff-Appellee,*

v.

UNITED STATES OF AMERICA, ET AL.,
*Defendants-Appellants.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Nos. 3:21-cv-1066, 3:23-cv-9962

## APPELLEE'S ANSWER BRIEF

ASHLEY MOODY
  *Attorney General of Florida*

HENRY C. WHITAKER
  *Solicitor General*
Office of the Attorney General       DANIEL W. BELL
PL-01, The Capitol                     *Chief Deputy Solicitor General*
Tallahassee, FL 32399-1050           DARRICK W. MONSON
(850) 414-3300                         *Assistant Solicitor General*
(850) 410-2672 (fax)                 JAMES H. PERCIVAL
*henry.whitaker@myfloridalegal.com*    *Chief of Staff*
                                     NATALIE P. CHRISTMAS
                                     JOSEPH E. HART
                                       *Counselors to the Attorney General*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Florida certifies that, to the best of its knowledge, the following is a complete list of interested persons in addition to those included in Appellants' brief:

Americans for Immigrant Justice, Inc.

Bailey, Andrew

Bird, Brenna

Canizares Law Group LLC

Cameron, Daniel

Carr, Christopher M.

Catholic Charities Legal Services, Archdiocese of Miami, Inc.

Commonwealth of Kentucky

Commonwealth of Virginia

Drummond, Genter F.

Ferguson, Andrew N.

Fitch, Lynn

Gallagher, Kevin M.

Garcia, Miranda & Gonzalez-Rua, P.A.

Griffin, Tim

Gurian Group, P.A.

Hilgers, Michael T.

Hill, Bridget

Jackley, Marty J.

Knudsen, Austin

Kobach, Kris

Labrador, Raúl

Landry, Jeff

Marshall, Steve

Minot, M. Jordan

Miyares, Jason S.

Morrisey, Patrick

Prada, Mark A.

Reyes, Sean D.

Rokita, Theodore E.

State of Alabama

State of Alaska

State of Arkansas

State of Georgia

State of Idaho

State of Indiana

State of Iowa

State of Kansas

State of Louisiana

State of Mississippi

State of Missouri

State of Montana

State of Nebraska

State of North Dakota

State of Ohio

State of Oklahoma

State of South Carolina

State of South Dakota

State of Utah

State of West Virginia

State of Wyoming

Taylor, Treg

Wenski, Thomas G.

Wilson, Alan

Wilson, Sarah S.

Wrigley, Drew

Yost, Dave

## ORAL ARGUMENT STATEMENT

Florida agrees with Appellants that oral argument would aid the Court in resolving the numerous complex legal and factual issues raised in the consolidated appeals.

# TABLE OF CONTENTS

Oral Argument Statement ................................................................................. i

Table of Contents........................................................................................... ii

Table of Citations ........................................................................................ iv

Introduction ................................................................................................... 1

    I.    Legal background ................................................................................ 2

    II.    Factual background ............................................................................ 4

Standard of Review ....................................................................................... 9

Summary of Argument ................................................................................ 10

Argument....................................................................................................... 15

    I.    Florida has standing to challenge the parole policies...................... 15

    II.    The parole policies are reviewable .................................................. 28

        A.    The parole policies are final agency action. ......................... 28

        B.    Judicial review is not barred by 5 U.S.C. § 701(a)(2). .......... 29

        C.    Judicial review is not barred by 8 U.S.C. § 1252(a)(2)(B)(ii)............. 31

        D.    Florida is within the statutory zone of interests.. ................ 32

    III.    The parole policies are unlawful...................................................... 33

        A.    The parole policies violate Section 1182(d)(5)(A). ............. 33

        B.    The parole policies are arbitrary and capricious. ................ 41

        C.    DHS unlawfully issued the policies without notice and comment.... 44

    IV.    The district court's remedies are lawful.......................................... 46

    V.    The equities support the preliminary injunction against PWC..................... 48

Conclusion..................................................................................................... 49

Certificate of Compliance ................................................................................... 50

Certificate of Service ......................................................................................... 51

# TABLE OF CITATIONS

**Page(s)**

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ................................................................ 10

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................... 16, 24

*Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*,
  571 F.3d 1143 (11th Cir. 2009) ................................................................ 23

*Baez-Sanchez v. Barr*,
  947 F.3d 1033 (7th Cir. 2020) .................................................................. 44

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................... 12, 28, 29

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ........................................... 1, 13, 26, 30, 38

*Bidi Vapor LLC v. FDA*,
  47 F.4th 1191 (11th Cir. 2022) ................................................................ 43

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015) ............................................................ 23, 47

*Brown Express, Inc. v. United States*,
  607 F.2d 695 (5th Cir. 1979) .................................................................. 45

*California v. Texas*,
  141 S. Ct. 2104 (2021) ........................................................................ 21

*Campaign Legal Ctr. v. Scott*,
  49 F.4th 931 (5th Cir. 2022) .................................................................. 23

*Chiles v. Thornburgh*,
  865 F.2d 1197 (11th Cir. 1989) ............................................................ 18, 20

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ........................................................................... 44

*Cruz-Miguel v. Holder*,
  650 F.3d 189 (2d Cir. 2011) .................................................................. 34

*Demore v. Kim*,
  538 U.S. 510 (2003) ...................................................................... 12, 33

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) ....................................................... 12, 20–21, 29–30

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .................................................................. 26, 28, 31

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) .................................................................. 47

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................... 41
*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ................................................................ 41, 43
*Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*,
  692 F.3d 507 (6th Cir. 2012) ........................................................... 10
*Florida v. United States*,
  2023 WL 3813774 (11th Cir. June 5, 2023) ............................... 45–46
*Garrido v. Dudek*,
  731 F.3d 1152 (11th Cir. 2013) ........................................................ 10
*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ........................................................ 47
*Georgia v. Tenn. Copper Co.*,
  206 U.S. 230 (1907) ......................................................................... 24
*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ......................................................................... 40
*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................... 31
*Jean v. Nelson*,
  711 F.2d 1455 (11th Cir. 1983) ........................................................ 44
*Jean v. Nelson*,
  727 F.2d 957 (11th Cir. 1984) .......................................................... 45
*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ..................................................................... 3–4
*Kucana v. Holder*,
  558 U.S. 233 (2010) ......................................................................... 32
*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................. 48
*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ......................................................................... 25
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ......................................................................... 23
*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................... 11–12, 16–17, 23–25, 33
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ......................................................................... 32
*Moorhead v. United States*,
  774 F.2d 936 (9th Cir. 1985) ............................................................. 2
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................... 41

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ................................................................. 14, 47
*Nat'l Park Hosp. Ass'n v. DOI*,
    538 U.S. 803 (2003) ................................................................................ 14, 45
*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ..................................................................... 14, 46
*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013) .............................................................. 15, 49
*Pennsylvania v. Porter*,
    659 F.2d 306 (3d Cir. 1981) ......................................................................... 17
*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ........................................................................................ 44
*Plyer v. Doe*,
    457 U.S. 202 (1982) ...................................................................................... 18
*Schwab v. Crosby*,
    451 F.3d 1308 (11th Cir. 2006) .................................................................... 30
*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................... 15
*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .............................................................13, 38, 40
*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ................................................................... 17, 20
*United States v. Schwarzbaum*,
    24 F.4th 1355 (11th Cir. 2022) .............................................................. 10, 47
*United States v. Texas*,
    579 U.S. 547 (2016) ...................................................................................... 17
*United States v. Texas*,
    599 U.S. —, 2023 WL 4139000 (2023) .................. 11–12, 20, 22, 25–26, 31
*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) .................................................................................... 22
*West Virginia v. U.S. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) .....................................15, 17, 20, 24–25, 48
*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
    247 F.3d 1262 (11th Cir. 2001) ...................................................................... 9

## Statutes

5 U.S.C. § 553................................................................................................33, 44
5 U.S.C. § 701(a) ...........................................................................................29, 30
5 U.S.C. § 704.......................................................................................................28
5 U.S.C. § 705.......................................................................................................47

5 U.S.C. § 706(2) ........................................................................ 33
8 U.S.C. § 1101(a) .................................................................... 2, 4
8 U.S.C. § 1158(a) ....................................................................... 3
8 U.S.C. § 1225(a) ....................................................................... 2
8 U.S.C. § 1225(b) .................................................................... 3, 5
8 U.S.C. § 1226(a) ....................................................................... 5
8 U.S.C. § 1229a .......................................................................... 5
8 U.S.C. § 1231(i) ................................................................ 19, 33
8 U.S.C. § 1252(a)(2)(B) ...................................................... 12, 31
8 U.S.C. § 1182(d)(5)(A) .......................... 1–4, 7, 10, 12–13, 30–41
18 U.S.C. § 3142(f) ..................................................................... 26
28 U.S.C. § 1651 ......................................................................... 48
Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 ...................................... 34
Immigration and Nationality Act,
    Pub. L. No. 82-414, 66 Stat. 163 (1952) .............................. 33–34

## Regulations

7 C.F.R. § 273.4(a) ....................................................................... 4
8 C.F.R. § 1.2 ........................................................................ 23, 40
8 C.F.R. § 212.5 ......................................................................... 45
8 C.F.R. § 212.5(b) ............................................................ 23, 39, 40
8 C.F.R. § 212.5(c) ................................................................. 23, 40
8 C.F.R. § 235.3 ......................................................................... 23
8 C.F.R. § 274a.12(c)(11) ................................................ 4, 12, 26

## Other Authorities

Alexander Aleinikoff, et al.,
    Immigration and Citizenship: Process and Policy (8th ed. 2016) ............................ 34
Emer de Vattel,
    The Law of Nations (B. Kapossy & R. Whatmore eds. 2008) .................................. 24
H.R. Rep. No. 104-469 (1996) ............................................... 34, 39
U.S. Customs and Border Prot., *Custody and Transfer Statistics FY2022*,
    https://tinyurl.com/wtr9aea3 .................................................. 42
U.S. Customs and Border Prot., *Custody and Transfer Statistics FY 2023*,
    https://tinyurl.com/hd3fhxf8 ................................. 1, 7, 21–22, 28, 38, 42

**INTRODUCTION**

For more than two years, the Department of Homeland Security has authorized the mass-release into the United States of migrants arrested at the southern border, flouting congressional directives to keep inadmissible aliens detained pending their removal proceedings and release them only under a special parole status "temporarily" on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). These expedited appellate proceedings concern the two most recent iterations of that policy—"Parole Plus Alternatives to Detention" ("Parole+ATD") and "Parole with Conditions" ("PWC"). Under these policies, DHS has released into the country as many as 100,000 aliens per month under the guise of granting "case-by-case" parole with no reasonable prospect of returning them to custody.[1] *See Biden v. Texas*, 142 S. Ct. 2528, 2554 (2022) (Alito, J., dissenting) (observing that 27,000 grants of parole in one month implies that DHS is violating Section 1182(d)(5)(A)). That parole status not only results in release from custody, it confers affirmative legal benefits on the released aliens.

