**Nos. 23-11528, 23-11644**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

STATE OF FLORIDA,

Plaintiff-Appellee,

v.

ALEJANDRO MAYORKAS, Secretary
of Homeland Security, in his official
capacity; et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

**APPELLANTS' REPLY BRIEF**
_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*
WILLIAM C. PEACHEY
  *Director*
EREZ REUVENI
  *Assistant Director*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
  *Trial Attorneys*
  U.S. Dep't of Justice, Civil Division
  Office of Immigration Litigation,
  District Court Section
  P.O. Box 868, Ben Franklin Station
  Washington, DC 20044

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellants

certify that the following have an interest in the outcome of this appeal:

<u>Natural Persons</u>

Bell, Daniel W.

Boynton, Brian M.

Brodeen, Karen A.

Butler, Steven

Christmas, Natalie

Coody, Jason R.

Crapo, Matt A.

Darrow, Joseph A.

DeSantis, Ronald

Fabian, Sarah B.

Faruqui, Bilal A.

Fudim, Elissa P.

Garland, Merrick

Guard, John M.

Hart, Joseph E.

Hudak, Matthew

Jaddou, Ur M.

Johnson, Tae D.

Mayorkas, Alejandro

Miller, Troy

Monson, Darrick

Moody, Ashley

Moyle, Marie A.

Ortiz, Raul

Patel, Anita J.

Peachey, William C.

Percival, James H.

Reuveni, Erez

Ryan, Erin T.

Ward, Brian C.

Wetherell, T. Kent

Whitaker, Henry C.

Wilson, Sarah S.

Entities

Immigration Reform Law Institute

State of Florida

Florida Office of the Attorney General

United States of America

U.S. Attorney's Office, Northern District of Florida

U.S. Citizenship and Immigration Services

U.S. Customs and Border Protection

U.S. Department of Homeland Security

U.S. Immigration and Customs Enforcement

U.S. Department of Justice, Civil Division


Dated:  July 3, 2023                    */s/ Elissa P. Fudim*
                                        ELISSA P. FUDIM

## STATEMENT REGARDING ORAL ARGUMENT

Appellants ("the federal government") believe that oral argument would assist the Court in resolving this matter.

# **TABLE OF CONTENTS**

**Page**

**INTRODUCTION**..................................................................................1

**ARGUMENT** .....................................................................................3

**I.    Florida Does Not Have Standing to Challenge Parole+ATD and PWC** .....3

    **A.    Florida has not suffered a direct, cognizable injury** ...........................3

    **B.    The district court wrongly concluded that Florida suffered injury traceable to Parole+ATD and PWC** ......................................................6

    **C.    Florida's alleged injury is not redressable by a court order**...............7

**II.   The APA Does Not Permit Review of Florida's Challenges to Parole+ATD and PWC** ........................................................................8

    **A.    Parole+ATD and PWC are committed to agency discretion** .............8

    **B.    8 U.S.C. § 1252(a)(2)(B)(ii) precludes review** .....................................11

    **C.    Parole+ATD and PWC are not reviewable final agency actions**......12

    **D.    Florida is not in the statutory zone of interests**...................................13

**III.  The District Court Erroneously Held the Parole+ATD and PWC Are Contrary to Law** .................................................................................14

    **A.    The memoranda are consistent with the history of Section 1182(d)(5)** ................................................................................................14

    **B.    The memoranda satisfy the "return to custody" and "case" clauses** ..................................................................................................15

    **C.    The memoranda meet the case-by-case requirement** .......................17

       **D.**    **The memoranda satisfy the substantive parole standard** ................**19**

**IV.**    **The Memoranda Are Not Arbitrary and Capricious** .................................**21**

**V.**    **Parole+ATD and PWC Did Not Require Notice-and-Comment Rulemaking** ...........................................................................................**24**

**VI.**    **The Equities Do Not Support the District Court's Injunction of PWC**....**26**

**VII.**    **The District Court's Orders are Impermissibly Overbroad**.....................**27**

      **CONCLUSION**.......................................................................................**28**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*,
   571 F.3d 1143 (11th Cir. 2009) ............................................................................6

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...........................................................................................12

*Brown Express, Inc. v. United States*,
   607 F.2d 695 (5th Cir. 1979) ..............................................................................24

*Clarke v. Securities Indus. Ass'n*,
   479 U.S. 388 (1987) ...........................................................................................13

*Delgado-Sobalvarro v. Att'y Gen.*,
   625 F.3d 782 (3d Cir. 2010) ........................................................................ 15, 17

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .....................................................................................8, 9

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) ...........................................................................................26

*Farah v. U.S. Att'y Gen.*,
   12 F.4th 1312 (11th Cir. 2021)...........................................................................23

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...........................................................................................21

*Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996)..............................................................................13

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ...........................................................................................18

*Florida v. Mellon*,
   273 U.S. 12 (1927) ...............................................................................................5

*Haaland v. Brackeen*,
   143 S.Ct. 1609 (2023) .........................................................................................7

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................10

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ....................................................24

*Kucana v. Holder*,
    558 U.S. 233 (2010) ........................................................................11

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)............................................................26

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ..........................................................................5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .....................................................................3, 6

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .....................................................................3, 4

*Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*,
    226 F.3d 1226 (11th Cir. 2000) ......................................................7

*National Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)........................................................24

*Nat'l Parks Conservation Ass'n v. Norton*,
    324 F.3d 1229 (11th Cir. 2003) ....................................................12