After 18 months of litigation culminating in a four-day bench trial, on March 8, 2023, the district court vacated Parole+ATD as exceeding DHS's authority under

---

[1] *See* U.S. Customs and Border Prot., *Custody and Transfer Statistics FY2023*, https://tinyurl.com/hd3fhxf8 (hereinafter "2023 Release Statistics") (under tab titled "U.S. Border Patrol – Disposition and Transfers") (130,541 aliens paroled in December 2022 under Parole+ATD); Doc. 35-1 at 3–4 in No. 3:23-cv-9962 (8,807 aliens released in less than two days under PWC).

Section 1182(d)(5)(A) and violating the procedural requirements of the Administrative Procedure Act. App. 430. The district court subsequently preliminarily enjoined PWC on similar grounds because the court recognized that policy for what it was—a naked attempt to circumvent the vacatur of Parole+ATD rather than seek appellate review.

Both rulings should be affirmed. The policies are unlawful many times over. They exceed the narrow authority Congress gave DHS by authorizing officials to grant parole benefits to improve DHS's internal operating efficiency rather than for urgent, case-by-case humanitarian reasons; they are arbitrary and capricious; and at a minimum they should have gone through notice and comment.

## BACKGROUND

### I. Legal background

The Immigration and Nationality Act (INA) "establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985). Most relevant to this case, a DHS component, Customs and Border Protection (CBP), manages that comprehensive scheme at the southwest border. While CBP's Office of Field Operations runs the ports of entry, where lawful entry is supposed to occur, another CBP unit, U.S. Border Patrol, patrols the land between ports of entry.

Under the INA, both aliens who come to ports of entry and aliens who seek to cross unlawfully are "deemed . . . applicant[s] for admission." *See* 8 U.S.C. § 1225(a)(1); *see also* 8 U.S.C. § 1101(a)(4) (defining "applicant for admission"). By virtue of their

2

physical presence in the United States, these aliens are generally entitled to apply for asylum, *see* 8 U.S.C. § 1158(a)(1), as untold millions have done in recent years. If CBP apprehends such aliens, the United States then determines whether to admit these aliens—and, if sought, whether to grant them asylum—using either expedited removal proceedings or standard removal proceedings. *See* 8 U.S.C. § 1225(b)(1) (discussing expedited removal); *id.* § 1225(b)(2) (discussing proceedings under Section 1229a, known as standard removal proceedings or "240[2] proceedings"). DHS initiates removal proceedings by issuing a charging document. The most common charging document is the one used for 240 proceedings, called a Notice to Appear or an NTA.

While expedited removal proceedings and 240 proceedings are different in many respects, they share a common feature that is the subject of this case: aliens in such proceedings "shall be detained," 8 U.S.C. § 1225(b), until the completion of those proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (Section 1225(b) "mandate[s] detention of applicants for admission").

The statute, however, contains a narrow exception to this detention mandate. DHS may release applicants for admission into the United States on parole under 8 U.S.C. § 1182(d)(5)(A), but only "temporarily," "on a case-by-case basis," and only "for urgent humanitarian reasons or significant public benefit." *See Jennings*, 138 S. Ct. at 837. Once paroled, the alien "shall forthwith return or be returned to the custody from

---

[2] Section 1229a is Section 240 of the INA.

3

which he was paroled" once "the purpose of the parole has been served." *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). Although a grant of parole does not render an alien lawfully admitted into the country, *see* 8 U.S.C. § 1101(a)(13)(B), it does confer legal benefits such as eligibility for work authorization, *see* 8 C.F.R. § 274a.12(c)(11); *see also* 7 C.F.R. § 273.4(a)(6)(i)(D) (allowing parolees who meet certain qualifications to receive supplemental nutrition assistance benefits).

## II. Factual background

At issue in this expedited appellate proceeding is the Biden Administration's attempt to transform parole from a narrow humanitarian safety valve into a primary processing mechanism for mass releasing millions of inadmissible aliens into the interior of this country. The Administration is doing so despite having apprehended, and decided to pursue removal proceedings against, these aliens.

The district court's findings reflect that soon after inauguration, the Biden Administration began adopting policies that caused massive increases in the number of migrants unlawfully flowing over the southern border into the United States, such as asking Congress to reduce DHS's detention capacity, including eliminating all of its family-unit detention capacity. App. 361. The Administration also eliminated mandatory immigration detention during pending removal proceedings, except where DHS deemed the alien a public-safety or flight risk. App. 358–60. As the district court put it, "[c]ollectively, these actions were akin to posting a flashing 'Come In, We're Open' sign on the southern border." App. 340.

The resulting tsunami of aliens unlawfully flowing into the country over the southern border, and self-inflicted overcrowding of immigration-detention facilities that predictably followed, necessitated other changes to immigration-detention policy starting in March 2021. Traditionally, DHS has circumvented Section 1225(b)'s unequivocal detention mandate by issuing an alien subject to detention a "notice to appear," thus initiating an ordinary removal proceeding against the alien under 8 U.S.C. § 1229a. DHS would then claim that it was entitled to release the alien under 8 U.S.C. § 1226(a), which generally permits release of an alien who is subject to removal proceedings.[3] Finding even the mere issuance of a notice to appear too burdensome, though, in March 2021 DHS instead began mass-releasing aliens by issuing them a "notice to report" without initiating removal proceedings, with nothing more than a hope and a prayer that the alien would subsequently report to ICE for initiation of removal proceedings. *See* App. 432–33. The vast majority of course did not report. App. 346–47.

Eighteen months of litigation then ensued between Florida and DHS over that and similar mass-release policies, with Florida challenging various DHS policies as unlawful, only to have DHS—like Lucy whisking the football away from Charlie Brown—repeatedly rescind each challenged policy and substitute new, but equally unlawful, ones in their place.

---

[3] As the district court correctly concluded, App. 354–66, that practice too is unlawful, but it is not at issue in these appeals.

Initially, Florida caught wind of DHS's March 2021 "notice to report" mass-release policy in the news media—DHS had not publicly revealed the policy—and Florida sued in September 2021 to invalidate it. App. 22–44. DHS made no attempt to defend that policy. Instead, DHS responded to Florida's complaint by revoking the policy and unveiling in its place the first iteration of Parole+ATD—a reference to "Alternatives to Detention," including conditions on release—which authorized granting aliens parole benefits under 8 U.S.C. § 1182(d)(5) to achieve essentially the same mass-release practices, though ostensibly limited to family units. App. 511–13. Like the March 2021 policy, under Parole+ATD, DHS processed aliens for removal proceedings by first releasing them into the interior and instructing them to report to an ICE office within 15 days for removal proceedings to be formally instituted against them. App. 512.

Eight months later, while the parties were litigating the first iteration of Parole+ATD, Florida learned through deposition questioning that DHS had, without informing Florida or the district court, quietly expanded that policy to apply beyond family units. Doc. 70 at 2, Doc. 70-1 at 86–88 in No. 3:21-cv-1066. Five days after that deposition, DHS formally replaced the first iteration of Parole+ATD with a new memorandum establishing a second iteration of the policy—no longer limited to family units and having no explicit instructions that an alien was to report to ICE for issuance of a notice to appear. App. 1–4. Florida again amended its complaint to challenge this new policy, App. 86–118, under which, as the district court found, many aliens likewise were

6

absconding rather than reporting to ICE as the policy contemplated. App. 358. As DHS delayed judicial review of its mass-release policies by constantly whisking away the football, DHS was unlawfully releasing an average of close to 100,000 aliens per month into the United States.[4]

Against that backdrop, the district court held a bench trial beginning on January 9, 2023. Unbeknownst to Florida or the district court, however, DHS had on January 2 stopped using Parole+ATD altogether. App. 438. DHS nonetheless permitted a trial regarding the policy to proceed full steam ahead, and even represented to the district court that "disastrous consequences" would flow from vacating a policy that DHS was secretly no longer using. Doc. 151 at 227, Doc. 156 at 180 in No. 3:21-cv-1066.