*Patel v. Garland*,
    142 S. Ct. 1614 (2022) ..................................................................11

*DHS v. Regents*,
    140 S. Ct. 1891 (2020) ..................................................................10

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................................................10

*Roper Corp. v. Litton Sys., Inc.*,
    757 F.2d 1266 (Fed. Cir. 1985) ....................................................23

*Sure-Tan, Inc. v. NLRB*,
   467 U.S. 883 (1984) ...............................................................................5

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ...............................................................14

*Texas v. Biden*,
   142 S. Ct. 2528 (2022) ..................................................................... 8, 14

*United States v. Texas*,
   No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023) .................................. *passim*

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ...............................................................................5

## FEDERAL STATUTES

5 U.S.C. 704 ..............................................................................................12

5 U.S.C. § 553(b)(B) .................................................................................25

8 U.S.C. § 1182(d)(5) ....................................................................... *passim*

8 U.S.C. § 1182(d)(5)(A) .................................................................. *passim*

8 U.S.C. § 1226(a) .....................................................................................8

8 U.S.C. § 1231(i) .....................................................................................13

8 U.S.C. § 1252(a)(2)(B) ..........................................................................11

8 U.S.C. § 1252(f)(1) .................................................................................8

13 U.S.C. § 141 ..........................................................................................9

Pub. L. 116-92 (2019) ..............................................................................19

Pub. L. 117-43 (2021) ..............................................................................19

Pub. L. 117-128 (2022) ............................................................................19

## FEDERAL REGULATIONS

8 C.F.R. § 212.5 .........................................................................................8

8 C.F.R. § 212.5(b) ................................................................13

8 C.F.R. § 212.5(e) ............................................................ 2, 16

8 C.F.R. § 274a.12 ......................................................... 10, 11

8 C.F.R. § 274a.12(c)(11) ........................................................5

**INTRODUCTION**

"The Constitution affords federal courts considerable power, but it does not establish 'government by lawsuit.'" *United States v. Texas*, 599 U.S. ___, 2023 WL 4139000, at *17 (2023) (Gorsuch, J., concurring). Yet that is the effect of the district court's orders vacating the "Parole Plus Alternatives to Detention" (Parole+ATD) memorandum and enjoining the "Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document" (PWC) memorandum. Appendix (A) 323-431, 460-76.

Florida lacks standing to challenge the Parole+ATD and PWC policies. The district court gave Florida the benefit of special solicitude when considering each of the three prongs of standing. A372-73. But in *Texas*, the Supreme Court rejected the application of special solicitude in a case brought by states alleging an identical injury—a challenge to its sovereignty and indirect fiscal costs flowing from the presence of more noncitizens in its state. Even with the benefit of special solicitude Florida failed to establish it has standing to challenge the policies as it cannot trace its costs to the policies challenged. Finally, the district court's orders do not redress Florida's putative injury because even without the memoranda, the Department of Homeland Security (DHS) retains the discretion to release the same noncitizens on parole.

1

The orders frustrate the measures DHS determined to be the most effective means to secure the border while protecting the health and welfare of federal agents and noncitizens during periods of significantly-increased border encounters. Both policies are within the Secretary's statutory authority and issued consistent with federal rulemaking requirements. Consistent with 8 U.S.C. § 1182(d)(5)(A), the temporary grant of parole expires no later than when the noncitizens are placed in removal proceedings. 8 C.F.R. § 212.5(e)(2)(i), (ii). The policies require individualized vetting and a "case-by-case" determination that the parole serves an "urgent humanitarian reason or significant public benefit" by allocating limited detention space to those who the public has the greatest interest in detaining while balancing public health concerns associated with overcrowded border patrol facilities. DHS's interpretation of these terms to include the humanitarian and public-interest scenarios that arise when border sectors are dangerously overcrowded is longstanding and reasonable and has not been disturbed by Congress. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983). The Court should reverse the district court's orders vacating Parole+ATD and enjoining PWC.

## ARGUMENT

### I.    Florida Does Not Have Standing to Challenge Parole+ATD and PWC.

To have standing, a plaintiff must suffer an injury-in-fact caused by the challenged action, traceable to the challenged action, and redressable by a court order. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).

A. <u>Florida has not suffered a direct, cognizable injury.</u>

In *United States v. Texas*, the Supreme Court held that two states lacked standing to challenge DHS's immigration enforcement policies because they lacked "a legally and judicially cognizable" injury where their alleged injury were costs associated with having more noncitizens in their states. 599 U.S. __, No. 22-58, 2023 WL 4139000, at *3–4 (U.S. June 23, 2023). Florida similarly fails to satisfy the "bedrock constitutional requirement" of standing. *Id*. at *3.

The district court relied on the doctrine of special solicitude articulated in *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), that "injuries to state sovereignty can be real and concrete even though they are intangible." A372, A471. Applying this lower threshold to its standing analysis, the court concluded that Florida has standing based on conjecture that Florida will inevitably face the same indirect fiscal harm alleged in *Texas*. A373, A471. Florida repeats the court's reasoning and argues it is entitled to special solicitude. Florida's Opposition Brief (Opp.) at 16–17, 23–25, 33; A371-72, A497, A467-71.