The district court ultimately held that Parole+ATD violated Section 1182(d)(5)(A) in three ways: (1) it did not provide a mechanism to return paroled aliens to custody once the purposes of parole have been served; (2) it focused parole decisions on DHS's operational circumstances rather than on a case-by-case assessment of an individual alien's circumstances; and (3) it used parole as a "processing pathway" to increase administrative efficiency rather than to address an individual alien's urgent humanitarian needs or significant benefit to the public. App. 411–17. The court also concluded that Parole+ATD was arbitrary and capricious for failing to consider the backlog

---

[4] *See* 2023 Release Statistics, *supra* n.1 (from October to December 2022, the three months of fiscal year 2023 Parole+ATD was in use, DHS averaged 96,654 grants of parole per month).

it would cause in immigration proceedings, failing to explain or acknowledge the expansion of Parole+ATD from family units to all aliens, and for failing to consider or explain evidence that the prior version of the policy had been used to release aliens *en masse* despite admonishments that the policy was to be used sparingly. App. 418–21. The court further concluded that DHS unlawfully issued the policy without notice and comment. App. 421–24. The court vacated the policy but stayed its order sua sponte for seven days to allow DHS the chance to appeal the vacatur. App. 430–31. Rather than take advantage of that stay and seek expedited relief from that judgment, DHS waited 58 days, appealing on May 5.

DHS then waited until May 10—the eve of ending Title 42—and re-issued a mass-release policy that was, in the district court's words, "materially indistinguishable," App. 467, from the vacated policy, under the new label "Parole with Conditions," or PWC.

Both Parole+ATD and PWC established thresholds for certain levels of decreased detention capacity or increased border encounters before a Border Patrol sector became eligible to use the policy. App. 3, 8. Both policies permitted the use of parole to enhance DHS's operational efficiency and to account for a lack of detention capacity. App. 2 (referring to Parole+ATD as a "processing mechanism" with various operational benefits), 9 (authorizing parole when Border Patrol thinks resources are better spent elsewhere because its "resources are finite"). Neither policy said anything about ensuring that parolees are returned to custody when the purposes of their parole have

been served, and both policies claimed that they were expected to be used "sparingly." App. 2, 8. The PWC memorandum required parolees to schedule an appointment with ICE within 60 days, App. 5, while the Parole+ATD memorandum provided no deadline.

Concerned that DHS appeared to be operating a vacated policy, Florida sued again. App. 450–59. The district court promptly granted a temporary restraining order, noting that "DHS cannot . . . adopt a functionally identical policy as the one the Court vacated . . . and then expect a different outcome." App. 470.

Waiving its right to an evidentiary hearing, DHS moved the district court to immediately convert the TRO into a preliminary injunction. Doc. 13 at 15–17 in No. 3:23-cv-9962. The parties stipulated that the court could treat Florida's TRO motion as a motion for a preliminary injunction and could adjudicate the motion without a hearing on the condition that the court could rely on the record from the Parole+ATD case to the extent relevant. Doc. 16 at 1–2 in No. 3:23-cv-9962. Doing so, the court granted a preliminary injunction and denied DHS a stay pending appeal of both the preliminary injunction and the prior vacatur order. App. 20. DHS then moved in this Court for a stay of both orders pending appeal, which the Court denied.

## STANDARD OF REVIEW

This Court reviews jurisdictional issues such as standing de novo but reviews any factual findings underlying the jurisdictional determination for clear error. *Wooden v. Bd.*

9

*of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1271 n.9 (11th Cir. 2001). The Court reviews a district court's order setting aside agency action under the APA de novo. *United States v. Schwarzbaum*, 24 F.4th 1355, 1363 (11th Cir. 2022). And the Court reviews a grant of a preliminary injunction for an abuse of discretion but reviews any underlying legal conclusions de novo and factual findings for clear error. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). The scope of an injunction is also reviewed for abuse of discretion. *Garrido v. Dudek*, 731 F.3d 1152, 1158 (11th Cir. 2013).

## SUMMARY OF ARGUMENT

DHS challenges the district court's determination that DHS's mass-release policies exceed its authority under 8 U.S.C. § 1182(d)(5)(A), that they are arbitrary and capricious, and that they were unlawfully issued without notice and comment. For good measure, DHS throws seven additional grounds for reversal at the wall. None sticks. *Cf. Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 509 (6th Cir. 2012) ("When a party comes to us with nine grounds for reversing the district court, that usually means there are none.").

1. Florida has Article III standing to challenge the parole policies. When it joined the Union, Florida ceded some sovereign power to the federal government, including the power to regulate immigration into its borders. Thus, Florida must rely on the federal government to protect its sovereign interest in controlling migration and preventing people from unlawfully entering Florida's territory. When the federal government fails,

Florida has standing to vindicate its sovereign interests through any procedural mechanism Congress has provided to do so, such as the APA. *See Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). That DHS is permitting masses of people to enter Florida's territory who have no right to be there establishes standing.

The district court also did not clearly err in finding that DHS's parole policies likely cause Florida financial harm. The evidence showed that DHS paroled around 80,000 aliens into Florida within the first nine months of the challenged policies. Around the same time, the population of immigrant students in Florida public schools increased by 17,000, straining education resources and ultimately requiring additional expenditures. The district court found, given the numbers, that it was more likely than not that at least some of those students arrived in Florida via the challenged policies. The district court further found that it was more likely than not that at least one of more than 80,000 parolees would commit a crime, seek unemployment benefits, or seek state-subsidized emergency medical services—all of which cost the State. As the factfinder, the court was entitled to draw logical inferences from the evidence, and DHS's dissatisfaction with those inferences cannot establish clear error.

Florida's sovereign and financial injuries are judicially cognizable. The parole policies do not govern decisions to "arrest" or to "prosecute" a removal proceeding but instead control "the continued detention of [aliens] who have already been arrested." *United States v. Texas*, 599 U.S. —, 2023 WL 4139000, at *8 (2023). And regardless,

granting parole is more than a decision not to detain; it also confers "legal benefits" by permitting parolees to obtain work authorization. *Id.*; *see* 8 C.F.R. § 274a.12(c)(11).

2. The parole polices are reviewable final agency action. The policies mark the consummation of DHS's decisionmaking. They establish "processing mechanisms," App. 2, 6, for aliens encountered at the border and provide instructions, including rules on when the mechanism may and may not be used, governing DHS officials in mass-paroling inadmissible aliens. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

3. The parole authority is not committed to agency discretion by law. That bar applies only when an agency's discretion is completely "unbounded." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019). Section 1152(d)(5)(A), on the contrary, broadly limits DHS's discretion.

4. Judicial review is not barred by 8 U.S.C. § 1252(a)(2)(B)(ii). As reflected in that statute's title and in the enumerated list in clause (i), clause (ii) simply bars other "denials of discretionary relief." Florida does not challenge any specific grant or denial of discretionary relief to any particular alien but instead challenges programmatic policies.

5. Florida is within the statutory zone of interests. Section 1182(d)(5)(A) governs when DHS may release otherwise inadmissible aliens into states like Florida. Any time Congress controls Executive action in a field important to the states' sovereign interests, it does so to protect the states. *See Massachusetts*, 549 U.S. at 519. Congress also regulates the detention of inadmissible aliens in part to protect states from suffering undue costs. *See Demore v. Kim*, 538 U.S. 510, 518–19 (2003).

12

6. The policies violate the parole statute, Section 1182(d)(5)(A). That statute requires parole determinations (1) to be made on a "case-by-case" basis; (2) to be only for "urgent humanitarian reasons or significant public benefit;" and (3) to be temporary, such that the parolee is "forthwith . . . returned" to custody once the purpose of parole has been served. Congress added those constraints in direct response to and to preclude exactly the kind of abuses DHS is committing here: using parole as a programmatic tool to release masses of aliens into the country. *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021), *rev'd on other grounds*, *Biden*, 142 S. Ct. 2528.

Both parole policies violate all three requirements. Neither policy provides for parolees to be taken back into custody. The policies make clear, and DHS agrees, the purpose of parole under the policies has been served once the parolee is issued an NTA, yet neither policy mandates that the parolee be taken back into custody at that point. In fact, both contemplate that in many cases, the parolee will not. Although the policies parrot the statute's case-by-case language, they make clear that programmatic considerations, not the case-by-case circumstances of individual aliens, drive parole grants. And the policies allow parole to be granted for reasons other than an alien's urgent humanitarian needs or the public benefit the alien offers, directing officials to consider unrelated factors like DHS's operational circumstances, the alien's criminal history, or the alien's community ties.

7. The parole policies are arbitrary and capricious. Parole+ATD provided no explanation for its dramatic expansion from family units to all aliens encountered at the

13

border. It also failed to explain why the policy's benefits outweighed the significant backlog it would cause in immigration proceedings.

PWC was arbitrary and capricious because it was issued in violation of the court's order vacating Parole+ATD. Rather than seeking a stay of the district court's order, DHS issued a materially identical policy with every feature that the district court said made Parole+ATD unlawful.

8. The policies unlawfully dispensed with notice and comment. The policies are not a general statement of policy exempt from notice and comment because they are not merely a communication from DHS to the public about its views. *See Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 809 (2003). Rather, the policies instruct DHS officials how to use a statutory authority, including by setting requirements for when they may and may not use it and what factors they must consider.

DHS also cannot invoke the good cause exception for PWC based on the termination of the Title 42 order. DHS knew for months that the Title 42 order would terminate on May 11 and waited until May 10 to issue PWC. DHS cannot use its own delay to establish good cause. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018).

9. The remedies are lawful. DHS argues that the vacatur order and injunction should be limited to aliens who indicate a final address in Florida. But vacatur cannot be so limited because vacatur does not act on persons—it acts on the agency action itself, nullifying it entirely. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

14

1409 (D.C. Cir. 1998). And although an injunction acts on specific persons rather than the agency action, here the injunction was vindicating the district court's vacatur order and was necessary to grant Florida complete relief because aliens who do not list a Florida address could easily travel or move to Florida.