3

In *Texas* the Supreme Court rejected the plaintiff-states' argument that they were entitled to special solicitude under *Massachusetts v. EPA*, explaining that "that decision does not control this case." *Texas*, 2023 WL 4139000, at *8 n.6. The Court thus rejected plaintiff-states' argument, similar to that of Florida, that they were "entitled to special solicitude in th[e] Court's standing analysis" because they had a procedural right to challenge the enforcement priorities "under the APA" and because those priorities purportedly implicated the Federal Government's "failure to protect certain formerly sovereign prerogatives [of the states] that are now lodged in the Federal Government," including the "power to admit or exclude aliens" and the states' "quasi-sovereign interests in the health and well-being … of their residents in general." Opp. 16-17; *Texas*, No. 22-58 (U.S.) (cleaned up). Justice Gorsuch went so far as to suggest that "that lower courts should just leave th[e] idea [of special solicitude] on the shelf in future" cases, *id.* at *10 (Gorsuch, J., concurring). Rather, "nothing in [Article III] suggests a State may have standing when a similarly situated private party does not." *Id.* at *9. If Florida were entitled to special solicitude based on the local effects of immigration policy, then so too would have been the states in *Texas*, where they similarly argued that the guidelines resulted in more people in their territory who had no right to be there.

Florida argues that even if it is not entitled to special solicitude, it has proven economic injury sufficient for standing—indirect fiscal consequences from more

noncitizens in the state. Opp. 18-20. But "federal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 2023 WL 4139000 at *6, n.3. When a state's claim to standing is based "only [on] those kinds of indirect effects," the state's claim for standing becomes "more attenuated." *Id*. Indeed, the Supreme Court has repeatedly held that actions by the United States that indirectly injure a state's economy do not inflict a direct injury sufficient to show standing. *See, e.g.*, *Texas*, 2023 WL 4139000 at *6, n.3; *see also Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992); *Florida v. Mellon*, 273 U.S. 12, 18 (1927). This case is no different.[1] At a minimum, the Court should remand these cases for the district court

---

[1] In *Texas*, the Court also found that the states lacked standing because they have "no judicially cognizable interest in procuring enforcement of the immigration laws." *See Texas*, 2023 WL 4139000, at *4 (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) and *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). Florida argues that holding is inapplicable here because the challenged parole policies do not concern the exercise of prosecutorial discretion, but rather the detention of noncitizens DHS has already elected to arrest and prosecute. Opp. 25-26. But this is a distinction the court declined to draw, noting in dicta only that "policies governing the continued detention of noncitizens who have already been arrested *arguably might* raise a different standing question than arrest or prosecution policies." *Texas*, 2023 WL 4139000 at *8 (emphasis added). Although the parole policies do not implicate the decision whether to prosecute someone, they concern the discretionary decision of whether to detain or parole, and with that, when to issue the NTA (i.e., when to commence prosecution).

Florida also argues that *Texas* does not apply because, unlike the enforcement guidelines, the parole policies confer a "legal benefit"—entitling subject noncitizens "to request work authorization." Opp. 26. But the challenged policies do not mention work authorization. A.1-11. The process for applying for work authorization is governed by separate regulation, 8 C.F.R. § 274a.12(c)(11), a provision Florida has not challenged. *Id*.

to reconsider whether in the absence of special solicitude, Florida's highly speculative evidence of an indirect financial injury is sufficient to support the "more attenuated" standing theory pressed here. *Texas*, 2023 WL 4139000 at *6 n.3.

B. <u>The district court wrongly concluded that Florida suffered injury traceable to Parole+ATD and PWC.</u>

Standing requires the evidence of harm to be "concrete and particularized" and have a "causal connection . . . to the conduct complained of." *Lujan*, 504 U.S. at 560-61. The district court erred in finding standing based on projections that 100,000-plus noncitizens released at the Southwest border since January 2021 went to Florida and 17,000 more "immigrant children and youth" enrolled in Florida schools during the 2021-2022 school year. A375-80. Despite having no concrete evidence linking any of these individuals or any specific expenditure to the challenged policies, Florida argues the evidence creates a "reasonable inference" that it is "more likely than not" that at least one of these individuals enrolled in school, committed a crime, or received benefits from the State. Opp. 21-22.

The Court cannot find standing based on a pure conjecture. Defendants' Opening Brief ("Br.") at 22-23. The district court did not, as Florida contends, "draw reasonable and logical inferences from the evidence." *Id.* (citing *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143, 1155 (11th Cir. 2009)). Instead, the district court found that because Florida was entitled to special solicitude, "the requirements of traceability. . . are relaxed." A372. It then speculated that despite

6

the lack of any concrete evidence of harm, there was nonetheless reason to believe that harm probably existed. But special solicitude does not apply, *see supra* I(A), and speculation does not meet the preponderance standard. *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229 (11th Cir. 2000) (conjecture does not satisfy standing even at the pleading stage). Accordingly, Florida did not establish its injury was traceable to the policies it challenges.