10. The equities support preliminary injunctive relief against PWC. Neither DHS nor the public has a legitimate interest in DHS exceeding its lawful authority, no matter how much good DHS thinks it is accomplishing. Without an injunction, Florida will suffer irreparable harm to its sovereign interests and to its financial interests because DHS's sovereign immunity prevents any adequate remedy at law. *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

## ARGUMENT

## I.    Florida has standing to challenge the parole policies.

The district court correctly concluded that Florida has standing to challenge both parole policies. To establish Article III standing, Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But "[s]tates are not normal litigants for purposes of" establishing Article III standing. *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). States sometimes suffer "intangible"—yet nonetheless judicially cognizable—"injuries to their sovereignty that private parties do not." *Id.* And when attempting to remedy such a sovereign injury though a congressionally granted

15

procedural right, states are "entitled to special solicitude in [the] standing analysis." *Massachusetts*, 549 U.S. at 519–20.

1. Florida asserts an injury to its sovereignty: the presence of people in its territory "who have no right to be there." *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J., concurring in part and dissenting in part). Between November 2021 and July 2022 alone, around 80,000 inadmissible aliens released under Parole+ATD ended up in Florida. *See* Doc. 85-10 at 2 in No. 3:21-cv-1066.[5] Excluding aliens unlawfully present in the sovereign's territory is an "inherent attribute of sovereignty." *Arizona*, 567 U.S. at 422 (Scalia, J., concurring in part and dissenting in part). The power to exclude, however, like some other sovereign powers, has largely been ceded by the states to the federal government. *See Massachusetts*, 549 U.S. at 519 (by joining the union, states surrender some sovereign powers to the federal government); *Arizona*, 567 U.S. at 401–02 (Congress has occupied the field of alien registration).

---

[5] DHS (at 22) criticizes the district court for relying on its "belie[f]" that DHS released more than 100,000 aliens into Florida because not all of those releases were under Parole+ATD. But as DHS acknowledges, Parole+ATD was not the only challenged policy before the district court, so the district court had no reason to limit its consideration to the Parole+ATD numbers. Even so, the data relied on by the district court, which DHS itself provided, included numbers specific to Parole+ATD. DHS produced the chart found on page two of Doc. 85-10 in No. 3:21-cv-1066, which was admitted at trial as Plaintiff's Exhibit 10, *see* Doc. 147-1 at 1. The last column of the chart contains numbers for aliens in Florida released under Parole+ATD. The first row shows that 34,019 non-detained parolees had pending immigration proceedings with ICE's Miami field office ("ERO Miami"), *see* Doc. 85-10 at 6, which handles immigration enforcement for aliens in Florida, Puerto Rico, and the Virgin Islands. The last row shows that 47,984 parolees provided CBP with a Florida address but did not report to ICE to initiate immigration proceedings. Together, those numbers amount to 80,003.

But just because Florida has largely surrendered its sovereign *authority* to control presence in its borders, that does not mean it no longer has a sovereign *interest* in who is present in its borders. As the Supreme Court explained in *Massachusetts*, states maintain sovereign interests even in areas where they have ceded sovereign authority to the federal government, and the federal government exercises that ceded authority in part to protect those sovereign interests. *See* 549 U.S. at 519. Thus, the INA protects states' sovereign interests by regulating alien immigration into their territories and requiring the Executive Branch to act to prevent aliens from unlawfully inhabiting them. *See id.* (Congress directs executive action in areas where states lack regulatory authority in order to "protect" the states' sovereign interests). And when, as DHS has here, the Executive Branch neglects its obligation to protect state sovereignty, states have standing to invoke any procedural rights Congress has provided and vindicate their sovereign interests. *See id.* at 520 & n.17.

The APA provides Florida a right to challenge the adequacy of DHS's efforts. *See Texas v. United States (DAPA)*, 787 F.3d 733, 752 (5th Cir. 2015) (holding that the APA grants states a procedural right), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016). That sovereign injury alone constitutes a judicially cognizable injury regardless of any other harm parolees' presence in Florida may cause. *See West Virginia*, 59 F.4th at 1136 (states need not assert a tangible injury if asserting an injury to a sovereign interest); *Pennsylvania v. Porter*, 659 F.2d 306, 318 n.16 (3d Cir. 1981) (states

17

need not show "conventional indicia of injury in fact" such as "specific monetary losses" when asserting a sovereign injury).

Even apart from sovereign injury, Florida presented more than enough to establish by a preponderance of the evidence that DHS's *en masse* parole policies do in fact cause the State "economic detriment"—"the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989). The district court did not clearly err in crediting and drawing reasonable inferences from that evidence. As the district court found, an influx of more than 80,000 aliens in the state leads to increased costs for Florida through costs of public education, "incarceration, unemployment benefits, and emergency Medicaid." App. 367–68, 375–76.

Florida is required to provide public education to the children of paroled aliens. *See Plyer v. Doe*, 457 U.S. 202, 230 (1982). The Florida Department of Education tracks the public-school enrollment of "immigrant students"—students born outside the United States who did not attend school in the United States in the last three years. App. 139. Its data reflected that in the school year following DHS's implementation of the first Parole+ATD iteration, immigrant students in Florida public schools increased by 17,000.[6] App. 185, 190–92, 375–76. And Florida spends roughly $8,000 per student per year to provide public education. App. 139. Because the Florida legislature

---

[6] The first iteration of Parole+ATD was superseded by the second, but that simply expanded Parole+ATD to apply to all aliens apprehended at the border and not just family units.

18

appropriates public-education funds annually before each school year, a mid-school-year influx of students requires the State to strain its resources by stretching whatever the legislature previously appropriated to cover the spike in demand. App. 178. A Florida Department of Education official testified that "especially throughout this past school year"—after DHS began using its mass parole policies—an influx of immigrant students had significantly strained the resources in many districts throughout the State. App. 208–09. And after such a resource-straining influx of students, the State has two options: increase public-education spending or continue operating on strained resources. App. 179.

On top of education costs, Florida spends roughly $130 million incarcerating around 7,000 "undocumented criminal aliens"[7] per year, with only a fraction reimbursed by the federal government. App. 138. Paroled aliens may also apply for authorization to work in the United States, which entitles them to unemployment benefits from Florida if they otherwise qualify. App. 140–41. And because medical providers participating in the Medicaid program must provide emergency medical treatment regardless of immigration status, Florida covers portions of emergency medical treatments for any paroled alien who qualifies. App. 139–40. Considering those facts along with the sheer numbers of aliens DHS has paroled into Florida under Parole+ATD, the district court

---

[7] An "undocumented criminal alien" is any undocumented alien, including those released on parole, who has been convicted of a felony or two misdemeanors. 8 U.S.C. § 1231(i)(3).

did not clearly err in concluding that it was more likely than not that at least one of the more than 80,000 parolees would cost Florida money by committing a crime, seeking unemployment benefits, or obtaining state-subsidized emergency medical treatment. And when the federal government's unlawful release of people into a state causes the state to spend resources, the state suffers clear injury in fact.[8] *See Chiles*, 865 F.2d at 1209 (concluding that a county had standing to sue the federal government because the county expended resources after detainees escaped from federal custody); *DAPA*, 787 F.3d at 748.

2. Florida's sovereign and financial injuries are traceable to the challenged policies and thus likely to be redressed by the district court's rulings. DHS's own data revealed that around 80,000 aliens paroled in the first nine months of Parole+ATD went to Florida. Doc. 85-10 at 2 in No. 3:21-cv-1066.[9] That alone establishes that Florida's sovereign injury—the unlawful presence of people in its borders—is traceable to the policy.

---

[8] Although a state's assertion of standing "can become more attenuated" when based only on a federal policy's indirect effects on state spending or revenue, *Texas*, 2023 WL 4139000, at *6 n.3, such effects can still be sufficient to confer standing. *See Dep't of Com.*, 139 S. Ct. at 2565 (holding that New York had standing to challenge a census question because the question would lead to lower participation in the census, which would lead to a population undercount, which would lead to New York's receiving less funding from the federal government). In any event, Florida does not assert only financial harms but also direct harms to its "intangible" yet "nonetheless concrete" sovereign interest in the unlawful presence of people within its borders. *West Virginia*, 59 F.4th at 1136.

[9] *See supra* n.5 for an explanation of this chart.

20

DHS responds (at 17) that because parolees must independently decide to go to Florida, their presence in Florida is not traceable to the policies. But the authority DHS cites itself makes clear that when third parties "react in predictable ways" to a government policy, any resulting injuries are traceable to the policy. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Dep't of Com.*, 139 S. Ct. at 2566). Florida is the third-most populous state in the country, and DHS released an average of nearly 100,000 aliens per month under Parole+ATD.[10] That some parolees would travel to Florida was entirely predictable, especially because, as DHS acknowledges (at 54), many aliens provide DHS a Florida address before being released. Florida's sovereign injury is thus traceable to the policies and redressable by vacating them or enjoining their use.