C.  Florida's alleged injury is not redressable by a court order.

Florida argues that the court's vacatur order satisfies the redressability prong because the order provides a "partial remedy" in that "DHS's own data make clear that it does not believe that mass parole is an option available to DHS officials unless a policy authorizes it." Opp. 22, n.12. Florida's argument fails. First, DHS's data does not show what DHS believes; nor are a party's beliefs about the effect of a judicial decision determinative of redressability. It is "the federal court's judgment," not the voluntary compliance or beliefs of the parties, "that remedies an injury," and it is to the judgment that one must look to assess redressability. *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023); *Texas*, 2023 WL 4139000 at *12 (Gorsuch, J., concurring). Second, Florida is incorrect. DHS's parole authority is granted by statute and implemented by regulation and therefore is available whenever an authorized official concludes that parole supports an urgent humanitarian reason or significant public benefit, including under the circumstances outlined in the

7

challenged policies. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5. Finally, even if a remedial order could decrease the number of parole releases, it would not undermine DHS's authority to release noncitizens who have crossed the border between ports of entry under §1226(a). Opp. 5; *see, e.g.*, A356, A400. Nor does it preclude DHS from declining to commence removal proceedings at the time of encounter against those noncitizens it lacks the capacity to detain, or otherwise require federal officials to detain every person who crosses the Southwest border in order to shield Florida from the need to spend money—which would be impossible in any event. *Texas v. Biden*, 142 S. Ct. 2528, 2535 (2022) ("DHS has never had sufficient detention capacity to maintain in custody every single person described in section 1225."); *see also* 8 U.S.C. § 1252(f)(1) (barring lower court injunctions requiring detention). As a result, the outcome of this litigation will not redress the injuries on which it is premised. *Texas*, 2023 WL 4139000 at *11 (Gorsuch, J., concurring).

## II.  The APA Does Not Permit Review of Florida's Challenges to Parole+ATD and PWC.

### A. Parole+ATD and PWC are committed to agency discretion.

The manner of DHS's implementation of its parole authority through Parole+ATD and PWC is committed to agency discretion. Br. 23-27. Florida fails to identify any standard against which to judge the agency's exercise of discretion under §1182(d)(5)(A). *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568

8

(2019); Opp. 30-31. The statute offers no meaningful guidance for a court to determine when the purpose of parole has been served, leaving this solely "in the opinion of the [Secretary]." 8 U.S.C. § 1182(d)(5)(A). Nor does the statute offer any guidance how the "case-by-case" inquiry must be conducted, or what constitutes an "urgent humanitarian reason" or "significant public benefit," leaving these determinations to the "discretion" conferred to the Secretary in the provision. *See id.*

Contrary to Florida's claims, neither Parole+ATD nor PWC is "a policy permanently paroling all applicants for admission from a particular country for no stated reason." Opp. 31. The policies therefore do not test the limits of the Secretary's discretion. Even if the statute can be read to supply benchmarks for determining whether DHS is ignoring the limits placed on its discretion, as suggested in Florida's example, §1182(d)(5)(A) offers no meaningful standard to judge how DHS is applying that discretion, the issue presented here.

Florida argues that a matter falls under §701(a)(2) "only if there are no constraints on the exercise of discretion such that a court would not be capable of reviewing the action at all." Opp. 30 (citing *Dep't of Commerce*, 139 S. Ct. at 2568). This is not the standard, and not what *Department of Commerce* held. In *Department of Commerce*, the Supreme Court rejected the application of §701(a)(2) to the census statute, 13 U.S.C. § 141, which, unlike §1182(d)(5)(A), does not expressly commit the relevant decision to the "discretion" the Secretary. *See* 139 S. Ct. at 2568. The

9

Supreme Court recognized decisions regarding enforcement action are traditionally committed to agency discretion. *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985)). Contrary to Florida's argument, Opp. 31, Parole+ATD and PWC are closer to the enforcement context than not. Although the policies do not directly address whether to initiate removal proceedings, they do address the timing of that determination, and whether to detain and process noncitizens or to parole pending further processing—all of which are inherently discretionary enforcement decisions. *See Heckler*, 470 U.S. at 831-832; *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (government has discretion to halt removal proceedings at any stage "for humanitarian reasons or simply for its own convenience").

Florida finally argues that §701 "does not apply to policies that grant legal benefits." Opp. 31 (citing *DHS v. Regents*, 140 S. Ct. 1891, 1906 (2020)). However, Parole+ATD and PWC do no such thing. Parole+ATD and PWC do not "confer affirmative immigration relief" from removal, but only release on parole while a noncitizen is processed for proceedings *to potentially remove them* from the United States. *Id.* And while parolees, along with a host of other categories of noncitizens, can apply for work authorization, this is a function of regulation and not an element of the Parole+ATD or PWC memoranda. *See generally* 8 C.F.R. § 274a.12. Further, neither memorandum guarantees, offers any guidelines for granting, or even mentions work authorization; that is a separate process and discretionary

10

determination made by a different sub-agency, U.S. Citizenship and Immigration Services (USCIS). *See* 8 C.F.R. § 274a.12-.14. Florida is not challenging policies governing that separate discretionary determination here.

B. 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review.

Courts lack jurisdiction to review decisions related to parole under 8 U.S.C. § 1252(a)(2)(B)(ii). Br. 26-27. In response, Florida argues only that §1252(a)(2)(B)(ii) precludes review of "a particular grant or denial of discretionary relief by DHS" and not a challenge to a policy guiding that ultimate decision. Opp. 31-32. This argument is wrong and nonresponsive to the interpretive light shed on §1252(a)(2)(B)(ii) by the Supreme Court's interpretation of its neighboring provision, §1252(a)(2)(B)(i), in *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022). Section 1252(a)(2)(B)(i) bars review of "judgments of whatever kind" covered by the statute, "not just discretionary judgments or the last-in-time judgment," and so "encompasses not just the granting of relief but also any judgment relating to the granting of relief." *Patel*, 142 S. Ct. at 1622. Because this reasoning similarly applies to §1252(a)(2)(B)(ii), *see Kucana v. Holder*, 558 U.S. 233, 247 (2010), *Patel* indicates that the bar on judicial review covers not only DHS's ultimate judgement to grant or deny parole, but its intermediate, related judgments to promulgate policies guiding those grants of parole, such as the decisions to issue the parole policies challenged here.