Florida's financial injuries are also fairly traceable to the policies. As explained above, Florida received an influx of 17,000 "immigrant students"—a category under which parolees fall—in its public schools after Parole+ATD went into effect, which strained the State's education resources and ultimately required additional spending. Florida also presented anecdotal evidence that some of those students had recently entered the United States from another country via the southern border, which the district court found credible. App. 367. Based on that evidence and the fact that at least around 80,000 parolees were in Florida, the district court drew the reasonable inference that at least some of the influx was attributable to Parole+ATD. The district court also drew

---

[10] *See* 2023 Release Statistics, *supra* n.1

the reasonable inference that it was "more likely than not" that at least one of the more than 80,000 parolees would either commit a crime,[11] receive unemployment benefits, or receive state-subsidized emergency medical care, noting that the contrary conclusion—that not a single parolee would do any of those things—would be "implausible." App. 368–69. And because the challenged policies caused the mass of parolees that ended up in Florida, vacating and enjoining their use would redress Florida's financial injuries.[12]

---

[11] Even ICE's head of enforcement and removal operations conceded that an obvious inference from the data was that at least some parolees would commit crimes in Florida. Doc. 125 at 13, 129–30 in No. 3:21-cv-1066 (played by video at trial, *see* Doc. 149 at 11).

[12] In *Texas*, three Justices concluded that States could not sue to vacate the federal government's guidance regarding immigration arrests and removals because, even if that unlawful policy were vacated, federal officials could continue to exercise their discretion to violate immigration law in the same manner even in the policy's absence. 2023 WL 4139000, at *11 (Gorsuch, J., concurring).

Florida's lawsuit does not suffer from that problem. Here, the remedies Florida obtained provided at least "a partial remedy" for, and hence would redress, Florida's injuries. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) (cleaned up). DHS's own data make clear that it does not believe that mass parole is an option available to DHS officials unless a policy authorizes it. In fact, DHS's decision to issue the PWC policy on the eve of the Title 42 expiration makes little sense if DHS believed it could take the same actions without a formal policy. Moreover, from February to April 2023—the three months DHS operated without either parole policy for the entire month—DHS averaged 25 grants of parole per month. *See* 2023 Release Statistics, *supra* n.1. From October to December 2022—the most recent three months where DHS operated with one of the policies for the entire month, DHS averaged almost 100,000 grants of parole per month. *See id.* And despite paroling 8,807 aliens in the two days PWC was in effect, *see* Doc. 35-1 at 3–4 in No. 3:23-cv-9962, DHS paroled only 27 aliens for the rest of month following the preliminary-injunction order. *See* 2023 Release Statistics, *supra* n.1. That is probably because the current regulatory mechanism upon which DHS relies (at 40–41) for paroling aliens in this manner is unavailable for the aliens described in the

DHS quibbles (at 21–22) with the district court's factual findings without acknowledging its burden to show that they were clearly erroneous. According to DHS, the district court should have required Florida to present conclusive evidence tying a state expenditure to a specific alien paroled under the policies. In other words, Florida lacks standing because it is theoretically possible that not one of 80,000 parolees was also one of the 17,000 immigrant students to enroll in Florida schools and that not one of the 80,000 committed a crime or used state benefits available to them.

Florida had no burden of disproving that fanciful hypothesis. A plaintiff need establish standing only by a preponderance of the evidence. *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022). And as the factfinder, the district court was entitled to "draw reasonable and logical inferences from the evidence." *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143, 1155 (11th Cir. 2009). Requiring direct evidence of a specific expenditure tied to a specific alien is not required—just as an environmental plaintiff need not show that his injury was caused by "specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged." *Black Warrior Riverkeeper, Inc. v.*

---

challenged memoranda. *See* 8 C.F.R. §§ 212.5(b) (citing 8 C.F.R. § 235.3(b) & (c)), 212.5(c) (applying only to "arriving aliens," which DHS's regulations define to exclude aliens apprehended after crossing the border between ports of entry, *see* 8 C.F.R. § 1.2).

In any event, Florida need not "'meet[] all the normal standards for redressability'" because Florida asserts "'procedural right[s]'" under the APA. *See Massachusetts*, 549 U.S. at 518–19 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.7 (1992) (Scalia, J.)).

23

*U.S. Army Corps of Eng'rs,* 781 F.3d 1271, 1280–81 (11th Cir. 2015). It was perfectly reasonable, and certainly not clearly erroneous, for the district court to infer from the evidence that it was more likely than not that at least one parolee caused the State to spend additional resources.

3. DHS's alternative attempts to negate standing are unpersuasive. First, DHS argues (at 20) that Florida cannot claim standing based on a sovereign injury and distinguishes the sovereign injuries present in *West Virginia* and *Massachusetts* on the grounds that they involved state tax revenue and threatened loss of territory. But the unlawful presence of people in a sovereign's territory has been considered a fundamental sovereign interest for centuries. *See Arizona*, 567 U.S. at 417 (Scalia, J., concurring in part and dissenting in part) (quoting Emer de Vattel, The Law of Nations, bk. II, ch. VII, § 94, p. 309 (B. Kapossy & R. Whatmore eds. 2008)). If Florida has a judicially cognizable interest "in all the earth and air within its domain," *Massachusetts*, 549 U.S. at 519 (quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)), then surely it has an interest in the people there too.

Contrary to DHS's suggestion (at 20), the parole policies here have at least as much, if not more, of a "direct effect" on Florida as was true in those decisions. In *West Virginia*, the plaintiff states challenged a stimulus package's condition that it could not be used to offset reductions in state taxes. 59 F.4th at 1132. Even though the condition had never been and was not likely to be enforced—and thus had not had any "direct effect" on state revenue—the Court held that the condition nonetheless intangibly

24

injured the states by indirectly interfering with their sovereign interests in establishing taxation schemes. *See id.* at 1135–36. And in *Massachusetts*, states challenged EPA's refusal to regulate greenhouse gas emissions from new motor vehicles. 549 U.S. at 505. Despite no evidence that EPA's failure to regulate new-vehicle emissions directly caused Massachusetts to lose any territory, the Court held that Massachusetts had standing because the failure to regulate might have even a small effect on global climate change which could in turn contribute to rising sea levels, causing Massachusetts to lose some territory. *Id.* at 521–23. Here, the effect is more direct. DHS's own data shows that in just the first nine months, roughly 80,000 aliens released under Parole+ATD took residence in Florida. *See* Doc. 85-10 at 2 in No. 3:21-cv-1066.[13] That influx injures Florida's "intangible" but "nonetheless concrete" sovereign interests because the parolees are unlawfully present in Florida's territory. *West Virginia*, 59 F.4th at 1136.

Second, DHS contends that—apparently even if Florida suffers ruinous financial injury from its unlawful policies—Florida lacks standing because it has no "judicially cognizable interest in the prosecution or nonprosecution of another." Br. 18 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). The Supreme Court, in a similar vein, applied *Linda R.S.* to hold that States lacked standing to challenge the federal government's guidelines for arresting and initiating removal proceedings against aliens. *See Texas*, 2023 WL 4139000, at *4. But *Linda R.S.* applies at most only to suits challenging

---

[13] *See supra* n.5 for an explanation of this chart.

the Executive Branch's enforcement decisions—*i.e.*, "whether to arrest or prosecute." *Id.* The parole policies, by contrast, govern whether aliens whom DHS has already arrested and decided to pursue removal proceedings against should be granted parole pending those proceedings. App. 1–2, 5. In holding that the *Linda R.S.* principle precluded standing in *Texas*, the Supreme Court emphasized that its decision did not extend to "policies governing the continued detention of noncitizens who have already been arrested"—like the parole policies. *Texas*, 2023 WL 4139000, at *8. And that distinction makes sense because matters of pretrial detention after the Executive has decided to enforce do not implicate the Executive's Article II "principle of enforcement discretion over arrests and prosecutions." *Id.* at *5; *see, e.g.*, 18 U.S.C. § 3142(f)(2) (authorizing judges to initiate pretrial detention hearings sua sponte in some circumstances). Indeed, the Supreme Court itself has reached the merits of a suit challenging DHS's policies governing continued detention post arrest. *See Biden*, 142 S. Ct. at 2541.

The parole policies do not implicate the *Linda R.S.* rule for another reason identified by the Court in *Texas*, which distinguished the nonenforcement policy challenged there from one that conferred "legal benefits" beyond nonprosecution. 2023 WL 4139000, at *8. A policy that grants affirmative benefits like authorizing aliens to "request work authorization" is "more than simply a non-enforcement policy." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020). DHS does not dispute that granting aliens parole under the challenged policies not only releases them into the United States, but also entitles them to request work authorization. App. 141; 8 C.F.R.

26

§ 274a.12(c)(11). And that authorization allows them to obtain Florida unemployment benefits when they otherwise qualify. App. 140. Because the parole policies are not enforcement policies—because they both concern only detention and grant affirmative legal benefits—Florida has a judicially cognizable interest in remedying the sovereign and financial injuries they cause.

Finally, DHS argues (at 22–23) that Florida lacked standing to obtain a preliminary injunction against PWC because Florida produced no standing evidence specific to that policy and cannot rely on the Parole+ATD evidence.[14] The parties stipulated that the district court could rely on the Parole+ATD record in adjudicating the preliminary-injunction motion. Doc. 16 at 1–2 in No. 3:23-cv-9962. The district court did not err in relying on the Parole+ATD evidence to conclude that Florida would likely establish standing to challenge PWC too. As the court noted, the policies are "functionally identical," App. 470, and DHS now, at long last, more or less admits as much its appellate brief (at 29–40) by drawing virtually no distinction between the two policies in defending them as lawful. In the less than two days that PWC was operative, DHS used it to release 8,807 aliens into the interior of the United States—an even more rapid pace

---

[14] DHS fails to mention that the reason Florida produced no PWC-specific evidence before obtaining the injunction was because DHS waived its right to an evidentiary hearing and asked the district court to immediately convert the TRO to a preliminary injunction so DHS could appeal. Doc. 13 at 15–17 in No. 3:23-cv-9962. In other words, DHS asked the district court to enter an injunction without taking evidence so it could appeal sooner and now seeks reversal because no evidence was taken.

than aliens were ever released under Parole+ATD.[15] Doc. 35-1 at 3–4 in No. 3:23-cv-9962. The district court thus did not clearly err in finding that Florida would likely suffer the same injuries from PWC. App. 467, 497.