11

C. Parole+ATD and PWC are not reviewable final agency actions.

The district court also erred by finding Parole+ATD and PWC are reviewable final agency actions. Br. 27-29. The memoranda do not create any rights for noncitizens to obtain parole or create any legal obligations for them or other third parties. The policies impose procedures on Border Patrol agents for the release of someone on Parole+ATD or PWC, and "procedural" agency actions are categorically not "final," challengeable actions. 5 U.S.C. § 704; *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

Florida argues that the memoranda are "final" because they create "rights and obligations" by setting triggering conditions for application of the memoranda and procedures for agents to follow in determining who gets released and how they are processed. Opp. 28-29. But memoranda setting forth overcapacity benchmarks that could meet the "urgent humanitarian reason or significant public benefit standard" in individual cases do not prescribe necessary conditions precedent to release noncitizens on parole under §1182(d)(5)(A), a pathway available regardless of detention capacity. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) ("final" agency action permitted agency to act under statute "only if it complied with prescribed conditions."). Although the memoranda state that certain persons are ineligible for release under Parole+ATD or PWC—notably, noncitizens deemed public safety or national security risks, A4, A10—those are not new restrictions imposed by these

memoranda, but rather are consistent with longstanding limits on release generally and release on parole. *See, e.g.*, 8 C.F.R. § 212.5(b) (parole of individuals detained in accordance with 8 C.F.R. § 235.3(b) or (c) unavailable for "security risk[s]"). None of Florida's or the district court's rationales indicate that the memoranda themselves are final agency actions.

D. Florida is not in the statutory zone of interests.

Florida does not fall within the statutory zone of interests. Br. 29. Florida acknowledges that it surrendered its sovereignty over noncitizen admission, but it counterintuitively argues that federal law governing parole is intended to protect state interests. Opp. 32-33. But nothing in the text, structure, or purpose of §1182(d)(5)(A) suggests that Congress intended to permit a third party (such as a state) to invoke regional impacts of parole policies to contest those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). The only example of such intent Florida offers is 8 U.S.C. § 1231(i) (compensating states for costs related to detention of noncitizens). Opp. 33. But even if Florida were in the zone of interests to sue under §1231(i), Florida offers no evidence that Congress was thinking about state interests when it enacted §1182(d)(5)(A), which is "the statute … in question" here. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987).

13

III.  **The District Court Erroneously Held that Parole+ATD and PWC Are Contrary to Law.**

Parole+ATD and PWC satisfy all requirements in §1182(d)(5)(A) and represent a lawful use of DHS's express discretion under that statute. Br. 29-41.

A.  The memoranda are consistent with the history of Section 1182(d)(5).

Florida suggests the memoranda are "mass release" policies that contradict the purpose of Congress's imposition of new limitations on parole in its 1996 amendment in response to concerns that various administrations had used parole to circumvent immigration admission requirements and provide a route to permanent status via parole. Opp. 33-35. The "return to custody" clause predated this amendment, but Congress in 1996 added the "case-by-case basis" phrase and slightly changed the standard from "emergent reasons or for reasons deemed strictly in the public interest" to "urgent humanitarian reasons or significant public benefit." *See Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022).  In adopting that change, Congress rejected an alternative proposal from the House Judiciary Committee that would have narrowly defined "urgent humanitarian reasons" to refer only to certain medical emergencies and "public interest" as applying only where the parolee assisted the U.S. Government in a law enforcement activity or was to be criminally prosecuted. *See* H. Rep. 104-469 (1996) at 77-78. The alternative provisions defining and restricting when parole could be used were

14

removed from the legislation before the bill was considered by the full House. H.R. Rep. No. 104-828, at 245 (1996) (Conf. Rep.).

But even assuming (as Florida contends) that the point of the 1996 amendment to §1182(d)(5) was to limit the use of parole as an avenue to lawful permanent status, that concern would be irrelevant to Parole+ATD and PWC, which do not provide open-ended parole as an opportunity for adjustment of status, but authorize parole for the limited period necessary for noncitizens to schedule an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility for the initiation of appropriate removal proceedings or request service of a Notice to Appear (NTA) by mail. *See Delgado-Sobalvarro*, 625 F.3d 782, 786 (3d 2009) ("the history of the statute suggests that Congress sought to limit the universe of those who could adjust status to aliens whose admission was 'for urgent humanitarian reasons or significant public benefit' as set forth in § 212(d)(5)(A).").

B. The memoranda satisfy the "return to custody" and "case" clauses.

The district court concluded that Parole+ATD and PWC violate §1182(d)(5) because they "do not provide for returning parolees to custody" once they have received their NTA. Florida's defense of that conclusion, Opp. 35-37, fails to persuade.