## II.    The parole policies are reviewable.

Along with its many jurisdictional and merits theories for reversal, DHS presents four theories that the policies are unreviewable under the APA. None overcomes the "basic presumption of judicial review" under the APA. *Regents*, 140 S. Ct. at 1905.

### A.    The parole policies are final agency action.

To be reviewable under the APA, an act must constitute "final agency action." 5 U.S.C. § 704. Final agency action "mark[s] the 'consummation' of the agency's decisionmaking process" and determines "rights or obligations" or otherwise has "legal consequences." *Bennett*, 520 U.S. at 178. The Parole+ATD and PWC memoranda create official policies for DHS. Both create obligations and have legal consequences for the administration of DHS's parole authority at the border. They set threshold capacity requirements that a sector must meet before obtaining approval to release aliens under the policies, App. 3, 8; indicate the factors that officials must consider in deciding whether to release aliens, App. 3–4, 9–10; establish circumstances under which officials are barred from releasing aliens on parole, App. 4, 10; and set procedures governing the

---

[15] 8,807 releases in two days amounts to nearly 134,000 in one month based on an average month length of 30.4 days. The highest monthly total under Parole+ATD was 130,541 in December 2022. 2023 Release Statistics, *supra* n.1.

subsequent processing of paroled aliens, App. 4, 10. That plainly creates obligations for border officials that have legal consequences in how border officials exercise the parole authority.

DHS's only response (at 28) is that the memoranda are not final agency action because even though they establish when and how officers may exercise the parole authority, they "do not dictate detention or release decisions"—leaving some discretion to officers. But even that is not entirely accurate: the memoranda dictate several circumstances under which aliens may not be released. *See* App. 3–4, 8, 10. Regardless, a policy need not remove all discretion in order to constitute final agency action. *See Bennett*, 520 U.S. at 177 (concluding that a biological opinion constituted final agency action even though it neither "conclusively determine[d]" nor "constrain[ed] the Bureau's discretion as to how the available water should be allocated"). A policy is final if it "prescribe[s] conditions" under which agency officials may act, which both memoranda do. *Id.* at 178.

### B.   Judicial review is not barred by 5 U.S.C. § 701(a)(2).

DHS also contends (at 23) that Section 701(a)(2) precludes judicial review under the APA because the parole policies are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has interpreted Section 701(a)(2)'s exception to judicial review "quite narrowly." *Dep't of Com.*, 139 S. Ct. at 2568. It applies only in "rare circumstances" in which the agency's discretion is "unbounded" and the "relevant

statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.*

As the Supreme Court has explained, DHS's authority under Section 1182(d)(5)(A) "is not unbounded" and thus its exercise of that authority "must be reasonable and reasonably explained" under the APA.[16] *Biden*, 142 S. Ct. at 2543. DHS's emphasis (at 25–26) on the ways in which a grant of parole involves discretionary determinations is beside the point. An agency action is not unreviewable simply because it involves some exercise of discretion; it is unreviewable only if there are no constraints on the exercise of discretion such that a court would not be capable of reviewing the action at all. *See Dep't of Com.*, 139 S. Ct. at 2568. Were DHS's view accurate, courts would never be able to follow Section 706(2)(A)'s directive to set aside agency action determined to be an abuse of discretion. *See id.* (Section 701(a)(2) must be read narrowly "to give effect to the command that courts set aside agency action that is an abuse of discretion").

Section 1182(d)(5)(A) places several constraints on DHS's discretion: DHS may parole an applicant for admission into the United States only "temporarily," "on a case-by-case basis," and "for urgent humanitarian reasons or significant public benefit." And when the Secretary determines that the purpose of parole has been served, the alien

---

[16] DHS dismisses (at 24) the Supreme Court's analysis as "dicta." But "there is dicta, and then there is Supreme Court dicta . . . . [D]icta from the Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006).

"shall forthwith return or be returned" to custody. 8 U.S.C. § 1182(d)(5)(A). If DHS adopted a policy permanently paroling all applicants for admission from a particular country for no stated reason, a court could readily ascertain that DHS's exercise of discretion exceeded Section 1182(d)(5)(A)'s limits.

Citing *Heckler v. Chaney*, DHS also contends (at 24) that the policies are unreviewable because a "decision not to prosecute or enforce" is inherently committed to its discretion. But as explained above, the parole policies do not govern decisions "not to prosecute or enforce"; they govern decisions to *release* aliens already subject to DHS enforcement action. *See Texas*, 2023 WL 4139000, at *8 (distinguishing detention and enforcement policies). And the policies go even beyond that, granting eligibility to apply for work authorization. The *Heckler* bar does not apply to policies that grant legal benefits. *Regents*, 140 S. Ct. at 1906. Congress is empowered to decide how the Executive implements the immigration-detention system, and "Congress may limit an agency's exercise of enforcement power if it wishes." *Heckler v. Chaney*, 470 U.S. 821, 833 (1985). Congress did so here.

## C.    Judicial review is not barred by 8 U.S.C. § 1252(a)(2)(B)(ii).

The district court correctly rejected DHS's argument that 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of the parole policies. As reflected in its title, Section 1252(a)(2)(B) precludes judicial review of "[d]enials of discretionary relief." Clause (i) bars courts from reviewing certain decisions made under an enumerated list of statutes to grant aliens discretionary relief from removal, including waivers of inadmissibility

31

and cancellations of removal. *See Kucana v. Holder*, 558 U.S. 233, 239 & n.2 (2010). Clause (ii) follows, providing a catchall that prevents courts from reviewing "any other decision" committed to the Secretary's discretion. The use of the phrase "any other decision" links clause (ii) to clause (i) and "suggests that Congress had in mind decisions of the same genre" as those authorized by the statutes enumerated in clause (i). *Id.* at 246. Clause (ii) is thus informed by statutes listed in clause (i) and simply bars courts from reviewing other denials of discretionary relief not listed. *See id.* at 247. Florida does not challenge a particular grant or denial of discretionary relief by DHS. Rather, Florida challenges DHS's parole policies as structurally exceeding its statutory authority. And Section 1182(d)(5)(A), as explained in the previous section, does not give DHS "discretion" to willy-nilly mass release aliens in the manner its policies allow.

### D. Florida is within the statutory zone of interests.

To seek review under the APA, a plaintiff "must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). That test is not "especially demanding." *Id.* at 225. It "do[es] not require any indication of congressional purpose to benefit the would-be plaintiff" and only precludes the suit when the "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

States naturally fall within the zone of interests of statutes like Section 1182(d)(5)(A) that govern the circumstances under which DHS may release aliens into their states. As explained above, alien admissibility and removal is an area of sovereign authority that the states ceded to the federal government when they joined the union. *See Massachusetts*, 549 U.S. at 519. Additionally, Congress constrains the Executive Branch's detention discretion in part because of the costs widespread release inflicts on states. *See Demore*, 538 U.S. at 518–19; 8 U.S.C. § 1231(i) (providing for compensation to states for costs related to alien incarceration). Florida is thus within the zone of interests protected by Section 1182(d)(5)(A)'s constraints on DHS's parole authority.

## III.    The parole policies are unlawful.

The district court correctly concluded that Parole+ATD is unlawful several times over and that PWC is likely unlawful for largely the same reasons. Both policies violate Section 1182(d)(5)(A)'s limits on DHS's parole authority, are arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A), and were issued without notice and comment in violation of 5 U.S.C. § 553.

### A.    The parole policies violate Section 1182(d)(5)(A).

When the INA was first enacted in 1952, it granted the Attorney General the authority to "parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 188 (1952). The statute also required that the parolee

33

be "forthwith" returned to custody when the Attorney General determined that the purpose of the parole had been served. *Id.*

Over following decades, the Executive Branch often relied on that parole authority to mass-release certain classes of aliens into the United States. *See* Alexander Aleinikoff, et al., Immigration and Citizenship: Process and Policy 22–23 (8th ed. 2016) (describing ways the Executive Branch in the 1960s and 70s mass paroled certain categories of aliens by tens of thousands); H.R. Rep. No. 104-469, at 140 (1996) (describing 1994 executive agreement with Cuba to parole 20,000 Cubans into United States). In response, Congress enacted a "limitation on use of parole" in 1996, amending the statute to its current form to authorize parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009, 3009–689; 8 U.S.C. § 1182(d)(5)(A). Congress enacted that amendment in direct response to the Executive Branch's programmatic mass parole policies, explaining that "limitations on the Attorney General's discretion [were] necessary" because "parole has been used increasingly to admit entire categories of aliens." H.R. Rep. No. 104-469, at 140. The new amendment, the House Judiciary Committee explained, would "end the use of parole authority to create an ad hoc immigration policy." *Id.* at 175; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that Congress amended the parole statute out of "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy").

34

Thus, in passing the current version of Section 1182(d)(5)(A), Congress created a narrow release mechanism: DHS may "parole into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States" and must ensure that "when the purposes of such parole shall . . . have been served the alien shall forthwith return or be returned to . . . custody." The statute thus imposes three limits on DHS's use of the parole authority: (1) parole decisions must be made on a case-by-case basis; (2) only for urgent humanitarian reasons or significant public benefit; and (3) paroled aliens must immediately return to custody when the purposes of the parole have been served. DHS's twin parole policies violate all three.