At the outset, Florida fails to explain why Parole+ATD or PWC must provide guidelines addressing *each* part of the parole process. The decision to take a

15

noncitizen back into custody after parole has terminated by virtue of 8 C.F.R. §212.5(e)(2)(i), (ii) involves a separate custody decision by ICE, a separate sub-agency (whose subsequent parole decisions are not governed by either memorandum), A4, A9-10. And Florida has not challenged ICE's custody-redetermination procedures, just the Parole+ATD and PWC memoranda.

Florida also fails to defend reading the passive phrase "return or be returned" as imposing an obligation on DHS. Br. 33-35. Florida also brushes aside as "common" the incongruity between its reading of §1182(d)(5)(A) to grant the Secretary unfettered discretion to determine when parole should be terminated, with a judicially enforceable *mandate* that the Secretary immediately detain such noncitizens.[2] Br. 35; Opp. 37. Florida's primary rejoinder is that "it is plain as day this requirement applies to DHS" because otherwise DHS would have "free rein under the statute to parole aliens into the wind" permanently. Opp. 37. This overtly purposivist theory offers no help in interpreting the "return to custody" clause in §1182(d)(5)(A). Florida offers no explanation for why Congress would have used the phrase "return or be returned" had it meant to impose an obligation on DHS. In any event, Congress was not principally concerned with the prospect that some

---

[2] Contrary to Florida's suggestion, Opp. 37, DHS need not make an official "finding" that the purpose of parole has been served, thus making it unclear when and how any supposed mandatory arrest obligation would be triggered.

parolees—in whatever numbers—might remain in the United States for long periods, and indeed it amended the INA to permit parolees to obtain lawful permanent resident status. *See Delgado-Sobalvarro*, 625 F.3d at 786. Rather, Congress was concerned with *which* noncitizens could use parole to obtain lawful permanent resident status, *id.* at 787 (the addition of parole in 8 U.S.C. § 1255(a) in 1960 was to allow parolees to obtain lawful permanent resident status, "not to grant eligibility for adjustment of status . . . to aliens who entered the United States surreptitiously"). Thus, when Congress amended §1182(d)(5) in 1996 to add the "case-by-case basis" language and slightly revise the standard ("urgent humanitarian reasons or significant public benefit"), it limited the types of noncitizens who could use parole in this way.  Congress, by contrast, did *not* amend the "return" clause to, for example, require more re-arrests of parolees. *See id.*

C.  <u>The memoranda meet the case-by-case requirement.</u>

The court erred in concluding that the individualized "case-by-case" parole assessments explicitly called for by the Parole+ATD and PWC memoranda were pretextual and failed to satisfy the "case-by-case" requirement of §1182(d)(5)(A). Br. 37-40. In response, Florida points to nothing in the record to suggest agents are not following the memoranda's express case-by-case procedural requirements, and indeed does not make any argument from the record on this point, but rather relies on alleged implications from extra-record data concerning the number of individuals

17

released on Parole+ATD or PWC. Opp. 37-38. Florida cannot rely on extrinsic evidence under the APA, where review is based on the administrative record already in existence, not some new record made initially in the reviewing court. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). And Florida never obtained leave to supplement the administrative record on the ground that it was incomplete. A81-85.

Regardless, the fact that there may be more parole grants under Parole+ATD or PWC when encounter rates are higher does not establish that case-by-case consideration is not occurring. Opp. 38. Congress did not numerically limit the Secretary's exercise of his parole authority and did not define what a "case-by-case" determination must involve, instead entrusting the exercise of this authority to the Secretary's "discretion." 8 U.S.C. § 1182(d)(5)(A). Florida does not point to anything in the record to contradict the memoranda's text and record evidence that Border Patrol agents are conducting the multi-faceted, individualized determinations that DHS has determined are appropriate to satisfy §1182(d)(5)(A)'s "case-by-case" requirement and safeguard the American public.

Florida also argues that considerations of the dangers from facility overcrowding and resource prioritization informing the memoranda are "inconsistent with the statute's requirement to consider the case-specific situation of each individual alien" and Congress's reason for amending §1182(d)(5)(A) in 1996.

Opp. 38. First, the statute does not preclude considering factors that might impact multiple individuals, alongside the particularized impact on the individual noncitizen whose release is being determined. *See* 8 U.S.C. § 1182(d)(5)(A). Second, since 1996, when the "case by case" language was added, Congress has endorsed the categorical use of parole for classes of noncitizens, *see* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92 (Dec. 20, 2019), and enacted laws extending benefits to noncitizens who were paroled based on group characteristics. *See, e.g.*, Pub. L. No. 117-128 (2022); Pub. L. No. 117-43 (2021). Accordingly, in adding the "case-by-case" language, Congress did not intend to prohibit DHS from paroling multiple (or even numerous) individuals based on common humanitarian reasons or public benefit factors. *See Bob Jones Univ.*, 461 U.S. at 599 (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

D. The memoranda satisfy the substantive parole standard.

The district court's conclusion that Parole+ATD and PWC violate the substantive "urgent humanitarian reasons or significant public benefit" requirement was erroneous. Br. 40-41. Florida argues that the memoranda "fail to limit the exercise of case-by-case discretion to aliens with 'urgent humanitarian' reasons or whose presence in the United States provides a 'significant public benefit'" because