1. Neither policy so much as acknowledges Section 1182(d)(5)(A)'s requirement that paroled aliens return to custody once parole's purposes have been served. Even though the policies address subsequent processing of parolees after release, *see* App. 2, 4–6, 10, they do not provide for returning parolees to custody. In fact, both policies contemplate that parolees will *not* return to custody. The purpose of parole under the policies as reflected in the memoranda is to increase efficiency at Border Patrol facilities by postponing and transferring to the interior the initiation of removal proceedings with an NTA. *See* App. 2, 6. DHS does not dispute that parole's purpose under the policies has thus been served once an NTA is issued. *See* Br. 32–33 (explaining that parole should terminate upon the issuance of an NTA). Yet both policies contemplate continued nondetention after the issuance of an NTA. Parole+ATD permits the use of

"alternatives to detention" all the way until a parolee has a final order of removal. App. 2 ("The goal of the ICE ATD program is . . . to increase compliance with release conditions, court appearances, and final orders of removal."). And PWC permits parolees to request service of an NTA by mail online, all but guaranteeing that they will not return to custody at that time. App. 6. Indeed, the administrative record for Parole+ATD makes clear that "a noncitizen will not be taken into custody" even after an NTA is issued. App. 517. The policies blatantly violate Section 1182(d)(5)(A)'s return-to-custody requirement.

In response DHS asserts (at 33) that the policies govern only the initial release on parole and that whether the parolee is subsequently taken into custody is a "separate enforcement decision not governed by either policy." That is better described as an indictment of the policies than as a defense of them: that they fail to "govern" return to custody only underscores that they do not comply with the mandate for a return to custody. But in any event, the policies plainly cover more than just the initial release— they have multiple sections discussing subsequent processing after the initial release. *See* App. 2, 4–6, 10. And even if compliance with Section 1182(d)(5)(A)'s return-to-custody requirement were a separate decision, the policies make it in many cases impossible for the decisionmaker to comply by authorizing NTAs to be issued by mail. *See* App. 5, 514.

DHS also takes the remarkable position (at 34) that the statute's return-to-custody requirement does not apply to it because the provision is written in passive voice.

36

In other words, because Section 1182(d)(5)(A) says that a parolee "shall forthwith return or be returned to . . . custody," it imposes obligations only on the parolee personally or on other entities that have custody of the parolee. Passive voice or not, however, it is plain as day that this requirement applies to DHS because it is the entity responsible for deciding whether to parole aliens in the first place, and as well to decide "when the purposes of such parole . . . have been served," which is precisely what triggers the obligation to return to custody. 8 U.S.C. § 1182(d)(5)(A). If DHS, as it asserts, had free rein under the statute to parole aliens into the wind, that would make a mockery of is obligation to ensure that parole is only "temporar[y]." *Id.*

Lastly, DHS contends (at 35) that "nothing in the statute suggests congressional intent to displace background principles of enforcement discretion." But if terms like "temporarily" and "shall forthwith" do not "suggest" removal of discretion, then it is hard to imagine what would. True, the statute allows the Secretary to exercise discretion in determining when the purpose of parole has been served (although here DHS agrees that purpose is served when the NTA is issued). But mandatory obligations are triggered by discretionary findings all the time, including in DHS's own policies. *See* App. 4, 10 (requiring officers to deny parole upon a discretionary finding that an alien is a flight or safety risk). DHS does not explain how this common feature in law is "exceedingly odd." Br. 35.

2. Although both policies refer to the case-by-case requirement, they only nominally purport to impose it. The memoranda do not hide their true purpose: to create a

new "processing mechanism," App. 2, 6, to alleviate congested detention space and increase Border Patrol's operational efficiency. The only way the policies could be successful in doing so is if they were used to categorically process masses of aliens into the United States. That is inconsistent with the statute's requirement to consider the case-specific situation of each individual alien. Indeed, Congress added the case-by-case requirement in direct response to the Executive Branch's use of mass-parole policies and to prevent further usage of parole as a "programmatic policy tool." *Texas*, 20 F.4th at 947; *see also supra* 33–34.

DHS's implementation of the parole policies confirms what their text makes clear: the policies create a blunderbuss mass-release program. Under Parole+ATD, for example, DHS paroled as many as 130,000 aliens in a single month.[17] PWC was on pace for a similar performance. In less than two days, DHS used PWC to release 8,807 aliens, which amounts to nearly half of all aliens encountered at the border on May 10–11. Doc. 35-1 at 3–4, Doc. 28 at 4 in No. 3:23-cv-9962. It defies imagination that Border Patrol is conducting a meaningful case-by-case evaluation and finding Section 1182(d)(5)(A)'s exceptional circumstances in over 100,000 cases a month. *See Biden*, 142 S. Ct. at 2554 (Alito, J., dissenting) (27,000 aliens paroled in one month "gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis").

---

[17] *See* 2023 Release Statistics, *supra* n.1.

3. The policies also fail to limit the exercise of case-by-case discretion to aliens with "urgent humanitarian" needs or whose presence in the United States provides a "significant public benefit." Both policies provide as the relevant case-by-case considerations: immigration status, criminal history, compliance history, community ties, and role as caregiver without any explanation of what those have to do with urgent humanitarian needs or any significant benefit the alien would provide the public. App. 4, 9. Parole+ATD also mentions "other humanitarian or medical factors" while PWC references "medical concerns" App. 4, 9, confirming that they authorize parole beyond the "urgent" needs specified in the statute. The only limit is that the parolee cannot be a national-security, flight, or public-safety risk or an unaccompanied minor. App. 4, 10. In other words, while Section 1182(d)(5)(A) creates only a narrow class of aliens who are eligible for parole, DHS's parole policies establish a narrow class who are not.

PWC even more explicitly authorizes parole for reasons having nothing to do with the parolee's humanitarian needs or benefit to the public. The policy authorizes parole if "processing personnel and resources are necessary to process other noncitizens . . . or accomplish enforcement actions that are immediately critical." App. 9. But the statute requires that the alien's temporary release—not DHS's subsequent enforcement actions against others—result in a significant public benefit, such as when an alien is a witness or defendant in a criminal case. *See* H.R. Rep. No. 104-469, at 175; 8 C.F.R. § 212.5(b)(4).

Even so, DHS claims (at 40) that its own regulation authorizing parole for "[a]liens whose continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), authorizes mass-parole policies for administrative efficiency and is entitled to *Chevron* deference. But that provision does not even apply in this context; by its own terms, it applies only to aliens already in removal proceedings. 8 C.F.R. § 212.5(b) (applying only to aliens "who have been or are detained in accordance with § 235.3(b) or (c) of this chapter"). And even the catchall in Section 212.5(c) applies only to "other arriving aliens," which, according to DHS's own regulatory definition of "arriving alien," does not include aliens who are apprehended after crossing the border in between ports of entry. *See* 8 C.F.R. § 1.2. But even if Section 212.5(b)(5) did apply, it simply parrots the "public interest" language from the pre-1996 version of the statute—the version that Congress amended precisely to prevent programmatic uses of parole by limiting DHS's discretion.[18] *See supra* 33–34; *Texas*, 20 F.4th at 947 (comparing the statutes). And even then, it flips the standard on its head. Section 1182(d)(5)(A) allows parole only when the alien's temporary *release* results in a public benefit. Section 212.5(b)(5) requires the alien's *detention* to result in a public benefit or else parole is available. A by-its-own-terms inapplicable parroting regulation that apes an outdated version of the statute and manages to get the outdated statutory standard backwards is entitled to no deference.

---

[18] Even if "public interest" remained the statutory standard, parroting regulations are not entitled to deference. *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

Because DHS's parole policies permit parolees to remain released after parole is supposed to terminate, provide for *en masse* rather than case-by-case parole, and authorize parole for internal operating efficiency rather than urgent humanitarian reasons or significant public benefit, the policies violate Section 1182(d)(5)(A).

**B.    The parole policies are arbitrary and capricious.**

The district court correctly held that Parole+ATD is arbitrary and capricious. An agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Simply put, agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

The district court correctly held that it was arbitrary and capricious for DHS to fail to acknowledge or explain the expansion of Parole+ATD beyond family units to single adults. App. 421. Such a dramatic expansion, which transformed a limited policy to a universal one, warranted at a minimum an acknowledgement of the change and a reasonable explanation for the shift. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.")

41

Having no justification for its failure, DHS denies (at 44) that the first iteration of Parole+ATD was ever limited to family units. The assertion is false. The first Parole+ATD memorandum explicitly stated that if the conditions triggering the policy were met, Border Patrol could use the policy "on a case-by-case basis *for FMUs*." App. 512 (emphasis added). Worse yet, DHS told the district court that the first Parole+ATD policy was limited to family units when DHS thought that fact would be helpful in getting the district court to dismiss Florida's claim challenging that policy. *See* Doc. 23-1 at 6 in No. 3:21-cv-1066 ("The [Parole+ATD memorandum] outlines a narrow set of circumstances, *applying only to family units* processed in certain sectors . . . ." (emphasis added)). DHS's about-face only underscores that it acted arbitrarily and capriciously.

The assertion in both parole policies that they would be used sparingly despite mounting evidence to the contrary was also arbitrary and capricious. App. 2, 8, 420. In the three months preceding the July 2022 Parole+ATD memorandum, Border Patrol used the first Parole+ATD policy to release nearly 40,000 or more aliens each month.[19] And in the final three months of Parole+ATD's use, Border Patrol used it to release nearly 70,000, then 90,000, then 130,000 aliens.[20] It is unreasonable for any policy with aspirations to be used "sparingly" to fail to consider or address the fact that prior iterations were not used anywhere near sparingly.