19

the memoranda direct agents to consider, among other factors, "immigration status, criminal history, compliance history, community ties, and role as caregiver," and various other factors, which Florida maintains have nothing to do with, or do not reach the level of, urgent humanitarian reasons or significant public benefit. Opp. 39-41. This view is mistaken. The memoranda make clear that urgent humanitarian reasons or significant public benefit can be determined for individuals from other factors, such as whether the individual would face health and safety risks from overcapacity conditions in the Border Patrol facility where they would be held if not paroled, or if devoting resources to detaining that individual would jeopardize public safety by preventing detention of a higher-risk person or monopolizing resources needed for other critical border security tasks. A2-4, A6-9. And, as explained, *supra* III(C), the fact that multiple noncitizens in a sector be paroled for the same urgent humanitarian reasons or significant public benefit is consistent with the Congressional intent underlying this phrase in §1182(d)(5)(A).[3]

---

[3] Florida misunderstands the memoranda's requirement that a parolee not be a "national-security, flight, or public-safety risk or an unaccompanied minor." Opp. 39. The absence of these considerations does not alone indicate that there is an urgent humanitarian reason or significant public benefit. Rather, these factors go to whether, even if that standard would otherwise be met, parole is nevertheless inappropriate.

**IV.    The Memoranda Are Not Arbitrary and Capricious.**

The Parole+ATD and PWC memoranda satisfy the highly deferential APA review standard. Br. 42-44.

First, Florida argues that "it was arbitrary and capricious for DHS to fail to acknowledge or explain the expansion of Parole+ATD beyond family units to single adults." Opp. 41-42. Although the first iteration of Parole+ATD addressed family units, A434-36, the July 2022 memorandum's provision of Parole+ATD for single adults did not represent a reversal of position requiring explanation. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Single adults have always been eligible for parole by Border Patrol (when they meet the terms of §1182(d)(5)), and for enrollment in ICE ATD, the two components of the Parole+ATD policy. Section 1182(d)(5) permits Border Patrol to parole any applicant for admission, including single adults, for an urgent humanitarian reason or significant public benefit. ICE also has the authority to condition any release on enrollment in the ATD program, regardless of whether it was before or after the July 2021 memorandum.

Second, Florida argues that the language in both memoranda that the authority be "used sparingly" was arbitrary and capricious in light of extra-record evidence that tens of thousands of noncitizens were released on parole. Opp. 42-43. This reliance on extra-record evidence was inconsistent with the court's own ruling that judicial review of Parole+ATD was limited to the administrative record. A420; A81-

21

85. Regardless, the term "sparingly" does not cap the number of paroles permitted under the Parole+ATD or PWC policies. Rather it limits when Parole+ATD or PWC can be used–only when overcrowding and appropriate approvals, as defined in the memoranda, exists. A1-11. Thus, it is a precatory term and can be defined only relative to the circumstances. It therefore cannot be "untrue" or "contrary to the evidence before the agency." A420. And it cannot create an objective, judicially-enforceable limitation on the use of Parole+ATD. Rather, the record demonstrates that DHS's use of Parole+ATD was congruent with the circumstances necessitating it as a health and safety measure. A2.

Third, Florida maintains that it was arbitrary and capricious "for DHS to fail to consider or justify the backlog Parole+ATD would create in immigration proceedings." Opp. 43. Florida concedes that the administrative record shows DHS's consideration of the data associated with the backlog of noncitizens awaiting NTA issuance, *id.*; *see* A503-622, but nevertheless argues the Parole+ATD memorandum was flawed because it lacked an explicit cost-benefit analysis concerning the backlog. However, the July 18, 2022 memorandum recognized and addressed concerns regarding the backlog, as reflected in its efforts to address the issue by directing CBP and ICE to find ways to streamline processing and instructing each to be responsible for 50% of the subsequent NTA processing. A4. The agency "need not write an exegesis" on an issue so long as its decision indicates that it "considered

22

and reasoned through" the evidence. *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1329 (11th Cir. 2021). Evidence of the backlog data in the record and the Parole+ATD memorandum's measures for dealing with it demonstrate that DHS "considered and reasoned through" the drawbacks associated with the backlog.

Finally, Florida argues that PWC is arbitrary and capricious as "an attempt to circumvent a court order instead of good-faith policymaking" because it was "materially the same" as the vacated Parole+ATD memorandum. Opp. 43-44. However, the district court did not rule on Florida's PWC arbitrary and capricious claim, prudently recognizing that this claim could not be fairly assessed absent the not-yet-assembled administrative record, A498 at n.4, and thus this claim is not presented by this appeal. *See Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1271 (Fed. Cir. 1985) (finding it inappropriate for the Court of Appeals to decide an issue on an appeal of a preliminary injunction order that the district court expressly reserved). Regardless, Florida's allegation is incorrect. The court acknowledged that there were differences between the memoranda, and its vacatur of Parole+ATD did not preclude DHS from using its parole authority to issue PWC, even if it ultimately held (erroneously) that the two memoranda have similar deficiencies. *See, e.g.*, A469-70.

23

## V.  Parole+ATD and PWC Did Not Require Notice-and-Comment Rulemaking.

Both memoranda are exempt from notice-and-comment rulemaking because they are statements of policy. For PWC, good cause also excused notice-and-comment.

Florida relies heavily on *Brown Express, Inc. v. United States* to argue that Parole+ATD and PWC are not "general statements of policy" because they do more than announce a "policy which the agency hopes to implement." 607 F.2d 695, 701 (5th Cir. 1979). The Eleventh Circuit has since clarified *Brown Express* and explained that a primary "overriding factor frequently relied upon by courts addressing the issue" is "the extent to which the challenged policy leaves the agency, or its implementing official, free to exercise discretion to follow, or not follow, the general policy in an individual case." *Jean v. Nelson*, 711 F.2d 1455, 1481-82 (11th Cir. 1983). That test makes clear that Parole+ATD and PWC are general statements of policy that do not require notice-and-comment. Br. 44-47.