---

[19] *See* U.S. Customs and Border Prot., *Custody and Transfer Statistics FY2022*, https://tinyurl.com/wtr9aea3 (under tab titled "U.S. Border Patrol – Disposition and Transfers").

[20] *See* 2023 Release Statistics, *supra* n.1.

DHS responds (at 43) that the district court should have ignored DHS's own public data because it was not part of the administrative record. But courts may consider evidence beyond the administrative record when evaluating whether an agency "considered all the 'relevant factors' and 'important aspect[s].'" *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022). The overwhelming evidence in DHS's public data that directly contradicts the policies' stated aspirations was certainly a "relevant factor" and an "important aspect" that DHS should have at least considered and addressed. Its failure to do so was arbitrary and capricious.

It was also arbitrary and capricious for DHS to fail to consider or justify the backlog Parole+ATD would create in immigration proceedings. App. 419–20, 610 (every 90 days Parole+ATD is in effect, it adds several years and millions of dollars in backlog). True, the administrative record shows that DHS was at least aware of some data about the increasing backlog under Parole+ATD, App. 610–20, but nowhere in the record or in the memorandum did DHS weigh this cost against Parole+ATD's purported benefits or explain why dramatically increasing the backlog was warranted. *See Prometheus Radio*, 141 S. Ct. at 1158 (agency action must be reasonably explained).

Although DHS has not yet produced the administrative record for PWC, that policy too was arbitrary and capricious because it was an attempt to circumvent a court order instead of good-faith policymaking. The district court vacated Parole+ATD and remanded to DHS for proceedings consistent with the order. DHS neither challenged the vacatur order by seeking a stay nor expedited its appeal: it simply reissued materially

the same policy under a new name. DHS cannot now reasonably dispute that the policies are identical in all legally relevant aspects. DHS does not advance a single argument that PWC survives even if the district court rightly vacated Parole+ATD. Issuing PWC without changing any of the legal defects identified by the district court was brazen defiance of the district court's vacatur and remand order and thus arbitrary and capricious. *See Baez-Sanchez v. Barr*, 947 F.3d 1033, 1035 (7th Cir. 2020) ("We have never before encountered [an agency's] defiance of a remand order, and we hope never to see it again.").

### C.    DHS unlawfully issued the policies without notice and comment.

The district court correctly rejected all of DHS's attempts to evade the notice and comment requirements of 5 U.S.C. § 553. Section 553's notice-and-comment procedures are generally required when an agency issues a "legislative rule." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). A "legislative rule" is one issued under a grant of authority by Congress and that "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). The parole policies are legislative rules. They were issued under DHS's authority to manage the grant of parole to aliens entering the United States, and they affect rights and obligations by dictating the circumstances under which aliens may or may not be granted parole. *See Jean v. Nelson*, 711 F.2d 1455,

1475 (11th Cir. 1983) (holding that the administration's parole policies are subject to notice and comment), *reh'g en banc*, 727 F.2d 957 (11th Cir. 1984) (en banc).[21]

Contrary to DHS's assertions (at 45), the parole policies are not general statements of policy because they are not "merely an announcement to the public of the policy which the agency hopes to implement." *Brown Express, Inc. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979). Nor were they simply statements "designed to inform the public of [DHS's] views on the proper application of" the statute. *Nat'l Park Hosp.*, 538 U.S. at 809. Rather, the policies established a "processing mechanism" and instructed DHS officials how to use it—including by establishing threshold requirements and factors to consider, which officials use to determine whether aliens at the border will be detained or released into the United States and be eligible for benefits like work authorization. *See Brown Express*, 607 F.2d at 701. ("[A] change in the method by which an agency will grant substantive rights is not a 'general statement of policy.'"). And DHS has traditionally proceeded by notice and comment when establishing parole policies. *See* 8 C.F.R. § 212.5.

As to PWC, DHS cannot avoid notice and comment by invoking the "good cause" exception based on the May 11 termination of the Title 42 order. The district court vacated the Parole+ATD policy more than two months earlier, and DHS waited until the day before Title 42's termination to issue a new policy. *See Florida v. United*

---

[21] The en banc court did not reach the notice-and-comment issue because it had become moot. *Jean*, 727 F.2d at 962.

*States*, Nos. 23-11528, 23-11644, 2023 WL 3813774, at *2 (11th Cir. June 5, 2023) (noting that DHS waited until the day before Title 42's termination to issue PWC despite having known for months that day was coming). "Good cause cannot arise as a result of the agency's own delay . . . ." *Nat. Res. Def.*, 894 F.3d at 114.

DHS responds (at 47) that the situation at the border worsened in the days preceding the Title 42 order's termination in ways DHS did not predict. That excuse rings hollow since DHS sought an emergency stay of the district court's decision to enjoin the policy even after the situation at the border following the rescission of Title 42 turned out to be unexpectedly much better than DHS had previously predicted. *See Florida*, 2023 WL 3813774, at *2; Doc. 8-1 at 19 (stating that DHS needs the parole policies to "safely address future increases in encounters as they arise, recognizing that increases can occur suddenly without warning"). DHS has known since the district court vacated Parole+ATD in March that unless that order was stayed or reversed, DHS would be unable to use parole as a programmatic mass-parole mechanism to ease the burden of any sudden surges. DHS chose to take the risk of not seeking a timely stay or expedited appeal.

## IV. The district court's remedies are lawful.

DHS contends (at 54) that the district court should have limited the scope of its remedies to "noncitizens with children who provided a final address in Florida." In pressing this argument, DHS incorrectly conflates vacatur and injunctive relief. A vacatur order does not act on any specific parties: it acts on the agency action itself, nullifying

46

it and denying it legal effect. *Nat'l Mining*, 145 F.3d at 1409. Thus, when a policy is vacated under Section 706 of the APA, it is necessarily invalidated in full. *Id.*; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021); *see also United States v. Schwarzbaum*, 24 F.4th 1355, 1364 (11th Cir. 2022) (equating vacatur of an agency action with an appellate court's vacatur of a lower court's order). The preliminary relief authorized by 5 U.S.C. § 705 confirms that understanding; it authorizes a reviewing court to "postpone the effective date of an agency action"—a preliminary remedy that operates universally on the action itself. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2604 (2022) (noting that the Supreme Court had "granted a stay, preventing the rule from taking effect"). It would make little sense if the APA's preliminary remedy operated in a way its final remedy could not.[22]

Injunctions, on the other hand, operate on parties to prevent irreparable harm. The proper scope of an injunction is whatever "extent necessary to protect the interests of the parties." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022). DHS simply disagrees with the district court's finding that DHS's proposed injunction—*i.e.*, limited to aliens who claim Florida as their destination—would not provide Florida complete relief. But DHS cannot overcome that conclusion unless it shows that it was an abuse of discretion. *See id.* at 1292. And far from an abuse of discretion, the district

---

[22] To the extent DHS's brief can be read to argue that vacatur is not a remedy under the APA at all, that argument is foreclosed by this Court's precedent. *See Black Warrior Riverkeeper*, 781 F.3d at 1290 ("[V]acatur is the ordinary APA remedy." (cleaned up)).

court's conclusions were reasonable. As the court noted, were the injunction limited to aliens who name Florida as their destination, nothing would stop an alien who named another state from traveling to Florida. App. 427, 484. Indeed, DHS itself has represented in this litigation that parolees do not always reside in the state that they indicate. *See* App. 365 n.20. Moreover, the only reason DHS has an injunction against it is because it disregarded the district court's vacatur order and reinstituted a "functionally identical" policy under a different name. App. 470. The district court did not err in entering an injunction to aid in ensuring compliance with its lawful vacatur order. *See* 28 U.S.C. § 1651.

## V. The equities support the preliminary injunction against PWC.

Finally, DHS argues (at 48) that even if it is likely to lose on the merits as to PWC, the Court should reverse the preliminary injunction because the equities weigh in favor of DHS continuing its unlawful policy. But neither DHS nor the public has an interest in DHS continuing to exceed its lawful authority. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Conversely, the public has a significant interest in DHS following the law. *See id.* And both Florida's sovereign and financial injuries are irreparable—its sovereign injury precisely because it is "intangible," *West Virginia*, 59 F.4th at 1136, and its financial injuries because Florida has no remedy at law to recover

them by virtue of DHS's sovereign immunity, *see Odebrecht*, 715 F.3d at 1289.[23] The

equities weigh in favor of preliminary injunctive relief.

## CONCLUSION

The Court should affirm both orders.


Dated: June 26, 2023                     Respectfully submitted,

                                        ASHLEY MOODY
                                          *Attorney General of Florida*

                                        */s/ Henry C. Whitaker*
                                        HENRY C. WHITAKER
                                          *Solicitor General*
                                        DANIEL W. BELL
                                          *Chief Deputy Solicitor General*
                                        DARRICK W. MONSON
                                          *Assistant Solicitor General*

                                        JAMES H. PERCIVAL
                                          *Chief of Staff*
                                        NATALIE P. CHRISTMAS
                                        JOSEPH E. HART
                                          *Counselors to the Attorney General*

                                        Office of the Attorney General
                                        The Capitol, PL-01
                                        Tallahassee, Florida 32399
                                        (850) 414-3300
                                        *henry.whitaker@myfloridalegal.com*

                                        *Counsel for Plaintiff-Appellee*

---

[23] *Odebrecht* forecloses DHS's argument (at 51) that sovereign immunity cannot render a monetary injury irreparable.

49

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,943 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Henry C. Whitaker*
Solicitor General

## CERTIFICATE OF SERVICE

I certify that on June 26, 2023, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Henry C. Whitaker*
Solicitor General