At the outset, neither memorandum bound the Secretary himself; he retained the freedom to depart from either memorandum as necessary. The fact that the memoranda allegedly bound individual line officers is irrelevant. Indeed, a central virtue of policy statements is that they allow senior officials to guide lower-level personnel in a public way, thereby promoting predictability and transparency. *See Natl' Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (deeming an

24

"instruction to [agency] staff" a policy statement). In any event, as the government explained, both memoranda left in place the discretion delegated by the Secretary to individual Border Patrol agents to grant parole in appropriate circumstances, considering the facts on a case-by-case basis. Br. 44-46. Florida argues that the memoranda "established a 'processing mechanism' and instructed DHS officials how to use it[,]" but under the memoranda individual agents retained the same discretion granted to them by statute. Without more, Florida's argument fails to demonstrate these memoranda are anything more than general policy statements.

In addition, "good cause" excused the agency from engaging in notice-and-comment rulemaking prior to issuing the PWC memorandum. 5 U.S.C. § 553(b)(B), (d)(3). Florida argues, with the benefit of hindsight, that the government should have issued the PWC memorandum before the numbers were rising and also suggests that the government has undermined its claim to "good cause" by seeking a stay with this Court when numbers were low (though predicted to rise in the future). But CBP has to take necessary action based on available information and its best predictions. At the time the PWC memorandum was issued, the numbers of noncitizens crossing the border were increasing, providing good cause for the PWC memorandum to address those concerns. Br. 46-47. When Title 42 ended, numerous factors—including other measures taken by the government—led to border crossings dropping and then staying lower than the government expected. But this does not mean that the

"emergency situation" prompting the PWC memorandum did not constitute good cause.

## VI.    The Equities Do Not Support the District Court's Injunction of PWC.

The public has a strong and important interest in "the Executive Branch's constitutional and statutory authority to implement its immigration priorities and secure the border based on its '[p]redictive judgment[s].'" Br. 48 (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988)). The public interest is not served if DHS's efforts to secure the border are undermined by states challenging federal government policies with which they have policy disagreements.

Florida argues that DHS does not have an interest in "exceeding its lawful authority" and the public has a "significant interest in DHS following the law." Opp. 48 (citing *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Florida's argument therefore assumes success on the merits and provides no independent basis for the injunction. Indeed, the cited language from *Newby* followed a finding that the plaintiffs in that case had an "extremely high likelihood of success on the merits[,]" *Newby*, 838 F.3d at 12, which is not the situation here. For the reasons discussed above, the lawfulness of the PWC memoranda and the government's likelihood of success on the merits on that issue undermine Florida's position.

26

## VII.    The District Court's Orders are Impermissibly Overbroad.

The district court's orders are overbroad, coercively interfere with DHS's discretion to manage the border, and far exceed the scope of Florida's alleged injury. Br. 53-55. Justice Gorsuch's concurring opinion in *Texas* underscores that nationwide injunctions and vacatur orders "intrude on powers reserved for the elected branches" and "encourage parties to engage in forum shopping and circumvent rules governing class-wide relief." *Texas*, 2023 WL 4139000 at *13 (Gorsuch, J., concurring); *see id.* at *17 (discussing vacatur). Justice Gorsuch also persuasively rebuts Florida's contention (Opp. 46-47) that vacatur orders are, by definition, universal in scope. Like any other form of equitable relief, vacatur should be limited to redressing the specific injuries of the parties before the court. *Texas*, 2023 WL 4139000, at *16-*17 (Gorsuch, J., concurring); *see id.* at *17 ("And courts of appeals must do their part, too, asking whether party-specific relief can adequately protect the plaintiff's interests. If so, an appellate court should not hesitate to hold that broader relief is an abuse of discretion.").

Here, the district court violated these equitable considerations and limitations in issuing nationwide relief, and further impermissibly issued relief that went beyond the alleged injury that it found conferred standing. Providing a remedy well beyond the confines of Florida and the alleged injury was error. If the Court finds for Florida on the merits, it should nevertheless reverse and remand for entry of a

27

tailored remedial order. *See Texas*, 2023 WL 4139000 at *17.

## CONCLUSION

The Court should reverse the district court's orders vacating Parole+ATD and preliminarily enjoining PWC.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant Attorney*
   *General*
WILLIAM C. PEACHEY
   *Director*
EREZ REUVENI
   *Assistant Director*
*/s/ Elissa P. Fudim*
JOSEPH A. DARROW
ELISSA P. FUDIM
ERIN T. RYAN
   *Trial Attorneys*
   U.S. Dep't of Justice, Civil Division
   Office of Immigration Litigation,
   District Court Section
   P.O. Box 868, Ben Franklin Station
   Washington, DC 20044

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it contains 6,402 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Elissa P. Fudim*
ELISSA P. FUDIM

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system. Plaintiffs' counsel was also notified of this motion by email.

*/s/ Elissa P. Fudim*
ELISSA P. FUDIM

## RULE 28(f) STATUTORY ADDENDUM

8 U.S.C. 1182(d)(5)(A) provides:

The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.